# EXHIBIT L

# PART 6

## SERVICE OF DOCUMENTS

**Contents**

*I. Scope of this Part and Interpretation*

| | | |
|---|---|---|
| 6.1 | Part 6 rules about service apply generally. . . . . . . . . . . . . . | para.6.1 |
| 6.2 | Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.2 |

*II. Service of the Claim Form in the Jurisdiction*

| | | |
|---|---|---|
| 6.3 | Methods of service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.3 |
| 6.4 | Who is to serve the claim form. . . . . . . . . . . . . . . . . . . . . | para.6.4 |
| 6.5 | Personal service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.5 |
| 6.6 | Where to serve the claim form—general provisions . . . . . . . | para.6.6 |
| 6.7 | Service on a solicitor within the United Kingdom . . . . . . . . . | para.6.7 |
| 6.8 | Service of the claim form where before service the defendant gives an address at which the defendant may be served . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.8 |
| 6.9 | Service of the claim form where the defendant does not give an address at which the defendant may be served . . . . . | para.6.9 |
| 6.10 | Service of the claim form in proceedings against the Crown . | para.6.10 |
| 6.11 | Service of the claim form by contractually agreed method. . . | para.6.11 |
| 6.12 | Service of the claim form relating to a contract on an agent of a principal who is out of the jurisdiction. . . . . . . . . . . . | para.6.12 |
| 6.13 | Service of the claim form on children and protected parties . | para.6.13 |
| 6.14 | Deemed service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.14 |
| 6.15 | Service of the claim form by an alternative method or at an alternative place. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.15 |
| 6.16 | Power of court to dispense with service of the claim form. . . | para.6.16 |
| 6.17 | Notice and certificate of service relating to the claim form. . . | para.6.17 |
| 6.18 | Notification of outcome of postal service by the court . . . . . . | para.6.18 |
| 6.19 | Notice of non-service by bailiff . . . . . . . . . . . . . . . . . . . . . | para.6.19 |

*III. Service of Documents other than the Claim Form in the United Kingdom*

| | | |
|---|---|---|
| 6.20 | Methods of service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.20 |
| 6.21 | Who is to serve . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.21 |
| 6.22 | Personal service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.22 |
| 6.23 | Address for service to be given after proceedings are started. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.23 |
| 6.24 | Change of address for service . . . . . . . . . . . . . . . . . . . . . . | para.6.24 |
| 6.25 | Service on children and protected parties . . . . . . . . . . . . . . | para.6.25 |
| 6.26 | Deemed service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.26 |
| 6.27 | Service by an alternative method or at an alternative place. . | para.6.27 |
| 6.28 | Power to dispense with service . . . . . . . . . . . . . . . . . . . . . | para.6.28 |
| 6.29 | Certificate of service . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.29 |

*IV. Service of the Claim Form and other Documents out of the Jurisdiction*

| | | |
|---|---|---|
| 6.30 | Scope of this Section . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.30 |
| 6.31 | Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.31 |
| 6.32 | Service of the claim form where the permission of the court is not required—Scotland and Northern Ireland . . . . . . . . | para.6.32 |
| 6.33 | Service of the claim form where the permission of the court is not required—out of the United Kingdom . . . . . . . . . . | para.6.33 |
| 6.34 | Notice of statement of grounds where the permission of the court is not required for service . . . . . . . . . . . . . . . . . . . | para.6.34 |

| | | |
|---|---|---|
| 6.35 | Period for responding to the claim form where permission was not required for service. . . . . . . . . . . . . . . . . . . . . . . | para.6.35 |
| 6.36 | Service of the claim form where the permission of the court is required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.36 |
| 6.37 | Application for permission to serve the claim form out of the jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.37 |
| 6.38 | Service of documents other than the claim form— permission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.38 |
| 6.39 | Service of application notice on a non-party to the proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.39 |
| 6.40 | Methods of service—general provisions . . . . . . . . . . . . . . | para.6.40 |
| 6.41 | [Omitted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.41 |
| 6.42 | Service through foreign governments, judicial authorities and British Consular authorities . . . . . . . . . . . . . . . . . . . . . | para.6.42 |
| 6.43 | Procedure where service is to be through foreign governments, judicial authorities and British Consular authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.43 |
| 6.44 | Service of claim form or other document on a State. . . . . . . | para.6.44 |
| 6.45 | Translation of claim form or other document . . . . . . . . . . . | para.6.45 |
| 6.46 | Undertaking to be responsible for expenses . . . . . . . . . . . | para.6.46 |
| 6.47 | Proof of service before obtaining judgment . . . . . . . . . . . . | para.6.47 |
| | *V. Service of Documents from Foreign Courts or Tribunals* | |
| 6.48 | Scope of this Section . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.48 |
| 6.49 | Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.49 |
| 6.50 | Request for service. . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.50 |
| 6.51 | Method of service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.51 |
| 6.52 | After service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6.52 |
| | Practice Direction 6A—Service within the United Kingdom . . | para.6APD.1 |
| | Practice Direction 6B—Service out of the Jurisdiction. . . . . . | para.6BPD.1 |
| | Notes on Heads of Jurisdiction in Paragraph 3.1 of Practice Direction 6B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6HJ.1 |
| | Notes on Rules of Jurisdiction in Judgments Regulation (Recast). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | para.6JRx.1 |

**Editorial introduction**

6.0.1    The Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) substituted a new Pt 6 (Service of Documents) for the existing Part, and a new r.7.5 (Service of a claim form). These changes came into effect on 1 October 2008. Until 2020, the only changes that had been made to this rule came into effect in April 2010 and 2011 in relation to addresses for service in EEA States.

On 31 January 2020 ("exit day"), the UK left the EU under the terms of the Agreement on the withdrawal of the United Kingdom of Great Britain and Northern Ireland from the European Union and the European Atomic Energy Community dated 19 October 2019 (the "Withdrawal Agreement"). The Withdrawal Agreement was implemented into domestic law by the European Union (Withdrawal) Act 2018 (the "EU Withdrawal Act") as amended by the European Union (Withdrawal Agreement) Act 2020 (the "Withdrawal Agreement Act"). The Withdrawal Agreement established a transition period, which ended at 23.00 on 31 December 2020. This is referred to in the EU Withdrawal Act as the "implementation period", and the end of the period is referred to, somewhat awkwardly, as "IP completion day" (s.1A(6) of the EU Withdrawal Act).

During the implementation period, EU law continued to apply to and in the UK, unless otherwise provided in the Withdrawal Agreement, and references to EU Member States in EU law or relevant domestic legislation were understood as including the UK (see art.127 of the Withdrawal Agreement and ss.1A and 1B of the EU Withdrawal Act). Accordingly, during the implementation period, the rules on jurisdiction and enforcement of judgments under the Judgments Regulation (1215/2012) continued to apply as between the UK and the EU, as did the provisions relating to service and the taking of evidence under the Service Regulation (1393/2007) and Taking of Evidence Regulation (1206/2001).

The UK also continued to be bound, during the implementation period, by obligations stemming from international agreements to which the EU is a party (see art.129 of the Withdrawal Agreement), including international agreements relevant to Pt 6 such as the Brussels and Lugano Conventions and the 2005 Hague Convention on Choice of Court Agreements.

With effect from IP completion day (subject to transitional provisions), a number of changes have been made which affect Pt 6. First, the Civil Jurisdiction and Judgments (Amendment) (EU Exit) Regulations 2019 (SI 2019/479) revoked the Judgments Regulation (EU 1215/2012) and amended domestic legislation so that it ceased to apply the Brussels and Lugano Conventions. Secondly, the Service of Documents and Taking of Evidence in Civil and Commercial Matters

(Revocation and Saving Provisions) (EU Exit) Regulations 2018 (SI 2018/1257) revoked the Service Regulation (1393/2007) and the Taking of Evidence Regulation (1206/2001) so that they no longer apply to the UK. The effect of this is to require the service of documents to be carried out using some other method, for example under the Hague Service Convention, where that is applicable. Thirdly, the European Communities (Lawyer's Practice) Regulations 2000 (SI 2000/1119) were to be revoked by the Services of Lawyers and Lawyer's Practice (Revocation etc.) (EU Exit) Regulations 2019 (SI 2019/375) reg.3(b). The 2019 Regulations were revoked as from 24 November 2020 by Services of Lawyers and Lawyer's Practice (Revocation etc.) (EU Exit) Regulations 2020 (SI 2020/1342), which also, as from 31 December 2020, revoked the 2000 Regulations. All of these Regulations, subject to applicable transitional provisions, required substantial revisions to Sections II, III and IV of Part 6 which were implemented by the Civil Procedure Rules 1998 (Amendment) Regulations 2019 (SI 2019/521) (as amended by the Civil, Criminal and Family Justice (Amendment) (EU Exit) Regulations 2020). (In the commentary to this Pt 6, references to SI 2019/521 are to that SI as amended.)

**Practice Directions**

This Part is supplemented by two practice directions, PD 6A—Service Within the United **6.0.2** Kingdom (see para.6APD.1), and PD 6B—Service Out of the Jurisdiction (see para.6BPD.1), referred to in the text of the rules, respectively, as "Practice Direction 6A" and "Practice Direction 6B".

**Related sources**

- CPR r.55.6 (Service of claims against trespassers) **6.0.3**
- CPR r.55.23 (Service of claim form for interim possession order
- Companies Act 1985 ss.694A, 695 and 725.
- Companies Act 2006 s.1139

**Forms**

- **N215** Certificate of service (see Civil Procedure Forms in the online *Civil Procedure Forms* **6.0.4** *Volume*)
- **N217** Order for substituted service (see Civil Procedure Forms in the online *Civil Procedure Forms Volume*)
- **N251** Notice of funding of case or claim (see Civil Procedure Forms in the online *Civil Procedure Forms Volume*)
- **N510** Service out of the jurisdiction (see Civil Procedure Forms in the online *Civil Procedure Forms Volume*)

**Notes on rules of jurisdiction and on heads of jurisdiction**

Rule 6.33 provides for the service of claim forms on defendants out of the jurisdiction (that is to **6.0.5** say, out of the United Kingdom) without the permission of the court in several different circumstances. For proceedings issued before 31 December 2020 (IP completion day), but not after that date, those circumstances include where each claim made against the defendant to be served and included in the claim form is one which the court has power to determine under the Judgments Regulation (1215/2012). Notes providing commentary on the rules of jurisdiction in that Regulation (that is to say on matters relevant to r.6.33—see further explanation at para.6.33.9 below) are found below, beginning at para.6JRx.1.

Where the permission of the court is required under r.6.36, r.6.37 states that the application for permission must set out which ground in para.3.1 of PD 6B is relied on. The complete text of PD 6B is set out at para.6BPD.1. Notes providing commentary on the heads of jurisdiction in para.3.1 of that Practice Direction (that is to say on matters relevant to r.6.37) are found below beginning at para.6HJ.1.

*I.   Scope of this Part and Interpretation*

## Part 6 rules about service apply generally[1]

**6.1**   This Part applies to the service of documents, except where— **6.1**
   **(a)**   **another Part, any other enactment or a practice direction makes different provision; or**
   **(b)**   **the court orders otherwise.**
**(Other Parts, for example, Part 54 (Judicial Review) and Part 55 (Possession Claims) contain specific provisions about service.)**

**Effect of rule (r.6.1)**

Other Parts and practice directions in the CPR making significantly different provision to that **6.1.1** made in Pt 6 include Pt 54 (Judicial Review and Statutory Review) and Pt 55 (Possession Claims) and the practice directions supplementing those Parts.

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

In *Godwin v Swindon BC* [2001] EWCA Civ 641; [2002] 1 W.L.R. 997, CA, it was held that the court could not dispense with service under r.6.1(b) (or under what is now r.6.16) where such a dispensation would constitute a retrospective extension of time for service specifically forbidden by r.7.6(3) (see further commentary following r.6.16).

## Interpretation[1]

**6.2**   **6.2   In this Part—**

      **(a)**   **"bank holiday" means a bank holiday under the Banking and Financial Dealings Act 1971 in the part of the United Kingdom where service is to take place;**

      **(b)**   **"business day" means any day except Saturday, Sunday, a bank holiday, Good Friday or Christmas Day;**

      **(c)**   **"claim" includes petition and any application made before action or to commence proceedings and "claim form", "claimant" and "defendant" are to be construed accordingly;**

      **(d)**   **"solicitor" includes any other person who, for the purposes of the Legal Services Act 2007, is an authorised person in relation to an activity which constitutes the conduct of litigation (within the meaning of that Act).**

      **(e)**   **[Omitted]**

**Effect of rule (r.6.2)**

**6.2.1**   This rule brings together definitions particularly relevant in the texts of the rules in Pt 6 generally, especially in Sections II and III. Dedicated provisions containing definitions for recurring expressions in Sections IV and V of Pt 6 are found in, respectively, r.6.31 and r.6.49. It was amended by reg.4(3) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521), with effect from 31 December 2020 (IP completion day). From that date r.6.2(e), which contained a definition of "European Lawyer" and a signpost to the European Communities (Services of Lawyers) Order 1978 (SI 1978/1910) as it was previously annexed to PD 6A, were deleted from the rule.

**Jurisdiction**

**6.2.2**   Throughout Pt 6, the distinction between service of claim forms and of other documents within the jurisdiction and without the jurisdiction is important. In CPR r.2.3(1) it is stated that in the CPR generally "jurisdiction" means, unless the context requires otherwise, England and Wales and any part of the territorial waters of the UK adjoining England and Wales. Consequently it does not include the Channel Islands and the Isle of Man.

**"claim" "claim form"**

**6.2.3**   The meaning of "claim form" in this context is important, as it is the distinction between claim forms (as defined) and other documents relating to the proceedings that distinguishes Section II from Section III, both of which are concerned with the service of documents "in the jurisdiction". Before 1 October 2008, the expressions "claim" and "claim form" had, for the purposes of service out of the jurisdiction, the meanings ascribed to them by paras (h) and (i) of r.6.18. (As to the meaning of "claim form" in Section IV, see commentary following r.6.30 below.)

Rule 7.2(1) states that proceedings are started when the court issues a claim form. According to para.(c) of r.6.2, for the purposes of Pt 6, "claim form" includes, in addition, a petition and any application made before action (e.g. for an order for disclosure of documents before a claim has been made) or to commence proceedings. The definition of "claim form" does not include an application notice, except in those circumstances where it is the appropriate process for the making of an application before action.

For date of service of a claim form see r.6.14. Where the particulars of claim are contained in a separate document and are not served with the claim form, the particulars of claim are not "a claim form" for the purposes of Pt 6 and the deemed service provisions in r.6.26 will apply to the particulars of claim when served in the UK. The combined effect of rr.6.3, 6.14, 7.5(1) and 6.26 is that where the Claim Form and Particulars of Claim are separate, but delivered together, the only method of service that would give the same date of deemed service for both Claim Form and Particulars of Claim is service by first class post, or by document exchange or other service that provides delivery on the next business day. See table in Note 6APD.10.

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390), the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

CPR 6

When a claim form is issued there is (1) an original sealed claim form retained by the court, and (2) original sealed claim forms so that one can be retained by the claimant and one or more can be served on the defendants. For explanations of court practice, see *Hills Contractors and Construction Ltd v Struth* [2013] EWHC 1693 (TCC); [2014] 1 W.L.R. 1 (Ramsey J) at [45]; *United Utilities Group Plc v Hart*, 24 September 2015, unrep. (Judge Graham Wood QC) at [5]. The claim forms falling within the second category are not copies (though not infrequently misleadingly referred to as such). If a party makes an image of a claim form in that category then that would be a copy. The general rule is that, if service is to be properly effected on a defendant, a claim form in the second category must be served. See further para.6.3.2.

CPR r.81.10(2) states that, where a committal application is made against a person who is not an existing party to the proceedings, it is made against that person by an application notice under Part 23. Such a notice is "a document in which the applicant states his intention to seek a court order" (r.23.1). By operation of r.6.2(c), it is also it a "claim form" and in appropriate circumstances could be within the meaning of r.6.36 (Service of the claim form out of the jurisdiction where the permission of the court is required) (*Dar Al Arkan Real Estate Development Co v Al Refai* [2013] EWHC 4112 (QB); [2014] 1 C.L.C. 813 (Andrew Smith J) ([70]–[73]).

**"bank holiday" "business day"**

In combination, these definitions have the same effects as those previously offered in para.(3) of **6.2.4** former r.6.7 (Deemed service). The definition of "bank holiday" acknowledges that service of a document (in certain circumstances) may be effected in Scotland or Northern Ireland, rather than in England and Wales, in which event any differences in the bank holiday arrangements between the several jurisdictions may have to be taken into account. In fact, in Pt 6, the only provision in which "bank holiday" is referred to is r.6.2(a). In RSC Ord.115 r.36A (Giving effect to an overseas freezing order), "business day" has the same meaning as in r.6.2.

## *II.  Service of the Claim Form in the Jurisdiction*

## Methods of service[1]

**6.3—(1)  A claim form may be served by any of the following methods—**    **6.3**
    **(a)  personal service in accordance with rule 6.5;**
    **(b)  first class post, document exchange or other service which provides for delivery on the next business day, in accordance with Practice Direction 6A;**
    **(c)  leaving it at a place specified in rule 6.7, 6.8, 6.9 or 6.10;**
    **(d)  fax or other means of electronic communication in accordance with Practice Direction 6A; or**
    **(e)  any method authorised by the court under rule 6.15.**
  **(2)  A company may be served—**
    **(a)  by any method permitted under this Part; or**
    **(b)  by any of the methods of service permitted under the Companies Act 2006.**
  **(3)  A limited liability partnership may be served—**
    **(a)  by any method permitted under this Part; or**
    **(b)  by any of the methods of service permitted under the Companies Act 2006 as applied with modification by regulations made under the Limited Liability Partnerships Act 2000.**

**Effect of rule (r.6.3)**

This rule and the following rules in Section II of Pt 6 (rr.6.4 to 6.19) are concerned with the  **6.3.1** service of claim forms within the jurisdiction. Prior to 31 December 2020 (IP completion day), provision was made for service in specified circumstances on an address for service in the EEA of a solicitor, European lawyer or party. Such provision was omitted by reg.4 of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

As to the meaning of "claim form" for these purposes, see para.6.2.3. For methods for service within the jurisdiction of documents other than claim forms (as defined in r.6.2(c)), see r.6.20 below.

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390), the Civil Procedure (Amendment) Rules 2011 (SI 2011/88), the Civil Procedure (Amendment No.2) Rules 2011 (SI 2011/1979) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

Rule 6.3(1)(b) is supplemented by paras 2.1 and 3.1 of PD 6A (Service Within the United Kingdom), and r.6.3(1)(d) by para.4; see para.6APD.2.

Rule 6.6(1) states that the claim form must be served within the jurisdiction except where r.6.11 (Service by a contractually agreed method) applies, or as provided by Section IV of this Part.

The CPR do not define what is meant by service other than by prescribing how it may be done (*Asia Pacific (HK) Ltd v Hanjin Shipping Co Ltd* [2005] EWHC 2443 (Comm); [2005] 2 C.L.C. 747; (2005) 102(46) L.S.G. 25 (Christopher Clarke J) at [20]). In the *Access to Justice–Final Report* (July 1996) it was said (in relation to the service of documents generally, if not of service of claim forms in particular) that, before any procedural step which depends on proper service of a document can take place, "the court would have to be satisfied that the method used either had put the recipient in a position to ascertain its contents or was reasonably likely to enable him to do so within any relevant time period" (Ch.12, para.25). (The phrase "put ... in position" takes account of the situation where the recipient "deliberately avoids informing himself".) The several methods of service are designed to achieve that objective. (In this vein, r.6.15(2) speaks of steps taken "to bring the claim form to the attention of the defendant".) In the CPR Glossary, the legal expression "service" is defined as "Steps required by rules of court to bring documents used in court proceedings to a person's attention".

As a practical matter, the law as to the service of originating process provides answers to five questions: by whom? on whom? when? where? and how? In a given case, depending on the circumstances, the answer to one or other of these questions may admit of multiple, alternative or cumulative answers; e.g., the answer to "by whom?" may be by the court, by the claimant or by their agent (see r.6.5(4)), and the answer to "on whom?" may be not only the defendant but on others as well (see Sch.1 RSC Ord.115 r.7). The expression "method of service" is a term of art of long standing in English law and is primarily concerned with the question of "how?". However, the definition of a particular "method" (in order to be comprehensible and to differentiate it from other methods) may also touch upon the question of "where?". Questions of "how?" demand answers in the form of active, transitive verbs (leaving with, posting to, delivering at, transmitting to, etc.). Such words appear, expressly or impliedly, in the various methods of service listed in this rule. They are brought out more clearly generally in r.7.5 (Service of a claim form) and, in relation to personal service particularly, in r.6.5.

It might be expected that, in a set of rules designed to act as a comprehensive (if not complete) code, the five questions would be dealt with in a logical order. However, that is not the way that Section II of Pt 6 runs. It begins with the last question first.

Once upon a time, personal service was the dominant method. Over time, other methods were permitted (but were tightly controlled) and were listed in rules of court. Those rules are the ancestors of r.6.3.

For an explanation as to why it is that methods of service cannot be at large and have to be restricted by law to certain prescribed methods, see *Access to Justice–Final Report* (July 1996) Ch.12, para.20.

In a given case, the questions that are likely to cause the most anxiety for the moving party are "on whom?", "when?", and "where?". Answers to those questions require reference to other provisions. (The question "by whom?" is not unimportant and, in relation to the method of personal service, is given a comprehensive answer by r.6.5(4).)

### Service of original sealed claim form generally required

**6.3.2**    Rule 7.2(1) states that proceedings are started when the court issues a claim form at the request of the claimant and r.2.6(1) states that the court must seal the claim form on issue. In practice, when a claim form is issued there is an original sealed claim form retained by the court and original sealed claim forms provided so that one can be retained by the claimant and one or more can be served on the defendants (see further para.6.2.3). The seal is intended to give a clear message to the defendant that he or she is being served with originating process by authority of the court, and not being sent some informal demand. In *Hills Contractors and Construction Ltd v Struth* [2013] EWHC 1693 (TCC); [2014] 1 W.L.R. 1 (Ramsey J) it was held that the effect of r.7.2(1) and r.2.6(1) is that a claim form is the document issued by the court on which the court seal is placed and when therefore r.6.3(1) states that "a claim form" may be served by any of the methods mentioned therein, as a general rule, where service is to be effected within the jurisdiction, it is the document issued and sealed by the court which is the relevant claim form. In that case, after issuing a claim form, the claimant's solicitors sent a letter to the defendant's solicitors enclosing by way of information a photocopy of the sealed claim form. The judge held (contrary, be it noted, to the defendant's submission), in accordance with that general rule, that service did not meet the requirements of r.6.3(1), and therefore the claim form had not been properly served. Clearly, there are exceptions, in particular when a claim form is served by fax or other means of electronic communication under r.6.3(1)(d) in accordance with PD 6A. In such circumstances the hard or soft copy of the fax or the soft copy or print out of the attachment to an email is the document served, but in each case the hard or soft copy represents a copy of the claim form issued and sealed by the court. In para.4.3 of PD 6A (see para.6APD.4) it is expressly provided that, where a document is served by electronic means, the parties serving the document need not in addition send or deliver a hard copy.

The rules and authorities relevant to the general rule were carefully examined in *United Utilities Group Plc v Hart*, 24 September 2015, unrep. (Judge Graham Wood QC). In that case solicitors for a claimant in County Court proceedings served a copy of the claim form (made by them) rather than the original, sealed document, through the DX to the defendant's solicitors. It was held, on appeal from a district judge, that the claimant had made an error of procedure within the meaning of r.3.10 (being an error of form, not of substance) which the court may, and in the circumstances, should remedy. It was noted that his was not a case where the claimant had resorted to facsimile service at the very last moment.

In *Dory Acquisitions Designated Activity Co v Frangos* [2020] EWHC 240 (Comm) the claimant's solicitor served a claim form and particulars of claim which did not have a claim number date of issue or court seal, however these documents were accompanied by a document entitled "E-filing submission confirmation", which, amongst other matters, states: "Court: Commercial Court (QBD). Filing type: filing claim form part 7". Mr Justice Bryan held, relying upon *Hills Contractors and Constuction Ltd v Struth*, that service was not valid. However, in the circumstances, he found the attempted service to be an error of procedure which could be corrected under r.3.10.

Rule 6.15 provides that where there is good reason to do so, the court may authorise service by an alternative method. For obvious reasons the court's power in that respect is wide enough to enable the court to authorise service by a method that does not comply with the general rule; for example, the court may authorise service by either of the non-compliant methods adopted by the claimants in *Hills Contractors and Construction Ltd v Struth*, op cit, and *United Utilities Group Plc v Hart*, op cit; see *Dunbar Assets Plc v BCP Premier Ltd* [2015] EWHC 10 (Ch) (John Baldwin QC), where in the event the court held that there was no good reason to authorise such alternative method of service. See further para.6.15.1.

As to the effect of the general rule in cases where service of a claim form is to be effected out of the UK by a method of service provided for by r.6.40, see para.6.40.3.

### "first class post" or "other service" (r.6.3(1)(b))

**6.3.3**  Initially, service by post was confined to service by Royal Mail first class post. In 6 April 2006, the rule was expanded to include other Royal Mail services (apart from first class post) providing for delivery "on the next working day". (Previously, it had been held that service by Royal Mail "special delivery" (guaranteed for the next day) was the same as first class post for these purposes (*Petford v Saw* [2002] C.L.Y. 478).) The Royal Mail's postal service monopoly ended in 2006. The rule now permits in addition, as a service method, service by a non-Royal Mail providers of services providing for delivery "on the next business day". Paragraph 3.1 of PD 6A (Service Within the United Kingdom) indicates how service is effected by such "other service" (para.3.1 also applies to service by post and by DX) (see para.6APD.3 below).

As to service by post or by other service at address within the jurisdiction when resident defendant out of the jurisdiction temporarily or indefinitely, see para.6.9.7 below.

### "business day" (r.6.3(1)(b))

**6.3.4**  See definition in r.6.2(b) above.

### "electronic communication" (r.6.3(1)(d))

**6.3.5**  Paragraph (d) of r.6.3(1) in relation to the service of claim forms is supplemented by PD 6A (Service Within the United Kingdom) paras 4.1 to 4.3 (see para.6APD.4 below). Those provisions also supplement para.(d) of r.6.20(1) in relation to the service of documents other than the claim form and in that respect they are more fully dealt with in the commentary following r.6.20 (Methods of service of documents other than the claim form). See "Service of claim form by electronic method" at para.6.20.4 below.

The provisions paras 4.1 to 4.3 of 6APD were considered in *Andrew Brown v Innovatorone* [2009] EWHC 1376 (Comm). In that case, the claimants' solicitors issued claim forms, inter alia, against the seventh defendant ("D7"), an individual and the eighth defendant ("D8"), a partnership. The claim forms were not served but copies were sent to these defendants for information with an indication that they would be served within the four month period for service laid down by Pt 7 and that after service a stay would be sought. Subsequently, both defendants instructed solicitors each of whom later wrote to the claimants' solicitors on their firms' notepaper which stated their fax numbers, indicating that they had been instructed. However, neither stated that they had been instructed to accept service and at that stage neither had. On the last day for service within the four month period, at about two hours before midnight, the claimant's solicitors faxed claim forms (now amended to add further parties) to these defendants' respective solicitors on the said fax numbers, by way of purported service. By this stage D8 but not D7 had instructed its solicitors that they could accept service but still, neither defendant's solicitors had informed the claimants' solicitors that they were so instructed. In answer to the defendants' applications for declarations that the claim form was not validly served, the claimants maintained that this was good service, relying on r.6.3 (1)(d) and PD 6A para.4.1, the combined effect of which is, they said, that when a claimant's solicitor has received correspondence from a solicitor who was acting for a defendant on notepaper containing that solicitor's fax number, a claim form can be validly served by sending it by fax to that number. The judge rejected this interpretation of the rules and PD and found that the words

in PD6 para.4.1(2)(a) " ... acting for the party to be served ..." refer to the situation in which the solicitor is to be served under Pt 6.7. The mere fact that a defendant's solicitor has a fax number on their note paper does not mean that the solicitor can be validly served. It is only when the claimant has been told that the solicitor can be served that service may be upon the solicitor by fax. It is r.6.7 and not r.6.3 or the Practice Direction that is concerned with when a solicitor may be served on behalf of a client. The judge supported his conclusion by reference to *Maggs v Marshall* (see *Collier v Williams* [2006] EWCA Civ 20; [2006] 1 W.L.R. 1945, CA. The claim forms had therefore not been validly served. The claimants cross applied retrospectively for an order for service by an alternative method but this was refused. See para.6.15.5 below.

### Service on a company (r.6.3(2))

**6.3.6**    Paragraph (2) of r.6.3 states that a claim form may be served in the jurisdiction on a company by any method of service permitted by Pt 6 (see para.6.3.11) (including personal service, see r.6.5(3)(b)) or by any method permitted by the Companies Act 2006 (see para.6.3.7 below).

### Methods of service on company permitted by Companies Acts

**6.3.7**    Provisions in the 1985 Act relevant to the service of claim forms on companies are replaced by s.1139 of the 2006 Act which came fully into force on 1 October 2009. This section ensures that there is a place at which a document may be served on companies registered under the Act and it also applies to overseas companies registered in accordance with regulations made under s.1046. Subsection (5) makes clear that this section is supplemented by the "company communications provisions" of s.1143.

**6.3.8**    *Registered company*—Section 1139(1) of the 2006 Act states that a document may be served on a company registered under the Act "by leaving it at, or sending it by post to, the company's registered office". Section 1139(4) of the 2006 Act states that, where a company registered in Scotland or Northern Ireland carries on business in England and Wales, the process of any court in England may be served on the company by leaving it at, or sending it by post to, the company's principal place of business in England and Wales, addressed to the manager or other head officer in England and Wales of the Company. Where court process is so served, the person issuing out the process must send a copy of it by post to the company's registered office.

This statutory provision, like its predecessor in the 1985 Act, is to be read in the light of the Interpretation Act 1978 s.7, which states that service "by post" is "deemed to be effected by properly addressing, prepaying, and posting a letter containing the document". Thus "post" in this context is wide enough to include both ordinary and registered post (cf. r.6.3(1)(b)). Therefore a company is properly served with a document (including a claim form) which is sent by registered post to its registered office (*T.O. Supplies (London) Ltd v Jerry Creighton Ltd* [1952] 1 K.B. 42).

Section 1139 is not, in terms, expressed to relate only to service of court process. Further, there is nothing in it to suggest that it applies only to service on a company that is a party to legal proceedings. Accordingly, if a company is held out as authorised to accept service of process on behalf of a defendant (e.g. under r.6.11), that service can be effected in accordance with s.1139 (see *Amerada Hess v C W Rome* (2000) 97(10) L.S.G. 36; (2000) 144 S.J.L.B. 126 (Colman J) in relation to s.725(1) of the 1985 Act).

In *Cranfield v Bridgegrove Ltd* [2003] EWCA Civ 656; [2003] 1 W.L.R. 2441, CA, the Court of Appeal explained (at paras 83 to 85) that service of the claim form on a defendant company, either by leaving it at, or by sending it by post to, the company's registered office in accordance with s.725(1) of the 1985 Act (now s.1139 of the 2006 Act), or in accordance with one of the methods of service permitted by r.6.3(1), are true alternative service routes available to the claimant. Various consequences followed from this. For example, (1) if a defendant company or the company's solicitors act in accordance with r.6.7, a claimant may choose whether to follow the s.1139 route or serve at the business address of the solicitors; and (2) if a defendant company has not given an address for service, a claimant may choose whether to follow the s.1139 or the r.6.9 route for service. It is possible for the parties to make a binding contract whereby the claimant agrees to serve the claim form by the r.6.3(1) route rather than under s.1139 or vice versa (see r.6.11), in which event the respective routes cease to be true alternatives.

The court gave the following three examples of differences between the two service routes: (1) service under s.725(1) of the 1985 Act may be by second class post, whereas r.6.3(1)(b) provides for service by first class post (and now its equivalent); (2) service under s.725(1) of the 1985 Act is deemed to have been effected at the time at which the letter would be delivered "in the ordinary course of post" (Interpretation Act s.7) unless the contrary is proved, whereas r.6.14 provides that, where service is by first class post or equivalent, the document is irrefutably deemed to have been served on the second business day after completion of the relevant step under r.7.5(1); and (3) service under s.725(1) of the 1985 Act must be by leaving the document at, or posting it to, the registered office, whereas r.6.3(1) provides for a variety of permitted methods of service. References to s.725(1) in this decision may now be read as references to s.1139(1) of the 2006 Act.

Where, for the purpose of serving a claim form on a defendant company registered in Scotland or Northern Ireland, a claimant adopts a method of service permitted by s.1139(1) of the 2006 Act, that is a method of service "permitted by Section II" of Pt 6 within the meaning of r.6.40(2), and is valid service out of the jurisdiction provided it is effected within the six-month time limit fixed by

r.7.5(2) (*Ashley v Tesco Stores* [2015] EWCA Civ 414; [2015] 1 W.L.R. 5153). See further para.6.40.2 below.

**6.3.9** *Overseas company*—These are dealt with in s.1139(2) of the 2006 Act. If the particulars of an overseas company are registered under s.1046 of the Companies Act 2006 (and they must be if they have a branch in the UK), a document may be served by leaving it at, or sending it by post, to the registered address of any person resident in the UK who is authorised to accept service on the company's behalf or (if there is no such person or service cannot be effected for any other reason) by leaving it at or sending it by post to any place of business of the company in the UK.

### Service on directors and company secretaries, etc.

**6.3.10** Section 163 of the 2006 Act requires a company to enter a service address for each of its directors in its register of directors; s.167 includes this information among the director's particulars of which the company must notify the Registrar of Companies. There is similar provision for company secretaries in ss.276 and 277. Section 1140 of the 2006 Act ensures that a document may be effectively served on these company officers at the service address filed under the Act. These are new provisions concerning service on directors, company secretaries (including in insolvency proceedings, judicial factors, receivers and managers) or those specified for overseas companies. This allows the residential addresses of such persons to be withheld. The service address is the one publicly available in the register (which may or may not be the usual residential address). This address is valid for all service (not just matters to do with the company) until: (1) 14 days after the registration of a change of address; (2) all appointments for which this is the registered address have terminated; or (3) if, in respect of an overseas company, it has ceased to have the necessary connection to the UK for registration. By s.1142 unless the contrary is stipulated, all obligations to give an address in the Companies Acts are deemed to be obligations to give the service address. Section 1141 allows the Secretary of State to make regulations, subject to negative resolution, specifying the conditions that have to be met for an effective service address (see the Companies Act 2006 (Annual Return and Service Addresses) Regulations 2008 (SI 2008/3000)). Regulation 10 provides that:

> "For the purposes of section 1141 of the Companies Act 2006 (conditions with which a service address must comply) the conditions are that the service address must be a place where—
> (a)   the service of documents can be effected by physical delivery; and
> (b)   the delivery of documents is capable of being recorded by the obtaining of an acknowledgement of delivery."

Advantage may also be taken for service of the new provisions on company communications in s.1143.

### Methods of service on company permitted by Pt 6

**6.3.11** A company may be served by any method permitted under Pt 6 as an alternative to those set out in the statutory provisions in the Companies Act 2006 referred to above. There is some overlap between the statutory and rule provisions. Service under Pt 6 will usually be simpler and cheaper than service under the legislation.

Express provision for personal service of a claim form on a company or other corporation is made by r.6.5(3)(b).

Express rule provisions concerning the place at which a company may be served are found in r.6.9 (Service of the claim form where the defendant does not give an address for service etc). Where that rule applies, and service on a company is to be effected under it, the company should be served at the place listed in the table in r.6.9(2).

It seems that, where an overseas company has complied with the statutory provisions and registered an address for service (see para.6.3.9 above), that does not amount to the giving of an address for service in particular proceedings within r.6.8.

### Limited liability partnerships (r.6.3(3))

**6.3.12** The Limited Liability Partnership Act 2000 came into effect on 6 April 2001, and created a new form of legal person, the limited liability partnership (LLP). The Companies Act 1985 s.725 and now s.1139 of the 2006 Act, which provides for service of documents on companies by leaving the document at or posting it to an authorised place, is among the provisions in that Act applied to LLPs by Regulations made under the 2000 Act (see SI 2001/1090). Previously, express provision for LLPs was not made in this rule.

### Service on defendant in Scotland or Northern Ireland

**6.3.13** Section IV contains rules dealing with the service of claim forms out of the jurisdiction. In that section, r.6.40(2) states that, where a claimant serves a claim form on a defendant in Scotland or Northern Ireland it must be served by a method permitted by Section II, that is to say, by a method referred to in r.6.3, et seq. (In such circumstances, the references to "jurisdiction" in Section II (viz. in rr.6.6, 6.7, 6.8, 6.11 and 6.12) are modified accordingly.) See further commentary following r.6.40. Service by these methods is deemed good service in the same way as service in the jurisdiction—see rr.6.14 and 6.26.

For service on companies registered in Scotland or Northern Ireland carrying on business in England and Wales, see para.6.3.8 above, and note para.6.40.2 below.

### Rule 6.3(1) subject to Section IV of Pt 6

**6.3.14**     Rule 6.3(1) applies subject to the rules in Section IV of Pt 6 (rr.6.30 to 6.47) dealing with service of the claim form and other documents out of the jurisdiction. Those rules include r.6.40, which contains general provisions as to methods of service on a party out of the jurisdiction (both with and without the permission of the court). They also include rules dealing with service through foreign governments, judicial authorities and British Consular authorities (rr.6.42 and 6.43), and service on a State (r.6.44).

### Service on States and diplomatic agents

**6.3.15**     The question whether a State or diplomatic agent (a) is immune from jurisdiction (see para.6.44.1) is distinct from the question whether either (b) is immune from service or from certain modes of service. The latter immunity is distinct from and additional to the former.

In *Al-Malki v Reyes* [2017] UKSC 61; [2017] I.C.R. 1417, SC, former employees of a diplomatic agent commenced employment tribunal proceedings against the agent. The claim forms were sent through the post to the agent's private address in accordance with r.61(1)(a) of the Employment Tribunals Rules of Procedure 2013. The validity of the service was upheld at first instance and on appeals to the EAT, to the Court of Appeal, and to the Supreme Court. In the Supreme Court Lord Sumption explained (at [15]) that, in the case of States, the mode of service is prescribed by s.12 of the State Immunity Act 1978. Service must be effected on a state by the transmission of the document through the Foreign and Commonwealth Office. (Article 22 of the United Nations Convention on the Jurisdictional Immunities of States, when it is in force, will require service of process on states to be effected on states through diplomatic channels in the absence of agreement on any other mode of service.) There is, however, no corresponding provision relating to service on diplomatic agents either in the Diplomatic Privileges Act 1964 or in the Vienna Convention on Diplomatic Relations. Thus there is no basis for a diplomatic agent's claim for immunity from service unless the service violates the agent's person or residence, contrary to arts 29 and 30(1) of the Vienna Convention. In the instant case the delivery of the claim form by post caused no such violation, since it merely informed the agent of the civil proceedings against him and enabled him to protect himself in respect of any procedural steps that were required to be taken ([13]–[16]). Lord Sumption noted that apparently the practice had become established of serving process on diplomatic agents through diplomatic channels on the foreign state or its mission in the UK and commented that that practice had no basis in domestic or international law and was not an effective mode of service ([16]).

## Who is to serve the claim form[1]

**6.4**     **6.4—(1)  The court will serve the claim form except where—**
  **(a)   a rule or practice direction provides that the claimant must serve it;**
  **(b)   the claimant notifies the court that the claimant wishes to serve it; or**
  **(c)   the court orders or directs otherwise.**

**(2)  Where the court is to serve the claim form, it is for the court to decide which method of service is to be used.**

**(3)  Where the court is to serve the claim form, the claimant must, in addition to filing a copy for the court, provide a copy for each defendant to be served.**

**(4)  Where the court has sent—**
  **(a)   a notification of outcome of postal service to the claimant in accordance with rule 6.18; or**
  **(b)   a notification of non-service by a bailiff in accordance with rule 6.19,**

**the court will not try to serve the claim form again.**

### Effect of rule (r.6.4)

**6.4.1**     The general rule is that claim forms are served by the court. Service by the court is to be read in appropriate cases as the taking of the step required of the claimant for service by r.7.5(1). See *Stoute v LTA Operations Ltd (t/a Lawn Tennis Association)* [2014] EWCA Civ 657 at [7]. Where the general rule applies it is for the court to decide which method of service (see r.6.3) is to be used. Normally the court will serve by first class post; see PD 6A (Service Within the United Kingdom) para.8.1

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

(para.6APD.8 below). Where the claim form is to be served on a solicitor (r.6.7), service may be through a document exchange. Where the court serves a claim form it will also serve a copy of any notice of funding (Form **N251** Notice of funding of case or claim (see Civil Procedure Forms in the online *Civil Procedure Forms Volume*) that has been filed if it was filed as the same time as the claim form and copies of it were provided for service (ibid. para.8.2) The court will not do the photocopying. (In certain circumstances failure to notify the other party of a funding arrangement may mean that all or part of a success fee or insurance premium will not be recoverable.) Where the court serves the claim form in error, having been notified under r.6.4(1)(b) that the claimant wishes to serve it, this will amount to an error of procedure within r.3.10(a) and service will automatically be valid unless the court orders otherwise. See *Stoute v LTA Operations Ltd (t/a Lawn Tennis Association)* [2014] EWCA Civ 657 following *Steele v Mooney* [2005] EWCA Civ 96; [2005] 1 W.L.R. 2819 and *Phillips v Nussberger* (reported sub. nom. *Phillips v Symes (No.3)* [2008] UKHL 1; [2008] 1 W.L.R. 180).(Failure to notify the other party of a funding arrangement may mean that all or part of a success fee or insurance premium will not be recoverable.)

Paragraph 4.3 of PD 8C (Alternative Procedure for Statutory Review of Certain Planning Matters) states that, in proceedings to which that Practice Direction applies the Administrative Court "will not serve documents", subject to exceptions not applicable to the service of claim forms.

Where the court serves a claim form, the court will send to the claimant a notice which will include the date on which the claim form is deemed served under r.6.14 (see r.6.17(1)).

When the court has served the claim form by post and it is returned to the court, the court must send notification to the claimant (r.6.18). In such event, the court will not try to serve the claim form again (r.6.4(4)).

From April 2011 until March 2019, this rule stated that the normal rule (that the court would serve a claim form unless requested not to do so) was subject, in cases in which service was to be on solicitors, European lawyers or parties within another EEA state, to Section IV of Pt 6. From 31 December 2020 (IP completion day), r.6.4(1) was amended by reg.4 of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) to remove reference to service on solicitors, European lawyers or parties within another EEA State.

## Personal service[1]

**6.5—(1) Where required by another Part, any other enactment, a practice direction or a court order, a claim form must be served personally.** **6.5**

**(2) In other cases, a claim form may be served personally except—**
   **(a) where rule 6.7 applies; or**
   **(b) in any proceedings against the Crown.**
**(Part 54 contains provisions about judicial review claims and Part 66 contains provisions about Crown proceedings.)**

**(3) A claim form is served personally on—**
   **(a) an individual by leaving it with that individual;**
   **(b) a company or other corporation by leaving it with a person holding a senior position within the company or corporation; or**
   **(c) a partnership (where partners are being sued in the name of their firm) by leaving it with—**
      **(i) a partner; or**
      **(ii) a person who, at the time of service, has the control or management of the partnership business at its principal place of business.**

**(Practice Direction 6A sets out the meaning of "senior position".)**

### Effect of rule (r.6.5)

For personal service within the jurisdiction of documents other than claim forms (as defined in r.6.2(c)), see r.6.22 below. (Rule 6.22 incorporates by reference certain provisions in r.6.5.) **6.5.1**

Personal service is one of the "methods of service" for the service of claim forms listed in r.6.3(1). In the CPR the most important of the provisions stating that service of documents (whether documents in the form of originating process or some other form) should be by the method of personal service are those found in Pt 81 relating to applications and proceedings in relation to contempt of court and the service of certain documents (including court orders) in such applications and proceedings. The appropriate form of originating process for proceedings falling within s.III of Pt 81 (Committal for interference with the due administration of justice) is Pt 8 claim form. Rule 81.14(1) states that the claim form must be served personally on the respondent "unless the court otherwise directs".

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390).

For an explanation of the authorities on the law relating to personal service of a claim form on an individual "by leaving it with that individual" (r.6.5(3)(a)), see *Tseitlin v Mikhelson* [2015] EWHC 3065 (Comm); *Yukos Finance BV v Lynch* [2017] EWHC 1812 (Comm); *Gorbachev v Guriev* [2019] EWHC 2684 (Comm).

**Service on a solicitor**

**6.5.2**    Except where personal service is required by another Part, any other enactment, a practice direction or court order, a claim form may not be served on a defendant personally where, by virtue of r.6.7, it should be served on the defendant's solicitor or European lawyer. See further commentary following r.6.7 below.

**Proceedings against the Crown**

**6.5.3**    See further r.6.10 (Service of the claim form in proceedings against the Crown) and commentary following that rule.

**Personal service on company—"person holding a senior position"**

**6.5.4**    Practice Direction 6A (Service Within the United Kingdom) para.6.2 explains what is meant by "a person holding a senior position" (see para.6APD.6). Whether or not a person upon whom service is effected does hold such a position is a matter to be determined on the evidence (*Lakah Group v Al Jazeera Satellite Channel* [2003] EWHC 1231; [2004] B.C.C. 703; *The Times*, 18 April 2003 (Gray J)). Before the CPR came into effect, what is now stated in para.6.2 was in part stated in RSC Ord.65 r.3(1) and in *Kuwait Airways Corp v Iraqi Airways Co* [1995] 1 W.L.R. 1147, HL, it was held that an employee of a foreign body corporate carrying on business in England, who was in England and was in charge of its business there, fell within the description of "other similar officer" in that rule. In *SSL International Plc v TTL LIG Ltd* [2011] EWCA Civ 1170; [2012] 1 W.L.R. 1842, CA, an English company issued a claim form against an Indian company and purported to effect service on the Indian company in the jurisdiction under r.6.5(3)(b) by serving it personally at the claimant's own London offices on one of the directors of the Indian company who had been nominated as such by the claimant under the terms of a joint venture agreement. The claimant's application for default judgment was refused at first instance and it's appeal was dismissed by the C of A on the basis that if a company does not carry on business and is not present within the jurisdiction, personal service of the claim form on it may not be effected under r.6.5(3)(b) by leaving it with a person holding a senior position in the company. Although this is not explicitly stated in the rule, the rule is to be construed as in the pre-CPR authorities and interpreted accordingly.

**"principal place of business"**

**6.5.5**    See also, r.6.9(2).

## Where to serve the claim form—general provisions[1]

**6.6**    **6.6—(1)  The claim form must be served within the jurisdiction except where rule 6.7(2) or 6.11 applies or as provided by Section IV of this Part.**

**(2)  The claimant must include in the claim form an address at which the defendant may be served. That address must include a full postcode, unless the court orders otherwise.**

**(Paragraph 2.4 of Practice Direction 16 contains provisions about postcodes.)**

**(3)  Paragraph (2) does not apply where an order made by the court under rule 6.15 (service by an alternative method or at an alternative place) specifies the place or method of service of the claim form.**

**Effect of rule (r.6.6)**

**6.6.1**    This rule is concerned with, what is called elsewhere (e.g. in r.6.9(2)), "place of service". The expression "general provisions" reflects the fact that the rules immediately following (rr.6.7 to 6.13) contain particular provisions answering, not only the question "where?", but also the question "on whom?" a claim form should be served.

Rule 6.6(1) and (2), prior to 31 December 2020, made reference to service on solicitors and European lawyers in EEA States. Such reference was omitted by reg.4 of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

Rule 6.7(2) is concerned with service of the claim form on a solicitor in Scotland or Northern Ireland.

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390), the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

Rule 6.11 is concerned with the service of the claim form by a contractually agreed method (a method that may involve service at a place outside the jurisdiction) (see further commentary following that rule).

Section IV is concerned with service of the claim form (and other documents in proceedings) out of the jurisdiction, including on parties in Scotland or Northern Ireland (as to which, see further commentary following rr.6.3 and 6.4).

Rule 6.15 refers to the court's power to authorise service of a claim form "at a place not otherwise permitted by this Part" where there is "a good reason" to do so.

**Address for service to be included in claim form (r.6.6(2))**

**6.6.2** The drafting of the claim form is the responsibility of the claimant, and it is the claimant who must ensure (in compliance with r.6.6(2)) that the address at which the defendant may be served is included in it. In those cases where the claim form is to be served by the court the sense of this requirement is obvious. In those cases where it is to be served by the claimant it has practical utility (e.g. by ensuring congruence between the claim form and the certificate of service filed by the claimant).

Before a claim form is issued against them, no individual or corporate defendant is required to offer up for the convenience of the claimant or the court an address at which they may be served. Of course, they may do so and defendants very often do. They may, under r.6.8, give an address within the jurisdiction or the United Kingdom "for the purpose of being served with the proceedings", or under r.6.7, give the address of a solicitor in the jurisdiction at which they "may be served with the claim form", or they may, under r.6.11, have agreed by contract to a particular method and place of service (note also r.6.10 (standing arrangements for service on Crown)). Where a defendant does not co-operate with the claimant in this manner, then in accordance with r.6.9, the claim form must be served at "the place" shown in the table in that rule. Where r.6.7 or 6.9 apply (neither will apply where personal service is mandatory) the address for service included in the claim form should be the address of the solicitor, or the address of "the place" as the case may be, as it is at those places at which service must be effected otherwise there will be mis-service. Where r.6.8 applies, service at the address given is not mandatory, but as a practical matter, that is the address at which the claimant will intend the claim form to be served and therefore will be the address included in it in compliance with r.6.6(2).

The address at which the defendant may be served included in the claim form must include a full postcode unless the court orders otherwise. The sign post following r.6.6(2) draws attention to PD 16 (Statements of Case) para.2.4 (see para.16PD.2) wherein it is noted that postcode information may be obtained from *http://www.royalmail.com* [Accessed 5 February 2021], or the Royal Mail Address Management Guide. Paragraph 2.3 of PD 16 states that, where the defendant is an individual, the claimant should (if they are able to do so) include in the claim form "an address at which the defendant resides or carries on business" and further states that this requirement applies "even though the defendant's solicitors have agreed to accept service on the defendant's behalf". This facilitates the identification of the "defendant's home court" (see r.2.3(1) and para.2.3.8). Note also para.2.5 of PD 16.

This rule was amended, with effect from 31 December 2020 (IP completion day), by reg.4 of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) to remove reference to postcode equivalents in EEA States.

## Service on a solicitor within the United Kingdom[1]

**6.7** **6.7—(1)** *Solicitor within the jurisdiction:* **Subject to rule 6.5(1), where—**

    **(a)** **the defendant has given in writing the business address within the jurisdiction of a solicitor as an address at which the defendant may be served with the claim form; or**

    **(b)** **a solicitor acting for the defendant has notified the claimant in writing that the solicitor is instructed by the defendant to accept service of the claim form on behalf of the defendant at a business address within the jurisdiction, the claim form must be served at the business address of that solicitor.**

**("Solicitor" has the extended meaning set out in rule 6.2(d).)**

    **(2)** *Solicitor in Scotland or Northern Ireland:* **Subject to rule 6.5(1) and the provisions of Section IV of this Part, and except where any other rule or practice direction makes different provision, where—**

---

[1] Amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390), the Civil Procedure (Amendment) Rules 2011 (SI 2011/88), the Civil Procedure (Amendment No.2) Rules 2011 (SI 2011/1979) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

> (a)  **the defendant has given in writing the business address in Scotland or Northern Ireland of a solicitor as an address at which the defendant may be served with the claim form;**
>
> (aa)  **a solicitor acting for the defendant has notified the claimant in writing that the solicitor is instructed by the defendant to accept service of the claim form on behalf of the defendant at a business address within Scotland or Northern Ireland;**
>
> (b)  **[Omitted]**
>
> (c)  **[Omitted]**

**the claim form must be served at the business address of that solicitor.**

**(3)  [Omitted]**

**(For Production Centre Claims see paragraph 2.3(7A) of Practice Direction 7C; for Money Claims Online see paragraph 4(6) of Practice Direction 7E; and for Possession Claims Online see paragraph 5.1(4) of Practice Direction 55B.)**

### Effect of rule (r.6.7)

**6.7.1**  Before 6 April 2010, r.6.7 consisted of one paragraph and was confined to service of a claim form on a solicitor with a business address within England and Wales. By SI 2009/3390, with effect from that date, it was expanded by the addition of a second paragraph dealing with service of a claim form on a solicitor with a business address in an EEA state (so as to comply with EC Directive 2006/123/EC). Then by SI 2011/88, with effect from 6 April 2011, the rule was substituted in an amended form, the principal differences being the addition of a third paragraph (r.6.7(3)) dealing with service on a European lawyer with a business address in any EEA state and the re-casting of r.6.7(2) to include (together with a solicitor in an EEA state) a solicitor with a business address in Scotland or Northern Ireland (making explicit what was previously implied). The inadvertent omission from r.6.7(2) of a provision comparable to r.6.7(1)(b) was subsequently rectified by SI 2011/1979 (see now r.6.7(2)(aa)). Reference to European lawyers and EEA States was then omitted by amendments effected by reg.4 of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) as of 31 December 2020 (IP completion day).

The shoulder headings of this rule distinguish two different circumstances: (1) the situation whereby if the defendant or his solicitor in the jurisdiction has given an address for service of the claim form on that solicitor, it must be served at that address; (2) the situation whereby if the defendant or his solicitor in Scotland or Northern Ireland has given an address for service of the claim form of that solicitor, it must be served at that address. From April 2011 until IP Completion day, a third shoulder heading distinguished a third circumstance, the situation whereby if the defendant or his European Lawyer in any EEA State had given that lawyer's address for service of the claim form, it *had* to be served at that address.

As to service on a party's solicitor of documents in proceedings (other than claim forms, as defined in r.6.2(c)), see r.6.23 (Address for service).

Leaving a claim form at the business address of a solicitor where one or other of the conditions stated in r.6.7(1) is satisfied is one of the methods of service permitted by r.6.3. For the different considerations as to service that apply to r.6.7(2), see below.

Presumably "has given in writing" a solicitor's address for service (in r.6.7(1)(a) or (2)(a)) means has given to a particular claimant. Where a solicitor gives written notice (under r.6.7(1)(b) or (2)(b)) that they are instructed to accept service, that notice will only take effect if it is directed to "the claimant". In *Firstdale Ltd v Quinton* [2004] EWHC 1926 (Comm); [2005] 1 All E.R. 639; (2004) 101(40) L.S.G. 29 (Colman J), a case decided under the former (less precise) rules, it was held that an indication by a defendant's solicitor that he was authorised to accept service of proceedings by a particular claimant, could not ordinarily be taken to have indicated his authority to accept service of a claim form arising from the same dispute but from a different claimant (an assignee). Service on the defendant (rather than on the solicitor) was, therefore, valid service. In *Thorne v Lass Salt Garvin* [2009] EWHC 100 (QB). (Wyn Willams J), it was held by the Master and on appeal that service on a solicitor defendant in a claim for professional negligence was not service on a solicitor as such but on the client, in circumstances where the solicitors were unaware of the issue of the claim form and unaware that it was about to be served on them. In those circumstances it was not possible to regard the defendants as being their own legal representative.

Rules 6.7(1) and (2) are expressed in mandatory terms, subject to any requirement of personal service on the defendant (r.6.5(1)). In the (rare) circumstances where personal service of the claim form on the defendant is mandatory, r.6.7 yields. In the (usual) circumstances where personal service of the claim form on the defendant is but one of the methods of service that may be used, then r.6.7 has its full effect. In those circumstances, service on the defendant instead of on the solicitor is not valid service (*Nanglegan v Royal Free Hampstead NHS Trust* [2001] EWCA Civ 127; [2002] 1 W.L.R. 1043, CA). Rule 6.5(2)(a) (Personal service) expressly states that, where a claim form may (rather than must) be served personally it may not be so served where r.6.7 applies. For

obvious reasons, in that event r.6.9 (Service of the claim form where the defendant does not give an address for service) does not apply, and this is expressly stated in r.6.9(1)(b).

The further question arises, however, as to whether rr.6.7(1) and (2) take precedence over a contractual agreement as to the method or methods of service that may be used under r.6.11. Rule 6.7(2) is excepted when "any other rule or practice direction makes different provision" and it may therefore be argued that r.6.11 does make different provision and will trump those rules. Rule 6.7(1), however, contains no such exception (the only exception is for circumstances in which personal service is mandatory—r.6.5(1)) and therefore it would seem that where the circumstances in r.6.7(1)(a) or (b) apply, r.6.11 cannot be relied upon and the claim form must be served upon the lawyer in question.

If the circumstances are (1) that the defendant is a company which may be served by a method of service set out in the Companies Act 2006 (see r.6.3(2)); (2) that before any service is effected, one or other of the conditions in r.6.7 is satisfied; and (3) that service is effected, not on the solicitors, but on the company by one of the statutory methods, the service is good service (*Cranfield v Bridgegrove Ltd* [2003] EWCA Civ 656; [2003] 1 W.L.R. 2441, CA) (see the decision in *Murphy v Staples*, one of the conjoined appeals reported therein). Rule 6.3(2) makes it clear that a defendant company can be served under either "any method permitted under this Part" or by any of the statutory methods. Service on a solicitor where required under r.6.7 because the conditions therein have been met is a method "permitted under this Part", but it is nevertheless an alternative method to service under the statutory provisions (see paras 6.3.7 et seq.). The same reasoning applies where the defendant is an LLP (see r.6.3(3)). Although *Murphy v Staples* was decided under a provision which corresponded only with the new r.6.7(1), there is no reason to believe that the reasoning in that decision, based as it is on the present r.6.3(2) and the fact that service on a solicitor in accordance with r.6.7 is a method of service "permitted by the this part", does not apply to all of r.6.7(1) and (2), so that service on a company under s.1139 of the Companies Act 2006 would still be an available alternative even though service under the CPR would by r.6.7 require service on the company's solicitor.

Where a defendant gives in writing a solicitor's business address as their address for service, r.6.7 applies even though the solicitors had neither received nor accepted instructions (but, presumably, the effect of service on the solicitors in those events would not place the solicitors "on the record"; see further below). As a practical matter of course, in most cases the defendant's wish to be served in accordance with r.6.7 will be conveyed to the claimant by the solicitors as provided for by r.6.7(1)(b) or (2)(b).

Where r.6.7(1) applies a solicitor may be served by fax in accordance with r.6.3 and PD 6A. See *Andrew Brown v Innovatorone* [2009] EWHC 1376 (Comm) and the notes at para.6.3.5 above. Where the address for service of a party is the business address of their solicitor, the solicitor is considered to be "on the record" and will remain so. One consequence of the general rule that personal service on a party is disallowed where that party has a solicitor, is that a solicitor "on the record" cannot refuse service. If a solicitor finds themselves without instructions and cannot continue to act they must promptly apply for an order declaring that they have ceased to be the solicitor acting for a party (see r.42.3). Until this is done the solicitor will be considered to be solicitor for that party (r.42.1) and service must be effected upon them. As a practical matter, this consequence is more important where the document to be served is not a claim form, but is another document in proceedings; that is to say, in circumstances where r.6.23, and not r.6.5 and r.6.7, applies.

In *Activis Group HF v Ely Lilly & Co* [2013] EWCA Civ 517, a case in which the defendant's solicitors had been served but they disputed the extent of an agreement to accept service, the Court of Appeal ruled, applying the Supreme Court's decision in *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 W.L.R. 2900, that the extent of a solicitor's agreement to accept service must be determined objectively in the same way as would be the case with a commercial contract. The aim was to determine what the parties meant and the court had to ascertain what a reasonable person with the background knowledge reasonably available to the parties would have understood the parties to mean. In *Higgins v ERC Accountants and Business* [2017] EWHC 2190 (Ch), the claimant's solicitors under cover of a letter sent the defendant's solicitors a draft copy of the claim form and subsequently applied for a declaration that by those means service had been validly effected under r.6.7(1). In rejecting that application the judge explained (referring to supporting first instance authority) that the question whether the claim form had been validly served depended upon the true effect of the letter "judged objectively and in its factual context applying the principles that apply to the construction of written agreements" ([21]).

### Brexit transitional and saving provisions

**6.7.1.1**

Regulation 18(1)(a) and (b) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) provides transitional and saving provisions concerning service on solicitors or European lawyers in an EEA state. The provisions provide that where before 31 December 2020 (IP completion day) pursuant to r.6.7 (as then in force):

"(a)  a defendant has given, as the address at which the defendant may be served with the claim form, the business address of a solicitor in an EEA state outside the United Kingdom, or of a European lawyer in any EEA state; or

(b)  a solicitor acting for the defendant has notified the business address of that solicitor in

an EEA state outside the United Kingdom, or a European lawyer has notified the address of that European lawyer in any EEA State, as the address at which that solicitor or European lawyer is instructed to accept service of the claim form,

the claim form, if not served before IP completion day, must on or after IP completion day be served at that address notwithstanding the changes made by these Regulations."

### Service of the claim form where before service the defendant gives an address at which the defendant may be served[1]

**6.8**   **6.8   Subject to rules 6.5(1) and 6.7, and except where any other rule or practice direction makes different provision—**

    **(a)   the defendant may be served with the claim form at an address at which the defendant resides or carries on business within the UK and which the defendant resides or carries on business within the UK and which the defendant has given for the purpose of being served with the proceedings; or**

    **(b)   in any claim by a tenant against a landlord, the claim form may be served at an address given by the landlord under section 48 of the Landlord and Tenant Act 1987.**

**(For Production Centre Claims see paragraph 2.3(7A) of Practice Direction 7C; for Money Claims Online see paragraph 4(6) of Practice Direction 7E; and for Possession Claims Online see paragraph 5.1(4) of Practice Direction 55B.)**

**(For service out of the jurisdiction see rules 6.40 to 6.47.)**

### Effect of rule (r.6.8)

**6.8.1**   From April 2011 to 31 December 2020 (IP completion day) the service rules permitted any individual defendant who resided or carried on business in the United Kingdom or any EEA state to give his residential or business address as his address for service. Before these amendments came into force such defendants were restricted to such an address only in the United Kingdom (or a solicitor's address under r.6.7). On IP completion day, this provision was amended, by reg.4 of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521), to remove reference to the EEA and reinstate the requirement for a UK address.

It should be noted that service at the address given is not compulsory. Rule 6.8(a) says "the defendant may be served". Contrast the position under r.6.7 where service on an address of a solicitor given in writing is compulsory so that service anywhere else will not be effective.

Rule 6.5(1) states that a claim form must be served personally on the defendant in those (rare) circumstances where this is required by a Part of the CPR other than Pt 6, or by any other enactment, a practice direction or court order. Rule 6.7 deals with the circumstances in which the claim form must be served at the business address of the defendant's solicitor.

Leaving a claim form "at a place specified in rule 6.8" is one of the methods for the service of claim forms permitted by r.6.3. However, r.6.8 makes no mention of "place" but speaks of "address". Presumably what is meant is the "address" of a "place". See further, r.6.6(2) and commentary following (address "at which the defendant may be served" to be included in claim form). The rule has a signpost to service out of the jurisdiction under rr.6.40 to 6.47, though it is not clear why this is needed following the removal of reference to an EEA address from IP completion day. Service in Scotland and Northern Ireland is by the methods in rr.6.3 or 6.23 (r.6.40(2)).

For provisions as to service at an address given by a party to proceedings at which that party (whether claimant or defendant) may be served with documents in proceedings other than a claim form (as defined in r.6.2(c)), see r.6.23 (Address for service).

Where an overseas company has complied with the statutory provisions and registered an address for service (see para.6.3.9), that does not amount to the giving of an address for service in particular proceedings within r.6.8. This is because service under the Companies Act 2006 is an alternative to any form of service under Pt 6.

### Landlord and Tenant Act 1987 s.48

**6.8.2**   Subsection (1) of s.48 (Notification by landlord of address for service of notices) states that a landlord of premises to which Pt VI of the Act applies shall by notice furnish the tenant with an

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2011 (SI 2011/88), the Civil Procedure (Amendment No.2) Rules 2011 (SI 2011/1979) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

address in England and Wales at which notices (including notices in proceedings) may be served on them by the tenant; see Vol.2 at para.3A-718+ (on White Book on Westlaw UK or the Civil Procedure CD).

**Service of the claim form where the defendant does not give an address at which the defendant may be served[1]**

**6.9—(1)  This rule applies where—**                                                    **6.9**
   **(a)  rule 6.5(1) (personal service);**
   **(b)  rule 6.7 (service of claim form on solicitor); and**
   **(c)  rule 6.8 (defendant gives address at which the defendant may be served),**

do not apply and the claimant does not wish to effect personal service under rule 6.5(2).

(2)  Subject to paragraphs (3) to (6), the claim form must be served on the defendant at the place shown in the following table.

| *Nature of defendant to be served* | *Place of service* |
|---|---|
| 1. Individual | Usual or last known residence. |
| 2. Individual being sued in the name of a business | Usual or last known residence of the individual; or principal or last known place of business. |
| 3. Individual being sued in the business name of a partnership | Usual or last known residence of the individual; or principal or last known place of business of the partnership. |
| 4. Limited liability partnership | Principal office of the partnership; or any place of business of the partnership within the jurisdiction which has a real connection with the claim. |
| 5. Corporation (other than a company) incorporated in England and Wales | Principal office of the corporation; or any place within the jurisdiction where the corporation carries on its activities and which has a real connection with the claim. |
| 6. Company registered in England and Wales | Principal office of the company; or any place of business of the company within the jurisdiction which has a real connection with the claim. |
| 7. Any other company or corporation | Any place within the jurisdiction where the corporation carries on its activities; or any place of business of the company within the jurisdiction. |

(3)  Where a claimant has reason to believe that the address of the defendant referred to in entries 1, 2 or 3 in the table in paragraph (2) is an address at which the defendant no longer resides or carries on business, the claimant must take reasonable steps to ascertain the address of the defendant's current residence or place of business ("current address").

(4)  Where, having taken the reasonable steps required by paragraph (3), the claimant—

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

(a)   **ascertains the defendant's current address, the claim form must be served at that address; or**

(b)   **is unable to ascertain the defendant's current address, the claimant must consider whether there is—**
  (i)   **an alternative place where; or**
  (ii)  **an alternative method by which,**

**service may be effected.**

**(5)   If, under paragraph (4)(b), there is such a place where or a method by which service may be effected, the claimant must make an application under rule 6.15.**

**(6)   Where paragraph (3) applies, the claimant may serve on the defendant's usual or last known address in accordance with the table in paragraph (2) where the claimant—**

(a)   **cannot ascertain the defendant's current residence or place of business; and**

(b)   **cannot ascertain an alternative place or an alternative method under paragraph (4)(b).**

**(For service out of the jurisdiction see rules 6.40 to 6.47.)**

### Effect of rule (r.6.9)

**6.9.1**   Rule 6.9 is primarily concerned with the matter of ascertaining the proper place at which service of the claim form on the defendant is to be effected in those circumstances where the defendant has not given the claimant an address for service on which they may safely rely.

Where the method of service adopted is personal service (either because it must be or may be adopted) the question of "place of service" is not crucial to effectiveness (hence the exclusion of mandatory or discretionary personal service in r.6.9(1)); the defendant may be served wherever they are found within the jurisdiction.

In addition, for obvious reasons, the question of place of service is foreclosed where the position is that service must be effected on the defendant's solicitors at their business address (hence the exclusion in r.6.9(1)(b)), or where the defendant has given an address at which they may be served (hence the exclusion in r.6.9(1)(c). (Further the question does not arise where service is to be effected by fax or other means of electronic communication, where the defendant has given an "electronic identification" to which the claim form may be transmitted.)

### Service "method" and "place" of service

**6.9.2**   Rule 6.3(1) states that a claim form may be served by any one of several listed "methods" (including the methods falling within the exclusions in r.6.9(1)). Among them (and not falling within the exclusions) is that of "leaving it at" a place specified in r.6.9 (r.6.3(1)(c)). It can be said that, for the purposes of Section II of Pt 6, "leaving it at a place specified in r.6.9" is a discrete "method" of service. The interesting feature of this particular method of service is that it is customised according to the "nature" of the defendant to be served; "place" is determined by "nature". Further by r.6.3(2) and (3), the "leaving it at a place specified by r.6.9" method of service is made applicable where the "nature" of the defendant is that of a company or a limited liability partnership. However, this rule does not apply where r.6.7 applies and there is to be service on an address of a solicitor.

Another "method" of service permitted by r.6.3 to which the nature/place scheme in r.6.9 is relevant is the method of service by first class post, document exchange or other service etc (r.6.3(1)(b)). Again, this rule does not apply where r.6.7 applies. By definition, such method requires that the claim form be sent to a particular place of service. (It is assumed here that r.6.3(1)(c) is not to be taken literally and that "leaving it at a place specified" includes posting to such a place.)

### Service "place" and "address" thereof

**6.9.3**   The table in para.(2) of r.6.9 describes "place" of service in various ways; viz., "residence", "place of business", "principal office", and "place where corporation carries on activities". In some instances, qualifications are added: thus, for example, "usual or last known" residence, and "principal or last known" place of business or place of business having "a real connection with the claim". Obviously, such places have "addresses", but no mention is made of this in the table. However, in paras (3) to (6) references are made to the defendant's "address". Further, in those paragraphs (but not in the table), for purposes explained below, references are made to the defendant's "current residence" and "current place of business".

In a claim in which a number of partners are sued in the name of a firm, where r.6.9 applies it is to be construed on the footing that an action against a partnership is in substance an action against individual partners. In such circumstances, the claimant may serve the claim form on some or all of them at the usual or last known place of business of the firm (*Brooks v A H Brooks & Co*

[2010] EWHC 2720 (Ch); [2011] 3 All E.R. 982; (2010) 160 N.L.J. 1615 (Judge David Cooke)).

In *Noble Caledonia Ltd v Air Niugini Ltd* [2017] EWHC 1095 (QB) the High Court has held that a claim form served by the claimant tour operator on a London-based agent of the defendant was not properly served under CPR r.6.9. The issue was whether the agent's office was a place at which D was conducting its activities. Applying the criteria set out in *Adams v Cape Industries Plc* [1990] Ch. 433 (CA), and having in mind the usual practice in the airline and general service agency world, the judge did not accept that the agent's activities were the defendant's activities as opposed to those carried out by the agent to promote the defendant. Accordingly, the proceedings had not been properly served, and the defendant would have to be served out of the jurisdiction. The court ruled for the first time on the meaning of "carries on its activities" in the context of CPR r.6.9, clarifying that the principles to be applied were "much the same" as in earlier authorities, including *Cape.*

### Usual or last known residence

**6.9.3.1** The rule contains no guidance in relation to such concepts as "usual or last known residence" presumably because they are fact specific. Guidance as to the proper approach can be gained from *Relfo Ltd (In Liquidation) v Varsani* [2009] EWHC 2297 (Ch). The claim form was not served personally on the defendant but on his father at an address in London which was owned by the defendant and his wife and occupied by his wife and family. One of the grounds on which the defendant challenged the validity of service was that notwithstanding the ownership and occupation of the property, he worked and resided in Kenya and spent no more than a small fraction of his time at the property. On the evidence, the family were united but the defendant had to work in Kenya and spent a month a year in the property on holiday. The deputy High Court Judge held the service valid and found that the quality of his use of the property was as a home and the fact that his immediate and wider family lived there was also a factor of relevance. He distinguished *Cherney v Deripaska* [2007] EWHC 965 (Comm); [2007] 2 All E.R. (Comm) 785 and *OJSC Oil Co Yugraneft v Abramovich* [2008] EWHC 2613 (Comm) on the basis that it was dangerous to apply the conclusion reached in cases where extremely wealthy businessmen who owned and used extremely valuable property in the jurisdiction were not resident, in cases in which persons owned houses in the jurisdiction and occupied them for only a part of the year. The term "usual residence" meant that which was in ordinary use. There was a notion of regularity about it but not necessarily comparative intensity of use. A person who had more than one residence could have more than one "last known residence". On appeal ([2010] EWCA Civ 560) the first instance judge's decision that the test was whether the party serving the claim was able to satisfy the court that there was a "good arguable case" that the premises served at were the addressees usual or last know residence, was not challenged. The Court of Appeal rejected the contention that in determining whether a residence is a "usual" residence within r.6.9, the test to be applied is merely one of comparing periods of occupation, taking little account of the nature or quality of occupation and the occupation of the premises as a family home. They found that the critical test is of the addressee's pattern of life, citing *Levene v Commissioners of Inland Revenue* [1928] A.C. 217.

### Claimant's knowledge of individual defendant's residence or place of business

**6.9.4** This rule proceeds on the assumption that the claimant has knowledge of the "place" at which the claim form may be left or to which it may be posted. If the claimant (for example) wishes to serve the claim form on an individual defendant, and they have no knowledge of the defendant's "usual" or "last known" residence, the rule does not avail them.

Where, in accordance with para.(2) of r.6.9, a claimant serves a claim form on an individual defendant, it will normally be the case that the claimant will know, or at least believe, that the address at which it is left or to which it is posted, is the address of the defendant's usual or last known residence or principal or last known place of business (as the case may be). In those circumstances, provided the claim form is dispatched for service within the time limits fixed by r.7.5, the normal consequences of good service then follow. The service cannot be impugned by the defendant's showing that, nevertheless, the claim form did not come to their knowledge. Whether any judgment or order regularly obtained by the claimant following such service should be set aside on the ground of the defendant's lack of such knowledge is a different matter; see further r.13.2 (setting aside default judgment) and r.39.3 (setting aside judgment or order obtained in party's absence) and commentaries thereon.

In practice, difficulties can arise where the claimant's knowledge in this respect turns out to be inaccurate, with the result that the claim form is left at or posted to a place that is not the defendant's "usual" or "last known" residence, or not the "principal" or "last known" place of their business or of the partnership to which they belong. These difficulties are of long standing, not only in relation to the service of originating process, but in relation to the service of documents generally. Former r.6.5 was drafted with the intention of overcoming known difficulties in the pre-CPR document service rules (*Akram v Adam* [2004] EWCA Civ 1601; [2005] 1 W.L.R. 2762, CA) but was not wholly successful in that endeavour.

The question of whether the claim form was served at the defendant's "usual", or "last known" residence or the "principal" or "last known" place of their business, is separate from the question of whether the claim form came to their notice (actually or constructively). Modern cases raising

CPR 6

the first question include: *Marshall v Maggs* [2006] EWCA Civ 20; [2006] 1 W.L.R. 1945, CA (service not effected where claim form posted to an address at which, contrary to the claimant's belief, the defendant had never resided); *O'Hara v McDougal* [2005] EWCA Civ 1623; [2006] C.P. Rep. 18 (service not effected where claim form served at an address that was not the defendant's place of business); *Lexi Holdings Plc v Luqman* [2007] 10 WLUK 557 (service not effected at defendant's residence where, at time during which defendant serving substantial term in prison, claim form served at residence occupied by defendant beforehand).

Paragraph (3) of r.6.9 seeks to deal with a particular difficulty that may arise, that is to say, with the situation where the claimant has "reason to believe" that the defendant no longer resides at, or carries on business at, the "the address of the defendant referred to in entries 1, 2 or 3 in the table in paragraph (2)". On the face of it, this is a rather odd provision, given that there is no mention in the table of the "address" of a defendant. However, it is tolerably clear that what is meant is that para.(3) is engaged where (a) the claimant knows or believes that the defendant's last known residence or their last known place of business is (say) X, but (b) the claimant has reason to believe that X is not the place at which the defendant now resides or carries on business.

In these circumstances, para.(3) requires the claimant "to take reasonable steps" to discover the address of the defendant's "current residence or place of business" and, having taken such steps, then to proceed in accordance with paras (4) and (5) (see further below). It is important to notice that para.(6) allows that, if the process outlined in paras (3) to (5) proves unfruitful, service at the defendant's usual or last known address in accordance with the table in para.(2) will be good service, despite the fact that the claimant had "reason to believe" that the defendant no longer resides or carries on business there.

Before the provisions in paras (3) to (6) of r.6.9 came into effect, there was some authority for the proposition that (at least in certain circumstances) a claimant was required to make reasonable inquiries as to the defendant's "current" place of residence or of business, before purporting to effect service at the defendant's "last known" residence or place of business (see *Cranfield v Bridgegrove Ltd* [2003] EWCA Civ 656; [2003] 1 W.L.R. 2441, CA; *Collier v Williams* [2006] EWCA Civ 20; [2006] 1 W.L.R. 1945, CA, and cases referred to therein). The new provisions make it clear that that duty arises only where the claimant has "reason to believe" the matters referred to in para.(3). In *Varsani v Relfo Ltd (In Liquidation)* the Court of Appeal (obiter) suggested that there are difficulties and obscurities in the wording of r.6.9 and invited the Civil Procedure Rules Committee to consider them.

### Duty to take "reasonable steps" to ascertain current address and consequences thereof

**6.9.5**   The expression "reasonable steps" is not embellished by the rule, or by any provision in practice directions supplementing this Part.

Conceivably, in a given case, although the claimant believed (because they had reason to do so) that the defendant no longer resided or carried on business at a particular address (i.e. place), they may be wrong about that, and this may be revealed by their taking of reasonable steps to ascertain the defendant's current address.

In *MB Garden Buildings Ltd v Mark Burton Construction Ltd* [2014] EWHC 431 (IPEC) Hacon J ruled that the claimant is not required by the rule to conduct his enquiries in order to take "reasonable steps", on the day on which the step required for service within the meaning of r.7.5(1) is carried out, for example, the posting of the claim form. If the claimant has carried out inquiries with reasonable diligence as to the defendant's last known residence before that date and on that date it is still objectively reasonable for the claimant to believe that the defendant's residence has remained unchanged, even if it has in fact changed, then on that date the residence last known to the claimant is effective for service.

Paragraph (4)(b) of the rule proceeds on the assumption that the reasonable steps taken by the claimant have not yielded a current address for the defendant. In those circumstances, the claimant "must consider" whether there is an "alternative place" (that is to say, a place other than the places referred to in the table following para.(2)) where service may be effected, and if there is such a place, must make an application to the court for an order under r.6.15 (Service of claim form by an alternative method or at an alternative place). Paragraph (4)(b) further provides that the claimant must consider whether there is "an alternative method" by which service may be effected, and if there is must make an application under r.6.15. The point here is that (as was explained above) not all of the permitted methods of service listed in r.6.3 are available when r.6.9(2) is relied on. Under r.6.15 the court has power to authorise service by a method "not otherwise permitted by this Part". (See further commentary following r.6.15.)

The effect of para.(6) of r.6.9 is clear enough (but "ascertain ... an alternative method" is ugly). The effect of the provision (which in a given case could be harsh) points up the importance of the duties imposed on the claimant by paras (4) and (5) of the rule. Those duties were emphasised in *Sajid v Nuur*, 30 July 2018, unrep. (Judge Richard Roberts), where a landlord (C) bringing a claim for rent arrears against a tenant (D) served the claim form at the address of the rented premises after D had vacated them upon C's obtaining of possession. It was held on appeal that the judge had erred in holding that the claim form had been properly served. It was explained that in the circumstances it was mandatory that C ought to have considered whether there was an alternative place where (e.g. D's solicitors who were on the record in a related matter), or an alternative

method by which (e.g. by text to the mobile phone of D's daughter), service could be effected, and made an application under r.6.15 for permission to effect alternative service. The case illustrates that claimants should not readily conclude that alternative service is not an option. See further para.6.15.4.

**Individual being sued in the name of a business**

Paragraph 5A of PD 7A contains provisions for the starting of claims against partnerships. **6.9.6** Paragraph 5C thereof states that, where a claim is brought against an individual (X) and (1) X carries on a business within the jurisdiction (even if not personally within the jurisdiction); and (2) the business is carried on in a name other than X's own name ("the business name"), the claim may be brought against the business name "as if it were the name of a partnership". Rule 6.9(2) states that where X is being sued in the name of the business the claim form must be served within the jurisdiction at X's (a) usual or last known place of residence or (b) principal or last known place of business. An individual (Y) who is an employee of X's business or is a self-employed person working in X's business is not within this rule; see e.g. *Murrills v Derlanda* [2014] EWCA Civ 6; [2014] C.P. Rep. 21, CA, where it was held that Y, who resided in Italy, could not be served at X's place of business under r.6.9(2) but should be served at his place of Italian residence under the provisions of r.6.41.

**Resident out of jurisdiction at time of service**

Rule 6.3 is concerned with "methods" of service and says nothing about "place" of service. **6.9.7** Where service of a claim form is to be effected by first class post or by service by another comparable service, the appropriate place will be as provided by other rules, quite commonly by r.6.9 (Service of claim form where the defendant does not provide an address at which the defendant may be served). Under r.6.9 the appropriate place will turn on the nature of the defendant to be served; for example, where the defendant is an individual, his or her "usual or last known address", or where being sued in the name of a business, the "principal or last known place of business". Where the place to which the claim form is sent is an address within the jurisdiction then, obviously, the service is effected at a place within the jurisdiction. The question has arisen whether the service is valid if, at the time it is so effected at the address of a defendant resident within the jurisdiction, the defendant is absent from the jurisdiction because abroad on a business trip, or a holiday, or (by withdrawing temporarily or indefinitely) to avoid service. The relevant Court of Appeal authorities are *City & Country Properties Ltd v Kamali* [2006] EWCA Civ 1879; [2007] 1 W.L.R. 1219, CA, and *SSL International Plc v TTK LIG Ltd* [2011] EWCA Civ 1170; [2012] 1 W.L.R. 1842, CA; they were reviewed and applied in the context of service of documents other than claim forms (in particular, witness summonses) in *Clavis Liberty Fund 1 LP v Young* [2015] UKUT 72 (TCC); [2015] 1 W.L.R. 2949 (Warren J) at paras 26 to 32; and *Libyan Investment Authority v Société Générale* [2017] EWHC 781 (Comm) (Teare J) at paras 57 to 67. The principle that a defendant may be served with originating process within the jurisdiction only if he or she is "present in the jurisdiction" at the time is deeply embedded in English law (*Chellaram v Chellaram (No.2)* [2002] 3 All E.R. 17 (Lawrence Collins J) at para.47). The problem is that of reconciling that principle with the development of rules permitting service by post within the jurisdiction. The prevailing opinion seems to be that a defendant "resident" in the jurisdiction is "subject" to the jurisdiction and therefore "present" in the jurisdiction.

As to usual or last known address, see para.6.9.3.1 above.

## Service of the claim form in proceedings against the Crown[1]

**6.10   In proceedings against the Crown—**                                                   **6.10**
  (a)   **service on the Attorney General must be effected on the Treasury Solicitor; and**
  (b)   **service on a government department must be effected on the solicitor acting for that department.**

**(Practice Direction 66 gives the list published under section 17 of the Crown Proceedings Act 1947 of the solicitors acting in civil proceedings (as defined in that Act) for the different government departments on whom service is to be effected, and of their addresses.)**

**Effect of rule (r.6.10)**

In civil proceedings against the Crown, the claim form must be served in accordance with this **6.10.1** rule (PD 66—Crown Proceedings para.2.1, see para.66PD.2).

In terms, this rule is similar to r.6.5(8) as it stood before the substitution of Pt 6 on 1 October 2008. The former rule applied to service of documents in civil proceedings (as defined) generally, and therefore took effect both in proceedings by the Crown as well as against. Rule 6.10 is confined

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390).

to the service of claim forms on the Crown in proceedings against the Crown. The effect of the rule is not confined to "civil" proceedings (see further below).

Rule 6.5(2) states that a claim form may not be served personally "in any proceedings against the Crown". To compensate for this restriction, other arrangements are made for the service of claim forms on the Crown. (In any proceedings by or against the Crown, other documents must not be served personally in the Crown; see r.6.22(2)(b).)

Rule 6.10 follows statutory provisions found in the Crown Proceedings Act 1947, the effects of which have been extended by rules to service on the Crown of claim forms for claims for judicial review.

The list of solicitors acting in civil proceedings for different government departments is set out in Annex 2 to PD 66—Crown Proceedings; see para.66.0.2 and para.66PD.4. It is also set out in Annex 3 to the Administrative Court Judicial Review Guide; see Vol.2 para.1BA-156.

### Service of claim form on Crown in civil proceedings

**6.10.2**    The Crown Proceedings Act 1947 s.18 (Service of documents) states that all documents required to be served on the Crown for the purposes of or in connection with any "civil proceedings" by or against the Crown shall, if those proceedings are by or against an authorised Government department, be served on the solicitor for that department or the person, if any, acting for the purposes of this Act as solicitor for that department. If there is no such solicitor and no person so acting, or if the proceedings are brought by or against the Attorney-General, the documents are to be served on the Treasury Solicitor (see Vol.2 para.9B-1130+ below (on White Book on Westlaw UK or the Civil Procedure CD)). (This section was enacted at a time when the principal means of service was personal service and came to be seen as a provision stating that documents to be served on the Crown cannot be served personally.)

For the purpose of facilitating the operation of subs.(1) of s.18 of the 1947 Act (Parties in proceedings) provides that the Minister of the Civil Service shall prepare, publish and maintain a list: (a) specifying the several Government departments which are "authorised" departments for the purposes of the Act; and (b) specifying the name and address for service of the person who is the solicitor for each department (see Vol.2 para.9B-1134+ (on White Book on Westlaw UK or the Civil Procedure CD)). For convenience, this list is annexed to the practice direction supplementing CPR Pt 66 (Crown Proceedings) (para.66PD.4 below).

Subsection (3) of s.18 states that civil proceedings against the Crown shall be instituted against the appropriate authorised Government department. If none is appropriate or if the person instituting proceedings has any reasonable doubt as to which (if any) is, proceedings should be instituted against the Attorney-General (bringing into play s.18(4)).

These provisions apply to service of all documents required to be served on the Crown, and therefore include originating process in the form of claim forms. (It could be said that, in effect, the Crown is placed in a similar position to a putative defendant who has given the business address of their solicitor as an address at which they may be served with the claim form; see r.6.7.)

It should be noted that this statutory scheme for enabling and facilitating service on the Crown by providing for service on solicitors for authorised Government department does not apply to all civil proceedings to which the CPR applies. For the purposes of the scheme, "civil proceedings" by the Crown or against the Crown within s.17 is to be interpreted as defined in the 1947 Act. In this context, "civil proceedings against the Crown" (that is to say, proceedings in which questions as to the appropriate practice for the service of claim forms may arise) means the civil proceedings described in s.23(2) of the Act, but excluding the proceedings described in s.23(3) and subject to the definition of "civil proceedings" in s.38(2) (see Vol.2 paras 9B-1145+ and 9B-1167+ (on White Book on Westlaw UK or the Civil Procedure CD)). One effect of these provisions is to exclude from the operation of the scheme for service of documents civil proceedings in the form of claims against the Crown for judicial review (as to which, see immediately below).

### Service of claim form on Crown in judicial review claims

**6.10.3**    For the reasons explained in the commentary immediately above, the predecessor to r.6.5 expressly provided that personal service could not be effected on the Crown in "civil proceedings" as defined in the Crown Proceedings Act 1947. By providing that personal service of claim form cannot be effected in "any proceedings" against the Crown, r.6.5(2)(b) reflects the fact that this restriction extends to judicial review claims. By amendments brought into effect on 1 October 2008, the statutory scheme for service of documents on the solicitor for the appropriate authorised Government department, designed to compensate for the restriction, but In terms, limited to civil proceedings as defined in the 1947 Act, is extended to judicial review claims. This change is reflected in para.6.2 of PD 54A (Judicial Review) (see para.54APD.6).

## Service of the claim form by contractually agreed method[1]

**6.11**

**6.11**—(1)  **Where—**

    (a)  **a contract contains a term providing that, in the event of a claim being started in relation to the contract, the claim form may be served by a method or at a place specified in the contract; and**

    (b)  **a claim solely in respect of that contract is started,**

**the claim form may, subject to paragraph (2), be served on the defendant by the method or at the place specified in the contract.**

    (2)  **Where in accordance with the contract the claim form is to be served out of the jurisdiction, it may be served—**

    (a)  **if permission to serve it out of the jurisdiction has been granted under rule 6.36; or**

    (b)  **without permission under rule 6.32 or 6.33.**

### Effect of rule (r.6.11)

**6.11.1**

In terms, this rule is similar to r.6.15 as it stood before the substitution of Pt 6 on 1 October 2008.

The rule acknowledges that it is conceivable that a party may issue a claim form, starting a claim in respect of a contract over which the court has jurisdiction, in circumstances where the contract itself contains a term stipulating that, in such an event, the claim form may be served by a particular method or at a particular place specified therein. Historically speaking, the rule was introduced into High Court practice at a time when the only permitted methods of service were personal service or service by leaving the originating process at the defendant's residence. The rule enabled parties by contract to agree a wider range of service methods (most of which are now expressly permitted by the rules), including service at a place outside the jurisdiction, not only in cases where, normally, the court's leave would be required before such service could be effected, but also in cases where such service was not permitted (whether with or without leave). In Pt 6, rules relating to the service of claim forms in the jurisdiction are contained in Section II (the Section within which r.6.11 is placed), and rules for service out of the jurisdiction are contained in Section IV. As, in a given case, r.6.11 can have the effect of authorising service out of the jurisdiction (possibly its most important practical effect nowadays), it had to be drafted in terms that bridge Sections II and IV of this Part and it has to be treated as an exception to r.6.6(1).

The further question arises, however, as to whether it has been drafted to be an exception to rr.6.7 (1), (2) and (3). Rules 6.7(2) and (3) are excepted when "any other rule or practice direction makes different provision" and it may therefore be argued that r.6.11 does make different provision and will trump those rules. Rule 6.7(1), however, contains no such exception and therefore it would seem that where the circumstances in r.6.7(1) (a) or (b) apply, r.6.11 cannot be relied upon.

The rule makes it clear that service of a claim form pursuant to a provision in a contract is good service where the English court has jurisdiction to try the claim whether jurisdiction is conferred by a term in the contract or vests or is assumed by the court apart from such contract.

The claim form may, subject to para.(2) of the rule, be served on the defendant by a method or at the place specified in the contract. In this way the rule allows service of a claim form by methods and at places that may be either the same as those in r.6.3 and r.6.6 or may be different. This raises a question as to whether in the absence of a deeming provision in the contract, the deemed service provision in r.6.14 which applies to claim forms served "in accordance with this Part" applies to service by a method or at a place specified in a contract at all, or only to those methods and places within the aforementioned rules. The safer interpretation may be that the rules intend the process of service between parties under a contract to be carried out entirely within the four corners of the contract so that r.6.14 does not apply and the party serving under a contractual provision must look to fulfill the terms of the contract in order to prove valid and effective service and to serve in accordance with the contract before the expiry of the period of service allowed for the service of the claim form by the rules. This interpretation is supported by the decision in *Ageas (UK) Ltd v Kwik-Fit (GB) Ltd* [2013] EWHC 3261 (Green J) in which the claimant was required to give notice of any warranty claims within a specified period and to serve proceedings in respect of a notified claim within six months of the notice. The contract did not provide a specific mechanism for the service of legal proceedings. The defendant argued that because the contract referred to the claimant "validly issuing and serving legal process" the deemed service provisions in r.6.14 should be applied to decide whether the contractual deadline for service had been met. Green J disagreed and held that, in the absence of any express provisions to the contrary, in this context the word "serving" should be given its ordinary meaning, that is delivery in a form which brings the contents of the document being served to the attention of the recipient. It was common ground that the claim form had in fact been delivered and received by the defendant before the contractual deadline had

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

passed, and the judge held that the claim form had been validly served and was in time under the contract though it would not have been regarded as served in time if the deemed service provisions in r.6.14 had applied.

However, since the decision in *T & L Sugars Ltd v Tate & Lyle Industries Ltd* [2014] EWHC 1066 (Comm) (Flaux J) there appear to be conflicting first instance decisions on the meaning of the word "served" in a contract and whether it means served in accordance with the CPR. Flaux J decided that the word "served" in the contract meant service in accordance with the CPR and that the claims in that case had been "issued and served" within the meaning of the contractual provision when the claimant's solicitors delivered the claim form and particulars of claim to the defendant's solicitors within the 12-month time limit provided. The judge stated that he disagreed with Green J's reasoning in *Ageas*, that the word service in a similar contractual provision did not mean service in accordance with the CPR. However, he agreed with Green J's obiter comment that if service did mean service in accordance with the CPR, it was CPR r.7.5 and not CPR r.6.14 which prevailed for the purpose of determining when actual service took place. Therefore the effect of the decision is the same as that in Ageas, that a technical point cannot be taken that service under a contract is not effective because although physically served in time, rr.6.14 and 6.26 would deem the documents served at a later date outside the time limit in the contract.

For a claim in which the contract did contain a deeming provision see *ENER-G Holdings Plc v Hormell* [2012] EWCA Civ 1059. The provision (in respect of the service of a second "belt and braces" notice of breach) was found not to be relevant since although the first notice had not been delivered personally in accordance with the terms of the contract, the service terms within the contract were found not to be exclusive but permissive and the fact that the recipient had received and read the first notice on a particular date was taken as good service on that date.

The rule covers service pursuant to a contract within the jurisdiction as well as out of the jurisdiction. However, permission to serve out of the jurisdiction is required under r.6.36, unless permission is not required by virtue of r.6.36, 6.32 or 6.33.

In *Society of Lloyds v Tropp*, where the defendant was a US citizen who objected to service on a UK based agent for Lloyds names, a judge held that service on the underwriting agency appointed by contract to accept service of English proceedings in respect of names domiciled abroad was valid service ([2004] EWHC 33 (Comm), (Gross J)), and the defendant was refused permission to appeal ([2006] EWCA Civ 88).

In *DVB Bank SE v Isim Amin Ltd* [2014] EWHC 2156 (Comm) (Field J) the court ruled that in a case where the contractual provision allowed each party to serve on a nominated agent for service, that provision constituted an irrevocable holding out as to the authority of the nominated agent to accept service so that when the nominated agent entered creditor's voluntary liquidation so that actual authority to accept service lapsed, service could still be effected as if actual authority had not lapsed. In this case, service had been effected by post and courier on the agent and a default judgment was not set aside.

In *Bank of New York Mellon, London Branch v Essar Steel India Ltd* [2018] EWHC 3177 (Ch) (Marcus Smith J) the foreign defendants (D) did not defend a claim brought against them under a trust deed containing a non-exclusive English jurisdiction agreement and a clause irrevocably appointing agents (X) within the jurisdiction to receive for and on their behalf service of process in any proceedings brought in England. The judge held that the service of the claim form on X by the claimants (C) was good service sufficient to bring D properly before the court, even if D had withdrawn authority from X to accept service on their behalf (para.16). The clause said nothing about the agency relationship between D and X; rather it was concerned with a promise between C and D.

### "jurisdiction"

**6.11.2**    In *Royal Petrol Trading Co UK v Total India Pvt Ltd* [2018] EWHC 1272 (Comm), the relevant clause in the contract provided that the solicitors identified by each party had instructions to accept service of proceedings, and that if a party appointed other legal representatives it should give notice within 24 hours. The defendant instructed new solicitors who notified the claimant that they had been instructed to accept service and that the defendant would not make the payment under the agreement. The claimant terminated the contract and the defendant then notified the claimant that its new solicitors were no longer instructed to accept service. The claimant issued proceedings for breach of contract and served the claim form on the defendant's new solicitors. The claimant argued that there had been good service of the proceedings by a contractually agreed method pursuant to CPR r.6.11. The defendant argued that the contract had not provided for an irrevocable appointment of solicitors to accept service and it had not survived termination of the settlement agreement. The judge rejected the defendant's argument, holding that there had been an effective appointment of the new solicitors under the contract. Although the contract did not refer to revocation, there was no magic in the use of that word. The court had to look at the clause in the contract in context. In the instant case, the authority of the new solicitors could not be revoked and the relevant clause survived termination of the contract. It was an ancillary part of the mechanism for dealing with disputes. It was collateral or ancillary to the English law and jurisdiction clause, which it was agreed survived termination, and which was itself collateral or ancillary to the main subject matter of the agreement. There had accordingly been valid service on the defendant's new solicitors.

For the purposes of the CPR generally, and therefore for all Sections of Pt 6, unless the context requires otherwise, "jurisdiction" means England and Wales (see r.2.3).

## Service of the claim form relating to a contract on an agent of a principal who is out of the jurisdiction[1]

**6.12**—(1)  **The court may, on application, permit a claim form relating to a contract to be served on the defendant's agent where—** **6.12**

   (a)   **the defendant is out of the jurisdiction;**

   (b)   **the contract to which the claim relates was entered into within the jurisdiction with or through the defendant's agent; and**

   (c)   **at the time of the application either the agent's authority has not been terminated or the agent is still in business relations with the defendant.**

(2)   **An application under this rule—**

   (a)   **must be supported by evidence setting out—**

      (i)   **details of the contract and that it was entered into within the jurisdiction or through an agent who is within the jurisdiction;**

      (ii)   **that the principal for whom the agent is acting was, at the time the contract was entered into and is at the time of the application, out of the jurisdiction; and**

      (iii)   **why service out of the jurisdiction cannot be effected; and**

   (b)   **may be made without notice.**

(3)   **An order under this rule must state the period within which the defendant must respond to the particulars of claim.**

(4)   **Where the court makes an order under this rule—**

   (a)   **a copy of the application notice and the order must be served with the claim form on the agent; and**

   (b)   **unless the court orders otherwise, the claimant must send to the defendant a copy of the application notice, the order and the claim form.**

(5)   **This rule does not exclude the court's power under rule 6.15 (service by an alternative method or at an alternative place).**

### Effect of rule (r.6.12)

In terms, this rule is similar to r.6.16 as it stood before the substitution of Pt 6 on 1 October 2008. The rule has been substantially re-arranged. A practice direction provision which supplemented the former rule has been brought into the text of the rule, as para.(2). **6.12.1**

The significance of the rule is that it provides an exception to the general rule that service must be effected on a defendant in the jurisdiction. It enables service to be effected on a principal residing and carrying on business out of the jurisdiction but who has entered into a contract by or through an agent residing or carrying on business within the jurisdiction. The effect of the rule is to enable the claimant to serve the agent without having to obtain an order for service on the principal out of the jurisdiction under r.6.36. Permission must first be obtained under this rule and the order authorising service must state the period within which the defendant must respond to the particulars of claim. It should be noted that the response is required to the particulars of claim not the claim form (see Pt 7). In addition to effecting service on the agent the claimant must also send to the defendant copies of the order under r.6.16 and the claim form.

In proceedings in the Commercial Court and in Circuit Commercial Courts, the time period provided by r.6.12(3) for responding to the particulars of claim (see Pt 9) applies after service of the claim form (see rr.58.6(3) and 59.5(3)).

## Service of the claim form on children and protected parties[2]

**6.13**—(1)  **Where the defendant is a child who is not also a protected party, the claim form must be served on—** **6.13**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).
[2] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

> (a)  **one of the child's parents or guardians; or**
>
> (b)  **if there is no parent or guardian, an adult with whom the child resides or in whose care the child is.**

**(2)  Where the defendant is a protected party, the claim form must be served on—**

> (a)  **one of the following persons with authority in relation to the protected party as—**
>
> > (i)  **the attorney under a registered enduring power of attorney;**
> >
> > (ii)  **the donee of a lasting power of attorney; or**
> >
> > (iii)  **the deputy appointed by the Court of Protection; or**
>
> (b)  **if there is no such person, an adult with whom the protected party resides or in whose care the protected party is.**

**(3)  Any reference in this Section to a defendant or a party to be served includes the person to be served with the claim form on behalf of a child or protected party under paragraph (1) or (2).**

**(4)  The court may make an order permitting a claim form to be served on a child or protected party, or on a person other than the person specified in paragraph (1) or (2).**

**(5)  An application for an order under paragraph (4) may be made without notice.**

**(6)  The court may order that, although a claim form has been sent or given to someone other than the person specified in paragraph (1) or (2), it is to be treated as if it had been properly served.**

**(7)  This rule does not apply where the court has made an order under rule 21.2(3) allowing a child to conduct proceedings without a litigation friend.**

**(Part 21 contains rules about the appointment of a litigation friend and "child" and "protected party" have the same meaning as in rule 21.1.)**

### Effect of rule (r.6.13)

**6.13.1**  "Child" and "protected party" have the meanings given them by r.21.1(2) (see r.2.3(1)). CPR Pt 21 contains special provisions which apply in proceedings involving children and protected parties. A protected party must, and a child generally must, have a litigation friend to conduct proceedings on their behalf (r.21.2). The term "Persons under Disability" is no longer in use.

In terms, this rule is similar to r.6.6 as it stood before the substitution of Pt 6 on 1 October 2008, insofar as it applied to the service of claim forms.

Paragraph (3) states expressly what was formerly implied under the old rule. Paragraph (4) is interesting. It is derived from former RSC Ord.80, r.16(3), a provision that gave the court a similar power which could be exercised, not only (as para.(3) provides) retrospectively, but also prospectively. Under the CPR r.6.15 provides the basis for the exercise of the court's power prospectively. In either event, a copy of the order should be served on the person on whom the claim form has been served or is to be served.

For service on children and protected parties of documents other than claim forms (as defined in r.6.2(c)), see r.6.25 (wherein reference is made to r.21.8 (service of application for an order appointing a litigation friend)).

### Deemed service[1]

**6.14**  **6.14  A claim form served within the United Kingdom in accordance with this Part is deemed to be served on the second business day after completion of the relevant step under rule 7.5(1).**

### Effect of rule (r.6.14)

**6.14.1**  This rule provides for the fixing of the deemed day of service of a claim form (as defined in r.6.2(c)) within the UK. A separate rule provides for fixing such days for other documents in proceedings (see r.6.26). The two rules have replaced, from October 2008 with amendments, a single rule (former r.6.7, a provision that created some difficulty).

In a given case, the day on which service was actually effected on the defendant may not be the same day as the day on which, by operation of this rule, service was deemed to have been effected.

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2011 (SI 2011/88).

The deemed day is a construction. Such construction is justified by the need to provide certainty. In the interests of certainty, a deemed day is not rebuttable by evidence of actual receipt of the claim form by the defendant on a day before or after the deemed day (*Godwin v Swindon BC* [2001] EWCA Civ 641; [2002] 1 W.L.R. 997, CA; *Anderton v Clwyd CC (No.2)* [2002] EWCA Civ 933; [2002] 1 W.L.R. 3174, CA).

In any given proceedings, it is for various reasons important that there should be no room for doubt as to the day on which (and therefore the date on which) service of originating process is deemed effected. Within the CPR, the time limits for the taking of certain procedural steps are calculated by reference to the day on which service is deemed to have been effected (e.g. r.10.3 (The period for filing an acknowledgment of service)).

A deemed day is fixed for all methods by which service of a claim form may be effected within the UK (for methods of service in Scotland and Northern Ireland, see r.6.40(2)), including personal service (see below).

The deemed day is calculated from the "completion of the relevant step" (leaving with, posting, delivering to, etc.) under r.7.5(1). Rule 7.5(1) (which incorporates by reference r.6.5) stipulates, depending on the particular method of service chosen, the "step" that the claimant must "complete" where the claim form is to be served within the jurisdiction. For further explanation, see "relevant step under rule 7.5(1)" below.

This arrangement marks a significant change from the effect which r.7.5 had before 1 October 2008. The principal objective of the change was to reduce the instances in which the deemed day of service provisions had the effect of rendering service of claim forms out of time, with the result that, for the purpose of doing justice in individual cases, other provisions in the CPR that might conceivably be called in aid to rescue the claimant's claim, for example r.3.10 (court's power to rectify error of procedure), and r.6.16 (power of court to dispense with service), were pressed into uses for which they were not designed. (A similar policy objective underlies the provision now found in r.6.15(2); see para.6.15.5 below.)

In effect, r.6.14 provides that the time between the completion of the relevant step and the deemed day should be the same for all methods of service (the second business day after completion of the relevant step), thereby removing distinctions that existed under the previous rule between "day after" and "second day after". Further, no matter what method of service is used, the deemed day will be a business day.

In this context, "business day" means any day except Saturday, Sunday, a bank holiday, Good Friday or Christmas Day (r.6.2).

**Deemed day of personal service**

Under the former rule (r.6.7), a claim form served personally was served on the day on which **6.14.2** personal service was effected. No "deemed day" provision applied to that method of service. However, if it was served personally after 17.00 on a business day or at any time on a non-business day, it was "treated as being served" on the next business day. Under r.6.14, where service is effected by personal service the claim form is deemed to be served, not on the day on which is has been left with the appropriate person, but on the second business day after that day. Therefore, if a party was required to effect personal service not later than (say) 6 February, and on that day (at any time) they left the claim form with the person to be served, it would be deemed to be served on the second business day after that day. Thus the decisions in *Godwin v Swindon BC* [2001] EWCA Civ 641; [2002] 1 W.L.R. 997, CA and *Anderton v Clwyd CC (No.2)* [2002] EWCA Civ 933; [2002] 1 W.L.R. 3174, CA are particularly relevant to this form of service either when it is used voluntarily or when it is required to be used by another rule or Practice Direction, and the person served does not appear, so that the deeming provision must be relied on to prove that service is deemed to have taken place. It could also be a source of difficulty where the period required for service before a hearing is short. When serving proceedings issued against trespassers, r.55.5 provides that:

"(1)   The court will fix a date for the hearing when it issues the claim form. (2) In a possession claim against trespassers the defendant must be served with the claim form, particulars of claim and any witness statements (a) in the case of residential property, not less than five days; and (b) in the case of other land, not less than 2 days, before the hearing date."

Where the claim is against trespassers in non-residential property who have been served personally and they do not appear at the possession hearing, the effect of the combination of this rule and r.6.14 and r.7.5(1) and the above case law would appear to be that the trespassers will not be deemed to have been served until the second business day after service was actually effected (which depending on the date of that service could be anything between the third and fifth day after) so that the hearing would have to be at least two days later than the deemed date unless the court was prepared to abridge time under r.3.1(2)(a) at the hearing or the claimant had taken the precaution, on issue of the claim form, to get an order under r.6.1(b) that the trespassers should be deemed to be served, if served personally, on completion of the relevant step required by r.6.5(3) notwithstanding r.6.14 and r.7.5(1).

**"relevant step under rule 7.5(1)"**

Rule 7.5(1) states that where the claim form is to be served within the jurisdiction, the claimant **6.14.3** must "complete the step required" before midnight on the calendar day four months after the date

of issue of the claim form. (As a result of an amendment to r.56.3, the four month limit now applies to claim forms for new tenancies of the variety referred to in that rule.) (For extension of time for serving a claim form, see r.7.6).

Rule 6.14, however, states that a claim form served within the UK (which of course includes the jurisdictions of England & Wales, Scotland and Northern Ireland) in accordance with Pt 6 is deemed to be served on the second day after completion of the relevant step under r.7.5(1). It would seem therefore that r.6.14 must govern service in Scotland and Northern Ireland and deem service there if the steps in r.7.5(1) have been completed, even though the latter rule expresses itself to apply only to the jurisdiction. Rule 6.40(2) strangely only modifies references to "the jurisdiction" in Section II. A claim form to be served in Scotland or Northern Ireland is served out of the jurisdiction and therefore has a life of six months under rule 7.5(2).

A table following r.7.5(1) stipulates the "step" required to be completed, according to the method of service employed (as permitted by r.6.3). That table, for convenience set out immediately below, states as follows:

| Method of service | Step required |
| --- | --- |
| First class post, document exchange or other service which provides for delivery on the next business day | Posting, leaving with, delivering to or collection by the relevant service provider |
| Delivery of the document to or leaving it at the relevant place | Delivering to or leaving the document at the relevant place |
| Personal service under rule 6.5 | Completing the relevant step required by rule 6.5(3) |
| Fax | Completing the transmission of the fax |
| Other electronic method | Sending the email or other electronic transmission |

The step required by r.6.5(3), in the case of personal service on an individual, is that of "leaving it with that individual"; the steps required in the case of such service on a company or a partnership are also stipulated in that provision.

It is important to notice that the question whether there has been compliance with the time limit fixed by r.7.5 for service of a claim form within the jurisdiction (or in Scotland and Northern Ireland) is determined, not by inquiring as to whether the deemed day for service fell within the period, or whether personal service was effected within it (as was the case before 1 October 2008), but by asking whether the "step required" was "completed" within the period. Consequently, the problems encountered under the former rule, and dealt with by the Court of Appeal in cases such as *Godwin v Swindon BC* [2001] EWCA Civ 1478; [2002] 1 W.L.R. 997, CA, and *Anderton v Clwyd CC (No.2)* [2002] EWCA Civ 933; [2002] 1 W.L.R. 3174, CA, are avoided.

Rule 7.5(2) states that, where the claim form is to be served out of the jurisdiction, it must be served in accordance with Section IV of Pt 6 within six months of the date of issue. (Although it is not expressed to be so, this rule is subject to one of the rules in Section IV (r.6.40(2)) which requires claim forms served in Scotland or Northern Ireland to be served by CPR methods) The new deemed service regime explained in the above commentary does not apply to service of claim forms out of the UK. If challenged, the claimant has to show that service was effected within the foreign jurisdiction within the six months allowed.

Before 1 October 2008, for certain methods of service, the time of day before which a document, including a claim form, was dispatched for service could be critical to the calculation of the deemed day of service (e.g. a document transmitted by fax after 16.00 on a business day was not deemed to have been served on that day but on the next business day) (*Anderton v Clwyd CC (No.2)* [2002] EWCA Civ 933; [2002] 1 W.L.R. 3174, CA, at [82]). From 1 October 2008, onwards such "time of day" provisions do not apply to the calculation of the deemed day for service of claim forms, but they remain relevant to the calculation of the deemed day of service of other documents; see r.6.26 and commentary following that rule.

In *Diriye v Bojaj* [2020] EWCA Civ 1400 the Court of Appeal held that the Royal Mail "signed for" first-class service fell within CPR r.6.26 so that service was deemed to have taken place on the second day after posting. Any attempted distinction between two first-class services based on the date of actual delivery was wrong in principle.

The effects of r.6.14 on the operation of other rules in the CPR, in particular on r.7.5 (Service of a claim form), and vice versa have been considered in several cases at first instance, from which it is apparent that a number of difficulties not admitting of obvious solution arise. Some differences in judicial opinion have emerged. Those cases include: *Ageas (UK) Ltd v Kwik-Fit (GB) Ltd* [2013] EWHC 3261 (QB); *T&L Sugars Ltd v Tate & Lyle Industries* [2014] EWHC 1066 (Comm) (Flaux J); *Heron Bros Ltd v Central Bedfordshire Council* [2015] EWHC 604 (TCC); [2015] B.L.R. 362 (Edwards-Stuart J); *Brightside Group Ltd v RSM UK Audit* [2017] EWHC 6 (Comm); [2017] 1 W.L.R. 1943 (Andrew Baker J). In *Ageas* and *T & L Sugars Ltd* [2014] EWHC 1066 (Comm) it was held that the apparent inconsistency between rr.7.5 and 6.14, when taken together, can be reconciled by holding that the provisions of r.7.5 are concerned with how service of a claim form in compliance with the four-month time limit for service within the jurisdiction is to be accomplished, but that

r.6.14 has a different function and is concerned with a different starting date for the calculation of time standards for the progress of proceedings after service in accordance with the relevant procedural rule. Andrew Baker J in *Brightside Group Ltd* took a different approach holding that compliance with the date for service of a claim form or notice of discontinuance under a r.7.7 notice was to be determined by reference to r.6.14 not r.7.5. He noted that there was no prior authority on the relationship between rr.6.14 and 7.7. He held that the decisions in *Godwin v Swindon BC and Anderton v Clwyd CC (No.2)* (above) remain binding and make it clear that the deemed date of service is set out in r.6.14, which is a fixed and irrebuttable date. He distinguished previous authorities, *Ageas* and *T & L Sugars Ltd* on the ground that neither of those decisions was concerned with r.7.7. The decision in *Brightside* was considered by Master McCloud in *Paxton Jones v Chichester Harbour Conservancy* [2017] EWHC 2270 (QB) where she drew attention to "an unfortunate tension" between rr.6.14 and 7.5 and did not follow the decision in *Brightside*. The approach taken in *Ageas*, *T & L Sugars Ltd* and *Paxton Jones* was also followed by Sir David Eady in *Kennedy v National Trust for Scotland* [2017] EWHC 3368 (QB).

The issue has now been resolved by the decision of the Court of Appeal in *Kennedy v National Trust for Scotland* [2019] EWCA Civ 648 which held that the judge below was correct to follow the reasoning of Flaux J in *T&L Sugars Ltd* and Master McCloud in *Paxton Jones*.

Where the method of service is by an electronic method other than fax, the step required by r.7.5(1) is "sending" the email or other electronic transmission. In *European Union v Syrian Arab Republic* [2018] EWHC 181 (Comm), (Teare J), the question arising was whether, within the meaning of the State Immunity Act 1978 s.12(1), a claim form and related documents sent by email on 22 September 2017 had been "transmitted" through the Foreign and Commonwealth Office to the Ministry of Foreign Affairs of the defendant State. The judge found that, in the circumstances, "transmission" had taken place when the email arrived in the electronic depository of the recipient. (By operation of s.12(1) of the 1978 Act and para.6 of PD 6B, the time for the defendants to enter an acknowledgment of service or a defence in the proceedings began on 22 November 2017 and expired on 15 December 2017.) See further para.6.44.1.

**"served in accordance with this Part"**

**6.14.4** The deemed service day provisions as implemented by this rule apply where the claim form is served "in accordance with this Part". Where a claim form is served on a defendant company by sending it by post to the company's registered office as permitted by the Companies Act 2006 s.1139(1) it would seem that it is not "served in accordance with this Part"; see para.6.3.8 (and note also para.6.3.12). Consequently, in such circumstances the claim form is not deemed (by operation of r.6.14 and r.7.5(1)) to have been served on the second business day after posting, but is deemed to be effected at the time at which it would be delivered in the ordinary course of post (provided it was properly addressed pre-paid and posted to the proper address) (see the Interpretation Act 1978 s.7).

**Transition to new deemed day rules**

**6.14.5** It must follow that if particulars of claim are attached to a claim form, the date of service (where served other than by first class post or DX) is the same date as for the claim form (as in CPR 6.14) and not as in CPR 6.26, which applies to service of documents other than claim forms, which would include particulars of claim when served separately from the claim form. (see *Integral Petroleum SA v SCU-Finanz AG*, [2014] EWHC 702 (Comm), where it seems to have been assumed that r.6.26 applied in such a case—see the judgment of Popplewell J at para.11).

## Service of the claim form by an alternative method or at an alternative place[1]

**6.15** **6.15—(1)  Where it appears to the court that there is a good reason to authorise service by a method or at a place not otherwise permitted by this Part, the court may make an order permitting service by an alternative method or at an alternative place.**

**(2)  On an application under this rule, the court may order that steps already taken to bring the claim form to the attention of the defendant by an alternative method or at an alternative place is good service.**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

  **(3)  An application for an order under this rule—**
    **(a)  must be supported by evidence; and**
    **(b)  may be made without notice.**
  **(4)  An order under this rule must specify—**
    **(a)  the method or place of service;**
    **(b)  the date on which the claim form is deemed served; and**
    **(c)  the period for—**
       **(i)   filing an acknowledgment of service;**
       **(ii)  filing an admission; or**
       **(iii)  filing a defence.**

**Effect of rule (r.6.15)**

**6.15.1**    In combination, this rule and r.6.27 replaced r.6.8 as it stood before 1 October 2008.

A claim form may be served by any of the methods listed in r.6.3(1), and "by any method authorised by the court under rule 6.15" (r.6.3(1)(e)). This is a flexible rule, which can accommodate modern communication methods, such as social media: see, for instance, *Gray v Hurley* [2019] EWHC 1636 (QB) (service by WhatsApp message).

Rules of court permitting substituted service were first introduced when virtually the only prescribed method for service of originating process on an individual was personal service and were designed to assist claimants where defendants were deliberately evading service. The introduction of methods of service other than personal service (especially service by post) reduced the need for reliance on these rules.

The expression "service by an alternative method" in this rule reflects the use in r.6.3 of the expression "methods of service" to describe the various ways in which service of originating service may be effected validly. The rule provides for service, not only "by an alternative method", but also "at an alternative place". This reflects the fact that some particular methods of service permit of a choice of places at which service may be effected.

An application for an order under r.6.15(1) may be made either before or after the claimant has attempted service by a method permitted by Pt 6, as there is nothing in the rule restricting the exercise of the court's powers to the latter circumstance.

A method of service "not otherwise permitted by this Part" has been interpreted by the Supreme Court in *Abela v Baadarani* [2013] UKSC 44, in the context of service out of the jurisdiction as being done in cases (and only in cases) where none of the methods provided in r.6.40(3) has been adopted. By parity of reasoning, in relation to service in the jurisdiction, it occurs where none of the methods set out in, for example, rr.6.3, 6.11, 6.12, and 6.13 has been adopted. The question in these cases will therefore be not whether the method of service adopted was good service by a method permitted by Pt 6 (for example under the law of the state in which the document is served or to be served) but whether in an individual case there is good reason to declare that the method used, being ipso facto not a permitted method, is to be treated as good service.

As to service out of the jurisdiction by an alternative method, see further paras 6.15.3 and 6.40.3 below.

The absence of any reference in this rule to the prescribed method of service being "impracticable" has been regarded as giving the court a discretion broader than that given by the former rules (*Marconi Communications International Ltd v PT Pan Indonesia Bank Ltd TBK* [2004] EWHC 129 (Comm); [2004] 1 Lloyd's Rep. 594 (David Steel J); *Knauf UK GmbH v British Gypsum Ltd* [2001] EWCA Civ 1570; [2002] 1 W.L.R. 907, CA), opening up the possibility that applications that would have failed under the old rules (e.g. *Paragon Group Ltd v Burell* [1991] Ch. 498, CA (agreement sued on stipulating time limit for bringing claim not rendering prescribed service method impracticable)) would not necessarily fail under r.6.15.

In terms, r.6.15(1), being free of any reference to "steps" directed to bringing the document to the notice of the person to be served, the UKSC in *Cameron v Liverpool Victoria Insurance Co Ltd* [2019] UKSC 6, affirmed that alternative service as a mode of service must be such as could reasonably be expected to bring the proceedings to the defendant's attention. In so far as the Court of Appeal in *Abbey National Plc v Frost* [1999] 1 W.L.R. 1080, CA, suggested the contrary it was wrongly decided. Also see paras 37 and 38 of Lord Clarke's judgment in *Abela* and *Canada Goose UK Retail Ltd v Persons Unknown* [2020] EWCA Civ 303. And see para.6.15.3.

In *Brett Wilson v Person(s) Unknown* [2015] EWHC 2628 (QB); [2017] 4 W.L.R. 69 (Warby J), service of a claim form (and other documents) by email to two particular anonymous (or "front") addresses was authorised in libel proceedings against unknown defendants in respect of online publication, the court being satisfied that there were reasonable grounds for believing that such service would bring matters to the defendants' attention. See further para.19.1.3.

In *LJY v Persons Unknown* [2017] EWHC 3230 (QB); [2018] E.M.L.R. 19 (Warby J) an individual (C) applied for an interim non-disclosure order restraining persons unknown (D) from publishing allegations of serious criminal misconduct. C had been alerted to the possibility of publication in an anonymous letter received from D in which D invited C to make contact with them by "an unregistered and untraceable phone number" capable of receiving text messages which they said

"had been established for communication" for a limited period. The court (1) granted C's application for an order (a) requiring C to identify themselves and to provide an address for service, and (b) authorising C, in the event of D's non-compliance with that requirement, to serve the claim form by the alternative method of filing it at court, and (2) authorised service of that order on D by text message.

Rule 6.15 falls within Section II of Pt 6, and is therefore concerned with the court's power to permit service by an alternative method where the method (or methods) available to the claimant under the rules provide for service of the claim form (as defined in r.6.2(c)) within the jurisdiction. Section III of Pt 6 is concerned with the service of documents other than the claim form within the United Kingdom, and service of such documents by an alternative method is provided for by r.6.27 by stating simply that r.6.15 applies to them as it applies to a claim form. As to alternative methods of service in cases of service abroad of domestic process, see para.6.15.7.

Paragraph 3.6 of PD (Admiralty Claims) stipulates the ways in which a claim form in rem may be served and provides that the court may direct an alternative method of service under r.6.15 "provided that the property against which the claim is brought or part of it is within the jurisdiction of the court" (see Vol.2 para.2D-91).

Paragraph 11 of PD (Insolvency Proceedings) deals with substituted service of statutory demands and petitions (see Vol.2 para.3E-11).

In *Clarkson Plc v Persons Unknown* [2018] EWHC 417 (QB) (Warby J), where a company (C) brought proceedings for an injunction to prevent unknown persons (D) from disclosing or using confidential information illegally obtained from C's IT systems, in circumstances where D threatened to publicise the information unless a very substantial sum was paid, the court granted C an interim injunction, prohibiting D from communicating or disclosing certain information to any third party or using it in any other way, and made an order permitting C to serve the claim form on the email address used by D to make the blackmail threats.

### Practice and supporting evidence

An application for an alternative method service order for the service of a claim form may be made without notice and must be supported by evidence (r.6.15(3)). The supporting evidence must deal with the matters referred to and explained (with examples) in para.9 of PD 6A (Service Within the United Kingdom) (see para.6APD.9). **6.15.2**

There is a warning for practitioners in the drafting of an order under r.6.15 in *Dubai Financial Group LLC v National Private Air Transport Services* [2016] EWCA Civ 71 where the CA held, Longmore LJ dissenting, that the requirement in r.6.15(4)(c) that an order "must" specify the period for filing an acknowledgment of service, behoved the judge to specify a date for that, and if a defendant was never under a valid obligation to acknowledge service, either as specified by the Rules or by an order of court, then judgment in default could not be entered against it because it was not in default at all.

### "good reason to authorise"

The Supreme Court in *Abela v Baadarani* [2013] UKSC 44 has held: (1) That whether there is good reason to treat a method of service not permitted by Pt 6 as good service under r.6.15(1) and (2) is essentially a matter of fact. (2) The contrast with r.6.16 under which the court can only dispense with service of the claim form "in exceptional circumstances" shows that it is not right to add a gloss to the test by holding that there will only be good reason in exceptional circumstances. (3) That in these cases it should not be necessary for the court to spend undue time analysing decisions of judges in previous cases which have depended on their own facts. (4) The mere fact that the defendant has learned, by the method used, of the existence and content of the claim form cannot without more constitute a good reason to make an order under r.6.15(2), but the wording of the rule shows that it is a critical factor. (5) In this context the most important purpose of service is to ensure that the contents of the document is communicated to the defendant. The latter statement is one of importance. Lord Clarke in paras 37 and 38 of his judgment laid stress on this consideration. This would suggest that it should not now be the practice to make orders for what is commonly referred to as "deemed or substituted service" prospectively under r.6.15(1) unless there is a high degree of likelihood that the claim form or document (r.6.27) will come to the intended recipient's notice. The Court of Appeal applied this guidance and made an order under r.6.15(2) in *Power v Meloy White Robinson Solicitors* [2014] EWCA Civ 898, a case in which, after there had been pre-action case management, the court served the claim form on the defendant firm though they had been requested to return the service copies for solicitor service on the defendant's solicitors in order to effect valid service on them at their business address under r.6.7(1). There was good reason to order that there had been good service by an alternative means because as well as there having been preaction case management, there was after the purported service, correspondence between the parties proceeding on the clear understanding that the claimant was pursuing the claim and consistent with the claim form being accepted as having been served and further the defendants knew all they needed to know about the claim, hence there was something more than the mere fact that the defendant had learned of the existence and contents of the claim form. **6.15.3**

In *Knauf UK GmbH v British Gypsum Ltd* [2001] EWCA Civ 1570; [2002] 1 W.L.R. 907, CA, a German company (C) issued a claim form for claim against another German company (D1) and

against a British company (D2). C applied for an alternative method of service order permitting, as an alternative to serving the claim form on D1 out of the jurisdiction under the Hague Convention or the 1928 UK and Germany Convention (processes likely to take up to three months and which would otherwise be the prescribed methods of service), service within the jurisdiction on D1's London solicitors. The application was made principally for the purpose of ensuring that the English court would be "first seised" within the meaning of art.21 of the Brussels Convention and would therefore have priority over any proceedings that might be brought by D1 against C in Germany before C had managed to effect service on D1 in Germany. The Court of Appeal held that the application should be refused. There cannot be "good reason" for ordering service in England by an alternative method on a foreign defendant when such an order subverts, and is designed to subvert, in the absence of any difficulty about service, the principles on which service and jurisdiction are regulated by agreement between the UK and its Convention partners. An interesting feature of this case is that the court did not base its decision on C's inability to show that service by a prescribed means was "impracticable" (which under the pre-CPR rule might have provided D with a complete answer). Nevertheless (1) in *JSC BTA Bank v Ablyazov* [2011] EWHC 2988 the judge granted an order for service by an alternative method under this rule of a claim form on a Russian defendant namely by service in the jurisdiction on his English solicitors in a related action who did not have authority to accept service, for the reason that service under the Hague Convention in Russia was said by the Foreign Process Section at the Royal Courts of Justice to be likely to take eighteen months to two years. As this was a very long period, the litigation could be prejudiced and (2) in *BNP Paribas SA v Open Joint Stock Co Russian Machines* [2011] EWHC 308 (Comm); [2012] 1 Lloyd's Rep. 61; [2011] 2 C.L.C. 942 (Blair J), the judge did not think (see para.116) that questions of the legality of service under foreign law arose where the court exercises a power to order alternative service on a foreign defendant in England and Wales. This latter view is supported by the decision in *Abela v Baadarani* [2013] UKSC 44 where it was held that rr.6.15 (1) and (2) only come into effect where the method used is not one permitted by Pt 6, which include service under r.6.40(3)(c). If purported service under that rule was said to have taken place or to be about to take place then rr.6.15(1) and (2) would be otiose. However, the decision in that case that service on the second defendant's lawyers in Russia was good service must now be regarded as incorrect following *Abela v Baadarani* [2011] EWCA Civ 1571 (CA). This was conceded in the Court of Appeal in *BNP Paribas SA v Joint Stock Asset Management Co Ingosstrakh-Investments* [2012] EWCA Civ 644. Also see the decision of Teare J in the *Russian Machines* case reported at [2012] EWHC 1023 at para.2. Further, in that decision the court was of the view that on consideration of the decision in *Abela*, the fact that delay in service under the Hague Convention was likely to prejudice the trial date was a good reason for making an exceptional order to validate retrospectively under r.6.15(2) service of the claim form on the second defendant's solicitors in the jurisdiction. In the *Ingosstrakh-Investments* case the court stressed the exceptional nature of retrospective validation of a form of service not authorised by an order of the court and the necessity for a good reason. The fact in that case that service under the Hague Convention might not be effected because of delay, before a fixed date trial was capable of being such a reason. However, the Supreme Court in *Abela v Baadarani* [2013] UKSC 44 held that the contrast with r.6.16 under which the court can only dispense with service of the claim form "in exceptional circumstances" shows that it is not right to add a gloss to the test in r.6.15(1) by holding that there will only be good reason in exceptional circumstances. Nevertheless, in para.34 of his judgment Lord Clarke stressed that *Abela* was not a case in which the Hague Service Convention or other treaty applied and that therefore the argument that an alternative service order would subvert the provisions of such a convention or treaty (cf the reasoning of the Court of Appeal in *Knauf UK* (above) and *Cecil v Byatt* [2011] EWCA Civ 135; [2011] 1 W.L.R. 3086) was not relevant in *Abela*. He specifically said nothing about the position where there is a convention or treaty and thus the Court of Appeal decisions in *Knauf* and *Cecil* are unaffected in this respect.

*Deutsche Bank AG v Sebastian Holdings Inc* [2014] EWHC 112 (Comm); [2014] 1 All E.R. (Comm) 733 (Cooke J), was a case in which an order for alternative service on a defendant served in Connecticut by a method valid under the law of that State and which had come to his notice, was set aside on the grounds that there was no good reason not to use the method of service available under the Hague Convention. The judge found that the fact that in *Abela* there was no service convention involved but that in *Cecil* there was, was a critically important distinction and that while in *Abela* the Supreme Court considered that in *Cecil*, to talk of "interference with the sovereignty of a foreign state" was to overstate the position, the fact remains that where there is an applicable convention, the two states in question have specifically agreed to the service of foreign process in accordance with it. In such circumstances this must represent the prime way of service in such a contracting state. There must be good reason for allowing service by a means other than provided by r.6.40(3)(b). There was no evidence that service under the Hague Convention would cause substantial delay or of attempts to avoid service.

However, in *Koza Ltd v Akcil* [2018] EWHC 384 (Ch), a Hague Convention case involving attempted service in Turkey, the court held that the starting point was that the case was one to which the Hague Service Convention applied. Turkey was a signatory, and had exercised its entitlement to limit the means by which service could be effected on Turkish parties to the medium of service via official channels in Turkey. There was a difference in case law on whether the test to permit

alternative service under r.6.15(1) in a Hague Service Convention case was that there be exceptional, special circumstances, or whether there needed to be a "good reason". The test in *Société Générale v Goldas Kuyumculuk Sanayi Ithalat Ihracat AS* [2017] EWHC 667 (Comm) was the right one, and *Cecil v Bayat* [2011] EWCA Civ 135; [2011] 1 W.L.R. 3086 was followed. The judge held that a likely delay of five months or more if the Hague Service Convention route for service was used, and the fact that the political situation in Turkey was deteriorating which could cause significant delay in bringing the proceedings to trial, were not a strong or compelling ground identifying likely prejudice. But the claimants' second ground was more significant, namely that given its serious allegations of wrongdoing against the current regime in Turkey and its control and abuse of the Turkish judicial system, and the fact that one defendant was an organ of the Turkish state, it was unlikely that the Hague method of service which directly involved the Ministry of Justice, would be effective. That was a powerful reason for saying that the instant case was one in which there was a good reason for alternative service to be permitted.

In *Bill Kenwright Ltd v Flash Entertainment FZ LLC* [2016] EWHC 1951 (QB), where the court upheld an order for service of a claim form out of the jurisdiction by an alternative method (registered mail to a foreign address), the judge explained that, although it is clear that the existence of a Service Treaty is relevant to the court's discretion as a matter of comity and must be taken into account when considering whether there is a good reason to make an alternative service order, the matter is not immutable. In that case a combination of factors constituted "good reason" for authorising service by an alternative method, including lengthy delay if the relevant Service Treaty method was used. The judge also applied *Abela* (above) in concluding that the court had power to order a date for deemed service in an order under r.6.15 relating to service out of the jurisdiction under r.6.37(5)(b)(i).

In *Brown v Innovatorone Plc* [2009] EWHC 1376 (Comm); [2010] 2 All E.R. (Comm) 80; [2010] C.P. Rep. 2 (Andrew Smith J), the judge ruled that (in the circumstances) service by fax of a claim form should not be permitted to stand as good alternative service, and stated that (1) the expression "a good reason" in r.6.15(1) is a general one and is not confined to specific and limited categories of case, (2) the mere absence of prejudice to a defendant will not usually in itself be sufficient reason to make an order under r.6.15, and (3) "exceptional circumstances" are not required to justify a respective order under r.6.15(2), but the court should adopt a rigorous approach.

In *Flota Petrolera Ecuatoriana v Petroleos de Venezuela SA* [2017] EWHC 3630 (Comm); [2017] 2 C.L.C. 759 (Leggatt J), the court declined to set aside an order granting the claimant permission under r.6.15 to serve an arbitration claim form on the defendant (a Venezuelan company) by an alternative method consisting of service on its London solicitors. In doing so the court rejected the submission that where (as in this case) arrangements had been made for service in accordance with the Hague Convention, the "good reason to authorise service" test in r.6.15 should be given a particular gloss and that service by an alternative method should be regarded as exceptional, to be permitted in special circumstances only (para.20). In principle there was no reason for such a gloss, unless the country in question had indicated some positive objection to persons resident in its territory being served by any means other than in accordance with the Convention. See further para.6.40.3 below.

### Claimant unable to ascertain defendant's current address (r.6.9(4)(b))

**6.15.4** Where disputes arise as to whether or not service of a claim form has been properly effected as prescribed by the rules, it is likely to be in a case to which r.6.9 applies; that is to say, where r.6.5 (Personal service) and r.6.7 (Service of claim form on a solicitor) do not apply and the defendant has not given an address for service (r.6.8). In particular, it is likely to be a case where the defendant is an individual and (as the rules prescribe) the claim form must be served on them at their "usual or last known address" or "principal or last known place of business" (either by post or by leaving it there). Where the claimant "has reason to believe" that such address is an address at which the defendant no longer resides or carries on business, paras (3) to (6) of r.6.9 come into play with the result that the claimant may be required to make an application for an order under r.6.15 permitting service by an alternative method or at an alternative place (see further commentary following r.6.9). It would seem that, if a claimant does not make such an application when they should have done so, nevertheless they might still apply under r.6.15(2) for an order to the effect that such service as they did effect was valid. See further para.6.9.5.

### Retrospective operation—"steps already taken"

**6.15.5** Paragraph (2) of r.6.15 is designed to remedy what were thought to be defects in the law as it stood before 1 October 2008. The point is illustrated by *Elmes v Hygrade Food Products Plc* [2001] EWCA Civ 121; [2001] C.P. Rep. 71. In that case a claimant making a personal injury claim, instead of serving the claim form on the defendant, served it on the defendant's insurers. The Court of Appeal rejected the claimant's submission (made after the time for service had expired) that the court had power to order retrospectively that the erroneous method of service already adopted by the claimant should be allowed to stand as service by an alternative method permitted by the court. (See also *Maggs v Marshall* [2005] EWHC 200 (QB) (Gray J).) Paragraph (2) states that the court may order that "steps already taken to bring the claim form to the attention of the defendant by an alternative method or at an alternative place" is good service. The particular significance of this provision is that it may enable a claimant to escape the serious consequences

that would normally ensue where there has been mis-service and, not only has the period for service of the claim form fixed by r.7.5 has run, but also the relevant limitation period has expired. This statement in the text of this work is cited with apparent approval in para.36 of the judgment of Lord Clark in *Abela v Baadarani* [2013] UKSC 44.

The rule is concerned with giving retrospective validation to an event which has already happened and it is not engaged unless some event such as purported service at some place or by some method as could be deemed to be service at or by an alternative place or method has occurred. See *AstraZeneca UK Ltd v Vincent* [2014] EWHC 1637 (QB).

The question as to whether there is good reason to authorise service by an alternative method or at an alternative place is distinct from the question as to whether an alternative service order should take effect retrospectively.

Many of the issues that can arise in an application under r.6.15(2) were reviewed and the effect of the relevant authorities were examined in *Caretech Community Services Ltd v Oakden* [2017] EWHC 1944 (QB) (Master McCloud), where a Master refused to validate retrospectively as good service the sending "for information only" of a claim form to solicitors who were not authorised to accept service.

In *Kaki v National Private Air Transport Co* [2015] EWCA Civ 731; [2016] C.L.C. 948, CA (Case No.A3/2014/1912) the defendant Saudi company appealed against a decision ([2014] EWHC 1947 (Comm)) that the steps taken by the claimant to bring its claim form to the appellant's attention constituted good service under CPR r.6.15(2). In determining whether retrospectively to validate steps taken by a claimant as good alternative service under CPR r.6.15(2), the court had only to decide whether there was a good reason to do so: if the court found a good reason, there was no further discretion not to deem the service good. The fact that a r.6.15(2) application had been made after the time limit for service had expired was only one factor to take into account, and did not require any more rigorous or robust an approach.

In *R. (Lalu Hanuman) v University of East Anglia* [2015] EWHC 4122 (Admin); (Case Nos CO/3442/2009, CO/15250/2009) the court retrospectively ordered service by alternative method under CPR r.6.27 holding that the debtor's refusal to accept service by email was unreasonable as he was residing in Barbados and had refused to provide an alternative address for service in the UK.

But note that in *OOO Abbott v Econowall UK Ltd* [2016] EWHC 660 (IPEC) it was held that applications under r.6.15 were to be considered in the light of *Abela v Baadarani* [2013] UKSC 44; 1 W.L.R. 2043, and the court rejected the defendants' contention that the case of *Bethel Construction Ltd* (see above) meant that the requirements of CPR r.7.6(3) were to be imported into r.6.15 in cases concerning failure to serve a claim form in time. The case involved conduct falling short of the overriding objective, which, together with the fact that the defendants knew the content of the claim form by delivery of a photocopy of the unsigned claim form, amounted to sufficient collectively to authorise service retrospectively, deemed by delivery of the unsigned photocopy claim form.

In *Barton v Wright Hassall LLP* [2018] UKSC 12; [2018] 1 W.L.R. 1119; [2018] 3 All E.R. 487, the claimant (a litigant in person) purported to serve the claim form on the defendant's solicitors by email, without obtaining any prior indication that they were prepared to accept service by that means. In the circumstances, that was not good service (though the claimant mistakenly thought that it was) and, as a result, the claim form expired unserved on the following day. At first instance, and on appeals, the courts declined to exercise their power under r.6.15(2) retrospectively to validate the purported service, and a further appeal by the claimant to the Supreme Court was dismissed. The authorities and the current state of the law regarding validation of service where the steps taken by a claimant to draw a claim form to the attention of a defendant do not accord with the rules as to service were examined in the Court of Appeal's judgment ([2016] EWCA Civ 177, at para.19) and in the two judgments (one dissenting) delivered in the Supreme Court. See also the discussion in the judgment in *Higgins v ERC Accountants and Business* [2017] EWHC 2190 (Ch), at para.16.

In *Woodward v Phoenix Healthcare Distribution* [2018] EWHC 2152 (Ch) (Judge Hodge QC), the claimants issued their claim form on the day before the expiry of the six-year limitation period relevant to their claim, and their solicitors served it on the defendants' solicitors two days before the expiry of the four month period of initial validity. The service was ineffective because the defendants' solicitors were not authorised to accept service. On the claimants' application under r.6.15(2), a Master ordered that the service was good service but the judge allowed the defendant's appeal, finding that the Master had erred in treating the position in respect of service of the claim form as equivalent to that in respect of relief from sanctions generally.

In *Gee 7 Group Ltd v Personal Management Solutions Ltd* [2016] EWHC 891 (Ch) (Arnold J, Ch. D.) the court held that, even looked at cumulatively, the factors relied upon for seeking a retrospective order for alternative service, namely (a) the claim form being brought to the defendants' attention; (b) the limitation period not expiring and therefore the ability to issue another claim form; (c) the absence of prejudice if service was treated as effective; (d) the assertion that the claimants thought they were entitled to serve the defendants' solicitors; and (e) no denial of authority by the defendants' solicitors, were not good enough reasons for authorising service by an alternative method.

Popplewell J has given a helpful analysis of the principles applicable to CPR 6.15 and 6.16 in *Société Générale v Goldas Kuyumculuk Sanayi Ithalat Ihracat AS* [2017] EWHC 667 (Comm). He dismissed the claimant's retrospective application for permission for service by an alternative method in circumstances where there had been deliberate delay and abusive conduct by the claimant once it knew that its attempted service on defendants in Turkey was disputed and had no reason to believe that purported service in Dubai was valid.

*Société Générale v Goldas Kuyumculuk Sanayi Ithalat Ihracat AS* was applied by Deputy High Court Judge Sara Cockerill QC in *Aquila WSA Aviation Opportunities II Ltd v Onur Air Tasimacilik AS* [2017] EWHC 1259 (Comm). The claimant had served proceedings on a service agent appointed under a contract, but one day after the agent's appointment expired. The court held that the claimant's right to effect service could not be affected by the fact that the defendant had only appointed the service agent for one year and then failed to renew its appointment, as the clause intended that an agent was appointed irrevocably. The critical factor was whether the defendant had learned of the claim form's existence. However, the mere fact that the defendant had learned of the claim form's existence was not enough; something more was required. If a party was playing technical games it would count against them. The court exercised its discretion and allowed service under r.6.15(2).

The relevant rules and authorities were reviewed and explained in *BVC v EWF* [2018] EWHC 2674 (QB) (Karen Steyn QC), where the judge ordered, pursuant to rr.6.15(2) and 6.27, that steps already taken by the claimant to bring to the attention of a defendant out of the jurisdiction the claim form and court orders by an alternative method of service, namely, by sending those documents to him by email, constituted good service.

In *Wilton UK Ltd v Shuttleworth* [2018] EWHC 911 (Ch); [2018] 1 W.L.R. 4677 (Judge Davis-White QC), the claimant issued a claim form for a derivative claim but postponed filing the evidence for the permission application as required by r.19.9A(2) and did not obtain the permission required to continue the claim before serving the claim form on the defendant. On the claimant's application for retrospective permission to continue the claim, it was held that the matter should be dealt with, not in accordance with the principles to validate retrospectively non-compliant service of originating process under r.6.15(2), but as an application under r.3.9 for relief from sanctions for non-compliance with a rule (in this case r.19.9(4)). See further para.3.9.23 above and para.19.9A.2 below.

#### Application of r.6.15 to service of other documents in proceedings

In terms, r.6.15 is confined to the service of claim forms (as defined in r.6.2(c)). Service by an **6.15.6** alternative method or at an alternative place of other documents in proceedings is provided for by r.6.27. That rule simply incorporates r.6.15 by reference.

It may be noted that by these means, a claimant who failed to serve particulars of claim by a method provided for by this Part may apply for an alternative service order. In the well known case of *Nanglegan v Royal Free Hampstead NHS Trust* [2001] EWCA Civ 127; [2002] 1 W.L.R. 1043, CA, the Court of Appeal held that a court did not have power to order retrospectively that the claimant's mis-service of his particulars of claim (in the form of service by post on the defendant instead of on his nominated solicitor) should stand as permitted alternative service. It is now clear that the combined effect of r.6.27 and 6.15 gives the court such power.

In *NPV v QEL* [2018] EWHC 703 (QB) Nicklin J permitted service of an application and injunction under the Protection from Harassment Act 1997 by text message as "the only practical alternative means presently available to the Claimant."

#### Service out of jurisdiction by an alternative method

Section IV of Pt 6 contains provisions dealing with the service of the claim form and other **6.15.7** documents out of the jurisdiction. That Section (as inserted in the CPR by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178)) contains no provision dealing with service "by an alternative method" of a claim form or any other document. This omission has raised the question whether the court has power to order service by an alternative method where a claim form or other document is to be served out of the jurisdiction.

Any doubt has been resolved by the Supreme Court in *Abela v Baadarani* [2013] UKSC 44 where the concession that r.6.37(5)(b)(i), which gives the court power to "give directions about the method of service", authorises the court to make an order for alternative service prospectively or retrospectively under r.6.15(1) and r.6.15(2) was expressly approved by Lord Clarke at para.20 of his judgment. See para.6.40.3 below.

## Power of court to dispense with service of the claim form[1]

**6.16—(1)  The court may dispense with service of a claim form in  6.16 exceptional circumstances.**

**(2)  An application for an order to dispense with service may be made at any time and—**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

> (a)   **must be supported by evidence; and**
>
> (b)   **may be made without notice.**

### Effect of rule (r.6.16)

**6.16.1**   This rule gives the court power on application to dispense with service of a claim form. The application may be made without notice, but must be supported by evidence (in the form of a witness statement or affidavit). (Before the CPR came into effect, although the court had power to dispense with the service of a petition for a matrimonial cause, it had no power under rules of court to dispense with the service of other forms of originating process.) Note that r.6.1(a) states that the rules as to service apply except where "any other enactment ... makes different provision", and see the notes to r.6.28 below as to the consequences where a statute lays down the period for service.

This rule is similar to r.6.9 as it stood before the substitution of Pt 6 on 1 October 2008. That rule gave the court an unrestricted discretionary power to dispense with service "of a document", and in *Anderton v Clwyd CC (No.2)* [2002] EWCA Civ 933; [2002] 1 W.L.R. 3174, CA, the Court of Appeal held that it applied to the service of a document in the form of a claim form. In terms, r.6.16 applies to dispensing with the service of claim forms (as defined in r.6.2(c)), and of claim forms only. For the power to dispense with service of other documents, see r.6.28 below.

On the question whether an order dispensing with service of a claim form may be made under r.6.16 in circumstance where the normal method of service would be that provided for by r.6.44 (Serve of claim form or other document on a State), see para.6.44.1 below.

A principal objective of the changes made (with effect from 1 October 2008) to the rules dealing with the manner in which the deemed day of service is fixed for the service of claim forms (r.6.14 and r.7.5(1)) was to reduce the instances of applications to the court by claimants who were disadvantaged by the fact that such rules had rendered service of their claim forms out of time, and who were driven to relying on the court's power to dispense with service for relief (see further para.6.16.3 below). The advantage given to claimants by those changes (albeit claimants who leave service to the last minute) is balanced by the fact that applications to dispense with service under r.6.16 should be granted only in exceptional circumstances.

CPR r.81.10 states that an application for committal of a person for breach of a judgment, order or undertaking to do or abstain from doing an act must be served personally on the respondent, but the court may dispense with service "if it considers it just to do so" or make an order in respect of service by an alternative method or an at alternative place (r.81.10(5)).

However, in appropriate cases r.3.10 can be relied on to regard a procedural step in service of a claim form or other document as not invalidated, so that an order under r.6.16 need not be made. In *Integral Petroleum SA v SCU-Finanz AG* [2014] EWHC 702 (Comm). Poppelwell J, the judge, relying on the decision of the House of Lords in *Phillips v Nussberger* (reported sub nom *Phillips v Symes (No.3)* [2008] 1 W.L.R. 180, held that a failure to fulfill the conditions in PD 6A (because the email address of the EEA lawyer to whom the Particulars of Claim was transmitted was not contained in the Acknowledgment of Service nor was it on the writing paper of the lawyer and he had not indicated in writing that an email address might be used for service) was an error of procedure in serving the Particulars of Claim by email and was a failure to comply with a rule of Practice Direction which fell within CPR r.3.10. It should be noted, however, (1) that while the view that the failure of procedure in the *Phillips* case was within the CPR r.3.10 was very powerful obiter (the decision was in fact about whether in the circumstances the first instance judge was right to invoke not r.3.10 but the then r.6.9 (now r.6.16) to dispense with service), the judge, had difficulty with the view that an error of procedure in CPR r.3.10 could encompass circumstances where there is no purported service of any document of any kind. He reinforced this by stating:

> "I can envisage circumstances in which purported service by a method which is not permitted by the rules at all is sufficiently distant from what is required by the rules as arguably to fall outside CPR r.3.10. Moreover I should not be thought to be endorsing any proposition that CPR r.3.10 can be used as a matter of course to circumvent service out of the jurisdiction on a firm of solicitors or other lawyers as a matter of practical convenience without seeking an order for service by an alternative method."

The judge also opined that a narrower approach to CPR r.3.10 is justified when it is sought to be applied to the service of originating process, because such service is what establishes in personam jurisdiction over the defendant. (3) the logic of r.3.10(a) is that it treats as valid, steps which fall within the rule automatically without need of an order remedying the error under r.3.10(b).

The decision in *Integral Petroleum SA*, together with the dicta in the *Phillips* case (see in particular Lord Brown at para.33) suggest that the question to be asked is whether the attempt to serve the claim form or other document was or was not ineffective so that it could be said that there has been an "error of procedure" within r.3.10(a) which does not invalidate the step taken in the proceedings, that is, in this case, attempted service. Read in that way, r.3.10 prevents triumph of form over substance and does not readily apply where there has been no attempt at a procedural step or such step is one which is not permitted by or within the rules at all where an order under r.6.16 might be appropriate.

### Prospective service dispensing orders

**6.16.2**   A significant feature of the rule as it is now formulated is that the "in exceptional circumstances" test applies, not only to retrospective exercises of the power, but also to prospective exercises of the power.

The vast majority of applications, in which it will be appropriate to make an order to dispense with service, will be for prospective orders sought and granted before the end of the period for service of the claim form.

**Retrospective service dispensing orders**

Under the CPR, applications by claimants for extensions of the period of validity for service of claim forms (as fixed by r.7.5) are subject to stricter control than under the former rules (see r.7.6 and commentary thereon). This has drawn attention to the question whether the court, in circumstances where it would not extend time for service after the period for validity for service had expired, may nevertheless exercise its power to dispense with service.

**6.16.3**

In *Godwin v Swindon BC* [2001] EWCA Civ 1478; [2002] 1 W.L.R. 997, CA, the Court of Appeal held that the discretionary power to dispense with service under the former rule (i.e. r.6.9) should not be used as a means of circumventing and rendering nugatory the statutory limitation provisions and to do what is forbidden by the clear provisions of r.7.6(3). The court should only dispense with service where there is a possibility of effective service, which is capable of being dispensed with. There was no such possibility of effective service where the time for service of the claim form had expired.

In *Anderton v Clwyd CC (No.2)*, op cit, the court concluded that the former rule was sufficiently widely worded to entitle the court to dispense retrospectively with service of the claim form in an appropriate case. The court acknowledged that, as a general rule, applications made for retrospective orders to dispense with service will be caught by the reasoning in the *Godwin* case, but held that there may be exceptional cases in which it is appropriate to dispense with service without undermining the principle in that the court's power to dispense with service should not be used to circumvent the restrictions on granting extensions of time for service as laid down in r.7.6(3) and thereby validate late service of the claim form.

In the *Anderton* case, the court held that this rule as it stood before 1 October 2008, gave the court power to dispense with service of a claim form after the period in which it remained valid for service (in accordance with r.7.5), as well as before; that is to say, the power could be exercised retrospectively as well as prospectively. The court further held that it is only exercisable retrospectively in exceptional circumstances. The court drew a distinction between an application (1) for a retrospective dispensing order made by a claimant who has not even attempted to serve a claim form in time by one of the methods permitted, and (2) for a dispensing order made by a claimant, who has in fact already made an ineffective attempt in time to serve a claim form by one of the methods permitted. In the first instance the claimant still needs to serve the claim form in order to comply with the rules and to bring it to the attention of the defendant; that case is clearly caught by the *Godwin* case principles as an attempt to circumvent the limitations in r.7.6(3) on the grant of extensions of time for service of the claim form. In the second instance (subsequently referred to in reported cases as a "Category 2 case") the claimant's case is not that they need to obtain permission to serve the defendant out of time in accordance with the rules, but rather that they should be excused altogether from the need to prove service of the claim form in accordance with the rules.

In some of the reported cases illustrating a Category 2 case in the context of the dispensing with service rule as it stood before 1 October 2008, the claimant's attempt in time to serve the claim form was ineffective because the method of service adopted did not accord with the methods stipulated by Pt 6 (the "simple mis-service cases"). In other cases the facts were that, although the period of validity expired after the claim form actually had been received by the defendant, the period had expired before the deemed day of service as fixed by the rules (so-called "deemed late service cases"). In *Kuenyehia v International Hospitals Group Ltd* [2006] EWCA Civ 21, the Court of Appeal reviewed the authorities on both varieties of Category 2 case (including *Wilkey v BBC* [2002] EWCA Civ 1561; [2003] 1 W.L.R. 1, CA, and *Cranfield v Bridgegrove Ltd* [2003] EWCA Civ 656; [2003] 1 W.L.R. 2441, CA) and stated that the principles to be derived (and applicable to each variety) are: (1) it requires an exceptional case before the court will exercise its powers to dispense with service where the time limit for service of the claim form in r.7.5 has expired before service was effected in accordance with Pt 6, (2) the power is unlikely to be exercised save where the claimant has either made an ineffective attempt to serve by one of the methods permitted by (what is now) r.6.3, or has served in time in a manner which involved a minor departure from one of those permitted methods of service, (3) it is not possible to give an exhaustive guide to the circumstances in which it would be right to dispense with service of a claim form.

Before 1 October 2008, some of the "simple mis-service cases" variety of Category 2 case were cases in which mis-service had come about as a result of the claimant's non-compliance with the detailed provisions in (what is now) r.6.9(2) (service of claim form where defendant does not give an address for service). It is important to note that, with effect from that date, innovative provisions in paras (3) to (6) of r.6.9 impose duties on claimants to take steps in certain circumstances to ascertain the defendant's current address. It could be argued that, where a claimant did not discharge those duties when they ought, it would be difficult for them to submit subsequently that the circumstances were exceptional and service should be dispensed with under r.6.16.

In *Olafsson v Gissurarson (No.2)* [2008] EWCA Civ 152; [2008] 1 W.L.R. 2016, CA, where the claimant made an ineffective attempt within the relevant time limits to serve a claim form out of the juris-

diction by a method allowed by the service rules, the Court of Appeal held (1) the court's power to dispense with service retrospectively under (what is now) r.6.16 should be limited to truly exceptional cases, (2) there is no reason why the general principles identified in the domestic law cases on that rule should not be applied to the exercise of the court's discretion to dispense with service, whether the purported service is invalid in England or elsewhere (see further commentary following r.6.43).

In *Lonestar Communications Corp LLC v Kaye* [2019] EWHC 3008 (Comm) (Teare J) the court was prepared to find exceptional circumstances. Attempts to serve a defendant in Israel under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters 1965 had failed. Thereafter the claimant had made numerous other attempts to inform the defendant of the proceedings via the defendant's former solicitors and various social media and web sites connected with him. The court was prepared to conclude that the defendant was attempting to avoid service and that there would be no prejudice to him in making the order.

In *Thorne v Lass Salt Garvin* [2009] EWHC 100 (QB). (Wyn Willams J), it was held by the Master and on appeal that service on a solicitor defendant in a claim for professional negligence was not service on a solicitor but on the client in circumstances where the solicitors were unaware of the issue of the claim form and unaware that it was about to be served on them. In those circumstances it was not possible to regard the solicitors as being their own legal representative. Service by fax without prior agreement therefore failed and the court held that although the solicitors would have no doubt acted for themselves had they had prior intimation of the claim this was only one factor and did not amount to exceptional circumstances warranting dispensing with service.

In *Bethel Construction Ltd v Deloitte and Touche* [2011] EWCA Civ 1321 (CA) (see above para.6.15.5) the court held that if, as was the case, the facts could not support a good reason for exercising the discretion under r.6.15 they could not amount to exceptional circumstances under r.6.16. This case was not a simple mis-service in time case, but one where the claim form had deliberately not been served and by inadvertence was not served until after an extension of time to serve granted by the defendants had come to an end.

In *Arkhangelsky v Bank of Saint-Petersburg OJSC* [2013] EWHC 2068 (Comm), Judge Mackie QC (Lawtel AC9701056) the judge refused to exercise the discretion to dispense with service as there were no exceptional circumstances and the claimant could bring its claim as a counterclaim within existing proceedings.

Again, in *Chopra v Bank of Singapore Ltd* [2015] EWHC 1549 (Ch) the court declined to exercise its power to retrospectively dispense with service as the case was not exceptional. The claimants had left service until the last minute and had not served at the place specified by r.6.9(2).It was held that retrospectively dispensing with service would enable them to avoid compliance with r.6.9(2) and establish the court's jurisdiction in circumstances not permitted by the CPR.

It should be noted that the changes made to r.7.5 (with effect from 1 October 2008) are designed (at least in part) to deal with the problems caused by the so-called "deemed late service cases" variety of Category 2 case, and to make it unnecessary for the court to consider in such cases whether the court's power under r.6.16 should be invoked. Under r.7.5 (as amended), a claim form is served within the period of validity provided it is dispatched for service within the period. The fact that the deemed day (see r.6.14) falls after the period has expired does not render the service ineffective (and therefore the claimant is not forced to make an application for a dispensing order for the purpose of maintaining their claim).

### Notice and certificate of service relating to the claim form[1]

**6.17**  **6.17—(1)  Where the court serves a claim form, the court will send to the claimant a notice which will include the date on which the claim form is deemed served under rule 6.14.**

(2)  **Where the claimant serves the claim form, the claimant—**

  (a)  **must file a certificate of service within 21 days of service of the particulars of claim, unless all the defendants to the proceedings have filed acknowledgements of service within that time; and**

  (b)  **may not obtain judgment in default under Part 12 unless a certificate of service has been filed.**

(3)  **The certificate of service must state—**

  (a)  **where rule 6.7, 6.8, 6.9 or 6.10 applies, the category of address at which the claimant believes the claim form has been served; and**

  (b)  **the details set out in the following table.**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

| Method of service | Details to be certified |
|---|---|
| 1. Personal service | Date of personal service. |
| 2. First class post, document exchange or other service which provides for delivery on the next business day | Date of posting, or leaving with, delivering to or collection by the relevant service provider. |
| 3. Delivery of document to or leaving it at a permitted place | Date when the document was delivered to or left at the permitted place. |
| 4. Fax | Date of completion of the transmission. |
| 5. Other electronic method | Date of sending the e-mail or other electronic transmission. |
| 6. Alternative method or place | As required by the court. |

#### Effect of rule (r.6.17)

**6.17.1**    This rule replaced (with amendments) provisions formerly found in two separate rules (r.6.10, which applied to certificates of service generally, and r.6.14, which applied to certificates of service of claim forms particularly, and also to court notices).

Paragraph (2)(a) of this rule is expressly disapplied by r.55.8(6) in proceedings to which r.55.8 applies (hearing of certain possession claims).

For certificates relating to service within the jurisdiction of documents other than claim forms (as defined in r.6.2(c)), see r.6.29.

#### Notice by court

**6.17.2**    Generally, a claim form is served in the jurisdiction, not by the claimant, but by the court (r.6.4). Clearly it is essential that the court should notify the claimant, not only that service has been effected, but also when, so that the claimant can calculate the relevant date for the taking of the next step (which may be, for example, the entry of judgment in default). That is provided for by r.6.17(1).

However, when the court staff fail to complete the endorsement on the court file confirming service of the claim form on the defendant by post, there is no presumption that service has been effected, if the claimant provides evidence to the contrary (*Patel v Smeaton*, 24 October 2000, unrep., CA).

#### Certificate of service and default judgment

**6.17.3**    The failure to comply with the mandatory requirement to file a certificate of service in order to obtain a default judgment under r.12.3 will not render irregular any default judgment actually obtained. In *Henriksen v Pires* [2011] EWCA Civ 1720 Ward LJ said:

> "It is plain in my judgment that CPR 6.17(2) does, while CPR 12.3 does not, make it a requirement for a request to enter a default judgment that the claimant has filed a certificate of service. Rule 6.17(2) creates a free-standing requirement, independent of CPR 12.3, which does not itself require a certificate of service as a pre-condition for a default judgment. It follows that a failure to file a certificate of service will not lead to a mandatory order setting aside the default judgment. This construction of the rule does not mean that a failure to file a certificate of service renders CPR 6.17(2) of no effect ... a failure to file a certificate of service may or may not have a significant impact upon the merits of an application to set aside a default judgment under CPR 13.3(1)(b)(i) or (ii). The judge hearing an application to set aside will undoubtedly approach it with the absolute prohibition against applying for default judgment without first having served a certificate of service well in mind. However, the failure may have occasioned the defendant no meaningful prejudice because it is established by evidence that the claim form was undoubtedly served at a specific time and on a specific date and by a specific means or, as in the present case, that the claimant has filed a document which, while not a certificate of service in form N215, contains all the information required of a certificate of service."

#### Certificate of service

**6.17.4**    For form of certificate of service of a claim form in the jurisdiction, see Form **N215** Certificate of service (see Civil Procedure Forms in the online *Civil Procedure Forms Volume*).

The matters referred to in para.(3) of r.6.17 must be dealt with in the certificate.

A certificate of service is included amongst the documents that must be verified by a statement

of truth (r.22.1(1)(f)). It has been the position since 30 June 2004, that a certificate of service is no longer required to state expressly that the claim form served has not been returned undelivered.

The details required by r.6.17(3) appear to assume that service of the claim form has been effected by, as r.6.3(2) states, "any method permitted under this Part". Where, in the case of a registered company defendant or LLP defendant, the method of service is not by any such method but "by leaving it at or by sending it by post to" a place as permitted by the Companies Act 1985 s.725(1) (Companies Act 2006 s.1139(1)), the requirement imposed by r.6.17(2) still arises, and the details given in the certificate should be adjusted accordingly.

A claimant may obtain judgment in default under Pt 12 only if the conditions in r.12.3 are satisfied. Rule 6.17(2)(b) imposes an additional requirement; see further paras 12.3.1 and 13.3.1 below.

### Time limit for filing certificate of service

**6.17.5**   With effect from 1 October 2008, para.(2)(a) of r.6.17 had the effect of extending the time for filing from (as stated in former r.6.14(2)) "within 7 days of service of the claim form" to "within 21 days of service of the particulars of claim". Further, it also had the effect of providing that a claimant is not required to file a certificate of service under para.(2)(a) where an acknowledgment of service has been filed (as in that circumstance, a certificate would be either unnecessary or otiose). CPR r.10.3(1) states that, as a general rule, the period for filing an acknowledgment of service is, (a) where the defendant is served with a claim form which states that the particulars of claim are to follow, 14 days after service of the particulars of claim and, (b) in any other case, 14 days after service of the claim form.

Where a defendant does not file an acknowledgment of service within the periods stipulated by r.10.3(1) the claimant has a further week in which to file a certificate of service. Rule 7.4(3) states that, where a claimant serves particulars of claim separately from the claim form (as provided by r.7.4(1)(b)), the claimant must within seven days of service file a copy of the particulars. As a consequence of para.(2) of r.6.17, the further requirement in r.7.4(3) to the effect that the claimant should file with the particulars a certificate of service has been excised from that provision.

### Documents to be filed by claimant with certificate of service

**6.17.6**   Where, pursuant to r.6.17(2), the claimant files a certificate of service, the claimant is not required to file, and should not file, with the certificate a further copy of the claim form. The claimant is not required to file, and should not file, with the certificate the particulars of claim (where not included in the claim form) or any document attached to the particulars of claim where that document has already been filed with the court; see PD 6A (Service Within the United Kingdom) para.7.1 (para.6APD.7). (Where particulars of claim are served separately from the claim form, a copy of them should be filed with the court within seven days of service on the defendant; see r.7.4(3).)

## Notification of outcome of postal service by the court[1]

**6.18**   **6.18—(1)   Where—**

  **(a)   the court serves the claim form by post; and**

  **(b)   the claim form is returned to the court,**

**the court will send notification to the claimant that the claim form has been returned.**

  **(2)   The claim form will be deemed to be served unless the address for the defendant on the claim form is not the relevant address for the purpose of rules 6.7 to 6.10.**

### Effect of rule (r.6.18)

**6.18.1**   Paragraph (1) of this rule replaces r.6.11 as it stood before 1 October 2008, insofar as it applied to the service of claim forms.

Where the court has sent the claimant a notice under r.6.18(1), the court will not try to serve the claim form again (r.6.4(4)(a)).

Paragraph (2) is important (it did not appear in former r.6.11). Presumably it is intended that that paragraph takes effect in the circumstances referred to in para.(1). The claim form may be served either by the court or by the claimant (r.6.4(1)). Where it is served by the court the method of service will be service by first class post.

A claimant must include in the claim form an address for service (r.6.6(2)). That address must be that of the defendant's solicitor (where r.6.7 applies), or may be an address given by the defendant as an address at which they may be served (r.6.8), or if the defendant has not given such an address, an address derived from the terms of r.6.9. In proceedings against the Crown the address must be as derived from r.6.10. The claim form may be served either by the court or by the claim-

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

ant (r.6.4(1)). Where it is served by the court the method of service will be service by first class post at the address as given by the claimant in the claim form (an address derived in accordance with rr.6.7 to 6.10). The effect of para.(2) of r.6.18 is to provide that, in these circumstances, the claim form will be deemed to be served, despite the fact that it is returned to the court, unless the address on the claim form is not "the relevant address" for the purposes of rr.6.7 to 6.10.

Receipt of a notice under r.6.18(1) (or r.6.19) should prompt the serving party to consider what further action should be taken (e.g. whether to attempt personal service, to check the address, to apply for an extension of time for service under r.7.6, or (relying on r.6.18(2)), after the appropriate interval, to apply for judgment in default of an acknowledgment of service or defence).

In *Tanir v Tanir* [2015] EWHC 3363 (QB) the operation of the deeming provision in r.6.18(2) was considered. Because in the instant case it was far from certain on the evidence that the court ever had served the claim form by post, it was held that the claimant could not rely on the rule and a default judgment was set aside.

## Notice of non-service by bailiff[1]

**6.19   Where—**                    **6.19**

  **(a)   the court bailiff is to serve a claim form; and**

  **(b)   the bailiff is unable to serve it on the defendant,**

**the court will send notification to the claimant.**

### Effect of rule (r.6.19)

This rule replaced r.6.11A as it stood before the substitution of Pt 6 on 1 October 2008, and is, **6.19.1** in terms, limited to notice of non-service of claim forms (as defined in r.6.2(c)).

Where the court has sent the claimant a notice under r.6.19, the court will not try to serve the claim form again (r.6.4(4)(b)).

### III.   Service of Documents other than the Claim Form in the United Kingdom

## Methods of service[2]

**6.20—(1)   A document may be served by any of the following methods—**  **6.20**

  **(a)   personal service, in accordance with rule 6.22;**

  **(b)   first class post, document exchange or other service which provides for delivery on the next business day, in accordance with Practice Direction 6A;**

  **(c)   leaving it at a place specified in rule 6.23;**

  **(d)   fax or other means of electronic communication in accordance with Practice Direction 6A; or**

  **(e)   any method authorised by the court under rule 6.27.**

 **(2)   A company may be served—**

  **(a)   by any method permitted under this Part; or**

  **(b)   by any of the methods of service permitted under the Companies Act 2006.**

 **(3)   A limited liability partnership may be served—**

  **(a)   by any method permitted under this Part; or**

  **(b)   by any of the methods of service permitted under the Companies Act 2006 as applied with modification by regulations made under the Limited Liability Partnerships Act 2000.**

### Effect of rule (r.6.20)

As the title to Section III indicates, the rules in this Section are confined to the service of documents "other than the claim form". Necessarily, the range of documents to which this rule, and the other rules in Section III of Pt 6, might apply is wide. **6.20.1**

Rule 6.20 plays the same role for service in the jurisdiction and in Scotland and Northern Ireland of documents other than claim forms (as defined in r.6.2(c)) as r.6.3 plays for the service of claim forms. It was amended, with effect from 31 December 2020 (IP completion day), by reg.4 of

---

 [1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

 [2] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2009 (SI 2009/2092), the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390), the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521), to omit reference to service out of the jurisdiction on solicitors, European lawyers and parties.

The rule applies generally to the service of non-claim form documents in cases where the claim form is served within the United Kingdom. In many CPR provisions particular methods of service for such documents are stipulated; often in provisions stating that the document may be served by personal service or by a particular method alternative thereto (see further commentary on r.6.22).

Provisions about methods of service for service of non-claim form documents out of the jurisdiction in proceedings where the claim form is served out of the jurisdiction, including in Scotland or Northern Ireland, are found in Section IV (especially in rr.6.40 and 6.42). The combined effect of these provisions is that after a claim form has been served in Scotland or Northern Ireland, other documents may be served there by CPR methods and deemed served in accordance with r.6.26.

For the definition of "business day", see. r.6.2.

In civil proceedings by or against the Crown documents in the proceedings required to be served on the Crown must be served in accordance with this rule (PD 66—Crown Proceedings para.2.1, see para.66PD.2).

### "first class post, document exchange or other service" (r.6.20(1)(b))

**6.20.2**     Paragraph (b) of r.6.20(1) is supplemented by PD 6A (Service Within the United Kingdom) paras 2 and 3 (see para.6APD.2).

Rule 6.20 applies to the service of documents other than a claim form. Paragraph (1)(a) of that rule states that a document may be served by first class post. Rule 6.9 provides for the service of claim forms and in that rule it is expressly provided that, where a claim is served by post on an individual defendant, the place of service will be that individual's "usual or last known residence". There is no such express provision in r.6.20, but it has become accepted that it is right to apply it to service of other documents (e.g. a witness summons) by analogy (*Clavis Liberty Fund 1 LP v Young* [2015] UKUT 72 (TCC); [2015] 1 W.L.R. 2949 (Warren J) at para.21; *Libyan Investment Authority v Société Générale* [2017] EWHC 781 (Comm) (Teare J) at para.58). See further para.6.9.7 above.

In *Libyan Investment Authority v Société Générale*, op cit, on 3 January 2017, some of several defendants (D) issued a witness summons for purpose of securing attendance of an individual (X) at a trial, and on 15 February 2017, sent it by first class post to the address of a London flat of which X was leaseholder since January 2014 and which X vacated on 18 February 2017, mid-way through the period of two-month's notice which his landlord had been required by statute to grant him for the termination of the lease. Earlier, on 24 December 2016, X had left London for Paris and subsequently travelled elsewhere abroad, returning to Paris on 3 March 2017. On 28 February 2017, in X's absence, the court declared that the witness summons had been validly served by post. Subsequently, a judge dismissed X's application to set aside service of the summons. In doing so the judge (1) found that X was resident within the jurisdiction until 18 February 2017, and (2) rejected X's submission that, as he was not physically within the jurisdiction when the summons was issued (on 15 February) and when it was deemed to be served (17 February), there could not be any valid service.

For further information on this method of service, see the commentary on r.6.3(1)(b) above.

### "electronic communication" (r.6.20(1)(d))

**6.20.3**     Paragraph (d) of r.6.20(1) is supplemented by PD 6A (Service Within the United Kingdom) paras 4.1 to 4.3 (as is para.(d) of r.6.3(1)); see para.6APD.4). For obvious reasons, para.4.1 is expressed as subject to paras (5) and (6) of r.6.23 (Address for service)).

Paragraph 4.1 is slightly different to the provision it replaced. The explanation is as follows. The former provision was para.3.1 of PD (Service). That paragraph stated that, as a condition for use of methods of service involving "electronic means" (in the circumstances in which they are permitted by the Rules), the party to be served or their "legal representative" must have "indicated in writing to the party serving" their willingness to accept service by the method. Such indication could be given expressly, but para.3.1(2)(b) stated that it would be implied where the party to be served set out in a statement of case or a response to a claim filed with the court a fax number, an email address or an electronic identification. Further, para.3.1(2)(a) stated that an indication of willingness to accept service by fax, but not by email or other electronic method, would be implied from the fact that a fax number is set out on the writing paper of the "legal representative" of the party who is to be served. Paragraph 4.1. is different in two respects. First, throughout the provision "legal representative" is replaced by "solicitor", by which is meant the solicitor "acting for" the party to be served (presumably retained by and acting for the party in the proceedings in which the document is to be served and not in related proceedings, see *Hart Investments Ltd v Fidler* [2006] EWHC 2857 (TCC); [2007] B.L.R. 30). Secondly, the restriction (by para.3.1(2)(b)) of para.3.1(2)(a) to service by fax has been removed and its effect extended to an email address set out on the solicitor's writing paper, but only where it is expressly stated there that it may be used for service. As to deemed willingness to accept service by fax, see further para.6.23.2 below.

Paragraph 4.2 states that, where a party intends to serve a document by electronic means (other than by fax) they must first request from the intended recipient the information referred to in that paragraph (specification of format, etc.).

Paragraph 4.3 states that, where a document is served by electronic means, the party serving the

document need not in addition send a hard copy. However, unless there has been acknowledgment of receipt of the electronic version, sending a hard copy is prudent.

**Service of claim form by electronic method (r.6.3(1)(b))**

**6.20.4** Service by electronic means is a method of service permitted by the rules, not only for the service of documents in proceedings other than the claim form (as r.6.20(1)(d) states), but also for the service within the jurisdiction of a claim form (see r.6.3(1)(b)). Necessarily, a claim form received by a defendant when it is served by an electronic method is not a document issued by the court (as in the case of personal service or service by first class post) but a copy of it (*Cranfield v Bridgegrove Ltd* [2003] EWCA Civ 656; [2003] 1 W.L.R. 2441, CA, at para.87; see further para.6.3.14). Much of what is contained in paras 4.1 and 4.2 of PD 6A is clearly directed at the service of "other documents". As there are traps for the unwary in the provisions for service by electronic means and scope for misunderstandings arising between putative parties, and as mis-service of a claim form can have serious consequences (not associated with the mis-service of other documents), claimants should scrutinise those paragraphs carefully before adopting this method of service for service of a claim form. In *Kuenyehia v International Hospitals Group Ltd* [2006] EWCA Civ 21, it was held that the failure of the claimant's solicitor to obtain from the defendant the required written consent before attempting to effect service of the claim form by fax rendered the service invalid and rejected the submission that, in the circumstances, the court should exercise its power under (what is now) r.6.16 to dispense with service. However, in *Integral Petroleum SA v SCU-Finanz AG* [2014] EWHC 702 (Comm). Popplewell J, relying on the decision of the House of Lords in *Phillips v Nussberger* (reported sub nom *Phillips v Symes (No.3)* [2008] 1 W.L.R. 180 held that a failure to fulfill the conditions in PD 6A (because the email address of the EEA lawyer, which was permissible under the rules applicable at the time, to whom the Particulars of Claim was transmitted was not contained in the Acknowledgment of Service nor was it on the writing paper of the lawyer and he had not indicated in writing that an email address might be used for service) was an error of procedure in serving the Particulars of Claim by email and was a failure to comply with a rule or Practice Direction which fell within r.3.10. It should be noted, however, that while the view of the H of L that the failure of procedure in the *Phillips* case was within r.3.10 was very powerful obiter (the decision was in fact about whether in the circumstances the first instance judge was right to invoke not r.3.10 but the then r.6.9 (now r.6.16) to dispense with service), the judge in *Integral Petroleum*, had difficulty with the view that an error of procedure in r.3.10 could encompass circumstances where there is no purported service of any document of any kind. He reinforced this by stating:

> "I can envisage circumstances in which purported service by a method which is not permitted by the rules at all is sufficiently distant from what is required by the rules as arguably to fall outside CPR r.3.10. Moreover I should not be thought to be endorsing any proposition that CPR r.3.10 can be used as a matter of course to circumvent service out of the jurisdiction on a firm of solicitors or other lawyers as a matter of practical convenience without seeking an order for service by an alternative method"

The decision in *Integral Petroleum SA*, together with the dicta in the *Phillips* case (see in particular Lord Brown at para.33) suggest that the question to be asked is whether the attempt to serve the claim form or other document was or was not ineffective so that it could be said that there has been an "error of procedure" within r.3.10(a) which does not invalidate the step taken in the proceedings, that is, in this case, attempted service. Read in that way, r.3.10 prevents triumph of form over substance and does not readily apply where there has been no attempt at a procedural step or such step is one which is not permitted by or within the rules at all.

Particular care should be taken in noting the differences between what may be taken as a sufficient indication in writing of a willingness to accept service given by, on the one hand, the defendant, and on the other, the defendant's solicitor (in those circumstances where the solicitor is authorised to accept service). For example, it should be noted that a putative defendant's inclusion in their business letterhead of a fax number is not an indication in writing of their willingness to accept service of a claim form by that electronic method (*Molins Plc v GD SpA* [2000] 1 W.L.R. 1741, CA).

In *Brown v Innovatorone Plc* [2009] EWHC 1376 (Comm); [2010] 2 All E.R. (Comm) 80; [2010] C.P. Rep. 2 (Andrew Smith J), where questions arose as to the efficacy of the service of a claim form by fax on a firm of solicitors who were defendants in the proceedings, it was held that para 4.1 of PD 6A, insofar as it applies to service by fax or other electronic means on solicitors, is restricted to those circumstances where, by operation of r.6.7 (Service of the claim form on a solicitor), the claim form must be served on the solicitors.

For deemed day of service of claim form, where served by fax or by other electronic method, see rr.6.14, 7.5(1) and 6.40(2).

**Service on company or limited liability partnership (r.6.20(2) and (3))**

**6.20.5** See commentary on r.6.3(2) and (3) above.

**Service on party in Scotland or Northern Ireland**

**6.20.6** Section IV contains rules dealing with the service of documents in proceedings where the claim form is served out of the jurisdiction. In that Section, r.6.40(2) states that, where a party serves a

document in proceedings on a party in Scotland or Northern Ireland it must be served by a method permitted by Section III, that is to say, by a method referred to in rr.6.20 et seq. See further commentary following r.6.40.

### Who is to serve[1]

**6.21**   **6.21—(1)  A party to proceedings will serve a document which that party has prepared except where—**

> **(a)   a rule or practice direction provides that the court will serve the document; or**
>
> **(b)   the court orders otherwise.**

**(2)   The court will serve a document which it has prepared except where—**

> **(a)   a rule or practice direction provides that a party must serve the document;**
>
> **(b)   the party on whose behalf the document is to be served notifies the court that the party wishes to serve it; or**
>
> **(c)   the court orders otherwise.**

**(3)   Where the court is to serve a document, it is for the court to decide which method of service is to be used.**

**(4)   Where the court is to serve a document prepared by a party, that party must provide a copy for the court and for each party to be served.**

**Effect of rule (r.6.21)**

**6.21.1**    This rule plays the same role for service in the United Kingdom of documents other than claim forms (as defined in r.6.2(c)) as r.6.4 plays for the service of claim forms.

The rule starts with the assumption that (subject to exceptions) a party who has prepared a non-claim form document will serve it.

Paragraph 4.3 of PD 8C (Alternative Procedure for Statutory Review of Certain Planning Matters) states that, subject to exceptions, in proceedings to which that Practice Direction applies the Administrative Court "will not serve documents" and that service must be effected by the parties; the exceptions apply to documents in the form of court orders and reasons thereof (see paras 7.3 and 10.1 of PD 8C).

Where the court serves a document to which this rule applies, the method will normally be service by first class post or its equivalent; see PD 6A (Service Within the United Kingdom) para.8.1 (see para.6APD.8). Where the court delivers a defence to a claimant or notifies a claimant that a defendant has filed an acknowledgment of service, the court will also deliver a copy of any notice of funding (Form **N251**) that has been filed if it was filed as the same time as the defence or acknowledgment of service and copies of it were provided for service (ibid. para.8.2) The court will not do the photocopying. (Failure to notify the other party of a funding arrangement may mean that all or part of a success fee or insurance premium will not be recoverable.)

Where a document to which this rule applies served by the court is returned, the court is not required by the rule to send notification to any party affected (cf. r.6.18).

See further, commentary following r.6.4 above.

### Personal service[2]

**6.22**   **6.22—(1)  Where required by another Part, any other enactment, a practice direction or a court order, a document must be served personally.**

**(2)   In other cases, a document may be served personally except—**

> **(a)   where the party to be served has given an address for service under rule 6.23; or**
>
> **(b)   in any proceedings by or against the Crown.**

**(3)   A document may be served personally as if the document were a claim form in accordance with rule 6.5(3).**

**(For service out of the jurisdiction see rules 6.40 to 6.47.)**

**Effect of rule (r.6.22)**

**6.22.1**    For personal service within the jurisdiction of claim forms, see r.6.5 above. For commentary on certain matters common to both rules, see commentary on r.6.5, above.

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

[2] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2011 (SI 2011/88).

The mandatory exceptions stipulated in para.(2) accord with those in r.6.5.

Personal service is one of the "methods of service" for the service of documents (other than claim forms) listed in r.6.20(1). An example of provisions in the CPR requiring service by the method of personal service of such documents is r.71.3 (expressed as subject to the court's power to dispense with service); note also r.65.3 (service of applications for housing injunctions), PD 25A (Interim Injunctions) para.7.4 (service of search orders) (see para.25APD.7). In Pt 81 (Applications and proceedings in relation to contempt of court) numerous rules provide for personal service of documents; see rr.81.6, 81.7(1) and (2), 81.15(5), 81.22, 81.23(1), 81.26(4), 81.34(2) and 81.35. Where those provisions take effect it is commonly further provided that, by rule or by court order, either that service may be dispensed with or that it may effected by an alternative method; see rr.81.8, 81.15(6), 81.24 and 81.26(5).

Numerous provisions in the CPR state that particular documents may be served personally or by some other stipulated method. An example is: r.62.18(7), Sch.1 RSC Ord.115 r.17.

## Address for service to be given after proceedings are started[1]

**6.23—(1)  A party to proceedings must give an address at which that party may be served with documents relating to those proceedings. The address must include a full postcode unless the court orders otherwise.**

**6.23**

**(Paragraph 2.4 of Practice Direction 16 contains provisions about postcodes.)**

**(2)  Except where any other rule or practice direction makes different provision, a party's address for service must be—**

> **(a)   the business address within the United Kingdom of a solicitor acting for the party to be served; or**
>
> **(b)   [Omitted]**
>
> **(c)   where there is no solicitor acting for the party—**
>
>> **(i)   an address within the United Kingdom at which the party resides or carries on business;**
>>
>> **(ii)   [Omitted]**

**(For Production Centre Claims see paragraph 2.3(7) and (7A) of Practice Direction 7C; for Money Claims Online see paragraph 4(3A) and (6) of Practice Direction 7E, and for Possession Claims Online see paragraph 5.1(3A) and (4) of Practice Direction 55B.)**

**(3)  Where none of sub-paragraphs (2)(a) or (c) applies, the party must give an address for service within the United Kingdom.**

**(Part 42 contains provisions about change of solicitor. Rule 42.1 provides that where a party gives the business address of a solicitor as that party's address for service, that solicitor will be considered to be acting for the party until the provisions of Part 42 are complied with.)**

**(4)  Subject to the provisions of Section IV of this Part (where applicable), any document to be served in proceedings must be sent or transmitted to, or left at, the party's address for service under paragraph (2) or (3) unless it is to be served personally or the court orders otherwise.**

**(5)  Where, in accordance with Practice Direction 6A, a party indicates or is deemed to have indicated that they will accept service by fax, the fax number given by that party must be at the address for service.**

**(6)  Where a party indicates in accordance with the Practice Direction 6A that they will accept service by electronic means other than fax, the e-mail address or electronic identification given by that party will be deemed to be at the address for service.**

**(7)  In proceedings by or against the Crown, service of any document in the proceedings on the Crown must be effected in the same manner prescribed in rule 6.10 as if the document were a claim form.**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390), the Civil Procedure (Amendment) Rules 2011 (SI 2011/88), the Civil Procedure (Amendment No.2) Rules 2011 (SI 2011/1979) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

**(8)  This rule does not apply where an order made by the court under rule 6.27 (service by an alternative method or at an alternative place) specifies where a document may be served.**

**(For service out of the jurisdiction see rules 6.40 to 6.47.)**

### Effect of rule (r.6.23)

**6.23.1**    Much of former r.6.5 prior to 1 October 2008, in so far as its provisions were relevant to parties' addresses for service of documents other than claim forms, is re-enacted in this rule. In the previous rule, however, an address for service provided by a party had to be a residential or business address "within the jurisdiction". In contrast, until 31 December 2020 (IP completion day), r.6.5(2) enabled a party to give such an address or the business address of a solicitor "within the United Kingdom or any other EEA state" or the business address of a European Lawyer in an EEA state. The rule was amended by reg.4 of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521), with effect from 31 December 2020 (IP completion day), to remove references to European lawyers and EEA States, but it still allows service within the United Kingdom rather than "within the jurisdiction". This relieves defendants with a residential or business address in Scotland or Northern Ireland from the need to find an address within the jurisdiction as a post box.

It should be noted that where a solicitor's address is not given under r.6.23(2)(a) the address must be an address within the United Kingdom at which the party resides or carries on business. The precise wording of this rule is important because on occasions defendants attempt to give a PO box address as an address for service. However, a person cannot "reside" at or "carry on business" at a PO box although such a business might be carried on by using such a PO box address. In the circumstances a PO box would not be a valid address for service under that rule.

The former r.6.5(6) anticipated that a party might fail to provide an address for service of documents and explained how service should be effected in that circumstance. In relation to the service of claim forms, that provision is in effect replicated in r.6.9(2), but it is not replicated in r.6.23.

Cases may arise in which a party (often an unrepresented party) does not adequately comply with r.6.23(1), or does not notify changes of address (as required by r.6.24), or, in any event, in the course of pre-trial proceedings persistently asserts, either rightly or wrongly, that they have not received documents required to be served on them by the court or by other parties (e.g. application notices, notices of hearings, copies of orders, amended pleadings, witness statements, etc.). In *E Group Ltd v Bay Baker* [2008] EWHC 2349 (TCC), for the purpose of preventing further delays and the increase of the claimant's costs, the court ordered that an address provided by the defendant at a particular hearing should stand forthwith as the defendant's proper address for service (such address not to be disclosed to a third party without an order of the court). In the case of a failure to provide an address for service the court could be asked either to order that service at an alternative place or by an alternative method be adopted or could make an order striking out the statement of case of the party in default unless an address was provided.

For address for service of claim forms (as defined in r.6.2(c)), as distinct from other documents provided for by this rule, see rr.6.7(1) and (2) and 6.8.

### Brexit transitional and saving provisions

**6.23.2**    Regulations 18(2)(a) and (b) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) provide transitional and saving provisions concerning service of documents, where a party to proceedings has before 31 December 2020 (IP completion day) pursuant to r.6.23 (as then in force) given as the address for service a business address in an EEA State, outside of the UK, of a solicitor acting for that party or such an address in any such EEA state of a European lawyer nominated to accept service of documents. The provisions provide that in such circumstances:

"(a)    that address will continue on and after IP completion day to be that party's address for service unless and until that party elects to change the address for service; and

(b)    if that party elects on or after IP completion day to change the address for service, the new address for service may be any address for service permitted by rule 6.23 as in force immediately before IP completion day."

### Address for service where service by means of electronic communication

**6.23.3**    Express provision is made in r.6.23(5) and (6) for the service of documents by the method of service permitted by r.6.20(1)(d), that is to say, "by fax or by other means of electronic communication". Neither of these provisions alters the requirement that the party, where a solicitor's address is not given, must if he has one, give an address within the United Kingdom at which the party resides or carries on business, that is, a physical address. To comply with the rule a party may not give just a fax number or email address for example as the actual address for service although the party may be willing to be served by those means. Where the party has indicated that it will accept service by transmission of a fax, the rule requires that the fax number given must be at the address for service. In a case in which the party has indicated a willingness to be served by electronic means other than fax, the email address or electronic identification given by that party will be deemed to be at the address for service.

Rules 6.23(5) and (6) are supplemented by para.4 of PD 6A (Service Within the United Kingdom)

(see para.6APD.4). See further commentary following r.6.20 (especially para.6.20.3). (And see *Integral Petroleum SA v SCU-Finanz AG* [2014] EWHC 702 (Comm), Popplewell J, in respect of a failure to comply with the conditions of para.4.)

## Change of address for service[1]

**6.24   Where the address for service of a party changes, that party must give notice in writing of the change as soon as it has taken place to the court and every other party.**   **6.24**

### Effect of rule (r.6.24)

In terms, this rule is similar to para.7 of PD (Service), as it stood before 1 October 2008. It is conceivable that the address for service given by a party may be that of the party's legal representative. In that circumstance, the party's duty to give notice extends to giving notice of any change of address of the legal representative.   **6.24.1**

## Service on children and protected parties[2]

**6.25—(1)   An application for an order appointing a litigation friend where a child or protected party has no litigation friend must be served in accordance with rule 21.8(1) and (2).**   **6.25**

**(2)   Any other document which would otherwise be served on a child or a protected party must be served on the litigation friend conducting the proceedings on behalf of the child or protected party.**

**(3)   The court may make an order permitting a document to be served on the child or protected party or on some person other than the person specified in rule 21.8 or paragraph (2).**

**(4)   An application for an order under paragraph (3) may be made without notice.**

**(5)   The court may order that, although a document has been sent or given to someone other than the person specified in rule 21.8 or paragraph (2), the document is to be treated as if it had been properly served.**

**(6)   This rule does not apply where the court has made an order under rule 21.2(3) allowing a child to conduct proceedings without a litigation friend.**

### Effect of rule (r.6.25)

This rule replaces former r.6.6(1) as it applied to the service of documents in proceedings other than claim forms. (Insofar as that provision applied to service of claim forms, it has been replaced by r.6.13.)   **6.25.1**

CPR Pt 21 contains special provisions which apply in proceedings involving children (a person under 18) and protected parties (a party, or intended party, who lacks capacity to conduct the proceedings); in particular, rules providing for the appointment of a litigation friend. Paragraphs (1) and (2) of r.21.8 deal with the service of application notices for the appointment of litigation friends by court order. Where such an application is made before proceedings are commenced it could perhaps be argued that the notice is, by definition, a claim form (see r.6.2(c)), and that service thereof is governed, not by the provisions of Section III of Pt 6, but by those in Section II. However, it seems that that is not intended and, as a practical matter, nothing turns on the distinction.

## Deemed service[3]

**6.26   A document, other than a claim form, served within the United Kingdom in accordance with these Rules or any relevant practice direction is deemed to be served on the day shown in the following table—**   **6.26**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).
[2] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).
[3] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390) and the Civil Procedure (Amendment) Rules 2011 (SI 2011/88).

| Method of service | Deemed date of service |
|---|---|
| **1. First class post (or other service which provides for delivery on the next business day)** | **The second day after it was posted, left with, delivered to or collected by the relevant service provider provided that day is a business day; or if not, the next business day after that day.** |
| **2. Document exchange** | **The second day after it was left with, delivered to or collected by the relevant service provider provided that day is a business day; or if not, the next business day after that day.** |
| **3. Delivering the document to or leaving it at a permitted address** | **If it is delivered to or left at the permitted address on a business day before 4.30p.m., on that day; or in any other case, on the next business day after that day.** |
| **4. Fax** | **If the transmission of the fax is completed on a business day before 4.30p.m., on that day; or in any other case, on the next business day after the day on which it was transmitted.** |
| **5. Other electronic method** | **If the e-mail or other electronic transmission is sent on a business day before 4.30p.m., on that day; or in any other case, on the next business day after the day on which it was sent.** |
| **6. Personal service** | **If the document is served personally before 4.30p.m. on a business day, on that day; or in any other case, on the next business day after that day.** |

**(Paragraphs 10.1 to 10.7 of Practice Direction 6A contain examples of how the date of deemed service is calculated.)**

**Effect of rule (r.6.26)**

**6.26.1**   This rule deals with deemed service of documents other than claim forms (as defined in r.6.2(c)). Rule 6.14 deals with deemed service of claim forms. (Rule 6.14 is a much simpler provision than this rule, as it is able to incorporate by reference the "relevant steps" in new r.7.5(1).) It deems service in the UK from April 2011. This is logical as CPR methods of service must be used to serve the claim form in Scotland and Northern Ireland (r.6.40(2)) and service of claims forms is also deemed in those circumstances as from April 2011 (r.6.14).

In r.6.26, the calculations of the deemed day of service for all six methods of service are dealt with in tabular form. (The description of each method reflects paras (a) to (d) of r.6.20(1).) (Though the text of r.6.26 speaks of "the day" on which a document is deemed to be served, the column heading in the table speaks of "date"; it is submitted that "day" is to be preferred to "date".) As the signpost at the end of the rule indicates, worked examples showing how the day of deemed service is to be calculated are set out in PD 6A (Service Within the United Kingdom) para.10 (see para.6APD.10).

For definition of "business day", see. r.6.2.

There are two significant features of this rule. First, it provides that the deemed day of service should always be, whatever the method of service adopted, a business day. Secondly, it provides a uniform method for calculating the deemed day in cases where service is by fax or by another electronic method. The result is that unjustifiable anomalies in the calculation of the deemed day are removed.

In relation to four of the methods of service (nos. 3 to 6 in the table) for documents to which this rule applies, the time of "before 4.30 pm" on a business day may be critical to the calculation of the deemed day of service. Before 1 October 2008, "before 4 pm", or in the case of personal service, "before 5.00 pm", could be critical to the calculation of the deemed day of service for claim

forms. Since that date, the rules applicable to the calculation of the deemed day of service for claim forms (r.6.14 and r.7.5(1)) do not, in relation to any particular method of service, turn on the time of day before which the "step required" to dispatch the claim form for service was completed.

Note, however, that where the period for service is statutory and the statute does not provide for the CPR to apply, that limit cannot be cut down by CPR provisions as to deemed service. See the notes to r.6.28.

For further commentary, relevant both to this rule and to r.6.14 (Deemed service of claim form), see commentary following r.6.14.

## Service by an alternative method or at an alternative place[1]

**6.27   Rule 6.15 applies to any document in the proceedings as it applies to a claim form and reference to the defendant in that rule is modified accordingly.**

### Effect of rule (r.6.27)

In combination, this rule and r.6.15 and r.6.26 replace r.6.8 as it stood before 1 October 2008.   **6.27.1**

In Section II of Pt 6, r.6.15 contains provisions dealing with the service of the claim form (as defined by r.6.2(c)) by an alternative method of service or at an alternative place. In that rule, alternative means alternative to the methods and places stipulated or permitted directly or indirectly by other provisions in Section II. Rules dealing with methods of service and places for service of documents in proceedings, that is to say, documents other than claim forms, are found elsewhere in Section III of Pt 6. By the device of incorporating r.6.15 by reference, this rule gives the court power to order the service of such documents by an alternative method or at alternative place to those otherwise permitted where it appears to the court that there is "good reason" to do so. The power thus incorporated includes the power to order that steps already taken by a method of service not permitted by the rules to bring a document (e.g. particulars of claim where they are not contained in and served with the claim form) to the attention of the other party is good service.

An application for an alternative method service order may be made without notice and must be supported by evidence (r.6.15(3)). The supporting evidence must deal with the matters referred to and explained (with examples) in para.9 of PD 6A (Service Within the United Kingdom) (see para.6APD.9).

See further commentary following r.6.15 (Service of the claim form by an alternative method or at an alternative place) and in particular the decision in *Andrew Brown v Innovatorone* [2009] EWHC 1376 (Comm) in relation to application of retrospective orders

In *NPV v QEL* [2018] EWHC 703 (QB) Nicklin J permitted service of an application and injunction under the Protection from Harassment Act 1997 by text message as "the only practical alternative means presently available to the Claimant."

## Power to dispense with service[2]

**6.28—(1)   The court may dispense with service of any document which is to be served in the proceedings.**

**(2)   An application for an order to dispense with service must be supported by evidence and may be made without notice.**

### Effect of rule (r.6.28)

In terms, this rule is similar to r.6.9 as it stood before the substitution of Pt 6 on 1 October   **6.28.1**
2008, insofar as it applied to the service documents other than claim forms. For the power to dispense with service of claim forms, see r.6.16 above.

The rule gives the court an unfettered discretion, whereas under r.6.16 the power to dispense with service of a claim form (whether prospectively or retrospectively) may be granted "in exceptional circumstances".

Unlike r.6.16 this rule does not explicitly refer to exceptional circumstances. In *Lonestar Communications Corp LLC v Kaye* [2019] EWHC 3008 (Comm) the judge noted that the claimant was prepared to proceed on the basis that it also had to show exceptional circumstances under r.6.28 and found that exceptional circumstances existed. It is suggested that this approach is not correct and there are good reasons why dispensing with the service of originating process, such as a claim form, should require exceptional circumstances to be established and a lesser standard should apply to documents served in the course of proceedings, see generally paras 6.2.3 and 6.3.1.

On the question whether an order dispensing with service of a document may be made under r.6.28 in circumstance where the normal method of service would be that provided for by r.6.44 (Serve of claim form or other document on a State), see para.6.44.1.

Note that r.6.1(a) states that the rules as to service apply except where "any other enactment ...

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).
[2] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

makes different provision", so that the above discretion may be curtailed or overridden by statute. For example, before rules and directions regulating appeals to the High Court under the Extradition Act 2003 were transferred from the CPR to the Criminal Procedure Rules 2014, para.21.1(3)(d) of PD 52D (formerly para.22.6A(3)(d) of PD 52) required an appellant in such an appeal to serve on the CPS within a specified time a copy of the appellant's notice filed in the court. In *Mucelli v Government of Albania and Moulai v Deputy Public Prosecutor in Creteil, France* [2009] UKHL 2; [2009] 1 W.L.R. 276, HL (conjoined appeals) the House of Lords held that para.22.6A reflected the time limits imposed by s.26(4) and s.103(9) of the Extradition Act 2003 and that a notice of appeal must be served as well as filed within the time limits fixed by those provisions. The power of the court under the CPR to extend time for the taking of any step (r.3.1(2)(a)), to make any order remedying any error of procedure (r.3.10) or to dispense with service of documents (now under this rule in Pt 6), cannot be invoked to extend a statutory time limit or to avoid service required by statute unless the statute so provides. In the conjoined appeal of *Moulai v Deputy Public Prosecutor in Creteil, France* the House also held that where a statutory provision such as s.26(4) imposes a time limit for the serving of a notice of appeal, that limit cannot be cut down by CPR provisions as to deemed service, for example the rule deeming a fax sent after 4.30 pm to be served on the next business day. In that case the Divisional Court ruled that by r.3.1(2)(a) or r.3.10, the faxed notice could be deemed to have been served earlier than in accordance with the CPR (which would have deemed service of a fax sent on the last day of the statutory period for service to have been effected on the next day) in order to hold that the notice had been served within the statutory time limit, or that service could be dispensed with. The House disagreed with both propositions and held that (1) the server of the document can rely on proof of actual service by midnight on the last day of the statutory period by whatever means and also (2) that in any event, where such a statutory provision applies and the recipient's office is closed on the whole of the last day of the service period, it will be validly served if it is served on the next business day (confirming *Pritam Kaur v S Russell & Sons Ltd* [1973] Q.B. 336; [1973] 2 W.L.R. 147; [1973] 1 All E.R. 617). Also see *General Dynamics UK Ltd v Libya* [2019] EWCA Civ 1110 where the Court of Appeal held that the court could dispense with service of an order granting permission to enforce an arbitration award, despite the terms of s.12 of the State Immunity Act 1978 (see para.6.44.1 below).

In practice the power granted by the rule is useful for dispensing with the re-service of a document; for example, where a document is attached to an application to amend which is successful, or the recipient has already been given a copy, service of the amended document may be dispensed with.

See the commentary on r.6.16.

### Certificate of service[1]

**6.29**   **6.29   Where a rule, practice direction or court order requires a certificate of service, the certificate must state the details required by the following table—**

| *Method of service* | *Details to be certified* |
| --- | --- |
| 1. Personal service | Date and time of personal service. |
| 2. First class post, document exchange or other service which provides for delivery on the next business day | Date of posting, or leaving with, delivering to or collection by the relevant service provider. |
| 3. Delivery of document to or leaving it at a permitted place | Date and time of when the document was delivered to or left at the permitted place. |
| 4. Fax | Date and time of completion of the transmission. |
| 5. Other electronic method | Date and time of sending e-mail or other electronic transmission. |
| 6. Alternative method or place permitted by the court | As required by the court. |

**Effect of rule (r.6.29)**

**6.29.1**   Express CPR provisions requiring certificates of service of documents other than claim forms are rare. One example is r.55.8(6), which requires the production at the hearing of certain posses-

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

sion proceedings of a certificate of service of a document in the form particulars of claim (such document not being a claim form within Section II of Pt 6).

Rule 22.1(1)(f) and PD 22 (Statements of Truth) para.1.1(6) state that a certificate of service must be verified by a statement of truth (see para.22PD.1).

For certificates of service of claim forms, see r.6.17 above.

## IV.  Service of the Claim Form and other Documents out of the Jurisdiction

## Scope of this Section[1]

**6.30    This Section contains rules about—**                                    **6.30**

   **(a)    service of the claim form and other documents out of the jurisdiction;**

   **(b)    when the permission of the court is required and how to obtain that permission; and**

   **(c)    the procedure for service.**

**("Jurisdiction" is defined in rule 2.3(1).)**

### Brexit transitional and saving provisions

Before the completion of the UK's withdrawal from the EU on 31 December 2020 (IP comple-   **6.30.1** tion day), the claimant did not require permission to serve a claim form on a defendant outside the jurisdiction where the court's power to hear the case was derived from the Judgments Regulation or the Brussels or Lugano Conventions (broadly, where the defendant is domiciled in an EU Member State or in Iceland, Norway or Switzerland), or the 2005 Hague Convention on Choice of Court Agreements (broadly, where there was an exclusive jurisdiction clause in favour of the English court entered into on or after 1 October 2015), subject in each case to the exclusions contained in r.6.33.

With effect from IP completion day, the Civil Jurisdiction and Judgments (Amendment) (EU Exit) Regulations 2019 (SI 2019/479) disapplied the Judgments Regulation (reg.89) and the Brussels and Lugano Conventions (reg.82) (and, at reg.26, introduced separate provision in relation to consumer and employment matters). Section IV of CPR Pt 6 underwent substantial revisions from IP completion day to reflect these changes (see reg.4(15) et seq of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521), as amended by the Civil, Criminal and Family Justice (Amendment) (EU Exit) Regulations 2020 (SI 2020/1493)).

The Civil Jurisdiction and Judgments (Amendment) (EU Exit) Regulations 2019 (SI 2019/479) contains saving provisions (at regs 92 and 93A) which, in effect, provide for the pre-Brexit regime, including the Judgments Regulation and the Brussels and Lugano Conventions, to continue to apply to determine questions of jurisdiction in proceedings of which the court was seised before IP completion day and which are not concluded before that day. Regulation 18(3A) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) (inserted by reg.9(3) of the Civil, Criminal and Family Justice (Amendment) (EU Exit) Regulations 2020 (SI 2020/1493)) contains corresponding transitional and saving provisions in respect of the service out provisions where the court's jurisdiction is based on the Judgments Regulation, but there are no equivalent provisions where the court's jurisdiction is based on the Brussels or Lugano Conventions (see para.6.33.1 below).

Where proceedings are commenced after IP completion day, the same rules that apply to service out in other cases (broadly speaking, where proceedings are to be served in non-EU countries) will apply. See rr.6.33, 6.36 and 6.37 and the commentary thereto.

The position will change if the UK is able to accede to the Lugano Convention after IP completion day. The UK Government submitted its application to accede to the Lugano Convention on 8 April 2020. It previously announced, on 28 January 2020, that it had received statements of support from Norway, Iceland and Switzerland for its intent to accede, but agreement is also required from the EU and Denmark (which has an "opt-out" of justice and home affairs under relevant EU treaties, but is a contracting party to the Convention). As at the time of writing, no such agreement has been forthcoming.

One aspect of the previous regime which will be preserved in any event is the 2005 Hague Convention on Choice of Court Agreements (r.6.33(2B) (see para.6.33.3)). The UK was initially party to the 2005 Hague Convention by virtue of its EU membership, which ceased on 31 January 2020, but during the implementation period the UK continued to be treated as an EU member state for these purposes. The UK then acceded in its own right as from 1 January 2021. Section 1(2) of the Private International Law (Implementation of Agreements) Act 2020 provides that the 2005 Hague Convention shall have the force of law in the UK (by introducing a new s.3D to the Civil Jurisdiction and Judgments Act 1982). Paragraph 7 of Sch.5 to the 2020 Act provides that, for the purposes of the 2005 Hague Convention as it has the force of law in the UK, the date of its entry into force for the UK is 1 October 2015.

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

### Rule 6.30 (Scope of Section)

**6.30.2**     Before Pt 6 was re-enacted with amendments by SI 2008/2178, with effect from 1 October 2008, rules of court that fall within the scope of Section IV (rr.6.30 to 6.47) fell within the scope of Section III of Pt 6.

Section IV contains rules about service of the claim form and other documents out of the jurisdiction (r.6.30(a)). The bulk of its provisions are concerned with the service of claim forms and not of "other documents". The interpretation rule in the Section (r.6.31) contains no definition of "claim form". Paragraph (c) of r.6.2 (Interpretation) states that "claim" includes petition and any application made before action or to commence proceedings, and "claim form" is to be construed accordingly. As indicated in the parentheses at the end of r.6.30, "jurisdiction" is defined in r.2.3(1). This provides that, in the CPR generally, "jurisdiction" means, unless the context requires otherwise, England and Wales and any part of the territorial waters of the UK adjoining England and Wales. Service in Scotland or Northern Ireland is therefore considered service out of the jurisdiction for these purposes.

As r.6.30(b) indicates, service on a defendant out of the jurisdiction may require the permission of the court. The principal provisions in Pt 6 dealing with service out of the jurisdiction where the permission of the court is not required are r.6.32 (Service in Scotland or Northern Ireland) and r.6.33 (Service out of the United Kingdom), and those dealing with service where the permission of the court is required are r.6.36 (service out of England and Wales) and PD 6B.

Key rules in the Section dealing with "the procedure for service" are r.6.30(c)) are r.6.40 (Methods of service—general provisions) and r.6.42 (Service through foreign governments etc.).

Section IV is supplemented by PD 6B (see para.6BPD.1). Practice Direction 6A contains relevant provisions supplementing r.6.40 (Methods of service—general provisions) in relation to the method of service on a party in Scotland or Northern Ireland.

In CPR Pt 62 (Arbitration Claims), r.62.5(1) provides for the circumstances in which the court may give permission to serve an arbitration claim form out of the jurisdiction (Vol.2 para.2E-12).

### Service of claim form out of the jurisdiction—effects of the physical presence rule

**6.30.3**     In England and Wales, rules of court dealing with the service of originating process have had to reflect the long-established "physical presence" rule (a common law rule that emerged when the prevailing method of service was personal service) and its consequences. Put shortly, that rule holds that the jurisdiction of an English court is invoked where the defendant is served with originating process within the territorial area of the court. It matters not, for example, that the defendant is domiciled and resident elsewhere. Further, even service on a defendant only fleetingly present within the jurisdiction will suffice.

Two important consequences of the rule, both of which obviously require mitigation in the interests of justice, are as follows. First, through service of originating process on a defendant within the jurisdiction, the English court may have conferred upon it jurisdiction in a case which is inappropriate for trial in England (for example, where neither the parties nor the facts of the case have any connection with this country and the law to be applied is foreign law). The inconvenience and unfairness of this consequence can be avoided in an appropriate case by the court's exercise of its discretionary power to stay proceedings on the basis of the doctrine of forum non conveniens.

Secondly, the inability of a claimant to effect service of originating process on a defendant because the defendant is not present within the jurisdiction to enable service to be effected (on him, her or it) has the consequence of denying the court jurisdiction in cases which may be appropriate for trial here (e.g. where the cause of action is a tort committed within the jurisdiction).

Looking backwards it can be seen that the inconvenience and unfairness of this second consequence was mitigated by legislation in two respects, general and specific.

First, there was legislation traceable to the Common Law Procedure Act 1852, and flourishing later in delegated legislation in the form of rules of court, giving the court a discretionary power to grant a claimant permission to serve originating process upon a defendant outside the jurisdiction in a variety of circumstances.

Secondly, on occasion particular statutes were enacted (often implementing international conventions) expressly contemplating that proceedings under them could be brought in England against persons who were not within the jurisdiction of the court as well as against persons who were, and providing that, in the former event (as well as in the latter), service could be effected without the permission of the court.

By these two statutory devices the jurisdiction of the English court was extended beyond the confines imposed, as a practical matter, by the physical presence rule. And in those devices are seen the foundations of the distinction nowadays apparent in the rules in Section IV of CPR Pt 6 between the circumstances in which service of originating process on a defendant out of the jurisdiction may be effected without the permission of the court and those in which such permission is required.

### Service of claim form out of the UK—pre-EU withdrawal provisions

**6.30.4**     Before the UK joined the European Community, the existing Member States were bound by the Convention on jurisdiction and enforcement of judgments in civil and commercial matters, signed at Brussels on 27 September 1968. Upon the accession of the UK (together with Denmark and

Ireland) the 1968 Convention was amended and was given the force of law in the United Kingdom by the Civil Jurisdiction and Judgments Act 1982 s.2(1) (with effect from 1 October 1983). For convenience of reference the 1968 Convention as amended was set out in Sch.1 of the 1968 Act. That Convention contained rules designed to make clear how it was to be determined, in a given civil or commercial matter falling within its scope, which Member State's courts (or, possibly, which of several Member States' courts) were to have jurisdiction. In that Convention (in its original form and as amended), the basic rule of jurisdiction was that a person domiciled in a Member State should be sued in the courts of that State. That basic rule was subject to many exceptions allowing that a defendant domiciled in one Member State may be sued in the courts of another Member State.

The bringing into effect by the 1982 Act of the amended 1968 Convention was accompanied by revisions to the Rules of the Supreme Court providing for the service of originating process on a defendant out of the jurisdiction where each claim made against the defendant was a claim which by virtue of the Civil Jurisdiction and Judgments Act 1982 the English court "has power to hear and determine" (RSC Ord.11 r.1(2)(a)). It was expressly provided that such service was permissible without the leave of the court. After the UK's accession to the European Community, the Lugano Convention (1988), modelled on the amended 1968 Convention, was made between the Member States of the European Community and those of the European Free Trade Association (EFTA). That Convention was brought into effect in the UK on 1 May 1992 by the Civil Jurisdiction and Judgments Act 1991 and, for convenience of reference, was set out in Sch.3C of the 1982 Act. At the same time RSC Ord.11 r.1(2)(a) was amended (with effect from 1 October 1992) to provide for service out of the jurisdiction without the court's permission where the English court had jurisdiction under the Lugano Convention. That was how matters stood in 1999 when RSC Ord.11 r.1(2)(a) was incorporated in Sch.1 of the CPR.

On 1 March 2002, Council Regulation (EC) No.44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the "Brussels I Regulation") came into force. The rules of jurisdiction in that Regulation were constructed on similar principles to the amended 1968 Convention and in effect largely replaced it (see Vol.2 para.5-3).

The relevant rule in the CPR dealing with service out of the jurisdiction (that is to say, out of the UK) of originating process for claims which the English court had power to determine under the Conventions, which was, from 2 May 2000, until 1 October 2008, r.6.19(1), was adjusted as necessary to take account of these developments. The particular amendment required to take account of the Brussels I Regulation was made by SI 2001/4015 (with effect from 1 March 2002), and consisted of the insertion of para.(1A) in r.6.19. When Pt 6 was re-enacted by SI 2008/2178, with effect from 1 October 2008, r.6.19(1) and r.6.19(1A) became, respectively, r.6.33(1) and r.6.33(2). Rule 6.33(2) was further amended by SI 2014/2948 (with effect from 10 January 2015) to take account of the replacement of the Brussels I Regulation by Regulation (EU) No.1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast) (the "Judgments Regulation"). Beforehand, with effect from 1 January 2010, r.6.33(1) was amended (by SI 2009/3131) to take account of the replacement of the Lugano Convention (1988) by the Lugano Convention (2007), which contains provisions generally parallel in nature to the equivalent provisions in the Brussels I Regulation and is directly applicable in the UK. (The amendment then made to r.6.33(1) was consequential upon the omitting of Sch.3 to the 1982 Act, which for convenience of reference had contained the text of the Lugano Convention (1988).)

The UK's departure from the EU on 31 January 2020 did not result in any immediate revision to r.6.33 because, during the implementation period established by the Withdrawal Agreement (which ended on 31 December 2020, known as IP completion day), EU law including the Judgments Regulation continued to apply to and in the UK (and thereafter, the Judgments Regulation continues to apply where proceedings were commenced before IP completion day, due to art.67 of the Withdrawal Agreement). The UK also continued to be bound, during the implementation period, by obligations stemming from the Brussels and Lugano Conventions and the 2005 Hague Convention on Choice of Court Agreements (see art.127 of the Withdrawal Agreement).

Substantial revisions have however been made to r.6.33 with effect from IP completion day, subject to transitional provisions, to reflect the disapplication of the Judgments Regulation and the Brussels and Lugano Conventions. See further para.6.0.1 and 6.30.1 above and para.6.33.1 below.

## Summary of regimes for service of claim forms out of the jurisdiction

**6.30.5** The rules of service out of the jurisdiction can be divided into two categories; first, where permission of the court is not required, and secondly, where permission is required.

A. *Permission not required*–In this category falls:

(1)  service in Scotland and Northern Ireland:

    (a)  under r.6.32(1) where jurisdiction is conferred on the English court by the Civil Jurisdiction and Judgments Act 1982 (in the three separate sets of conditions provided for by r.6.32(1), summarised in para.6.32.1);

    (b)  under r.6.32(2) where jurisdiction is conferred on the English court by an enactment other than the 1982 Act;

(2)  service in any jurisdiction other than England and Wales, Scotland and Northern Ireland:

(a)   under r.6.33(2) where jurisdiction is conferred on the English court by ss.15A to 15E of the 1982 Act (in the two sets of conditions provided for by r.6.33(2), summarised in para.6.33.2);

(b)   under r.6.33(2B) where jurisdiction is conferred on the English court by the 2005 Hague Convention (in the conditions provided for by that Convention, summarised in para.6.33.3) or (from 6 April 2021) where there is otherwise a contractual choice of jurisdiction in favour of the English court (see para.6.33.4 below);

(c)   under r.6.33(3) where jurisdiction over a defendant not within the jurisdiction is conferred on the English court otherwise than by the 1982 Act or the 2005 Hague Convention.

There is also no need to obtain permission to serve out where a claim falls within the transitional and savings provisions introduced by reg.18(3A) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521), i.e. where the proceedings were commenced before IP completion day and the court's jurisdiction is based on the Judgments Regulation (see paras 6.30.1 above and 6.33.1 below).

B. *Permission required*: In any proceedings to which rr.6.32 or 6.33 do not apply, the claimant may serve a claim form out of the jurisdiction with the permission of the court if each of the claims falls within one or more of the "grounds" or "heads" of extra-territorial jurisdiction (often nowadays described as jurisdictional "gateways") under r.6.36 and PD 6B, and a court in England and Wales can be shown to be the most appropriate forum for the resolution of the claim (see rr.6.36 and 6.37 and the commentary thereon).

### Setting aside order for service and service out of the jurisdiction

**6.30.6**   An application under r.6.36 for permission to serve a claim form on a defendant out of the jurisdiction may be made without notice. An order made on an application under r.6.36, whether made with or without notice, may be challenged by the defendant either before or after service has been effected in accordance with the order, by an application to set aside the order and, if service has been effected, to set aside the service.

Where service is effected without notice on a defendant out of the jurisdiction without permission under r.6.32 or 6.33, the validity of the service may be challenged by the defendant by an application to set service aside.

In either event, the grounds for the defendant's challenge to the order or to the service will of course relate to the circumstances of the case. Conceivably the challenge may be to the jurisdiction of the court or to the method of service. A defendant who wishes to dispute the court's jurisdiction to try the claim, or argue (where it is open to him to do so) that the court should not exercise its jurisdiction, may apply to the court under r.11 for a declaration to that effect; see further commentary in para.11.1.1 below. An order containing a declaration made under r.11 may include (in addition to other orders) an order setting service aside or staying the proceedings (r.11(6)).

### Related sources

**6.30.7**
- Civil Jurisdiction and Judgments Act 1982 (Vol.2 para.5-8)
- Service Regulation (EC) No.1393/2007 (Vol.2 para.5-222.1)
- Judgments Regulation (EC) No.1215/2012 (Vol.2 para.5-249)
- Convention of 30th October 2007 on Jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (Revised Lugano Convention) (Vol.2 para.5-392+)
- Civil Jurisdiction and Judgments Order 2001 (Vol.2 para.5-201)
- The Admiralty and Commercial Courts Guide Appendix 9 (Vol.2 para.2A-176)

## Interpretation[1]

**6.31**   **6.31   For the purposes of this Section—**

**(a)   "the Hague Convention" means the Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters signed at the Hague on 15 November 1965;**

**(b)   "the 1982 Act" means the Civil Jurisdiction and Judgments Act 1982;**

**(c)   "Civil Procedure Convention" means any Convention (including the Hague Convention) entered into by the United Kingdom regarding service out of the jurisdiction;**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Jurisdiction and Judgments Regulations 2009 (SI 2009/3131), the Civil Procedure (Amendment No.7) Rules 2014 (SI 2014/2948), the Civil Jurisdiction and Judgments (Hague Convention on Choice of Court Agreements 2005) Regulations 2015 (SI 2015/1644) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

(d) **[Omitted]**

(e) **[Omitted]**

(f) **"Commonwealth State" means a state listed in Schedule 3 to the British Nationality Act 1981;**

(g) **[Omitted]**

(h) **[Omitted]**

(i) **[Omitted]**

(j) **[Omitted]**

(k) **"the 2005 Hague Convention" means the Convention on Choice of Court Agreements concluded on 30th June 2005 at the Hague.**

CPR 6

**Editorial note**

Rule 6.31(k) was added to reflect the coming into force on 1 October 2015 of the Civil Jurisdiction and Judgments (Hague Convention on Choice of Court Agreements 2005) Regulations 2015 (SI 2015/1644). This put the 2005 Hague Convention into force in England and Wales, Scotland and Northern Ireland by making amendments to the Civil Jurisdiction and Judgments Act 1982 and to the Civil Procedure Rules. It was retained following the UK's exit from the European Union on 31 December 2020 (IP completion day) as a consequence of the UK acceding to the Convention in its own right as from 1 January 2021 (see para.6.33.3). **6.31.1**

Substantial amendments were made to this r.6.31 to delete references, as from IP completion day, to EU Regulations and the Brussels and Lugano Conventions that were previously within the scope of this rule; see reg.4(15) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

## Service of the claim form where the permission of the court is not required—Scotland and Northern Ireland[1]

**6.32—(1)  The claimant may serve the claim form on a defendant in Scotland** **6.32** **or Northern Ireland where each claim made against the defendant to be served and included in the claim form is a claim which the court has power to determine under the 1982 Act and—**

(a) **no proceedings between the parties concerning the same claim are pending in the courts of any other part of the United Kingdom; and**

(b) (i) **the defendant is domiciled in the United Kingdom;**

(ii) **the proceedings are within paragraph 11 of Schedule 4 to the 1982 Act; or**

(iii) **the defendant is a party to an agreement conferring jurisdiction, within paragraph 12 of Schedule 4 to the 1982 Act.**

**(2)  The claimant may serve the claim form on a defendant in Scotland or Northern Ireland where each claim made against the defendant to be served and included in the claim form is a claim which the court has power to determine under any enactment other than the 1982 Act notwithstanding that—**

(a) **the person against whom the claim is made is not within the jurisdiction; or**

(b) **the facts giving rise to the claim did not occur within the jurisdiction.**

**Effect of rule (r.6.32)**

Paragraphs (1) and (2) of r.6.32 provide for service of a claim form out of the jurisdiction (that **6.32.1** is to say out of England and Wales) on a defendant in Scotland or Northern Ireland in two quite different circumstances. In neither is the permission of the court required.

Paragraph (1) provides for service where each claim included in the claim form is for a claim which the court has power to determine under the Civil Jurisdiction and Judgments Act 1982 (see para.6.32.2 below), and no proceedings between the parties concerning the same claim are pending in the courts of any other part of the UK (see para.6.32.3 below), where at least one of three conditions applies, that is either (a) the defendant is domiciled in the UK, or (b) the proceedings are within r.11 of Sch.4 to the 1982 Act, or (c) the proceedings are within r.12 of that Schedule (see para.6.32.4 below).

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

Paragraph (2) provides for service where each claim included in the claim form is for a claim which the court has power to determine "under any enactment other than the 1982 Act". For commentary on the provenance and purpose of that rule, and the scope of the English court's power to determine claims under other enactments, see paras 6.32.6 and 6.33.5 below.

In proceedings where the claim does not fall within para.(1) or (2) of r.6.32, service of the claim form on a defendant in Scotland or Northern Ireland may be possible with the permission of the court under r.6.36, subject to the special considerations stated in para.(4) of r.6.37. See further paras 6.37.7 and 6.37.8 (Application for permission under r.6.36 to serve in Scotland or Northern Ireland).

Rule 6.34 (Notice of statement of grounds where permission of the court is not required for service) applies where the claimant intends to serve a claim form on a defendant under r.6.32.

For methods of service of a claim form (or other document) where service is to be effected on a party in Scotland or Northern Ireland, see r.6.40(2) and commentary thereon (para.6.40.2).

For the periods for responding to a claim form served under r.6.32, see r.6.35(2).

### Power to determine claim under the 1982 Act (r.6.32(1))

**6.32.2**     As explained at para.6.30.4 above, upon the accession of the UK (together with Denmark and Ireland) to the EU, the 1968 Brussels Convention was amended and was given the force of law in the UK by the Civil Jurisdiction and Judgments Act 1982 s.2(1) (with effect from 1 October 1983). The Convention as amended was set out in Sch.1 of the 1968 Act.

A modified version of Title II (Jurisdiction) of that Convention was included in Sch.4 to the Act and s.16(1) of the Act provided that that modified version would govern the allocation of jurisdiction between the constituent "parts" of the UK (i.e. England and Wales, Scotland, and Northern Ireland) where the subject-matter of the proceedings was within the scope of the amended 1968 Convention and certain conditions were satisfied.

When the Brussels I Regulation came into effect on 1 March 2002, Sch.4 was substituted for the purpose of bringing its terms into line with equivalent provisions in that Regulation and appropriate amendments were made to s.16(1). Further amendments were made on the coming into effect, on 10 January 2015, of the Judgments Regulation, and again on the completion of the UK's withdrawal from the EU by regs 28 and 59 of the Civil Jurisdiction and Judgments (Amendment) (EU Exit) Regulations 2019 (SI 2019/479), in particular to disapply those provisions in consumer and employment matters to which ss.15A to 15E of the 1982 Act apply (see para.6.32.2). For the current text of Sch.4 as so substituted (and as subsequently amended), see Vol.2 para.5-145.

The Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) effected no changes to r.6.32(1), which remains in the same terms as before the UK's withdrawal from the EU.

In *Kleinwort Benson Ltd v City of Glasgow City Council* (C-346/93) EU:C:1995:85; [1996] Q.B. 57, ECJ, the European Court of Justice ruled that the interpretation of the rules in Sch.4 is a matter for the UK national courts. In *Cook v Virgin Media Ltd* [2015] EWCA Civ 1287; [2016] I.L.Pr. 6, the Court of Appeal explained that the several rules in Sch.4 do not mirror the Judgments Regulation, but reproduce provisions of the Regulation with modifications, tailored to make them appropriate to UK domestic law (para.30). In contrast to the position under the Judgments Regulation (see para.6.37.22), the court can stay its proceedings on grounds of forum non conveniens where the defendant is domiciled in Scotland (or Northern Ireland) and that is clearly the more appropriate forum for the dispute (*Kennedy v National Trust for Scotland* [2019] EWCA Civ 648; [2020] Q.B. 663).

### "no proceedings … pending" (r.6.32(1)(a))

**6.32.3**     It is a condition of r.6.32(1) that no proceedings between the parties concerning the same claim are pending in the courts of any other part of the UK. However, Sch.4 to the Act contains no rule comparable to that found in art.29 of the Judgments Regulation, and other Conventions, requiring (subject to exceptions) any court "other than the court first seised" of its own motion to stay its proceedings—commonly referred to as the "lis pendens" articles.

It is somewhat of an anomaly that, if the case falls outside of r.6.32 because of pending proceedings elsewhere in the UK, the question of whether a claimant can obtain the court's permission to serve the proceedings on the defendant in Scotland or Northern Ireland under r.6.36 appears to depend on whether any of the grounds set out in para.3.1 of Practice Direction 6B (i.e. the common law jurisdictional gateways) apply, and not whether the court has power to determine the claim under Sch.4. That does not fit easily with para.2 of Sch.4 which provides:

"Persons domiciled in a part of the United Kingdom may be sued in the courts of another part of the United Kingdom only by virtue of rules 3 to 13 of this Schedule."

### Schedule 4 to the 1982 Act (r.6.32(1)(b))

**6.32.4**     The conditions stated in para.(b) of r.6.32(1) reflect provisions in s.16(1) and in Sch.4 of the 1982 Act. That Schedule contains Chapter II of the Judgments Regulation as modified which provides rules for allocation of jurisdiction within the UK in certain civil proceedings (see Vol.2 paras 5-145 et seq) and is given effect by s.16(1). Rule 1 therein states the general rule that persons domiciled in a part of the UK "shall be sued in the courts of that part", r.3 (Special jurisdiction)

sets out circumstances in which a person domiciled in a part of the UK may be sued in another part of the UK, r.11 (Exclusive jurisdiction) states that in certain circumstances the courts of a particular part shall have jurisdiction regardless of domicile, and r.12 (Prorogation of jurisdiction) states that jurisdiction may be conferred on the courts of a particular part by party agreement (see Vol.2, paras 5-155 and 5-156). (In r.6.32(1)(b) these derogating "rules" are identified as "paragraphs".) Section 16(1)(b), reflected in para.(b)(i) of r.6.32(1), states that the provisions set out in Sch.4 shall have effect where the defendant is domiciled in the UK "or the proceedings are of a kind mentioned in art.24 of the Regulation (exclusive jurisdiction regardless of domicile)".

**Third Parties (Rights Against Insurers) Act 2010 s.13**

**6.32.5**  The effect of s.13 of the Third Parties (Rights Against Insurers) Act 2010 is to provide that a "third party" (C) within the meaning of s.1 of the Act, domiciled in one part of the UK, may bring proceedings as provided for by that Act against an insurer (D) domiciled in another part by issuing proceedings in either C's or in D's place of domicile, regardless of any contrary provisions in the insurance contract. In the absence of that section, in those circumstances the proceedings would fall within s.16 and Sch.4 of the 1982 Act and any relevant clause in the contract, with the possible result that C would be prevented from suing in the courts of their own place of domicile.

**Power to determine claim under any other enactment (r.6.32(2))**

**6.32.6**  Well before the CPR came into effect, and well before the UK's accession to the EU, rules of court dealing with service of High Court originating process recognised that a particular UK statute may have territorial effect outside England and Wales. Such rules provided that, where a claim was brought for a cause of action arising under such statute which the High Court had power to hear and determine, a claimant may, without the court's permission, serve originating process on a defendant out of England and Wales, which might mean (depending on the statute's proper construction) (1) on a defendant in Scotland or Northern Ireland, and/or (2) on a defendant outside the UK. In the CPR, the provision dealing with (1) is r.6.32(2), and the provision dealing with (2) is r.6.33(3). See further commentary on r.6.33(3) in para.6.33.5 below.

**Period within which service to be effected**

**6.32.7**  Rule 7.5(2) states that, where a claim form is to be served "out of the jurisdiction", it must be served "in accordance with Section IV of Part 6" within six months of the date of issue. Service on a defendant in Scotland or Northern Ireland under r.6.32 is service out of the jurisdiction in accordance with Section IV of Pt 6 within the meaning of r.7.5(2). In CPR Pt 62 (Arbitration Claims) r.62.4(2) states that, unless the court orders otherwise, an arbitration claim form must be served on the defendant within one month of issue (and r.7.5 is modified accordingly).

See further para.7.5.1 below.

**Methods of service**

**6.32.8**  Where a claim form is to be served out of the jurisdiction the methods of service are not at large but are prescribed, particularly by r.6.40 (Methods of service—general provisions). Rule 6.40(2) states that, where a party serves a claim form or other document on a party in Scotland or Northern Ireland, it must be served by a method permitted by Section II (claim forms) or Section III (other documents) and r.6.23(4) (address for service) applies. See further commentary at para.6.40.2 below.

## Service of the claim form where the permission of the court is not required—out of the United Kingdom[1]

**6.33**  **6.33—(1)  [Omitted]**

**(2)  The claimant may serve the claim form on a defendant out of the United Kingdom where each claim made against the defendant to be served and included in the claim form is a claim which the court has power to determine under sections 15A to 15E of the 1982 Act and—**

**(a)  no proceedings between the parties concerning the same claim are pending in the courts of any other part of the United Kingdom; and**

**(b)  (i)  [Omitted]**

**(ii)  the defendant is not a consumer, but is a party to a consumer contract within section 15B(1) of the 1982 Act; or**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Jurisdiction and Judgments Regulations 2009 (SI 2009/3131), the Civil Procedure (Amendment No.7) Rules 2014 (SI 2014/2948), the Civil Jurisdiction and Judgments (Hague Convention on Choice of Court Agreements 2005) Regulations 2015 (SI 2015/1644), the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) and the Civil Procedure (Amendment) Rules 2021 (SI 2021/117).

> **(iii)** the defendant is an employer and a party to a contract of employment within section 15C(1) of the 1982 Act;
>
> **(iv)** [Omitted]
>
> **(v)** [Omitted]

**(2A)** [Omitted]

**(2B)** The claimant may serve the claim form on the defendant outside of the United Kingdom where, for each claim made against the defendant to be served and included in the claim form—

> **(a)** the court has power to determine that claim under the 2005 Hague Convention and the defendant is a party to an exclusive choice of court agreement conferring jurisdiction on that court within the meaning of Article 3 of the 2005 Hague Convention; or
>
> **(b)** a contract contains a term to the effect that the court shall have jurisdiction to determine that claim.

**(3)** The claimant may serve the claim form on a defendant out of the United Kingdom where each claim made against the defendant to be served and included in the claim form is a claim which the court has power to determine other than under the 2005 Hague Convention, or notwithstanding that—

> **(a)** the person against whom the claim is made is not within the jurisdiction; or
>
> **(b)** the facts giving rise to the claim did not occur within the jurisdiction.

### Effect of rule (r.6.33)

**6.33.1**     After the re-enactment of Pt 6 by SI 2008/2178 (with effect from 1 October 2009), this rule was amended: (1) by SI 2009/3390 (with effect from 1 January 2010), upon the coming into effect of the Lugano Convention (as described in r.6.31(j)); (2) by SI 2014/2948 (with effect from 10 January 2015), upon the coming into effect of the recast Judgments Regulation (as described in the then r.6.31(d)); (3) by SI 2015/1644 (with effect from 1 October 2015), upon the coming into effect of the 2005 Hague Convention. It was then amended substantially, with effect from 31 December 2020 (IP completion day), including to omit reference to the Judgments Regulation and the Brussels and Lugano Conventions, see reg.4(16) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521). The amendments did not, however, remove the "or" before "notwithstanding" in CPR r.6.33(3). It is anticipated that this typographical error will be corrected in due course.

The general rule is that a claim form can be served on a defendant present within the territorial jurisdiction of England and Wales (r.2.3(1)), but not outside that territory. As was explained in para.6.30.3, there are exceptions to that rule. In relation to some exceptions service may be effected outside the jurisdiction only with the permission of the court; in relation to others no such permission is required. Rules 6.32 and 6.33 are concerned with exceptions of the latter category and are similar to that extent. They differ in that r.6.32 is concerned with service in Scotland and Northern Ireland, which (together with England and Wales) constitute parts of the United Kingdom. Rule 6.33 on the other hand is concerned with service "out of the United Kingdom". (Before 1 October 2008, the provisions in rr.6.32 and 6.33 rules were found in a single rule, r.6.19.)

For commentary on r.6.32, see paras 6.32.1 et seq.

The rules in r.6.33 provide for service out of the United Kingdom where the English court has power to determine claims in four different contexts:

> (1)   under provisions added to the Civil Jurisdiction and Judgments Act 1982 from IP completion day in relation to consumer and employment matters (r.6.33(2));
>
> (2)   under the 2005 Hague Convention (r.6.33(2B)(a));
>
> (3)   (from 6 April 2021) pursuant to a contract term conferring jurisdiction on the English court (r.6.33(2B)(b));
>
> (4)   under other legislation (r.6.33(3)).

There is also no need to obtain permission to serve out where a claim falls within the transitional and saving provision introduced by reg.18(3A) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) (inserted by reg.9(3) of the Civil, Criminal and Family Justice (Amendment) (EU Exit) Regulations 2020 (SI 2020/1493)), i.e. where the proceedings were commenced before IP completion day and the court's jurisdiction is based on the Judgments Regulation (see paras 6.30.1 and 6.30.5 above). This provides, in effect, that where a claim to which r.6.33(2) (as it was before IP completion day) applies was issued before IP completion day but the claim form had not been served by that day, rr.6.33 and 6.35 apply on and after IP completion day in relation to service of the claim form and the period for responding to the claim form as if

the changes to those rules from IP completion day had not been made. For these purposes, r.6.33(2) as it applied before IP completion day was as follows (and see the commentary at para.6.33.9 below):

"(2)  The claimant may serve the claim form on a defendant out of the United Kingdom where each claim made against the defendant to be served and included in the claim form is a claim which the court has power to determine under the Judgments Regulation and—

(a)  subject to paragraph (2A) no proceedings between the parties concerning the same claim are pending in the courts of any other part of the United Kingdom or any other Member State; and

(i)  the defendant is domiciled in the United Kingdom or in any Member State;

(ii)  the defendant is not a consumer, but is a party to a consumer contract within article 17 of the Judgments Regulation;

(iii)  the defendant is an employer and a party to a contract of employment within article 20 of the Judgments Regulation;

(iv)  the proceedings are within article 24 of the Judgments Regulation; or

(v)  the defendant is a party to an agreement conferring jurisdiction within article 25 of the Judgments Regulation.

(2A)  Paragraph (2)(a) does not apply if the jurisdiction conferred by the agreement referred to in paragraph (2)(b)(v) is exclusive."

There is no equivalent transitional and saving provision for r.6.33(1) where the proceedings were commenced (but not served) before IP completion day and the court's jurisdiction is based on the Brussels or Lugano Conventions, despite those Conventions continuing to apply to proceedings commenced before IP completion day (see para.6.30.1 above and para.6.33.9 below). It may be, therefore, that an application for permission to serve out is needed in those circumstances.

The various grounds for service out of the jurisdiction are set out in separate "boxes" in Form **N510** (Service out of the jurisdiction), which is the notice which the claimant is required by r.6.34 to file and serve where service of a claim form out of the jurisdiction under r.6.33 is intended; see further commentary following r.6.34.

### Service of claim form out of the UK—permission not required where court has power to determine claim under sections 15A to 15E of 1982 Act (r.6.33(2))

The Civil Jurisdiction and Judgments (Amendment) (EU Exit) Regulations 2019 (SI 2019/479) **6.33.2** amended the 1982 Act to introduce provisions equivalent to the rules in the Judgments Regulation relating to jurisdiction in: cases brought by or against UK domiciled consumers and cases brought by or against UK domiciled employees, or by employees working in the UK or engaged by a UK business. These are at ss.15A to 15E of the 1982 Act. Rule 6.33(2) was amended by reg.4(16) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) to allow service out of the jurisdiction without the court's permission in cases that fall within these provisions.

In circumstances where r.6.33(2) applies, it is a condition for service of a claim form out of the United Kingdom without permission under those provisions that no proceedings between the parties concerning the same claim are pending in the courts of any other part of the United Kingdom.

### "a claim which the court has power to determine under the 2005 Hague Convention" (r.6.33(2B)(a))

The Convention on Choice of Court Agreements was concluded at the Hague on 30 June 2005. **6.33.3** This Convention ("the 2005 Hague Convention") was signed by the European Union on 1 April 2009, ratified on 11 June 2015, and entered into force on 1 October 2015 for the Member States of the EU and for Mexico (the only other State which had ratified the Convention at that date). The UK ceased to be a signatory via its membership of the EU on 31 January 2020, but during the implementation period established by the UK/EU withdrawal agreement (which ended on 31 December 2020) the UK continued to be treated as an EU Member State for these purposes. It acceded as a signatory in its own right as from 1 January 2021. Section 1(2) of the Private International Law (Implementation of Agreements) Act 2020 provides that the 2005 Hague Convention shall have the force of law in the UK (by introducing a new s.3D to the 1982 Act). Paragraph 7 of Sch.5 to the 2020 Act provides that, for the purposes of the 2005 Hague Convention as it has the force of law in the UK, the date of its entry into force for the UK is 1 October 2015.

In relation to matters falling within its scope, this Convention deals with both jurisdiction and the recognition and enforcement of judgments. The principal clauses dealing with jurisdiction are in Ch.II (arts 5 to 7) and the principal clauses dealing with recognition and enforcement are in Ch.III (arts 8 to 15). Upon the coming into effect of this Convention necessary amendments were made to the CPR, including the insertion of para.2B in r.6.33, and to other legislation, including in particular the Civil Jurisdiction and Judgments Act 1982, by the Civil Jurisdiction and Judgments (Hague Convention on Choice of Court Agreements 2005) Regulations 2015 (SI 2015/1644), with effect from 1 October 2015. (At that time r.6.33(2B) dealt only with circumstances where the English court's jurisdiction arises under the 2005 Hague Convention. From 6 April 2021, r.6.33(2B) was amended to add a new subpara.(b) which applies where the court's jurisdiction is otherwise

based on a jurisdiction clause in favour of the English court (i.e. one not falling within the 2005 Hague Convention) and the original subject matter of r.6.33(2B), where the 2005 Hague Convention applies, became subpara.(a). See para.6.33.4 below.)

CPR r.6.33(2B)(a) applies where each claim against the defendant to be served and included in the claim form is a claim which the court has power to determine under the Convention and the defendant is a party to an "exclusive choice of court agreement" conferring jurisdiction on the court within the meaning of art.3 of the Convention (for text see below). According to the Hartley/Dogauchi Explanatory Report on the 2005 Hague Convention (paras 105–106) asymmetric or hybrid jurisdiction clauses are not exclusive choice of court agreements for the purposes of the Convention.

Article 3 (Exclusive choice of court agreements) states:
"For the purposes of this Convention—
(a) 'exclusive choice of court agreement' means an agreement concluded by two or more parties that meets the requirements of paragraph c) and designates, for the purpose of deciding disputes which have arisen or may arise in connection with a particular legal relationship, the courts of one Contracting State or one or more specific courts of one Contracting State to the exclusion of the jurisdiction of any other courts;
(b) a choice of court agreement which designates the courts of one Contracting State or one or more specific courts of one Contracting State shall be deemed to be exclusive unless the parties have expressly provided otherwise;
(c) an exclusive choice of court agreement must be concluded or documented—
    (i) in writing; or
    (ii) by any other means of communication which renders information accessible so as to be usable for subsequent reference;
(d) an exclusive choice of court agreement that forms part of a contract shall be treated as an agreement independent of the other terms of the contract. The validity of the exclusive choice of court agreement cannot be contested solely on the ground that the contract is not valid."

The full text of the Convention may be found at Vol.2 para.5-526 et seq. The other current Contracting States (apart from the EU, UK and Mexico as referred to above) are Denmark (which has an "opt-out" of justice and home affairs under relevant EU treaties, but is a separate contracting party to the Convention), Montenegro and Singapore.

**"a contract contains a term to the effect that the court shall have jurisdiction..."**

**6.33.4** CPR r.6.33(2B) was amended with effect from 6 April 2021 by r.6 of the Civil Procedure (Amendment) Rules 2021 (SI 2021/117). The amendment added a new r.6.33(2B)(b), which removes the need for the court's permission to serve the claim form outside the jurisdiction where there is a jurisdiction clause in favour of the English court, and that jurisdiction clause does not fall within the 2005 Hague Convention (for example because it is not an "exclusive choice of court agreement" within the meaning of art.3 of the Convention—see para.6.33.3 above).

Prior to 31 December 2020 (IP completion day) the court's permission was not required to serve the claim form out of the jurisdiction where the court had power to hear the claims included in the claim form under the Judgments Regulation and (subject to certain other requirements) the defendant was a party to an agreement conferring jurisdiction within art.25 of that Regulation. That provision (at r.6.33(2)(b)(v)) ceased to apply from IP completion day, save in the transitional cases referred to at para.6.33.1 above.

The new r.6.33(2B)(b) is intended to fill this gap, removing the procedural hurdle of an application to serve out in circumstances where the defendant has previously agreed that the English court should have jurisdiction to hear the claim. The new provision was inserted following a recommendation by the Lord Chancellor's Advisory Committee on Private International Law.

At the same time, and in consequence of this change, para.3.1(6) of Practice Direction 6B was omitted to remove (as redundant) the head of jurisdiction at para.3.1(6)(d) which previously allowed service out of the jurisdiction with the court's permission under r.6.36 if a claim is made in respect of a contract containing a jurisdiction clause in favour of the English court (see para.6HJ.20 below).

Cases decided in respect of para.3.1(6)(d) of Practice Direction 6B are likely to remain relevant in relation to r.6.33(2B)(b). So for example, case law under para.3.1(6)(d) established that a good arguable case must be made out that the contract in respect of which the claim is made existed. It is not enough for the claimant to show that, if there is a contract (or a serious issue that there is a contract), it would arguably contain a term to the effect that the English court shall have jurisdiction (*Rimpacific Navigation Inc v Daehan Shipbuilding Co Ltd (The "MV Jin Man")* [2009] EWHC 2941 (Comm); [2010] 2 Lloyd's Rep. 236 (David Steel J), where the court held that law and jurisdiction clauses were not separable from guarantees on which the claimants sued and which the defendants asserted were invalid).

The impact of a jurisdiction clause on claims brought by or against third parties is a question of construction of that clause, although absent plain language to the contrary, the contracting parties were likely to have intended neither to benefit nor to prejudice such third parties. For a case where it was held that the jurisdiction clause did extend to claims brought against an affiliate, albeit only

the parent company party to the jurisdiction clause could enforce it, see *Dell Emerging Markets (EMEA) Ltd v IB Maroc.com SA* [2017] EWHC 2397 (Comm); [2017] 2 C.L.C. 417. For a case where the court decided the jurisdiction clause did not extend to claims against non-parties, see *Team Y&R Holdings Hong Kong Ltd v Ghossoub* [2017] EWHC 2401 (Comm). For a further discussion of the principles applicable to determine whether a jurisdiction clause can extend to claims against non-parties, see *Clearlake Shipping Pte Ltd v Xiang Da Marine Pte Ltd* [2019] EWHC 2284 (Comm); [2020] 1 All E.R. (Comm) 61 (Andrew Burrows QC).

### "a claim which the court has power to determine other than…" (r.6.33(3))

**6.33.5**   Rule 6.33(3) states that a claim form may be served on a defendant out of the UK without the permission of the court provided that each claim against the defendant is a claim which the court has power to determine (other than under the 2005 Hague Convention, i.e. the instrument referred to at para.(2B)(a) of r.6.33) notwithstanding that the defendant is abroad and the relevant conduct occurred overseas.

This rule derives from RSC Ord.11 r.1(2)(b), which referred to a claim which by virtue of "any other enactment" the court had power to determine notwithstanding that neither the defendant nor the relevant conduct were within the jurisdiction. In *Orexim Trading Ltd v Mahavir Port and Terminal Private Ltd* [2018] EWCA Civ 1660; [2018] 1 W.L.R. 4847, the Court of Appeal noted that r.6.33(3) is in very similar terms to RSC Ord.11 r.1(2)(b) and that, although the power of the court under the current rule is not limited to claims brought under an enactment, it "seems unlikely that that omission was intended to change the scope of the rule": see Dicey, Morris & Collins, *The Conflict of Laws* (15th edn), para.11-136.

In the case of *Re Harrods (Buenos Aires) Ltd* [1992] Ch. 72, CA, the background to RSC Ord.11 r.1(2)(b) was explained and it was said (at p.116 per Dillon LJ) that to be within it an enactment must, if it does not use the precise wording of the rule, at least indicate on its face that it is expressly contemplating proceedings against persons who are not within the jurisdiction of the court or where the wrongful act, neglect or default giving rise to the claim did not take place within the jurisdiction. In the *Harrods* case it was held, applying that test, that the rule did not permit the service out of the jurisdiction, without leave, of a petition under the Companies Act 1985 s.459. See also: *Fern Computing Consultancy Ltd v Intergraph Cadworx & Analysis Solutions Inc* [2014] EWHC 2908 (Ch); [2014] Bus L.R. 1397 (Mann J), where it was held that the Commercial Agents (Council Directive) Regulations 1993 (SI 1993/3053) did not use the wording of the rule, or anything like it, to confer jurisdiction on the English court; and *Re Banco Nacional de Cuba* [2001] 1 W.L.R. 2039 (Lightman J), where it was held that the wording of the Insolvency Act 1986 s.423 did not bring that section within the rule.

For a comparable provision taking effect in a different context, see r.6.32(2) and the commentary thereon.

Note also that the court may give permission to serve the claim form out of the jurisdiction where the ground of jurisdiction at para.3.1(20)(a) of PD 6B applies, namely where a claim is made "under an enactment which allows proceedings to be brought and those proceedings are not covered by any of the other grounds referred to in this paragraph"; see commentary at para.6HJ.35.

### Service in Scotland and Northern Ireland without permission (r.6.32)

**6.33.6**   Rule 6.33 deals with the circumstances in which, without the permission of the court, a claim form may be served on a defendant "out of the United Kingdom". The rule is not concerned with service out of the jurisdiction, that is to say, out of England and Wales, on a defendant in Scotland or Northern Ireland (both, together with England and Wales, constituent parts of the UK). Before 1 October 2008, rules as to service of a claim form out of the UK and as to service in Scotland and Northern Ireland were contained in a single CPR rule, r.6.19. From the re-enactment of Pt 6 effected on that date, rules as to the latter are contained in r.6.32. See further commentary on that rule in paras 6.32.1 et seq. above.

### Period within which service to be effected

**6.33.7**   Rule 7.5(2) states that, where a claim form is to be served "out of the jurisdiction" it must be served "in accordance with Section IV of Part 6" within six months of the date of issue. Service on a defendant out of UK under r.6.33 is service out of the jurisdiction in accordance with Section IV of Pt 6 within the meaning of r.7.5(2). A claim form is served in accordance with Section IV only if it is served out of the jurisdiction (*American Leisure Group Ltd v Garrard* [2014] EWHC 2101 (Ch); [2014] 1 W.L.R. 4102 (David Richards J), at para.19).

In CPR Pt 62 (Arbitration Claims) r.6.24(2) states that, unless the court orders otherwise, an arbitration claim form must be served on the defendant within one month of issue.

See further commentary following r.7.5.

### Methods of service

**6.33.8**   Where a claim form is to be served out of the jurisdiction the methods of service are not at large but are prescribed, particularly by r.6.40 (Methods of service—general provisions). For available methods of service where service is to be effected on a defendant out of the UK without permission under r.6.33, see r.6.40 and commentary thereon.

### Brexit transitional and saving provisions

**6.33.9**   Rule 6.33(1) (as it applied before IP completion day) related to cases where the court had power to determine the claims included in the claim form under the 1982 Act (i.e. in the limited number

of cases where the Brussels Convention continued to apply: broadly, where the defendant is domiciled in one of a number of overseas territories belonging to the Contracting States to that Convention) or the Lugano Convention (broadly, where the defendant is domiciled in Iceland, Norway or Switzerland). Rule 6.33(2) (as it applied before IP completion day) related to cases where the court had power to determine the claims included in the claim form under the Judgments Regulation.

As explained at para.6.33.1 above, reg.18(3A) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) (inserted by reg.9(3) of the Civil, Criminal and Family Justice (Amendment) (EU Exit) Regulations 2020 (SI 2020/1493)) introduced a transitional and saving provision where a claim to which r.6.33(2) (as it was before IP completion day: see para.6.33.1 above) applies was issued (but not served) before IP completion day. In those circumstances, r.6.33 applies on and after IP completion day in relation to service of the claim form as if the changes to those rules from IP completion day had not been made. The upshot is that there is no need to obtain permission to serve out where a claim was issued before IP completion day and the court's jurisdiction is based on the Judgments Regulation.

There is no equivalent transitional and saving provision for r.6.33(1), where the court's jurisdiction is based on the Brussels or Lugano Conventions, despite those Conventions continuing to apply to proceedings commenced before IP completion day (see para.6.30.1 above). It may be, therefore, that an application for permission to serve out is needed in those circumstances.

In a given case, whether or not the court has power to determine the claim under the Judgments Regulation (or the Brussels or Lugano Convention) depends on the application to the circumstances of the case of the rules of jurisdiction in those instruments. For detailed information on these rules of jurisdiction, see "Notes on Rules of Jurisdiction in Judgments Regulation (recast)", paras 6JR.1 et seq below. The commentary in this paragraph is intended only as a brief overview.

The conditions at r.6.33(2)(a) (and the equivalent condition at r.6.33(1)(a)) reflected the "court first seised" rule under the "lis pendens-related actions" articles of the Judgments Regulation (and the Brussels and Lugano Conventions). That rule is designed to deal with the inconvenience and confusion that may arise where the courts of more than one Member (or Contracting) State have jurisdiction over a matter. It provides that, in the event of proceedings being brought in the courts of different states "any court other than the court first seised shall of its own motion stay its proceedings". Accordingly, it was a condition at r.6.33(1)(a) and (subject to the exception addressed below) r.6.33(2)(a)) that no proceedings between the parties concerning the same claim were pending in the courts of any other part of the UK or (as the case may be) any other Convention territory or any Member State.

The "court first seised" rule is however subject to an exception under art.31(2) of the Judgments Regulation, in proceedings commenced on or after 10 January 2015, where a Member State court has jurisdiction under an exclusive jurisdiction clause subject to art.25. Under art.31(2), the chosen court takes precedence and any other Member State court must stay its proceedings unless and until the chosen court declares that it has no jurisdiction. Rule 6.33(2A) was inserted by the Civil Procedure (Amendment No.7) Rules 2014 (SI 2014/2948) r.4(3) to reflect this exception. For further explanation see paras 6JR.40 et seq below.

Where the conditions at r.6.33(2)(a) are satisfied (or the exception at r.6.33(2A) applies), the question is then whether the court does have power to determine the claims included in the claim form under the Judgments Regulation. The basic rule (subject to the other provisions under the Regulation) is that persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that state (see further explanation at paras 6JR.x.10 to 6JR.x.12 below). However, the Regulation provides for a wide range of circumstances (based on justifiable policy considerations) in which persons domiciled in a Member State may (or sometimes must) be sued in the courts of one or more other Member States. These comprise:

- Rules of special jurisdiction under which a defendant domiciled in a Member State may be sued in a court other than that of their domicile. These rules of jurisdiction are not mandatory: they give a choice to the claimant to sue in one or more other courts, apart from that of the defendant's domicile. They include provisions that in "matters relating to contract" a person may be sued in the courts "for the place of performance of the obligation in question"; in "matters relating to tort, delict or quasi-delict" a person may be sued in the courts "for the place where the harmful event occurred or may occur"; and, where a person is one of a number of defendants, they may be sued in the courts of the Member State in which any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings. See further explanation at paras 6JR.13 to 6JR.24 below.

- Rules of jurisdiction in matters relating to insurance, consumer contracts and individual contracts of employment. These rules of jurisdiction are mandatory and override both the basic rule of jurisdiction (domicile) and the rules of special jurisdiction referred to immediately above. Broadly speaking these provisions enable a policy holder, consumer or employee to sue the insurer, trader or employer in the courts of a Member State other than that of its domicile, while preserving the basic rule of jurisdiction where the policy holder, consumer or employee is sued. In addition, the Judgments Regulation (but not the Brus-

sels or Lugano Conventions) provides rules of jurisdiction where the trader or employer is not domiciled in a Member State: these are reflected in the rules at r.6.33(2)(b)(ii) and (iii). The rules of jurisdiction relating to insurance, consumer contracts and individual contracts of employment may be departed from only by an agreement which satisfies particular conditions set out in the relevant instrument. See further explanation at paras 6JRx.25 to 6JRx.28 below.

- Rule of exclusive jurisdiction "regardless of domicile". These set out circumstances in which particular courts of a Member State will have jurisdiction over proceedings relating to particular subject matter irrespective of the domicile of the parties or the other rules of jurisdiction. Thus, for example, art.24 of the Judgments Regulation states that in proceedings which have as their object rights in rem in immovable property or tenancies of immovable property, the courts of the Member State in which the property is situated shall have exclusive jurisdiction. (Equivalent provisions are at art.16 of the Brussels Convention and art.22 of the Lugano Convention.) These provisions are reflected in the rules at r.6.33(2)(b)(iv). See further explanation at paras 6JRx.29 to 6JRx.33 below.
- Rules relating to jurisdiction by agreement or "prorogation of jurisdiction". These provide a means by which parties may confer jurisdiction on a court or courts of a Member State by an agreement to the effect that they are to have jurisdiction to settle any disputes which have arisen or which may arise "in connection with a particular relationship". The relevant provision in the Judgments Regulation is art.25, which applies regardless of whether any party to the agreement is domiciled in a Member State. (Equivalent provisions are at art.17 of the Brussels Convention and art.23 of the Lugano Convention, save that under those provisions (in contrast to art.25 of the Judgments Regulation) at least one party to the agreement must be domiciled in a Contracting State.) These provisions are reflected in the rules at r.6.33(2)(b)(v). See further explanation at paras 6JRx.34 to 6JRx.38 below.
- Rules conferring jurisdiction on the courts of a Member State before which the defendant enters an appearance, i.e. submits to the jurisdiction. See further explanation at para.6JRx.39 below.

## Notice of statement of grounds where the permission of the court is not required for service[1]

**6.34—(1)  Where the claimant intends to serve a claim form on a defendant under rule 6.32 or 6.33, the claimant must—**    **6.34**

    (a)   **file with the claim form a notice containing a statement of the grounds on which the claimant is entitled to serve the claim form out of the jurisdiction; and**

    (b)   **serve a copy of that notice with the claim form.**

**(2)  Where the claimant fails to file with the claim form a copy of the notice referred to in paragraph (1)(a), the claim form may only be served—**

    (a)   **once the claimant files the notice; or**

    (b)   **if the court gives permission.**

### Effect of rule (r.6.34)

Paragraph 2.1 of PD 6B provides that, where r.6.34 applies, the claimant must file practice Form **N510** (Service out of the jurisdiction) when filing the claim form (para.6BPD.2). See also PD 7A (How to Start Proceedings—The Claim Form) para.3.5 (para.7APD.3). Where a claim form for service on a defendant out of the jurisdiction under r.6.32 or 6.33 is not accompanied by Form **N510** as required by r.6.34(1), the claim form may only be served once this form is filed with the court, or if the court gives permission under r.6.34(2).    **6.34.1**

It is stated in Form **N510** that, where a claim form is served without particulars of claim, it must be accompanied by a copy of Form **N1D** (Notes for defendant on replying to claim form served out of the jurisdiction). A claimant's failure to comply with that requirement does not appear to incur a breach of any rule. In *BDI · Bioenergy International AG v Argent Energy Ltd*, 19 December 2017, unrep. (Judge Hacon), the judge concluded that such failure was of no practical impact and was a procedural error which the court could cure under r.3.10.

For Forms **N510** and **N1D**, see the online *Civil Procedure Forms Volume*.

### "statement of the grounds" (r.6.34(1)(a))

The various grounds on which service of a claim form may be effected on a defendant out of the jurisdiction without the court's permission under rr.6.32 and 6.33 are listed in "boxes" in Form **N510**, each with an appropriate statement of facts. The claimant is required to state, by ticking the relevant box, the factual basis upon which it is asserted that the claims in the claim form are claims    **6.34.2**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

which the English court has power to determine under the provisions referred to in rr.6.32 and 6.33, and to certify the facts so stated with a statement of truth.

Form **N510** is expected to incorporate significant changes following the completion of the UK's withdrawal from the EU on 31 December 2020 (IP completion day), to reflect the amendments to r.6.33 (see para.6.33.1 above). As at the time of writing, however, the revised form had not been published.

Form **N510** was introduced with effect from 1 October 2008. Beforehand r.6.19(3) provided that the claim form "must contain" a statement of the grounds on which the claimant was entitled to serve it out of the jurisdiction and recommended wording for each of the several grounds was set out in PD 6B, but no express provision was made for the consequences of a failure to endorse the claim form with the requisite statement of grounds. It was held at first instance that failure to endorse did not necessarily invalidate service (*Trustor AB v Barclays Bank Plc* (2000) 97(44) L.S.G. 45; *The Times,* 22 November 2000 (Rimer J), *Harris Calnan Construction Co Ltd v Ridgewood (Kensington) Ltd* [2007] EWHC 2738 (TCC); [2008] Bus. L.R. 636 (Judge Peter Coulson QC). However, in *National Navigation Co v Endesa Generacion SA* [2009] EWHC 196 (Comm); [2009] 1 Lloyd's Rep. 666 (Gloster J), where a claim had been served on the defendants in Spain under (what became subsequently) r.6.33(2) on the basis that the English court had power to determine it under the Brussels I Regulation, the court granted the defendants' application under r.11 challenging the jurisdiction of the court and struck out the claim. In doing so the judge stated that it is very important that practitioners issuing claim forms should take particular care to ensure that they have a reasonable basis for their belief that the claim is one which the English court has power to determine under the relevant Regulation, and that the facts supporting it are stated in a transparent fashion in the claim form. The failures of the claimant's solicitors in these respects were among the factors which the judge took into account in determining to award the defendants their costs of the application on the indemnity basis.

In para.1(b) of Appendix 9 to the Admiralty and Commercial Courts Guide it is stressed that it is very important that the statement as to the grounds upon which the claimant is entitled to serve the claim form out of the jurisdiction is accurate and made with care (Vol.2 para.2A-176). If entitlement to serve out of the jurisdiction without leave is wrongly asserted, a claimant may be ordered to pay the costs of a defendant's application to strike out the claim or set aside serve of the claim form on an indemnity basis (ibid).

In *Heraeus Medical GmbH v Biomet UK Healthcare Ltd* [2016] EWHC 1369 (Ch) Mann J concluded that, although the claimant's solicitor had stated in Form **N510** that there were no proceedings concerning the same claim in another member state, whereas there were proceedings in Germany, the claimants could rely on an element of conditionality and say that England was the appropriate forum if they were wrong on the territorial effect of the German proceedings.

In *BDI · Bioenergy International AG v Argent Energy Ltd,* 19 December 2017, unrep. (Judge Hacon), a claim form was served on a Scottish company (one of two defendant companies in a patent claim) under r.6.32. On their application to have service set aside the company submitted (amongst other things) (1) that Form **N510** served with the claim form was defective because it stated the wrong basis upon which the English court had jurisdiction, and (2) that the claimants had failed to file Form **N510** with the court as required by r.6.34(1)(a). The judge rejected the first submission, holding that the important consideration was not what the claimants had put on the form, but whether the court had jurisdiction, but accepted the second, finding that the failure was a non-trivial procedural error and holding that service would be defective on that ground unless the claimants obtained relief from sanction (which in the event was granted). See also *Philip Stephen Wallace (as Liquidator of Carna Meats (UK) Limited) v George Wallace* [2019] EWHC 2503 (Ch) (Adam Johnson QC).

In *Sullivan v Ruhan* [2019] EWHC 1336 (Comm) ) the court refused to grant a default judgment for failure to file acknowledgments of service where the claimant was unable to show that he had validly served the claim form on the defendants in the Isle of Man, none of the grounds in r.6.33 which allowed service of the claim form out of the jurisdiction without the court's permission applied, and the claim form had not been accompanied by a notice as required under r.6.34.

## Period for responding to the claim form where permission was not required for service[1]

6.35    **6.35—(1)  This rule sets out the period for—**

        **(a)  filing an acknowledgment of service;**

        **(b)  filing an admission; or**

        **(c)  filing a defence,**

**where a claim form has been served out of the jurisdiction under rule 6.32 or 6.33.**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

**(Part 10 contains rules about acknowledgments of service, Part 14 contains rules about admissions and Part 15 contains rules about defences.)**

*Service of the claim form on a defendant in Scotland or Northern Ireland*

**(2)  Where the claimant serves on a defendant in Scotland or Northern Ireland under rule 6.32, the period—**

> **(a)   for filing an acknowledgment of service or admission is 21 days after service of the particulars of claim; or**
>
> **(b)   for filing a defence is—**
>
> > **(i)   21 days after service of the particulars of claim; or**
> >
> > **(ii)   where the defendant files an acknowledgment of service, 35 days after service of the particulars of claim.**

**(Part 7 provides that particulars of claim must be contained in or served with the claim form or served separately on the defendant within 14 days after service of the claim form.)**

**(3)  [Omitted]**

**(4)  [Omitted]**

*Service on a defendant elsewhere*

**(5)  Where the claimant serves the claim form under rule 6.33, the period for responding to the claim form is set out in Practice Direction 6B.**

### Effect of rule (r.6.35)

With effect from 1 October 2008, this rule replaced two rules. One (former r.6.22) dealt with the periods within which a defendant served out of the jurisdiction should file an acknowledgment of service or should file or serve an admission, and the other (former r.6.23) with the period within which they should file a defence. It was amended substantially as from 31 December 2020 (IP completion day) to delete references in what was r.6.35(3), (4) and (5) to Convention territories and EU Member States, see reg.4(17) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

**6.35.1**

When particulars of claim are served on a defendant, the defendant may: (a) file or serve an admission in accordance with Pt 14, (b) file a defence in accordance with Pt 15 (or do both, if they admit only part of the claim), or (c) file an acknowledgment of service in accordance with Pt 10 (r.9.2).

The periods (a) for returning an admission or for filing it under rr.14.5, 14.6 or 14.7, (b) for filing a defence, and (c) for filing an acknowledgment of service, are fixed, respectively, by rr.14.2, 15.4 and 10.3. (In proceedings in the Commercial List and in Circuit Commercial Courts, provisions in Pts 14, 15 and 10 take effect subject to certain modifications made by rules in Pts 58 and 59, one of which is that an acknowledgment of service should be filed in all contested cases.)

Rule 6.35 modifies the effect of the time period provisions in rr.14.2, 15.4 and 10.3 in the circumstances in which the rule applies.

The rule brings out clearly the distinction between service on a defendant either (a) in Scotland or Northern Ireland, or (b) "elsewhere". Where a claimant serves the claim form on a defendant elsewhere, the period for responding is determined in accordance with para.6 of PD 6B (Service Out of the Jurisdiction) (see para.6BPD.6).

Rule 6.35 extends the periods for the filing of the documents referred to beyond those that would normally apply. This is done in recognition of the fact that it is reasonable to give a defendant served out of the jurisdiction, including those in Scotland and Northern Ireland (who now may be served by "domestic" methods of service, see r.6.40(2)), extra time in which to comply.

Rule 58.6(3) states that in proceedings in the Commercial List the time periods provided by r.6.35 apply "after service of the claim form". Rule 59.5(3) has the same effect for claims in the Circuit Commercial Courts. By operation of r.63A.4(5), r.58.6(3) is applied to claims in the Financial List. The period for filing an acknowledgment of service is calculated from the service of the claim form, whether or not the claim form included or was accompanied by the particulars of claim.

The periods fixed by r.6.35 for filing a defence where the claim form is served out of the jurisdiction apply to claims in the Commercial List, in the Financial List, and to Circuit Commercial Court claims, except that if the particulars of claim are served after the defendant has filed an acknowledgment of service the period for filing a defence is 28 days from service of the particulars of claim (see r.58.10(2), r.59.9(2) and r.63A.4(5)).

See further para.1(c) and para.6(c) and (d) of Appendix 9 to the Admiralty and Commercial Courts Guide (Vol.2 para.2A-176).

### Brexit transitional and saving provision

Regulation 18 of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521), as amended by the Civil, Criminal and Family Justice (Amendment) (EU Exit) Regula-

**6.35.2**

tions 2020 (SI 2020/1493), provides transitional and saving provisions the period for responding to a claim under r.6.35.

Regulation 18(3) applies where service was effected under r.6.35(3) or (4) as they were in force prior to 31 December 2020 (IP completion day). Where such service was effected, the period for filing an acknowledgement of service or defence remains that provided for by those rules as they were in force prior to IP completion day.

Regulation 18(3A) applies where a claim to which r.6.33(2) (as it was before IP completion day) was issued but not served before IP completion day. In those circumstances, r.6.35 applies on and after IP completion day in relation to the period for responding to the claim form as if the changes made by the 2019 Regulations had not been made.

For the purposes of these transitional and saving provisions, r.6.35(3) and (4) (as they applied before IP completion day) stated as follows:

"(3)    Where the claimant serves the claim form on a defendant in a Convention territory within Europe or a Member State under rule 6.33, the period—

    (a)    for filing an acknowledgment of service or admission, is 21 days after service of the particulars of claim; or

    (b)    for filing a defence is—

        (i)    21 days after service of the particulars of claim; or

        (ii)    where the defendant files an acknowledgment of service, 35 days after service of the particulars of claim....

(4)    Where the claimant serves the claim form on a defendant in a Convention territory outside Europe under rule 6.33, the period—

    (a)    for filing an acknowledgment of service or admission, is 31 days after service of the particulars of claim; or

    (b)    for filing a defence is—

        (i)    31 days after service of the particulars of claim; or

        (ii)    where the defendant files an acknowledgment of service, 45 days after service of the particulars of claim."

## Service of the claim form where the permission of the court is required[1]

**6.36**    **6.36  In any proceedings to which rule 6.32 or 6.33 does not apply, the claimant may serve a claim form out of the jurisdiction with the permission of the court if any of the grounds set out in paragraph 3.1 of Practice Direction 6B apply.**

### Service out of jurisdiction with court's permission

**6.36.1**    A claimant does not require the permission of the court to serve a claim form on a defendant out of the jurisdiction in the circumstances provided for by r.6.32 (service on a defendant in Scotland or Northern Ireland) or by r.6.33 (service on a defendant out of the United Kingdom). Rule 6.36 applies to proceedings to which those rules do not apply.

As indicated in the parentheses at the end of r.6.30, "jurisdiction" is defined in r.2.3(1). This provides that, in the CPR generally, "jurisdiction" means, unless the context requires otherwise, England and Wales and any part of the territorial waters of the UK adjoining England and Wales.

The claimant may serve a claim form out of the jurisdiction with the permission of the court if any of the "grounds" set out in para.3.1 of PD 6B apply; see para.6BPD.3. For commentary on the scope of the several grounds, see the "Notes on Heads of Jurisdiction in paragraph 3.1 of Practice Direction 6B", at para.6HJ.1.

When the CPR came into effect, these grounds, or "heads of jurisdiction" (as they were traditionally named), or "gateways", as they are nowadays colloquially called, were enacted in CPR Sch.1 RSC Ord.11 r.1(1), and from 2 May 2000 until 1 October 2008 they were contained in r.6.20. From the latter date they were relegated from rule form to practice direction form, specifically as listed in para.3.1 of PD 6B. (That arrangement caused some surprise, given that the grounds in effect extend the jurisdiction of the court, something that requires legislation.)

A claimant seeks the court's permission by application. See further r.6.37 and the commentary thereon.

CPR r.7.2(1) states that proceedings are started when the court "issues a claim form at the request of the claimant". It may be noted that, before the CPR came into effect, RSC Ord.6 r.7(1) provided that no writ which is to be served on a defendant out of the jurisdiction "shall be issued for such service without the leave of the court" unless the action was one to which other rules applied, being rules that permitted service of the writ out of the jurisdiction without the permission of the court. There is no comparable provision in the CPR. An application under r.6.36 is for permission to serve, not for permission to issue.

In terms, r.6.36 is concerned with the service out of the jurisdiction of "a claim form". In Pt 6

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390).

"claim" includes petition and any application made before action or to commence proceedings and "claim form", "claimant" and "defendant" are to be construed accordingly: see r.6.2(c). Accordingly, in appropriate circumstances, an application notice can be a "claim form" for these purposes: see *ED&F Man Capital Markets LLP v Obex Securities LLC* [2017] EWHC 2965 (Ch); [2018] 1 W.L.R. 1708 (Catherine Newman QC) in relation to an application for pre-action disclosure and *Dar Al Arkan Real Estate Development Co v Al Refai* [2014] EWCA Civ 715; [2015] 1 W.L.R. 135, CA, in relation to a committal application against a person who is not an existing party to the proceedings.

A claimant does not require the permission of the court to serve a counterclaim on a foreign claimant because, by bringing proceedings in the English court, the foreign claimant submits to the court's jurisdiction in regard to any counterclaim (*Derby & Co v Larsson* [1976] 1 W.L.R. 202, HL).

## Application for permission to serve the claim form out of the jurisdiction[1]

**6.37**

**6.37**—**(1)   An application for permission under rule 6.36 must set out—**
  **(a)   which ground in paragraph 3.1 of Practice Direction 6B is relied on;**
  **(b)   that the claimant believes that the claim has a reasonable prospect of success; and**
  **(c)   the defendant's address or, if not known, in what place the defendant is, or is likely, to be found.**

**(2)   Where the application is made in respect of a claim referred to in paragraph 3.1(3) of Practice Direction 6B, the application must also state the grounds on which the claimant believes that there is between the claimant and the defendant a real issue which it is reasonable for the court to try.**

**(3)   The court will not give permission unless satisfied that England and Wales is the proper place in which to bring the claim.**

**(4)   In particular, where—**
  **(a)   the application is for permission to serve a claim form in Scotland or Northern Ireland; and**
  **(b)   it appears to the court that the claimant may also be entitled to a remedy in Scotland or Northern Ireland, the court, in deciding whether to give permission, will—**
    **(i)   compare the cost and convenience of proceeding there or in the jurisdiction; and**
    **(ii)   (where relevant) have regard to the powers and jurisdiction of the Sheriff court in Scotland or the County Court or courts of summary jurisdiction in Northern Ireland.**

**(5)   Where the court gives permission to serve a claim form out of the jurisdiction—**
  **(a)   it will specify the periods within which the defendant may—**
    **(i)   file an acknowledgment of service;**
    **(ii)   file or serve an admission;**
    **(iii)   file a defence; or**
    **(iv)   file any other response or document required by a rule in another Part, any other enactment or a practice direction; and**
  **(b)   it may—**
    **(i)   give directions about the method of service; and**
    **(ii)   give permission for other documents in the proceedings to be served out of the jurisdiction.**

**(The periods referred to in paragraphs (5)(a)(i), (ii) and (iii) are those specified in the Table in Practice Direction 6B.)**

### Effect of rule (r.6.37)

**6.37.1**

The provisions in r.6.37 deal sequentially (but not exhaustively) with three topics. First, with the content of the application for permission (paras (1) and (2)), secondly, with the decision of the

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390).

court whether or not to grant permission (paras (3) and (4)), and thirdly, with practical issues arising when permission is granted (para.(5)).

In addition to the matters explained immediately below, note also the commentary to r.6.36 and the information contained in the Court Guides as follows: Chancery Guide Ch.7 paras 7.12 to 7.14 (Permission to serve out of the jurisdiction), and Ch.11 paras 11.7 and 11.8 (Service out) (Vol.2 paras 1A-56 and 1A-77); Queen's Bench Guide (Service of proceedings—out of the jurisdiction) paras 5.4.1–5.4.3 and 5.4.7–5.4.10 (Vol.2 para.1B-27); Admiralty and Commercial Courts Guide para.B.8 (Service of the claim form out of the jurisdiction) and Appendix 9 paras 2 to 4 (Application for permission), and paras 7 to 8 (Practice under rule 6.36) (Vol.2 paras 2A-176 and 2A-180.1); Circuit Commercial Court Guide paras 3.10 to 3.12 (Service of the claim form out of the jurisdiction) (Vol.2 para.2B-20).

Normally, for obvious reasons, an application to serve a claim form out of the jurisdiction under r.6.36 will be made ex parte and without notice; for the implications of this see commentary at para.6.37.4 below. In the High Court an application in the Chancery Division or Queen's Bench Division will be dealt with by a Master or a District Judge (CPR r.2.4) (who may refer the matter to a Judge), and in the Commercial Court or a Circuit Commercial Court by a Judge. Usually an application will be dealt with on paper, without an oral hearing.

A defendant may apply for an order setting aside the order for permission and (if service has been effected) setting aside service. See the commentary on CPR Pt 11.

Where the claim form is to be served out of the jurisdiction, it must be served in accordance with Section IV of Pt 6 within six months of the date of issue (r.7.5(2)). It should be noted that that time limit runs from the date of issue; not from the date on which permission to serve out is given. That is an important point to be kept in mind where the claimant does not, before the claim form is issued, make an application for permission to serve out. As to the period for service where the claim form (though naming a foreign defendant) is, at issue, marked by the court "not for service out of the jurisdiction", see para.6.37.10 below. The claimant may apply for an order extending the period for service of a claim form (r.7.6(1)). Where the period of initial validity of a claim form (whatever that might be and however determined) has expired the court retains power to extend it retrospectively, and to entertain an application to serve the claim form out of the jurisdiction made within the extended time. See commentary following r.7.6 (Extension of time for service a claim form).

### Content of application for permission (r.6.37(1))

**6.37.2**   Applications for permission to serve a claim form out of the jurisdiction under r.6.36 are made in accordance with CPR Pt 23. Rule 23.6 states that an application notice must state (a) what order the applicant is seeking and (b) briefly, why the applicant is seeking the order.

The applicant for permission under r.6.36 should use Form **N244** (Application notice) and include in it the additional information referred to in Form **PF 6A** (Application for permission to serve claim form out of the jurisdiction (rr.6.36 and 6.37)), which reflects the requirements imposed on applicants by r.6.37. That Form states that the claimant must set out, either in the application notice itself or within a witness statement to be filed with the application notice, the matters referred to in r.6.37(1), the facts relied on under r.6.37(3), and the grounds, facts etc relied on for satisfying r.6.37(2) and (4) (where those sub-rules are relevant). If the information relied on is set out in the application notice itself, the notice must be verified by a statement of truth (r.22.1(3)).

The written evidence may be given by any person with knowledge of the facts but it is more usually made by the claimant's solicitor upon knowledge, information and belief. The evidence should be sufficiently full to establish the matters referred to in r.6.37 and reflected in Form **PF 6A**. The burden of establishing that the claimant's claim falls within one of the grounds stated in para.3.1 of PD 6B (r.6.37(1)(a)) and that the claimant's claim has a reasonable prospect of success (r.6.37(1)(b)) falls on the claimant; see further, as to burden and standard of proof, paras 6.37.13 et seq below.

Paragraph (2) of r.62.5 (Service out of jurisdiction of arbitration claims) states that an application under that rule must be supported by written evidence (a) stating the grounds on which the application is made and (b) showing in what place or country the person to be served is, or probably may be found (Vol.2 para.2E-12).

### Application in respect of claim in para.3.1(3) of PD 6B (r.6.37(2))

**6.37.3**   Paragraph (2) of r.6.37 is confined to applications to the court for permission to serve a claim form out of the jurisdiction where the claim is made under para.3.1(3) of PD 6B, that is to say, where the claimant, having brought a claim against a defendant, applies for permission to serve the claim form on "another person" out of the jurisdiction on the ground that that other person is a necessary or proper party to the claim against the defendant. The width of that head of jurisdiction and its potential for abuse by claimants bringing against a defendant a specious or weak claim (or perhaps one in which the defendant connived) as a pretext for bringing proceedings against "another person" attracted judicial concern. In response to that concern, in 1987 the formulation for the head of jurisdiction was significantly amended and at the same time what is now r.6.37(2) was first introduced into the rules (and has remained largely in the same terms since). The phrase "a real issue which it is reasonable for the court to try" replicates the terms of para.3.1(3) of PD 6B. See further para.6HJ.5 below.

**Application under r.6.36 to serve out—duty of disclosure**

**6.37.4**
On an ex parte application the applicant is under an obligation to make full and fair (or "frank") disclosure. The duty arises on any ex parte application, and certainly so on one made under r.6.36, where the court is asked to exercise what has traditionally been seen as an exorbitant jurisdiction, bringing a foreign defendant within the jurisdiction even if only to incur the cost and inconvenience of fighting a jurisdiction application successfully (though in recent years the courts have moved away from the characterisation of the court's power to permit service out of the jurisdiction as "exorbitant": see *Abela v Baadarani* [2013] UKSC 44; [2013] 1 W.L.R. 2043, SC, at [53] per Lord Sumption).

For an explanation of variations in the extent of the duty to disclose more generally, and of the gravity of any lack of frankness, depending on the character of the application, contrasting applications under r.6.36 with ex parte applications made in other contexts (especially for interim injunctions), see *Payabi v Amstel Shipping Corporation* [1992] Q.B. 907 (Hobhouse J), at p.918; *MRG (Japan) Ltd v Engelhard Metals Japan Ltd* [2003] EWHC 3418 (Comm); [2004] 1 Lloyd's Rep. 731 (Toulson J), at paras 25 and 26.

In the context of ex parte applications under r.6.36, the disclosure duty has been summarised in various ways. In para.6 of Form **PF 6A** (Application for permission to serve claim form out of the jurisdiction (rules 6.36 and 6.37)) it is stated that the application "should also bring to the attention of the court any matter which, if the other party were represented, that party would wish the court to be aware of" (adopted from *ABCI v Banque Franco-Tunisienne* [1996] 1 Lloyd's Rep. 485 (Waller J) at p.489). In para.2(c) of Appendix 9 of the Admiralty and Commercial Courts Guide is said (in a formulation that has stood since that Guide was first published in 1986) that the applicant should "draw attention to any features which might reasonably be thought to weigh against the making of the order sought" (Vol.2 para.2A-176). See also *Masri v Consolidated Contractors International Co SAL* [2011] EWHC 1780 (Comm); (2011) 108(30) L.S.G. 25 (Burton J) at para.59 ("any material facts, and in particular any which may constitute a defence or some ground for not granting the order sought").

Such features, matters, material facts, etc., must be clearly drawn to the judge's attention. Those preparing statements in support of applications under r.6.36 should not proceed on the assumption that it is sufficient if, somewhere in the exhibits or in the statement, a point of materiality can be discerned (*ABCI v Banque Franco-Tunisienne* op cit at p.491).

A failure to refer to arguments on the merits which the defendant may seek to raise in answer to the claimant's claim at the trial should not generally be characterised as a failure to make a full and fair disclosure, unless they are of such weight that their omission may mislead the court in dealing with the application (*BP Exploration Co (Libya) Ltd v Hunt* [1976] 1 W.L.R. 788 (Kerr J), at p.798; approved in *Electric Furnace Co v Selas Corp of America* [1987] R.P.C. 23, CA, at p.29 per Slade LJ). In *MRG (Japan) Ltd v Engelhard Metals Japan Ltd* [2003] EWHC 3418 (Comm); [2004] 1 Lloyd's Rep. 731 (Toulson J), a judge, in dismissing the defendant's application to set aside an order for service out, rejected the submission that if an applicant knew matters which would not on any reasonable view make any difference to whether there was a serious issue to be tried, or to any of the other questions which the judge had to consider, but which were relevant to the ultimate merits of the action, they must be disclosed.

Where an order is made on an ex parte application under r.6.36 (or on any other ex parte application), and it is subsequently established that the applicant deliberately misled the court or deliberately withheld information which he or she knew would, or might, be material, the order will ordinarily be set aside (e.g. *Congentra AG v Sixteen Thirteen Marine SA* [2008] EWHC 1615 (Comm); [2009] 1 All E.R. (Comm) 479 (Flaux J)). The mere fact that the non-disclosure may have been innocent does not deprive the court of its discretion to set aside an order for service out of the jurisdiction if the applicant has failed to make sufficient disclosure of material facts in the course of his application for permission (*Lazard Bros & Co v Midland Bank* [1933] A.C. 289, HL, at p.307 per Lord Wright). In *The Hagen* [1908] P. 189, CA, Farwell LJ said (at p.201) that a failure to make full and fair disclosure would justify the court in discharging an order for service out "even although the party might afterward be in a position to make another application" (a dictum subsequently much-quoted).

It is not uncommon for applications to set aside orders for service out to be dismissed on the ground that, although there was material non-disclosure, if the full facts had been before the judge, permission would still have been given (e.g. *Kuwait Oil Co (KSC) v Idemitsu Tankers KK (The "Hida Maru")* [1981] 2 Lloyd's Rep. 510, CA). Failure to disclose to the court a limitation defence available to the defendant has been regarded as a serious omission (*ABCI v Banque Franco-Tunisienne* op cit), especially where the application is accompanied by an application to extend the period of validity of the claim form which would, if granted, deprive the defendant of an accrued right of limitation (*BUA International v Hai Hing Shipping Co Ltd (The "Hai Hing")* [2000] 1 Lloyd's Rep. 300 (Rix J)).

One of the matters which may well be material on an ex parte r.6.36 application is the existence of foreign proceedings between the same or related parties (whether pending or prospective), as not only may that go to the issue as to whether it is an appropriate case to be tried in England, but also to the possible applicability of any provisions in a civil procedure convention or the Judgments Regulation affecting priority of jurisdiction (*Masri v Consolidated Contractors International Co SAL* op

cit at para.59). In normal circumstances that matter must be disclosed, and the non-disclosure of it may well of itself lead to the order for permission being set aside (*Ophthalmic Innovations International (UK) Ltd v Ophthalmic Innovations International Inc* [2004] EWHC 2948 (Ch); [2005] I.L.Pr.10 (Lawrence Collins J) at para.45). See also *Punjab National Bank (International) Ltd v Srinivasan* [2019] EWHC 3495 (Ch).

In *NML Capital Ltd v Republic of Argentina* [2011] UKSC 31, 273; [2011] 2 A.C. 495, SC, Lord Collins explained (at para.136) that in cases of non-disclosure, the court has a discretion (a) to set aside the order for service and require a fresh application, or (b) to treat the claim form as validly served, and deal with the non-disclosure if necessary by a costs order. See further para.11.1.9.

In *Evison Holdings Ltd v International Co Finvision Holdings LLC* [2020] EWHC 239 (Comm), Teare J set aside orders for service out of the jurisdiction and for service by alternative means on grounds of material non-disclosure, but reinstated those orders.

### "the court will not give permission unless satisfied" (r.6.37(3))

**6.37.5**    Rule 6.36 and para.3.1 of PD 6B state the grounds upon which the court may grant a claimant permission to serve a claim form out of the jurisdiction. In a given case, assuming that the court concludes that it has such power, that does not conclude the matter. As para.(3) of r.6.37 states, the court will not give permission unless satisfied that England and Wales is "the proper place in which to bring the claim". It is an over-simplification to say that this provision gives the court a discretion. In effect it flags up sophisticated conflict of law rules, particularly as regards the doctrine of forum non conveniens, which would come into play, whether or not their existence was noted and acknowledged in r.6.37. See paras 6.37.13 et seq below.

Where proceedings are started in an English court and served on the defendant within the jurisdiction, on application the court has power to stay the proceedings in favour of foreign proceedings where the court determines that England is not the proper place in which to bring the claim. That power also is exercisable in accordance with conflict of law rules. It is quite separate from the power exercisable by the court in accordance with r.6.37(3), but similar considerations may arise; see paras 6.37.22 et seq below.

### Permission to serve a claim form elsewhere in the UK (r.6.37(4))

**6.37.6**    Since the coming into effect of the Civil Jurisdiction and Judgments Act 1982, generally service of a claim form in Scotland or Northern Ireland may be made without permission under r.6.32. In the rare circumstances where permission is required r.6.37(4) applies. The rule was initially enacted in the late nineteenth century to placate Scottish concerns that English courts then too readily granted claimants permission to serve writs on defendants in Scotland. The effect of r.6.37(4) is confined to its context. Thus, where service is effected on a defendant in Scotland or Northern Ireland in circumstances where it was not necessary for the claimant to obtain the court's permission, and the defendant applies to set aside the service on forum non conveniens grounds, r.6.37(4) does not add anything to the defendant's submissions.

The effect of the rule may be misunderstood. In *Williams v Cartwright* [1895] 1 Q.B. 142, CA, it was explained (at p.146 per Lord Esher MR) that it is not an additional ground for giving permission to serve out of the jurisdiction; it is an additional obstacle that the applicant has to surmount. The cost and convenience of all parties to the action, not of the claimant alone, is relevant (ibid, at pp.147 and 149). There is no comparable reciprocal rule in the Rules of the Court of Session. For other early authorities on the rule, see *White Book* 2008 Vol.1 para.6.21.8. The early cases show that the chief considerations of convenience are the obvious ones of the residence of the parties and witnesses, the inconvenience of double litigation and the fact of one of the courts having already acquired seisin of the case, the location of documents for convenience of disclosure, the probability of despatch or delay, and the enforcement of the remedy sought in the action. Those cases were decided at a time when the differences between the considerations that the court had to take into account in this context, and where defendants were resident in other countries, were more marked than they subsequently became.

### Directions as to service etc where court gives permission (r.6.37(5))

**6.37.7**    The appropriate form where an order for permission is granted is Form **PF 6B** (Order for permission to serve claim form out of jurisdiction (r.6.37(5)).

Various rules in the CPR impose time limits within which a defendant served with a claim form should take certain procedural steps, if minded to do so. Paragraph (5) of r.6.37 acknowledges that the periods specified in such time limits should not apply where the defendant is served out of the jurisdiction, because it would be unrealistic to expect compliance. Those time limits are not disapplied, but instead the court is required to specify alternative periods for the procedural steps referred to in subparas (i) to (iv) of para.(a) of r.6.37(5).

As the parenthesis at the end of r.6.37 indicates, the periods referred to in subparas (i), (ii) and (iii) of r.6.37(5)(a) are as specified in para.6.1 of PD 6B (see para.6BPD.5). The period specified should be inserted in para.2 of Form **PF 6B**. Where an application notice is to be served out of the jurisdiction on a person who is not a party to the proceedings, paras (i), (ii) and (iii) of r.6.37(5)(a) do not apply (r.6.39(1)).

Where the claim form is to be served out of the jurisdiction it must be served in accordance with Section IV of Pt 6 within six months of the date of issue (r.7.5). The court may give directions

about "the method of service" and give permission for other documents in the proceedings to be served out of the jurisdiction (para.(b) or r.6.37(5)) and normally such directions will be sought by the claimant. For general provisions as to methods of service of claim forms out of the jurisdiction, see r.6.40 below. For commentary on the question whether the court may permit service out of the jurisdiction by "an alternative method", and for relevance of r.6.37 to that issue, see para.6.40.3.

For procedure where service is to be through foreign governments, judicial authorities and British Consular authorities, see r.6.42 and r.6.43, and commentary thereon.

**Amendment of claim form before service**

A claimant's application for permission to serve out of the jurisdiction under r.6.36 must set out which of the grounds in para.3.1 of PD 6B is relied on (r.6.37(1)(a)). In practice this means demonstrating to the court in the application how the claimant's claim comes within one or more of those grounds. Rule 17.1(1) provides that a party may amend his statement of case at any time before it is served on any other party. (Subject to what is said immediately below, this rule and other rules relating to amendment apply to claim forms served out of the jurisdiction in the same way as they apply to other actions.) It is conceivable that a claimant, having been granted permission to serve out of the jurisdiction on one ground may, before serving it, resolve to amend the claim adding a new cause of action. Where the new cause of action is not one falling within any of the grounds stated in para.3.1, such amendment is not permissible (*Waterhouse v Reid* [1938] 1 K.B. 743, CA). Where the claimant's position is that the amended claim does fall within one of the grounds he or she cannot proceed on the assumption that the court's order granting permission covers the amended claim; the claimant must make a fresh application under r.6.36 for permission to serve the claim form out of the jurisdiction relating the claim in its amended form to a ground in para.3.1 (*Trafalgar Tours Ltd v Henry* [1990] 2 Lloyd's Rep. 298, CA).

**6.37.8**

**Amendment of claim form after service**

An applicant for permission under r.6.36 must show that each claim made in the claim form has the attributes set out in at least one of the subparagraphs listed under para.3.1 of PD 6B; each such subparagraph being read, generally speaking, disjunctively (*Matthews v Kuwait Bechtel Corp* [1959] 2 Q.B. 57, CA). This may be a straight-forward matter. On the other hand it may involve a detailed analysis of issues of fact and law (perhaps quite complicated), creating scope for well-founded rival submissions in the event of an order for service out being challenged by the defendant. Where the order is so challenged the claimants may seek to support it on a different analysis of their pleaded case to that upon which they relied at the ex parte hearing. A question which has arisen is whether the claimants, anticipating at an inter partes hearing a formidable challenge to the order granting service out, may seek the court's permission to amend their pleaded case, putting the claim on a different basis to that for which permission to serve out was granted ex parte and relating the amended claim to one or other of the grounds set out in para.3.1 of PD 6B.

**6.37.9**

It had been thought that, in deciding whether service out of the jurisdiction should be set aside, the court had to confine itself to considering only those matters relied on as bringing the case within (what is now) para.3.1 of PD 6B when the original permission was given. The Court of Appeal so held in *Parker v Schuller* (1901) 17 T.L.R. 299, CA. Subsequently, that Court of Appeal decision was referred to or applied in numerous decisions at first instance or in the Court of Appeal (well summarised in *Al-Sadi v Al-Sadi* [2011] EWHC 976 (Comm) at [18] and [19], and [34] et seq) in support of the proposition that a claimant who had been given permission to serve out could not resist an application challenging the jurisdiction by pleading a new cause of action. If the claimants wished to rely on the amended claim (perhaps because forced to in order to keep the claim alive), they had to make a fresh application for permission to serve out (which almost invariably would involve applying for an extension of time for service).

In the Supreme Court case of *NML Capital Ltd v Republic of Argentina* [2011] UKSC 31; [2011] 2 A.C. 495, SC, Lord Phillips (with whom the other Justices agreed on this point) stated that he was prepared to hold, should it be necessary to do so, that the so-called rule in *Parker v Schuller* should no longer be applied. His lordship explained (at [76] and [77]) that there are a number of authorities, starting with *Holland v Leslie* [1894] 2 Q.B. 450, CA, which suggest that there is, in principle, no objection to amending a pleading which has been served out of the jurisdiction (whether by amending to add a cause of action or to substitute one), unless the effect will be to add a claim in respect of which leave could not, or would not, have been given to serve out. There was no obvious reason why it should be mandatory for the claimant to be required to start all over again rather than that the court should have a discretion as to the order that would best serve the overriding objective. (The same principle applies to reliance on a new jurisdictional gateway to justify service out of the jurisdiction, where there is no amendment to the claimant's substantive case: see para.6.37.14 below.)

Where a claimants' application to amend involves a defendant outside the jurisdiction who is already before the court, the court should not adopt any different approach to that adopted in a domestic case, provided that the new cause of action is one for which permission to serve out could be obtained if necessary (*JSC VTB Bank v Skurikhin* [2013] EWHC 3863 (Comm) at [9]).

See further commentary on r.11 (Disputing the court's jurisdiction)

**Claim form marked "not for service out of the jurisdiction"**

In para.5.4.3 of the Queen's Bench Guide, it is explained that a claimant may issue a claim form against a defendant who appears to be out of the jurisdiction, without first having obtained

**6.37.10**

permission for service out, provided that, if the case is not one where service may be effected without permission, the claim form is endorsed by the court "not for service out of the jurisdiction" (Vol.2 para.1B-25). See also, to similar effect, para.11.7 of the Chancery Guide (Vol.2 para.1A-77). That practice is of very long standing. Before the enactment of the CPR it was dealt with in practice directions (including *Practice Note (Writ: Service Abroad)* [1987] 1 W.L.R. 86).

The explanation usually given for the purpose of the practice has been (1) that it ensures that the claim form issued by the court is not valid for service out of the jurisdiction in circumstances where permission to serve out is required, and (2) that it is convenient where the defendant with a foreign address has a solicitor within the jurisdiction willing to accept service and/or where there are other defendants who could be served out of the jurisdiction without permission. A lack of the relevant endorsement will not, however, affect the validity of the claim form (*Alli-Balogun v On The Beach Ltd* [2021] EWHC 83 (QB), Bourne J at [63]).

The periods of initial validity for service of a claim form (four months or six months) depend on whether it is to be served (respectively) within or without the jurisdiction (see r.7.5). The claimant may apply for an order extending the period of initial validity, but if the application is made after the claim form has expired it is subject to additional hurdles under r.7.6(3). Where the claim form is marked at issue "not for service out of the jurisdiction" (permission to serve out not having been obtained at that point), and an application for permission to serve out of the jurisdiction is made more than four months but less than six months after the date of issue, the court's discretion to grant the application is not constrained by r.7.6(3) (*Anderton v Clwyd CC (No.2)* [2002] EWCA Civ 933; [2002] 1 W.L.R. 3174, CA, at paras 97 and 98).

### Admiralty claims

**6.37.11**    In Part 61 (Admiralty claims) special rules as to the service out of the jurisdiction of claim forms for collision claims and for limitation claims are stated in, respectively, r.61.4(7) and r.61.11(5). Claim forms may not be served out of the jurisdiction unless the conditions stated in those provisions are met, and "the court grants permission under Section IV of Part 6"; see Vol.2 paras 2D-29 & 2D-73. See further paras N5.3 and N6.2 of the Admiralty and Commercial Courts Guide (Vol.2 paras 2A-133 & 2A-134).

### Appeal

**6.37.12**    An appeal from a refusal by a Master to give permission to serve the claim form out of the jurisdiction lies to a judge of the High Court. Should a party wish to challenge a decision of a judge of the High Court which was itself an appeal from a decision of a Master, permission to appeal must be sought from the Court of Appeal to which any such appeal (a second appeal) lies (see CPR r.52.3 to 52.7, and Table 1 to PD 52A).

### Determination of applications under r.6.37—principles in outline

**6.37.13**    Rule 6.36 states that a claimant may serve a claim form out of the jurisdiction with the permission of the court if any of "the grounds" set out in para.3.1 of PD 6B apply. Such grounds (or heads) of jurisdiction (also known colloquially as "gateways") are set out in para.3.1(1) to (21).

As to grounds for permission to serve an arbitration claim form out of the jurisdiction, see CPR r.62.5.

The several paragraphs in para.3.1 of PD 6B cover a wide range of circumstances. Each is complete in itself and independent of the others. All are concerned to identify some "substantial and not merely casual or adventitious link between the cause of action and England" (*Brownlie v Four Seasons Holdings Inc* [2017] UKSC 80; [2018] 1 W.L.R. 192, SC, at para.28 per Lord Sumption).

For detailed commentary on the scope of each of the paragraphs, see Notes on Heads of Jurisdiction in para.3.1 of PD 6B, para.6HJ.1.

The general principles to be applied by the court, when hearing and determining an application under r.6.36, were summarised in *Altimo Holdings and Investment Ltd v Kyrgyz Mobile Tel Ltd* [2011] UKPC 7; [2012] 1 W.L.R. 1804, PC, at paras 71, 81 and 88 per Lord Collins, and in *VTB Capital Plc v Nutritek International Corp* [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep. 313, CA, at paras 99 to 101, in a joint judgment delivered by Lloyd Jones LJ. The claimant must satisfy the court:

1.    that there is a good arguable case that the claim against the foreign defendant falls within one or more of the heads of jurisdiction for which leave to serve out of the jurisdiction may be given as set out in para.3.1 of PD 6B (see further para.6.37.14);

2.    that, in relation to the foreign defendant to be served with the proceedings, there is a serious issue to be tried on the merits of the claim (see further para.6.37.15);

3.    that in all the circumstances (a) England is clearly or distinctly the appropriate forum for the trial of the dispute (forum conveniens) (see further para.6.37.16), and (b) the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction (see further para.6.37.25).

### Claim falls within the ground relied on ("good arguable case")

**6.37.14**    An application for permission under r.6.36 must set out which head of jurisdiction (or "ground") is relied on (r.6.37(1)(a)). It had been thought that, if a claim was put forward at the permission stage on one legal basis, the claimant could not subsequently justify permission on another legal

basis; a fresh application for permission was needed. This was referred to as the rule in *Parker v Schuller* (see para.6.37.9 above) and was said to apply not just to the cause of action asserted, but also to the jurisdictional gateway relied upon (see *Albon v Naza Motor Trading Sdn Bhd* [2007] EWHC 9 (Ch); [2007] 1 W.L.R. 2489 (Lightman J) at para.16, referring to *ABCI v Banque Franco-Tunisienne* [2002] 1 Lloyd's Rep. 511 and *Metall und Rohstaff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 Q.B. 391).

That is no longer the case, however, following the Supreme Court's decision in *NML Capital Ltd v Republic of Argentina* [2011] UKSC 31; [2011] 2 A.C. 495, SC, disapproving the rule in *Parker v Schuller*. Although the Supreme Court's comments on this point were obiter, it is now accepted that the court has a discretion to allow a claimant to rely on a new jurisdictional gateway that was not referred to at the permission stage. See e.g. *Alliance Bank JSC v Aquanta Corp* [2012] EWCA Civ 1588; [2013] 1 All E.R. (Comm) 819 (at [75]); *Apex Global Management Ltd v Fi Call Ltd* [2013] EWHC 1652 (Ch); [2014] B.C.C. 286 (at [23]); *Gunn v Diaz* [2017] EWHC 157 (QB); [2017] 2 All E.R. (Comm) 129 (at [71]–[74]).

The position must, however, be assessed as at the time of the original permission hearing. New evidence may be adduced at the hearing of the application to set aside, but only if it sheds light on the position as at the permission stage: see *Satfinance Investment Ltd v Athena Art Finance Corp* [2020] EWHC 3527 (Ch) (Morgan J) at [41] and [52]. In that case, the claimant sought to justify the grant of permission to serve out under the "necessary or proper party" gateway (see paras 6HJ.5 et seq.) by reference to the joinder of a new "anchor defendant" after the date of the original permission hearing. The court held that this was not permissible, distinguishing *NML Capital* and *Alliance Bank*, op cit, on the basis that, in those cases, the new grounds the claimant sought to rely on to justify the grant of permission did not depend on facts which occurred only after the original permission hearing (see [123]–[124]). A fresh application was therefore required.

Obviously it would be unsatisfactory if it were sufficient for a claimant merely to assert that his or her claim fell within one or other of the heads of jurisdiction set out in para.3.1 of PD 6B. Not infrequently, the question whether the claimant's claim comes within one or other of the heads of jurisdiction raises factual and legal issues of considerable difficulty. So far as factual issues are concerned, the standard of proof that the claimant must satisfy, in relation to establishing that the claim against the foreign defendant falls within one or more of the relevant heads of jurisdiction, is that of "a good arguable case": see *VTB Capital Plc v Nutritek International Corp* [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep. 313, CA, at [99], and *Altimo Holdings and Investment Ltd v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2012] 1 W.L.R. 1804, PC, at [71] and [81] (see below as to the court's approach where the existence of jurisdiction depends on a question of law). That point did not arise directly in *Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran* [1994] 1 A.C. 438, HL, as attention was concentrated upon the separate question of the strength of the case on the merits which a claimant has to establish in order to justify the grant of leave to serve proceedings out of the jurisdiction (see further para.6.37.15). But the point was made clear by Lord Goff in his analysis of *Vitkovice Horni A Hutni Tezirstvo v Korner* [1951] A.C. 869, HL, demonstrating that in that case the House of Lords rejected the submission that the standard of proof in relation to establishing that a case fell with one of the heads of jurisdiction was the civil standard of "balance of probabilities" (a higher standard than "good arguable case") (452E to 454D).

In this context "good arguable case" connotes more than a serious issue to be tried or a real prospect of success, but not as much as balance of probabilities (*Carvill America Inc v Camperdown UK Ltd* [2005] EWCA Civ 645; [2005] 2 Lloyd's Rep. 457, CA, at para.45 per Clarke LJ). That standard of proof applies to an issue going to jurisdiction both where the issue is one which will also be an issue at trial and where it will not be. In *Canada Trust v Stolzenberg (No.2)* [1998] 1 W.L.R. 547, CA, Waller LJ explained (at p.555E) that it is important to remember that in cases where points arise which relate to jurisdiction, but which might also be argued about at the trial, the court must be concerned not even to appear to express some concluded view as to the merits (e.g. as to whether the contract existed or not). And it is also right to remember that the "good arguable case" test, although obviously applicable to the ex parte stage, becomes of most significance at the inter partes stage where two arguments are being weighed in the interlocutory context (which is not a trial). In that context, Waller LJ stated, "good arguable case" reflects "that one side has a much better argument on the material available". This so-called *Canada Trust* gloss was approved by Lord Steyn in the appeal to the House of Lords in the *Canada Trust* case ([2002] 1 A.C. 1, HL, at p.13), endorsed by the Privy Council in *Bols Distilleries BV v Superior Yacht Services* [2006] UKPC 45; [2007] 1 W.L.R. 12, PC, at paras 26 to 28, and *Altimo Holdings and Investment Ltd v Kyrgyz Mobil Tel Ltd*, op cit, at para.71), and applied in various other cases though at times in terms that doubted whether the word "much" added much to the test (see e.g. *AstraZeneca UK Ltd v Albemarle International Inc* [2010] EWHC 1028 (Comm); [2010] 2 Lloyd's Rep. 61 (Hamblen J) at para.26 and *Aeroflot · Russian Airlines v Berezovsky* [2013] EWCA Civ 784; [2013] 2 Lloyd's Rep. 242 at para.50).

In *Brownlie v Four Seasons Holdings Inc* [2017] UKSC 80; [2018] 1 W.L.R. 192, SC, Lord Sumption expressed the opinion that the *Canada Trust* gloss "is a serviceable test, provided that it is correctly understood". He explained that the reference to "a much better argument on the material available" is not a reversion to the civil burden of proof which the House of Lords had rejected in *Vitkovice Horni A Hutni Tezirstvo v Korner*, op cit. Instead, it means (1) that the claimant must supply

a plausible evidential basis for the application of a relevant jurisdictional gateway; (2) that if there is an issue of fact about it, or some other reason for doubting whether it applies, the court must take a view on the material available if it can reliably do so; but (3) the nature of the issue and the limitations of the material available at the interlocutory stage may be such that no reliable assessment can be made, in which case there is a good arguable case for the application of the gateway if there is a plausible (albeit contested) evidential basis for it. His lordship doubted whether anything was gained by the use of the word "much" in the test, which suggests "a superior standard of conviction that is both uncertain and unwarranted in this context".

In *Goldman Sachs International v Novo Banco SA* [2018] UKSC 34; [2018] 1 W.L.R. 3863, SC, the Supreme Court endorsed the three-limbed explanation of the "better of the argument" test given by Lord Sumption in the *Brownlie* case, thereby removing doubts that it was obiter. Subsequently, in *Kaefer Aislamientos SA de CV v Atlas Drilling Mexico SA de CV* [2019] EWCA Civ 10; [2019] 1 W.L.R. 3514, the Court of Appeal provided guidance (at paras 72 to 86) as to how the test is to be applied in practice. The court also stated (at para.77) that the adjunct "much" in the *Canada Trust* formulation must be laid to rest, noting that the word was deemed superfluous by Lord Sumption in *Brownlie*. See also *Coward v Ambrosiadou* [2019] EWHC 2105 (Comm) (Andrew Henshaw QC).

It has been held that, where the claimant puts his claim in the alternative, alleging that one or other of the defendants must be liable, it is sufficient to demonstrate a good arguable case that one or other of the defendants is liable (*Virgin Atlantic Airways Ltd v KI Holdings Co Ltd* [2014] EWHC 1671 (Comm) (Burton J) at para.18).

In *Al Jaber v Al Ibrahim* [2018] EWCA Civ 1690; [2019] 1 W.L.R. 885, where the claimants made a claim for money owing and unpaid under an oral loan agreement, the judge granted permission to serve out of the jurisdiction only in respect of the claim for the principal sum and not in respect of the claim for interest, taking the view that the claimants had shown a good arguable case for the former claim but not the latter (which was based on a disputed implied term). The Court of Appeal held that the judge had erred, holding (1) that the claim for interest was dependent on (or "accessory to") the primary claim for repayment, (2) that once the judge had decided that there was a good arguable case that the primary claim fell within at least one of the heads of jurisdiction in para.3.1 of PD 6B, the accessory claim did so too.

Where the defendant in a claim form is a foreign state, the applicant for permission under r.6.36 to serve the claim form out of the jurisdiction must show distinctly, not only under which head of jurisdiction within para.3.1 of PD 6B the claim falls, but also why the prospective defendant is not absolutely immune from suit; see further para.6.44.1.

Where a question of law arises in connection with a dispute about service out of the jurisdiction and that question of law goes to the existence of the jurisdiction, then the court will normally decide the question of law, as opposed to seeing whether there is a good arguable case on that issue of law, if the facts are clear (*E F Hutton & Co (London) Ltd v Mofarrij* [1989] 1 W.L.R. 488, CA, per Kerr LJ, at 495; *Altimo Holdings and Investment Ltd v Kyrgyz Mobile Tel Ltd* [2011] UKPC 7; [2012] 1 W.L.R. 1804, PC, at [81]; *VTB Capital Plc v Nutritek International Corp* [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep. 313, CA, at [99]; *Lungowe v Vedanta Resources Plc* [2017] EWCA Civ 1528; [2017] B.C.C. 787, CA, at [63]; *Airbus SAS v Generali Italia SPA* [2019] EWCA Civ 805; [2019] 4 All E.R. 745, at [52] to [53]). There are exceptions to this approach where (as on summary judgment applications) the question is a particularly difficult one or is in a controversial or developing area of law (*Flota Petrolera Ecuatoriana v Petroleos de Venezuela SA* [2017] EWHC 3630 (Comm); [2017] 2 C.L.C. 759 (Leggatt J)). The more doubtful the point of law the more cautious the court should be; as to the facts, the court should proceed on the basis of the pleaded case (*Lungowe v Vedanta Resources Plc*, op cit, at para.63). This approach has consistently been applied to cases where jurisdiction has depended on the applicable law of a contract for the purposes of what is now para.3.1(6)(c) of PD 6B. In such cases the court does not consider whether the claimant has a good arguable case that the contract is governed by English law, but rather whether the contract is governed by English law (*Chellaram v Chellaram (No.2)* [2002] EWHC 632 (Ch); [2002] 3 All E.R. 17 (Lawrence Collins J), at [136]).

### The merits of the claim ("the merits threshold")

**6.37.15**    The claimant must satisfy the court that there is a serious issue to be tried on the merits of the claim, that is, a substantial question of fact or law or both; that means that there has to be a real, as opposed to a fanciful, prospect of success on the claim (*Altimo Holdings and Investment Ltd v Kyrgyz Mobile Tel Ltd* [2011] UKPC 7; [2012] 1 W.L.R. 1804, PC, at [71]; *VTB Capital Plc v Nutritek International Corp* [2013] UKSC 5; [2013] 2 A.C. 337, SC, at [164]).

In delivering the principal speech in *Seaconsar Far East Ltd v Bank Markazi Jomhouri Islam Iran* [1994] 1 A.C. 438, HL, Lord Goff traced the history of the distinction between the question whether the claimant has sufficiently established that the case falls within one of the heads of jurisdiction, now specified in para.3.1 of PD 6B, and the separate question (which was the one arising in that case) whether the claimant has established a sufficiently strong case on the merits of his claim, and the occasional unfortunate intermingling of those questions (a problem that has not entirely gone away). His lordship noted that a number of different tests had been stated by judges as being apposite for the latter question, reflecting a number of conflicting considerations. The House of Lords held (p.457) that in respect of that question (sometimes called "the merits

threshold") it was sufficient for the claimant to establish that there was "a serious issue to be tried" in that there was a substantial question of fact or law or both arising on the facts disclosed by the written evidence that the claimant bona fide desired to have tried.

The "merits threshold" under this test is the same as if the claimant were resisting an application by the defendant for summary judgment under r.24.2. This is reflected in the terms of r.6.37(1)(b) which imposes on the applicant for permission to serve out of the jurisdiction the obligation of setting out in his application evidence that he believes that his claim has "a reasonable prospect of success", the antithesis of a claim which has "no real prospect of succeeding" and is therefore liable to summary dismissal under r.24.2 (*MRG (Japan) Ltd v Engelhard Metals Japan Ltd* [2003] EWHC 3418 (Comm); [2004] 1 Lloyd's Rep 731 (Toulson J), at [10]). There are sound policy reasons for the former test not being in substance different from the latter where there are other defendants inside the jurisdiction (*de Molestina v Ponton* [2002] 1 All E.R. (Comm) 587; [2002] 1 Lloyd's Rep. 271 (Colman J), at [3.1] to [3.8]). The underlying rationale is that the court should not subject a foreign litigant to proceedings which the defendant would be entitled to have summarily dismissed (see *Carvill America Inc v Camperdown UK Ltd* [2005] EWCA Civ 645; [2005] 2 Lloyd's Rep. 457, CA, at [24] per Clarke LJ, and authorities referred to there). It is important to have in mind that the test is not a high one. An issue which is imaginary or fanciful is not a serious issue to be tried; a claimant has a real prospect of success if its chances of success are not fanciful (ibid). See also *Pakistan v Zardari* [2006] EWHC 2411 (Comm); [2006] C.L.C. 667 (Lawrence Collins J), at [136]; *Cecil v Bayat* [2010] EWHC 641 (Comm), at [16].

The *Seaconsar* case was decided on the basis of RSC Ord.11 r.4(1)(b), the predecessor to r.6.37(1)(b). The former provision required that the deponent in an affidavit in support of an application for permission to serve out of the jurisdiction should state "that in the deponent's belief the plaintiff has a good cause of action". After the CPR came into effect, it was held that the change in wording, from "a good cause of action" to "a reasonable prospect of success" did not indicate a legislative intention to alter the test for the merits threshold as laid down in the *Seaconsar* case (*BAS Capital Funding Corp v Medfinco Ltd* [2003] EWHC 1798 (Ch); [2004] I.L.Pr. 16 (Lawrence Collins J) at para.153).

As can be seen from the above, the standards of proof are different as between (1) whether there is a serious issue to be tried on the merits of the action and (2) whether it is established that a relevant ground of jurisdiction in para.3.1 of PD 6B has been engaged. It is necessary therefore to consider whether an ingredient for a cause of action relevant to (1) is also part of what has to be established for (2). If so, the lower standard of proof (for (1)) is subsumed into the higher (for (2)), and becomes irrelevant (*Cecil v Bayat* [2010] EWHC 641 (Comm) (Hamblen J), at [19]).

### English court the appropriate forum (forum conveniens)

**6.37.16**  As explained above, certain principles apply where the court is required to determine whether or not a claimant should be granted permission to serve a claim form out of the jurisdiction (see para.6.37.13). They include the principle that a claimant, in applying ex parte for permission to serve a claim form out of the jurisdiction under r.6.36, must establish, amongst other things, that in all the circumstances England is clearly or distinctly the appropriate forum (forum conveniens).

In giving the leading speech in *Spiliada Maritime Corp v Consulex Ltd (The Spiliada)* [1987] A.C. 460, HL, Lord Goff noted the distinction between (1) the circumstances considered in this paragraph (and arising in that case) where an application is made to the English court by a claimant under what is now r.6.36 for permission for service on the defendant out of the jurisdiction (a "service out case"), and (2) circumstances where the jurisdiction of the English court has been founded "as of right", that is to say by service of proceedings on the defendant within the jurisdiction (e.g. because the defendant was in the jurisdiction or a ship was arrested here), and the defendant applies to the court for a stay of the proceedings on the ground of forum non conveniens (a "service in case"). Put simply, *The Spiliada* raised the question whether the judge, in determining whether the case was "a proper one" for service out of the jurisdiction, had applied the correct test, in particular in determining whether England (and not Canada) was the appropriate forum (forum conveniens).

Lord Goff concluded that the stage had been reached where the "fundamental principle" applicable in both "service out cases" and "service in cases" is that the court:

"... has to identify in which forum the case could most suitably be tried for the interests of all the parties and for the ends of justice."

His lordship drew out considerations common to both groups and identified distinctions between them and, in giving guidance, dealt directly with the question of permission to serve out of the jurisdiction (pp.478E to 482A) and indirectly with the question of stay of English proceedings (475C to 478E). He expressly did not deal with the question of injunctions designed to constrain a party from pursuing foreign proceedings (*Cannon Screen Entertainment Ltd v Handmade Films (Distributors) Ltd*, 11 July 1989, unrep. (Hobhouse J) at 44).

Lord Goff's speech has been regarded as the locus classicus in relation to issues of appropriate forum, both in "service in cases" and in "service out cases" at common law. However, confusion is likely to occur unless it is remembered that a submission by a defendant in a "service out case" that England is not the forum conveniens is not the same as a plea by a defendant in a "service in case" of forum non conveniens, though the relevant principles to be applied by the court overlap to an

extent. On occasion, certain principles stated by Lord Goff to be considered by a court when determining, in "service in cases", whether the English proceedings should be stayed on forum non conveniens grounds (see (a) to (f) on pp.475C to 478E, summarised at para.6.37.22) have been relied on in "service out cases" where the question was whether England was the forum conveniens. See, e.g., *VTB Capital Plc v Nutritek International Corp* [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep. 313, CA, where the Court of Appeal, at para.129, noted this error in the interpretation of Lord Goff's speech. (It appears to have arisen because reliance was placed on reduced versions of what Lord Goff actually said in the *Spiliada* case.)

The guidance given by Lord Goff as to the determination of the appropriate forum in "service out cases", which is the matter specifically relevant to commentary on rr.6.36 and 6.37, is at pp.478E to 482A of his speech. Recourse should be had to those passages. Some important points to bear in mind are as follows:

1.  The burden is on the claimant, not merely to persuade the court that England is the appropriate forum, but "to show that this is clearly so" (*The Spiliada* op cit at p.481); alternatively, to adopt the words of r.6.37(3), "the court has to be satisfied by the claimant that England is the proper place in which to bring the claim" (*VTB Capital Plc v Nutritek International Corp* [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep. 313, CA, at para.131); see too *Erste Group Bank AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ 379; [2015] 1 C.L.C. 706, CA, at para.78(viii).

2.  The "fundamental principle" (applicable to both "service out" and "service in" cases alike) is that the court "has to identify in which forum the case could most suitably be tried for the interests of all the parties and for the ends of justice" (*The Spiliada*, op cit, at para.474A).

3.  The determination of the appropriate forum in a given case requires the proper application of relevant private international law rules on the doctrine of *forum conveniens* as derived from extensive case law. It is not a simple "exercise of discretion" (though frequently couched in those terms). The court is required to reach an evaluative judgment upon whether, in the light of the relevant considerations, England is clearly the more appropriate forum (*VTB Capital Plc v Nutritek Capital Holdings Ltd* [2013] UKSC 5; [2013] 2 A.C. 337, SC, at para.97 per Lord Neuberger, and at para.156 per Lord Wilson).

4.  Each case depends on its own particular facts. Reported decisions of first instance judges in deciding whether or not to permit a foreign defendant to be served outside of the jurisdiction are illustrations of circumstances in which a discretion has been exercised, and are not binding authority on how that discretion is to be exercised (*Jong v HSBC Private Bank (Monaco) SA* [2015] EWCA Civ 1057; [2015] 2 C.L.C. 607, CA, at para.18).

Clearly a court cannot decide where a matter should be most appropriately and justly tried without being clear what it is that is to be tried. In *Conversant Wireless Licensing SARL v Huawei Technologies Co Ltd* [2019] EWCA Civ 38; [2019] R.P.C. 6, it was accepted that this question should not be answered simply by reference to the relief claimed, since in an English action the relief claimed will almost inevitably be framed in English terms, particularly where it is statutory. The court explained (paras 32 to 35, and paras 95 et seq) that the proper characterisation of the dispute involves analysis of the overall dispute between the parties and at how the claim is to be answered insofar as that is known. The "case" is not restricted to an analysis of the claim and relief sought by the claimant. The inquiry requires the court to identify which is the natural or appropriate forum or forum conveniens for the dispute between the parties, not merely the claims the claimant wishes to advance or the relief it wishes to seek (*Re Harrods (Buenos Aires) Ltd* [1992] Ch. 72, CA, per Bingham LJ, at p.123).

In *Limit (No.3) Ltd v PDV Insurance Co Ltd* [2005] EWCA Civ 383; [2005] 2 All E.R. (Comm) 347, CA, the Court of Appeal noted that, in general, where a defendant wishes to set aside an order for permission to serve out of the jurisdiction on the basis that the action involves or may involve issues which it would be appropriate should be tried in a court or courts outside the jurisdiction, it is incumbent upon him or her, so far as possible, to identify the issues concerned and to state as clearly as possible how they arise or may arise in the proceedings (per Clarke LJ at para.72). That is so even though, on such an application, the burden of proving that England is the more appropriate forum for the trial of the action is on the claimant. It is not appropriate for a defendant merely to speculate as to the issues which might arise (ibid).

The factors which a court is entitled to take into account in considering whether England is the appropriate forum are legion. In a given case, one judge and another judge might quite reasonably disagree on the weight to be given to the relevant factors and as to their cumulative effect. In *The Spiliada*, op cit, Lord Templeman, perhaps aware of the fact that the flexibility introduced into the law by the decision of the House of Lords in that case would increase the scope for disputes between parties in particular cases about the application of the doctrine of *forum conveniens* (and of *forum non conveniens*), observed that the authorities do not, perhaps cannot, give any clear guidance as to how these factors are to be weighed in any particular case. His lordship said that the judge should not be referred to other decisions on other facts but should study the evidence and refresh his memory of Lord Goff's speech in the quiet of his room and the hearing of submissions should "be measured in hours and not days" (at pp.465F to 465G). It has frequently been noted that this dictum has proved to be wildly optimistic. (In this procedural context the controls on excessive citation of authority appear to be ineffective.) Lord Templeman added that the solution of disputes

about the relative merits of trial in England and trial abroad is pre-eminently a matter for the judge, and that "[a]n appeal should be rare and the appellate court should be slow to interfere" (ibid). Appeal judgments repeating the latter dictum, or containing dicta expressing the same sentiment, are common. However, despite such exhortations it is not the case that such appeals are rare, and it has to be said that the incidence of appeal courts interfering with the decisions of judges does not appear to be sufficiently low to act as any real deterrent to appeals.

In giving guidance in the *Spiliada* case, Lord Goff referred to a number of "matters", "factors" or "circumstances" which in his opinion should be, or may be, regarded as relevant, but without attempting to be exhaustive and without suggesting that any of them were to be treated as determinative in claims based on particular causes of action. Included among these "matters" etc. are the ground of jurisdiction within which the claimant's claim falls (e.g. where England is the place where the contract was made), the defendant's residence or place of business, the applicable substantive law (e.g. the law of the contract), and generally the legal and practical issues involved (including the availability of witnesses, costs and delay). The court should give to such factors "the weight which, in all the circumstances of the case, it considers to be appropriate" (p.482A).

A number of factors the court may consider in a "service out case", in determining whether the English court is the appropriate forum for the dispute to be heard, as considered in *The Spiliada* and other cases, are considered in the paragraphs immediately below. These factors may apply equally (but from the opposite perspective) when the court is considering, in a "service in case", whether there is another more appropriate forum.

**6.37.17** *Treatment of "a legitimate personal or juridical advantage"*—In the *Spiliada* case, Lord Goff gave attention to the question whether it was relevant for the court to inquire whether or not a refusal of permission to serve out of the jurisdiction would deprive the claimant of a "legitimate personal or juridical advantage" accruing to him or her in the English jurisdiction, for example, damages awarded on a higher scale, a more complete procedure of disclosure, a power to award interest, a more generous limitation period (pp.482A to 484D). As a general rule the court should not be deterred from refusing permission for service out of the jurisdiction (or from granting a stay of proceedings in a "service in case") simply because the claimant will be deprived of such an advantage, provided that the court is satisfied that substantial justice will be done in the available appropriate forum (p.482E). On the matter of limitation periods in particular, Lord Goff concluded that, where the claimant's claim is time-barred in the foreign jurisdiction and would undoubtedly be defeated if it were brought there, practical justice should be done, so that if the claimant acted reasonably in commencing proceedings in England, and did not act unreasonably in not commencing proceedings in the foreign country, it may not be just to deprive the claimant of the benefit of the English proceedings (p.483H).

In *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 Q.B. 391, CA, it was explained that the correct approach in principle is that only if the court decides that another forum is, prima facie, more appropriate should it then consider whether, after all, there exists a juridical advantage for the claimant such that trial in England is required if substantial justice is to be done between the parties (at p.488 per Slade LJ). In that case the claimant's failure to issue a protective writ in the foreign forum in time to avoid a time-bar was characterised as not manifestly unreasonable because, though possibly negligent, it was not part of a calculated procedural scheme designed to make it easier for them to obtain permission to serve out of the jurisdiction. See, further, *Lewis v King* [2004] EWCA Civ 1329; [2005] I.L.Pr. 16, CA, at para.37, where difficulties inherent in the principle are noted.

Other significant authorities on the "justice in the foreign jurisdiction" factor, and its possible relevance not only in "service out cases" but in "service in cases" as well, are: *Connelly v R.T.Z. Corp Plc* [1998] A.C. 854, HL, at p.872G per Lord Goff ("if a clearly more appropriate forum overseas has been identified generally speaking the plaintiff will have to take that forum as he finds it"); *Deripaska v Cherney* [2009] EWCA Civ 849; [2010] 2 All E.R. (Comm) 456, CA, at para.60; *Altimo Holdings and Investment Ltd v Fellowes International Holdings Ltd* [2011] UKPC 7; [2012] 1 W.L.R. 1804, PC, at paras 89 to 102; *Ferrexpo AG v Gilson Investments Ltd* [2012] EWHC 721 (Comm); [2012] 1 Lloyd's Rep. 588 (Andrew Smith J) at para.33; *Lungowe v Vedanta Resources Plc* [2019] UKSC 20; [2019] 2 W.L.R. 1051, at paras 88 to 101.

Where the defendant submits that a foreign court is the appropriate forum, and that is met by the claimant's submission that that forum is not available (e.g. because of personal risks to the claimant in pursuing claims in that jurisdiction, or because the foreign court would find that it did not have jurisdiction), it is not incumbent on the claimant to show on the balance of probabilities that proceedings could not take place in the foreign court, merely that there is a real risk of that happening (*Cecil v Bayat* [2010] EWHC 641 (Comm) (Hamblen J), at para.28, citing *Cherney v Deripaska* [2009] EWCA Civ 849; [2009] C.P. Rep. 48, CA, at para.29 per Waller LJ; see also *BAT Industries Plc v Windward Prospects Ltd* [2013] EWHC 4087 (Comm); [2014] 1 Lloyd's Rep. 559; [2014] 2 All E.R. (Comm) 757 (Field J) at para.69).

**6.37.18** *The Cambridgeshire factor*—In the *Spiliada* case, the judge at first instance, in rejecting the submission of the foreign defendants (served out of the jurisdiction) that England was not the forum conveniens, considered amongst other things the fact that the accumulated experience of counsel

and solicitors, derived from their participation in the trial of a related shipping action at the time being tried by the judge (the Cambridgeshire action), would lead to savings of time and money. The House of Lords held (disagreeing with the Court of Appeal) that the judge had not erred in his assessment of this factor. Labelled by Lord Goff as "the Cambridgeshire factor", his lordship stated (pp.485 and 486) that the judge was entitled to take the view (as he did) that that matter was not merely of advantage to the claimants, but also constituted an advantage which was not balanced by a countervailing equal disadvantage to the defendants; and (more pertinently) further to take the view that having experienced teams of lawyers and experts available on both sides of the litigation, who had prepared for and fought a substantial part of the Cambridgeshire action for the defendants (among others) on one side and the relevant owners on the other, would contribute to efficiency, expedition and economy, to assisting the court to reach a just resolution, and to promoting a possibility of settlement, in the *Spiliada* case itself.

The Cambridgeshire factor may be seen as a manifestation of the problem of concurrent (or "parallel" or "fragmented") proceedings, creating the risks of waste of resources and inconsistent judgments, a problem which arises in other procedural contexts, e.g., on applications for the stay of proceedings on forum non conveniens grounds, and for anti-suit injunctions.

**6.37.19**   *Relevance of governing law*—In *VTB Capital Plc v Nutritek International Corp* [2013] UKSC 5; [2013] 2 A.C. 337, SC, an English company (C) applied for permission to serve a claim form out of the jurisdiction on four defendants, two in Russia and two in the BVI. The cause of action was in tort. A Master granted C's application. The relevant head of jurisdiction was para.3.1(9)(i) of PD 6B. The defendants applied to set aside the Master's order, submitting (amongst other things) that England was not the forum conveniens. Both the judge and, on C's appeal, the Court of Appeal held that Russian law was the proper law and that Russia was the appropriate forum, and accordingly service should be set aside ([2011] EWHC 3107 (Ch) (Arnold J) at paras 185 et seq and [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep. 313, CA, at paras 128 et seq).

In dismissing C's further appeal the Supreme Court held that the judge and the Court of Appeal had both been in error in holding that the governing law was Russian rather than English. The fact that the governing law of the alleged torts was English law was in general a positive factor in favour of trial in England. However, the error as to the governing law did not disturb the conclusions which they both reached as to Russia being the appropriate forum.

Lord Mance said that the factor of English law being the governing law is important because it is generally preferable, other things being equal, that a case should be tried in the country whose law applies. That factor is of particular force if (as was not the case here) issues of law are likely to be important and if there is evidence of relevant differences in the legal principles or rules applicable to such issues in the two countries in contention as the appropriate forum (para.46).

In *Navig8 Pte Ltd v Al-Riyadh Co for Vegetable Oil Industry (The Lucky Lady)* [2013] EWHC 328 (Comm); [2013] 2 Lloyd's Rep. 104 (Andrew Smith J) the judge, whilst noting that Lord Mance's statement was obiter, accepted that it presented a synthesis of the approach of the Court of Appeal and the High Court in a number of other cases where "the parties had (expressly or impliedly) chosen English law" and was of general application (para.28). See also *Caresse Navigation Ltd v Office National De L'electricite ("The Channel Ranger")* [2013] EWHC 3081 (Comm); [2014] 1 Lloyd's Rep 337 (Males J) at para.61; *Golden Endurance Shipping SA v RMA Watanya SA* [2014] EWHC 3917 (Comm); [2015] 1 Lloyd's Rep. 266 (Burton J) at para.32; *JSC BTA Bank v Turkiye Vakiflar Bankasi TAO* [2018] EWHC 835 (Comm) (Butcher J) at para.98. Where issues involving any novel, complex or undecided issue of English law may arise, that would be a significant factor pointing in favour of England as the appropriate forum (*Surrey (UK) Ltd v Mazandaran Wood and Paper Industries* [2014] EWHC 3165 (Comm) (Eder J) at para.40).

**6.37.20**   *Relevance of related claims*—The fact that all possible related claims can be tried in one of the competing fora but not another carries great weight in deciding where the claims can best be tried in the interests of the parties and the interests of justice (see *BAT Industries Plc v Windward Prospects Ltd* [2013] EWHC 4087 (Comm); [2014] 1 Lloyd's Rep. 559; [2014] 2 All E.R. (Comm) 757 (Field J) at para.70, and authorities referred to there). However, there is no inflexible rule that it could never be in the interests of the parties or in the interests of justice for identical proceedings to be brought against one defendant or group of defendants in one jurisdiction, and against another defendant or group of defendants in another jurisdiction (ibid at para.80). In *Conductive Inkjet Technology Ltd v Uni-Pixels Displays Inc* [2013] EWHC 2968 (Ch); [2014] 1 All E.R. (Comm) 654 (Roth J), the judge, after reviewing the authorities and identifying the relevant factors to be taken into account (paras 121 to 128), concluded that the considerable "overlap" between issues arising in two claims made by the claimants, a patents claim (in relation to which the court had no power to decline jurisdiction) and a breach of confidence claim, was a "very significant factor" and found that the balance was clearly in favour of England as the appropriate forum for the trial of the breach of confidence claim (para.130). In *Denby Pottery Co Ltd v David Shaw Silverware North America Ltd* [2013] EWHC 4458 (QB) (Andrew Smith J) a judge set aside service out, finding that the English proceedings raised no issue arising in proceedings already on foot in a foreign court. The judge (1) noted that it is generally regarded as vexatious, and not in accordance with the overriding objective, for a party to bring in England a second action without good reason if the second action overlaps with other proceedings, and (2) stated that there was no good reason to take a different ap-

proach where (as in this case) the other action was brought, without contravening any relevant contract, in another jurisdiction to which the claimant in the second action was amenable and to which it had submitted (para.40).

The issue of whether England is the appropriate forum may arise in circumstances in which the claimant (C) has brought closely related claims against two defendants, where the claim against one (D1) has been brought as of right pursuant to the Judgments Regulation (so is not susceptible to a challenge on forum non conveniens grounds: see para.6.37.22 below—though since the completion of the UK's withdrawal from the EU on 31 December 2020 (IP completion day) this will only apply to transitional cases, where proceedings were issued before that day) and the claim against the other (D2) may be served out of the jurisdiction with the court's permission. In determining whether England (rather than a foreign forum) is the appropriate forum for C's claim against D2, the court may take into account the likely undesirable consequences of (in effect) parallel proceedings being pursued both in England and in the foreign forum (e.g. duplication of costs and the risk if irreconcilable judgments); this is a very important factor but it should not be regarded as a trump card. In *Lungowe v Vedanta Resources Plc* [2019] UKSC 20; [2019] 2 W.L.R. 1051, the Supreme Court was critical of the approach taken in previous cases (in particular *OJSC VTB Bank v Parline Ltd* [2013] EWHC 3538 (Comm), which was followed by the judge at first instance) in circumstances where it was clear that the claimants would in any event continue proceedings against the anchor defendant in England. In those cases, the courts treated the avoidance of irreconcilable judgments as decisive in favour of England as the proper place, even if all other connecting factors favoured a foreign jurisdiction. In *Vedanta*, the Supreme Court found that this approach involved an error of principle. The judge had given insufficient weight to the fact that the anchor defendant had offered to submit to the jurisdiction of the Zambian courts so that the whole case could be tried there. Accordingly, the risk of irreconcilable judgments stemmed from the claimants' decision to pursue the anchor defendant in England. They were entitled to do so, but not necessarily in a way that avoided incurring the risk of irreconcilable judgments (see paras 66 to 87). In *ED&F Man Capital Markets Ltd v Straits (Singapore) Pte Ltd* [2019] EWCA Civ 2073, the Court of Appeal noted that there was nothing in the Supreme Court's decision in *Vedanta* which represented a step-change in the law requiring the court to discount the importance of the avoidance of a multiplicity of proceedings and the risk of irreconcilable judgments, and found that the judge at first instance had been correct to distinguish *Vedanta* in circumstances where (unlike in *Vedanta*) the claimant had no real choice as to where to sue the anchor defendants.

*Jurisdiction agreements*—Where parties have bound themselves by a jurisdiction agreement, whether **6.37.21** exclusive or non-exclusive, the effect of that agreement may become relevant in various procedural contexts.

In proceedings commenced before completion of the UK's withdrawal from the EU on 31 December 2020 (IP completion day), where the parties have agreed that the English court shall have jurisdiction, the question of whether England is the forum conveniens is unlikely to come into play. In such circumstances, the claim will almost certainly be subject to the Judgments Regulation and the prorogation of jurisdiction provisions therein: see para.6JRx.34—or broadly similar provisions under the Lugano Convention, if the defendant is domiciled in Iceland, Norway or Switzerland, or under the 2005 Hague Convention, if any party is domiciled in Mexico, Montenegro or Singapore. If, unusually, these provisions do not apply, the existence of the jurisdiction agreement will be relevant to the question of whether there is a good arguable case that the claimant's claim falls within para.3.1(6)(d) of PD 6B (see para.6HJ.20), and also as a factor relevant to the question whether England is the forum conveniens.

In proceedings commenced after IP completion day, an application to serve proceedings on a defendant outside the jurisdiction will not be necessary if there is an exclusive jurisdiction clause in favour of the English courts entered into on or after 1 October 2015, as in those circumstances the 2005 Hague Convention will apply and the claim form can be served without the court's permission under r.6.33(2B)(a), unless the agreement is null and void under the law of that State (art.6(1) of the 2005 Hague Convention). In those circumstances, it also seems that questions of forum non conveniens will not be relevant, as art.6(2) provides:

"A court that has jurisdiction under paragraph 1 shall not decline to exercise jurisdiction on the ground that the dispute should be decided in a court of another State."

See further para.6.33.3 above.

Similarly, if there is a jurisdiction clause in favour of the English courts which falls outside the 2005 Hague Convention (for example because it is non-exclusive or was entered into before 1 October 2015), an application to serve out will not be necessary as a result of the rule change referred to at para.6.33.1 above, i.e. to add a new r.6.33(2B)(b) allowing service out of the jurisdiction without the court's permission where the claim otherwise falls within a choice of court agreement in favour of the English courts (that is, one which does not fall within the 2005 Hague Convention). In those circumstances, however, it would still be open to a defendant to challenge the court's jurisdiction on grounds of forum non conveniens.

Questions of forum non conveniens may also be relevant where the parties have agreed to the jurisdiction of a foreign court (in cases falling outside the Judgments Regulation, the Lugano Convention and the 2005 Hague Convention).

The leading authority on the effect of jurisdiction agreements generally (outside the context of the Judgments Regulation) is the decision of the House of Lords in *Donohue v Armco Inc* [2001] UKHL 64; [2002] 1 Lloyd's Rep. 119, HL, where the point at issue was the effect of an exclusive jurisdiction agreement in a separate procedural context, that is, whether the court should grant an anti-suit injunction restraining a party from bringing or continuing proceedings in a foreign court. Lord Bingham said (at para.24) that the general rule is clear: where parties have bound themselves by an exclusive jurisdiction clause, effect should ordinarily be given to that obligation in the absence of strong reasons for departing from it. Whether a party can show strong reasons, sufficient to displace the other party's prima facie entitlement to enforce the contractual bargain, will depend on all the facts and circumstances of the particular case. Thus, the court may find that, despite an agreement giving a foreign court jurisdiction, England is the forum conveniens, but it will not do so lightly.

For further discussion of the effect of jurisdiction agreements in this context, see para.11.1.15.

**6.37.22**   *The doctrine of forum non conveniens*—The doctrine of forum non conveniens will be relevant where the claimant has served the defendant with proceedings within the jurisdiction and the defendant makes an application under Pt 11 arguing that the court should not exercise any jurisdiction it might have to try the claim. A plea of forum non conveniens is not available where the English court has jurisdiction to hear the claim based on a mandatory ground of jurisdiction (such as the defendant's domicile) under the Judgments Regulation (*Owusu v Jackson* (C-281/02) EU:C:2005:120; [2005] Q.B. 801, ECJ) (in transitional cases, where proceedings were commenced before completion of the UK's withdrawal from the EU on 31 December 2020 (IP completion day): see para.6.30.1 above and para.6JRx.11) or where there is an exclusive English jurisdiction clause falling within the 2005 Hague Convention (see para.6.37.21 above).

As noted above, in *Spiliada Maritime Corp v Consulex Ltd (The Spiliada)* [1987] A.C. 460, HL, Lord Goff stated that the "fundamental principle" (applicable to both "service in" and "service out" cases alike) is that the court:

"... has to identify in which forum the case could most suitably be tried for the interests of all the parties and for the ends of justice" (para.474A).

In *The Spiliada*, in relation to "service in" cases, Lord Goff stated the law in six principles (see (a) to (f) on pp.475C to 478E), in effect broadening the circumstances in which the English court might stay its own proceedings on forum non conveniens grounds and as a consequence greatly increasing the incidence of applications for stays.

In numerous subsequent cases, judges have offered summaries of the principles, some more elaborate than others but all short of Lord Goff's detailed reasoning and of the illustrations he gave, generally tailored to the particular questions raised for decision in those cases, and usually agreed by the parties. See e.g. *KMG International NV v Chen* [2018] EWHC 1078 (Comm) (Moulder J) at [14]; *Conversant Wireless Licensing SARL v Huawei Technologies Co Ltd* [2018] EWHC 808 (Pat); [2018] R.P.C. 16 (Henry Carr J) at [42].

There are a number of important aspects to the principles, and they should not be lost sight of. Those aspects are conveniently tabulated in *The Owners of the Ship "Al Khattiya" v The Owners And/Or Demise Charterers of the Ship "Jag Laadki"* [2018] EWHC 389 (Admlty); [2018] 2 Lloyd's Rep. 243 (Bryan J) at [18]–[20]. (See also *Performing Right Society Ltd v Qatar Airways Group QCSC* [2020] EWHC 1872 (Ch) in which the defendant criticised the claimant's summary of the test in *The Spiliada*, which used the wording in *Al Khattiya*. Birss J said he doubted there was any real difference between the rival summaries in practice, but adopted the defendant's summary because its wording was closer to the words in *The Spiliada* ([20]).)

Lord Goff's six principles are summarised below, although they are not strictly relevant to a case where the claimant is applying to serve proceedings out of the jurisdiction (see para.6.37.16 above). It is commonly said that his lordship formulated "a two-stage test" for the determination of the question whether proceedings should be stayed on forum non conveniens grounds. At the first stage, it is for the defendant to satisfy the court that there is another forum which is prima facie the "appropriate" forum for the trial of the action. If the defendant does so, then the second stage is to decide whether there are special circumstances by reason of which justice required that the trial should, nevertheless, take place in England (pp.476D to 476E). That test is apparent in the last three of the principles.

1.   The basic principle is that a stay will only be granted on the ground of forum non conveniens where the court is satisfied that there is some other available forum, having competent jurisdiction, which is the appropriate forum for the trial of the action, i.e., in which the case may be tried more suitably for the interests of all the parties and the ends of justice.

2.   In general the burden of proof rests on the defendant to persuade the court to exercise its discretion to grant a stay. However, each party will seek to establish the existence of factors which it relies upon, and in respect of any such matter the evidential burden will rest on the party who asserts its existence. If the court is satisfied that there is another available forum which is prima facie the appropriate forum, the burden will shift to the claimant to show that there are special circumstances by reason of which justice requires that the trial should nevertheless take place in England.

3.   The defendant has the burden not just to show that England is not the natural or appropriate forum for the trial, but to establish that there is another available forum which is clearly or distinctly more appropriate than the English forum.

4.  Since the question is whether there exists some other forum that is clearly more appropriate for the trial of the action, the court will look first to see what factors there are which point in the direction of another forum. The natural forum is that with which the action has the most real and substantial connection. Connecting factors will include not only factors affecting convenience or expense (such as availability of witnesses), but also other factors such as the law governing the relevant transaction, and the places where the parties respectively reside or carry on business.

5.  If the court concludes at that stage that there is no other available forum which is clearly more appropriate for the trial of the action, it will ordinarily refuse a stay.

6.  If, however the court concludes at that stage that there is some other available forum which prima facie is clearly more appropriate for the trial of the action, it will ordinarily grant a stay unless the circumstances by reason of which justice requires that the stay should nevertheless not be granted. In this inquiry, the court will consider all the circumstances of the case, including circumstances which go beyond those taken into account when considering connecting factors with other jurisdictions. One such factor can be the fact, if established objectively by cogent evidence, that the claimant will not obtain justice in the foreign jurisdiction, and the burden is on the claimant to prove this.

As to the "obtaining justice in the foreign jurisdiction" circumstance, see further para.6.37.17 above.

*Forum non conveniens—court's power to stay proceedings on case management grounds*—Section **6.37.23** 49(3) of the Senior Courts Act 1981 refers to the power of the High Court (and the Court of Appeal) to stay any proceedings before it, where it thinks fit to do so, either of its own motion or on the application of any person, whether or not a party to the proceedings. And in CPR r.3.1 the power to stay the whole or part of any proceedings either generally or until a specified date or event is listed among the court's general powers of management (r.3.1(2)(f)).

Circumstances may arise where a defendant, in making a plea of forum non conveniens, submits, in the alternative, that the proceedings should be stayed on case management grounds.

Where proceedings were commenced before completion of the UK's withdrawal from the EU on 31 December 2020 (IP completion day) and the Judgments Regulation therefore applies (see para.6.30.1 above), the court's discretionary power to manage proceedings before it by staying them may not be exercised if to do so would conflict with the Judgments Regulation, or allow it to introduce thereby considerations of forum non conveniens (*Ferrexpo AG v Gilson Investments Ltd* [2012] EWHC 721 (Comm); [2012] 1 Lloyd's Rep. 588 (Andrew Smith J) at [120] and [200]). The court must not "under the guise of case management, achieve by the back door a result against which the ECJ has locked the front door" (*Skype Technologies SA v Joltid Ltd* [2009] EWHC 2783 (Ch); [2011] I.L.Pr. 8 (Lewison J) at [22]).

Where the power to stay may be exercised without inconsistency with the Judgments Regulation, it is available both when the court with jurisdiction concurrent with the English court is the court of a Member State and when it is the court of a non-Member State (*Ferrexpo AG v Gilson Investments Ltd* [2012] EWHC 721 (Comm); [2012] 1 Lloyd's Rep. 588 (Andrew Smith J) at [199]).

The usefulness of the court's power to stay proceedings as referred to in r.3.1(2)(f) in circumstances where its exercise would not be inconsistent with the Judgments Regulation was noted in *Reichhold Norway ASA v Goldman Sachs International* [1999] 2 Lloyd's Rep. 567 (Moore-Bick J) where it was explained (at p.571) that the court has an interest in deciding the order in which concurrent proceedings in the same or different jurisdictions should be tried, not only because the existence of concurrent proceedings may give rise to undesirable consequences in the form of inconsistent decisions, but also because the outcome of one set of proceedings may have an important effect on the conduct of the other. The power to stay proceedings for this purpose is not readily exercised, and should be exercised only in "rare and compelling circumstances" and account is always taken of the legitimate interests of claimants which are to be prejudiced no more than the interests of justice require (*Reichhold Norway ASA v Goldman Sachs International* [2000] 1 W.L.R. 173, CA, at p.186 per Lord Bingham CJ). See further *Standard Chartered Bank (Hong Kong) Ltd v Independent Power Tanzania Ltd* [2015] EWHC 1640 (Comm); [2015] 2 Lloyd's Rep. 183; [2016] 1 All E.R. (Comm) 233 (Flaux J), where the authorities are discussed, at first instance at paras 128 to 131, and on appeal, at paras 42 to 45 per Longmore LJ. It may be noted that, on the appeal, the court accepted that an FNC waiver clause in a non-exclusive jurisdiction agreement did not preclude an application for a case management stay of the kind ordered by the court in *Reichhold Norway ASA* case (at para.43).

*Forum non conveniens—court's power to stay proceedings on abuse of process grounds*—The court **6.37.24** has a discretion which has long existed at common law to stay proceedings which are vexatious or oppressive or otherwise an abuse of process. Circumstances may arise where a defendant, making a plea of forum non conveniens, submits in the alternative that the proceedings should be stayed for abuse of process; see *Standard Chartered Bank (Hong Kong) Ltd v Independent Power Tanzania Ltd* [2015] EWHC 1640 (Comm); [2015] 2 Lloyd's Rep. 183; [2016] 1 All E.R. (Comm) 233 (Flaux J), at paras 132 to 164, and on appeal in *Standard Chartered Bank (Hong Kong) Ltd v Independent Power Tanzania Ltd* [2016] EWCA Civ 411; [2016] 2 Lloyd's Rep. 25, CA, at paras 29 to 41 per Longmore

LJ (a case in which the circumstances were complicated by the fact that the defendants were bound by a jurisdiction clause containing an FNC waiver).

Where proceedings were commenced before completion of the UK's withdrawal from the EU on 31 December 2020 (IP completion day) and the Judgments Regulation therefore applies (see para.6.30.1 above), if the circumstances are such that "the Owusu reasoning" applies, and the court is precluded from staying particular proceedings on forum non conveniens grounds for that reason, the court's power to stay the proceedings as an abuse of process may remain unaffected. In *Catalyst Investment Group Ltd v Lewinsohn* [2009] EWHC 1964 (Ch); [2010] Ch. 218 (Barling J) it was explained (at para.100) that one example of such a case would be where a person submitted to or participated in foreign proceedings and then sought to re-litigate the dispute in England. Such a claim might well be dismissed as an abuse. However, the mere fact of a lis alibi pendens would not normally be sufficient to found such an application. See also *Ferrexpo AG v Gilson Investments Ltd* [2012] EWHC 721 (Comm); [2012] 1 Lloyd's Rep. 588 (Andrew Smith J) at para.192.

In *Municipio de Mariana v BHP Group Plc* [2020] EWHC 2930 (TCC) (Turner J), the court struck out the claims of over 200,000 claimants against two defendants (domiciled in England and Australia respectively) arising out of the collapse of the Fundão Dam in Brazil in 2015. Turner J struck out the claims as an abuse of process in light of concurrent proceedings and compensation schemes in Brazil. In the alternative, he would have stayed the proceedings under the "related actions" provisions of the Judgments Regulation (in respect of the English-domiciled defendant) or the common law doctrine of forum non conveniens (in respect of the Australian-domiciled defendant).

Note also the court's power to stay proceedings which amount to an abuse of EU law, as an exception to the mandatory effect of the basic rule of jurisdiction (based on the defendant's domicile) under the Judgments Regulation, though this should be interpreted narrowly: see *Lungowe v Vedanta Resources Plc* [2019] UKSC 20; [2019] 2 W.L.R. 1051, at para.29 per Lord Briggs, and *PJSC Commercial Bank Privatbank v Kolomoisky* [2019] EWCA Civ 1708; [2020] 2 W.L.R. 993, at paras 102 et seq.

### The court's general discretion

**6.37.25**     As explained above, certain principles apply where the court is required to determine whether or not a claimant should be granted permission to serve a claim form out of the jurisdiction (see para.6.37.13). Judicial summaries of the principles not uncommonly have appended reference to a residual "general discretion", to the effect that the applicant for permission must satisfy the court that, in all the circumstances, the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction (e.g. *Ashton Investments Ltd v OJSC Russian Aluminium (Rusal)* [2006] EWHC 2545 (Comm); [2007] 1 Lloyd's Rep. 311 (Jonathan Hirst QC) at [86]; *Altimo Holdings and Investment Ltd v Kyrgyz Mobile Tel Ltd* [2011] UKPC 7; [2012] 1 W.L.R. 1804, PC, at [99]; *VTB Capital Plc v Nutritek International Corp* [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep. 313, CA, at [100] per Lloyd Jones LJ). Presumably, this general discretion can be exercised only in one way, that is, in favour of the foreign defendant in the event of the judge finding that the burdens placed on the claimant by the principles have not been satisfied.

Doubtless the discretion does exist and exists independently; it is not bound up in and (as it were) exhausted within the *forum conveniens* principle or within r.6.37(3). For obvious reasons, cases in which the granting of an order for permission to serve out of the jurisdiction, or of an order setting aside permission, will turn on the correct exercise of the general discretion alone are likely to be rare.

In *Erste Group AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ 379; [2015] 1 C.L.C. 706, CA, where the judge granted the claimant bank permission to serve the claim form on them out of the jurisdiction (in Russia) under certain paragraphs in para.3.1 of PD 6B, the appellant defendants argued that, in concluding that it was appropriate in all the circumstances to grant permission, the judge had erred by going outside the reasonable ambit of his general discretion. The Court of Appeal accepted this submission, finding that the judge did not give any consideration to the fact that in reality the only "commercial driver" behind the bank's issue of proceedings in England against the principal defendants was to enable a claim to be brought against the appellant defendants and to attempt to execute against their assets, whether in Russia or elsewhere ([150]). Whilst taken on its own this particular factor did not predicate that permission to serve out should be refused, it was, in the circumstances of this case, clearly an important factor that should have been taken into account.

It has been said that inordinate delay in seeking permission to serve the claim form may be a ground for refusing permission (*Schothorst and Schuitema v Franz Dauter GmbH (The Nimrod)* [1973] 2 Lloyd's Rep. 91 (Kerr J) (two-and-a-half years' delay between issuing writ and seeking permission to serve, during which the limitation period expired)). In *National Bank of Greece SA v Outhwaite* [2001] C.P. Rep. 69 (Andrew Smith J) it was said it would be appropriate only in very limited circumstances to allow service out the jurisdiction where to do so would enable a claimant to escape the consequences of their not issuing and serving the proceedings more promptly (at [46] and [50]).

## Service of documents other than the claim form—permission[1]

**6.38**—**(1)  Unless paragraph (2) or (3) applies, where the permission of the court is required for the claimant to serve the claim form out of the jurisdiction, the claimant must obtain permission to serve any other document in the proceedings out of the jurisdiction.**

 **(2)  Where—**

  **(a)   the court gives permission for a claim form to be served on a defendant out of the jurisdiction; and**

  **(b)   the claim form states that particulars of claim are to follow,**

**the permission of the court is not required to serve the particulars of claim.**

 **(3)  The permission of the court is not required if a party has given an address for service in Scotland or Northern Ireland.**

**6.38**

### Effect of rule (r.6.38)

Paragraphs (1) and (2) of this rule replaced (from 1 October 2008) paras (2) and (3) of former r.6.30, insofar as those provisions applied to documents other than claim forms.

Under r.6.38(1) the requirements of r.6.36 and para.6B of PD 6B with regard to claim forms are expressly preserved in relation to documents other than claim forms, subject to the exceptions set out in subparas (2) and (3). Note that the court may give permission for such documents to be served out of the jurisdiction at the same time as giving permission in respect of the claim form (r.6.37(5)(b)(ii)), in which case no separate application will be needed.

**6.38.1**

### "any other document"

The rule applies to any document other than a claim form. Under Pt 6, "claim" includes an application made before action (as well as a claim made "to commence proceedings"), and "claim form" is "to be construed accordingly" (see r.6.2(c)). Consequently, by definition a claim form includes an application notice issued before action and such an application notice is not a document falling within r.6.38.

Issues under r.6.38(1) sometimes arise where the "other document" to be served out of the jurisdiction is an application against a non-party to the proceedings (see r.6.39 for further provisions that apply in these circumstances).

In *C Inc Plc v L* [2001] 2 All E.R. (Comm) 446, Aikens J, it was held that the court had power, under r.6.38(1) (formerly r.6.30(2)), to grant a claimant permission to serve an application for a freezing order against a non-party (L) out of the jurisdiction, where the claimant sought an order against the judgment debtor for the appointment of a receiver, it was anticipated that the receiver would claim an indemnity against L, and there was a risk of dissipation in respect of L's assets. Aikens J expressed the view that, on the proper construction of the rule, the claimant had to satisfy the court that there was a head of jurisdiction which allowed the court to grant permission to serve the application notice against L out of the jurisdiction; that requirement was satisfied because L was a "necessary or property party" (under what is now para.3.1(3) of PD 6B) to the application against the judgment debtor for the appointment of a receiver, and the relief sought against L was incidental to the application to appoint a receiver.

In *Vitol AS v Capro Marine Ltd* [2008] EWHC 378 (Comm); [2009] Bus L.R. 271 (Tomlinson J), the court held that it does not have jurisdiction to grant permission for service out of the jurisdiction of orders made under CPR Pt 71 (Orders to Obtain Information from Judgment Debtors) requiring officers of a judgment debtor company who were resident abroad to attend for questioning and to produce documents. Tomlinson J held that r.6.38(1) (formerly r.6.30(2)) does not provide the court with machinery to enable it to permit service of such an order out of the jurisdiction, as that rule is concerned with documents to be served on parties to the proceedings, rather than third parties. Further, citing Aikens J in *C Inc Plc v L*, op cit, he noted that the rule requires the identification of a relevant head of jurisdiction in respect of the document to be served, and there was none applicable to an order or an application for an order under r.71.2.

In *Masri v Consolidated Contractors International Co SAL (No.4)* [2009] UKHL 43; [2009] 3 W.L.R. 385, HL, the House of Lords approved Tomlinson J's analysis and conclusions in *Vitol v Capri Marine*, op cit (allowing an appeal from a decision of the Court of Appeal granting permission to serve out of the jurisdiction a r.71.2 order on an officer of a corporate foreign judgment debtor). Lord Mance explained that the Court of Appeal in *Masri* had adopted a wide interpretation of (the predecessor to) r.6.38(1), leading to the "surprising result" that, where service of the original proceedings took place abroad with leave using one of the gateways in CPR r.6.20, there would be an open discretion to grant leave for service out of the jurisdiction of any ancillary document on a non-party (and, still more surprisingly, if the original proceedings did not require leave to serve out, a non-party could be served abroad without leave). That, he said, could not be right.

**6.38.2**

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

**Particulars of claim**

**6.38.3**    Practice Direction (How to Start Proceedings—The Claim Form) para.6.2 states that, if the particulars of claim are not included in, or have not been served with, the claim form (r.7.4), the claim form must contain a statement that the particulars of claim will follow (see para.7APD.6 below).

**Address for service in Scotland or Northern Ireland**

**6.38.4**    Where a party serves a document other than a claim form on a party in Scotland or Northern Ireland it must be served by a method permitted by Section III of Pt 6 (r.6.40(2)). In Section III, r.6.23(1) states that a party to proceedings must give an address at which that party may be served with documents relating to those proceedings. That address must be within the UK (r.6.23(2) and (3)). See further commentary following r.6.40.

### Service of application notice on a non-party to the proceedings[1]

**6.39**    **6.39—(1)  Where an application notice is to be served out of the jurisdiction on a person who is not a party to the proceedings rules 6.35 and 6.37(5)(a)(i), (ii) and (iii) do not apply.**

**(2)  Where an application is served out of the jurisdiction on a person who is not a party to the proceedings, that person may make an application to the court under Part 11 as if that person were a defendant, but rule 11(2) does not apply.**

**(Part 11 contains provisions about disputing the court's jurisdiction.)**

**Effect of rule (r.6.39)**

**6.39.1**    With effect from 1 October 2008, this rule replaced para.(1) of former r.6.30. The provision has been slightly amended, for purposes of clarification.

The rule applies where an application notice is served out of the jurisdiction on a non-party. It does not apply where the application notice is for pre-action relief, as in Pt 6 such a notice is, by definition, a claim form (see r.6.2(c)).

Paragraph (1) provides that the set periods for filing an acknowledgment of service, filing or serving an admission, or filing a defence where the claim form is served out of the jurisdiction (either with or without the court's permission) do not apply where an application notice is served on a non-party out of the jurisdiction.

The rule does not provide that r.6.32, r.6.33, r.6.36 and r.6.37(1)–(4) do not apply; an application notice can only be served on a non-party out of the jurisdiction if the requirements of those provisions are satisfied. See r.6.38 and the commentary thereon.

Paragraph (2) expressly provides for a Pt 11 challenge to the jurisdiction in respect of an application served out of the jurisdiction on a non-party. Rule 11(2), disapplied by para.(2) of this rule, states that a defendant who wishes to dispute the court's jurisdiction, or to argue that the court should not exercise its jurisdiction, must first file an acknowledgment of service.

### Methods of service—general provisions[2]

**6.40**    **6.40—(1)  This rule contains general provisions about the method of service of a claim form or other document on a party out of the jurisdiction.**

*Where service is to be effected on a party in Scotland or Northern Ireland*

**(2)  Where a party serves a claim form or other document on a party in Scotland or Northern Ireland, it must be served by a method permitted by Section II (and references to "jurisdiction" in that Section are modified accordingly) or Section III of this Part and rule 6.23(4) applies.**

*Where service is to be effected on a party out of the United Kingdom*

**(3)  Where a party wishes to serve a claim form or other document on a party out of the United Kingdom, it may be served—**

   **(a)   by any method provided for by—**
       **(i)   [Omitted]**
       **(ii)  rule 6.42 (service through foreign governments, judicial authorities and British Consular authorities); or**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

[2] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

    **(iii) rule 6.44 (service of claim form or other document on a State);**

  **(b) by any method permitted by a Civil Procedure Convention or Treaty; or**

  **(c) by any other method permitted by the law of the country in which it is to be served.**

**(4) Nothing in paragraph (3) or in any court order authorises or requires any person to do anything which is contrary to the law of the country where the claim form or other document is to be served.**

**(The texts of the Civil Procedure Treaties which the United Kingdom has entered into may be found on the Foreign and Commonwealth Office website at** *http://www.fco.gov.uk/en/publications-and-documents/treaties/lists-treaties/ bilateral-civil-procedure.***)**

### Effect of rule (r.6.40)

Rule 6.40 applies to claim forms (as defined in r.6.2(c)) or other documents in proceedings to be served on a party outside the jurisdiction. Rule 6.40(2) applies to service on a party in Scotland or Northern Ireland, and r.6.40(3) and (4) apply to service on a party outside the UK. **6.40.1**

### Service on a party in Scotland or Northern Ireland (r.6.40(2))

A claimant may serve a claim form out of the jurisdiction on a defendant in Scotland or Northern Ireland without the permission of the court in the circumstances provided for in r.6.32 (or, more unusually, with the court's permission under r.6.36, in which case see also r.6.37(4)). Where a claimant serves a defendant out of the jurisdiction, the periods within which the defendant should file an acknowledgment of service, an admission and a defence are longer than those that would apply when a defendant was served within the jurisdiction (see r.6.35 and r.6.37(5)). **6.40.2**

Rule 6.40(2) refers to the methods of service permitted by Sections II and III of Pt 6. The methods of service permitted by Section II are methods relating to the service of claim forms (as defined in r.6.2(c)) in the jurisdiction, and the methods of service permitted by Section III are methods relating to service of documents other than claim forms, again in the jurisdiction. Rule 6.40(2) states that these methods of service are permitted for service of the documents to which they relate on a party not in the jurisdiction but in Scotland or Northern Ireland. Indeed, not only may they be used, they must be used. This marks a significant change in the rules. Before 1 October 2008, the general rule that service out of the jurisdiction must be effected in accordance with the law of the receiving country or a relevant international convention or treaty applied to service of documents in Scotland and Northern Ireland.

The fact that Scotland and Northern Ireland, though separate legal systems, are parts of the same State (the UK) makes a departure from the general rule not only possible but (on grounds of convenience for parties to proceedings) desirable. Service of a document (whether claim form or other document in proceedings) out of England and Wales on a party in Scotland or Northern Ireland must be effected by any of the methods of service permitted by Section II or Section III, including personal service. The particular significance of this is that the English personal service rules apply, even though the comparable Scottish and Northern Irish rules (by limiting the persons by whom such service may be effected) are more restrictive.

In *Ashley v Tesco Stores* [2015] EWCA Civ 414; [2015] 1 W.L.R. 5153, where the claimant (C) chose to effect service on a Scottish company (D) under the Companies Act s.1139(1) (see para.6.3.8 above) by posting the claim form to it at its registered office in Scotland, the Court of Appeal held that this was valid service out of the jurisdiction by a method permitted by Section II, rejecting the submission that, in the circumstances, C should have effected service at D's place of business within the jurisdiction (and should have done so within four months of issue, rather than the six months permitted where a claim form is served out of the jurisdiction: see r.7.5(2)).

Rule 6.23 (Address for service) applies to documents other than the claim form and para.(4) of that rule (referred to in r.6.40(2)) states that such documents must be sent or transmitted to, or left at, the party's address for service, under paras (2) or (3) of the rule, unless they are to be served personally or the court orders otherwise. Under paras (2) or (3) the address for service which a party is required to give under r.6.23 may be in Scotland or Northern Ireland (see further commentary following r.6.23).

Where service is to be effected on a party in Scotland or Northern Ireland under r.6.40(2), the "deemed day" of service provisions in r.6.14 and r.6.26 apply. This has been made clear by amendment as from April 2011 to add reference to the UK in both rules.

### Service on a defendant out of the UK (r.6.40(3) and (4))

Rule 6.40(3) sets out a number of available methods of service for a claim form or other document on a party out of the UK. Prior to completion of the UK's withdrawal from the EU on 31 December 2020 (IP completion day), r.6.40(3)(a)(i) made reference to the EU Service Regulation (Regulation (EC) No.1393/2007). This provision was omitted by reg.4(18) of the Civil Procedure **6.40.3**

Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521), as the EU Service Regulation no longer applies to the UK from that date, having been revoked by the Service of Documents and Taking of Evidence in Civil and Commercial Matters (Revocation and Saving Provisions) (EU Exit) Regulations 2018 (SI 2018/1257).

By virtue of r.6.40(4) no order of the English court can be taken to authorise or direct the doing of anything contrary to the law of the state where service is to be effected. Thus where service of a claim form is purportedly made in a foreign country by a private person instructed by the claimant, and where the law of that country stipulates that service should be through official channels, the English court will not, except in a very strong and unusual case, exercise discretion to allow the purported service to stand (*Ferrarini SpA v Magnol Shipping Co Inc (The Sky One)* [1988] 1 Lloyd's Rep. 238, CA). Rule 6.40(4) applies if service of a claim on the defendant is altogether prohibited by the relevant foreign law, even if the method of service used would not be unlawful in itself (*Von Pezold v Border Timbers Ltd* [2020] EWHC 2172 (QB), Julia Dias QC). The burden of proof is on the claimant to establish that service would not contravene the relevant foreign law, and in *Von Pezold* it was held that the relevant standard of proof is on the balance of probabilities rather than a good arguable case.

There is no express provision in Section IV of Pt 6 permitting service of a claim form out of the jurisdiction by an alternative method, but it is now settled that the court has such jurisdiction and that it is derived from the court's power to give directions as to service under r.6.37(5)(b)(i) (*Cecil v Bayat* [2011] EWCA Civ 135; [2011] 1 W.L.R. 3086, CA and *Abela v Baadarani* [2013] UKSC 44; [2013] 1 W.L.R. 2043 (judgment of Lord Clarke, [20])). This authorises the court to make an order for alternative service (i.e. by a method or at a place not otherwise permitted by Pt 6) pursuant to r.6.15(1), and also to make such an order with retrospective effect pursuant to r.6.15(2). Where the court grants an application made by a claimant under r.6.15 for service of a claim form out of the jurisdiction by an alternative method, the order must specify the matters referred to in r.6.15(4), including the date on which the claim form is deemed served; otherwise the order would be defective (*Bill Kenwright Ltd v Flash Entertainment FZ LLC* [2016] EWHC 1951 (QB), at [61]).

Where a party seeks an order for service by an alternative method against a defendant who is resident outside of the jurisdiction, in circumstances where permission would be needed to serve proceedings on that defendant outside the jurisdiction, permission to serve out will still be needed even if the effect of the order to serve by an alternative method is that service will in fact be effected within the jurisdiction (*Marashen Ltd v Kenvett Ltd* [2017] EWHC 1706 (Ch); [2018] 1 W.L.R. 288, David Foxton QC sitting as a deputy judge).

In *Bacon v Automatic Inc* [2011] EWHC 1072 (QB); [2012] 1 W.L.R. 753 (Tugendhat J), the judge stated that on an application for permission for service by an alternative method there should be evidence as to whether the proposed method of service is permitted by the law of the country in which the claim form is to be served. However, in *Abela v Baadarani*, op cit, the Supreme Court held that an order for service by an alternative method can be made only where none of the methods provided in r.6.40(3) has been successfully adopted, including of course service by a method permitted by the law of the country in which the claim form or document is to be served (under r.6.40(3)(c)). The only bar to the exercise of the court's discretion to make such order is that, by r.6.40(4), nothing in a court order must authorise any person to do anything which is contrary to the law of the country where the claim form is to be served. Thus, the proposed method of service may not be permitted by the law of that country; the bar applies only where such method is positively contrary to the law of that country. The evidence required would therefore seem to be that the proposed method of service (or, in retrospective cases, the method that has been used): (1) is not permitted under Pt 6; and (2) will not be or was not contrary to the law of the country where the claim form or other document is to be served, pursuant to r.6.40(4).

The question to be asked by the court is whether there is good reason to declare that service by the proposed method or at the proposed place shall be regarded as good service (in prospective cases) or as having amounted to good service (in retrospective cases). Speed is a relevant consideration but, in general, the desire of a claimant to avoid the delay inherent in service by the methods permitted by r.6.40 cannot of itself justify an order for service by an alternative method (*Cecil v Bayat*, op cit, at [66]).

In *Cruz City 1 Mauritius Holdings v Unitech Ltd* [2013] EWHC 1323 (Comm); [2013] 2 All E.R. (Comm) 1137 (Field J), the judge, relying on the judgment of Tomlinson J in *Kyrgyz Republic Ministry of Transport Department of Civil Aviation v Finrep GmbH* [2006] EWHC 1722 (Comm); [2006] 2 C.L.C. 402 and the Court of Appeal decision in *Joint Stock Asset Management Co v BNP Paribas SA* [2012] EWCA Civ 644; [2012] 1 Lloyd's Rep. 649, confirmed the Commercial Court's practice in the case of an arbitration whose seat is in the jurisdiction, to regard the fact that service on the respondent's lawyers within the jurisdiction is far more speedy than service under a Convention or Treaty or the Service Regulation, as a good reason within r.6.15(1) and (2). See also *Flota Petrolera Ecuatoriana v Petroleos de Venezuala SA* [2017] EWHC 3630 (Comm); [2017] 2 C.L.C 759 (Leggatt J), at [22].

In *Abela v Baadarani*, op cit, Lord Clarke noted that that was not a case in which the Hague Service Convention or any bilateral service convention or treaty applied as between the UK and the country in which service was to take place (Lebanon). He made clear that he was saying nothing about the position where there was a relevant convention or treaty ([34]). The threshold test for

granting an order for service out of the jurisdiction by alternative means where the Hague Convention applies has been considered in a number of subsequent first instance decisions, where varying conclusions have been reached. In *Marashen Ltd v Kenvett Ltd* [2017] EWHC 1706 (Ch); [2018] 1 W.L.R. 288 (David Foxton QC), the judge held that, in cases covered by the Hague Convention or a bilateral service treaty which is exclusive in its application: (i) "exceptional circumstances", rather than merely good reason, must be shown before an order for alternative service other than in accordance with the terms of the treaty can be used; and (ii) mere delay or expense in serving in accordance with the treaty cannot, without more, constitute such "exceptional circumstances". In *Flota Petrolera Ecuatoriana v Petroleos De Venezuala SA* [2017] EWHC 3630 (Comm); [2017] 2 C.L.C. 759, Leggatt J rejected the notion that a country being a signatory to the Hague Convention meant that permission to serve by alternative means could only be ordered in exceptional circumstances, "unless the country in question has indicated some positive objection to persons resident in its territory being served by any means other than in accordance with the Convention". In *Koza v Akcil* [2018] EWHC 384 (Ch), Richard Spearman QC, sitting as a deputy Judge of the High Court, reached a similar conclusion but considered that in a Hague Convention case the invocation of the rule "certainly requires a clear foundation", adding that "good reason" means good reason in all the circumstances of the particular case. These cases were considered in *Punjab National Bank (International) Ltd v Srinivasan* [2019] EWHC 89 (Ch) by Chief Master Marsh, who preferred the test of exceptional circumstances adopted in *Marashen*, and Sir Geoffrey Vos C agreed with that view on appeal to the High Court: see [2019] EWHC 3495 (Ch).

Prior to completion of the UK's withdrawal from the EU on 31 December 2020 (IP completion day), an order for alternative service was not available where this would be inconsistent with the EU Service Regulation, which was a mandatory and exhaustive code for the purposes of service in civil and commercial matters: *Asefa Yesuf Import and Export v AP Moller-Maersk A/S (t/a Maersk Line)* [2016] EWHC 1437 (Admlty) (Simon Bryan QC). However, the Service Regulation no longer applies to the UK from IP completion day, as noted above.

Parties are free to agree an ad hoc mode of service outside the methods set in the CPR (*McCulloch v Bank of Nova Scotia* [2006] EWHC 790 (Ch); [2006] 2 All E.R. (Comm) 714).

The court's powers to dispense with service of a claim form (under r.6.16) or other documents (under r.6.28) may be exercised whether the attempts to serve the defendant took place within England and Wales or outside the jurisdiction: see *Olafsson v Gissurarson (No.2)* [2008] EWCA Civ 152; [2008] 1 W.L.R. 2016 and *Lonestar Communications Corp LLC v Kaye* [2019] EWHC 3008 (Comm) (Teare J), and the commentary at para.6.16.3 above.

### Service on foreign firms

Part 6 applies to partners, or an individual, carrying on a business under a firm name within **6.40.4** the jurisdiction. A firm that trades only abroad presents difficulties; if such a firm has no legal existence apart from its individual members, those members ought to be named and served (*Von Hellfeld v Rechnityer* [1914] 1 Ch. 748 at 755). It is, however, difficult to ascertain the legal status of foreign firms, particularly in continental countries, where there are bodies of a status not found in England. As a working rule it is often fairly safe to sue a firm in the style in which it enjoys legal rights and liabilities in its country of domicile.

### Service on a foreign state

See s.12 of the State Immunity Act 1978 and r.6.44. **6.40.5**

### Civil Procedure Conventions and Treaties (r.6.40(3)(b))

For the definition of Civil Procedure Convention, see para.(c) of r.6.31 (Interpretation). The **6.40.6** most well-known is the Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters signed at the Hague on 15 November 1965 (Hague Service Convention, printed HMSO, Cmnd.3986 (1969)). That Convention came into effect on 10 February 1969, after ratification by three States (art.27). It provides (inter alia) that each contracting state shall designate a Central Authority to receive requests for service coming from other contracting states and to execute them. The Central Authority for England and Wales is the Senior Master of the Senior Courts, Queen's Bench Division. Documents for service must be lodged with the Foreign Process Office, Room E16, Royal Courts of Justice, Strand, London WC2A 2LL, for onward transmission. The contracting states are at liberty to impose restrictions under certain articles of the Convention and information as to these can be obtained from the above-named Department and from the HCCH website. This multilateral Convention does not invalidate the bilateral Conventions already in force and listed in the websites referred to at the end of r.6.40. The following is a list of the states that are members of the Hague Convention Organisation who have acceded to the Service Convention and also of those states that are non-members (marked with an asterisk) who have acceded to the Convention or regard themselves as bound by earlier accession by their former colonial government. In the case of some countries in the list there exists the possibility that the UK Government has not acceded to that country's accession. This may be checked on the HCCH website. (Note that in the case of many Commonwealth countries the possibility exists of service on an agent to agent basis outside the Convention. For details consult the Foreign Process Section at the Royal Courts of Justice.)

Albania
Andorra
Antigua and Barbuda*
Argentina
Armenia
Australia
Austria
Bahamas*
Barbados*
Belarus
Belgium
Belize*
Bosnia and Herzegovina
Botswana*
Brazil
Bulgaria
Canada
China, People's Republic of
Colombia*
Costa Rica
Croatia
Cyprus
Czech Republic
Denmark
Egypt
Estonia
Finland
France (besides Metropolitan France and the Overseas Departments (French Guyana, Guadeloupe, Reunion, Martinique), the Convention applies to all of the other French overseas territories)
Germany
Greece
Hungary
Iceland
India
Ireland
Israel
Italy
Japan
Kazakhstan
Korea, Republic of
Kuwait*
Latvia
Lithuania
Luxembourg
Malawi*
Malta
Mexico
Monaco
Montenegro
Morocco
Netherlands
Nicaragua*
Norway
Pakistan*
Philippines
Poland
Portugal
Republic of Moldova
Republic of North Macedonia
Romania
Russian Federation
Saint Vincent and the Grenadines*
San Marino*
Serbia
Seychelles*
Slovakia
Slovenia
Spain

Sri Lanka
Sweden
Switzerland
Tunisia
Turkey
Ukraine
United Kingdom
United States of America (includes Guam, Puerto Rico and the Virgin Islands)
Venezuela
Vietnam

**Civil procedure treaties**

Other civil procedure treaties have been concluded with foreign states, for example with the **6.40.7** United Arab Emirates (Treaty Series No.1 of 2009 Cmd Paper 7535).

**Service by postal channels under the Hague Service Convention**

The Hague Service Convention permits the sending of "judicial documents by postal channels **6.40.8** directly to persons abroad" provided "the state of destination does not object" to such method of service (see arts 10 and 19). Provided therefore that service by post is permitted by and effected in accordance with the law of the country in which service is effected, there is nothing in the Hague Convention which cuts down the scope of this permission (*Noirhomme v Walklate* [1992] 1 Lloyd's Rep. 427). However, it should be noted that many signatories to the Convention have declared their opposition to incoming service under art.10. Any party considering outgoing service to a Hague Service Convention Country by post should consult the HCCH website as to the relevant declarations and reservations.

**Prompt execution of requests for service under the Hague Service Convention**

The February 2009 quinquennial Special Commission on the practical operation of the Hague **6.40.9** Apostille, Service, Evidence and Access to Justice Conventions recommended the following timelines in relation to the Service Convention:

(a) If a forwarding authority has not received any acknowledgment of receipt of the request for service from the requested State within 30 calendar days following the sending of the request, it is encouraged to contact the Central Authority in the requested State to inquire about the status of the request. Such inquiry should be answered within a reasonable time.

(b) Where the request for service cannot be executed as a result of inadequate information or document(s) forwarded, the Central Authority of the requested State is encouraged to contact, as promptly as possible, the forwarding authority in order to secure the missing information or document(s).

(c) Whenever the Central Authority of the requested State is considering, under art.4, whether the request complies with the provisions of the Convention, it is encouraged to take that decision within 30 calendar days of receipt of the request.

(d) If at any time during the execution of the request for service, an obstacle arises which may significantly delay or even prevent execution of the request, the Central Authority of the requested State is encouraged to communicate with the forwarding authority as promptly as possible.

(e) A request for execution of service should be executed as promptly as possible and States are encouraged to take measures to further improve the effective operation of the Convention.

(f) If the forwarding authority has not received a certificate confirming service or non-service from the relevant authority of the requested State within a reasonable time after sending the request, it is encouraged to contact the Central Authority of the requested State to inquire about the status of the execution of the request and the inquiry should be answered within a reasonable time.

(g) The Central Authority of the requested State is encouraged to take all reasonable and appropriate steps to execute the request until such time as the forwarding authority advises that service is no longer required.

(h) The forwarding authority is also encouraged to specify in the request a time after which service is no longer required or inform the relevant authority of the requested State at any time that service is no longer required.

**Service in accordance with the Service Regulation[1]**

**6.41**    **6.41  [Omitted]**

**Service through foreign governments, judicial authorities and British Consular authorities[2]**

**6.42**    **6.42—(1)  Where a party wishes to serve a claim form or any other document in any country which is a party to a Civil Procedure Convention or Treaty providing for service in that country, it may be served—**

        **(a)  through the authority designated under the Hague Convention or any other Civil Procedure Convention or Treaty (where relevant) in respect of that country; or**

        **(b)  if the law of that country permits—**

            **(i)  through the judicial authorities of that country, or**

            **(ii)  through a British Consular authority in that country (subject to any provisions of the applicable convention about the nationality of persons who may be served by such a method).**

**(2)  Where a party wishes to serve a claim form or any other document in any country with respect to which there is no Civil Procedure Convention or Treaty providing for service in that country, the claim form or other document may be served, if the law of that country so permits—**

        **(a)  through the government of that country, where that government is willing to serve it; or**

        **(b)  through a British Consular authority in that country.**

**(3)  Where a party wishes to serve the claim form or other document in—**

        **(a)  any Commonwealth State which is not a party to the Hague Convention or is such a party but HM Government has not declared acceptance of its accession to the Convention;**

        **(b)  the Isle of Man or the Channel Islands; or**

        **(c)  any British overseas territory,**

**the methods of service permitted by paragraphs (1)(b) and (2) are not available and the party or the party's agent must effect service direct, unless Practice Direction 6B provides otherwise.**

**(A list of British overseas territories is reproduced in paragraph 5.2 of Practice Direction 6B.)**

**Effect of rule (r.6.42)**

**6.42.1**    With effect from 1 October 2008, this rule replaced former r.6.25, but has been adjusted to take account of the provision made in para.(2) of r.6.40 for service of documents in Scotland and Northern Ireland. It applies to the service of "other documents" as well as to claim forms.

**Hague Service Convention**

**6.42.2**    For explanation, see para.(a) of r.6.31 (Interpretation) above. Parties to litigation in England and Wales are also able to serve in countries that are signatories to the Hague Service Convention as set out in art.10 of the Convention. However, it should be noted that many signatories to the Convention have declared their opposition to incoming service under that article. Any party considering outgoing service to a Hague Service Convention State by this means should consult the HCCH website as to relevant declarations and reservations.

**Civil Procedure Convention**

**6.42.3**    For explanation, see para.(c) of r.6.31 (Interpretation) above.

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390) and the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and omitted by the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

[2] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390) and the Civil Procedure (Amendment) Rules 2011 (SI 2011/88).

**Commonwealth State**

For explanation, see para.(f) of r.6.31 (Interpretation) above. Paragraph (3) of r.6.42 does not **6.42.4** apply where, in the case of a Commonwealth State, the judicial authorities have required service to be in accordance with r.6.42(1)(b)(i) (see PD 6B (Service Out of the Jurisdiction) para.5.1).

**British overseas territory**

For the purposes of para.(3)(c) of r.6.42, the territories are as listed in para.5.2 of PD 6B **6.42.5** (Service Out of the Jurisdiction); see para.6BPD.5 below.

**Brexit transitional and saving provision**

Regulation 18(5) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 **6.42.6** (SI 2019/521) provides a transitional and saving provision concerning service of documents where the documents (specified in r.6.41(2) as it applied before 31 December 2020 (IP completion day)) had been filed by an applicant prior to IP completion day but the action required by r.6.41(3) had not been carried out by that day. In such a circumstance the transitional and saving provision provides that "the court may treat the request for service of the documents in question as a request for service pursuant to rule 6.42(1) or (2) as appropriate".

For these purposes, r.6.41(2) and r.6.41(3) (as they applied before IP completion day) stated as follows:

"(2)   The party must file—
   (a)   the claim form or other document;
   (b)   any translation; and
   (c)   any other documents required by the Service Regulation.
(3)   When a party files the documents referred to in paragraph (2), the court officer will forward the relevant documents to the Senior Master."

## Procedure where service is to be through foreign governments, judicial authorities and British Consular authorities[1]

**6.43**—**(1)  This rule applies where a party wishes to serve a claim form or** **6.43** **any other document under rule 6.42(1) or 6.42(2).**

**(2)  Where this rule applies, that party must file—**
   **(a)  a request for service of the claim form or other document specify-ing one or more of the methods in rule 6.42(1) or 6.42(2);**
   **(b)  a copy of the claim form or other document;**
   **(c)  any other documents or copies of documents required by Practice Direction 6B; and**
   **(d)  any translation required under rule 6.45.**

**(3)  Where a party files the documents specified in paragraph (2), the court officer will—**
   **(a)  seal(GL) the copy of the claim form or other document; and**
   **(b)  forward the documents to the Senior Master.**

**(4)  The Senior Master will send documents forwarded under this rule—**
   **(a)  where the claim form or other document is being served through the authority designated under the Hague Convention or any other Civil Procedure Convention or Treaty, to that authority; or**
   **(b)  in any other case, to the Foreign, Commonwealth and Development Office with a request that it arranges for the claim form or other document to be served.**

**(5)  An official certificate which—**
   **(a)  states that the method requested under paragraph (2)(a) has been performed and the date of such performance;**
   **(b)  states, where more than one method is requested under paragraph (2)(a), which method was used; and**
   **(c)  is made by—**
      **(i)  a British Consular authority in the country where the method requested under paragraph (2)(a) was performed;**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390), the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and the Transfer of Functions (Secretary of State for Foreign, Commonwealth and Development Affairs) Order 2020 (SI 2020/942).

(ii)   **the government or judicial authorities in that country; or**

(iii)   **the authority designated in respect of that country under a Civil Procedure Convention or Treaty,**

**is evidence of the facts stated in the certificate.**

**(6)   A document purporting to be an official certificate under paragraph (5) is to be treated as such a certificate, unless it is proved not to be.**

**Effect of rule (r.6.43)**

**6.43.1**   The claimant must provide copies of the documents referred to in para.(2)(c) of the rule for each party to be served out of the jurisdiction (PD 6B (Service Out of the Jurisdiction) para.4.1; note also para.4.2).

Where it is common ground that the defendant has not received actual notice of the proceedings, the onus is on the claimant to show that the method of service adopted was adequate and in compliance with the local rules; *Arros Invest Ltd v Rafik Nishanov* [2004] EWHC 576; [2004] I.L.Pr. 22.

In *Chare v Fairclough* [2003] EWHC 180 (QB) (Treacy J), it was held that where service was effected through the Foreign and Commonwealth Office under CPR r.6.43, service was not effected by the court but by the claimant through the medium of the Foreign and Commonwealth Office. Therefore, cases where service was effected pursuant to CPR r.6.43 fell within CPR r.7.6(3)(b), not r.7.6(3)(a), and the onus was on the claimant to show that they had taken all reasonable steps to effect service. It should be noted that the court as such never serves out of the jurisdiction. It is the parties who serve through the agency of the court and in some cases the FCO as well.

Note that in the case of *Olafsson v Gissurarson* [2008] EWCA Civ 152; [2008] 1 All E.R. (Comm) 1106, the Court of Appeal upheld the judge's decision ([2006] EWHC 3162 (QB); [2007] 1 Lloyd's Rep. 184) that this was a truly exceptional case in which service could be dispensed with retrospectively. Although service had been effected through British Consular authorities in Iceland, as a signatory to the Lugano Convention, based on a request for service made under CPR r.6.43 and there was no dispute that the defendant had received the papers, the Consular Officer serving the papers had failed to obtain from the defendant a signed receipt for the papers being served. The failure to obtain the receipt rendered service ineffective under Icelandic law. The Consular Authority provided a certificate of personal service on the basis of which interlocutory judgment was entered. While the court had sympathy in this case with the claimant's solicitors who believed that the process had been validly served, the Master of the Rolls expressed the view that "the experience of this case should lead claimants' solicitors in the future to ensure that the service is in fact valid by the relevant law". It would seem therefore that solicitors requesting service through the Senior Master and the FCO should satisfy themselves as to what is proper service under the law of the country in which it is to be effected and ensure that the FCO are requested to serve in a specific manner accordingly.

### Service of claim form or other document on a State[1]

**6.44**   **6.44—(1)   This rule applies where a party wishes to serve the claim form or other document on a State.**

**(2)   In this rule, "State" has the meaning given by section 14 of the State Immunity Act 1978.**

**(3)   The party must file in the Central Office of the Royal Courts of Justice—**

(a)   **a request for service to be arranged by the Foreign, Commonwealth and Development Office;**

(b)   **a copy of the claim form or other document; and**

(c)   **any translation required under rule 6.45.**

**(4)   The Senior Master will send the documents filed under this rule to the Foreign, Commonwealth and Development Office with a request that it arranges for them to be served.**

**(5)   An official certificate by the Foreign, Commonwealth and Development Office stating that a claim form or other document has been duly served on a specified date in accordance with a request made under this rule is evidence of that fact.**

**(6)   A document purporting to be such a certificate is to be treated as such a certificate, unless it is proved not to be.**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and the Transfer of Functions (Secretary of State for Foreign, Commonwealth and Development Affairs) Order 2020 (SI 2020/942).

**(7) Where—**
    **(a)**   **section 12(6) of the State Immunity Act 1978 applies; and**
    **(b)**   **the State has agreed to a method of service other than through the Foreign, Commonwealth and Development Office,**
**the claim form or other document may be served either by the method agreed or in accordance with this rule.**

**(Section 12(6) of the State Immunity Act 1978 provides that section 12(1) enables the service of a claim form or other document in a manner to which the State has agreed.)**

### Actions against foreign states

**6.44.1**   Under the doctrine of state immunity (a doctrine of customary international law) a state enjoyed absolute immunity from suit in the court of another state. In the early part of the twentieth century, in the UK and elsewhere, this doctrine yielded to the doctrine of restrictive immunity. In the UK statutory force was given to that doctrine by the State Immunity Act 1978, a statute that had its origins in the need to give effect to the European Convention on State Immunity. That Act provides that the immunity of a foreign state from action in UK courts is not absolute, but is restricted to acts of a governmental nature (*jure imperii*), and not of a commercial nature (*jure gestionis*). Subsequently, the Civil Jurisdiction and Judgments Act 1982 s.31 dealt with a matter not covered by the 1978 Act, that is, the recognition and enforcement in the UK of judgments given by a court of an "overseas country" (whether or not an EU Member State) against a state other than the UK or the state to which that court belongs.

   The law relating to the doctrine of restrictive immunity is complicated and need not be outlined here. What needs to be noted in this context is that, where the defendant in a claim form is a foreign state, the applicant for permission under r.6.36 to serve the claim form out of the jurisdiction must show distinctly, not only (as always) under which head of jurisdiction within para.3.1 of PD 6B the claim falls, but also why the prospective defendant is not absolutely immune from suit. As a practical matter, that usually means showing that the proceedings come within the commercial transaction proceedings exemption provided for in s.3 of the 1978 Act and therefore the defendant enjoys restrictive immunity only. This additional requirement is not expressly referred to in Form **N510** but it is clearly a matter that should be brought to the attention of the court (see Form **PF 6A** para.6).

   In *NML Capital Ltd v Republic of Argentina* [2011] UKSC 31; [2011] 2 A.C. 495, SC, the claimants sought permission to serve the claim form out of the jurisdiction under para.3.1(10) of PD 6B and the particular question arising on the defendant's application under r.11(1) to set aside service was whether the defendant was not absolutely immune from suit. Initially the claimant's submission was that either their claim fell within the commercial transaction proceedings exemption or that the defendant had waived, and agreed not to plead, any claim that it might have to state immunity, but subsequently the possibility that the defendant was not absolutely immune from suit for other reasons emerged (see further para.6HJ.24). The authorities on the nature and scope of the doctrine of restrictive immunity were exhaustively examined in the judgments delivered in the Court of Appeal and the Supreme Court in this case. See also *Boru Hatlari Ile Petrol Tasima AS v Tepe Insaat Sanayii AS* [2018] UKPC 31, PC, where the particular question arising was the meaning of "property of a State" within s.13(2)(b) of the 1978 Act.

   Where permission for service of the claim form out of the jurisdiction is granted, service of the claim form on the foreign state defendant is governed by r.6.44. Section 12(6) of the 1978 Act provides that s.12(1) enables the service of a claim form or other document in a manner to which the state has agreed. Except where there is agreement to the contrary under s.12(6), the requirements are mandatory and good service cannot be made without adhering to them (*Kuwait Airways Corp v Iraqi Airways Co* [1995] 1 W.L.R. 1147, HL).

   Under the State Immunity Act 1978, where a foreign state is served, the periods for filing an acknowledgment of service under Pt 10, or for filing or serving an admission under Pt 14, are regulated by special rules; see PD 6B para.6.5.

   As is explained elsewhere (para.6.37.16), the court will not give permission to serve out of the jurisdiction unless satisfied that England and Wales is the proper place in which to bring the claim (r.6.37(3)). The fact that the prospective defendant is a foreign state, and the question of whether a judgment of an English court against it is likely to be effective, would generally be important factors to be considered by the court in this respect.

   The question whether a state or diplomatic agent (a) is immune from jurisdiction is distinct from the question whether either of them (b) is immune from service or from certain modes of service. The latter immunity is distinct from and additional to the former.

   In *Al-Malki v Reyes* [2017] UKSC 61; [2017] I.C.R. 1417, SC, former employees of a diplomatic agent commenced employment tribunal proceedings against the agent. The claim forms were sent through the post to the agent's private address in accordance with r.61(1)(a) of the Employment Tribunals Rules of Procedure 2013. The validity of the service was upheld at first instance and on appeals to the EAT, the Court of Appeal, and the Supreme Court. In the Supreme Court Lord Sumption explained (at [15]) that, in the case of states, the mode of service is prescribed by s.12 of

the State Immunity Act 1978. Service must be effected on a state by the transmission of the document through the Foreign and Commonwealth Office. (Article 22 of the United Nations Convention on the Jurisdictional Immunities of States, when it is in force, will require service of process on states to be effected on states through diplomatic channels in the absence of agreement on any other mode of service.) There is, however, no corresponding provision relating to service on diplomatic agents either in the Diplomatic Privileges Act 1964 or in the Vienna Convention on Diplomatic Relations. Thus there is no basis for a diplomatic agent's claim for immunity from service unless the service violates the agent's person or residence, contrary to arts 29 and 30(1) of the Vienna Convention. In the instant case the delivery of the claim form by post caused no such violation, since it merely informed the agent of the civil proceedings against him and enabled him to protect himself in respect of any procedural steps that were required to be taken ([13]–[16]). Lord Sumption noted that apparently the practice had become established of serving process on diplomatic agents through diplomatic channels on the foreign state or its mission in the UK and commented that that practice had no basis in domestic or international law and was not an effective mode of service ([16]).

Section 12(1) of the 1978 Act provides for service through the Foreign & Commonwealth Office of: "any writ or other document required to be served for instituting proceedings against the State". In *General Dynamics UK Ltd v State of Libya* [2019] EWCA Civ 1110; [2019] 1 W.L.R. 6137, the Court of Appeal confirmed (obiter) that, where s.12 applies, there is no power to dispense with service as its provisions are mandatory. However, the court held that an order granting permission to enforce an arbitration award against a foreign state (being a New York Convention award enforceable pursuant to the Arbitration Act 1996 s.101) was not a "writ or other document required to be served for instituting proceedings against the State" and therefore did not fall within s.12. The court had jurisdiction to dispense with service in an appropriate case, under both CPR rr.6.16 (claim forms) and 6.28 (other documents), though it would always be appropriate to make arrangements to notify the state in question. The Court of Appeal stressed that such notification did not amount to alternative service, which could not be used where the respondent is a state. Where the document was not a claim form and therefore the application fell within r.6.28, it could be said that the court had a general discretion, without a requirement for "exceptional circumstances" as under CPR r.6.16. However, the court considered that, when the order permitting enforcement was the first time the foreign state received notice of a claimant's attempt to enforce the award, it was "only right and proper" to apply the test of exceptional circumstances.

Section 12(1) of the 1978 Act further provides that "service shall be deemed to have been effected when the writ or document is received at the Ministry". In *European Union v Syrian Arab Republic* [2018] EWHC 181 (Comm), the method of service of a claim form on a foreign state was by email (sent by the Foreign and Commonwealth Office in effecting service under r.6.44), and no delivery failure notification was received by the sender to suggest that the recipient server was unavailable or busy. Teare J found (applying the reasoning in *Anson v Trump* [1998] 1 W.L.R. 1404, CA) that service had been effected under s.12(1) when the email arrived in the electronic depository of the recipient. However, in *Heiser's Estate v Iran* [2019] EWHC 2074 (QB), in considering similar provisions at s.12(5) of the 1978 Act relating to service of default judgments, Stewart J held that service by email was not permitted under s.12, disagreeing with the conclusion of Teare J in *Anson*. He also held that service was not effected where the representative of Ministry of Affairs in Iran refused to accept the default judgment, given the requirement for documents to be "received".

## Translation of claim form or other document[1]

**6.45**   **6.45—(1)  Except where paragraph (4) or (5) applies, every copy of the claim form or other document filed under rule 6.43 (service through foreign governments, judicial authorities etc.) or 6.44 (service of claim form or other document on a State) must be accompanied by a translation of the claim form or other document.**

**(2)  The translation must be—**

**(a)  in the official language of the country in which it is to be served; or**

**(b)  if there is more than one official language of that country, in any official language which is appropriate to the place in the country where the claim form or other document is to be served.**

**(3)  Every translation filed under this rule must be accompanied by a statement by the person making it that it is a correct translation, and the statement must include that person's name, address and qualifications for making the translation.**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2011 (SI 2011/88) and the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

**(4)  A party is not required to file a translation of a claim form or other document filed under rule 6.43 (service through foreign governments, judicial authorities etc.) where the claim form or other document is to be served—**

    (a)   **in a country of which English is an official language; or**

    (b)   **on a British citizen (within the meaning of the British Nationality Act 1981), unless a Civil Procedure Convention or Treaty requires a translation.**

**(5)  A party is not required to file a translation of a claim form or other document filed under rule 6.44 (service of claim form or other document on a State) where English is an official language of the State in which the claim form or other document is to be served.**

##### Effect of rule

**6.45.1** Prior to 31 December 2020 (IP completion day) this rule signposted reference to the Service Regulation as it contains provisions concerning the translation of documents. This signpost was omitted by reg.4(20) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521), as of IP completion day.

### Undertaking to be responsible for expenses[1]

**6.46** **6.46  Every request for service filed under rule 6.43 (service through foreign governments, judicial authorities etc.) or rule 6.44 (service of claim form or other document on a State) must contain an undertaking by the person making the request—**

    (a)   **to be responsible for all expenses incurred by the Foreign, Commonwealth and Development Office or foreign judicial authority; and**

    (b)   **to pay those expenses to the Foreign, Commonwealth and Development Office or foreign judicial authority on being informed of the amount.**

### Proof of service before obtaining judgment[2]

**6.47** **6.47  Where—**

    (a)   **a hearing is fixed when the claim form is issued;**

    (b)   **the claim form is served on a defendant out of the jurisdiction; and**

    (c)   **that defendant does not appear at the hearing,**

**the claimant may not obtain judgment against the defendant until the claimant files written evidence that the claim form has been duly served in accordance with this Part.**

##### Effect of rule

**6.47.1** Rule 6.47 (unless disapplied in certain circumstances which otherwise might apply) prevents a claimant from taking further steps against a defendant served with a claim form out of the jurisdiction, until the claimant files written evidence showing that such service has been duly effected. The written evidence must show that the claim form has been duly served out of the jurisdiction "in accordance with this Part". Where, by an order obtained under r.6.15, the claimant has effected service by an alternative method, r.6.47 requires that the claimant should file written evidence that the claim form has been duly served by that method, a requirement that will be satisfied if written evidence is produced which shows that such steps as the court may have specified in the order made under r.6.15 have been complied with (*Bill Kenwright Ltd v Flash Entertainment FZ LLC* [2016] EWHC 1951 (QB), at [62]).

In r.6.47(a) the words "a hearing is fixed when the claim form is issued" cannot be read literally as applying the rule only to fixed date claims where a hearing date is given on issue, since few such actions could be expected to be served abroad (they are largely possession claims). Further, r.6.40(2) does not modify the term "jurisdiction" in this Section but only in Section II; therefore the general definition in r.2.3 would seem to apply. Nevertheless it would be odd if the words in r.6.47(b) "out

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Transfer of Functions (Secretary of State for Foreign, Commonwealth and Development Affairs) Order 2020 (SI 2020/942).

[2] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

of the jurisdiction" in the context of this rule referred to Scotland and Northern Ireland in circumstances in which service of claim forms in Scotland and Northern Ireland must be under Section II, so that the filing of written evidence as opposed to the certificate of service should not be necessary.

*V.   Service of Documents from Foreign Courts or Tribunals*

### Scope of this Section[1]

**6.48**    **6.48  This Section—**

> **(a)  applies to the service in England and Wales of any document in connection with civil or commercial proceedings in a foreign court or tribunal;**
>
> **(b)  [Omitted]**

**Effect of rule (r.6.48)**

**6.48.1**    This rule introduces Section V which replaces Section IV of Pt 6 as it stood before the substitution of the whole of that Part with effect from 1 October 2008. The language of the several rules (rr.6.49 to 6.52) in this Section has been re-phrased in a number of respects. In terms, the Section now applies to service in England and Wales of "any document" (rather than "any court process") in connection with civil or commercial proceedings in a foreign court or tribunal.

This rule was amended by reg.4(21) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521) to omit r.6.48(b), as of 31 December 2020 (IP completion day). That rule had referred to the Service Regulation.

For further commentary, see para.6.52.1.

### Interpretation[2]

**6.49**    **6.49  In this Section—**

> **(a)  "convention country" means a country in relation to which there is a Civil Procedure Convention (which has the same meaning as in rule 6.31(c));**
>
> **(b)  "foreign court or tribunal" means a court or tribunal in a country outside of the United Kingdom; and**
>
> **(c)  "process server" means—**
>
>> **(i)  a process server appointed by the Lord Chancellor to serve documents to which this Section applies, or**
>>
>> **(ii)  the process server's agent.**

**Editorial note**

**6.49.1**    Although not amended to say so expressly r.6.49(a) would also cover a civil procedure treaty.

### Request for service[3]

**6.50**    **6.50  The Senior Master will serve a document to which this Section applies upon receipt of—**

> **(a)  a written request for service—**
>
>> **(i)  where the foreign court or tribunal is in a convention country, from a consular or other authority of that country; or**
>>
>> **(ii)  from the Secretary of State for Foreign, Commonwealth and Development Affairs, with a recommendation that service should be effected;**

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).
[2] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).
[3] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Transfer of Functions (Secretary of State for Foreign, Commonwealth and Development Affairs) Order 2020 (SI 2020/942).

(b)   **a translation of that request into English;**

(c)   **two copies of the document to be served; and**

(d)   **unless the foreign court or tribunal certifies that the person to be served understands the language of the document, two copies of a translation of it into English.**

## Method of service[1]

**6.51   The Senior Master will determine the method of service.**                    **6.51**

## After service[2]

**6.52—(1)   Where service of a document has been effected by a process**   **6.52**
**server, the process server must—**

(a)   **send to the Senior Master a copy of the document, and**

    (i)   **proof of service; or**

    (ii)   **a statement why the document could not be served; and**

(b)   **if the Senior Master directs, specify the costs incurred in serving or attempting to serve the document.**

(2)   **The Senior Master will send to the person who requested service—**

(a)   **a certificate, sealed with the seal of the Senior Courts for use out of the jurisdiction, stating—**

    (i)   **when and how the document was served or the reason why it has not been served; and**

    (ii)   **where appropriate, an amount certified by a costs judge to be the costs of serving or attempting to serve the document; and**

(b)   **a copy of the document.**

### Effect of Section V

This section sets out the procedure for the incoming service of judicial documents through the   **6.52.1**
Senior Master in England and Wales.

Parties to foreign litigation in a country which is a signatory to the Hague Convention on the Service of Judicial and Extrajudicial Documents are also able to effect service in England and Wales as set out in art.10 of the Convention which states:

"Provided the State of destination does not object, the present Convention shall not interfere with—

(a)   the freedom to send judicial documents, by postal channels, directly to persons abroad,

(b)   the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officials or other competent persons of the State of destination,

(c)   the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officials or other competent persons of the State of destination."

In art.10 "other competent persons of the State of destination" in the case of service in England and Wales is regarded by The Senior Master as meaning Solicitors of the Senior Courts. The Central Authority Section for the UK on the HCCH website contains the following statements in that respect:

"Extract from a letter dated 11 September 1980 addressed by the Foreign and Commonwealth Office of the Permanent Bureau:

'(...) Thank you for your letter of 31 July in which you ask for assistance in the interpretation of the declaration made by the United Kingdom on 17 November 1967 in relation to Article 10(c) of the Convention. I am happy to confirm that our declaration does not preclude any person in another Contracting State who is interested in a judicial proceeding (including his lawyer) from effecting service in the United Kingdom "directly" through a competent person other than a judicial officer or official, e.g., a solicitor. (...)' Conclusion and Recommendation No 58 of the 2003 Special Commission (SC) states: 'The 2003 SC noted that the UK confirmed its position expressed at the Special Commission meeting of 1989, indicating its preference for the use of direct service through English solicitors on residents of England and Wales.'"

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178).

[2] Introduced by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178) and amended by the Civil Procedure (Amendment) Rules 2009 (SI 2009/2092).

## Practice Direction 6A—Service within the United Kingdom
*This Practice Direction supplements CPR Part 6*

### Scope of this Practice Direction
**6APD.1**   **1.1**   This Practice Direction supplements—
(1)   Section II (service of the claim form in the jurisdiction) of Part 6;
(2)   Section III (service of documents other than the claim form in the United Kingdom) of Part 6; and
(3)   rule 6.40 in relation to the method of service on a party in Scotland or Northern Ireland.

(Practice Direction 6B contains provisions relevant to service on a party in Scotland or Northern Ireland, including provisions about service out of the jurisdiction where permission is and is not required and the period for responding to an application notice.)

### When service may be by document exchange
**6APD.2**   **2.1**   Service by document exchange (DX) may take place only where—
(1)   the address at which the party is to be served includes a numbered box at a DX, or
(2)   the writing paper of the party who is to be served or of the solicitor acting for that party sets out a DX box number, and
(3)   the party or the solicitor acting for that party has not indicated in writing that they are unwilling to accept service by DX.

### How service is effected by post, an alternative service provider or DX
**6APD.3**   **3.1**   Service by post, DX or other service which provides for delivery on the next business day is effected by—
(1)   placing the document in a post box;
(2)   leaving the document with or delivering the document to the relevant service provider; or
(3)   having the document collected by the relevant service provider.

### Service by fax or other electronic means
**6APD.4**   **4.1**   Subject to the provisions of rule 6.23(5) and (6), where a document is to be served by fax or other electronic means—
(1)   the party who is to be served or the solicitor acting for that party must previously have indicated in writing to the party serving—
  (a)   that the party to be served or the solicitor is willing to accept service by fax or other electronic means; and
  (b)   the fax number, e-mail address or other electronic identification to which it must be sent; and

(2)   the following are to be taken as sufficient written indications for the purposes of paragraph 4.1(1)—
  (a)   a fax number set out on the writing paper of the solicitor acting for the party to be served;
  (b)   an e-mail address set out on the writing paper of the solicitor acting for the party to be served but only where it is stated that the e-mail address may be used for service; or
  (c)   a fax number, e-mail address or electronic identification set out on a statement of case or a response to a claim filed with the court.

**4.2**   Where a party intends to serve a document by electronic means (other than by fax) that party must first ask the party who is to be served whether there are any limitations to the recipient's agreement to accept service by such means (for example, the format in which documents are to be sent and the maximum size of attachments that may be received).

**4.3** Where a document is served by electronic means, the party serving the document need not in addition send or deliver a hard copy.

### Service on members of the Regular Forces and United States Air Force

**5.1** The provisions that apply to service on members of the regular forces (within the meaning of the Armed Forces Act 2006) and members of the United States Air Force are annexed to this practice direction.  **6APD.5**

### Personal service on a company or other corporation

**6.1** Personal service on a registered company or corporation in accordance with rule 6.5(3) is effected by leaving a document with a person holding a senior position.  **6APD.6**

**6.2** Each of the following persons is a person holding a senior position—
(1) in respect of a registered company or corporation, a director, the treasurer, the secretary of the company or corporation, the chief executive, a manager or other officer of the company or corporation; and
(2) in respect of a corporation which is not a registered company, in addition to any of the persons set out in sub-paragraph (1), the mayor, the chairman, the president, a town clerk or similar officer of the corporation.

### Certificate of service where claimant serves the claim form

**7.1** Where, pursuant to rule 6.17(2), the claimant files a certificate of service, the claimant is not required to and should not file—  **6APD.7**
(1) a further copy of the claim form with the certificate of service; and
(2) a further copy of—
    (a) the particulars of claim (where not included in the claim form); or
    (b) any document attached to the particulars of claim,

with the certificate of service where that document has already been filed with the court.

(Rule 7.4 requires the claimant to file a copy of the particulars of claim (where served separately from the claim form) within 7 days of service on the defendant.)

### Service by the court

**8.1** Where the court serves a document in accordance with rule 6.4 or 6.21(2), the method will normally be first class post.  **6APD.8**

### Application for an order for service by an alternative method or at an alternative place

**9.1** Where an application for an order under rule 6.15 is made before the document is served, the application must be supported by evidence stating—  **6APD.9**
(1) the reason why an order is sought;
(2) what alternative method or place is proposed, and
(3) why the applicant believes that the document is likely to reach the person to be served by the method or at the place proposed.

**9.2** Where the application for an order is made after the applicant has taken steps to bring the document to the attention of the person to be served by an alternative method or at an alternative place, the application must be supported by evidence stating—
(1) the reason why the order is sought;
(2) what alternative method or alternative place was used;
(3) when the alternative method or place was used; and
(4) why the applicant believes that the document is likely to have reached the person to be served by the alternative method or at the alternative place.

**9.3**   Examples—

(1)   an application to serve by posting or delivering to an address of a person who knows the other party must be supported by evidence that if posted or delivered to that address, the document is likely to be brought to the attention of the other party;

(2)   an application to serve by sending a SMS text message or leaving a voicemail message at a particular telephone number saying where the document is must be accompanied by evidence that the person serving the document has taken, or will take, appropriate steps to ensure that the party being served is using that telephone number and is likely to receive the message; and

(3)   an application to serve by e-mail to a company (where paragraph 4.1 does not apply) must be supported by evidence that the e-mail address to which the document will be sent is one which is likely to come to the attention of a person holding a senior position in that company.

### Deemed service of a document other than a claim form

**6APD.10**   **10.1**   Rule 6.26 contains provisions about deemed service of a document other than a claim form. Examples of how deemed service is calculated are set out below.

### 10.2   Example 1

Where the document is posted (by first class post) on a Monday (a business day), the day of deemed service is the following Wednesday (a business day).

### 10.3   Example 2

Where the document is left in a numbered box at the DX on a Friday (a business day), the day of deemed service is the following Monday (a business day).

### 10.4   Example 3

Where the document is sent by fax on a Saturday and the transmission of that fax is completed by 4.30p.m. on that day, the day of deemed service is the following Monday (a business day).

### 10.5   Example 4

Where the document is served personally before 4.30p.m. on a Sunday, the day of deemed service is the next day (Monday, a business day).

### 10.6   Example 5

Where the document is delivered to a permitted address after 4.30p.m. on the Thursday (a business day) before Good Friday, the day of deemed service is the following Tuesday (a business day) as the Monday is a bank holiday.

### 10.7   Example 6

Where the document is posted (by first class post) on a bank holiday Monday, the day of deemed service is the following Wednesday (a business day).

**Editorial note**

**6APD.10.1**   Comparison of deemed dates of service for claim form and Particulars of Claim when Particulars of Claim are served separately from claim form.

**Table of Comparison of Deemed Dates of Service for Claim Form and Particulars of Claim**

| METHOD OF SERVICE CPR 6.3 and 6.26 | DEEMED DATE OF SERVICE OF CLAIM FORM CPR 6.14 and 7.5(1); 6.5(3) | DEEMED DATE OF SERVICE OF PARTICULARS OF CLAIM CPR 6.26 |
|---|---|---|
| First Class Post, document exchange or other service that | The second business day after completion of the step, e.g. | The second day after it was posted, or left with, delivered |

| provides delivery on the next business day | posted, left with, delivered to or collected by the relevant document delivery service on Monday, deemed served on Wednesday; or posted, left with, delivered to or collected by the relevant document delivery service on Friday, deemed served on the following Tuesday (unless Monday is a Bank Holiday, then deemed service on Wednesday). | to or collected by the relevant service provider, provided that day is a business day, if not the next business day after that day, e.g. posted, left with, delivered to or collected by the relevant document delivery service on Monday, deemed served on Wednesday posted, left with, delivered to or collected by the relevant document delivery service on Friday, deemed served on the followingMonday (unless Monday is a Bank Holiday, then deemed service on Tuesday). |
|---|---|---|
| Delivery of the document or leaving it at the relevant place | Second business day after delivering to or leaving at the relevant place, e.g. delivered /left on Monday, served on Wednesday; delivered/left on Friday, deemed served on Tuesday (unless Monday is a Bank Holiday, then deemed service on Wednesday). | If delivered/left at permitted address on a business day before 4.30pm, on that day, or in any other case, the next business day, e.g. delivered/left 4pm Monday, deemed served Monday (unless Monday is a Bank Holiday, then deemed service on Tuesday); delivered/ left 5pm Monday, deemed served Tuesday delivered/left 4pm Friday, deemed served Friday; delivered/left 5pm Friday, deemed served the following Monday (unless Monday is a Bank Holiday, then deemed service on Tuesday). |
| Personal Service | Second business day after leaving claim form in accordance with r.6.5(3), e.g. left on Monday, deemed served on Wednesday; left on Friday, deemed served on the following Tuesday (unless Monday is a Bank Holiday, then deemed service on Wednesday). | If served personally before 4.30pm, on a business day, on that day, or in any other case, the next business day, e.g. personally delivered 4pm Monday, deemed served Monday (unless Monday is a Bank Holiday, then deemed service on Tuesday); personally delivered 5pm Monday, deemed served Tuesday personally delivered 4pm Friday, deemed served Friday; personally delivered 5pm Friday, deemed served the following Monday (unless Monday is a Bank Holiday, then deemed service on Tuesday). |
| Fax | Second Business day after transmission of the fax is completed, e.g. transmission of fax completed on Monday, deemed served on Wednesday; transmission of fax completed on Friday, deemed served on the following Tuesday (unless Monday is a Bank Holiday, then deemed service on Wednesday). | If transmission of the fax is before 4.30pm on a business day, on that day, or in any other case, the next business day, e.g. transmitted 4pm Monday, deemed served Monday (unless Monday is a Bank Holiday, then deemed service on Tuesday); transmitted 5pm Monday, deemed served Tuesday; transmitted 4pm Friday, deemed served Friday; transmitted 5pm Friday, deemed served the following Monday (unless Monday is a Bank Holiday, then deemed service on Tuesday). |

CPR 6

| Email or other Electronic Method | Second Business day after sending the email or other electronic transmission, e.g. transmission on Monday, deemed served on Wednesday; transmission on Friday, deemed served on the following Tuesday (unless Monday is a Bank Holiday, then deemed service on Wednesday). | If electronic transmission is before 4.30pm on a business day, on that day, or in any other case, the next business day, e.g. transmitted 4pm Monday, deemed served Monday (unless Monday is a Bank Holiday, then deemed service on Tuesday); transmitted 5pm Monday, deemed served Tuesday; transmitted 4pm Friday, deemed served Friday; transmitted 5pm Friday, deemed served the following Monday (unless Monday is a Bank Holiday, then deemed service on Tuesday). |
|---|---|---|

*Annex*

### Service on Members of the Regular Forces

**6APD.11**   **1.**  The following information is for litigants and legal representatives who wish to serve legal documents in civil proceedings in the courts of England and Wales on parties to the proceedings who are (or who, at the material time, were) members of the regular forces (as defined in the Armed Forces Act 2006).

**2.**  The proceedings may take place in the County Court or the High Court, and the documents to be served may be claim forms, interim application notices and pre-action application notices. Proceedings for divorce or maintenance and proceedings in the Family Courts generally are subject to special rules as to service which are explained in a practice direction issued by the Senior District Judge of the Principal Registry on 26 June 1979.

**3.**  In this Annex, the person wishing to effect service is referred to as the 'claimant' and the member of the regular forces to be served is referred to as 'the member'; the expression "overseas" means outside the United Kingdom.

### Enquiries as to address

**6APD.12**   **4.**  As a first step, the claimant's legal representative will need to find out where the member is serving, if this is not already known. For this purpose the claimant's legal representative should write to the appropriate officer of the Ministry of Defence as specified in paragraph 10 below.

**5.**  The letter of enquiry should in every case show that the writer is a legal representative and that the enquiry is made solely with a view to the service of legal documents in civil proceedings.

**6.**  In all cases the letter must give the full name, service number, rank or rate, and Ship, Arm or Trade, Regiment or Corps and Unit or as much of this information as is available. Failure to quote the service number and the rank or rate may result either in failure to identify the member or in considerable delay.

**7.**  The letter must contain an undertaking by the legal representative that, if the address is given, it will be used solely for the purpose of issuing and serving documents in the proceedings and that so far as is possible the legal representative will disclose the address only to the court and not to the claimant or to any other person or body. A legal representative in the service of a public authority or private company must undertake that the address will be used solely for the purpose of issuing and serving documents in the proceedings and that the address will not be disclosed so far as is possible to any other part of the legal representative's employing organisation or to any other person but only to the court. Normally on receipt of the required information and undertaking the appropriate office will give the service address.

**8.** If the legal representative does not give the undertaking, the only information that will be given is whether the member is at that time serving in England or Wales, Scotland, Northern Ireland or overseas.

**9.** It should be noted that a member's address which ends with a British Forces Post Office address and reference (BFPO) will nearly always indicate that the member is serving overseas.

**10.** The letter of enquiry should be addressed as follows—

(a) Royal Navy and Royal Marine Officers, Ratings and Other Ranks—

> Director Naval Personnel
> Fleet Headquarters
> MP 3.1
> Leach Building
> Whale Island
> Portsmouth
> Hampshire
> PO2 8BY

(b) Army Officers and other Ranks—

> Army Personnel Centre
> Disclosures 1
> MP 520
> Kentigern House
> 65 Brown Street
> Glasgow
> G2 8EX

(c) Royal Air Force Officers and Other Ranks—

> Manning 22E
> RAF Disclosures
> Room 221B
> Trenchard Hall
> RAF Cranwell
> Sleaford
> Lincolnshire
> NG34 8HB

**Assistance in serving documents on members**

**11.** Once the claimant's legal representative has ascertained the member's **6APD.13** address, the legal representative may use that address as the address for service by post, in cases where this method of service is allowed by the Civil Procedure Rules. There are, however, some situations in which service of the proceedings, whether in the High Court or in the County Court, must be effected personally; in these cases an appointment will have to be sought, through the Commanding Officer of the Unit, Establishment or Ship concerned, for the purpose of effecting service. The procedure for obtaining an appointment is described below, and it applies whether personal service is to be effected by the claimant's legal representative or the legal representative's agent or by a court bailiff, or, in the case of proceedings served overseas (with the leave of the court) through the British Consul or the foreign judicial authority.

**12.** The procedure for obtaining an appointment to effect personal service is by application to the Commanding Officer of the Unit, Establishment or Ship in which the member is serving. The Commanding Officer may grant permission for the document server to enter the Unit, Establishment or Ship but if this is not appropriate the Commanding Officer may offer arrangements

for the member to attend at a place in the vicinity of the Unit, Establishment or Ship in order that the member may be served. If suitable arrangements cannot be made the legal representative will have evidence that personal service is impracticable, which may be useful in an application for service by an alternative method or at an alternative place.

### General

**6APD.14**  **13.**  Subject to the procedure outlined in paragraphs 11 and 12, there are no special arrangements to assist in the service of legal documents when a member is outside the United Kingdom. The appropriate office will, however, give an approximate date when the member is likely to return to the United Kingdom.

**14.**  It sometimes happens that a member has left the regular forces by the time an enquiry as to address is made. If the claimant's legal representative confirms that the proceedings result from an occurrence when the member was in the regular forces and the legal representative gives the undertaking referred to in paragraph 7, the last known private address after discharge will normally be provided. In no other case, however, will the Ministry of Defence disclose the private address of a member of the regular forces.

### Service on Members of United States Air Force

**6APD.15**  **15.**  In addition to the information contained in the memorandum of 26 July 1979, and after some doubts having been expressed as to the correct procedure to be followed by persons having civil claims against members of the United States Air Force in England and Wales, the Lord Chancellor's Office (as it was then) issued the following notes for guidance with the approval of the appropriate United States authorities.

**16.**  Instructions have been issued by the United States authorities to the commanding officers of all their units in England and Wales that every facility is to be given for the service of documents in civil proceedings on members of the United States Air Force. The proper course to be followed by a creditor or other person having a claim against a member of the United States Air Force is for that person to communicate with the commanding officer or, where the unit concerned has a legal officer, with the legal officer of the defendant's unit requesting the provision of facilities for the service of documents on the defendant. It is not possible for the United States authorities to act as arbitrators when a civil claim is made against a member of their forces. It is, therefore, essential that the claim should either be admitted by the defendant or judgment should be obtained on it, whether in the High Court or the County Court. If a claim has been admitted or judgment has been obtained and the claimant has failed to obtain satisfaction within a reasonable period, the claimant's proper course is then to write to: Office of the Staff Judge Advocate, Headquarters, Third Air Force, R.A.F. Mildenhall, Suffolk, enclosing a copy of the defendant's written admission of the claim or, as the case may be, a copy of the judgment. Steps will then be taken by the Staff Judge Advocate to ensure that the matter is brought to the defendant's attention with a view to prompt satisfaction of the claim.

#### Editorial note

**6APD.16**  The European Communities (Services of Lawyers) Order 1978 (SI 1978/1910) was added to PD 6A as Annex 2 by CPR Update 55 (February 2011). It was omitted with effect from 31 December 2020 (IP completion day).

## PRACTICE DIRECTION 6B—SERVICE OUT OF THE JURISDICTION
*This Practice Direction supplements CPR Part 6*

### Scope of this Practice Direction
**1.1** This Practice Direction supplements Section IV (service of the claim **6BPD.1** form and other documents out of the jurisdiction) of Part 6.

(Practice Direction 6A contains relevant provisions supplementing rule 6.40 in relation to the method of service on a party in Scotland or Northern Ireland.)

### Service out of the jurisdiction where permission of the court is not required
**2.1** Where rule 6.34 applies, the claimant must file practice form N510 **6BPD.2** when filing the claim form.

### Service out of the jurisdiction where permission is required
**3.1** The claimant may serve a claim form out of the jurisdiction with the **6BPD.3** permission of the court under rule 6.36 where—

*General grounds*
  (1)  A claim is made for a remedy against a person domiciled within the jurisdiction.
  (2)  A claim is made for an injunction ((GL)) ordering the defendant to do or refrain from doing an act within the jurisdiction.
  (3)  A claim is made against a person ("the defendant") on whom the claim form has been or will be served (otherwise than in reliance on this paragraph) and—
    (a)  there is between the claimant and the defendant a real issue which it is reasonable for the court to try; and
    (b)  the claimant wishes to serve the claim form on another person who is a necessary or proper party to that claim.
  (4)  A claim is an additional claim under Part 20 and the person to be served is a necessary or proper party to the claim or additional claim.
  (4A) A claim is made against the defendant in reliance on one or more of paragraphs (2), (6) to (16), (19) or (21) and a further claim is made against the same defendant which arises out of the same or closely connected facts.

*Claims for interim remedies*
  (5)  A claim is made for an interim remedy under section 25(1) of the Civil Jurisdiction and Judgments Act 1982.

*Claims in relation to contracts*
  (6)  A claim is made in respect of a contract where the contract—
    (a)  was made within the jurisdiction;
    (b)  was made by or through an agent trading or residing within the jurisdiction; or
    (c)  is governed by English law.
    (d)  [Omitted]
  (7)  A claim is made in respect of a breach of contract committed within the jurisdiction.
  (8)  A claim is made for a declaration that no contract exists where, if the contract was found to exist, it would comply with the conditions set out in paragraph (6).

*Claims in tort*
  (9)  A claim is made in tort where—

    (a)   damage was sustained, or will be sustained, within the jurisdiction; or

    (b)   damage which has been or will be sustained results from an act committed, or likely to be committed, within the jurisdiction.

### *Enforcement*

(10)  A claim is made to enforce any judgment or arbitral award.

### *Claims about property within the jurisdiction*

(11)  The subject matter of the claim relates wholly or principally to property within the jurisdiction, provided that nothing under this paragraph shall render justiciable the title to or the right to possession of immovable property outside England and Wales.

### *Claims about trusts etc.*

(12)  A claim is made in respect of a trust which is created by the operation of a statute, or by a written instrument, or created orally and evidenced in writing, and which is governed by the law of England and Wales.

(12A)A claim is made in respect of a trust which is created by the operation of a statute, or by a written instrument, or created orally and evidenced in writing, and which provides that jurisdiction in respect of such a claim shall be conferred upon the courts of England and Wales.

(13)  A claim is made for any remedy which might be obtained in proceedings for the administration of the estate of a person who died domiciled within the jurisdiction or whose estate includes assets within the jurisdiction.

(14)  A probate claim or a claim for the rectification of a will.

(15)  A claim is made against the defendant as constructive trustee, or as trustee of a resulting trust, where the claim arises out of acts committed or events occurring within the jurisdiction or relates to assets within the jurisdiction.

(16)  A claim is made for restitution where—

    (a)   the defendant's alleged liability arises out of acts committed within the jurisdiction; or

    (b)   the enrichment is obtained within the jurisdiction; or

    (c)   the claim is governed by the law of England and Wales.

### *Claims by HM Revenue and Customs*

(17)  A claim is made by the Commissioners for H.M. Revenue and Customs relating to duties or taxes against a defendant not domiciled in Scotland or Northern Ireland.

### *Claim for costs order in favour of or against third parties*

(18)  A claim is made by a party to proceedings for an order that the court exercise its power under section 51 of the Senior Courts Act 1981 to make a costs order in favour of or against a person who is not a party to those proceedings.

(Rule 46.2 sets out the procedure where the court is considering whether to exercise its discretion to make a costs order in favour of or against a non-party.)

### *Admiralty claims*

(19)  A claim is—

    (a)   in the nature of salvage and any part of the services took place within the jurisdiction; or

    (b)   to enforce a claim under section 153, 154, 175 or 176A of the Merchant Shipping Act 1995.

*Claims under various enactments*
(20) A claim is made—
   (a) under an enactment which allows proceedings to be brought and those proceedings are not covered by any of the other grounds referred to in this paragraph.

*Claims for breach of confidence or misuse of private information*
(21) A claim is made for breach of confidence or misuse of private information where—
   (a) detriment was suffered, or will be suffered, within the jurisdiction; or
   (b) detriment which has been, or will be, suffered results from an act committed, or likely to be committed, within the jurisdiction.

### Documents to be filed under rule 6.43(2)(c)

**4.1** A party must provide the following documents for each party to be **6BPD.4** served out of the jurisdiction—
   (1) a copy of the particulars of claim if not already contained in or served with the claim form and any other relevant documents;
   (2) a duplicate of the claim form, a duplicate of the particulars of claim (if not already contained in or served with the claim form), copies of any documents accompanying the claim form and copies of any other relevant documents;
   (3) forms for responding to the claim; and
   (4) any translation required under rule 6.45 in duplicate.

**4.2** Some countries require legalisation of the document to be served and some require a formal letter of request which must be signed by the Senior Master. Any queries on this should be addressed to the Foreign Process Section (Room E02) at the Royal Courts of Justice.

### Service in a Commonwealth State or British overseas territory

**5.1** The judicial authorities of certain Commonwealth States which are not **6BPD.5** a party to the Hague Convention require service to be in accordance with rule 6.42(1)(b)(i) and not 6.42(3). A list of such countries can be obtained from the Foreign Process Section (Room E02) at the Royal Courts of Justice.

**5.2** The list of British overseas territories is contained in Schedule 6 to the British Nationality Act 1981. For ease of reference, these are—
   (a) Anguilla;
   (b) Bermuda;
   (c) British Antarctic Territory;
   (d) British Indian Ocean Territory;
   (e) British Virgin Islands;
   (f) Cayman Islands;
   (g) Falkland Islands;
   (h) Gibraltar;
   (i) Montserrat;
   (j) Pitcairn, Henderson, Ducie and Oeno;
   (k) St. Helena and Dependencies;
   (l) South Georgia and the South Sandwich Islands;
   (m) Sovereign Base Areas of Akrotiri and Dhekelia; and
   (n) Turks and Caicos Islands.

### Period for responding to a claim form

**6.1** Where rule 6.35(5) applies, the periods within which the defendant **6BPD.6** must—
   (1) file an acknowledgment of service;

409

(2)   file or serve an admission; or

(3)   file a defence,

will be calculated in accordance with paragraph 6.3, 6.4 or 6.5.

**6.2**   Where the court grants permission to serve a claim form out of the jurisdiction the court will determine in accordance with paragraph 6.3, 6.4 or 6.5 the periods within which the defendant must—

(1)   file an acknowledgment of service;

(2)   file or serve an admission; or

(3)   file a defence.

(Rule 6.37(5)(a) provides that when giving permission to serve a claim form out of the jurisdiction the court will specify the period within which the defendant may respond to the claim form.)

**6.3**   The period for filing an acknowledgment of service under Part 10 or for filing or serving an admission under Part 14 is the number of days listed in the Table after service of the particulars of claim.

**6.4**   The period for filing a defence under Part 15 is—

(1)   the number of days listed in the Table after service of the particulars of claim; or

(2)   where the defendant has filed an acknowledgment of service, the number of days listed in the Table plus an additional 14 days after the service of the particulars of claim.

**6.5**   Under the State Immunity Act 1978, where a State is served, the period permitted under paragraphs 6.3 and 6.4 for filing an acknowledgment of service or defence or for filing or serving an admission does not begin to run until 2 months after the date on which the State is served.

**6.6**   Where particulars of claim are served out of the jurisdiction any statement as to the period for responding to the claim contained in any of the forms required by rule 7.8 to accompany the particulars of claim must specify the period prescribed under rule 6.35 or by the order permitting service out of the jurisdiction under rule 6.37(5).

### Period for responding to an application notice

**6BPD.7**   **7.1**   Where an application notice is served out of the jurisdiction, the period for responding is 7 days less than the number of days listed in the Table.

### 7.2   Further information

Further information concerning service out of the jurisdiction can be obtained from the Foreign Process Section, Room E02, Royal Courts of Justice, Strand, London WC2A 2LL (telephone 020 7947 6691).

### Table

| Place or country | Number of days |
| --- | --- |
| Afghanistan | 23 |
| Albania | 25 |
| Algeria | 22 |
| Andorra | 21 |
| Angola | 22 |
| Anguilla | 31 |
| Antigua and Barbuda | 23 |
| Antilles (Netherlands) | 31 |
| Argentina | 22 |
| Armenia | 21 |

(6BPD.8 label appears at row "Afghanistan")

CPR 6

| Place or country | Number of days |
|---|---|
| Ascension Island | 31 |
| Australia | 25 |
| Austria | 21 |
| Azerbaijan | 22 |
| Azores | 23 |
| Bahamas | 22 |
| Bahrain | 22 |
| Balearic Islands | 21 |
| Bangladesh | 23 |
| Barbados | 23 |
| Belarus | 21 |
| Belgium | 21 |
| Belize | 23 |
| Benin | 25 |
| Bermuda | 31 |
| Bhutan | 28 |
| Bolivia | 23 |
| Bosnia and Herzegovina | 21 |
| Botswana | 23 |
| Brazil | 22 |
| British Virgin Islands | 31 |
| Brunei | 25 |
| Bulgaria | 23 |
| Burkina Faso | 23 |
| Burma | 23 |
| Burundi | 22 |
| Cambodia | 28 |
| Cameroon | 22 |
| Canada | 22 |
| Canary Islands | 22 |
| Cape Verde | 25 |
| Caroline Islands | 31 |
| Cayman Islands | 31 |
| Central African Republic | 25 |
| Chad | 25 |
| Chile | 22 |
| China | 24 |
| China (Hong Kong) | 31 |
| China (Macau) | 31 |
| China (Taiwan) | 23 |
| China (Tibet) | 34 |
| Christmas Island | 27 |
| Cocos (Keeling) Islands | 41 |
| Colombia | 22 |
| Comoros | 23 |
| Congo (formerly Congo Brazzaville or French Congo) | 25 |

| Place or country | Number of days |
| --- | --- |
| Congo (Democratic Republic) | 25 |
| Corsica | 21 |
| Costa Rica | 23 |
| Croatia | 21 |
| Cuba | 24 |
| Cyprus | 31 |
| Czech Republic | 21 |
| Denmark | 21 |
| Djibouti | 22 |
| Dominica | 23 |
| Dominican Republic | 23 |
| East Timor | 25 |
| Ecuador | 22 |
| Egypt | 22 |
| El Salvador | 25 |
| Equatorial Guinea | 23 |
| Eritrea | 22 |
| Estonia | 21 |
| Ethiopia | 22 |
| Falkland Islands and Dependencies | 31 |
| Faroe Islands | 31 |
| Fiji | 23 |
| Finland | 24 |
| France | 21 |
| French Guyana | 31 |
| French Polynesia | 31 |
| French West Indies | 31 |
| Gabon | 25 |
| Gambia | 22 |
| Georgia | 21 |
| Germany | 21 |
| Ghana | 22 |
| Gibraltar | 31 |
| Greece | 21 |
| Greenland | 31 |
| Grenada | 24 |
| Guatemala | 24 |
| Guernsey | 21 |
| Guinea | 22 |
| Guinea-Bissau | 22 |
| Guyana | 22 |
| Haiti | 23 |
| Holland (Netherlands) | 21 |
| Honduras | 24 |
| Hungary | 22 |
| Iceland | 22 |
| India | 23 |

| Place or country | Number of days |
|---|---|
| Indonesia | 22 |
| Iran | 22 |
| Iraq | 22 |
| Ireland (Republic of) | 21 |
| Ireland (Northern) | 21 |
| Isle of Man | 21 |
| Israel | 22 |
| Italy | 21 |
| Ivory Coast | 22 |
| Jamaica | 22 |
| Japan | 23 |
| Jersey | 21 |
| Jordan | 23 |
| Kazakhstan | 21 |
| Kenya | 22 |
| Kiribati | 23 |
| Korea (North) | 28 |
| Korea (South) | 24 |
| Kosovo | 21 |
| Kuwait | 22 |
| Kyrgyzstan | 21 |
| Laos | 30 |
| Latvia | 21 |
| Lebanon | 22 |
| Lesotho | 23 |
| Liberia | 22 |
| Libya | 21 |
| Liechtenstein | 21 |
| Lithuania | 21 |
| Luxembourg | 21 |
| Macedonia | 21 |
| Madagascar | 23 |
| Madeira | 31 |
| Malawi | 23 |
| Malaysia | 24 |
| Maldives | 26 |
| Mali | 25 |
| Malta | 21 |
| Mariana Islands | 26 |
| Marshall Islands | 32 |
| Mauritania | 23 |
| Mauritius | 22 |
| Mexico | 23 |
| Micronesia | 23 |
| Moldova | 21 |
| Monaco | 21 |
| Mongolia | 24 |

| Place or country | Number of days |
|---|---|
| Montenegro | 21 |
| Montserrat | 31 |
| Morocco | 22 |
| Mozambique | 23 |
| Namibia | 23 |
| Nauru | 36 |
| Nepal | 23 |
| Netherlands | 21 |
| Nevis | 24 |
| New Caledonia | 31 |
| New Zealand | 26 |
| New Zealand Island Territories | 50 |
| Nicaragua | 24 |
| Niger (Republic of) | 25 |
| Nigeria | 22 |
| Norfolk Island | 31 |
| Norway | 21 |
| Oman (Sultanate of) | 22 |
| Pakistan | 23 |
| Palau | 23 |
| Panama | 26 |
| Papua New Guinea | 26 |
| Paraguay | 22 |
| Peru | 22 |
| Philippines | 23 |
| Pitcairn, Henderson, Ducie and Oeno Islands | 31 |
| Poland | 21 |
| Portugal | 21 |
| Portuguese Timor | 31 |
| Puerto Rico | 23 |
| Qatar | 23 |
| Reunion | 31 |
| Romania | 22 |
| Russia | 21 |
| Rwanda | 23 |
| Sabah | 23 |
| St. Helena | 31 |
| St. Kitts and Nevis | 24 |
| St. Lucia | 24 |
| St. Pierre and Miquelon | 31 |
| St. Vincent and the Grenadines | 24 |
| Samoa (U.S.A. Territory) (See also Western Samoa) | 30 |
| San Marino | 21 |
| Sao Tome and Principe | 25 |
| Sarawak | 28 |

| Place or country | Number of days |
|---|---|
| Saudi Arabia | 24 |
| Scotland | 21 |
| Senegal | 22 |
| Serbia | 21 |
| Seychelles | 22 |
| Sierra Leone | 22 |
| Singapore | 22 |
| Slovakia | 21 |
| Slovenia | 21 |
| Society Islands (French Polynesia) | 31 |
| Solomon Islands | 29 |
| Somalia | 22 |
| South Africa | 22 |
| South Georgia (Falkland Island Dependencies) | 31 |
| South Orkneys | 21 |
| South Shetlands | 21 |
| Spain | 21 |
| Spanish Territories of North Africa | 31 |
| Sri Lanka | 23 |
| Sudan | 22 |
| Surinam | 22 |
| Swaziland | 22 |
| Sweden | 21 |
| Switzerland | 21 |
| Syria | 23 |
| Tajikistan | 21 |
| Tanzania | 22 |
| Thailand | 23 |
| Togo | 22 |
| Tonga | 30 |
| Trinidad and Tobago | 23 |
| Tristan Da Cunha | 31 |
| Tunisia | 22 |
| Turkey | 21 |
| Turkmenistan | 21 |
| Turks & Caicos Islands | 31 |
| Tuvalu | 23 |
| Uganda | 22 |
| Ukraine | 21 |
| United Arab Emirates | 22 |
| United States of America | 22 |
| Uruguay | 22 |
| Uzbekistan | 21 |
| Vanuatu | 29 |
| Vatican City State | 21 |
| Venezuela | 22 |

| *Place or country* | *Number of days* |
|---|---|
| Vietnam | 28 |
| Virgin Islands—U.S.A | 24 |
| Wake Island | 25 |
| Western Samoa | 34 |
| Yemen (Republic of) | 30 |
| Zaire | 25 |
| Zambia | 23 |
| Zimbabwe | 22 |

**Annex—Service Regulation (Rule 6.41)**

**6BPD.9** *Note*—The Service Regulation was annexed to this PD until it was omitted with effect from 31 December 2020 (IP completion day).

## NOTES ON HEADS OF JURISDICTION IN PARAGRAPH 3.1 OF PRACTICE DIRECTION 6B

*Introduction*

These notes provide a commentary on the several heads of jurisdiction, or jurisdictional **6HJ.1** "gateways", set out in para.3.1 of Practice Direction 6B. For the text of para.3.1, see para.6BPD.3 above.

CPR r.6.36 states that, in any proceedings to which rr.6.32 or 6.33 does not apply, the claimant may serve a claim form out of the jurisdiction with the permission of the court "if any of the grounds set out in paragraph 3.1 of Practice Direction 6B apply". The exclusion of proceedings to which r.6.32 and r.6.33 apply is made for obvious reasons, as those rules deal with service of a claim form out of the jurisdiction (respectively, in Northern Ireland and Scotland, and out of the UK) where the permission of the court is not required.

The formulations for the heads of jurisdiction currently enacted in para.3.1 of Practice Direction 6B have evolved over a long period. Amendments made from time to time have been significant. In referring to authorities on particular heads of jurisdiction, care has to be taken to note the terms of the formulation in force at the relevant time. For that reason, in these notes reference is made to important amendments.

In delivering the principal speech in *Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran* [1994] 1 A.C. 438, HL, for the purpose of construing the heads of jurisdiction as then listed in RSC Ord.11 r.1 (in particular the contractual claim provisions), and the relationship between them and what is now r.6.37, Lord Goff explained their historical background ([450C] et seq). That account remains useful.

The general principles to be applied by the court, when hearing and determining an application (whether ex parte or inter partes) made by a claimant under r.6.36 for permission to serve proceedings on a defendant who is out of the jurisdiction on the basis that the claim comes under one or other of the heads of jurisdiction stated in para.3.1 of Practice Direction 6B, are as derived from the authorities. For a more detailed account of those principles, see paras 6.37.13 et seq. Put shortly, the principles are:

1.   that there is a good arguable case that the claim against the foreign defendant falls within one or more of the heads of jurisdiction for which leave to serve out of the jurisdiction may be given as set out in paragraph 3.1 of Practice Direction 6B (para.6.37.14);
2.   that, in relation to the foreign defendant to be served with the proceedings, there is a serious issue to be tried on the merits of the claim (para.6.37.15); and
3.   that in all the circumstances (a) England is clearly or distinctly the appropriate forum for the trial of the dispute (forum conveniens) (para.6.37.16), and (b) the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction (para.6.37.25).

For the general principles to be applied by the court in the quite different exercise of hearing and determining an application by a defendant for a stay of proceedings, where the originating process has been served on him or her within the jurisdiction, see para.6.37.22.

(Note that under CPR r.62.5, there are separate grounds on which the court can grant permission to serve an arbitration claim form out of the jurisdiction, such as where the claimant seeks to challenge an arbitration award made within the jurisdiction, or seeks some other remedy affecting an arbitration, an arbitration agreement or an arbitration award: see Vol.2 para.2E-12.)

*General grounds (para.3.1(1) to (4A))*

In para.3.1 of Practice Direction 6B, five particular heads of jurisdiction are marshalled under **6HJ.2** the heading "General Grounds" in subparas (1) to (4A).

### Paragraph 3.1(1): Claim for remedy against person domiciled within the jurisdiction

Paragraph 3.1(1) of Practice Direction 6B states that a claimant may serve a claim form out of **6HJ.3** the jurisdiction with the permission of the court under r.6.36 where a claim is made "for a remedy against a person domiciled within the jurisdiction".

In *Colt Industries v Sarlie (No.1)* [1966] 1 W.L.R. 440, CA, it was explained by the judge at first instance (quoting authority) that the common law principle was that the jurisdiction of a court was based upon the principle of territorial dominion, and that all persons within the dominion "owe their allegiance to its sovereign power and obedience to all its laws and to the lawful jurisdiction of its courts" (at 442 and 443 per Lyell J). A corollary of that was that the courts had no jurisdiction to entertain an action against a defendant who, being absent from England, could not be served with originating process here. One obvious resulting hardship was that, where a person who was normally within the territory, and who therefore usually owed allegiance to its sovereign power and obedience to all its laws, was absent from the territory, that person (whilst absent, and perhaps strategically so) could not be served with originating process, and therefore the court lacked jurisdiction to hear and determine a claim against them.

In the mid-nineteenth century that hardship was remedied generally by a rule to the effect that

service of a writ out of the jurisdiction was permissible with the leave of the court if, in the action begun by the writ, relief was sought "against a person domiciled or ordinarily resident within the jurisdiction" (see RSC 1965 Ord.11 r.1(1)(c)). That rule was among the rules modified (by SI 1983/1181) when the UK acceded to the European Community and the Civil Jurisdiction and Judgments Act 1982 came into force (1 January 1987). Thereafter the rule read, as it does now, that service of a claim form may be permitted out of the jurisdiction where a claim is made for a remedy against a person "domiciled within the jurisdiction" (para.3.1(1) of Practice Direction 6B). Until 31 December 2020 (the final day of the implementation period for the UK's withdrawal from the EU, as provided for in the European Union (Withdrawal Agreement) Act 2020), r.6.31(i) incorporated statutory definitions of "domicile" in the 1982 Act and the Judgments Regulation, in relation to a Convention territory or Member State, respectively. Rule 6.31(i) was however omitted by reg.4(15)(d) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI 2019/521).

It is not clear whether the definition of "domicile" previously set out at r.6.31(i) applied to the common law head of jurisdiction based on domicile, or whether it only applied to cases falling within the Brussels/Lugano regime. In practice, until the end of the Brexit implementation period, where the defendant was domiciled within the jurisdiction, the English court would ordinarily have jurisdiction pursuant to the basic rule of jurisdiction under the Judgments Regulation in any event, in which case the claim form could be served out of the jurisdiction without the court's permission pursuant to r.6.33 (see para.6.33.1 above). The head of jurisdiction at para.3.1(1) of Practice Direction 6B was only relevant where the claim fell outside the scope of the Judgments Regulation. It is likely to take on greater significance now that the Judgments Regulation no longer applies to the UK (albeit that in many cases where the defendant is domiciled within the jurisdiction it will be possible to serve proceedings on the defendant within the jurisdiction, obviating the need for an application for permission to serve out). The continuing lack of clarity as to the definition of "domicile" for these purposes is therefore a matter of greater concern.

### Paragraph 3.1(2): Claim for injunction restraining act within the jurisdiction

**6HJ.4**   Paragraph 3.1(2) of Practice Direction 6B states that a claimant may serve a claim form out of the jurisdiction with the permission of the court if the claim is made for an injunction ordering the defendant "to do or refrain from doing an act within the jurisdiction".

A claim for an injunction restraining the defendant in relation to several acts, some committed within the jurisdiction, and some committed out of the jurisdiction, does not fall within this head of jurisdiction; further, the fact that one injunction sought by the claimant falls within the head does not found a basis for granting permission to serve out of the jurisdiction claim forms claiming relief by related injunctions (*GAF Corp v Amchem Products Inc* [1975] 1 Lloyd's Rep. 601 (Megarry J); *Innovia Films Ltd v Frito-Lay North America Inc* [2012] EWHC 790 (Pat); [2012] R.P.C. 24 (Arnold J) at [114]–[120]; *Conductive Inkjet Technology Ltd v Uni-Pixel Displays Inc* [2013] EWHC 2968 (Ch); [2014] 1 All E.R. (Comm) 654 (Roth J)). However, if one injunction sought by the claimant falls within para.3.1(2), the claimant may obtain permission under the head of jurisdiction at para.3.1(4A) to serve further claims seeking injunctions (or other remedies) against the same defendant if those further claims arise out of the same or closely connected facts (see *Unlockd Ltd v Google Ireland Ltd* [2018] EWHC 1363 (Ch); [2019] E.C.C. 1 at [48] and para.6HJ.10 below).

A claim for a FRAND injunction against Chinese companies who were alleged to have infringed UK standard essential patents fell within para.3.1(2) (*Conversant Wireless Licensing SARL v Huawei Technologies Co Ltd* [2018] EWHC 808 (Pat); [2018] R.P.C. 16, (Henry Carr J)).

The discretion to grant permission under this head of jurisdiction will not be exercised unless: (i) an injunction is a genuine part of the substantive relief sought and has not been claimed merely to bring the case within the rule (*Rosler v Hilbery* [1925] Ch. 250, CA, at 261 et seq.), and (ii) there is a reasonable prospect of an injunction (itself a discretionary remedy) being granted (*Watson v Daily Record* [1907] 1 K.B. 853 CA). In this context "reasonable prospect" means "real prospect" and not some higher test such as "good arguable case" (*Fujifilm Kyowa Kirin Biologics Co Ltd v Abbvie Biotechnology Ltd* [2016] EWHC 2204 (Pat); [2017] Bus. L.R. 333 (Arnold J)).

### Paragraph 3.1(3): Another person a necessary or proper party to a claim

**6HJ.5**   This head of jurisdiction, as now formulated in para.3.1(3) of Practice Direction 6B, provides that a claimant (C) may serve a claim form out of the jurisdiction with the permission of the court under CPR r.6.36 where a claim is made against a person (D1) on whom the claim form has been or will be served (otherwise than in reliance on para.3.1(3) itself) and (a) there is between C and D1 a "real issue which it is reasonable for the court to try"; and (b) C wishes to serve the claim form on D2 who is a "necessary or proper party" to that claim.

*Development*

**6HJ.6**   The formulation for this head of jurisdiction has evolved over the years. Throughout it has been described as unusual or anomalous in that, by contrast with the other heads of jurisdiction, it is not founded upon any territorial connection between the claim, the subject matter of the relevant action, and the jurisdiction of the English courts. The connecting factor is instead the connection between a claim against one defendant, which is brought in the English courts, and a claim against another. Because of the potential width of this head of jurisdiction, it is to be treated with caution (see *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2012] 1 W.L.R. 180, PC at [73], and the authorities referred to there).

When first introduced in the 1880s the formulation stated that service of originating process could be allowed on any person out of the jurisdiction who was a necessary or proper party to an action "properly brought" against some other person "duly served within the jurisdiction".

Many of the early cases in which this head of jurisdiction fell for consideration dealt with issues around the meaning of "properly brought", and in particular with arguments about whether the action said by the applicant to have been "properly brought" was in fact hopeless, specious, unnecessary or bogus and was commenced (sometimes with the connivance of a defendant within the jurisdiction) simply for the purpose of providing a basis for invoking this head of jurisdiction against a foreign defendant. It was held that proceedings, though bona fide, were not "properly brought" against the original defendant where the law is plain or the facts are uncontradicted and it is clear that the claimant could not succeed against the defendant or, as it is often put in the case law, the claim is "bound to fail" (*Tyne Improvement Commissioners v Armement Anversois SA (The "Brabo") (No.2)* [1949] A.C. 326, HL, *Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd* [1983] Ch. 258, CA; [1983] 2 All E.R. 563, CA, *Borealis AB v Stargas Ltd (The "Berge Sisar")* [2001] 1 Lloyd's Rep. 663, HL).

In the revision of Ord.11 which came into effect on 1 January 1987, where this head of jurisdiction appeared as r.1(1)(c), "properly brought" was reduced to "brought" and, as a safeguard against specious claims against the original defendant, it was expressly provided in r.4(1)(d) that the written evidence in support of an application under this particular head of jurisdiction should contain, in addition to the usual matters common to applications under all of the heads of jurisdiction, the grounds for the deponent's belief that there was "a real issue" which the plaintiff "may reasonably ask the court to try" in the claim against the person duly served (for convenience, this could be called "the foundation claim" against the "anchor defendant") and to which it was said that a person out of the jurisdiction was a necessary or proper party. (Thus, the requirement that the claim "brought" should be "properly" brought was in effect preserved.) The 1987 revision also broadened this head of jurisdiction by providing that the person "duly served" with process for the foundation claim may be a person either served within the jurisdiction (which had previously been a mandatory requirement under the rule) or served without the jurisdiction, an amendment made to take account of the rules introduced by the 1987 revision permitting service out of the jurisdiction without permission where the claim was a claim which the court had power to hear and determine by virtue of the Civil Jurisdiction and Judgments Act 1982. (A practical disadvantage of the rule as it previously stood was that, because it was independent of the other heads of jurisdiction and not cumulative, it did not avail a claimant where the defendant to the foundation claim and the "necessary or proper party" were both out of England.) It is now clear that service on the anchor defendant may be: within the jurisdiction; outside the jurisdiction without permission if permission is unnecessary; or outside the jurisdiction with permission, if permission is required (*Alliance Bank JSC v Aquanta Corp* [2012] EWCA Civ 1588; [2013] 1 All E.R. (Comm) 819, CA at [79]).

With effect from 2 May 2000, the formulation of this head of jurisdiction was brought into the CPR as r.6.20(3), in effect rolling together former r.1(1)(c) and r.4(1)(d), but the latter provision was also retained in a separate rule (r.6.21(2)) setting out generally requirements as to grounds that should be stated in applications for permission to serve a claim form out of the jurisdiction. In addition the formulation was expanded by providing that the claim form for the foundation claim has either been served on the anchor defendant (which had previously been a mandatory requirement under the rule) or will be served. (This removed the practical disadvantage, where the defendant to the foundation claim and the "necessary or proper party" are both out of England, of the claimant having to decide how to proceed against the defendant before knowing whether the court would allow service on the other party.)

The rule was amended by SI 2004/2072 by the addition of the words "otherwise than in reliance on this paragraph" to make it clear that where the service of process for the foundation claim is effected, or will be effected, on a defendant out the jurisdiction, the head of jurisdiction upon which such service is permitted is not this head but some other. (Strictly speaking, the reference to "paragraph" should read "subparagraph".)

Since 1 October 2008, the formulation for this head of jurisdiction has stood as para.3.1(3) of Practice Direction 6B. Judgments handed down before that date have to be read and understood in the light of the formulations for this head of jurisdiction as they stood at the time insofar as they materially differed from the modern formulation.

The principles usually relevant to an application under para.3.1(3) were helpfully summarised in *Gunn v Diaz* [2017] EWHC 157 (QB); [2017] 1 Lloyd's Rep. 165 (Andrews J) at [86].

Where the claimant establishes a good arguable case that the claim falls within para.3.1(3), the court must still apply the other elements referred to at para.6HJ.1 above (serious issue to be tried and forum conveniens/exercise of the court's discretion) in the usual way. There is no presumption in favour of granting the claimant permission to serve D2 out of the jurisdiction. The factors which make D2 a necessary or proper party will also weigh heavily in favour of granting C permission to make D2 a party, although they will not be conclusive (*Societe Commerciale de Reassurance v Eras International Ltd (The Eras Eil Actions)* [1992] 1 Lloyd's Rep. 570; [1992] 2 All E.R. 82, CA).

*"a real issue which it is reasonable for the court to try" (para.3.1(3)(a))*

**6HJ.7** It is for C to demonstrate that there is between them and D1 "a real issue" and that that issue is one which is "reasonable for the court to try". The issue arises both where D1 is served (or to be served) within the jurisdiction and where D1 is served (or to be served) out of the jurisdiction. The requirement is underlined by r.6.37(2) (formerly RSC Ord.11 r.4(1)(d), and then CPR r.6.21(2))

which states that, where an application is made in respect of a claim referred to in para.3.1(3) of Practice Direction 6B, the application must also state the grounds on which C believes that there is between C and D1 "a real issue which it is reasonable for the court to try".

It is to be noted that para.3.1(3)(a) speaks of a real issue, not between C and D2, but between C and D1. However, on any application for permission to serve a foreign defendant out of the jurisdiction the claimant has to satisfy the court that, in relation to the foreign defendant, there is a serious issue to be tried on the merits (see para.6HJ.1). Where the application is made under para.3.1(3), therefore, the merits of C's claims against both D1 and D2 are relevant. There is no practical difference between the "real issue" and "serious issue" tests, and they are in turn the same as the test for summary judgment (see *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2012] 1 W.L.R 180, PC at [82] and *Vedanta Resources Plc v Lungowe* [2019] UKSC 20; [2019] 2 W.L.R. 1051, SC at [42]).

In *AK Investment CJSC*, op cit, the Privy Council considered a provision in the Civil Procedure Rules of the Isle of Man which referred to a necessary or proper party to an action "properly brought" against a person served within the jurisdiction, similar to the formulation of this head of jurisdiction when it appeared at RSC Ord.11 r.1(1). However, the Judicial Committee of the Privy Council treated the relevant provision as in substance no different in its effect from the formulation at para.3.1(3) (see [67]). In handing down the judgment of the Board, Lord Collins explained several propositions relevant to an application for permission to serve out of the jurisdiction under this head of jurisdiction:

   (1)   the mere fact that the anchor defendant (D1) is sued only for the purpose of bringing in the other person (D2) is not fatal to the application for permission to serve D2 out of the jurisdiction, as the better view is that the claimant's motive in suing D1 is a factor in the exercise of the court's discretion, not an element in the question whether the action was properly brought ([76]–[79]);

   (2)   the action against D1 is not properly brought if it is bound to fail; if the question is whether the claim against D1 is bound to fail on a question of law it should be decided on the application for permission to serve D2, but not otherwise ([80]–[86]); and

   (3)   permission will not be granted if the lack of a plausible action against D1 shows that the presence of D1 in the jurisdiction is being used as a device to bring in D2 ([80]).

In applying para.3.1(3)(a) the court has to examine the nature of the claim which arises against D1 in isolation; that is to say on the assumption that there will be no additional joinder of D2, and has to be satisfied that not only is there "a real issue" between C and D1, but also that it is an issue "which it is reasonable for the court to try" (*Erste Group Bank AG (London) v JSC (VMZ Red October)* [2015] EWCA Civ 379; [2015] 1 C.L.C. 706, CA at [38]). In *Erste Group*, the Court of Appeal concluded that, notwithstanding an agreement between the claimant bank (C) and the anchor defendants (D1) as to English jurisdiction (an exclusive jurisdiction clause that applied to the contractual relations between C and D1), on a proper analysis of the facts of the case there was no real issue between those parties. The substance of the claim was between C and the foreign (Russian) defendants (D2) and C had issued proceedings against D1 in order to sue D2 and execute a judgment against their assets wherever located. The case was overwhelmingly a Russian case and had no connection whatsoever with England other than the exclusive jurisdiction clause.

The head of jurisdiction stated in para.3.1(3) is limited to cases where the substantive dispute is before the English courts. It cannot be relied on in a case where the substantive dispute is before a foreign court and the jurisdiction of the English court against the principal defendant is only engaged by virtue of the Civil Jurisdiction and Judgments Act 1982 s.25 (*Belletti v Morici* [2009] EWHC 2316 (Comm); [2009] I.L.Pr. 57 (Flaux J) at [36]–[38]).

The head of jurisdiction at para.3.1(3) can be relied on where the claim against the anchor defendant is an application for committal for contempt of court under CPR Pt 81 (*Dar Al Arkan Real Estate Development Co v Al-Refai* [2014] EWCA Civ 715; [2015] 1 W.L.R. 135, CA). In *Dar Al Arkan*, op cit, the judge (1) held that the court's power to make a committal order against the officer of a company under r.81.4 had extra-territorial effect, and (2) granted permission to serve a committal application on a company director (D2) out of the jurisdiction on grounds that he was a necessary or proper party to contempt proceedings against the company (D1) which was subject to the jurisdiction of the English court ([2013] EWHC 4112 (QB); [2014] 1 C.L.C. 813). The Court of Appeal upheld the judge's decision, explaining there was between the claimant and D1 a "real issue" which it was "reasonable for the court to try" as to whether D1 came within the scope of r.81.4 and whether there was jurisdiction to seek an order for D2's committal. For a similar analysis, see Integral *Petroleum SA v Petrogat FZE* [2018] EWHC 2686 (Comm); [2019] 1 W.L.R. 574 (Moulder J) at [89]–[95].

In *Microsoft Mobile Oy (Ltd) v Sony Europe Ltd* [2017] EWHC 374 (Ch); [2017] 2 Lloyd's Rep. 119 (Marcus Smith J) permission to serve out of the jurisdiction against certain defendants was set aside, because the claims against the first defendant (the anchor defendant) were stayed on the grounds that they fell within an arbitration clause. There was therefore no real issue which it was reasonable for the court to try against the first defendant ([117]).

Obtaining a default judgment pursuant to an administrative process does not involve the court "trying" the claim for the purposes of this gateway, but obtaining a summary judgment does: see *Satfinance Investment Ltd v Athena Art Finance Corp* [2020] EWHC 3527 (Ch) (Morgan J) at [92]. In that case it was held that the existence of a claim for a declaration meant there was a real issue which it was reasonable for the court to try, even though the first two defendants (the anchor defendants) did not intend to defend the claim. The critical point was that the court would not

make a declaration on default of pleading but only if the court was satisfied by evidence, which would require a hearing rather than merely an administrative process of the sort involved in obtaining a default judgment. However, the court declined jurisdiction on the basis that England was not the appropriate forum.

*"necessary or proper party" (para.3.1(3)(b))*

In *Massey v Heynes* (1888) 21 Q.B.D. 330, CA, Lord Esher MR said (at 338) that whether D2 is a proper party to a claim against D1 depends on the question: "supposing both parties had both been within the jurisdiction, would they both have been proper parties to the action?" In the same case Lindley LJ said (at 338) that where the liability of several persons "depends upon one investigation", they are all "proper parties" to the same action. In that case the causes of action against D1 and D2 were not joint or concurrent but were mutually exclusive (the principal question being whether D1, as D2 alleged, had exceeded their authority). The Court of Appeal rejected the submission that the rule was limited to joint defendants and did not apply to alternative remedies against two defendants, and held that D2 were "proper" parties to the action and that service on them out of the jurisdiction of notice of the writ might be allowed. There was no doubt that if both defendants were within the jurisdiction they would both be "proper parties" to the action. The fact that one of them was out of the jurisdiction did not alter the position.

The tests enunciated in the *Massey* case were much quoted subsequently; see for example *Petroleo Brasiliero SA v Mellitus Shipping Inc (The "Baltic Flame")* [2001] EWCA Civ 418; [2001] 2 Lloyd's Rep. 203, CA, and *Carvill America Inc v Camperdown UK Ltd* [2005] EWCA Civ 645; [2005] 2 Lloyd's Rep. 457, CA, where the Court of Appeal used or approved, in addition to "one investigation", the expressions "closely bound up" and "a common thread" (at [48], per Clarke LJ) (as explained in *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2012] 1 W.L.R. 180, PC at [87], per Lord Collins).

In *Petroleo Brasiliero*, op cit, the court noted (at [33]) that generally a person who may be joined in proceedings in accordance with the rules as to joinder of parties (see, in particular, CPR Pt 19) is a "proper party". In *Societe Commerciale de Reassurance v Eras International Ltd (The Eras Eil Actions)* [1992] 2 All E.R. 82, CA, it was stated that the description "necessary or proper party" encompasses a "wide and elastic class of persons" which could be identified, in general terms, by looking at the rule in the RSC 1965 then dealing with the joinder of parties in proceedings which are on foot (Ord.15 r.6(2)). While the court's powers to add or substitute a party to a claim are now expressed in different terms, under CPR r.19.2(2), they are no less wide than under the previous provisions (see *United Film Distribution Ltd v Chhabria* [2001] EWCA Civ 416; [2001] C.P. Rep. 84, CA at [38] per Blackburne J, *Alberta Inc v Katanga Mining Ltd* [2008] EWHC 2679 (Comm); [2009] I.L.Pr. 14 (Tomlinson J) at [26]).

The disjunctive word "or" in para.3.1(3)(b) shows that in an appropriate case permission may be given for the service of a claim form out of the jurisdiction in a case where D2 is a proper party to an action brought against D1, even if D2 is not a necessary party; the necessity or otherwise of the joinder is only one relevant factor for the court to consider (*Electric Furnace Co v Selas Corp of America* [1987] R.P.C. 23, CA, at p.32 per Slade LJ). See also *Iiyama (UK) Ltd v Samsung Electronics Co Ltd* [2018] EWCA Civ 220; [2018] 4 C.M.L.R. 23, CA in which the Court of Appeal upheld the judge's decision that, although two companies incorporated in South Korea were not necessary parties to cartel claims against three companies incorporated in England and Wales, they were "proper" parties to those claims ([121]).

In *AB Bank Ltd v Abu Dhabi Commercial Bank PJSC* [2016] EWHC 2082 (Comm); [2017] 1 W.L.R. 810 (Teare J), the court set aside an order for service of an application for a *Norwich Pharmacal* order against an Abu Dhabi bank (D2), which was involved in banking arrangements for the operation of an agreement between the claimant (C) and the first defendant (D1) which was alleged to have perpetrated a fraud. The judge held that D2 was neither a necessary nor a proper party to C's claim against D1, and therefore the head of jurisdiction at para.3.1(3) could not be relied on. The application was made on the basis that D2 had information as to what happened to sums which C had paid out and which would assist them in advancing a proprietary claim against D1. No allegation of fraud, or any other wrongdoing, was made against D2. C alleged a quite different cause of action against D2 (namely that which established a basis for *Norwich Pharmacal* relief), which would be established long before the fraud claim was established.

In *AB Bank v Abu Dhabi*, op cit, Teare J noted that a party not shown to be arguably liable in any action may not be made a party to proceedings simply in order to obtain discovery, referring to the Court of Appeal's decision in *Unilever Plc v Chefaro Proprietaries Limited* [1994] F.S.R. 135 (per Glidewell LJ at 4 of the judgment). While Unilever did not consider whether a *Norwich Pharmacal* defendant could be a necessary or proper party to the proceedings in support of which information is sought, Teare J considered that the Court of Appeal's approach was consistent with his view that such a defendant could not be a necessary or proper party. He disagreed with the contrary conclusion reached on an ex parte application in *Lockton Companies International v Persons Unknown* [2009] EWHC 3423 (QB) (Eady J).

## Paragraph 3.1(4): "necessary or proper party" to claim or Pt 20 additional claim

Before the CPR came into effect on 26 April 1999, service out of the jurisdiction with the permission of the court of a notice of counterclaim on a person who was not already a party to the action was provided for, not directly by a rule in RSC Ord.11, but by r.3(5) of RSC Ord.15 (Causes of Action, Counterclaims and Parties) which incorporated by reference the provisions of RSC Ord.11 generally. Similarly, service out of the jurisdiction with the permission of the court of a

**6HJ.8**

**6HJ.9**

CPR 6

third-party notice was provided for, not by a rule in RSC Ord.11, but by r.3(4) of RSC Ord.16 (Third Party and Similar Proceedings), which also incorporated by reference the provisions of Ord.11 generally.

One effect of the incorporation by reference of the Ord.11 rules to counterclaims and third-party proceedings was that, by the application of r.1(1)(c) of that Order, service of a notice of counterclaim or of a third-party notice out of the jurisdiction was permissible with the permission of the court if, in the action begun by the notice, the claim was brought against a person duly served within or out of the jurisdiction and a person out of the jurisdiction was a necessary or proper party thereto. So, if a party to proceedings, say the defendant (D), issued and duly served a notice of counterclaim on the claimant (C) and issued and served a third-party notice on a person (X) not already a party to the proceedings, under r.1(1)(c) with the permission of the court notices of both varieties could be served out of the jurisdiction on a necessary or proper party to the counterclaim (D against C) and/or to the third-party proceedings (D against X).

However, by a proviso added to RSC Ord.16 r.3(4) by SI 1983/1181, the circumstances in which permission to serve a third-party notice outside the jurisdiction could be granted in Ord.11 r.1(1)(c) cases were enlarged. The proviso stated that permission could also be granted to serve a third-party notice on any necessary or proper party "to the proceedings brought against the defendant". In *Societe Commerciale de Reassurance v Eras International Ltd (The Eras Eil Actions)* [1992] 1 Lloyd's Rep. 570; [1992] 2 All E.R. 82, CA, the Court of Appeal accepted that the proviso enabled permission to be given under r.1(1)(c) to serve a third-party notice, not only on a person out of the jurisdiction who could fairly be described as a necessary or proper party to D's third-party action against X, but also to C's action against D (being proceedings "brought against the defendant").

In the CPR, rules replacing those formerly found in RSC Ord.15, insofar as they dealt with counterclaims, and in RSC Ord.16 were enacted in Pt 20 (Counterclaims and Other Additional Claims) and came into effect on 26 April 1999, but that Part contained no rule comparable to r.3(5) of RSC Ord.15 or to r.3(4) of RSC Ord.16. And when RSC Ord.11 was brought into Pt 6 of the CPR by SI 2000/221 (and Ord.11 was revoked), with effect from 8 May 2000, no comparable rule was included in r.6.20 (Service out of the jurisdiction where the permission of the court is required), but a rule comparable to r.1(1)(c) of Ord.11 was included as r.6.20(3). However, shortly afterwards, with effect from 3 July 2000, SI 2000/1317 inserted para.(3A) in r.6.20 so as to provide that a claim form may be served out of the jurisdiction with the permission of the court if:

"a claim is a Part 20 claim and the person to be served is a necessary or proper party to the claim *against the Part 20 claimant"* (emphasis added).

It would seem that that rule was based on the proviso in r.3(4) of RSC Ord.16 explained above and, by not including a necessary or proper party to the Part 20 claim, was a narrower provision than that which was required if service out of Part 20 claims was to be permitted in equivalent circumstances to service out of third-party notices under the pre-CPR rules. This mistake was not rectified until 1 October 2008 (see further below).

The Civil Procedure (Amendment No.4) Rules 2005 (SI 2005/3515) substituted Pt 20, changing the term "Part 20 claim" to "Additional Claim", but no consequential amendment was made to r.6.20 at that time. Under Pt 20, "additional claim" means any claim other than the claim by the claimant against the defendant (r.20.2(2)(a)). A counterclaim by a defendant against the claimant or against some other person is an additional claim (r.20.2(1)(a)). So too is a claim by a defendant against any person (whether or not already a party) for contribution or indemnity, or some other remedy (r.20.2(1)(b)). Where an additional claim has been made against a person who is not already a party, any additional claim made by that person against any other person (whether or not already a party) is an additional claim (r.6.20(1)(b) and (c)).

When Practice Direction 6B was made by Update 47 (and came into effect on 1 October 2008), r.6.20(3A) became para.3.1(4) of the Practice Direction in an amended form incorporating the necessary consequential amendment by replacing "a Part 20 claim" with "an additional claim under Part 20". But, as made, para.3.1(4) also included another amendment by substituting for "to the claim against the Part 20 claimant" the phrase "to the claim *or additional claim*" (emphasis added). Thus, in its entirety, para.3.1(4) read:

"A claim is an additional claim under Part 20 and the person to be served is a necessary or proper party to the claim or additional claim."

The formulation for this head of jurisdiction has remained in the same terms since. The significance of the substitution of the words "claim or additional claim" (in place of "claim against the Part 20 claimant") is that they make good the mistake made (referred to above) when para.(3A) was inserted in r.6.20 by SI 2000/1317, with effect from 3 July 2000. The provision now incorporates the effects both of former r.3(5) of RSC Ord.15 and of former r.3(4) of RSC Ord.16, including the proviso to the latter rule, whereas previously the rule incorporated only the effect of that proviso.

The considerations that arise where an application is made to serve a claim form out of the jurisdiction under para.3.1(4) of Practice Direction 6B are similar to those that arise where the application is based on para.3.1(3). In *CH Offshore Ltd v PDV Marina SA* [2015] EWHC 595 (Comm) (Carr J), where the court rejected a defendant's argument that a third party was a necessary or proper party under para.3.1(4), the court found that there was no single investigation to be carried out in respect of the main claim and the third-party claim, the claims were not bound by a common thread, and they arose under very different contracts which gave rise to different and separate issues and were not back to back.

### Paragraph 3.1(4A): Claim "arises out of same or closely connected facts"

**6HJ.10**      Paragraph 3.1(4A) of Practice Direction 6B states that the claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made against the

defendant in reliance on one or more of certain subparagraphs of para.3.1 and a "further claim" is made against the same defendant which "arises out of the same or closely connected facts".

The subparagraphs which provide a foundation for this head of jurisdiction are subparas (2), (6) to (16), (19) and (21).

The object of this head of jurisdiction is to make it possible for the court to give permission for service out of the jurisdiction of a claim form making a claim ancillary to the claim made against the defendant under one or more of the heads of jurisdiction created by the subparagraphs enumerated where that ancillary claim itself does not fall within any of the heads of jurisdiction in para.3.1. The constraints are that the further claim is against the same defendant and arises out of the same or closely connected facts.

This head of jurisdiction was added to para.3.1 by CPR Update 81 (August 2015) and came into effect on 1 October 2015. A proposal for such an addition accompanied a number of proposals for changes to the formulations of the heads of jurisdiction in para.3.1 relating to the service out of the jurisdiction of trust claims made to the Civil Procedure Rule Committee by the Trust Law Committee of the Chancery Bar Association in May 2013. It is understood that the aim of the provision was to allow, in circumstances where the court had jurisdiction over a claim, the joinder of related claims in, for example, tort and restitution and constructive trust, thereby facilitating "one-stop" adjudication.

In *Eurasia Sports Ltd v Aguad* [2018] EWCA Civ 1742; [2018] 1 W.L.R. 6089, it was explained that para.3.1(4) and para.3.1(4A) are complementary in their operation; the former is concerned with adding additional parties to a given action, whereas the latter is concerned with adding additional claims to a claim against a given party; the common thread is that claims arising out of the same or closely related facts should be tried together, whether by adding defendants to an existing claim or adding claims to an action against an existing defendant; para.3.1(4A) does not permit a claim made in reliance on para.3.1(4) to be used to add a further claim against the same defendant ([46] and [47], per Floyd LJ). The fact that as a result of the enactment of para.3.1(4A), some defendants may be capable of being sued as necessary or proper parties to claims falling within that provision should not give rise to any concern, because it is eminently sensible that relevant claims against all defendants should be tried together; any legitimate concern that there is no sufficient connection with England should be dealt with when the court considers the issue whether England is the appropriate forum for the trial of the claims ([63] per Longmore LJ).

For extended discussion of the scope and purpose of para.3.1(4A), see, in addition to *Eurasia Sports Ltd v Aguad*, op cit, *Eli Lilly & Co v Genetech Inc* [2017] EWHC 3104 (Pat); [2018] 1 W.L.R. 1755 (Birss J) at [19]–[36].

### Claims for interim remedies (para.3.1(5))

**6HJ.11**

In para.3.1 of Practice Direction 6B, under the heading "Claims for interim remedies", one particular head of jurisdiction is listed in subpara.(5). That provision states that the claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made for an interim remedy under the Civil Jurisdiction and Judgments Act 1982 s.25(1). Section 25, as extended by the Civil Jurisdiction and Judgments Act 1982 (Interim Relief) Order 1997 (SI 1997/302), enables the High Court to grant "interim relief" in cases proceeding in courts other than the courts of England and Wales (see Vol.2 para.5-27). Such relief is defined as any interim relief of any kind which that court has power to grant in proceedings relating to matters within its jurisdiction, other than a warrant for the arrest of property or provision for obtaining evidence. In effect s.25 gives the court power to grant interim relief in support of overseas proceedings even where there is no substantive claim within the jurisdiction. CPR r.25.4 applies to applications for this form of interim relief. For information on the nature and extent of this statutory jurisdiction, see commentary on r.25.4, and Vol.2 para.15-5 (Interim injunctions—foreign proceedings), and note also para.6JRx.9.

Section 25 came into effect on 1 January 1987. At the time it was assumed that, in the event of a claimant wishing to serve a claim form or application notice for this form of interim relief on a defendant out of the jurisdiction, the claim would fall under one of the existing heads of jurisdiction in RSC Ord.11 r.1(1) for which the court's permission could be given. That assumption was shown to be wrong in *Mercedes Benz AG v Leiduck* [1996] A.C. 284, PC, where it was held that r.1(1) was confined to cases where there was a claim for substantive relief and did not extend to proceedings which were peripheral to an action before a foreign court concerning issues which could not be brought before the English court (not following *X v Y and Y Establishment* [1990] 1 Q.B. 220, CA). Order 11 was promptly amended by SI 1997/415, adding r.8A, the legislative antecedent to para.3.1(5) of Practice Direction 6B.

Applications are made under Pt 23, but in the Commercial Court and (at least where the relief sought is an injunction) in other courts, a claim form under CPR Pt 8 must be issued (*Ras Al Khaimah Investment Authority v Bestfort Development LLP* [2015] EWHC 1955 (Ch)).

See further Vol.2 Section 15 (Interim Remedies) at para.15-5, and authorities on service out with permission on this basis referred to there.

### Claims in relation to contracts (para.3.1(6) to (8))

**6HJ.12**

In para.3.1 of Practice Direction 6B, three particular heads of jurisdiction are marshalled under the heading "Claims in relation to contracts" in subparas (6) to (8).

### Paragraph 3.1(6) to (8): Claims in relation to contracts

**6HJ.13**     A claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where the claim (1) is made "in respect of" a contract, being a contract satisfying one of three conditions (para.3.1(6) of PD 6B), (2) is made "in respect of" a breach of contract committed within the jurisdiction (para.3.1(7)), or (3) is made for a declaration that no contract exists (para.3.1(8)). If, on the same facts, a claimant has a remedy in contract or tort, they can choose whether to seek permission for service out of the jurisdiction under the heads of jurisdiction at para.3.1(6) or (7) or on under the head of jurisdiction for claims in tort at para.3.1(9) considered at para.6HJ.23 below (*Matthews v Kuwait Bechtel Corp* [1959] 2 Q.B. 57, CA).

In the RSC 1965 the formulation for the head of jurisdiction now found in para.3.1(6), but then found in Ord.11 r.1(1)(f), was the claim was brought "to enforce, rescind, dissolve, annul or otherwise affect a contract", or "to recover damages or obtain other relief in respect of the breach of contract". And the formulation for the head of jurisdiction now found in para.3.1(7) was then found in Ord.11 r.1(1)(g). By the time the CPR came into effect, para.(1)(f) and para.(1)(g) of r.1 of Ord.11 had become, respectively, para.(1)(d) and para.(1)(e) of that rule, and remained largely in the same terms. (RSC Ord.11 r.1 had been recast substantially by SI 1983/1181, upon the coming into effect of the Civil Jurisdiction and Judgments Act 1982.)

When RSC Ord.11, as enacted in Sch.1 to the CPR, was brought into Pt 6 of the CPR (by the Civil Procedure (Amendment) Rules 2000 (SI 2000/221), with effect from 2 May 2000), para.(1)(d) and para.(1)(e) of r.1 of the Order were enacted in simplified terms as para.(5) and para.(6) of r.6.20 under the heading "Claims in relation to contracts". Although the terms were simplified, there was no legislative intention to alter the law as to heads of jurisdiction as developed to that time. At the same time, a new head of jurisdiction was introduced as para.(7) of r.6.20 (claim for declaration that no contract exists). Upon the substitution of the whole of Pt 6 by the Civil Procedure (Amendment) Rules 2008 (SI 2008/2178), with effect from 2 October 2008, r.6.20 (as enacted by SI 2000/221) became r.6.36, as supplemented by para.3.1 of Practice Direction 6B (made by CPR Update 47). Paragraphs (5), (6) and (7) of r.6.20 became para.3.1(6), para.3.1(7) and para.3.1(8) of that Practice Direction.

Historically speaking, para.3.1(6) of PD 6B is of more recent derivation than para.3.1(7) thereof. The original version of the head of jurisdiction now found at para.3.1(6) came into being after the decision of the House of Lords in *Johnson v Taylor Brothers & Co* [1920] A.C. 144, HL, where an English company (C) and a Swedish company (D) entered into a c.i.f. contract under which D agreed to ship goods from Sweden to C's location in England from time to time upon instructions, and to tender shipping documents on C within the jurisdiction upon the making of each shipment. On the refusal of D to make any further deliveries under this contract, C applied for permission to serve notice of a writ of summons upon D in Sweden in an action for breach of contract, under what was then the only rule in RSC Ord.11 r.1 for service out of the jurisdiction upon which C could conceivably rely. That rule (the ancestor of what is now para.3.1(7) in PD 6B) stated that permission could be granted where:

> "... the action is founded on any breach or alleged breach within the jurisdiction of any contract wherever made, which, according to the terms thereof, ought to be performed within the jurisdiction."

The "breach within the jurisdiction" relied on by C was D's failure to tender shipping documents within the jurisdiction. The House of Lords (to the surprise of some) reversed the decision of the Court of Appeal (upholding a judge) and held (for various reasons) that permission to serve out of the jurisdiction could not, or should not, be granted because the essential breach on which the action was founded was a breach outside the jurisdiction, that is D's failure to ship the goods at the foreign port. As a consequence, in 1921, RSC Ord.11 r.1 was amended to provide that service out of the jurisdiction could be authorised where a claim was brought to enforce, etc., a contract which was "by its terms or by implication to be governed by English law".

### Paragraph 3.1(6): Claim made in respect of a contract

**6HJ.14**     A claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where the claim is made "in respect of" a contract, being a contract satisfying one of certain conditions (e.g. made within the jurisdiction) (para.3.1(6) of PD 6B). Before 2 May 2000, the equivalent rule in RSC Ord.11 r.1(1)(d) was rather more elaborate. It recognised that legal claims concerning contracts fall into two broad categories. There are those affecting the contract itself; that is, claims to enforce, rescind, dissolve or annul a contract; although the draftsman cautiously added "or otherwise affect a contract". And there are those brought for breach of contract, seeking to recover damages or some other remedy "in respect of" the breach. In para.3.1(6) all such claims are embraced by the simple formula "a claim made in respect of a contract".

Over the years, the formulations for this head of jurisdiction have been tested to destruction, and claims not obviously falling within the analysis given immediately above have been held to be within them. In interpreting and applying the formulation as it stood before 2 May 2000, the draftsman's caution was exploited without mercy. In *BP Exploration Co (Libya) Ltd v Hunt (No.1)* [1976] 1 W.L.R. 788, it was held that a claim for a declaration that a contract had become discharged as a result of frustration "affected" the contract in question, and therefore fell within this head of jurisdiction. "The words 'or otherwise affect' are very wide; indeed, almost as wide as they can be" (795, per Kerr J), and encompass a claim for a declaration that a contract has become discharged "whether as the result of frustration, repudiation, or otherwise". In other cases it has been held that the formulation includes a claim for a declaration that a contract is enforceable and subsisting, or that a contract has been avoided (*Gulf Bank KSC v Mitsubishi Heavy Industries Ltd*

[1994] 1 Lloyd's Rep. 323 (Hobhouse J)), and a declaration that a party is not in breach of a contract, admitted to exist, or that a defendant has suffered no loss (*Hogg Insurance Brokers Ltd v Guardian Insurance Co Inc* [1997] 1 Lloyd's Rep. 412 (Longmore J)). Note that this head of jurisdiction is available where a claimant could have brought an action in either contract or tort, but elects to sue in contract (*Matthews v Kuwait Bechtel Corp* [1959] 2 Q.B. 57, CA).

It has been assumed that it was not intended that the shorter formulation for this head of jurisdiction in para.3.1(6) should signal any retreat from the breadth of the previous formulation. Indeed, it has been said that the new formulation "is undoubtedly more broad than its predecessor" (*Alliance Bank JSC v Aquanta Corp* [2012] EWCA Civ 1588; [2013] 1 All E.R. (Comm) 819, CA at [63] per Tomlinson LJ).

It is clear that a claim may fall within para.3.1(6) even if it is not a contractual claim; the requirement is for a claim "in respect of" a contract, not a claim arising under a contract (see *Albon v Naza Motor Trading Sdn Bhd* [2007] EWHC 9 (Ch); [2007] 1 W.L.R. 2489 (Lightman J) at [26]). In *Albon v Naza*, op cit, it was held that claims to recover overpayments made by the claimants in performance of an agency agreement with the defendants were claims "in respect of" the agency contract and therefore fell within this head of jurisdiction. It did not matter that the claims were brought in restitution, to recover monies paid under a mistake of fact, and were not claims arising under the contract. In a subsequent decision in the same case ([2007] EWHC 1879 (Ch); [2007] 2 Lloyd's Rep. 420 (Lightman J)), it was held that a claim for an anti-suit injunction restraining the pursuit of arbitration or legal proceedings in connection with a contract governed by English law was a claim "in respect of" the contract within para.3.1(6). On appeal, neither party challenged the judge's holding that the court had jurisdiction to grant the injunctions ([2007] EWCA Civ 1124; [2008] 1 Lloyd's Rep. 1, CA). (Contrast *Navig8 Pte Ltd v Al-Riyadh Co for Vegetable Oil Industry* [2013] EWHC 328 (Comm); [2013] 2 Lloyd's Rep. 104, referred to below.) In *Cherney v Deripaska* [2009] EWCA Civ 849; [2010] 2 All E.R. (Comm) 456, CA, the Court of Appeal held that the "in respect of a contract" formulation is wide enough to encompass a claim based on rights said to arise out of a contract (being a contract to which the intended defendant was a party), even if those rights are of a proprietary nature and include allegations of constructive trust.

In *Cecil v Bayat* [2010] EWHC 641 (Comm) (Hamblen J) (reversed on appeal on other grounds, [2011] EWCA Civ 135; [2011] 1 W.L.R. 3086, CA), the court applied para.3.1(6) to a "two contract" case, seemingly for the first time. In that case, two of the claimants brought claims under contracts which did not have an English connection, but argued that, since those contractual claims were related to contracts which did fall within the relevant criteria, that was sufficient. The judge held that some relevant legal connection is required between the claim and the contract said to fall within the criteria ([49]). If that contract needs to be referred to and relied upon in order to assert the relevant cause of action then that requirement is likely to be satisfied since it will be a necessary part of the cause of action. However, a mere factual connection between the two contracts is not enough. The problems arising in "two contract" cases were discussed in *Global 5000 Ltd v Wadhawan* [2012] EWCA Civ 13; [2012] Bus. L.R. D101, CA, where attention was drawn (at [64]) to the anomaly of obtaining jurisdiction against a defendant not within the jurisdiction by reference to a contract to which the defendant is not party, and in *Alliance Bank JSC v Aquanta Corp* [2012] EWCA Civ 1588; [2013] 1 All E.R. (Comm) 819, CA.

Despite its breadth, the concept of a claim made "in respect of a contract" does have its limits. In *Alliance Bank JSC v Aquanta Corp* [2012] EWCA Civ 1588; [2013] 1 All E.R. (Comm) 819, CA, in which the Court of Appeal considered a number of the authorities referred to above, it was held that claims alleging a fraudulent conspiracy involving loan contracts governed by English law were not claims "in respect of" those contracts falling within para.3.1(6). Tomlinson LJ, giving the judgment of the court, said (at [71]) that he was "attracted by" the view that:

"... unless the claimant is suing in order to assert a contractual right or a right which has arisen as a result of non-performance of a contract, his claim is not in this context properly to be regarded as one made in respect of a contract."

He went on to say he thought it likely that, ordinarily, the contract relied on for the purposes of para.3.1(6) must be one to which the intended defendant is party; however, the case considered by Hamblen J in *Cecil v Bayat*, op cit, may show that that will not always be so. It was sufficient for the purposes of the court's decision to note that the required connection:

"... must inevitably be the more difficult to establish in a case where the intended defendant is not party to the contract upon which reliance is placed than in a case where he is party to it."

Whatever the position is regarding the intended defendant, it seems the intended claimant does not have to be a party to the contract "in respect of" which the claim is made for the purposes of para.3.1(6). In *Greene Wood & McClean LLP v Templeton Insurance Ltd* [2009] EWCA Civ 65; [2009] 1 W.L.R. 2013, CA, a firm of solicitors brought a claim against an ATE insurer who had refused to pay out to the solicitors' client under an ATE contract, resulting in the solicitors satisfying the costs orders made against its client. The solicitors brought a claim against the ATE insurer seeking a contribution under the Civil Liability (Contribution) Act 1978. It was held that this was a claim "in respect of" the ATE contract, which was governed by English law, even though the solicitors were not a party to that contract. (See also *Schiffahrtsgesellschaft Detlev Von Appen GmbH v Voest Alpine Intertrading GmbH (The Jay Bola)* [1997] 2 Lloyd's Rep. 279; [1997] C.L.C. 993, CA, in which the Court of Appeal held that the predecessor rule was not limited to cases where plaintiff and the defendant were parties "in the fullest sense". It also applied to claims by or against an assignee of a party's rights under the contract.)

In *Navig8 Pte Ltd v Al-Riyadh Co for Vegetable Oil Industry* [2013] EWHC 328 (Comm); [2013] 2

Lloyd's Rep. 104 (Andrew Smith J), a Singaporean company (C) (a time charterer) brought a claim against a Jordanian company (D), who had purchased a cargo from a shipper (X) who were sub-charterers from C. The cargo was carried under five bills of lading (governed by English law), each of which incorporated the terms of the sub-charter. C sought declarations of non-liability, asserting that it was not party to the bills of lading contracts, and also sought an injunction restraining D's pursuit of Jordanian proceedings against C and X on the ground that they were vexatious or oppressive. Applying *Alliance Bank v Aquanta*, op cit, the court found that the claim for an injunction was not a claim "in respect of" the bills of lading contracts within the meaning of para.3.1(6), as no contractual right was asserted and no right resulting from any (actual or threatened) non-performance of a contract was asserted.

A contract "in respect of" which a claim is made for the purposes of para.3.1(6) may be express or implied. See e.g. *Alliance Bank v Aquanta*, op cit, where the claimants asserted both express and implied contractual causes of action governed by English law and a claim under an implied indemnity was held to fall within para.3.1(6) (but the application for permission failed on forum conveniens grounds). In early cases it was held that an action on a judgment is also an action on the implied contract, contained in the judgment, to perform it (*Grant v Easton* (1883) 13 Q.B.D. 302, CA). And it was held that an action on an arbitral award is an action on the contract contained in the submission to arbitration, and it was said that the award itself may also be treated as the contract, in that it contains an implied agreement to perform it (*Bremer Oeltransport GmbH v Drewry* [1933] 1 K.B. 753, CA, and cases there cited). The development, as a discrete head of jurisdiction, of a claim brought "to enforce any judgment or arbitral award" (now para.3.1(10) of PD 6B) largely relieved claimants of the need to persuade courts that implied contracts of those varieties came within the contractual head of jurisdiction.

In *Fern Computers Consultancy Ltd v Intergraph Cadworx & Analysis Solutions Inc* [2014] EWHC 2908 (Ch); [2014] Bus. L.R. 1397 (Mann J), the claimants applied for permission to serve out of the jurisdiction a claim based on the Commercial Agents (Council Directive) Regulations 1993 (SI 1993/3053). The judge concluded that the rights given by the Regulations "are definitely not contractual as that word would normally be understood"; however, the claim was made "in respect of" the underlying agency contract as, for the purposes of this head of jurisdiction, a claim "does not itself have to sound in contract" ([39]). In that case however, the agency contract did not fall within para.3.1(6)(c) (claims governed by English law) as it contained a Texas law and jurisdiction clause and the Regulations did not affect the proper law of the contract.

### Paragraph 3.1(6)(a): Contract made within the jurisdiction

**6HJ.15**    Paragraph 3.1(6)(a) of Practice Direction 6B states that the claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made in respect of a contract where the contract "was made within the jurisdiction". The connecting factor is that the contract was made within the jurisdiction. In the CPR, unless the context requires otherwise, "jurisdiction" means England and Wales, and any part of the territorial waters of the UK adjoining England and Wales (r.2.3(1)).

In *Entores Ltd v Miles Far East Corp* [1955] 2 Q.B. 327, CA, the Court of Appeal explained that, although, where a contract is made by cable or post, it is complete as soon as the letter of acceptance is put into the postbox or the cable dispatched, where a contract is made by a method of instantaneous communication, e.g. by telephone, the contract is complete only when the acceptance is received by the offeror, since generally an acceptance must be notified to the offeror to make a binding contract. The court held that, as the contract had been completed by a telex communication accepting the plaintiff's (C's) offer sent by the defendants (D) in New York and received by C at their office in London, the contract was made within the English jurisdiction, and permission for C to serve their writ making a claim "in respect of" that contract (claiming damages for its breach) on D out of the jurisdiction (in New York) could be granted under this head of jurisdiction. By parity of reasoning communication by other forms of instantaneous communication, e.g. facsimile and email, is governed by the principles set out in *Entores Ltd* case.

If a contract which was made within the jurisdiction is subsequently amended by an agreement made outside the jurisdiction, the amended contract may still be taken as made within the jurisdiction, unless the amendment has the effect of substituting a new agreement. In any event, it is sufficient for the purposes of para.3.1(6)(a) if the contract was substantially made within the jurisdiction; otherwise the effect of the rule could be avoided by some very minor subsequent amendment or addendum executed abroad (*BP Exploration (Libya) Ltd v Hunt (No.1)* [1976] 1 W.L.R. 788; [1976] 3 All E.R. 879 (Kerr J)).

### Paragraph 3.1(6)(b): Contract made through an agent

**6HJ.16**    Paragraph 3.1(6)(b) of Practice Direction 6B states that the claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made in respect of a contract where the contract "was made by or through an agent trading or residing within the jurisdiction". The connecting factor is that, when the contract was made, the principal had an agent trading or residing within the jurisdiction or through whom the contract was made.

Before the terms of RSC Ord.11 r.1(1) were brought into Pt 6 of the CPR in modernised form (with effect from 2 May 2000), the formulation for this head of jurisdiction was more elaborate than that in para.3.1(6) and referred to a contract made by or through an agent trading or residing within the jurisdiction "on behalf of a principal trading or residing out of the jurisdiction". The policy considerations which led to the introduction of this head of jurisdiction were explained in *National Mortgage & Agency Co of New Zealand Ltd v Gosselin* (1922) 12 Ll. L. Rep. 318, CA, in which

it was held that "by or through" an agent includes the case of a contract negotiated by an agent in England but concluded by the principal abroad (e.g. where the agent has authority to obtain orders but not accept them).

The principal object of this head of jurisdiction is to enable a claimant to obtain permission to serve the claim form out of the jurisdiction on the agent's principal. In *Union International Insurance Co Ltd v Jubilee Insurance Co Ltd* [1991] 1 W.L.R. 415; [1991] 1 All E.R. 740 (Phillips J), it was held that in order to give a sensible construction to the rule as it then stood "principal" was to be construed as referring to a foreign defendant who had entered into a contract through an agent acting on his behalf within the jurisdiction and not a plaintiff foreign principal.

As an alternative to service out of the jurisdiction, the claimant may seek the court's permission under CPR r.6.12 to serve the claim form on the defendant's agent (within the jurisdiction) where the defendant is out of the jurisdiction, and the contract to which the claim relates was entered into "within the jurisdiction with or through the defendant's agent", provided that at the time of the application for permission either the agent's authority has not been terminated or the agent is still in business relations with the defendant. The evidence in support of the application must include an explanation of why service out of the jurisdiction cannot be effected.

### Paragraph 3.1(6)(c): Contract "governed by English law"

**6HJ.17** The claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made in respect of a contract where the contract "is governed by English law". The use of the governing law of a contract as a head of jurisdiction is limited to England and the Commonwealth. It plays no role in the United States, and it is not a ground of jurisdiction under the Judgments Regulation (recast) scheme or the Lugano Convention. A number of cases have stressed the exorbitance of this head of jurisdiction as an important factor to be placed in the balance against the grant of permission, where it is the sole head relied on (see e.g. *Amin Rasheed Shipping Corp v Kuwait Insurance Co (The Al Wahab)* [1984] A.C. 50). In *Novus Aviation Ltd v Onur Air Tasimacilik AS* [2009] EWCA Civ 122; [2009] 1 Lloyd's Rep. 576, CA at [72] et seq, Lawrence Collins LJ reviewed the authorities and considered the principles, noting that the fact that a contract was governed by English law would have a different weight in different circumstances. Factors which might weigh in favour of granting permission would include the fact that issues of English public policy may be involved (as in *EI du Pont de Nemours & Co v Agnew* [1987] 2 Lloyd's Rep. 585, *Mitsubishi Corp v Alafouzos* [1988] 1 Lloyd's Rep. 191) or that the foreign court may apply its own law despite an express choice of English law (*Coast Lines v Hudig & Veder Chartering NV* [1972] 2 Q.B. 34).

The contract in question has to be one governed by English law; it is not sufficient that the claim is an English law claim (*Fern Computers Consultancy Ltd v Intergraph Cadworx & Analysis Solutions Inc* [2014] EWHC 2908 (Ch); [2014] Bus L.R. 1397 (Mann J) at [39] and [40]). In determining the governing law of the contract:

1. for contracts entered into on or after 1 April 1991 but before 17 December 2009, the court will apply the Contracts (Applicable Law) Act 1990, implementing into English law the Rome Convention of 19 June 1980 on the law applicable to contractual obligations ([1980] OJ L266/1);

2. for contracts entered into after 17 December 2009 but before 1 January 2021 (that is, before the end of the Brexit transition period, referred to in the legislation as "IP completion day"), the court will apply the "Rome I Regulation", i.e. Regulation (EC) No.593/2008 of 17 June 2008 on the law applicable to contractual obligations ([2008] OJ L177/6), which continues to have effect by virtue of art.66 of the EU Withdrawal Agreement (and, to that extent, is "retained EU law" under s.3 of the European Union (Withdrawal) Act 2018); and

3. for contracts entered into on or after 1 January 2021, the court will apply the UK version of the Rome I Regulation, i.e. the Rome I Regulation as it has been implemented into UK law with amendments under the Law Applicable to Contractual Obligations and Non-Contractual Obligations (Amendment etc.) (EU Exit) Regulations 2019 (SI 2019/834) (and is therefore "retained EU law" under s.3 of the European Union (Withdrawal) Act 2018).

Section 6 of the European Union (Withdrawal) Act 2018 sets out rules for how the UK courts are to interpret retained EU law after IP completion day. Essentially, decisions made by the European Court before IP completion day are binding on UK courts, subject to exceptions for certain courts including the Supreme Court and Court of Appeal (all of which must apply the same test as the Supreme Court would apply in deciding whether to depart from the case law of the Supreme Court). Decisions made by the European Court after that date are not binding but UK courts may have regard to them so far as relevant.

The remainder of this Note does not seek to differentiate between the Rome I Regulation and the UK version of the Rome I Regulation, as the differences between the two are not significant for these purposes. However, it is possible that they may diverge in future if amendments are made to the UK version.

For contracts pre-dating 1 April 1991, or those rare cases involving a claim in respect of a contract which falls outside the scope of the Rome Convention and/or the Rome I Regulation, the governing law will fall to be determined under the English common law rules to determine the "proper law of the contract".

### The Rome I Regulation

**6HJ.18** The starting point in the Rome I Regulation, as in the Rome Convention, is that a contract is governed by the law chosen by the parties. In both instruments, this principle is found in art.3

(Freedom of choice). The choice shall be made expressly or clearly demonstrated (in the Rome Convention the phrase used is "demonstrated with reasonable certainty") by the terms of the contract or the circumstances of the case. The parties' choice of law will often be express, but both the Regulation and the Convention recognise the possibility that the court may, in the light of all the facts, find that the parties have made a real choice of law although this is not expressly stated in the contract; this has to be demonstrated with reasonable certainty and sufficient clarity either from the terms of the contract itself or the surrounding circumstances or both. The application of these propositions is demonstrated by *FR Lurssen Werft GmbH & Co KG v Halle* [2010] EWCA Civ 587; [2011] 1 Lloyd's Rep. 419, CA, where the court held that a German claimant, bringing a claim against an American resident on a commission agreement which was silent as to applicable law, had much the better of the argument that the agreement was governed by English law, as it was so closely related to two prior contracts between the same parties which contained an express choice of English law. The court therefore dismissed the defendant's appeal against the judge's order permitting service out of the jurisdiction under para.3.1(6)(c) of PD 6B.

In *Aeolian Shipping SA v ISS Machinery Services Ltd (The Aeolian)* [2001] EWCA Civ 1162; [2001] C.L.C. 1708, CA, where the submission that the parties had by implication agreed to vary the law governing a counterclaim was rejected, Potter LJ said (at 645) that the reference to "the circumstances of the case" in this context was significant and indicated that the circumstances which may be taken into account when deciding whether or not the parties have made an implied choice of law under art.3 (whether by initial choice or subsequent change) range more widely in certain respects than the considerations ordinarily applicable to the implication of a term into a written agreement. In *American Motorist Insurance Co v Cellstar Corp* [2003] EWCA Civ 206; [2003] I.L.Pr. 22, CA, Mance LJ reserved his position on that point, being of the view that, even when construing a written agreement at common law, the surrounding circumstances may be of considerable relevance. However, he found the analogy useful as it brought to mind the test governing the implication of an implied term at common law, on the grounds that it must have been intended or was so obvious that it went without saying and was one to which the parties would have said "of course" if anyone had suggested it; the mere fact that it would be "reasonable" will not suffice ([44]).

Article 3(5) of the Rome I Regulation provides that the existence and validity of the consent of the parties as to the choice of the applicable law shall be determined in accordance with certain other provisions in the Regulation, including art.10 (Consent and material validity) (see, in the Rome Convention, art.3(4) and art.8). Article 10(1) states that the existence and validity of a contract, or of any term of a contract, shall be determined by the law which would govern it under the Regulation if the contract or term were valid. Article 10(2) states that, nevertheless, a party may rely upon the law of the country in which they have their habitual residence to establish that they did not consent if it appears from the circumstances that it would not be reasonable to determine the effect of their conduct in accordance with the law specified in art.10(1). In *Horn Linie GmbH & Co v Panamerican Formas E Impresos SA (The Hornbay)* [2006] EWHC 373 (Comm); [2006] 2 Lloyd's Rep. 44 (Morison J), in a claim made in respect of an international contract containing a clause choosing English law and an English forum, a dispute arose as to whether it would be unreasonable in the circumstances to look to English law to determine whether the defendants (D) consented to the choice of English law, and (2) if it were unreasonable, whether D could rely upon Colombian law (Colombia being D's habitual residence) to establish that it did not consent to the clause. D submitted that the appropriate law to determine the validity of the clause was Colombian law, and by that law, a choice of law and court is void and contrary to public policy for contracts to be performed in Colombia. The judge rejected that submission, holding (1) that in the circumstances there was no good reason why it would be reasonable to judge the consent of D otherwise than by the law of their choice, and (2) that the mere fact that by agreeing an English law jurisdiction clause and an English law clause D offended Colombian public policy was not of itself a good reason for holding that their consent to the clause was not truly given or that it would be unfair or unreasonable to hold them to their bargain, whatever system of law was applied.

Article 4 of the Rome I Regulation sets out the rules to determine applicable law where the parties have not made a choice (subject to specific provisions relating to contracts of carriage, consumer, insurance, and employment contracts). Broadly speaking, this provides that the contract shall be governed by the law of the country where the party required to effect "characteristic performance" has their habitual residence, unless it is clear from all the circumstances that the contract is "manifestly more closely connected" with a different country. There are specific provisions which, essentially, determine which party is considered to effect characteristic performance in various types of contract (e.g. the seller in a contract for the sale of goods; the service provider in a contract for the provision of services). Article 4 of the Rome Convention is in rather different terms, providing that (in the absence of choice) the contract shall be governed by the law of the country with which it is most closely connected, but with a (rebuttable) presumption that the contract is most closely connected with the country where the party who is to effect characteristic performance has, at the time the contract is concluded, their habitual residence, central administration or (principal) place of business, depending on the circumstances.

In a case decided under art.4 of the Rome Convention, the court considered the proper approach to determining the country with which the contract was most closely connected and concluded that it was "entitled to take a broad approach to the question of connection, unlimited by any categorisation of the relevant factors": see *Apple Corp Ltd v Apple Computer Inc* [2004] EWHC 768 (Ch); [2004] I.L.Pr 34 (Mann J) at [60]. Subsequent authorities on art.4 of the Rome Convention, dealing in particular with the displacement (by art.4(5)) of the presumption arising, include:

*Marconi Communications International Ltd v PT Pan Indonesia Bank TBK* [2005] EWCA Civ 422; [2007] 2 Lloyd's Rep. 72, CA (where the Court of Appeal noted that the question of the weight to be accorded to the presumption in relation to letter of credit transactions "gives rise to considerations of some complexity" because they involve various contractual relationships); *Albon v Naza Motor Trading Sdn Bhd* [2007] EWHC 9 (Ch); [2007] 1 W.L.R. 2489; [2007] 2 All E.R. 719 (Lightman J) (where it was held that the presumption was triggered and was not displaced in a contract for the provision of agency services in England by an agent habitually resident in England).

*Proper law of the contract*

**6HJ.19** Where the governing law of a contract falls to be determined under the English common law rules, the governing law is the "proper law of the contract", that is to say (1) the system of law by which the parties intended the contract to be governed, or (2) where their intention is neither expressed nor to be inferred from the circumstances, the system of law with which the transaction has its closest and most real connection (*Re United Railways of Havana and Regla Warehouses Ltd* [1961] A.C. 1007, HL). For a summary of the principles, see *Merck KGaA v Merck Sharp & Dohme Corp* [2014] EWHC 3867 (Ch) (Nugee J) at [9] and [10]. These include that there are in theory three stages in the analysis, (1) express intention, (2) inferred intention, and (3) closest and most real connection, though in practice the second and third stages tend to merge into each other; and that the question of proper law falls to be determined at the time the contract was made.

### Contract with English jurisdiction clause (formerly para.3.1(6)(d))

**6HJ.20** Before 6 April 2020, Practice Direction 6B contained an additional head of jurisdiction, at para.3.1(6)(d), which provided that the claimant could serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim was made in respect of a contract which contained a term to the effect that the court "shall have jurisdiction to determine any claim in respect of the contract".

Paragraph 3.1(6)(d) was omitted by the 127th CPR Practice Direction Update (February 2021), as it became redundant upon the amendment of r.6.33(2B) with effect from 6 April 2021 by r.6 of the Civil Procedure (Amendment) Rules 2021 (SI 2021/117). That amendment removed the need for the court's permission to serve the claim form outside the jurisdiction where a contract contains a term to the effect that the court shall have jurisdiction to determine that claim. In other words, the amendment means that there is no need for permission to serve out where there is a jurisdiction clause in favour of the English court, even if that jurisdiction clause does not fall within the 2005 Hague Convention. (There would in any event have been no need for permission to serve out of the jurisdiction where the jurisdiction clause fell within that Convention, as that was the circumstance addressed by r.6.33(2B) before its amendment.) See para.6.33.4 above.

The head of jurisdiction at para.3.1(6)(d) was not, in any event, frequently relied upon in the years immediately prior to its omission. For proceedings commenced between 10 January 2015 and 31 December 2020, where there was an English jurisdiction clause, the recast Judgments Regulation almost invariably applied (unless for example it was not a civil or commercial matter and therefore fell outside the scope of the Regulation, but that would be rare in a case where a jurisdiction agreement was concerned) and there was no need for permission to serve out of the jurisdiction—see para.6.33.1. For proceedings commenced before 10 January 2015, the previous Judgments Regulation (44/2001) applied to a jurisdiction clause only if at least one party was domiciled in an EU Member State, and so the head of jurisdiction at para.3.1(6)(d) was more frequently of relevance.

### Paragraph 3.1(7): Claim for breach of contract within the jurisdiction

**6HJ.21** Paragraph 3.1(7) of Practice Direction 6B states that the claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where "a claim is made in respect of a breach of contract committed within the jurisdiction". The connecting factor is a contractual breach within the jurisdiction.

At the end of the nineteenth century the formulation for this head of jurisdiction stated that service out could be permitted where the action was founded:

"... on any breach or alleged breach within the jurisdiction of any contract wherever made, which, according to the terms thereof, ought to be performed within the jurisdiction."

Those terms emphasised what was then regarded as the most significant feature of this head of jurisdiction, that is, that it is available where the contract is made outside the jurisdiction as well as within it.

The formulation for this head of jurisdiction was amended in 1921 by an addition made for the purpose of reversing the effect of the decision of the House of Lords in *Johnson v Taylor Bros & Co* [1920] A.C. 144, HL. Thereafter it was provided that permission could be given "irrespective of the fact" that the breach or alleged breach:

"... was preceded or accompanied by a breach committed out of the jurisdiction that rendered impossible the performance of so much of the contract as ought to have been performed within the jurisdiction."

The formulation remained in those terms down to the enactment of the CPR, when it appeared in Sch.1 RSC Ord.11 r.1(1)(e).

When RSC Ord.11 was brought into Pt 6 of the CPR (with effect from 2 May 2000) the formulation was enacted (as r.6.20(6)) in the simple terms in which it is now stated in para.3.1(7) of Practice Direction 6B. Those terms do not capture the point that this head of jurisdiction is avail-

able to a claimant where the contract is made outside the jurisdiction as well as within it, but nothing turns on that. Also they do not capture the point of the remedial amendment made in 1921.

In a given case, whether the claimant's claim may be rightly categorised as "in respect of a breach of contract", and in particular a breach "committed within the jurisdiction", may be a simple matter, or it may raise complicated issues of fact and of law, in particular issues concerning the proper construction of the contract (including whether the obligation alleged to have been breached was express or implied).

Where the breach takes the form of a failure to perform an obligation under the contract, no breach can be committed "within the jurisdiction" within the meaning of this head of jurisdiction unless the relevant obligation had to be performed within the jurisdiction (*Cuban Atlantic Sugar Sales Corp v Compania de Vapores, etc.* [1960] 1 Q.B. 187; [1960] 1 All E.R. 141, CA). Where, however, the breach takes the form of an express repudiation of the contract, and that repudiation takes place in England, it seems it does not matter whether or not the contract was to be performed in England: the requirement in the original formulation of this head of jurisdiction that the contact "ought to be performed within the jurisdiction" does not appear in the modern formulation (see Dicey, Morris & Collins, *The Conflict of Laws,* 15th edn, para.11-196). Where a defendant wrongfully repudiates the contract by a letter posted in England, whether by the defendant itself or by its representative in England, the breach takes place within the jurisdiction (*Mutzenbecher v La Aseguradora Espanola* [1906] 1 K.B. 254, CA, *Oppenheimer v Louis Rosenthal & Co* [1937] 1 All E.R. 23), but not if the letter is posted from abroad (*Holland v Bennett* [1902] 1 K.B. 867, CA). The same is true if the defendant repudiates by telegram rather than by letter (*Martin v Stout* [1925] A.C. 359, PC), and it has been held that this also applies where the repudiation is by telex (*Brinkibon Ltd v Stahag Stahl und Stahlwarenhandels GmbH* [1980] 2 Lloyd's Rep. 556, CA), despite the obvious contrast with the position where a contract is accepted (rather than repudiated) by telex or some other method of instantaneous communication (*Entores Ltd v Miles Far East Corp* [1955] 2 Q.B. 327, CA: see para.6HJ.15 above).

Where no place of payment is provided by the terms of the contract (including such as are to be implied from the course of dealing between the parties) it is the duty of the debtor to seek out their creditor at their residence or place of business, and therefore a failure to pay money due to a claimant who resides or carries on business within the jurisdiction falls within this head of jurisdiction (*Robey & Co v Snaefell Mining Co Ltd* (1887) 20 Q.B.D. 152; *The Eider* [1893] P.119, CA; *Thompson v Palmer* [1893] 2 Q.B. 80, CA; *Charles Duval & Co v Gans* [1904] 2 K.B. 685, CA; *Drexel v Drexel* [1916] 1 Ch. 251; *Bremer Oeltransport GmbH v Drewry* [1933] 1 K.B. 753, CA).

As to a breach of contract to deliver goods, see *Nathan v Seitz* (1888) 4 T.L.R. 570; *Wancke v Wingren* (1889) 58 L.J.Q.B. 519; *Crozier, Stephens & Co v Auerbach* [1908] 2 K.B. 161, CA; *Johnson v Taylor* [1920] A.C. 144, HL.

### Paragraph 3.1(8): Claim for declaration that no contract exists

**6HJ.22**      A claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where the claim is made for a declaration "that no contract exists" where, if the contract was found to exist, it would comply with the conditions set out in para.3.1(6), that is to say, if found to exist it would be a contract (a) made within the jurisdiction, (b) made by or through an agent trading or residing within the jurisdiction, (c) governed by English law, or (d) containing a term to the effect that the court shall have jurisdiction to determine any claim in respect of the contract (subject to the prospective rule change referred to at para.6HJ.20 above). This particular head of jurisdiction was first enacted when RSC Ord.11 was brought into Pt 6 of the CPR (by the Civil Procedure (Amendment) Rules 2000 (SI 2000/221), with effect from 2 May 2000, when it appeared as r.6.20(7).

Before that date the law was otherwise. In *Finnish Marine Insurance Co v Protective National Insurance Co* [1990] 1 Q.B. 1078 (Adrian Hamilton QC) a claim was brought by reinsurers (C) against their reinsured, who were outside the jurisdiction, for a declaration that they were not bound by the reinsurance which had been made by their agents. It was held that the claim did not fall within paras (d) or (e) of Ord.11 r.1(1) as they then stood (precursors to what are now paras.3.1(6)(b) and para.3.1(7) of PD 6B), because the claim was not brought to "enforce, rescind, dissolve, annul or otherwise affect a contract" made through an agent within the jurisdiction or brought in respect of a breach of contract within the jurisdiction. Those heads of jurisdiction could not apply as C denied the existence of a contract.

### Claims in tort (para.3.1(9))

**6HJ.23**      In para.3.1 of Practice Direction 6B, under the heading "Claims in tort", one particular head of jurisdiction is listed in subpara.(9). This provides that a claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where the claim "is made in tort" and either:

> "(a) damage was sustained, or will be sustained, within the jurisdiction; or (b) damage which has been or will be sustained results from an act committed, or likely to be committed, within the jurisdiction."

If, on the same facts, a claimant has a remedy in contract or tort, they can choose whether to seek permission for service out of the jurisdiction under this head of jurisdiction or under the heads of jurisdiction at para.3.1(6) or (7) considered at paras 6HJ.13 et seq. above (*Matthews v Kuwait Bechtel Corp* [1959] 2 Q.B. 57, CA).

In RSC 1965 Ord.11 r.1(1) the formulation for this head of jurisdiction was narrower and said that permission could be given where the action begun by the writ was "founded on a tort committed within the jurisdiction". The rule was substituted by SI 1983/1181 (with effect from 1 January 1987) and thereafter read that permission could be given where the claim was founded on a tort and "the damage was sustained, or resulted from an act committed, within the jurisdiction". When RSC Ord.11 was brought into Pt 6 of the CPR by SI 2000/221 (with effect from 2 May 2000), the formulation for this head of jurisdiction appeared in r.6.20(8) and in two separate subparagraphs referred to (a) damage sustained within the jurisdiction (omitting the definite article "the"); and (b) damage sustained resulting from an act committed within the jurisdiction. The formulation was broadened by CPR Update 81, with effect from 1 October 2015, by the addition of the words "or will be sustained" in subpara.(a) and of the words "or likely to be committed" in subpara.(b). In referring to authorities on this head of jurisdiction care has to be taken to note the terms of the formulation in force at the relevant time.

Under subpara.(a) in para.3.1(9) it is enough that some significant damage has been sustained in England, whether or not damage has also been sustained elsewhere (*Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 Q.B. 391, CA). There is no need to distinguish between direct and indirect damage for these purposes: see *FS Cairo (Nile Plaza) LLC v Brownlie* [2020] EWCA Civ 996, in which the Court of Appeal followed the obiter views of the majority of the Supreme Court in *Brownlie v Four Seasons Holdings Inc* [2017] UKSC 80; [2018] 1 W.L.R. 82, SC (*Brownlie I*) and rejected an argument that this head of jurisdiction should be read so as to mirror the jurisdiction provisions of art.5(3) of the Brussels Convention, as subsequently interpreted in EU law. "Damage" should be given its natural and ordinary meaning, namely harm which has been sustained by the claimant whether physical or economic; in various first instance decisions, approved by the majority in *Brownlie I*, the courts have held that a claim falls within this head of jurisdiction if financial damage is suffered in England as a result of personal injuries inflicted abroad; *Booth v Phillips* [2004] EWHC 1437 (Comm); [2004] 1 W.L.R. 3292 (Mr Nigel Teare QC); *Cooley v Ramsey* [2008] EWHC 129 (QB); [2008] I.L.Pr. 27 (Tugendhat J); *Wink v Croatia Osiguranje DD* [2013] EWHC 1118 (QB), (Haddon-Cave J).

With regard to subpara.(b) in para.3.1(9), in *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 Q.B. 391, CA, the Court of Appeal considered in detail how the court should approach the question of whether damage resulted from an act committed within the jurisdiction. This requirement obliges the court to look at the tort alleged in a common sense way, and to ask whether damage has resulted from substantial and efficacious acts committed within the jurisdiction, regardless of whether or not such acts have been committed elsewhere. The question is where in substance the cause of action arises. If the court finds that the tort has in substance been committed in this country, the fact that some of the relevant events have happened abroad is irrelevant for these purposes.

In determining whether the claim is one which is "made in tort", difficult issues of characterisation may arise, which are further complicated where the cause of action has some connection with a foreign jurisdiction (which may be the case even if the tort was in substance committed in England). In *Metall v Rohstoff*, op cit, the court considered the position at common law and explained that, in deciding whether a tort has been committed in this or another country, the court must exclusively apply English law (and, if the tort was in substance committed abroad, the English court's jurisdiction would be limited to where the relevant acts would give rise to a tort actionable both in the foreign jurisdiction and in English law: the so-called "double actionability rule"). That is no longer the case, where the act or omission giving rise to the claim occurred on or after 1 May 1996. From that date, the Private International Law (Miscellaneous Provisions) Act 1995 abolished the double actionability rule (by s.10) and introduced rules for the English court to apply in determining the applicable law for a claim in tort, the general rule (under s.11) being the law of the country in which the events constituting the tort occur (though that rule is displaced, by s.12, if in all the circumstances it appears that it is substantially more appropriate for the applicable law to be the law of another country).

Where the event giving rise to damage occurred on or after 11 January 2009, Regulation (EC) No.864/2007 on the law applicable to non-contractual relations (the Rome II Regulation) applies in place of the 1995 Act, so that the general rule is that the applicable law is the law of the country in which the damage occurs (though this general rule is displaced if the tort is manifestly more closely connected with a different country). For events giving rise to damage on or after 1 January 2021, the court will apply the UK version of the Rome II Regulation, i.e. the Rome II Regulation as it has been implemented into UK law with amendments (see ss.3 and 20 of the European Union (Withdrawal) Act 2018 and reg.11 of the Law Applicable to Contractual Obligations and Non-Contractual Obligations (Amendment etc.) (EU Exit) Regulations 2019). Where, applying any of these provisions (as relevant), the court determines that the law applicable to a claim is the law of a foreign country, it seems that country's law (to the extent it is pleaded, and is shown to differ from English law) must be relevant in characterising the claim as one in tort (or otherwise) and considering where in substance it has been committed (cf. *Vidal-Hall v Google Inc* [2015] EWCA Civ 311; [2015] 3 W.L.R. 409, CA at [39]).

*Negligent or fraudulent misstatement*—In the context of a claim for negligent or fraudulent misstatement, the place where the where the harmful event giving rise to the damage has occurred is where the misstatement was made rather than where it was received (*Newsat Holdings Ltd v Zani* [2006] EWHC 342 (Comm); [2006] 1 Lloyd's Rep. 707 (David Steel J)).

*Computer hacking*—Where an attack emanating from another jurisdiction is directed at a computer server in London which is where hacking occurs, "significant damage" occurs in England and such damage occurs from acts committed within the jurisdiction where the hacking occurred and access to the server was achieved; *Ashton Investments Ltd v OJSC Russian Aluminium (Rusal)* [2006] EWHC 2545 (Comm); [2007] 1 Lloyd's Rep. 311 (Mr Jonathan Hirst QC).

*Cartel damages claims*—For a discussion as to where damages are sustained when a cartel damages claim raises issues of pass-on, see *Apple Retail UK Ltd v Qualcomm (UK) Ltd* [2018] EWHC 1188 (Pat); [2018] F.S.R. 27 (Morgan J) at [91]–[116].

*Breach of confidence and misuse of private information*—In *Kitechnology BV v Unicor GmbH Plastmaschinen* [1995] F.S.R. 765, CA, at 777–778 the Court of Appeal held that claims for breach of an equitable obligation of confidence did not arise in tort as a matter of English law in the context of considering whether they fell within art.5(3) of the Brussels Convention. In *Vidal-Hall v Google Inc* [2015] EWCA Civ 311; [2015] 3 W.L.R. 409, CA, the Court of Appeal held that it was bound by *Kitechnology* to find that breach of confidence was not a tort for the purposes of the head of jurisdiction at para.3.1(9), although it found that misuse of private information could be recognised as a tort for these purposes. Subsequently a new head of jurisdiction was added to PD 6B at subpara.3.1(21) dealing with both breach of confidence and misuse of private information in order to remedy this anomaly: see para.6HJ.36 below.

*Data protection*—*Vidal-Hall v Google*, op cit, also discusses the meaning of damage in s.13 of the Data Protection Act 1998 (the DPA) for the purposes of para.3.1(9), confirming that compensation is recoverable under s.13(1) for any damage suffered as a result of a contravention by a data controller of the requirements of the DPA. In *Lloyd v Google LLC* [2019] EWCA Civ 1599; [2020] Q.B. 747, CA a claim was made in a representative action to the effect that the defendants had secretly collated browser generated information from mobile phone users. The Court of Appeal held (overturning the first instance decision) that damages were capable of being awarded for loss of control of data under s.13 of the DPA, even if there was no pecuniary loss and no distress. Permission to serve the claim form on the defendants out of the jurisdiction under para.3.1(9) was therefore granted. It seems likely that a similar approach will be taken where claims are brought under the General Data Protection Regulation (Regulation (EU) 2016/679), or "GDPR", which largely superseded the DPA.

*Libel*—An alleged libel published in more than one country could give rise to a cause of action in each country in which the victim was known and in which they claimed to have suffered injury. A multi-jurisdictional libel should not be treated as giving rise to a single cause of action in respect of which the court had to ascertain where the global cause of action arose (see *Shevill v Presse Alliance* [1996] A.C. 959, HL, a case under the Brussels Convention which was followed in a non-convention case, *Berezovsky v Michaels* [2000] 1 W.L.R. 1004; [2001] I.L.Pr. 21, HL). In *Davison v Habeeb* [2011] EWHC 3031 (QB); [2012] 3 C.M.L.R. 6 (Judge Parkes QC), where it was alleged that the claimant (C) had been defamed by an internet publication, the judge referred to the relevant authorities and found that such publication as C had established within the jurisdiction did not amount to a real and substantial tort and refused permission to serve out of the jurisdiction on a foreign internet company.

### Enforcement (para.3.1(10))

**6HJ.24**    In para.3.1 of Practice Direction 6B, under the heading "Enforcement", one particular head of jurisdiction is listed in subpara.(10). That provision states that a claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made "to enforce any judgment or arbitral award".

This head of jurisdiction was introduced (by SI 1983/1181, with effect from 1 January 1987) as part of the substantial reforms to the relevant rules of court made necessary upon the coming into force of the Civil Jurisdiction and Judgments Act 1982. Before then, a provision in RSC Ord.11 r.1(1) to the effect that service out was permissible with the leave of the court where any relief was sought "against a person domiciled or ordinarily resident within the jurisdiction" embraced, amongst other forms of relief, relief to enforce any judgment or arbitral award. In the 1985 *White Book* (and in subsequent editions) it was noted that, as the presence of assets within the jurisdiction did not in itself give the English courts jurisdiction over a person outside the jurisdiction, before what is now para.3.1(10) of PD 6B was introduced, a foreign judgment could not be enforced against English assets in cases not falling within the provisions for the reciprocal enforcement of judgments legislation unless the debtor could be served in England or was "domiciled or ordinarily resident within the jurisdiction". It was commented that, after this revision, "the foreign judgment or award is itself a sufficient ground for the grant of leave", and in this respect the revision "blocks a small but irritating loophole in the law". This commentary was referred to by the Court of Appeal in *Tasarruf Mevduati Sigorta Fonu v Demirel* [2007] EWCA Civ 799; [2007] 1 W.L.R. 2508, CA, where the court held that para.3.1(10) (then r.6.20(9)) should be given its ordinary and natural meaning, with the result that the foreign judgment or award is itself a sufficient ground for the grant of permission, and rejected the submission that there should be implied into this provision a requirement that there must be assets in the jurisdiction. In *Linsen International Ltd v Humpuss Sea Transport Pte Ltd* [2011] EWCA Civ 1042, where the *Tasarruf* case was not cited, the Court of Appeal held that the court has no jurisdiction to permit service out under this gateway of a claim for a

worldwide freezing order against a third party (a Chabra-type injunction) commenced in aid of enforcement of an arbitration award where not only that party's assets, but also the debt that it owed to the defendant, were situated out of the jurisdiction. It appears that this decision has revived the question (thought to have been settled by the *Tasarruf* case) whether there is any territorial limitation to para.3.1(10) and created doubt (see *Parbulk II AS v PT Humpuss Intermoda Transporti TBK* [2011] EWHC 3143 (Comm); [2011] 2 C.L.C. 988 (Gloster J)). A claim for a freezing order made before judgment is obtained or an award made does not fall within para.3.1(10), as it is not made "to enforce" anything (*Mercedes-Benz AG v Leiduck* [1996] A.C. 284, PC).

In *Deutsche Bank AG v Sebastian Holdings Inc* [2016] EWHC 3222 (Comm); [2017] 1 W.L.R. 1842 (Teare J), a bank (C) applied under r.81.4 to commit for contempt the defendant (D), the owner of a company, for breach of an order under r.71.2 made in the course of long-running commercial proceedings brought by C against D and his company. In refusing C's application for permission to serve the application notice on D out of the jurisdiction the judge held ([19] and [20]) that C's application to commit D was not, within the meaning of para.3.1(10), a claim to enforce a "judgment" (see further para.81.10.4). In subsequent proceedings in the Court of Appeal, the question whether the judge's decision on this point was correct was raised on C's cross-appeal but in the event did not have to be determined. The court was content to say that there may well be considerable force in the view taken by the judge and, in recommending that any uncertainty in this area should be considered by the Rule Committee, expressed the opinion that it must be in the public interest that there should be a specific jurisdictional "gateway" permitting such service on an officer of a company, where the fact that he is out of the jurisdiction is no bar to the making of a committal application; see *Deutsche Bank AG v Vik* [2018] EWCA Civ 2011; [2019] 1 W.L.R. 1737, CA at [84]–[89] per Gross LJ. See also the discussion on this matter in *Integral Petroleum SA v Petrogat FZE* [2018] EWHC 2686 (Comm); [2019] 1 W.L.R. 574 (Moulder J) at paras [85]–[88].

In *NML Capital Ltd v Republic of Argentina* [2011] UKSC 31; [2011] 2 A.C. 495, SC, a claim was brought to enforce a judgment obtained by the claimants (C) in a New York court against a foreign state (D). Initially, in applying for permission under para.3.1(10), the claimants (C) averred that the defendant foreign state (D) was not absolutely immune from suit because their claim fell within the commercial transaction proceedings exemption as provided by the State Immunity Act 1978 s.3. Subsequently C conceded that that was erroneous because the claim was brought on the judgment rather than on the underlying transactions. However, on appeal, C argued and the Supreme Court accepted that the effect of the Civil Jurisdiction and Judgments Act 1982 s.31(1) is that a foreign judgment against a foreign state would be recognised and enforceable in England if (as in this case) the normal conditions for recognition and enforcement of judgments were fulfilled and (again, as in this case) the foreign state would not have been entitled to state immunity if the foreign proceedings had been brought in the UK. On that basis C's claim fell within para.3.1(10) of PD 6B and D was not absolutely immune from the action. See further para.6.44.1 (Actions against foreign states).

### Claims about property within the jurisdiction (para.3.1(11))

In para.3.1 of Practice Direction 6B, under the heading "Claims about property within the jurisdiction", one particular head of jurisdiction is listed in subpara.(11). This provides that a claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where the subject matter of the claim "relates wholly or principally to property within the jurisdiction", subject to the proviso that "nothing under this paragraph shall render justiciable the title to or the right to possession of immovable property outside England and Wales". **6HJ.25**

When the provisions in r.1(1) of RSC Ord.11 dealing with service out of the jurisdiction with permission, as re-enacted in Sch.1 to the CPR, were brought into the CPR by SI 2000/221, with effect from 2 May 2000 (as r.6.20), the elaborate formulations for the three heads of jurisdiction in that rule dealing with claims in relation to land (subparas (g) and (h)), and in relation to rights over movable property (subpara.(i)), were conflated into one simple rule (r.6.20(10)). That rule stated that the claimant may serve a claim form out of the jurisdiction with the permission of the court "where the whole subject matter of a claim relates to property located within the jurisdiction". In the case of *Re Banco Nacional de Cuba* [2001] 1 W.L.R. 2039 (Lightman J) it was stated (at [33]) that the evident purpose of this rule was, not only to lay down a single rule which embraced the three earlier rules, but to enact a rule "which extends beyond the contents of those rules"; in particular, the rule was no longer limited to land, but extended also to personal property (in that case shares in a company), and it was sufficient that the whole claim "relates to" property, instead of being confined to claims relating to ownership or possession.

The formulation for this head of jurisdiction remained in the same terms when translated into Practice Direction 6B, where it appeared as para.3.1(11), until this provision was substituted by CPR Update 81 (August 2015) with effect from 1 October 2015. The new wording replaced the requirement that the "whole subject matter of the claim" relates to property within the jurisdiction with a requirement that the subject matter relates "wholly or principally" to property within the jurisdiction, and added the proviso noted above, i.e. that it would not render justiciable the title to or the right to possession of immovable property outside England and Wales.

These amendments were prompted by a paper prepared by the Trust Law Committee of the Chancery Bar Association (9 May 2013), which proposed amendments to several of the heads of jurisdiction in para.3.1 of Practice Direction 6B for the purpose of broadening the circumstances in which service of trust claims outside the jurisdiction might be permitted by the court. In that paper it was suggested that, if the principal proposals were implemented, para.3.1(11) might usefully be extended so as to cover a claim for a remedy in relation to a trust where the trust fund

does not consist wholly of property situated within England and Wales but includes such property. This subsidiary proposal of the Committee was considered by the Lord Chancellor's Advisory Committee on Private International Law. The formulation for this head of jurisdiction as substituted by CPR Update 81 took into account recommendations made by the latter Committee, in particular the restriction of the scope of the formulation by the phrase "wholly or principally" and the safeguard imposed by the proviso.

It has been held that confidential information contained in digital form on a server constitutes "property" within para.3.1(11) (or its predecessor at CPR r.6.20(10)), and that such property on a server located within the jurisdiction would constitute "property located within the jurisdiction" (*Ashton Investments Ltd v OJSC Russian Aluminium (Rusal)* [2006] EWHC 2545 (Comm); [2007] 1 Lloyd's Rep. 311; [2007] 1 All E.R. (Comm) 857 (Jonathan Hirst QC)). However, in *Vidal-Hall v Google Inc* [2015] EWCA Civ 311; [2015] 3 W.L.R. 409, CA, the Court of Appeal described the question of whether "property" includes confidential information for these purposes as "a question of law of some difficulty" and said it should be argued in circumstances where (unlike in that case where the point was raised late) the parties have had a proper opportunity to put the relevant evidence and submissions of law before the court.

### Claims about trusts (para.3.1(12) to (16))

**6HJ.26**     In para.3.1 of Practice Direction 6B, under the heading "Claims about trusts etc", six particular heads of jurisdiction are listed in subparas (12) to (16).

It may be noted that none of these particular heads clearly applies to claims for breach of fiduciary duty. Further, none of the other heads of jurisdiction in para.3.1 is specifically designed for such claims. This is perhaps not surprising because claims of this variety are difficult to characterise. In *Twin Benefits Ltd v Barker* [2017] EWHC 1412 (Ch), (Marcus Smith J), the judge explained ([110]–[114]) that a claim for breach of fiduciary duty may sometimes be regarded as contractual (potentially falling within para.3.1(6)), or tortious (potentially falling within para.3.1(9)), or as giving rise to a claim against a defendant as constructive trustee (potentially falling within para.3.1(16)). The mere fact that para.3.1(6) refers to a claim in respect of a contract, and para.3.1(9) refers to a claim made in tort is insufficient to exclude a claim for breach of fiduciary duty from the ambit of those two heads of jurisdiction, provided that the breach is in substance a contractual claim or a tortious claim (as appropriate). The question in each case is what, in substance, is the nature of the claim being asserted.

### Paragraph 3.1(12) and (12A): Claim made in respect of a trust

**6HJ.27**     A claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made in respect of a trust which is created by the operation of a statute, or by a written instrument, or created orally and evidenced in writing, and which (under the head of jurisdiction at para.3.1(12) of Practice Direction 6B) "is governed by the law of England and Wales"; or (under the head of jurisdiction at para.3.1(12A)) "provides that jurisdiction in respect of such a claim shall be conferred upon the courts of England and Wales".

In the RSC 1965 the prescribed formulation for the corresponding head of jurisdiction, then found in Ord.11 r.1(1)(e), confined it to an action begun for the execution "as to property within the jurisdiction" of the trusts "of a written instrument". Upon the coming into effect of the Civil Jurisdiction and Judgments Act 1982 on 1 January 1987, RSC Ord.11 r.1 was substantially recast (by SI 1983/1181). In the process r.1(1)(e) became r.1(1)(j) and the requirement in that rule that the execution sought should be as to property within the jurisdiction was removed. Thereafter an absconding trustee who removed assets from within the jurisdiction was not beyond the reach of this head of jurisdiction. This broadening of this head of jurisdiction reflected the special jurisdiction provisions relating to claims against settlors, trustees or beneficiaries of trusts in the Brussels Convention then coming into effect.

When, with effect from 2 May 2000, RSC Ord.11 was brought into the CPR (by SI 2000/221), the formulation for this head of jurisdiction appeared in modernised form (as r.6.20(11)) but was to the same effect, and in that form was later incorporated in Practice Direction 6B as para.3.1(12). The provision stated that a claim form could be served out of the jurisdiction with the court's permission if a claim is made for any remedy which might be obtained in proceedings to execute the trusts "of a written instrument" where (a) the trust ought to be executed according to English law, and (b) the person on whom the claim form is to be served is a trustee of the trusts.

By CPR Update 79, with effect from 6 April 2015, subpara.(12) of para.3.1 of Practice Direction 6B was replaced by two new provisions, subpara.(12) and subpara.(12A), in the terms referred to above. These new provisions removed the previous restriction to: claims brought against (rather than by) a trustee; claims where the trust is created by a written instrument (rather than also by the operation of a statute, or where the trust is created orally and evidenced in writing); and claims where the trust is governed by English law (rather than also where it provides for the jurisdiction of the English courts). These amendments followed upon a consideration by the Rule Committee of proposals made in a paper prepared by the Trust Law Committee of the Chancery Bar Association (9 May 2013) and recommendations of the Lord Chancellor's Advisory Committee on Private International Law.

### Paragraph 3.1(13): Claim for remedy in proceedings for administration of deceased's estate

**6HJ.28**     Paragraph 3.1(13) of Practice Direction 6B states that a claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made for any

remedy which might be obtained in proceedings for the administration of an estate of a deceased person in two circumstances; first, where the person died domiciled within the jurisdiction; or secondly, where the estate of the person includes assets within the jurisdiction.

The first aspect of this head of jurisdiction is of very long standing and is based on the connecting factor of the domicile of the deceased person whose estate is under administration. See comments at para.6HJ.3 in relation to the meaning of "domicile" for the purposes of the common law heads of jurisdiction.

The second aspect is of modern creation, being added to para.3.1(13) by CPR Update 81, which came into effect on 1 October 2015, and is based on the connecting factor of estate assets being located within the jurisdiction. The addition was made following upon a recommendation made by the Lord Chancellor's Advisory Committee on Private International Law. Considerations which informed the addition of this aspect of this head of jurisdiction were that, where a person died domiciled abroad, the English courts (1) may appoint an executor in respect of property within the jurisdiction and in respect of property outside the jurisdiction, and (2) may appoint a foreign executor (resident outside the jurisdiction) in respect of property within the jurisdiction.

### Paragraph 3.1(14): Probate claim or will rectification claim

**6HJ.29** Paragraph 3.1(14) of Practice Direction 6B states that a claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where the claim is a probate claim or a claim for the rectification of a will.

In the RSC 1965 service out of the jurisdiction with the permission of the court of a writ for a probate action was provided for, not by rules in Ord.11 r.1(1), but by r.3 of Ord.76 (Probate proceedings). In 1971, upon the reconstitution of the High Court, Ord.76 was rewritten and the rule permitting service out of the jurisdiction of a probate action was then incorporated in Ord.11 r.1(1). (See also former CCR Ord.8 (Service out of England and Wales) r.2(1)(k), where "probate action", as defined in former CCR Ord.41 (Probate Actions) r.1, was referred to.) In the CPR as originally enacted, contentious probate proceedings were "specialist proceedings" and were provided for by a practice direction (in effect replacing RSC Ord.76 and CCR Ord.41) until replaced by Pt 57 as inserted in the CPR by the Civil Procedure (Amendment No.2) Rules 2001 (SI 2001/1388) with effect from 15 October 2001. As enacted, Pt 57 had three Sections, Sections I and II dealing with, respectively, probate claims and claims for rectification of wills. Beforehand (that is, as from 2 May 2000) it had been provided in the relevant rule in Pt 6 that a claim form may be served out of the jurisdiction with the permission of the court if a claim is made "in probate proceedings which includes a claim for the rectification of a will". Subsequently, with effect from 1 October 2008, that was tidied up so as to reflect accurately the terminology and structure of Pt 57. It remains the case that rules about probate claims and claims for the rectification of wills are contained, respectively, in Section I and Section II of Pt 57. "Probate claim" is defined at r.57.1(2)(a).

### Paragraph 3.1(15): Claim against trustee

**6HJ.30** Paragraph 3.1(15) of Practice Direction 6B states that a claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made against the defendant as constructive trustee, or as trustee of a resulting trust, in two circumstances: first, where the claim arises out of acts committed or events occurring within the jurisdiction; or secondly, where the claim relates to assets within the jurisdiction.

By SI 1990/1689, with effect from 1 October 1990, subpara.(t) was added to RSC Ord.11 r.1(1), and provided that service of a writ out of the jurisdiction was permissible with the permission of the court if, in the action begun by the writ, the claim was brought for money had and received or for an account or other remedy against the defendant as constructive trustee, and the defendant's alleged liability arose out of acts committed, "whether by him or otherwise", within the jurisdiction. At the time that was regarded as an important addition to the heads of jurisdiction. When RSC Ord.11 was brought into the CPR by SI 2000/221 (with effect from 2 May 2000), the aspect of this formulation relating to claims against the defendant as constructive trustee was enacted (in r.6.20(14)) in much simplified terms, and remained in those terms when brought into Practice Direction 6B as para.3.1(15) thereof (with effect from 1 October 2008). Thus it was stated that the claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made for a remedy against the defendant as constructive trustee where the defendant's alleged liability arose out of acts committed within the jurisdiction. (For the aspect of RSC Ord.11 r.1(1)(t) relating to restitutionary claims for money had and received, see para.6HJ.31 below.) Although the revised formulation omitted the words "whether by him or otherwise", it seems it remained the case that the relevant acts committed within the jurisdiction did not have to be those of the defendant (see *Nabb Bros Ltd v Lloyds Bank International (Guernsey) Ltd* [2005] EWHC 405 (Ch); [2005] I.L.Pr. 37 (Lawrence Collins J) at [86]).

By CPR Update 81, with effect from 1 October 2015, the formulation for this head of jurisdiction was wholly substituted for the purpose of broadening it in three respects. First, to include in terms a claim against a trustee of a resulting trust as well as against a constructive trustee; secondly, to apply it where the claim arises out of "events occurring" as well as "acts committed" within the jurisdiction; and thirdly, to apply it also where there are no such "events" or "acts" as connecting factors, but simply where the connecting factor is that the claim relates to assets within the jurisdiction. These amendments followed upon a consideration by the Rule Committee of recommendations of the Lord Chancellor's Advisory Committee on Private International Law.

For the meaning of "constructive trust" for the purposes of para.3.1(15), see *Nabb Bros Ltd v Lloyds Bank International (Guernsey) Ltd*, op cit at [72] and *Pakistan v Zardari* [2006] EWHC 2411

(Comm); [2006] 2 C.L.C. 667 (Lawrence Collins J), at [162] et seq. A *Quistclose* trust (deriving from the case of *Barclays Bank Ltd v Quistclose Investments Ltd* [1970] A.C. 567) is a form of resulting trust for the purposes of para.3.1(15) (*Ashley v Jimenez* [2019] EWHC 17 (Ch), Chief Master Marsh).

**Paragraph 3.1(16): Claim for restitution**

**6HJ.31**     Paragraph 3.1(16) of Practice Direction 6B states that the claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made in restitution where the defendant's alleged liability arises out of acts committed within the jurisdiction, or the enrichment is obtained within the jurisdiction, or the claim is governed by the law of England and Wales.

By SI 1990/1689, with effect from 1 October 1990, subpara.(t) was added to RSC Ord.11 r.1(1), and provided that service of a writ out of the jurisdiction was permissible with the permission of the court if, in the action begun by the writ, the claim was brought for money had and received or for an account or other remedy against the defendant as constructive trustee, and the defendant's alleged liability arose out of acts committed, whether by them or otherwise, within the jurisdiction. When RSC Ord.11 was brought into the CPR by SI 2000/221 (with effect from 2 May 2000), the aspect of this formulation relating to restitutionary claims for money had and received was enacted as a broader head of jurisdiction for claims for restitution, in r.6.20(15). (For the aspect of RSC Ord.11 r.1(1)(t) relating to claims against the defendant as construction trustee, see para.6HJ.30 above.) That rule stated that a claim form could be served out of the jurisdiction if a claim was made for restitution where the defendant's alleged liability "arises out of acts committed within the jurisdiction" (r.6.20(15)). The formulation remained in those terms when transferred to Practice Direction 6B as para.3.1(16).

By CPR Update 81 (August 2015) with effect from 1 October 2015, the text of para.3.1(16) was wholly substituted so as to embrace in terms, not only a claim for restitution where (a) the defendant's alleged liability arises out of acts committed within the jurisdiction, but also where (b) "the enrichment" is obtained within the jurisdiction, or (c) the claim is governed by the law of England and Wales. These amendments reflect the view that the single connecting factor in the previous formulation, limiting this head of jurisdiction to acts committed within the jurisdiction, was unnecessarily restrictive, and that the additional factors of enrichment obtained within the jurisdiction and the governing of the claim by English law could usefully be included. These amendments followed upon a consideration by the Rule Committee of recommendations of the Lord Chancellor's Advisory Committee on Private International Law.

For a discussion of the meaning of "restitution" within the para.3.1(16), see *Nabb Bros Ltd v Lloyds Bank International (Guernsey) Ltd* [2005] EWHC 405 (Ch); [2005] I.L.Pr. 37 (Lawrence Collins J, [74]–[77]). It has been held that the essence of a claim in restitution is, in general, the conduct of the claimant which has enriched the defendant, and therefore for the purposes of para.3.1(16)(a) the focus is principally, although not exclusively, on the acts of the claimant; the question will be whether a substantial part of those acts, though not necessarily all of them have been committed within the jurisdiction: see *Sharab v Al-Saud* [2012] EWHC 1798 (Ch); [2012] 2 C.L.C. 612 (Sir William Blackburne); *Bazhanov v Fosman* [2017] EWHC 3404 (Comm) (Daniel Toledano QC sitting as a deputy High Court judge).

*Claims by HM Revenue and Customs (para.3.1(17))*

**6HJ.32**     In para.3.1 of Practice Direction 6B, under the heading "Claims by HM Revenue and Customs", one particular head of jurisdiction is listed in subpara.(17). That provision states that a claim form may be served out of the jurisdiction with the permission of the court under r.6.36 where a claim is made by HMRC relating to duties or taxes against a defendant not domiciled in Scotland or Northern Ireland (para.3.1(17) of PD 6B).

*Claims for costs in favour of or against third parties (para.3.1(18))*

**6HJ.33**     In para.3.1 of Practice Direction 6B, under the heading "Claims for costs in favour of or against third parties", one particular head of jurisdiction is listed in subpara.(18). That provision states that a claim form may be served out of the jurisdiction with the permission of the court under r.6.36 where a claim is made by a party to proceedings for an order that the court exercise its power under the Senior Courts Act 1981 to make a costs order in favour of or against a person who is not a party to those proceedings (para.3.1(18) of PD 6B). This provision was introduced to cure the omission identified in *National Justice Compania Naviera SA v Prudential Assurance Co Ltd (No.2)* [2000] 1 W.L.R. 603; [2000] 1 All E.R. 37; [2000] 1 Lloyd's Rep. 129, CA.

*Admiralty claims (para.3.1(19))*

**6HJ.34**     In para 3.1 of Practice Direction 6B, under the heading "Admiralty claims", one particular head of jurisdiction is listed in subpara.(19). That provision states that a claim form may be served out of the jurisdiction with the permission of the court under r.6.36 where a claim is (a) in the nature of salvage and any part of the services took place within the jurisdiction, or (b) to enforce a claim under the Merchant Shipping Act 1995 ss.153, 154, 175 or 176A (para.3.1(19) of PD 6B).

When Pt 61 (Admiralty Claims) was inserted in the CPR by the Civil Procedure (Amendment

No.5) Rules 2001 (SI 2001/4015), and former RSC Ord.75 was revoked, a formulation for this head of jurisdiction was inserted (as r.6.20(17A). In relation to limitation claims, see CPR r.61.11(5) and commentary thereon (Vol.2 para.2D-73).

See also para.6.37.11 above.

### Claims under various enactments (para.3.1(20))

In para.3.1 of Practice Direction 6B, under the heading "Claims under various enactments", **6HJ.35** one particular head of jurisdiction is listed in para.3.1(20). This states, at subpara.(a), that a claim form may be served out of the jurisdiction with the permission of the court under r.6.36 where it is made "under an enactment which allows proceedings to be brought and those proceedings are not covered by any of the other grounds referred to in this paragraph". (Until 31 December 2020, when the Brexit implementation period ended, sub-para.(b) of para.3.1(20) contained a separate head of jurisdiction relating to claims made under Directive 76/308 of the Council of the European Communities dated 15 March 1976. Subparagraph (b) was omitted by CPR Update 107 (March 2019), with effect from 1 January 2021.)

In r.1(1) of Ord.11 of RSC 1965 one subparagraph included, among the actions for which service of a writ out of the jurisdiction was permissible with the leave of the court, actions under two particular, and quite different, statutes (the Carriage by Air Act 1932 and the Nuclear Installations Act 1965). In subsequent years other statutes were listed in r.1(1). When Ord.11 was brought into Pt 6 of the CPR (by SI 2000/221, with effect from 2 May 2000), and r.1(1) emerged as r.6.20, the relevant statutes were not listed in the rule but reference was made (in r.6.20(18)) to claims made "under an enactment specified in the relevant practice direction" and that was the second of the practice directions supplementing Pt 6. In that practice direction ten statutes were listed in para.5.2 (including, for example, several dealing with immigration) and others were added later on (including statutes dealing with financial services and pensions). These were all statutes that contained terms within them which expressly allowed certain proceedings to be brought in England, being proceedings which had a potential for engaging foreign parties. The list was not exhaustive.

That remained the position until the rearrangement and substantial amendment of Pt 6 and the practice directions supplementing that Part accomplished by SI 2008/2178 and CPR Update 47 (with effect from 1 October 2008), when the rules as to service out of the jurisdiction with permission were moved to para.3.1 of Practice Direction 6B. Thereafter, as indicated above, it was provided in para.3.1(20)(a) that service out could be permitted where a claim is made "under an enactment which allows proceedings to be brought", that is to say, brought in England, being proceedings that "are not covered by" any of the other heads of jurisdiction described in para.3.1. No list of statutes allowing such proceedings to be brought is contained in Practice Direction 6B as substituted by CPR Update 47. It seems that it was decided that the maintaining of such a list was impractical and, because it could not pretend to be exhaustive, likely to mislead.

In *Orexim Trading Ltd v Mahavir Port and Terminal Pte Ltd* [2018] EWCA Civ 1660; [2018] 1 W.L.R. 4847, CA, the Court of Appeal examined closely the scope of para.3.1(20)(a) in the light of relevant authorities. The court explained that a claim does not fall within sub-para.(a) simply because it is a claim made "under an enactment which allows proceedings to be brought"; the enactment under which the claim is made must be an enactment that expressly contemplates proceedings against persons who are not within the jurisdiction (at [33] per Lewison LJ). The court held, resolving earlier doubts, that a claim to set aside a transaction entered into at an undervalue under s.423 of the Insolvency Act 1986 falls within this provision (ibid at [47]).

In subpara.(a) of para.3.1(20), "proceedings" is not confined to proceedings in which a claim form has been issued and may include proceedings in the form of an application for pre-action disclosure (*ED&F Man Capital Markets LLP v Obex Securities LLC* [2017] EWHC 2965 (Ch); [2018] 1 W.L.R. 1708 (Catherine Newman QC)).

In *Conductive Inkjet Technology Ltd v Uni-Pixel Displays Inc* [2013] EWHC 2968 (Ch); [2014] 1 All E.R. (Comm) 654 (Roth J), the claimant's claims included claims made under the Patents Act 1977 ss.12 and 82, and it was conceded that those claims came within subpara.(a) of para.3.1(20).

In *General Medical Council v Brauwers* [2010] EWHC 106 (Admin), following upon disciplinary proceedings against a registered visiting medical practitioner (D), a doctor of German nationality and apparently domiciled in Germany, in which D did not participate and in which an interim order of suspension was imposed on D, the GMC (C) commenced proceedings against D in the High Court under the Medical Act 1983 s.41A for an order continuing the interim suspension order. The judge found that the claim fell within this head of jurisdiction.

### Claims for breach of confidence or misuse of private information (para.3.1(21))

In para.3.1 of Practice Direction 6B, under the heading "Claims for breach of confidence or **6HJ.36** misuse of private information", one particular head of jurisdiction is listed in subpara.(21). That provision states that a claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made for breach of confidence or misuse of private information where (a) detriment was suffered, or will be suffered, within the jurisdiction; or (b) detriment which has been, or will be, suffered results from an act committed, or likely to be committed, within the jurisdiction. That head of jurisdiction was inserted in para.3.1 by CPR Update 81 (August 2015) with effect from 1 October 2015, for the purpose of making, for the first time, express provision for service out of the jurisdiction with the court's permission where a claim form makes claims for breach of confidence or misuse of private information.

Not long before this subparagraph came into effect, in *Vidal-Hall v Google Inc* [2015] EWCA Civ 311; [2015] 3 W.L.R. 409, CA, the Court of Appeal held, affirming the decision of the judge at first instance, that misuse of private information should be recognised as a tort within para.3.1(9) for the purposes of service out the jurisdiction, and not classified for such purposes as a claim for breach of confidence. (Permission to appeal to the Supreme Court was granted in this case on 23 July 2015; [2015] 1 W.L.R. 4934, SC but the appeal was subsequently withdrawn.) The Court of Appeal also referred to the decision in *Kitechnology BV v Unicor GmbH Plastmaschinen* [1995] F.S.R. 765, CA as binding authority that the claims alleging breach of an equitable obligation of confidence, were not claims in tort within para.3.1(9). Paragraph 3.1(21), insofar as it applies to claims for breach of confidence, is designed to rectify that anomaly.

# NOTES ON RULES OF JURISDICTION IN JUDGMENTS REGULATION (RECAST)

## A.   Introduction

These notes on Ch.II (Jurisdiction) of the Judgments Regulation (recast) are retained for the **6JRx.1** purposes of the transitional and saving provisions for claims issued before completion of the UK's withdrawal from the EU on 31 December 2020 ("IP completion day"), in which the provisions of the Judgments Regulation (recast) and the Brussels and Lugano Conventions continue to apply: see paras 6.30.1, 6.33.1 and 6.33.9 above. They are not relevant to claims issued after IP completion day.

The notes are presented under the following six headings (A to F):

A.   Introduction (para.6JRx.1)
B.   Basic jurisdiction: Person to be sued in Member State where domiciled (para.6JRx.10)
C.   Special jurisdiction: Person may be sued in another Member State (para.6JRx.13)
D.   Exclusive jurisdiction: Jurisdiction regardless of the domicile of the parties (para.6JRx.29)
E.   Prorogation of jurisdiction (para.6JRx.34)
F.   Priority of jurisdiction—lis pendens and related actions (para.6JRx.40)

The transitional provisions relating to CPR r.6.33(2) provide for the service of claim forms on defendants out of the jurisdiction (that is to say, out of the UK) without the permission of the court where each claim made against the defendant to be served and included in the claim form is one which the court has power to determine under the Judgments Regulation (recast), and the claim form was issued before IP completion day. In that circumstance the jurisdiction of the English court is not based on service of the claim form on the defendant within the jurisdiction, or on the extended jurisdiction rules provided by CPR r.6.36, but on the "rules of jurisdiction" in this Regulation. The Regulation applies to all proceedings commenced on or after 10 January 2015 (and before IP completion day). For the provenance of the Regulation and its relationship with the 2007 Lugano Convention and the provenance of that Convention, see Vol.2 para.5-1.

There is no equivalent transitional and saving provision for r.6.33(1) where the proceedings were commenced (but not served) before IP completion day and the court's jurisdiction is based on the Brussels or Lugano Conventions, despite those Conventions continuing to apply to proceedings commenced before IP completion day (see paras 6.30.1 and 6.33.9 above). It may be, therefore, that an application for permission to serve out is needed in those circumstances.

Where the rules of jurisdiction under the Judgments Regulation apply, they preclude a common law analysis of which forum is the most appropriate and convenient to deal with a particular case and to that extent impose a more rigid regime (*Airbus Industrie GIE v Patel* [1999] 1 A.C. 119, HL).

In the notes which follow, the rules of jurisdiction in Chapter II of the Judgments Regulation (recast), starting with the general (or basic) rule and following with the exceptions and variations thereof, are briefly explained and the relevant authorities summarised.

The authorities referred to in the notes include those relevant to articles on the rules of jurisdiction as they stood (with different numbering) in Council Regulation (EC) No.44/2001 (sometimes referred to as "the Brussels I Regulation") which preceded the Judgments Regulation (recast), and those as they stood (again with different numbering) in the Convention which preceded that Regulation (the 1968 Convention, sometimes referred to as "the Brussels Convention").

Subject to exceptions (some of which are important) the rules of jurisdiction enacted in Title II in the 2007 Lugano Convention are in the same terms as those in Chapter II of the Judgments Regulation (recast). Summaries on authorities on articles in Title II are included in the notes which follow and an effort has been made to relate them to the comparable articles in Chapter II of the Judgments Regulation (recast).

Throughout, in summaries of authorities preceding the coming into effect of the Judgments Regulation (recast) and therefore emerging in the context of Regulations and Conventions which had different numbering systems, an effort has been made to relate them to the comparable articles as numbered in the recast.

Detailed commentaries on the rules of jurisdiction are given in the leading textbook, Dicey, Morris and Collins, *The Conflict of Laws*, 15th edn (London: Sweet & Maxwell, 2016), and in major monographs, A. Briggs and P. Rees, *Civil Jurisdiction and Judgments*, 6th edn (London: Informa Finance, 2015).

### 1.   Interpretation and definitions

To the extent that the Judgments Regulation continues to apply after 31 December 2020 (IP **6JRx.2** completion day), it is "retained EU law" under s.3 of the European Union (Withdrawal) Act 2018. Section 6 of that Act sets out rules for how the UK courts are to interpret retained EU law after IP completion day. Essentially, decisions made by the Court of Justice of the European Union (CJEU) before IP completion day are binding on UK courts, subject to exceptions for certain courts including the Supreme Court and Court of Appeal (all of which must apply the same test as the Supreme Court would apply in deciding whether to depart from the case law of the Supreme Court). Decisions made by the CJEU after that date are not binding but UK courts may have regard to them so far as relevant.

#### (a)   Interpretation

The jurisdiction of the CJEU to give rulings on the interpretation of the Judgments Regulation **6JRx.3** is derived from Art.267 of the Treaty on the Functioning of the European Union. The CJEU has

CPR 6

no comparable jurisdiction to give rulings on the interpretation of the 2007 Lugano Convention; however, Protocol No.2 to that Convention states that any court applying and interpreting its provisions "shall pay due account" to principles laid down by the CJEU in rulings interpreting corresponding provisions in the Judgments Regulation (recast) and its predecessors.

Any question of the meaning or effect of any provisions in the Judgments Regulation (recast) shall, if not referred to the CJEU, be determined in accordance with the principles laid down by and any relevant decision of that court. Judicial notice shall be taken of, or expression of opinion by, the CJEU on any such question. Reports of official commentators may be considered in ascertaining the meaning or effect of any provision and shall be given such weight as is appropriate in the circumstances.

The jurisprudence of the CJEU distinguishes between those concepts in the Brussels Convention and its successor Conventions and Regulations which have an autonomous or independent meaning, irrespective of their content in the law of any particular national system, and those which require the national court to give content to the Convention concept in accordance with its domestic law (*Canada Trust Co v Stolzenberg* [2002] 1 A.C. 1, HL). On the need for homogeneity of interpretation of particular concepts, see *R. v Secretary of State for the Home Department, Ex p. Adan* [2001] 2 A.C. 477, HL; *Martin Peters Bauunternehmung GmbH v Zuid Nederlandse Aannemers Vereniging* (C34/82) EU:C:1983:87; [1984] 2 C.M.L.R. 605, ECJ.

### (b) Definitions

**6JRx.4**     For the purposes of the Judgments Regulation (recast) various words and phrases are defined in art.2. With one exception none of the definitions offered therein is relevant to the interpretation of the rules of jurisdiction in Chapter II. The exception is the definition of "judgment". Where it appears that word means any judgment given by a court or tribunal of a Member State, "whatever the judgment may be called", including "decree, order, decision or writ of execution", as well as a decision on the determination of costs or expenses by an officer of the court (art.2(a)). The 2007 Lugano Convention does not contain a provision equivalent to art.2, but "judgment" is defined (in comparable terms) in art.32 thereof.

Article 3 extends the meaning of "court" to particular enforcement authorities in Hungary and Sweden.

### 2. Scope and exclusions

**6JRx.5**     Article 1(1) of the Judgments Regulation (recast) states that it applies "in civil and commercial matters whatever the nature of the court or tribunal", but "shall not extend", in particular to revenue, customs or administrative matters or to the liability of the State for acts or omissions in the exercise of State authority (*acta iure imperii*) (see para.6.37.24 above). And the Regulation "shall not apply" to the matters listed in art.1(2) (ibid), notably arbitration (see para.6JRx.7 below). (In the 2007 Lugano Convention art.1(1) and art.1(2) are to similar effect, though liability for acts of State or omissions is not specifically excluded (ibid para.5-392+ (on White Book on Westlaw UK or the Civil Procedure CD)).) For the purposes of the Regulation, "civil and commercial matters" has a generic Regulation and Convention meaning (*Grovit v De Nederlandsche Bank NV* [2007] EWCA Civ 953; [2008] 1 W.L.R. 51, CA). It has been held to cover, among other things, forfeiture proceedings in relation to unauthorised use of trademarks and false trade descriptions (*R. v Harrow Crown Court, Ex p. UNIC Centre SARL* [2000] 1 W.L.R. 2112). The concept of "civil and commercial matters" was examined and explained by the ECJ in *Revenue and Customs Commissioners v Sunico ApS* (C-49/12) EU:C:2013:545; [2014] Q.B. 391, ECJ, where the ruling was that it covered an action whereby a public authority of one Member State (UK) claimed, as against natural and legal persons resident in another Member State (Denmark), damages for loss caused by a tortious conspiracy to commit VAT fraud in the first Member State. In *Hellenic Republic v Kuhn* (C-308/17) EU:C:2018:911; [2019] 4 W.L.R. 49, the Claimant acquired bonds issued by the Greek State. Greece passed national legislation as a result of the Greek financial crisis the effect of which was that the terms under which the bonds were held were changed and the Claimant made a considerable loss when the bonds were sold. The Claimant sued the Greek State. The CJEU held that such a claim did not fall within the concept of "civil and commercial matters". See also *Pula Parking d.o.o. v Tederahn* (C-551/15) EU:C:2017:193; [2017] I.L.Pr. 15, ECJ. In *LG v Rina SpA* (C-641/18) EU:C:2020:349, the CJEU held that a damages claim against Italian companies engaged in the classification and certification of ships on behalf of, and under delegation from, a third state (Panama) was a "civil and commercial matter", provided that the activities were not exercised under public powers (which was a matter for the national court to determine).

The Judgments Regulation applies "whatever the nature of the court or tribunal". The limits of that broad concept were examined by the ECJ in *Pula Parking doo v Tederhan* (C-551/15), op cit, where the ruling was that notaries, acting within the framework of powers conferred on them by national law in enforcement proceedings based on an "authentic document", did not fall within the concept of "court". Throughout the Member States legislation requiring parties in dispute to engage in alternative dispute resolution procedures offered by authorities not obviously properly described as courts or tribunals before having resort (or being permitted to have resort) to judicial procedures is not uncommon. Questions may arise as to whether proceedings before such authorities and decisions made by them are proceedings and decisions within the scope of the Judgments Regulation. Neither the Judgments Regulation (recast) nor the Lugano II Convention contains a positive definition of what constitutes a "court" but the concept of "court" in the Convention differs

from that in the Regulation as art.62 of the Convention states that the expression "court" is to include any authorities designated by a State bound by the Convention as having jurisdiction in matters falling within the scope of the Convention. In *Schlomp v Landratsamt Schwabisch Hall* (C-467/16) EU:C:2017:993; [2018] C.E.C. 793 it was held that the *lis pendens* provisions in the Convention must be interpreted as meaning that the date on which a mandatory arbitration procedure was lodged before an arbitration authority under Swiss law is the date on which a "court" is deemed to be seised.

The authorities on the correct approach for the purpose of characterising a claim so as to determine whether it falls within or without the scope of the Regulation as provided by art.1.1 and art.1.2 were examined by the Court of Appeal in *Sabbagh v Khoury* [2017] EWCA Civ 1120, [139]–[146].

Of the exclusions referred to in art.1.1, as a practical matter the most important are proceedings in bankruptcy (art.1.2(b)) (see para.6JRx.6 below) and arbitration (art.1.2(d)) (see para.6JRx.7 below). Other exclusions fall for examination from time to time. For example, in *Sabbagh v Khoury*, op cit, the trial judge rejected objections to jurisdiction based on the claim being a matter of "succession" in the context of art.1.2(a) of the Brussels I Regulation (see now art.1.2(f)) and the Court of Appeal upheld that ruling (paras 147 to 162). In doing so the Court noted that there is no European authority which has attempted to define the content of the word "succession" and explained that the UK has opted out of the European Succession Regulation (No.650/2012) (Brussels IV). In *Iliev v Ilieva* (C-67/17) EU:C:2017:459; [2018] I.L.Pr. 10, where the CJEU considered the scope of the exclusion of "rights in property arising out of a matrimonial relationship" contained in art.1.2(a).

In *Cook v Virgin Media Ltd* [2015] EWCA Civ 1287; [2016] 1 W.L.R. 1672, a case in which a claimant domiciled in Scotland brought a claim in an English court against a company situated in England for damages for personal injuries arising from an accident in Scotland, the Court of Appeal explained (referring to a leading text) that the Regulation does not have any role where (as in the instant case) the matter "is demonstrably wholly internal to the United Kingdom", so that the only jurisdictional question which may arise is as to the part of or a place within the UK which has jurisdiction ([25]).

### (a)  Exclusion of proceedings in bankruptcy etc (art.1.2(b))

Article 1(2)(b) of the Judgments Regulation (recast) states that the Regulation shall not apply to **6JRx.6** "bankruptcy, proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings". In *Gourdain v Nadler* (C-133/78) EU:C:1979:49; [1979] 3 C.M.L.R. 180, the ECJ explained that insolvency proceedings were excluded from the 1968 Convention "because of the special nature of certain matters and of the profound differences between the laws of the Contracting States". At that time an important factor was also that work was proceeding on a draft of a convention on bankruptcy and similar proceedings to provide for the allocation of jurisdiction in such proceedings among Member States. In the event a Bankruptcy Convention never came into effect, but the distribution of jurisdiction in insolvency matters was achieved by Council Regulation (EC) No.1346/2000 of 29 May 2000 on insolvency proceedings (the Insolvency Regulation).

The principal rule of jurisdiction in the Insolvency Regulation states that the courts of the Member State within the territory of which "the centre of a debtor's main interests" is situated shall have jurisdiction to open insolvency proceedings (art.3.1). The rules of jurisdiction in that Regulation were considered in *Comité d'enterprise de Nortel Networks SA v Rogeau* (C-469/13) [2015] 3 W.L.R. 1275, ECJ, where the particular question arising on the reference concerned the division of jurisdiction between the courts of the state in which the main insolvency proceedings had been opened under art.3(1) of that Regulation and the courts of the state in which secondary proceedings had been opened under art.3(2), and the allocation of the insolvent debtor's assets between the two sets of proceedings.

The ECJ has held that the Insolvency Regulation and the Judgments Regulation (recast) must be interpreted in such a way as to void any overlap between the rules of law that those instruments lay down and any "legal vacuum" (*Nickel & Goeldner Spedition GmbH v "Kintra" UAB* (C-157/13) EU:C:2014:2145; [2015] Q.B. 96, ECJ). Accordingly, actions excluded, under art.1(2)(b) of the Judgments Regulation (recast), from the scope of that Regulation fall within the scope of the Insolvency Regulation; and actions which fall outside the scope of art.3(1) of the Insolvency Regulation fall within the scope of the Judgments Regulation (recast). In *Nickel & Goeldner Spedition GmbH v "Kintra" UAB* (C-157/13) EU:C:2014:2145; [2015] I.L.Pr. 1, the ECJ ruled that art.1.1 of the Judgments Regulation must be interpreted as meaning that an action for the payment of a debt based on the provision of carriage services taken by an insolvent administrator of an insolvent company in the course of insolvency proceedings opened in one Member State and taken against a service recipient established in another Member State comes under the concept of "civil and commercial matters" within the meaning of that provision. In *NK v BNP Paribas Fortis NV* (C-535/17) EU:C:2019:96; [2019] I.L.Pr. 10, the CJEU ruled that a claim for damages arising from a wrongful act by a third party brought by the liquidator and the proceeds of which, if successful, accrued to the general body of creditors was a "civil and commercial matter" falling within the scope of the Judgments Regulation. In *Valach v Waldviertler Sparkasse Bank AG* (C-649/16) EU:C:2017:986; [2018] C.E.C. 1027 the ruling was that the bankruptcy exclusion encompasses an action for liability in tort brought against the members of a committee of creditors making allegations concerning their conduct in voting on a restructuring plan in insolvency proceedings. The English courts have held that the bankruptcy exclusion excludes nothing more, and nothing less, than what was included

within the scope of the Insolvency Regulation (*Re Rodenstock GmbH* [2011] EWHC 1104 (Ch); [2011] Bus. L.R. 1245 (Briggs J); *Fondazione Enasario v Lehman Brothers Finance SA* [2014] EWHC 34 (Ch); [2014] 2 B.C.L.C. 662 (David Richards J)).

In addition to the authorities referred to above the scope of this exception has been considered by English courts and the ECJ in a number of cases, most of them concerned with the recognition and enforcement of judgments; see *Re Hayward* [1997] Ch. 45, *UBS AG v Omni Holding AG* [2000] 1 W.L.R. 916, *Ashurst v Pollard* [2001] Ch. 595, CA, *German Graphics Graphische Maschinen GmbH v van der Schee* (C-292/08) EU:C:2009:544; [2010] C.E.C. 499, *Byers v Yacht Bull Corp* [2010] EWHC 133 (Ch); [2010] I.L. Pr. 24 (Sir Andrew Morritt C) at [16] et seq., *Polymer Vision R&D Ltd v Van Dorren* [2011] EWHC 2951 (Comm); [2012] I.L.Pr. 14 at [46] et seq, *F-Tex SIA v Lietuvos-Anglijos UAB Jadecloud-Vilma* (C-213/10) [2012] I.L.Pr. 24, *ING Bank NV v Banco Santander SA* [2020] EWHC 3561 (Comm) (Cockerill J) at [140] et seq.

### (b)   Exclusion of arbitration (art.1.2(d))

**6JRx.7**   The Judgments Regulation (recast) shall apply in civil and commercial "matters" whatever the nature of the court or tribunal (art.4(1)), but "shall not apply ... to arbitration" (art.1(2)(d)). When the 1968 Convention was drafted the "arbitration exclusion" (as it may be called) was inserted (together with other exclusions) because arbitration was then, and has remained, the subject of other international conventions (notably the New York (United Nations) Convention on the Recognition and Enforcement of Foreign Arbitral Awards (1958)). In the 1968 Convention the arbitration exclusion stood in art.1(4).

Where a civil or commercial matter falls within the rules of jurisdiction in Chapter II of the Judgments Regulation (recast) the service of originating process out of the jurisdiction initiating that matter in an English court is regulated by the rules of court contained in CPR r.6.33. If the matter comes within the arbitration exclusion it does not fall within those rules of jurisdiction and such service is not regulated by r.6.33. That is one of the principal effects of the arbitration exclusion.

Where a claimant issues a Pt 8 arbitration claim form seeking a court order under the Arbitration Act 1996 s.18 appointing an arbitrator and wishes to serve that claim form on a defendant in another Member State, the claimant may properly seek permission to do so under CPR r.62.16, and should not attempt to so serve it without permission under CPR r.6.33 (see Vol.2 para.2E-35).

It does not take much imagination to realise that there are inherent difficulties in determining what may fall within the arbitration exclusion and what may not. In the explanation of the effects of the exclusion given in the Schlosser Report (the authoritative report on the Convention on the accession to the 1968 Convention of the UK signed on 9 October 1978) it was stated that the 1968 Convention does not cover court proceedings which are "ancillary to arbitration", for example, the appointment or dismissal of arbitrators, the fixing of the place of arbitration, an extension of the time limit for making awards, or a ruling by the court on a preliminary point of law (OJ 1979, C.59 at p.93 (para.64)). In the Judgments Regulation (recast) recital (12) states (in part) that the Regulation should not apply to any action or ancillary proceedings relating to, in particular, the establishment of an arbitral tribunal, the powers of arbitrators, the conduct of an arbitration procedure or any other aspects of such a procedure, nor to any action or judgment concerning the annulment, review, appeal, recognition or enforcement of an arbitral award (see further below).

In *Marc Rich & Co AG v Societa Italiana Impianti PA* (C-190/89) EU:C:1991:319; [1992] 1 Lloyd's Rep. 342, ECJ (the *Atlantic Emperor* case), following a reference from the Court of Appeal, the European Court of Justice ruled (1) that the appointment of an arbitrator by a national court is a measure adopted by the state as part of the process of setting arbitration proceedings in motion; it therefore comes within the sphere of arbitration and was thus covered by the arbitration exclusion contained, and (2) if, "by virtue of the subject-matter of the dispute" (such as the appointment of an arbitrator) a dispute falls outside the Regulation, the existence of a preliminary issue which the court must resolve in order to determine the dispute (e.g. whether there was no agreement to arbitrate) cannot, whatever that issue might be, justify application of the Regulation.

In *West Tankers Inc v Allianz SpA* (C-185/07) EU:C:2009:69; [2009] 1 A.C. 1138, ECJ (the *Front Comor* case), the English court had ruled on the validity of an arbitration clause, granted a declaration as to the clause's validity, and granted an anti-suit injunction restraining proceedings in an Italian court. On reference by the House of Lords, the ECJ ruled that, if, because of "the subject-matter of the dispute", that is, the nature of the rights to be protected in proceedings, such as a claim for damages, those proceedings come within the scope of the Regulation, a preliminary issue concerning the applicability of an arbitration agreement, including in particular its validity, also comes within its scope and does not fall within the arbitration exclusion. In the circumstances of this case, the granting of the anti-suit injunction was incompatible with the Regulation. The Italian court as the court which would "normally" have jurisdiction over the claim for damages, as it was the court for "the place where the harmful event occurred", must be left to decide on its own jurisdiction under the Regulation, including the "incidental question" of whether that jurisdiction was ousted by a binding arbitration agreement. The effect of the ECJ's ruling was to restrict the jurisdiction of the English court (previously regarded as clear under English law) to grant an anti-suit injunction to enforce a London arbitration clause, notwithstanding that a defendant to the injunction application had commenced proceedings in another Member State. Such an injunction is incompatible if it interferes with the court of a Member State deciding on its own jurisdiction under the Judgments Regulation.

In *Claxton Engineering Services Ltd v TXM Olaj-Es Gazkutato Kft* [2011] EWHC 345 (Comm); [2011] 1 Lloyd's Rep. 510 (Hamblen J), it was explained that the anti-suit injunction granted in the

*Front Comor* case was found by the ECJ to be incompatible with the Judgments Regulation because it interfered with the court of another Member State's deciding on its own jurisdiction under the Regulation. The judge held that an injunction restraining an arbitration in another Member State (Hungary) was not incompatible because it did not interfere with the court of a Member State deciding on its own jurisdiction; it interfered with an arbitration (albeit foreign arbitration), and arbitration is outside the scope of the Judgments Regulation. The Judgments Regulation governs conflicts of jurisdiction between courts of Member States. Arbitral tribunals are not courts of a State. In the case of *Gazprom OAO* (C-536/13) EU:C:2015:316; [2015] 1 W.L.R. 4937; [2015] 1 Lloyd's Rep. 610, the ECJ ruled that where an arbitral tribunal in one Member State (State A) makes an award prohibiting a party from bringing certain claims before the courts of Member State (State B), the Judgments Regulation does not preclude the courts of State B from recognising and enforcing, or refusing to recognise or enforce, such injunctive arbitral award.

The body of law to the effect that an agreement to the seat of an arbitration is akin to an exclusive jurisdiction clause remains good law and there is nothing in the *Front Comor* case which impacts upon the law as developed in this jurisdiction in relation to anti-suit injunctions which prevents a party to such an agreement from seeking such relief in respect of proceedings in a country which is not a Convention or Member State (*Shashoua v Sharma* [2009] EWHC 957 (Comm); [2009] 2 Lloyd's Rep. 376 (Gloster J).

The reasoning in the *Atlantic Emperor* case and in the *Front Comor* case put a premium on the identification of "the subject-matter of the dispute" (i.e. the nature of the rights to be protected in proceedings). It is the subject-matter of the proceedings which dictates whether particular proceedings are within or without the scope of the Regulation.

The *Atlantic Emperor* case and the *Front Comor* case were reviewed and their effects explained by the Court of Appeal in *National Navigation Co v Endesa Generacion SA* [2009] EWCA Civ 1397; [2010] 1 Lloyd's Rep. 193, CA; [2010] I.L. Pr. 10, CA (the *Wadir Sudr* case), a case in which ship owners (C) commenced an arbitration in London against Spanish consignees (D) of a cargo and also commenced proceedings in an English court against D seeking a declaration that an arbitration clause in the voyage charter had been incorporated in the bill lading. In proceedings brought by D in Spain (commenced shortly before C's English proceedings), in which D claimed damages for late delivery, the Spanish court, in dealing with the C's application for a stay of those proceedings, held that under Spanish law the arbitration clause had not been incorporated. The main question arising in the Court of Appeal was whether, under (what is now) art.36(1) (see above), the Spanish judgment should be recognised and enforced in the English proceedings and could be relied on by D as creating an issue estoppel so as to prevent the English court deciding the incorporation point differently. C's submission that the Spanish judgment fell within the arbitration exclusion and therefore should not be recognised by the English court was rejected. The Court of Appeal explained (1) that the essential subject matter of the claim brought by D in the Spanish court was their claim for damages for breach of the bill of lading, a claim which clearly came within the Judgments Regulation, (2) that the essential subject matter of a dispute is not determined by the nature of a preliminary issue arising therein, even if the nature of that issue differs from that of the principal dispute, (3) that therefore some issues which, viewed in isolation, would fall outside the Regulation may, if they arise as preliminary issues, have to be categorised as within the Regulation and vice versa, (4) that, accordingly, the Spanish court's ruling on the preliminary issue raised by C though not a judgment on the merits was a judgment which must be recognised and enforced under Chapter III of the Regulation.

In *Nori Holdings Ltd v Bank Otkritie Financial Corp* [2018] EWHC 1343 (Comm); [2018] 2 All E.R. (Comm) 1009 (Males J), the claimant companies (incorporated in Cyprus, Russia and BVI) (C) applied for final anti-suit injunctions to restrain a Russian bank (D) from pursuing court proceedings in Russia and Cyprus. C alleged that those proceedings were brought in breach of an arbitration clause having effect in relation to disputes arising under loan agreements. C submitted that the court had jurisdiction to grant an injunction, not only in relation to the Russian proceedings (which was not contested), but also in relation to the Cypriot proceedings (which was contested), because (so it was argued), since the coming into effect of the Judgments Regulation (recast), the decision in the *West Tankers* case no longer remained good law. The judge rejected the latter submission, and in doing so examined in detail the extent to which, if at all, the grounds upon which the decision was based "have been undermined by subsequent developments" ([70]–[99]). The judge concluded that there is nothing in the Recast Regulation to cast doubt on the continuing validity of the decision which remained an authoritative statement of EU law.

### 3. Burden and standard of proof

Where in interlocutory proceedings it is necessary to determine whether, according to the rules **6JRx.8** of jurisdiction in the Judgments Regulation, the English court has power to hear and determine the claimant's claim, for example, on an application by a defendant to set aside service of the claim form made out of the jurisdiction without the court's permission under r.6.33, it is for the claimant to prove that the court has such jurisdiction and not for the defendant to prove that it does not. The standard of proof is that of a good arguable case (*Canada Trust v Stolzenberg (No.2)* [1998] 1 W.L.R. 547, CA; *Konkola Copper Mines Plc v Caromin* [2006] EWCA Civ 5; [2006] 1 Lloyd's Rep. 410, CA).

In this context the phrase "good arguable case" connotes that one side has a better argument than the other. (The phrase "much better argument" was used in *Canada Trust v Stolzenberg (No.2)*, op cit, but the adjunct "much" has since been laid to rest: see *Brownlie v Four Seasons Holdings Inc*

[2017] UKSC 80; [2018] 1 W.L.R. 192 (at [7] per Lord Sumption) and *Kaefer Aislamientos SA de CV v AMS Mexico SA de CV* [2019] EWCA Civ 10; [2019] 1 W.L.R. 3514.) Any of the relevant authorities are cases in which the claimant's contention was that the English court had jurisdiction under art.25.1 because the parties (regardless of their domiciles) had agreed in a choice of court agreement that the English court should have jurisdiction (see para.6JRx.36 below). Leading and illustrative authorities are: *Bols Distilleries BV v Superior Yacht Services Ltd* [2006] UKPC 45; [2007] 1 W.L.R. 12, PC; *WPP Holdings Italy Srl v Benatti* [2007] EWCA Civ 263; [2007] 1 W.L.R. 2316, CA; *Football Dataco Ltd v Sportradar GmbH* [2010] EWHC 2911 (Ch); [2011] F.S.R 263 (Floyd J); *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2011] 4 All E.R. 1027, PC; *DSG International Sourcing Ltd v Universal Media Corp (Slovakia) SRO* [2011] EWHC 1116 (Comm); [2011] I.L. Pr. 33 (Steel J); *Global 5000 Ltd v Wadhawan* [2012] EWCA Civ 13; [2012] Lloyd's Rep. 239, CA; *Antonio Gramsci Shipping Corp v Recoletos Ltd* [2012] EWHC 1887 (Comm); [2012] I.L. Pr. 36 (Teare J).

### 4.  Provisional measures jurisdiction

**6JRx.9**    Section 10 of Chapter II of the Judgments Regulation (recast) consist of just one article, art.35. That provision states that application may be made to the courts of a Member State for "such provisional, including protective, measures" as may be available under the law of that Member State, "even if the courts of another Member State have jurisdiction as to the substance of the matter". In the 1968 Convention (as amended), the provision stood as art.24. In the original Judgments Regulation it stood as art.31, and it stands as art.31 in the 2007 Lugano Convention.

Subject to an amendment first appearing when this article was re-enacted as art.35 in the Judgments Regulation (recast), throughout the terms of the article have remained as they appeared in art.24 of the 1968 Convention. That amendment consisted of the removal of the words "under this Convention" from before the words "even if". (To that extent art.35 differs from art.31 in the 2007 Lugano Convention.)

By art.2(a) of the Judgments Regulation (recast), for the purposes of Chapter III (Recognition and Enforcement), "judgment" is defined as including provisional, including protective, measures ordered by a court or tribunal "which by virtue of this Regulation" has jurisdiction as to the substance of the matter.

In English law "provisional measures" and "protective measures" are not terms of art. However, it is well understood that, where proceedings have been commenced in an English court for a claim which the court has jurisdiction to hear and determine the court has power to grant interim, interlocutory and post-trial remedies ancillary to the trial of the substantive issues in the claim. (And there are some remedies which may be granted even before the proceedings have been formally commenced.) The clearest and most obvious example is the court's power to grant an interim remedy in the form of an order for a freezing injunction.

In the Judgments Regulation (recast), Recital (25) states that "the notion of provisional, including protective, measures" should include, for example, protective orders aimed at obtaining information or preserving evidence as referred to in Arts 6 and 7 of Directive 2004/48/EC of the European Parliament and of the Council of 29 April 2004 on the enforcement of intellectual property rights. However, it should not include measures which are not of a protective nature, such as measures ordering the hearing of a witness. But this should be without prejudice to the application of Council Regulation (EC) No.1206/2001 of 28 May 2001 on cooperation between the courts of the Member States in the taking of evidence in civil or commercial matters.

It is one thing for the English court to have power to grant remedies which may be described as "provisional" or "protective" where the court has jurisdiction to hear and determine the substantive claim, but quite another for it to have power to do so where it is not the English court but a court of another Member State which has jurisdiction to hear and determine the substantive claim under the rule of jurisdiction governing that claim. The rule of jurisdiction stated in art.35 gives the English court such power. It was incorporated in English law by the Civil Jurisdiction and Judgments Act 1982 ss.24 and 25.

If it is to be within art.35 a measure must be of a provisional nature and there must be some territorial connection between the relief sought and the territorial jurisdiction of the state of the courts to which the application is made (*Van Uden BV v KG Deco-line* EU:C:1998:543; [1999] Q.B. 1225, ECJ; *Belletti v Morici* [2009] EWHC 2316 (Comm); [2009] I.L.Pr. 57 (Flaux J)).

An English court may nevertheless grant worldwide freezing orders against a defendant who is resident and domiciled in England, notwithstanding that the courts of another Contracting State have substantive jurisdiction, and that those courts do not have power to give such relief (*Crédit Suisse Trust SA v Cuoghi* [1998] Q.B. 818, CA).

The rule that, with the permission of the court, a claim form may be served out of the jurisdiction on a person who is a necessary or a proper party is limited to cases where the substantive dispute is before the English courts; that rule cannot be relied on in a case where the substantive dispute is before a foreign court and the jurisdiction of the English court against the principal defendant is only engaged by virtue of art.35 and s.25 of the 1982 (*Belletti v Morici* op cit).

In *Cyprus Popular Bank v Vgenopoulos* [2018] EWCA Civ 1; [2018] Q.B. 886, the meaning of "measures of enforcement" and "protective measures" in the context of Chapter III (Recognition and Enforcement) of Council Regulation (EC) No.44/2001 (arts 32 to 56) fell for consideration by the Court of Appeal. The articles in that Chapter differ significantly to those in Chapter III of the Judgments Regulation (recast) (arts 36 to 57). The former Regulation provided for a "declaration of enforceability" procedure and it was specifically stated that such declaration carried within it

"the power to proceed to any protective measures" (art.47(2)) and that, pending any appeal, no "measures of enforcement" may be taken other than "protective measures" (art.47(3)). Although the issues arising in the *Cyprus Popular Bank* case do not arise under Chapter III of the Judgments Regulation (recast) (as the declaration of enforceability procedure is not re-enacted therein), and are different to any likely to arise in the application of art.35, nevertheless the discussion in the Court's judgment of freezing orders as "protective measures" is instructive generally and should be noted in this context.

# B.   General Jurisdiction: Person to be Sued in Member State Where Domiciled

### 1.   General provisions

In Chapter II (Jurisdiction) of the Judgments Regulation (recast) the articles in Section 1 (General provisions) (arts 4 to 6), include provisions stating what might be called the "general" or "basic" rule of jurisdiction. **6JRx.10**

In the 1968 Convention (amended) the general provisions as to jurisdiction were contained in Section 1 of Title II (arts 2 to 4), and in the original Judgments Regulation they were in Section 1 of Chapter II (arts 2 to 4). In the revised Lugano Convention (2007) they are in Section 1 of Title II (arts 2 to 4).

In the years since their first appearance in the original Brussels Convention, the terms of the general provisions have not changed materially.

### 2.   Connection between person sued and territory of Member State

Generally, in legal theory the jurisdiction of a court depends on the consent of the parties, ideally and most simply demonstrated by the claimant choosing to commence proceedings in the court and the defendant voluntarily engaging in them. Where the defendant does not voluntarily engage some substantial link between the case and the territory of the forum needs to be apparent. That link may take the form of a real connection between the defendant and the territory of the forum, but what is that link to be? Possibilities are presence, residence, nationality or domicile. In the original 1968 Convention as the basis for general jurisdiction the link chosen was domicile, in particular domicile as understood in the law of the original six Contracting States (see further para.6JRx.12 below). **6JRx.11**

Thus art.4 states that, "subject to this Regulation", persons domiciled in a Member State "shall, whatever their nationality, be sued in the courts of that Member State" (art.4(1)). Persons who are not nationals of the Member State in which they are domiciled "shall be governed" by the rules of jurisdiction applicable to nationals of that Member State (art.4(2)). Recital (15) of the Judgments Regulation (recast) explains that jurisdiction is generally based on the defendant's domicile, and should always be available on this ground save in a few well-defined situations in which "the subject-matter of the dispute" or "the autonomy of the parties" warrants a different connecting factor.

It is to be noted that this general rule of jurisdiction applies where a person domiciled in a Member State is "sued". Where a person domiciled in a Member State is properly before the English court an application by his opponent for an injunction ancillary and incidental to those proceedings is not a separate claim for which that person is "sued" requiring its own basis of jurisdiction (*Masri v Consolidated Contractors International (UK) Ltd (No.3)* [2008] EWCA Civ 625; [2009] Q.B. 503, CA). In *National Justice Compania Naviera SA v Prudential Assurance Co Ltd (No.2)* [2000] 1 W.L.R. 603, CA, after the Court of Appeal had ordered that judgment be given for the defendant (D) in an action brought against it by a company (C) registered in Panama and that it be awarded its costs of the action and of the appeal, D made an application for a non-party costs order against a person (X) domiciled, not in the UK, but in another Contracting State (Greece), alleging that X was the alter ego of C. The court held that the English court had jurisdiction to make the order sought by D and that D were not obliged to pursue C in the courts of his domicile.

In *Universal General Insurance Co (UGIC) v Group Josi Reinsurance Co SA* (C-412/98) EU:C:2000:399; [2001] Q.B. 68, ECJ, it was explained that, where a claimant (C) not domiciled in a Member State (or Contracting State) sues a defendant (D) domiciled in a Member State but does so by bringing proceedings against D in the courts of a Member State other than that in which D is domiciled, the proceedings are subject to the rules of jurisdiction in the Regulation (or Convention). In that case it was held that the application of the jurisdictional rules of the 1968 Convention generally depends on whether the defendant has its seat or domicile in a Contracting State, and it is only in the exceptional cases expressly provided for in the Conventions that the claimant's domicile is material. Accordingly, the Judgments Regulations and the Conventions can in principle apply to a dispute between a defendant domiciled in a Contracting State and a claimant domiciled in a non-Regulation or non-Contracting State.

Where, on the basis of the general rule of jurisdiction, the English court has jurisdiction the claimant is entitled to sue the defendant despite the absence of any factual or legal connection with this jurisdiction. In *Owusu v Jackson* (C-281/02) [2005] Q.B. 801 (ECJ), where the claimant had founded jurisdiction on art.4 on the basis of one of the defendants' domicile in a Member State,

the ECJ ruled that that state could not decline jurisdiction on forum conveniens grounds in favour of the courts of a non-Member State, where the other defendants were not domiciled in a Member State. In *Lungowe v Vedanta Resources Plc* [2019] UKSC 20; [2019] 2 W.L.R. 1051, the Supreme Court, upholding the Court of Appeal, emphasised the mandatory nature of the rule in art.4. Although, like the Court below, the Supreme Court did not exclude the possibility of challenging jurisdiction on the basis that the EU rules of jurisdiction were being used abusively, the cases demonstrated the narrowness of this concept which was limited to situations where an EU principle was invoked collusively to subvert other EU law provisions. The fact that art.4 precluded the application of the doctrine of forum non conveniens could not, of itself, be characterised as an abuse of EU law. See also *PJSC Commercial Bank Privatbank v Kolomoisky* [2019] EWCA Civ 1708; [2020] 2 W.L.R. 993 at [102] et seq, in the context of jurisdiction under the Lugano Convention.

In *Lucasfilm Ltd v Ainsworth* [2009] EWCA Civ 1328; [2010] 3 W.L.R. 333, CA, the Court of Appeal rejected the claimant's submission that the *Owusu* case decided that, for the EU, the courts of the Member State of the defendant's domicile have, and must exercise, "subject-matter" jurisdiction over any claim in any civil or commercial matter brought against a defendant (in this case, a claim to enforce the claimant's US copyrights) unless it is one of the excluded matters provided for in art.1 of the Judgments Regulation. On appeal, the Supreme Court did not deal with the point but expressed the view that a reference to the ECJ might be required to resolve it (*Lucasfilm Ltd v Ainsworth* [2011] UKSC 39; [2012] 1 A.C. 208, SC). In *Kennedy v National Trust for Scotland* [2019] EWCA Civ 648; [2020] Q.B. 63, the Court of Appeal confirmed that the *Owusu* case did not preclude the court staying its proceedings on grounds of forum non conveniens where proceedings were issued in the English court against a party domiciled in Scotland and Scotland was clearly the more appropriate forum.

The significance of the qualification in art.4 of the general rule being "subject to this Regulation" becomes immediately apparent in art.5(1), which states that a person domiciled in a Member State may be sued in the courts of another Member State "only by virtue of the rules set out in Sections 2 to 7" of Chapter II. And art.5(2) states that, in particular, "the rules of national jurisdiction" of which the Member States are to notify the Commission (pursuant to point (a) of art.76(1)) shall not be applicable as against such persons. In the case of the UK, such rules are those which enable jurisdiction to be founded on personal service of originating process on a defendant during his temporary presence in the UK, the presence within the UK of property belonging to the defendant, and the seizure by the claimant of property situated in the UK.

In *Gray v Hurley* [2019] EWCA Civ 2222; [2020] 1 F.L.R. 864, the Court of Appeal referred to the CJEU the question of whether art.4(1) confers a directly enforceable right on persons who are domiciled in an EU Member State, and (if so) whether Member States have an obligation to provide a remedy, including by the grant of an anti-suit injunction, where proceedings are brought against such persons in a non-EU state.

The Judgments Regulation recognises that Member States (or some of them) may be parties to international conventions conferring jurisdiction on their courts in particular circumstances. An example is the Geneva Convention on the Contract for the International Carriage of Goods by Road (CMR Convention). Article 71(1) of the Judgments Regulation states that that Regulation shall not affect any conventions to which the Member States are parties and which, in relation to a particular matter, govern jurisdiction (or the recognition or enforcement of judgments). More precisely, art.71(2)(a) states that in those circumstances the Regulation shall not prevent a court of a Member State from assuming jurisdiction in accordance with a specialised convention, even where the defendant is domiciled in another Member State which is not a party to that convention. The purpose of that exception is to ensure compliance with the rules of jurisdiction laid down by specialised conventions, since it can be assumed that when those rules were enacted account was taken of the specific features of the matters to which they relate. In *Nurnberger Allgemeine Versicherungs AG v Portbridge Transport International BV* (C-148/03) [2005] 1 Lloyd's Rep. 592, ECJ, a case arising in the context of the 1968 Convention (before the original Judgments Regulation came into effect), a German company brought a claim in a German court against a company (D) domiciled in Holland on the basis that the German court had jurisdiction under art.31.(1)(1)(b) of the CMR Convention. D did not enter an appearance but contested the jurisdiction of the German court on the ground that in the circumstances it was required by (what is now) art.28(1) of its own motion to declare that it had no jurisdiction. On a reference to the ECJ for a ruling that court rejected D's submission. The court ruled that, in the circumstances, the German court's jurisdiction must be regarded as "derived from" the 1968 Convention and in verifying of its own motion under art.28(1) whether it had jurisdiction with respect to that Convention, the German court had to take account of the rules of jurisdiction laid down by the CMR convention. In *Nickel & Goeldner Spedition GmbH v "Kintra" UAB* (C-157/13) EU:C:2014:2145; [2015] I.L. Pr. 1, the ECJ ruled that art.71(1) of the Judgments Regulation must be interpreted as meaning that, in a situation where a dispute falls within the scope of both that Regulation and the CMR, a Member State may, in accordance with that article, apply the rules concerning jurisdiction laid down in art.31(1) of the CMR.

### 3. *Domicile*

**6JRx.12**   In the original Brussels Convention, the concept of domicile adopted was that as applied in the laws of the original Contracting States, a concept much more flexible and closer to residence than the concept in English common law. On the accession of the UK to the Community adjustments had to be made to ensure that the English courts determined issues of domicile arising in the context of the rules of jurisdiction in accordance with the continental rather than the common law

concept of that status. Thus ss.41 to 46 of the Civil Jurisdiction and Judgments Act 1982 contain particular rules governing domicile of individuals, corporations and trusts in this context. In relation to both individuals and corporations "domicile" has a different meaning to that borne in other branches of English law, and in the case of individuals, approximates to genuine residence.

Where a question arises as to which law should be applied by the English court for the purposes of determining the domicile of an individual, a corporation, or a trust, that is to say, whether the court's "internal" law, or its rules of private international law, or the law of another Member State, should be applied to the question, the matter is to be resolved in accordance with the provisions of art.62 and art.63. A company or other legal association is domiciled where it has its statutory seat, its central administration, or its principal place of business (art.63 and s.42 of the 1982 Act). (For an explanation of meaning of "central administration", see *Young v Anglo American South Africa Ltd* [2014] EWCA Civ 1130; [2014] I.L.Pr. 40, CA; see also *Ministry of Defence and Support of the Armed Forces for Iran v Faz Aviation* [2007] EWHC 1042 (Comm); [2008] 1 All E.R. (Comm) 372 (Langley J), where held that the defendant company did not have its central administration, or its principal place of business in England.)

In a given case the question of the domicile of a company may have to be determined by the English court not for the purpose here under discussion, that is whether it is domiciled in the UK so that, according to the general rule of jurisdiction stated in art.4(1), it should be sued in an English court, but for other purposes related to the Judgments Regulation. Care has to be taken to ensure that the appropriate definition of domicile is adopted for the purpose in hand.

Although domicile of an individual is defined in terms of "residence", this concept must be construed in accordance with its ordinary meaning and connotes a settled or usual place of abode; this, in turn, requires "some degree of permanence or continuity" (*Bank of Dubai Ltd v Abbas* [1997] I.L. Pr. 308, CA). A very wealthy person with numerous houses and business interests in various parts of the world is not necessarily domiciled within the jurisdiction for the purposes of s.41 of the Civil Jurisdiction and Judgments Act 1982 or the Judgments Regulation because they own two substantial homes in England (*High Tech International AG v Deripaska* [2006] EWHC 3276 (QB); [2007] E.M.L.R. 15; *Cherney v Deripaska* [2007] EWHC 965 (Comm); [2007] 2 All E.R. (Comm) 785; [2007] I.L. Pr. 49). For guidance as to the factors to be considered in determining domicile under the recast Judgments Regulation, see *Eng King Ltd v Petrillo* [2016] EWHC 3801 (Comm); (Judge Waksman QC) and also *Bestolov v Povarenkin* [2017] EWHC 1968 (Comm) (Simon Bryan QC). In a given case, an important factor in the determination of the question whether the defendant (D) is domiciled in England may be the issue whether he ceased to be resident in the country at a particular time. In that determination any intention of D to stop residing within the jurisdiction is relevant but not determinative. To cease to reside in England, D has to have made a distinct break with England in the sense of there being an alteration in the pattern of his life (*Shulman v Kolomoisky* [2018] EWHC 160 (Ch) (Barling J) at [14]–[29]).

Where the court is unable to identify the defendant's place of domicile and has no firm evidence that the defendant is domiciled outside the EU, art.4 should be read as extending to the defendant's last known domicile: see *Gray v Hurley* [2019] EWHC 1636 (QB); [2020] 1 F.L.R. 182 (Lavender J).

## C.  Special Jurisdiction: Person May be Sued in Another Member State

### 1.  *Special jurisdiction—general (arts 7 and 8)*

In Ch.II (Jurisdiction) of the Judgments Regulation (recast) the articles in s.2 (arts 7 to 9) **6JRx.13** contain rules for what is described as "special jurisdiction". In the 1968 Convention (amended) these articles were contained in s.2 of Title II (arts 5 to 6a), and in the original Judgments Regulation they were in s.2 of Ch.II (arts 5 to 7). In the revised Lugano Convention (2007) they are in s.2 of Title II (arts 5 to 7).

In cases falling with the "special jurisdiction", a defendant may be sued in the courts of Member State other than the Member State in which the defendant is domiciled. Whereas "general" or "basic" jurisdiction is based on the connection between the territory of the forum and the defendant created by the defendant being domiciled in the territory, "special jurisdiction" is based on the connection between the territory of the forum and the facts of the case.

The articles as to special jurisdiction fall into two categories, and the former are subject to the latter. The former includes specific grounds of jurisdiction and is in some respects similar to the jurisdictional grounds (or "gateways") upon which a claimant may, with the permission of the court, serve a claim form out of the jurisdiction under r.6.36 and Practice Direction 6B para.3. For example, it is provided that in matters of contract a defendant may be sued in the courts for the place of performance of the obligation in question. The provisions relating to the former category (arts 7 to 9 of the Judgments Regulation (recast)) are not mandatory or exclusive; they do not deprive the claimant of the right to rely on other permitted grounds. See further para.6JRx.14 et seq below.

The rules of special jurisdiction in the second category are of a different kind. Where they are engaged they are mandatory, exclusive and exhaustive. They are concerned with (1) matters relating to insurance, (2) matters relating to consumer contracts, and (3) matters relating to individual contracts of employment. See further, respectively, paras 6JRx.26, 6JRx.27 and 6JRx.28 below.

Due to their being derogations, the articles containing the rules as to special jurisdiction are to

be construed restrictively (*Kalfelis v Bankhaus Schroder Munchmeyer Hengst & Co* (C-189/87) EU:C:1988:459; [1989] E.C.C. 407, ECJ at [19]; *Kleinwort Benson Ltd v Glasgow City Council* [1999] 1 A.C. 153, HL).

### (a)   Special jurisdiction—particular matters (art.7)

**6JRx.14**   A person domiciled in a Member State may be sued in another Member State "in matters relating to", "as regards of a civil claim for", and "as regards a dispute arising, brought or concerning" as listed in paras (1) to (7) of art.7.

*(i)   Matters relating to contract (art.7(1))*

**6JRx.15**   By art.7(1)(a) of the recast Judgments Regulation (formerly art.5(1)), in matters relating to a contract, a person domiciled in a Member State may be sued in the courts of the place of performance of the obligation in question. (The equivalent article in the revised Lugano Convention (2007) is art.5(1)(a), and in the 1968 Convention art.5(1).) In art.7(1)(b) (and in art.5.1(b) of the Lugano Convention) the meaning "the place of performance of the obligation in question" is clarified (no comparable provision was included in the 1968 Convention).

The Judgments Regulation does not apply to arbitration (art.1(2)(d)), but where a contract contains an arbitration clause this on its own does not have the effect of ousting the jurisdiction of the court under art.7(1)(a) (*Youell v La Réunion Aérienne* [2009] EWCA Civ 175; [2009] 1 Lloyd's Rep. 586, CA).

Jurisdiction in matters relating to independent contracts of employment is to be determined, not by art.7(1)(a), but by the provisions of s.5 of Ch.II (arts 20 to 23) (see para.6JRx.28 below). In *Holterman Ferho Exploitatie BV v Spies Von Bullesheim* (C-47/14) [2015] I.L.Pr. 44, the ECJ considered questions relating to the interpretation of art.7(1)(a) (and of art.7(2)) where the provisions of s.5 of Ch.II did not have the effect of precluding the application of art.7(1)(a) (and of art.7(2)) in a case where a person is sued by a company for improper performance of his duties, not only in his capacity as the managing director of the company and an employee of the company under a contract of employment, but also in his capacity as a director of the company from a company law perspective (see further para.6JRx.28 below).

The words "matters relating to a contract" cannot be understood as referring to a situation in which there is no undertaking freely agreed by one party towards another. The point is illustrated by *OTP Bank Nyilvanosan Mukodo Reszvenytarsasag v Hochtief Solution AG* (C-519/12) EU:C:2013:674; [2015] I.L. Pr. 30, ECJ, where the claim against the defendants was based on their failure to comply with declaration obligations, imposed by national law, as to the debts of a company they had acquired.

Where an English court was first seised of proceedings served on the defendant bank, which was domiciled in England, there was no jurisdiction to order a stay in favour of proceedings in Switzerland on the grounds of forum non conveniens; both England and Switzerland being subject to the Lugano Convention, although articles of the Convention gave the claimants a right, at their discretion, to litigate in Switzerland; the discretion is not that of the court (*Mahme Trust v Lloyds TSB Bank Plc* [2004] EWHC 1931; [2004] I.L.Pr. 43). The situation is no different in the case of a bank with overseas branches (ibid).

The relevant obligation for this purpose is the obligation on which the claim is based; *A De Bloos SPRL v Bouyer SA* (C-14/76) EU:C:1976:134; [1977] 1 C.M.L.R. 60, *Custom Made Commercial Ltd v Stawa Metallbau GmbH* (C-288/92) EU:C:1994:268; [1994] I.L.Pr. 516; *Royal & Sun Alliance Insurance Plc v MK Digital FZE (Cyprus Ltd)* [2006] EWCA Civ 629; [2007] I.L. Pr. 3; [2006] 2 Lloyd's Rep. 110, CA. A payment obligation may well be the obligation in question on this basis even though conditions of payment are to be satisfied elsewhere (*Chailease Finance Corp v Credit Agricole Indosuez* [2000] 1 Lloyd's Rep. 348, CA). Where a number of obligations are in issue, it is the principal obligation which determines jurisdiction; see *Royal & Sun Alliance* case above.

In *Canyon Offshore Ltd v GDF Suez E&P Nederland BV* [2014] EWHC 3810 (Comm); [2015] I.L. Pr. 8 (Judge Mackie QC), on ground that Dutch main contractors (D) had agreed to settle on behalf of their sub-contractors (X) invoices for work done for X by a Scottish company (C), C commenced proceedings against D in the High Court. D accepted that any alleged contract between them and C was governed by English law, but disputed the court's jurisdiction and submitted that C's claim should be brought in the Dutch courts. In rejecting D's application the court held (1) that the place of performance of the "obligation in question", that is, the obligation prescribed by the invoices, was equally Scotland and England, and (2) that the fact that there was more than one place of performance was not a bar to the applicability of (what is now) art.7.

Where relations between parties are characterised by the absence of obligations freely assumed by one party towards another on the occasion of negotiations with a view to the formation of a contract and by a possible breach of rules of law, an action founded on the pre-contractual liability of the defendant is not a matter within art.7(1)(a) but is a matter relating to tort, delict or quasi-delict within art.7(2). See *Case Fonderie Officine Meccaniche Tacconi SpA v Heinrich Wagner Sinto Maschinenfabrik GmbH (HWS)* (C-334/00) EU:C:2002:499.

Where a claim was brought in tort but the interpretation of a contract between the parties was indispensable to consider the lawfulness of the conduct complained of, the claim concerned "matters relating to a contract" for the purposes of art.7.1(a) (*Brogsitter v Fabrication de Montres Normandes EURL* (C-548/12) EU:C: 2014:148; [2014] Q.B. 753, ECJ). A claim where a creditor sought a declaration that the transfer by the debtor of an asset to a third party was invalid or ineffective (actio pauliana) was a "matter relating to a contract" (*Feniks Sp z oo v Azteca Products & Services Ltd* (C-337/17) EU:C:2018:805; [2019] C.E.C. 348).

In determining the relevant obligation, evidence of a course of dealing, for example the place where payments are made, may assist (*Deutsche Ruckversicherung AG v La Fondaria Assicurazioni SpA* [2001] 2 Lloyd's Rep. 621 (Steel J)).

"Obligation in question" does not include a quasi-contractual obligation to make restitution (*Kleinwort Benson Ltd v Glasgow City Council* [1999] 1 A.C. 153, HL). Nor does it include a claim of a co-insurer for contribution against a co-insurer in a case of double insurance: *XL Insurance Co SE (formerly XL Insurance Co Ltd) v AXA Corporate Solutions Assurance* [2015] EWHC 3431 (Comm); [2015] 2 C.L.C. 983 (Judge Waksman QC). On the other hand, the obligation in question could be the obligation to make full disclosure on placement of reinsurance in London (*Agnew v Lansforsakringsbolagens AB* [2001] 1 A.C. 223; [2000] Lloyd's Rep 317; [2000] 1 All E.R. 737, HL).

The place of performance of the obligation in question is to be decided in accordance with the law governing the contract according to the conflict of laws rule of the court seised (*Industrie Tessili Italiana v Dunlop AG* (C-12/76) EU:C:1976:133; [1977] 1 C.M.L.R. 26, ECJ, *GIE Group Concorde v Master of the Vessel Suhadiwarno Panjan, Pro-Line Ltd* (C-440/97) EU:C:1999:456; [2000] I.L. Pr. 626, ECJ). This may accordingly involve issues under the Rome Convention (*Raiffeisen Zentralbank Osterreich Aktiengesellschaft v National Bank of Greece SA* [1999] 1 Lloyd's Rep. 408, *Chailease Finance Corp v Credit Agricole Indosuez* [2000] 1 Lloyd's Rep. 348, CA, *Definitely Maybe (Touring) Ltd v Marek Lieberberg Konzertagentur GmbH* [2001] 1 W.L.R. 1745 (Morison J).

An English court does not have jurisdiction under art.7(1)(a) of the recast Judgments Regulation where a guarantor of general average has the right to make payment outside the jurisdiction (*Mora Shipping Inc of Monrovia v AXA Corporate Solutions Assurance SA* [2005] EWCA Civ 1069; [2006] I.L. Pr. 10, CA).

In *Kenburn Waste Management Ltd v Bergmann* [2002] EWCA Civ 98; [2002] I.L. Pr. 33, CA, the Court of Appeal determined that in proceedings concerning a negative obligation made by a German resident to refrain from communicating with individuals or companies in the UK, the proper law of the obligation in question was English law and the place of performance of that obligation was the UK. However, where an obligation not to do something has no geographical limit and no specific place for performance can be identified, it is the basic rule of jurisdiction in art.4.1 which governs the position (*Besix SA v Wasserreinigungsbau Alfred Kretzschmar GmbH & Co KG (Wabag)* (C-256/00) [2003] 1 W.L.R. 1113, ECJ).

Where a warranty is given as to existing rights in intellectual property that are transferred in London, there can be a good arguable case that London is the place of performance of the warranty for the purposes of art.7.1(a) (*Crucial Music Corp v Klondyke Management AG* [2007] EWHC 1782 (Ch); [2008] 1 All E.R. (Comm) 642 (a Lugano Convention case)).

As a matter of English law the place for performance of a carrier's obligation to use due diligence to make the ship seaworthy is the load port (*The "Sea Maas"* [1999] 2 Lloyd's Rep. 281).

Generally, determination of the place of performance will involve weighing factors in each direction. *Viskase Ltd v Paul Kiefel GmbH* [1999] 3 All E.R. 362, was a claim by the English purchaser of machines to be supplied by the German defendant with delivery in Germany. The English claimant sued for damages on the basis that the machines were not fit for their purpose. It was held by the Court of Appeal that the obligations of manufacture and supply in question, which formed the basis of the claimant's damages claim, were to be performed in Germany. Accordingly, the English court did not have jurisdiction under art.7.1(a) (then art.5.1 of the 1968 Convention). *MBM Fabri-Clad Ltd v Eisen-und-Huttenwerke Thale AG* [2000] C.L.C. 373; [2000] I.L. Pr. 505, CA was a damages claim by the English purchaser of rain panels for GCHQ which the German defendant had agreed to supply in England. It was held by the Court of Appeal that the obligation in question on which the claim for damages was based was the obligation to deliver in England. Accordingly, the English Courts had jurisdiction.

Under a contract of guarantee, the obligation characteristic of performance is the payment of money by the guarantor (*Samcrete Egypt Engineers & Contractors SAE v Stanger Ltd* [2001] EWCA Civ 916; [2002] 1 W.L.R. 3059, CA). For an examination of the issue of the whereabouts of the "place of performance of the obligation in question" in the case of the performance of a contract of guarantee, see *Commercial Marine Piling Ltd v Pierse Contracting Ltd* [2009] EWHC 2241 (TCC); [2009] I.L. Pr. 54 (Ramsey J).

Article 7(1)(b) of the recast Judgments Regulation expressly provides that the place of performance of the obligation in question shall be in the case of:

(i)    the sale of goods, the place in a Regulation State where, under the contract, the goods were delivered or should have been delivered; and

(ii)    the provision of services, the place in a Regulation State where, under the contract, the services were provided or should have been provided.

Where the national court hearing the dispute concludes that the relationship between the parties is founded on a contract for the sale of goods or for the provision of services, the rule of jurisdiction laid down in art.7(1)(a) is excluded. In view of the hierarchy which art.7(1)(c) establishes between art.7(1)(a) and art.7(1)(b), the rule of jurisdiction laid down in art.7(1)(a) is intended only to apply in the alternative and where the rules of jurisdiction in art.7(1)(b) do not apply (*Granarolo SpA v Ambrosi Emmi France* (C-196/15) EU:C:2016:559; [2016] I.L. Pr. 32, ECJ, at paras 30 and 32, and case law cited; *Saey Home & Garden NV/SA v Lusavouga-Maquinas e Acessorios Industriais SA* (C-64/17) EU:C:2018:173; [2018] 4 W.L.R. 95 at [34]).

Where there are several places of delivery of goods, "place of delivery" for the purposes of art.7(1)(b) has to be understood as the place with the closest linking factor between the contract and the court with jurisdiction which would, as a general rule, be at the place of the principal

delivery. If a principal place of delivery cannot be determined the claimant may sue in the court for the place of delivery of its choice (*Color Drack GmbH v Lexx International Vertriebs GmbH* (C-386/05) [2010] 1 W.L.R 1909, ECJ). See also *Saey Home & Garden NV/SA v Lusavouga-Maquinas e Acessorios Industriais SA* (C-64/17) EU:C:2018:173; [2018] 4 W.L.R. 95.

In *Car Trim GmbH v KeySafety Systems Srl* (C-381/08) EU:C:2010:90; [2010] 2 All E.R. (Comm) 770, the ECJ explained the interpretation that should be placed on "place of delivery" in the first indent in art.7(1)(b) in a case of a sale involving the carriage of goods. This ruling was applied in *Electrosteel Europe SA v Edil Centro SpA* (C-87/10) EU:C:2011:375; [2011] I.L. Pr. 28, ECJ, where the further question of the meaning of the words "under the contract" therein were clarified by the Court. These rulings confirm that the "place of delivery" is to be determined on the basis of the relevant terms of the contract, including terms which are generally recognised and applied in international trade or commerce. If that does not identify the place of delivery, reference should be had to the place where the purchaser obtained the actual power of disposal over the goods. However, some uncertainty has been created by the decision of the CJEU in *Zurich Insurance Plc v Abnormal Load Services (International) Ltd* (C-88/17) EU:C:2018:558; [2018] 4 W.L.R. 155, ECJ, where it was held, in the context of a contract for the carriage of goods, that not only the place of delivery of the goods, but also the place of dispatch was to be regarded as the place where the services were to be provided.

In *Krejci Lager & Umschlagbetriebs GMBH v Olbrich Transport und Logistik GMBH* (C-469/12) [2014] I.L. Pr.8, the ECJ held that a warehousing contract was a contract for the "provision of services" and therefore a claim for payment of fees due had to be made at the place where the warehouse was situated.

In *Kareda v Benko* (C-249/16) [2017] I.L. Pr. 29, the CJEU held that a credit agreement between a credit institution and two jointly and severally liable debtors was a "contract for the provision of services" and that, unless otherwise agreed, the place where that institution had its registered office had jurisdiction over a recourse claim between those joint debtors.

In *Worldview Capital Management SA v Petroceltic International Plc* [2015] EWHC 2185 (Comm); [2015] I.L. Pr. 46 (Judge Waksman QC), a Swiss-based private investment management company (C) agreed to support a share placing by an Irish company (D) in exchange for commitments given by D, including a commitment to carry out a review of its strategy and business. C brought a claim in the English court for specific performance of that particular commitment. In granting D's application to set aside the proceedings for want of jurisdiction the judge explained that where a contractual claim involved more than one obligation it is the principal one which is the operative one for the purposes of art.7(1) and held (amongst things) (1) that, in the instant case, that principal obligation was the undertaking of a review, (2) that although that review would require substantial consequential work, that did not mean that services were being provided in the art.7(1)(b) sense.

In the case of documentary sales where the place of discharge differs from the place of contractual delivery, it is appropriate to interpret art.7.1(b) (then art.5.1(b)) as referring to the place where delivery is due under the contract (*Scottish & Newcastle International Ltd v Othon Ghalanos Ltd* [2008] UKHL 11; [2008] I.L. Pr. 30, HL). In *Corman v Collins SA v La Maison du Whisky SA* (C-9/12) [2014] Q.B. 431, the ECJ considered that a framework cross-border distribution agreement was a contract for the provision of services falling within art.7.1(b).

Where, under the terms of the Judgments Regulation, an entity could bring proceedings within the jurisdiction to assert a contractual obligation, it is open to the entity against which the assertion could be made to seek within the jurisdiction a declaration to the contrary effect, even where the existence of a contract is denied (*Equitas v Wave City Shipping* [2005] EWHC 923 (Comm); [2005] 2 All E.R. (Comm) 301).

*(ii)  Matters relating to tort, delict or quasi-delict (art.7(2))*

**6JRx.16**    By art.7(2) of the recast Judgments Regulation (then art.5(3) of the Judgments Regulation), in matters relating to tort, delict or quasi-delict, a person domiciled in a Regulation State may be sued in the courts for the place where the harmful event occurred. As to the exercise of the discretion; see *Mahme Trust v Lloyds TSB Bank Plc*, at para.6JRx.15 above.

For the purposes of art.7(2) "tort, delict or quasi-delict" has an autonomous meaning, and covers actions which seek to establish the liability of a defendant and which are not related to a contract within the meaning of art.7(1) (*Mazur Media Ltd v Mazur Media GmbH* [2004] EWHC 1566 (Ch); [2004] 1 W.L.R. 2966). A preventive action brought by a consumer protection organisation for the purpose of preventing a trader from using terms considered to be unfair in contracts with private individuals is a matter relating to tort, delict or quasi-delict (*Verein fur Konsumenteninformation v Karl Heinz Henkel* (C-167/00) [2003] 1 All E.R. (Comm) 606; see also *Folien Fischer AG v Ritrama SpA* (C-133/11) [2013] 2 W.L.R. 373 (ECJ)).

The location of the harmful event can be both the place where damage is sustained and the place where the event occurs which precipitates loss; see *Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* (C-21/76) EU:C:1976:166; [1978] Q.B. 708, where French mines caused pollution of the Rhine damaging Bier's horticulture business in Holland. See also *Kronhofer v Maier* (C-168/02) [2005] 1 Lloyd's Rep 284; [2004] All E.R. (EC) 939, and *Sunderland Marine Mutual Insurance Co Ltd v Wiseman* [2007] EWHC 1460 (Comm); [2007] 2 Lloyd's Rep. 308.

In *Coty Germany GmbH v First Note Perfumes NV* (C-360/12) [2015] I.L.Pr. 13, ECJ, a question referred for a ruling was whether art.7(2) must be interpreted as meaning that, in the event of an allegation of unlawful comparative advertising or unfair imitation of a sign protected by a Community trade mark, prohibited by the law against unfair competition in which the court first seised

is situated, that provision attributes jurisdiction to hear an action for damages based on that national law against one of the presumed perpetrators who is established in another Member State and is alleged to have committed the infringement in that State. The ECJ ruled (1) that art.7(2) does not allow jurisdiction to be established, on the basis of the place where the event giving rise to the damage resulting from the infringement of that law occurred, for a court in that Member State where the presumed perpetrator who is sued there did not himself act there, but (2) in such a case does allow jurisdiction to be established, on the basis of the place of occurrence of damage, to hear an action for damages based on that national law brought against a person established in another Member State and who is alleged to have committed, in that State, an act which caused or may cause damage within the jurisdiction of that court.

In a case of negligent mis-statement, it is likely to be the place where the statement is made; see *Domicrest Ltd v Swiss Bank Corp* [1999] Q.B. 548 and *Sunderland Marine Mutual Insurance Co Ltd v Wiseman* [2007] EWHC 1460 (Comm); [2007] 2 Lloyd's Rep. 308. See also *London Helicopters Ltd v Heliportugal LDA-INAC* [2006] EWHC 108; [2006] 1 All E.R. (Comm) 595; [2006] I.L.Pr. 28 for a consideration of the place where damage occurred and that of the harmful event giving rise to the damage. Where, pursuant to a misrepresentation, a claimant commits itself to accepting a deal and puts it beyond itself to withdraw, the place where these events occurred is that where the harmful event occurred (*Maple Leaf Macro Volatility Master Food v Rouvroy* [2009] EWHC 257 (Comm); [2009] 2 All E.R. (Comm) 287; [2009] Lloyd's Rep 475).

As to the characterisation of a claim for damages for misrepresentation, both at common law and under the Misrepresentation Act 1967, as claims relating to tort within the meaning of art.7(2), see *Aspen Underwriting Ltd v Credit Europe Bank NV* [2018] EWCA Civ 2590; [2019] 1 Lloyd's Rep. 221 (at para.136 per Gross LJ), and the authorities referred to there, in particular *Alfred Dunhill Ltd v Diffusion Internationale de Maroquinerie de Prestige SARL* [2002] 1 All E.R. (Comm) 950 (Kenneth Rokison QC). This issue was not addressed by the Supreme Court in *Aspen*: see [2020] UKSC 11; [2020] 2 W.L.R. 919.

In *Kolassa v Barclays Bank Plc* (C-375/13) [2015] C.E.C. 753; [2015] I.L.Pr. 14 a claim was brought against the bank on the basis of alleged mistakes and wrongful information in a prospectus issued by it. The CJEU ruled that under art.5(3) (now art.7(2)) the court where the investor was domiciled and had its bank account had jurisdiction as this was the place where the loss occurred. See also *Löber v Barclays Bank Plc* (C-304/17) EU:C:2018:701; [2018] 4 W.L.R. 5. In *Universal Music International Holding BV v Schilling* (C-12/15) [2016] Q.B. 967, the ECJ restricted its decision in Kolassa. The ECJ held that in a claim seeking to recover losses suffered as a result of the professional negligence of the claimant's legal advisers, the place where the harmful event occurred did not include places where the only damage consisted of financial damage to the claimant's bank account (from which the claimant's losses had been paid) as a result of negligence occurring in another Member State (it being common ground that the event giving rise to the damage occurred in that State).

In a claim that a product is defective where that product has been manufactured in Member State A and then sold in Member State B, the place of the event giving rise to the damage is the place where the product is manufactured (*Kainz v Pantherwerke AG* (C-45/13) [2014] 1 All E.R. (Comm) 433; [2014] I.L.Pr. 16). But in a claim for damage suffered by purchasers of vehicles resulting from the installation of software designed to manipulate data relating to exhaust gas emissions, the place where the damage occurred (as opposed to the event giving rise to the damage) was the Member State where the vehicles were purchased; while the vehicles became defective as soon as the software was installed, the damage occurred only when they were acquired for more than their actual value (*Verein fur Konsumenteninformation v Volkswagen AG* (C-343/19) EU:C:2020:534).

Where a claim for damage to goods is made by the consignee against the actual carrier with whom they do not have a contract, the claim is within art.7(2) (formerly art.5.3) rather than art.7(1) (formerly 5.1). The place where the harmful event occurred in such a case will be taken as the place where the cargo is to be discharged; see *Reunion Europeenne SA v Spliethoff's Bevrachtingskantoor BV* (C-51/97) [2000] Q.B. 690, ECJ.

For a consideration of where damage occurs under art.7(2) (formerly art.5.3) when there is a failure to make a payment within the state alleged to have jurisdiction and of the distinction between direct and consequential harm, see *Dolphin Maritime & Aviation Services Ltd v Sveriges Angartygs Assurans Forening* [2009] EWHC 716 (Comm); [2009] 2 Lloyd's Rep. 123. In *AMT Futures v Marziller* [2015] EWCA Civ 143; [2015] Q.B. 699, CA, the Court of Appeal held (allowing the defendant's appeal) that where the tort or delict was based upon the claimant being deprived of a contractual benefit by the defendant's actions, in particular being deprived of the right to enforce an exclusive jurisdiction clause in favour of the English courts by the commencement of proceedings against them in German courts, damage was likely to have been suffered, not in the place where the benefit should have been received, but in the place where the wrongful proceedings were commenced. This decision was upheld by the Supreme Court, see [2017] UKSC 13; [2017] 2 W.L.R. 853, SC.

In *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2018] 2 W.L.R. 1125, SC, the Supreme Court considered the jurisdiction of the English court under art.5(3) of the Lugano Convention in the context of a tort conspiracy claim, where the defendants were alleged to have conspired in England in breach of a worldwide freezing order by wrongfully dealing with assets located abroad with the result that the claimant's opportunity to execute its judgment was lost or hindered (in effect, to conspire to commit contempts of court). The Court explained that the phrase "the place where the harmful event occurred" includes, not only the place where the damage occurred, but

also the place where the event giving rise to the damage occurred, and held (affirming the decision of the Court of Appeal) that in this case (1) the event which had set the tort in motion was the conspiratorial agreement, (2) since that event (though not the events implementing the conspiracy) had taken place in England the English court had jurisdiction.

Where a defendant procures the payment of money by a third party from a foreign bank account into their own account in England, and thereafter uses that money for their own purposes in England, a harmful act within the meaning of art.7(2) (formerly art.5.3) has occurred in England; see *Cronos Containers NV v Palatin* [2002] EWHC 2819 (Comm); [2003] 2 Lloyd's Rep 489. See also *Bank of Tokyo-Mitsubishi Ltd v Baskan Gida Sanayi Ve Pazarlama AS* [2004] EWHC 945 (Ch); [2004] I.L.Pr. 26 (Lawrence Collins J), for the place of loss where banks within the jurisdiction are victims of a conspiracy in which a letter of credit is drawn outside the jurisdiction.

Where an agreement is made pursuant to a misrepresentation that procures a greater price for the assets acquired than would otherwise have been the case, the place of the making of the agreement is that where a harmful event has occurred for the purposes of art.7(2) (*Crucial Music Corp v Klondyke Management AD* [2007] EWHC 1782; [2007] I.L.Pr. 54, a Lugano Convention case where the provision comparable to art.7(2) under consideration was art.5.3 thereof).

The considerations to be borne in mind when considering the place where the damage occurred, as per *Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* above, were explained in *Dolphin Maritime and Aviation Services Ltd v Sveriges Angartygs Assurans Forening* [2009] EWHC 716 (Comm); [2009] I.L.Pr. 52 (Christopher Clarke J) (a shipping collision case where the harm suffered was non-payment of compensation via a cargo recovery agent). The principles applicable to art.7(2), as established by the authorities (including decisions of the Supreme Court and the ECJ handed down during 2017 and 2018), were summarised and related authorities outlined in *Griffin Underwriting Ltd v Varouxakis* [2018] EWHC 3259 (Comm); [2019] 1 W.L.R. 2529 (Males J), at paras 63 to 75, where claims brought by insurers (C) against the director of a shipowning company included a claim for loss of a general average claim (on a subrogated basis against cargo interests) in circumstances where the holders of the bill of lading were obliged to pay any general average contributions to the adjuster in London. The judge rejected C's submission that damage was suffered in England. The initial and direct damage had been suffered in Oman where D's company had been induced by D to abandon the cargo.

The term "harmful event" is an autonomous Regulation and Convention concept, not to be determined by reference to national law. In *Melzer v MF Global UK Ltd* (C-228/11) [2013] Q.B. 1112, the ECJ considered that it was not permissible to define where the harmful event occurred by reference to a rule of national law which permitted a party to be sued in a place where one of the participants had taken part in committing the tort even if that party had committed no act within the jurisdiction of the court seised. In *Kolassa v Barclays Bank Plc* (C-375/13) [2015] I.L.Pr 14, the ECJ held that when considering whether it had international jurisdiction under the Judgments Regulation, it was not necessary to undertake a comprehensive review of facts that went both to jurisdiction and the merits. However, it was permissible for a court to take into account all information available to it, including, where appropriate, the allegations made by the defendant.

In a libel case there may be a number of different places where harm occurs depending on the range of publication, and the English courts will not regard the tort as actionable only in the jurisdiction of primary publication (*Lukowiak v Unidad Editorial SA (No.1)* [2001] E.M.L.R. 46; *Shevill v Presse Alliance SA* [1996] A.C. 959, HL). Moreover this jurisdiction is not to be declined on the ground of forum non conveniens (*Berezovsky v Michaels* [2000] 1 W.L.R 1004, HL).

In *eDate Advertising GmbH v X* (C-509/09 and C-161/10) [2012] Q.B. 654, ECJ, it was ruled that a person who considered that his personality rights had been infringed by means of content placed online on an internet website could bring an action (1), in respect of all the damage caused, before the courts of either the member state in which the publisher of the content was established or the member state in which the centre of the claimant's interests was based, or (2) before the courts of each member state in the territory of which content placed online was or had been accessible, in respect of the damage caused in the territory of that member state. In *Bolagsupplysningen OÜ v Svensk Handel AB* (C-194/16) EU:C:2017:766; [2018] Q.B. 963, ECJ, it was ruled that where a claimant alleges that his personality rights have been infringed (1) by the publication of incorrect information concerning him on the Internet, and (2) by the failure to remove comments relating to him the claimant may not bring an action (a) for rectification of that information, and (b) for removal of those comments, before the courts of each Member State in which the information so published was or had been accessible. Such an action for rectification and removal is a single and indivisible application and may only be entertained by a court with jurisdiction to rule on the entirety of an application for compensation for damage. For a consideration of the place where the harmful event might occur in the context of an action for trademark infringement on the internet, see *Wintersteiger AG v Products 4U Sondermaschinenbau GmbH* (C-523/10) [2012] I.L.Pr.23 and in the case of an action for copyright infringement by publication on the internet, see *Pinckney v KDG Mediatech AG* (C-170/12) [2013] Bus. L.R. 1313. In a more recent breach of copyright case, *Hi Hotel HCF SARL v Spoering* (C-387/12) [2014] 1 W.L.R 1912, the ECJ held that where there were several supposed perpetrators of damage allegedly caused to copyright protected in the member state of the court seised but the defendant was not alleged to have acted within that court's jurisdiction, jurisdiction could be established under art.7(2) (formerly art.5.3) on the basis of the place where the alleged damage had occurred but only in respect of damage which had occurred within the territory of that court's member state.

In *BVC v EWF* [2018] EWHC 2674 (QB); [2019] I.L.Pr. 7 (Karen Steyn QC), a British national (C) who currently worked in a South-East Asian country, commenced a claim for damages for

misuse of private information and harassment and applied for an interim injunction to restrain the defendant (D) from publishing his private information on a website. The defendant, a British citizen domiciled in Switzerland (a party to the Lugano Convention 2007), acknowledged service but challenged the court's jurisdiction by an application under r.11, raising the question whether, notwithstanding D's domicile, he could be sued in England on the basis that that was the place where the harmful event occurred or may occur. The judge reviewed the relevant authorities on internet publication and dismissed D's application, holding that C had established a good arguable case to that effect England was the Lugano Convention State "in which he had his centre of interests". For a case where the Court held that C had not established a good arguable case that England was the Contracting State "in which he had his centre of interests", see *Said v Groupe L'Express* [2018] EWHC 3593 (QB); [2019] I.L.Pr. 20.

In *Cartel Damage Claims (CDC) Hydrogen Peroxide SA v Akzo Nobel NV* (C-352/13) [2015] Q.B. 906, ECJ, the Court of Justice held that in a case of a claim for damages by victims of cartel, the claim can be brought either in the courts of the Member State where the cartel agreement was concluded, or in the courts of the Member State of the victim's domicile.

In *Tibor-Trans Fuvarozo es Kereskedelmi Kft v DAF Trucks NV* (C-451/18) EU:C:2019:635; [2019] 1 W.L.R. 1477, the CJEU held that loss in the form of higher prices suffered by an indirect purchaser of cartelised products covered (purchaser of trucks from dealership rather than manufacturer) constituted direct damage and therefore conferred jurisdiction under art.7(2).

In *Concurrence SARL v Samsung Electronics France SAS* (C-618/15) [2017] I.L.Pr 11, the CJEU held that a Member State Court had jurisdiction to consider a claim for damages suffered by a retailer for breach of a selective distribution network relating to sales via the internet notwithstanding that the sites were based in other EU countries. The Court considered that the harmful event occurred in the Member State where the prohibition on resale operated as it was there that the retailer in question suffered a reduction in sales.

For further guidance as to the place where the harmful event occurred and the place of damage in a claim for damages for anti-competitive conduct, see *AB "flyLAL-Lithuanian Airlines" In Liquidation v "Starptautiskā Lidosta 'Riga'" VAS* (C-27/17) EU:C:2018:533; [2019] 1 W.L.R. 669.

A party may seek a negative declaration within the same jurisdiction as positive relief can be sought under art.7(2) (formerly art.5.3) (*Equitas v Wave City Shipping* [2005] EWHC 923 (Comm); [2005] 2 All E.R. (Comm) 301; see also *Folien Fischer AG v Ritrama SpA* (C-133/11) [2013] Q.B. 523, ECJ). In *Parainen Pearl Shipping Ltd v Jebsen* [2017] EWHC 2570 (Pat) (Arnold J) the court considered the scope of the jurisdiction of the English court under the equivalent provision to art.7(2) in the Lugano Convention (that is art.5(3)) where various declarations of non-infringement in patent proceedings were sought, including declarations in respect of a European patent in its UK designation and in respect of other designations, and declarations to other effects. A claim under the Civil Liability (Contribution) Act 1978 falls within the European concept of "matters relating to tort, delict or quasi-delict" and therefore falls within art.7(2) (*Hewden Tower Cranes Ltd v Wolffkran GmbH* [2007] EWHC 857 (TCC); [2007] 2 Lloyd's Rep. 138; [2007] I.L.Pr. 43).

### (iii) Claims for damages or restitution (art.7(3))

Article 7(3) deals with claims for civil compensation or restitution arising out of criminal proceedings and grants jurisdiction for such claims to the court hearing those criminal proceedings to the extent that the court in question has jurisdiction under its own law to hear civil claims. **6JRx.17**

### (iv) Activities of a branch or agency (art.7(5))

By art.7(5) of the recast Judgments Regulation (formerly art.5.5), as regards a dispute arising out of the operations of a branch, agency or other establishment, a person domiciled in a Member State may be sued in the courts for the place in which the branch, agency or other establishment is situated. In tort, as well as in contract, all that is necessary to establish jurisdiction under art.7(5) is such nexus between the operations of the branch and the dispute as renders it natural to describe the dispute as one which has arisen out of the operations of the branch (*Anton Durbeck GmbH v Den Norske Bank ASA* [2003] EWCA Civ 147; [2003] Q.B. 1160, CA). In *ZX v Ryanair DAC* (C-464/18) EU:C:2019:311; [2019] 1 W.L.R. 4202, the CJEU held that a claim for compensation made over the internet which was unrelated to the activities of the branch in question (located in Spain) did not fall within the scope of art.7(5). **6JRx.18**

### (v) Trusts (art.7(6))

Article 7(6) of the Judgments Regulation (recast) states that a person domiciled in a Member State may be sued "as regards a dispute", brought against a settlor, trustee or beneficiary of a trust, in the courts of the Member State in which the trust is domiciled. (The words "as regards a dispute" were added for clarification and did not appear in the predecessor Conventions and Regulations.) The provisions of the Civil Jurisdiction and Judgments Act 1982 s.45 (see para.5-42 above) determine, for the purposes of the 1968 Convention and the Lugano Convention, whether a trust is domiciled in a part of the UK, and the Civil Jurisdiction and Judgments Order 2001 (SI 2001/3929) art.3 and Sch.1 para.12 (see para.5-204 above) make similar provisions for the purposes of the Judgments Regulation. Accordingly, a trust is domiciled in a part of the UK "if and only if the system of law of that part is the system of law with which the trust has its closest and most real connection". **6JRx.19**

Although a choice of English law might not be conclusive, it is very difficult to see what other circumstances would be sufficient to outweigh it, so that it would be another system of law with

which the trust had its closest and most real connection. It is more likely that a foreign choice of law in what would otherwise be an English trust may be disregarded where it is intended to avoid some important principle of English law (*Gomez v Gomez-Monche Vives* [2008] EWCA Civ 1065; [2009] Ch. 245, CA). Article 7(6) does not apply to a constructive trust (ibid).

Article 7(6) does not apply to appointors or protectors or to any other person with fiduciary powers who does not come within the normal meaning of the expression "trustee" (*Gomez v Gomez-Monche Vives* op cit).

**(b)  Multiple defendants, third parties, counterclaims and combined actions (art.8)**

**6JRx.20**    Article 8 of the Judgments Regulation is concerned with ensuring that in four varieties of circumstances related proceedings are heard together in the same court. Thus it is provided that a person domiciled in a Member State may also be sued in a different Member State (1) where he is one of a number of defendants (art.8(1)), (2) where he is a third party (art.8(2)), (3) where he is a defendant on a counterclaim (art.8(3)), and (4) where the claim against him relates to a contract which may be combined with proceedings relating to rights in rem in immovable property (art.8(4)).

*(i)  Sued as one of a number of defendants–risk of irreconcilable judgments (art.8(1))*

**6JRx.21**    The proviso in art.8(1), to the effect that the claims "are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings", was added to codify the ruling of the ECJ in *Kalfelis v Bankhaus Schroeder, Munchmeyer, Hengst & Co* (C-189/87) EU:C:1988:459; [1989] E.C.C. 407, ECJ. In that case it was also held that it is for national courts to determine in each individual case whether the condition in the proviso is satisfied. Article 8(1) is limited to cases where the same claimant is bringing proceedings against both a UK domiciled defendant and a non-domiciled defendant; it does not confer jurisdiction where there are two claimants and one sues a UK domiciled defendant and the other sues a non-domiciled defendant (*Madoff Securities International Ltd v Irving H Picard* [2011] EWHC 3102 (Comm); [2012] I.L.Pr. 15 (Flaux J)).

In numerous cases, the English courts have been concerned with the "irreconcilable judgments" proviso in cases where it has been submitted that the risk of irreconcilability arises from potentially conflicting findings of fact or potentially conflicting decisions on questions of law. The courts have applied a broad common sense approach, avoiding an over-sophisticated analysis; e.g. *ET Plus SA v Welter* [2005] EWHC 2115 (Comm); [2006] 1 Lloyd's Rep 251 at paras 57–59 and the cases there cited; see also *Brown v Innovatorone Plc* [2010] EWHC 2281 (Comm); [2011] I.L.Pr. 9, and *Gard Marine & Energy Ltd v Tunnicliffe* [2010] EWCA Civ 1052; [2011] I.L.Pr. 10.

Article 8(1) does not include a requirement that the action brought against the different defendants have identical legal bases. For decisions to be regarded as contradictory the divergence must arise in the context of the same situation of law and fact (*Freeport Plc v Arnoldsson* (C-98/06) [2008] Q.B. 634, ECJ). Article 8(1) (previously art.6(1)) can still be relied upon if actions are brought against several defendants for substantially identical copyright infringements but on national legal grounds which vary according to the Member States concerned (*Painer v Standard Verlags GMBH* (C-145/10) [2012] E.C.D.R. 6). In a cartel damages claim, art.8(1) can be used to bring claims against multiple cartelists in the place where one of them is domiciled (*Cartel Damage Claims (CDC) Hydrogen Peroxide SA v Akzo Nobel NV* (C-352/13) [2015] 3 W.L.R. 909, ECJ).

The authorities on the scope and application of art.8(1), in particular those dealing with the question whether claims for cartel losses made against several defendants were "closely connected" within the meaning of that provision, were examined in *Vattenfall AB v Prysmian SPA* [2018] EWHC 1694 (Ch) Anthony Elleray QC, at paras 47 to 52. In that case a Swedish company (C) brought proceedings in the English court for cartel loss claims (1) against a UK-domiciled company (D1) (over whom the court had jurisdiction under art.4), and (2) against non-UK domiciled companies (D2) belonging to the same corporate group as D1, on basis that the claims against D2 were, within the meaning of art.8(1), "closely connected" with the claim against D1. The claims were brought following a cartel decision of the European Commission in which several legal entities were identified, but not including D1 or D2. D1 contended that there was no arguable basis for C's claim that they had "knowingly implemented" the cartel arrangements and that the claim had no prospect of success, and applied for a declaration to that effect. It was further submitted that, if the declaration were granted, the court would have no jurisdiction over D2 under art.8(1), as D1 could not then be regarded as an "anchor" defendant within that provision. The judge rejected D1's application and confirmed that the English court had jurisdiction over D2 under art.8(1).

Alternative or contingent claims are commonplace in domestic litigation and art.8(1) is not to be given so restricted a meaning as to exclude them (*FKI Engineering Ltd v Dewind Holdings Ltd* [2008] EWCA Civ 316; [2009] 1 All E.R. (Comm) 118; [2008] I.L.Pr. 33).

In *PJSC Commercial Bank Privatbank v Kolomoisky* [2019] EWCA Civ 1708; [2020] 2 W.L.R. 993, the Court of Appeal considered whether, in addition to the express qualification regarding the risk of irreconcilable judgments, art.6(1) of the Lugano Convention (the equivalent of art.8(1) of the Judgments Regulation) is subject to a further qualification that it may not be invoked if the proceedings against D1 are brought with the "sole object" of removing D2 from the jurisdiction of his domicile or from another appropriate jurisdiction. The court reviewed the authorities which touched on this issue, including *Freeport Plc v Arnoldsson*, op cit, and concluded that there is no such "sole object" qualification. The Court of Appeal recognised, citing *Cartel Damage Claims (CDC) Hydrogen Peroxide SA v Akzo Nobel NV*, op cit, that art.6(1) (or art.8(1) of the Judgments Regulation) is subject to the EU principle against abuse of law, but said the principle was confined to cases where the claimant artificially fulfils, or prolongs the fulfilment of, the application of art.6(1).

That principle would not be breached where a claimant has a sustainable claim against D1, which it intends to pursue to judgment, even if its sole object in bringing that claim is to sue D2 in the same proceedings (see para.102).

Article 8(1) of the recast Judgments Regulation does not apply in European patent infringement proceedings involving a number of companies established in various contracting states, where those companies, which belong to the same group, may have acted in an identical or similar manner in accordance with a common policy elaborated by one of them (*Roche Nederland BV v Primus and Goldenberg* (C-539/03) [2007] I.L.Pr. 9). If a patentee possessing a bundle of European patent applications wished to enforce them, it would have to do so on a state by state basis (*SanDisk Corp v Koninklijke Philips Electronics NV* [2007] EWHC 332 (Ch); [2007] I.L.Pr. 22 (Pumfrey J)).

The relevant date under art.8(1) for determining whether the English court has jurisdiction over a prospective co-defendant is the date when the claim form is issued (*Petrotrade Inc v Smith* [1999] 1 W.L.R. 457 (Thomas J)).

Where the existence of proceedings against one defendant in England is the basis for service of proceedings on other defendants in other Contracting States under art.8, the claimant must show a good arguable case that the defendant sued in England was domiciled in England when the claim form was issued. It is not necessary that the proceedings should at that stage have been served (*Canada Trust Co v Stolzenberg (No.2)* [2002] 1 A.C. 1, HL).

In *Sabbagh v Khoury* [2017] EWCA Civ 1120, the Court of Appeal considered, but in the event did not have to determine, conflicting submissions as to whether, for the purpose of establishing jurisdiction under art.8(1) against non-anchor defendants, there was a need to consider the merits of the claim against the anchor defendant. Patten and Beatson LJJ concluded that, had it been necessary to do so, they would have found that there was such a need; if the claim was hopeless or had no serious issue to be tried, it could be inferred that it had been brought in order to remove the non-anchor defendants from the jurisdictions of their states of domicile ([32]–[72]). Gloster LJ reached a contrary conclusion ([166]–[220]). In *Senior Taxi Aereo Executivo LTDA v Agusta Westland SpA* [2020] EWHC 1348 (Comm), in agreement with the obiter view of the majority in *Sabbagh*, Waksman J held that art.8(1) requires a merits test. However, he considered that this principle could not be justified on the basis that it followed from the "sole object" qualification which was assumed in *Sabbagh* to apply to art.8(1). He noted that in *PJSC Commercial Bank Privatbank v Kolomoisky*, op cit, the Court of Appeal rejected the "sole object" qualification but, in Waksman J's view, the decision in *Kolomoisky* proceeded on the assumption that there had to be a sustainable claim against an anchor defendant before art.8(1) could be relied on. Jurisdiction may still be established under art.8(1) even if the UK domiciled "anchor" defendant subsequently fails to acknowledge service and a default judgment is obtained (*Linuzs v Latmar Holdings Corp* [2013] EWCA Civ 4; [2013] I.L.Pr. 19, CA).

Article 8(1) is wide enough to encompass defendants and claims in more than one action (*Masri v Consolidated Contractors Int (UK) Ltd* [2005] EWCA Civ 1436; [2006] 1 W.L.R. 830; [2006] 1 Lloyd's Rep. 391, CA). Article 8(1) can be relied upon where an action is brought in a Member State against a defendant who is domiciled there and a co-defendant domiciled on another Member State where, a provision of the State in which the action is brought, it is regarded as inadmissible from the time that it had been brought in relation to the first defendant (*Reisch Montage AG v Kiesel Baumaschinen Handels GmbH* (C-103/05) [2007] I.L.Pr. 10, ECJ).

A particular difficulty has been created as regards the question of whether parallel tort and contract claims against different defendants are sufficiently related for combination under (what is now) art.8(1) because of dicta of the Court of Justice in *Reunion Europeenne SA v Splietthoff's Bevrachttingskantoor BV* [2000] Q.B. 690, ECJ, in relation to the ruling of the Court in *Kalfelis v Bankhaus Schroder Munchmeyer Hengst & Co* (C-189/87) EU:C:1988:459; [1989] E.C.C. 407. In the *Kalfelis* case the Court of Justice held that a court with special jurisdiction under (what is now) art.7(3) over the tort part of an action would not thereby have jurisdiction to try other non-tort parts of the action, unless there was an alternative basis for jurisdiction under (what is now) art.8(1). In *Réunion Européenne* French consignees of a shipment of peaches sued in France the Australian issuers of the bill of lading under which the goods were carried (a contract claim) and the Dutch carriers and master of the ship in which they were carried (tort claims). In the course of its reasoning the Court of Justice observed at [50] that two claims in one action for compensation, directed against different defendants and based in one instance on contractual liability and in the other on liability in tort or delict, could not be regarded as connected for the purposes of (what is now) art.8(1). In *Casio Computer Co Ltd v Sayo* [2001] EWCA Civ 661; [2001] I.L.Pr. 43, Tuckey LJ said that there is nothing in the *Réunion Européenne* case which cuts down, qualifies or explains what was said in *Kalfelis*. However, in *Watson v First Choice Holidays and Flights Ltd* [2001] EWCA Civ 972; [2001] 2 Lloyd's Rep 339, the Court of Appeal considered that [50] of the *Réunion Européenne* ruling was clear in saying that parallel contract and tort claims could not be regarded as connected for purposes of (what is now) art.8(1). It accordingly referred to the Court of Justice the question whether its statement at [50] of the *Réunion Européenne* judgment was intended to have that effect. However, the reference was later withdrawn. It could be that the analysis of Tuckey LJ in *Casio* (apparently not cited in *Watson*) provides a cogent basis for considering joinder under (what is now) art.8(1) pending clarification by the Court of Justice.

## *(ii) Sued as a third party (art.8(2))*

Article 8(2) does not impose any obligation on the court to accede to a request to join a third party (*Kongress Agentur Hagen GmbH v Zeehaghe BV* (C365-88) EU:C:1990:203; [1991] I.L.Pr. 3). It must be established that it is appropriate to override the third party's right to be sued in the

**6JRx.22**

country of their domicile (*Kinnear v Falconfilms NV* [1996] 1 W.L.R. 920; *Knauf UK GmbH v British Gypsum Ltd* [2002] 2 Lloyd's Rep. 416, CA).

Article 8(2) will not prevail over a contrary jurisdiction agreement between the defendant and a third party which binds them to another jurisdiction under (what is now) art.25 (*Hough v P&O Containers Ltd* [1999] Q.B. 834).

Article 8(2) allows a claim for costs against a defendant domiciled in another Contracting State who has supported, or is the alter ego of, the losing party in litigation in England (*National Justice Compania Naviera SA v Prudential Assurance Co Ltd (The Ikarian Reefer) (No.2)* [2000] 1 W.L.R. 603; [2000] 1 All E.R. 37; [2000] 1 Lloyd's Rep. 129, CA).

For a consideration of the circumstances in which a Pt 20 claim for relief under s.1(1) of the Civil Liability (Contribution) Act 1978 can fall within art.8(2), see *Barton v Golden Sun Holidays Ltd v Avlida Hotel Ltd* [2007] 151 S.J.L.B. 1128; [2007] I.L.Pr. 57.

*(iii) Sued on a counterclaim arising from same contract or facts (art.8(3))*

**6JRx.23**    The power to bring a counterclaim under art.8(3) (previously art.6(3)) where the original claim is pending does not allow an insurer to join insureds other than in their state of domicile, having regard to the special provisions contained in art.11 et seq. (*Jordan Grand Prix Ltd v Baltic Insurance Group* [1999] 2 A.C. 127; [1999] 2 W.L.R. 134; [1999] Lloyd's Rep. I.R. 93; [1999] 1 All E.R. 289, HL).

Article 8(3) provides that a person domiciled in a Contracting State may also be sued on a counterclaim arising from the same contract or facts on which the original claim was based, in the court in which the original claim is pending. This situation does not cover a Pt 20 claim against a claimant by a party, nor a defendant in the proceedings, in respect of discrete groups of facts that enjoy a common background (*Dollfus Mieget Compagnie v CDW International Ltd* [2004] I.L. Pr. 12).

The power granted under art.8(3) is not exclusive and does not exclude the application of other jurisdictional rules contained in the Judgments Regulation (*Nothartova v Boldizsar* (C-306/17) EU:C:2018:360; [2018] 4 W.L.R. 96, ECJ).

*(iv) Sued in action for contract combined with action in matter relating to rights in rem in immovable property (art.8(4))*

**6JRx.24**    Paragraph (4) of art.8 first appeared when art.6 of the 1968 Convention was amended by the Civil Jurisdiction and Judgments Act 1982 (Amendment) Order 1990 at the time of the revision of that Convention upon the accession of Spain and Portugal. That amendment accompanied the addition of the proviso in, what is now, art.24(1). That proviso qualifies the rule that in proceedings which have as their object rights in rem in immovable property or tenancies of immovable property the courts of the Member State in which the property is situated shall have exclusive jurisdiction, regardless of the domicile of the parties (see para.6JRx.30 below).

### 2. Special Jurisdiction—Insurance, Consumer and Individual Employee Contracts (arts 10 to 23)

**6JRx.25**    As explained above (para.6JRx.14), in cases falling with the "special jurisdiction", a defendant may be sued in the courts of Member State other than the Member State in which the defendant is domiciled. The articles as to special jurisdiction fall into two categories, and the former are subject to the latter. The former (in Section 2 of Chapter II of the Judgments Regulation (recast)) includes specific grounds of jurisdiction is some respects similar to the jurisdictional grounds (or "gateways") upon which a claimant may, with the permission of the court, serve a claim form out of the jurisdiction under r.6.36 and Practice Direction 6B para.3. The rules of special jurisdiction in the second category (in Sections 3, 4 and 5 of Chapter II of the Judgments Regulation (recast)) are of a different kind. Where they are engaged they are mandatory, exclusive and exhaustive. They are concerned with (1) matters relating to insurance, (2) matters relating to consumer contracts, and (3) matters relating to individual contracts of employment.

### (a)  Jurisdiction in matters relating to insurance (arts 10 to 16)

**6JRx.26**    In the 1968 Convention (amended) comparable articles were contained in Section 3 of Title II (arts 7 to 12a), and in the original Judgments Regulation they were in Section 3 of Chapter II (arts 8 to 14). In the revised Lugano Convention (2007) they are in Section 3 of Title II (arts 8 to 14).

Articles 10 to 16 apply to "matters relating to insurance". In *Aspen Underwriting Ltd v Credit Europe Bank NV* [2020] UKSC 11; [2020] 2 W.L.R. 19 the Supreme Court held (dismissing the claimant insurer's appeal on this point) that a claim by an insurer against a bank that a settlement agreement arising out of an insurance claim had been procured by fraudulent misrepresentation was a "matter relating to insurance". However, it overturned the Court of Appeal's finding that the defendant bank could not take the benefit of the special protection afforded by art.14 as it was not a "weaker party" for whom the protection of that provision was designed. The decision confirms that there is no requirement that the defendant be in a weaker economic position than the insurer in order to benefit from the protection of art.14.

The special insurance regime of the Judgments Regulations and Conventions do not apply to reinsurance; *Universal General Insurance Co (UGIC) v Group Josi Reinsurance Co SA* (C-412/98) [2001] Q.B. 68; *Agnew v Lansforsakringsbolagens AB* [2001] 1 A.C. 223, HL; [2000] Lloyd's Rep. IR 317; [2000] 1 All E.R. 737. Accordingly, in *Agnew*, a claim to set aside a reinsurance contract for mate-

rial misrepresentation and non-disclosure was not a matter relating to insurance within Section 3 but rather a matter "relating to a contract" within art.5 (now art.7). The obligation in question was the pre-obligation to make a proper presentation of the risk.

Broadly, the effect of the insurance regime is to give a policy holder a wide choice of courts but to confine the insurer to the court of the policy-holder's domicile. The provisions of the section cannot be departed from by agreement unless that agreement complies with the stringent conditions of art.15 of the recast Judgments Regulation (art.13(2) of the Judgments Regulation). Moreover the special insurance regime binds insurers wherever domiciled in relation to litigation involving a policyholder in a Contracting State (*Jordan Grand Prix Ltd v Baltic Insurance Group* [1999] 2 A.C. 127, HL).

Article 11(1)(b) states that an insurer domiciled in a Member State may be sued, not only in the courts of the Member State where he is domiciled, but also in another Member State, in the case of actions brought by the policyholder, the insured or a beneficiary, in the courts for the place where the plaintiff is domiciled. Article 13(2) states that art.11 shall apply to actions brought "by the injured party directly against the insurer, where such direct actions are permitted". Article 13(3) adds that, if the law governing such direct actions provides that the policy holder or the insured may be joined as a party, then "the same court shall have jurisdiction over them". These provisions acknowledge that the national laws of Member States may differ as to whether or not actions by injured parties directly against the insurers of the persons who injured them are permitted, and that, if such actions are permitted, that the detailed substantive and procedural provisions governing such direct actions may differ. In *Hoteles Pinero Canarias SL v Keefe* [2015] EWCA Civ 598; [2016] 1 W.L.R. 904, the Court of Appeal held that under art.11(3) (now art.13(3)) a claimant could bring a claim in tort against the owner of a hotel in circumstances where the claimant also had a direct claim against the company's insurer as there was no requirement that the claim against the hotel's owner concerned the underlying policy or some other insurance dispute. However, in *Cole v IVI Madrid SL* [2019] 9 WLUK 373 (QBD), the High Court said there had been a number of more recent developments which cast doubt on that interpretation, including that the Supreme Court hearing an appeal in Keefe had referred to the CJEU the question of whether the claim against the insured had to involve "a matter relating to insurance" but the case had settled before the reference was heard. Accordingly, the High Court considered that there was real uncertainty as to the proper interpretation of art.13(3) and a reference to the CJEU was justified.

The protective function which art.13(2) fulfils, read in the light of art.11(1)(b), necessitates that the special jurisdiction afforded by those provisions is not to be extended to persons for whom the protection is not justified (*Hofsoe v LVM Landwirtschaftlicher Versicherungsverein* (C-106/17) EU:C:2018:50; [2019] C.E.C. 463, ECJ, where ruled that it did not extend to a person who carried out a professional activity recovering insurance indemnity claims against insurance companies, in his capacity as contractual assignee of such claims.

A direct right of action against insurers in road traffic cases was required to be introduced into the laws of all Member States (insofar as it did not already exist) by Directive 2000/26/EC of the European Parliament and Council of 16 May 2000. In the UK, the direct claim for these purposes was first provided for by the European Communities (Rights against Insurers) Regulations 2002 (SI 2002/3061). A simple question arises: if a person (C) domiciled in Member State A is injured in a car accident in Member State B, where the other driver and that driver's insurers (D) are domiciled in Member State B, can C bring an action against D in the courts of Member State A? In *Odenbreit v FBTO Schadeverzekeringen NV* (C-463/06) EU:C:2007:792; [2008] 2 All E.R. (Comm) 763; [2008] I.L.Pr. 12, the European Court of Justice ruled that the answer to this question was "yes", provided, as art.11(2) (now art.13(2)) states, such a direct action is "permitted". That settles the question of jurisdiction. (The question as to what law the court of Member State A should apply to the determination of the action is, of course, a different matter.) In a given case, the question whether or not a direct action is "permitted" is to be determined in accordance with the lex causae (not the lex fori) (*Maher v Groupma Grand Est* [2009] EWCA Civ 1191; [2010] 1 W.L.R. 1564; *Jones v Assurances Generales de France (AGF) SA* [2010] I.L.Pr. 4 (Judge Birtles)).

A jurisdiction clause conforming with art.15(3) of the recast Judgments Regulation cannot be relied on against a beneficiary under that contract who has not expressly subscribed to that clause and is domiciled in a Contracting State other than that of the policyholder and the insurer (*Societe Financiere Industrielle du Peloux v AXA Belgium* (C-112/03) [2006] Q.B. 251; [2005] 2 All E.R. (Comm) 419; [2005] I.L.Pr. 32).

In *Assens Havn v Navigators Management (UK) Ltd* (C-368/16) EU:C:2017:546; [2018] 2 W.L.R. 250, ECJ, the CJEU held that an exclusive jurisdiction clause in a policy of marine insurance did not bind a third party victim who sought to bring a direct claim against the insurer of the assured.

Proceedings between insurers are outside the scheme established by Section 3 of the Judgments Regulation (*Youell v La Réunion Aérienne* [2009] EWCA Civ 175; [2009] 1 Lloyd's Rep. 586, CA).

Third-party proceedings between insurers based on multiple insurance are not subject to the provisions of (what is now) art.14 of the Judgments Regulation (*Groupement d'Interet Economique (GIE) Reunion Europeenne v Zurich Espana* (C-77/04) [2005] I.L.Pr. 33, ECJ).

### (b)   Jurisdiction over consumer contracts (arts 17 to 19)

**6JRx.27**

In the 1968 Convention (amended) comparable articles were contained in s.4 of Title II (arts 13 to 15), and in the original Judgments Regulation they were in s.4 of Ch.II (arts 15 to 17). In the revised Lugano Convention (2007) they are in s.4 of Title II (arts 15 to 17).

This special jurisdiction regime covers consumer contracts which, in broad terms, are contracts for the provision of goods or services (excluding transport) to a person operating outside their

trade or profession, where the contract involves the provision of credit, or where the contract falls within the scope of commercial or professional activities which the counterparty pursues in, or directs to, the Member State of the consumer's domicile. In matters relating to a contract concluded by a person, the consumer, for a purpose which can be regarded as being outside his trade or profession, jurisdiction shall be determined by this Section, without prejudice to art.6 and point 5 of art.7, if:

(a) it is a contract for the sale of goods on instalment credit terms;

(b) it is a contract for a loan repayable by instalments, or for any other form of credit, made to finance the sale of goods; or

(c) in all other cases, the contract has been concluded with a person who pursues commercial or professional activities in the Member State of the consumer's domicile or, by any means, directs such activities to that Member State or to several States including that Member State, and the contract falls within the scope of such activities.

Articles 17 to 19 lay down special rules for consumer contracts which are similar to those in respect of insurance contracts and policyholders. Consumers for this purpose are persons dealing outside their trade or profession, and relevant contracts include credit agreements and contracts for the supply of goods and services.

A person who concludes a contract relating to goods which are in part within and in part outside their trade or profession can only rely on the special rule if the trade or professional purpose is negligible in the overall context of the supply and, where that person has acted in such a way as to lead the supplier reasonably to believe that the person was acting for business purposes, they cannot rely upon the special rule (*Gruber v BayWa AG* (C-464/01) [2006] Q.B. 204, ECJ). In *Schrems v Facebook Ireland Ltd* (C-498/16) EU:C:2018:37; [2018] 1 W.L.R. 4343, ECJ, on the basis that he was a consumer, a claimant (C) domiciled in Austria brought a claim in a court of a Member State against a social media company (D) domiciled in Ireland with whom C had an account alleging infringement of his privacy and data protection rights. In addition, C brought claims assigned to him (and solicited by him in his capacity as a well-known consumer activist in the matters pleaded in his and in the assigned claims) by several individuals (some not domiciled in Member States) similarly placed and claiming the same relief. The ECJ ruled that the special jurisdiction in art.18 did not include the assigned claims. The ECJ also ruled that C's conduct as a consumer activist did not entail the loss of his status as a consumer in relation to his own claim against D, and in doing so examined the authorities on the concept of "a consumer" within art.18.

A consumer can sue a supplier in the Member State where either of them is domiciled which is deemed to include, in relation to the supplier, a Member State where the supplier has a branch, agency or establishment whose operations have given rise to the dispute. The consumer can only be sued in the Member State where they are domiciled.

In *Gabriel Schlank and Schick GmbH* (C-96/00) EU:C:2002:436; [2002] I.L.Pr. 36, ECJ, gave a ruling on the meaning of (what is now) art.17.1(c) in proceedings where an Austrian national consumer domiciled in Vienna sought an order against a mail-order company established in Germany requiring that mail-order company to pay him a financial benefit. The court held that where a company had sent the consumer in person a letter likely to create the impression that a prize would be awarded to him on the condition that he ordered goods to a specified amount, and where that consumer actually placed an order in the State of their domicile without, however, obtaining payment of that financial benefit, judicial proceedings brought by the consumer against the company are contractual within the nature contemplated by art.17.1(c). In *Engler v Janus Versand GmbH* (C-27/02) [2005] I.L.Pr.8, the Court of Justice held that a claim fell within (what are now) art.7.1(a) and art.17.1(a) where a private individual was sent a letter addressed to her personally stating that she had won a prize without the imposition of any condition in respect of goods sold by the company offering the prize. A finding that a legal action was not contractual in nature for the purposes of art.17.1(a) does not prevent that action relating to a contract for the purposes of art.17.1(b) (*Re Jurisdiction in a Claim Based on a Prize Draw Notification* [2007] I.L.Pr. 15).

The *Gabriel* case was considered by the Court of Appeal in *Rayner v Davies* [2002] EWCA Civ 1880; [2003] I.L.Pr. 15, where it held that for a consumer contract to come within (what is now) art.17.1(c) it is the seller who must have invited the business and that a faxed offer from a defendant surveyor to a claimant purchaser regarding the terms of a survey was not the sort of specific invitation which art.17.1(c) contemplated on the grounds, inter alia, that there had not been advertising or positive conduct on the part of the surveyor preceding the contract and that, in this case, it was the claimant purchaser who had invited the surveyor to do business.

In *Hutchinson v Mapfre Espana Compania de Seguros Y Reaseguros SA* [2020] EWHC 178 (QB), Andrews J held that a UK-domiciled consumer could bring proceedings against a Spanish company in the English court under art.17 where the company had directed its activities to consumers in the UK at the material time, regardless of whether the claimant had entered into the contract as a result of those promotional activities. (On the facts, the claimant had entered into the contract as a result of promotional activities in Spain.)

In *Hobohm v Benedikt Kampik Ltd & Co KG* (C-297/14) EU:C:2015:844; [2016] 2 W.L.R. 940 a consumer, domiciled in Germany, entered into a brokerage contract with an intermediary in Spain to buy a holiday apartment in Spain being built by a German developer and marketed in Germany via a prospectus written in German. The developer encountered financial difficulties and the intermediary proposed to the consumer to finish the work in the apartment and for that purpose a transaction management contract was concluded in Spain between the consumer and the intermediary. The consumer brought a claim for sums paid under the transaction management

contract before the German courts on the basis of the special provisions relating to consumer contracts. Jurisdiction was challenged on the basis that although the brokerage contract was a consumer contract, the transaction management contract was not. The CJEU held that where a contract which was not a consumer contract was closely linked to a previous contract that was a consumer contract, the consumer could rely upon art.16(1) (now art.18(1)), and that a sufficient link was established where (i) the parties to both contracts were the same in law and fact, (ii) the economic objective of the contracts was identical and (iii) the second contract complemented the first in that it made it possible to achieve the objectives of the first contract.

In *AU v Reliantco Investments Ltd* (C-500/18) EU:C:2020:264, 2 April 2020, the ECJ held that a tort claim brought by a consumer will fall within art.17 if it is indissociably linked to a contract concluded between that consumer and the supplier. The ECJ found that art.17 applied to one of the consumer's claims in that case, as it was based on national provisions on consumer protection, namely the requirement for the supplier to inform consumers about the services provided and the risks to which they are exposed before concluding the contract, and therefore must be regarded as being indissociably linked to the contract.

In *Pillar Securitisation SARL v Arnadottir* (C-694/17) EU:C:2019:345; [2019] 1 W.L.R. 5285, the CJEU held that the fact that the value of a loan was too high for it to be classified as a "consumer credit agreement" under Council Directive 2008/48/EC had no bearing on the question whether a borrower was a "consumer" when sued for repayment of that loan.

In *Petruchova v Fibo Group Holdings Ltd* (C-208/18) EU:C:2019:825; [2020] C.E.C. 326, the CJEU held that a natural person who carries out transactions on the FOREX market through a contract for difference concluded with a brokerage company must be classified as a "consumer" within the meaning of art.17(1) if the conclusion of that contract does not fall within the scope of that person's professional activity, which it is for the national court to ascertain. For the purpose of that classification, factors such as the value of transactions carried out, the extent of the risks of financial loss associated, the person's knowledge or expertise in the field of financial instruments or his or her active conduct in such transactions were in principle irrelevant.

#### (c)  Jurisdiction over individual contracts of employment (arts 20 to 23)

**6JRx.28**

Originally the 1968 Convention, amended, did not deal expressly with individual contracts of employment. Article 5(1) was in the same terms as is art.7(1)(a) of the Judgments Regulation (recast). However, at the time of the revision of the 1968 Convention upon the accession of Spain and Portugal, words were added to art.5(1) to provide for individual contracts of employment (by the Civil Jurisdiction and Judgments Act 1982 (Amendment) Order 1990). Then in the original Judgments Regulation, instead of dealing with such contracts in 5.1(a), they were dealt with in a separate special jurisdiction (Section 5, arts 18 to 21), and in the same way in the revised Lugano Convention (2007), and then became arts 20 to 23 in the Judgments Regulation (recast).

Articles 22 and 23 of the Judgments Regulation (recast) are in the same terms as arts 20 and 21 of the original Judgments Regulation. Articles 20 and 21 of the recast replaced arts 18 and 19 of the original, but in terms modified for the purposes of clarification. Paragraph (2) of art.21, which expressly deals with the circumstance where the defendant employer is not domiciled in a Member State, had no counterpart in the original Judgments Regulation. The policy underlying these provisions is that the weaker party should be protected by rules of jurisdiction more favourable to his or her interests than provided for under the general rules for the allocation of jurisdiction; in matters coming within them, the employee is presumptively treated as the weaker party (*Arcadia Petroleum Ltd v Bosworth* [2016] EWCA Civ 818; [2016] C.P. Rep. 48, CA, at para.29 per Gross LJ).

Article 7(1)(a) states that, in matters relating to a contract, a person domiciled in a Member State may be sued in the courts for the place of performance of the obligation in question (thus providing an exception to the general rule that a person should be sued in the court of the Member State in which he or she is domiciled). The provisions in arts 20 to 23 modify the effects of art.7.1(a) where the matter relates to individual contracts of employment.

Where the work entrusted to the employee is carried out on the territory of more than one Member State, "the place where the employee habitually carries out his work" (art.21) can be defined as "the place where or from which the employee principally discharges his obligations towards his employer" (*Mulox IBC Ltd v Geels* (C-125/92) EU:C:1993:306; [1993] I.L.Pr. 668, ECJ, at [24]). Where there was no effective centre of professional activities from which the employee performed the essential part of his duties, the habitual place of work is the place where, or from which the employee in fact performed the essential part of his duties vis-à-vis his employer (*Nogueira v Crewlink Ireland Ltd* (C-168/16) EU:C:2017:688; [2018] I.C.R. 344, ECJ, where the question arising was the place where members of airline flight crew with a "home base" (a term of art in another context) habitually carried out their work).

In *Alfa Laval Tumba AB v Separator Spares International Ltd* [2012] EWCA Civ 1569; [2013] 1 W.L.R. 1110, the Court of Appeal held that an action in tort would be likely to fall within "matters relating to individual contracts of employment" no matter how it was pleaded if that act complained of would, if proved, amount to breaches of contract by the employee.

However, in *Arcadia Petroleum Ltd v Bosworth* [2016] EWCA Civ 818, CA; [2016] C.P. Rep 48, the Court of Appeal clarified that whether or not the claims could have been pleaded as a breach of contract could not be elevated into a test or touchstone, although it might be helpful in many cases. The correct approach was to consider whether the reality and substance of the conduct related to the individual contract of employment, having regard to the social purpose of Section 5 of Title II of the (applicable) Lugano Convention. Claims of conspiracy were bought by group companies against former executives at the group. The CA held that the conspiracy claims did not relate to the

defendants' individual contracts of employment and were therefore outside arts 18 and 20 of the Lugano Convention, save for those periods when the defendants were employed by the relevant claimant companies. However, subject to that proviso, the claims were correctly characterised as claims in tort and the English Court had jurisdiction. The defendants appealed to the Supreme Court, which referred various questions to the CJEU for a preliminary ruling including the question of whether it is sufficient to fall within the relevant provisions of the Lugano Convention that a claim could have been pleaded as a breach of the employment contract, even if no such breach was in fact relied on. However, the effect of the CJEU's ruling on a separate question (see below) meant that there was no individual contract of employment in this case and so there was no need to answer the other questions referred.

Article 21 preserves the position in art.5(1) of the 1968 Convention. An employer may be sued in the courts of the Member State where they are domiciled, or in another Member State (a) in the courts for the place where the employee habitually carries out their work or in the courts for the last place where they did so, or (b) if the employee does not or did not habitually carry out their work in any one country, in the courts for the place where the business which engaged the employee is or was situated. These provisions may be departed from only by an agreement which is entered into after the dispute has arisen, or which allows the employee to bring proceedings in courts other than those indicated by the provisions (art.23).

In *Merinson v Yukos International UK BV* [2019] EWCA Civ 830; [2020] Q.B. 336 the Court of Appeal held that claims to annul a settlement agreement concluded to settle an employment dispute were "matters relating to individual contracts of employment" within the meaning of art.20, applying the test set out in *Arcadia Petroleum Ltd v Bosworth* [2016] EWCA Civ 818; [2016] C.P. Rep. 48 (above). The court further held that the settlement agreement was not an agreement entered into after the dispute had arisen within the meaning of art.23(1), and so the exclusive jurisdiction clause in the settlement agreement (in favour of the Dutch courts) was not effective to prevent proceedings being brought against the English-domiciled defendant in the English courts under art.21. The applicable test for whether an agreement has been entered into after the dispute has arisen is (i) whether the parties have disagreed on a specific point, which requires that the subject matter of the disagreement has been communicated between them; and (ii) whether legal proceedings in relation to that disagreement are imminent or contemplated. This sets a high threshold for an agreement falling within art.23(1).

In *G. Pugliese v Finmeccanica SpA* (C-437/00) [2003] I.L.Pr. 21, the Court of Justice held that in a dispute between an employee and a first employer, the place where the employee performs his obligations to a second employer can be regarded as the place where he habitually carries out his work when the first employer, with respect to whom the employee's contractual obligations are suspended, has, at the time of the conclusion of the second contract of employment, an interest in the performance of the service by the employee to the second employer in a place decided on by the latter.

Further, by art.20(2), where an employee enters into an individual contract of employment with an employer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States, the employer shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State. Article 22(1) provides that an employer may bring proceedings only in the courts of the Member State in which the employee is domiciled.

A member of a group of companies may be treated as an employer for the purposes of arts 20 to 23 the Judgments Regulation (*Samengo-Turner v J & H Marsh & McLennon (Services) Ltd* [2007] EWCA Civ 723; [2007] 2 All E.R. (Comm) 813; [2007] I.L.Pr. 52; *Petter v EMC Europe Ltd* [2015] EWCA Civ 828; [2016] I.L.Pr. 3 (where held that, as a stock award agreement between an American company and their employee (employed through a UK subsidiary) fell within the Regulation, the court was bound to disregard the agreement's foreign exclusive jurisdiction clause, assume jurisdiction, and grant an anti-suit injunction).

In *Bosworth v Arcadia Petroleum Ltd* (C-603/17) EU:C:2019:310; [2020] C.E.C. 144 on a reference from the UK Supreme Court for a preliminary ruling, the CJEU held that an "individual contract of employment" requires a relationship of subordination between the company and the individual; accordingly, the equivalent provisions under the Lugano Convention (arts 18 to 21) did not apply to a company's directors who were able to determine the terms of their employment contracts and had control and autonomy over the day-to-day operation of the company's business and the performance of their own duties (and see *Alta Trading UK Ltd v Bosworth* [2020] EWHC 2757 (Comm)). See also *Holterman Ferho Exploitatie BV v Spies Von Bullesheim* (C-47/14) [2015] I.L.Pr. 44, ECJ on the requirements for an "individual contract of employment" within the equivalent provisions of the Brussels I Regulation (44/2001).

## D.   Exclusive Jurisdiction: Jurisdiction Regardless of the Domicile of the Parties (art. 24)

### 1.   *Exclusive jurisdiction regardless of domicile*

**6JRx.29**   The provisions as to exclusive jurisdiction contained in art.24 of the Judgments Regulation (recast) provide that in certain proceedings, being proceedings which "have as their object" or which are "concerned with" certain matters, the courts of a particular Member State (or of a State

bound by a Convention) shall have exclusive jurisdiction, regardless of the domicile of the parties. Despite the words "regardless of domicile", it seems art.24 only applies where a defendant is domiciled in an EU Member State; see *Choudhary v Bhattar* [2009] EWCA Civ 1176; [2010] 2 All E.R. 1031 in which Sir John Chadwick held that the words "regardless of domicile" in the predecessor to art.24 (art.22 of the Brussels I Regulation) merely overrode a claimant's usual right to sue in the defendant's EU domicile or another EU Member State which had jurisdiction based on a connecting factor; it did not mean that the article applied regardless of where the defendant was domiciled. That decision has been subject to substantial criticism (see *Dar Al Arkan Real Estate Development Co v Al-Refai* [2013] EWHC 4122 (Comm) (Andrew Smith J) and in the Court of Appeal ([2014] EWCA Civ 715; [2015] 1 W.L.R. 135, CA); and *Deutsche Bank AG v Sebastian Holdings Inc (No.2)* [2017] EWHC 459 (Comm); [2017] 1 W.L.R. 3056 (Teare J) at paras 21 to 26 and in the Court of Appeal (*Deutsche Bank AG v Vik* [2018] EWCA Civ 2011; [2019] 1 W.L.R. 1737, CA, at paras 76 to 83 per Gross LJ)). However, in *Integral Petroleum SA v Petrogat FZE* [2018] EWHC 2686 (Comm); [2019] 1 W.L.R. 574 Moulder J held that she was bound to apply the decision in *Choudhary* in a case concerned with art.24 of the recast Judgments Regulation.

In all five different varieties of proceeding are listed in the article (as paras (1) to (5)).

Article 24 stands as a single article in Section 6 of Chapter II of the Judgments Regulation (recast). The comparable provision in art.24 in the original Judgments Regulation was art.22, and in the 1968 Convention it was art.16. In the revised Lugano Convention (2007) it is art.22, where it stands in the same terms as it stood in art.22 in the original Judgments Regulation.

The exclusive jurisdiction under this article cannot be derogated from by a clause conferring jurisdiction on the courts of another contracting state (art.25) or by way of a tacit prorogation of jurisdiction (art.26). The courts of any state other than that whose courts are recognised as having exclusive jurisdiction pursuant to art.24 must declare of their own motion that they have no jurisdiction (art.27). Further, a foreign judgment handed down in breach of art.24 can neither be recognised (art.45) nor enforced (art.46) (see, e.g., *Prudential Assurance Co Ltd v Prudential Assurance Co of America* [2003] EWCA Civ 327; [2003] 1 W.L.R. 2295, CA, where held that the combined effect of (what are now) art.24(4) and art.45.1(e) was that, in proceedings concerned with the registration or validity of a national trade mark which was registered in the country where the proceedings were held, a prior judgment in another state on a similar or identical national trade mark is not to be recognised, since it would conflict with the provisions of art.24(4)).

In art.24, proceedings of five different varieties are listed. They are united by, what has been called, "the principle of proximity", that is to say, the principle that as a practical matter the courts of the locus rei sitae "are the best placed, for reasons of proximity, to ascertain the facts satisfactorily and to apply the rules and practices which are generally those of the state in which the property is situated" (*Webb v Webb* (C-294/92) [1994] Q.B. 696, 707, para.18).

The last variety (art.24(5)) consists of "proceedings concerned with the enforcement of judgments". In *Deutsche Bank AG v Sebastian Holdings Inc (No.2)* [2017] EWHC 459 (Comm); [2017] 1 W.L.R. 3056 (Teare J), a bank (C), having obtained an order under r.71.2 against the owner of a company (D), subsequently applied under r.81.4 to commit D for contempt on the grounds that he had failed fully to comply with the order. The judge accepted C's submission that permission to serve the notice on D out of the jurisdiction was not required because the proceedings concerned the enforcement of a judgment within art.24(5), rejecting D's submission that, because it was concerned with the taking of evidence and the disclosure of documents, the order under r.71.2 was not a "judgment" within the definition of that term given in art.2(a) (paras 22 to 24). In the event it was not necessary for the point to be determined, either by the judge or on appeal. However, the Court of Appeal expressed the provisional view that had it been required to do so it would likely have decided the point in accordance with the judge's ruling; see *Deutsche Bank AG v Vik* [2018] EWCA Civ 2011; [2019] 1 W.L.R. 1737, CA at paras 76 to 83 per Gross LJ).

## 2. *Rights in immovable property*

The first variety (art.24(1)) consists of proceedings which have as their object rights in rem in **6JRx.30** immovable property or tenancies of immovable property, for which the courts of the Member State in which the property is situated have exclusive jurisdiction.

The variation of this rule of jurisdiction to enable proceedings which have as their object short-term tenancies to be brought either in the courts of the Member State in which the property is situated or in the courts of the Member State in which the defendant is domiciled was effected at the time of the revision in 1990 of the 1968 Convention upon the accession of Spain and Portugal (see Civil Jurisdiction and Judgments Act 1982 (Amendment) Order 1990). (That variation was complemented by an amendment to art.8(4), see para.6JRx.24 above.)

In *Dansommer A/S v Gotz* (C-8/98) [2001] 1 W.L.R. 1069, ECJ, it was ruled that so far as (what is now) art.24(1) refer to "tenancies of immovable property", it applied to proceedings in which the dispute directly concerned rights and obligations arising under an agreement for the letting of immovable property, even where the action was brought not by the owner of the property but by a tour operator subrogated to his rights; and that, although it did not apply where the agreement was a complex one which also provided for the supply to the lessee of a range of other services, it was applicable where such further provision related to matters, such as insurance in the event of cancellation of a holiday letting or a guarantee of reimbursement in the event of the tour operator's insolvency, which were merely ancillary to a contract's principal status as a tenancy agreement.

In *Ashurst v Pollard* [2001] Ch. 595, CA, where it was held that an English court did not have

jurisdiction to order the sale of Portuguese land on the application of an English trustee in bankruptcy, the Court of Appeal stated that proceedings had as their object rights in rem if such rights were their "principle subject matter", but in considering whether art.24(1) (which was to be construed restrictively) applied to a particular case, it was material to have regard to the article's underlying rationale and consider whether the proceedings involved a factual investigation best carried out by the courts of the state in which the property was situated or raised questions of local law or practice.

In *Prazic v Prazic* [2006] EWCA Civ 497; [2007] I.L.Pr. 31, CA, the claimant (C) issued proceedings in England under the Trusts of Land and Appointment of Trustees Act 1996 against a defendant (D) domiciled in France. C sought a declaration in relation to two London flats that she was an equal owner in equity, and she also sought a tracing order in relation to the proceeds of sale of a property in Essex which had apparently been invested in some property in Switzerland. Upon D's challenge to the jurisdiction of the English court C submitted that the court had exclusive jurisdiction under (what is now) art.24(1). In rejecting that submission the Court of Appeal stated that (1) the TOLATA claim could not be said to be an action in rem in relation to the Essex property, (2) in relation to the other two properties what was really in issue was whether the dealings between the parties resulted in the creation of an equitable interest, (3) it did not matter where the property was situated and, therefore, it did not matter where the issues between the parties, the issues of fact, were to be tried, (4) there was nothing in the dispute that required any on-the-spot investigation or enquiries which was the rationale underlying the provisions of art.24.

In *Jarrett v Barclays Bank Plc* [1999] Q.B. 1, C.A., the claimant, who had borrowed money from the defendant bank (D) to finance purchase from a company of a time-share tenancy in property situated in a Member State abroad, brought a county court action against D on ground that it was liable for statutory misrepresentations in relation to the transaction. The Court of Appeal held that the English court was not denied jurisdiction by operation of art.24(1) as the action did not constitute a proceeding which had as its "object" a tenancy of immovable property situated elsewhere.

In *Komu v Komu* (C-605/14) EU:C:2015:833; [2016] 4 W.L.R. 26, the CJEU held that an action concerning a number of Finnish domiciled parties for the termination of the co-ownership of properties in Spain fell within the exclusive jurisdiction of the Spanish Court under (what is now) art.24(1).

In *Schmidt v Schmidt* (C-417/15) [2017] I.L.Pr 6, the CJEU held that an action to avoid a contract of gift of immoveable property on the ground of the donor's incapacity did not fall within art.24(1) of the Recast Regulation. However an action seeking to remove from the land register notices evidencing the dome's right of ownership did fall within the scope of that provision.

### 3.   Decisions of companies and their dissolution etc

**6JRx.31**   The second variety of proceedings (art.24(2)) consists of proceedings which have as their object the validity of the constitution, the nullity or the dissolution of companies or other legal persons or associations of natural or legal persons, or of the validity of the decisions of their organs, for which the courts of the Member State in which the company, legal person or association "has its seat" have exclusive jurisdiction. Since its re-enactment in the original Judgments Regulation (as art.22(2) therein), art.24(2) has stated that, in order to determine that seat, the court shall apply its rules of private international law.

In *Berliner Verkehrsbetriebe v JP Morgan Chase Bank* (C-144/10) [2011] 1 W.L.R. 2087, ECJ, it was said in the context of art.24(2) that the "object" of proceedings is the proceedings' "principal subject matter", and not a matter arising merely as a collateral question. It was further stated (1) that art.24(2) is to be interpreted as covering "only proceedings whose principal subject matter comprises the validity of the constitution, the nullity or the dissolution of the company, legal person or association or the validity of the decisions of its organs" (ibid para.44), (2) that the objectives of the Judgments Regulation include predictability and "to confer exclusive jurisdiction on the courts of a member state in specific circumstances where, having regard to the matter at issue, those courts are best placed to adjudicate upon the disputes falling to them, because there is a particularly close link between those disputes and the member state" (paras 33 to 36), (3) that a strict interpretation of art.24(2) which does not go beyond what is required by the objectives pursued by it is particularly necessary "because the jurisdiction rule which it lays down is exclusive, so that its application would deny the parties to a contract all autonomy to choose another forum" (ibid para.32).

In related proceedings involving the same parties, where this matter was exhaustively examined before the ECJ ruling in Case C-144/10, the English Court of Appeal reached a similar conclusion, endorsing the view that art.24 calls for an exercise in "overall classification" and an "overall judgment" (*JP Morgan Chase Bank NA v Berliner Verkehrsbetriebe (BVG) Anstalt des Öffentlichen Rechts* [2010] EWCA Civ 390; [2012] Q.B. 176, CA (at paras 86 to 89 per Aikens LJ; on appeal the Supreme Court made a reference to the ECJ; see Case C-54/11, referred to in Case C-144/10)). See also *Depfa Bank Plc v Provincia di Pisa* [2010] EWHC 1148 (Comm); [2010] I.L.Pr. 51 (Hamblen J); *Blue Tropic Ltd v Chkhartishvili* [2014] EWHC 2243 (Ch); [2014] I.L.Pr. 33 (Newey J).

In *Speed Investments Ltd v Formula One Holdings Ltd (No.2)* [2004] EWCA Civ 1512; [2005] 1 W.L.R. 1936, CA, a judge at first instance held that the English court had exclusive jurisdiction under (what is now) art.24(2) in proceedings brought by foreign resident shareholders concerning their rights in an English company (D) under a shareholders' agreement, with the effect that, in the

circumstances the jurisdiction of the English court should take precedence over that of a first seised court with non-exclusive jurisdiction. The Court of Appeal, in upholding the judge, stated (1) that although the main area of live dispute was the effect of the agreement the real subject matter of the dispute was the composition of the board of D; (2) that although the issue was not strictly the validity of the constitution of D, or any actual decisions of its board, determining the composition of the board was essential for the validity of future decisions; (3) that, therefore, since the subject matter of the dispute was, at least prospectively, the validity of decisions of D the proceedings fell within art.24(2).

The authorities on the ambit of art.24(2) were carefully examined in *Worldview Capital Management SA v Petroceltic International Plc* [2015] EWHC 2185 (Comm); [2015] I.L.Pr. 46 (Judge Waksman QC), where it was held that, on a proper analysis, art.24(2) was not engaged and that the question whether the English court had jurisdiction turned on (what is now) art.7(1). In *Akcil v Koza Ltd* [2019] UKSC 40; [2019] 1 W.L.R. 4830, the Supreme Court, reversing the Court of Appeal, held that where the English Court had jurisdiction over one claim ("claim A") under art.24(2), the mere fact that it was linked to another claim ("claim B") was not sufficient to bring that latter claim within art.24(2) unless claim B was inextricably linked to claim A and itself was principally concerned with the validity of the decision of a company with its seat in England.

Amongst other things, art.24(2) grants the courts of a Member State in which a company "has its seat" exclusive jurisdiction in proceedings which have as their object the "dissolution" of the company. In the case of *Re Rodenstock GmbH* [2011] EWHC 1104 (Ch); [2011] Bus. L.R. 1245 (Briggs J) the claimant company (C), incorporated in Germany, applied for the sanction by the English court of a scheme of arrangement pursuant to Pt 26 of the Companies Act 2006. C had its centre of main interest (COMI) in Germany, had no establishment in the UK, nor any assets in the UK likely to be affected by the scheme. In granting the application (which, in the event, was not opposed), the judge stated there was nothing in the Judgments Regulation which purported to restrict or exclude the English court's traditional jurisdiction in relation to the sanctioning of schemes of arrangement and, in particular, such proceedings did not fall within the exclusive jurisdiction conferred by art.24(2). However, under that provision the English court's jurisdiction to wind up a solvent company is excluded in circumstances where, as in the case of C, the company has its seat in a Member State other than the UK. Consequently, for as long as C continued to have both its seat and COMI in Germany, and had no establishment in the UK, the English court would have no jurisdiction to wind it up, whether solvent or insolvent, save on the public interest ground.

In *Eon Czech Holding AG v Dĕdouch* (C-560/16) [2018] 4 W.L.R. 94, a Czech company resolved in general meeting on the compulsory transfer of all participating securities in that company to its principal shareholder, the defendant, a German company. The claimant minority shareholders brought an action requesting a Czech court to review the reasonableness of that consideration. Even if the Czech court decided that the amount was not reasonable, Czech law precluded that decision from having the effect of invalidating the resolution. In that context, the CJEU nevertheless held that the Czech Court had exclusive jurisdiction over the dispute under (what is now) art.24(2).

### 4. Proceedings concerned with the registration or validity of patents etc

In the circumstances referred to in the second paragraph in art.24(4), the courts of each Member **6JRx.32** State shall have exclusive jurisdiction in proceedings concerned with the registration or validity of any European patent granted for that State. That paragraph first appeared in the original Judgments Regulation. The objective of art.22(4) is to ensure that jurisdiction for proceedings concerned with the registration or validity of intellectual property rights rests with courts closely linked in fact and law to the register, since those courts were best placed to adjudicate on cases where the validity of the right, or even the existence of the deposit or registration, were in dispute. In *Hanssen Beleggingen BV v Prast-Knipping* (C-341/16) [2017] I.L.Pr. 36, ECJ, where the point at issue appeared to be exclusively who owned a trade mark after the death of the proprietor, it was ruled that the proceedings did not fall within art.24(4).

Since its re-enactment in the Judgments Regulation (recast) art.24(4) has applied "irrespective of whether the issue is raised by way of an action or as a defence". That formulation did not appear in the comparable articles in the original Judgments Regulation (art.22.4) or in the 1968 Convention (art.22.4), and does not appear in the revised Lugano Convention (2007 (art.22.4).

The insertion of the words "irrespective of whether the issue is raised by way of an action or as a defence" gives legislative endorsement to the decision of the Court of Justice of the European Union in *Gesellschaft fur Antriebstechnik mbH & Co KG v Lamellen und Kupplungsbau Beteiligungs KG* (C-4/03) EU:C:2006:457; [2007] I.L.Pr. 34. The interpretation and application of art.24(4) has been considered in a number of decisions of the English courts and of the CJEU. The authorities were examined in *Anan Kasei Co Ltd v Molycorp Chemicals & Oxides (Europe) Ltd* [2016] EWHC 1722 (Pat); [2016] Bus. L.R. 945 (Arnold J) at paras 18 to 23. In that case it was held that, where a claim for infringement in relation to the German designation of a patent was countered by a defence challenging the validity of the patent, for the purposes of allocation of jurisdiction the issue of whether there had been an infringement of a valid claim of that patent had to be treated as a single issue and was not divisible into the sub issues of infringement and validity.

For an extended discussion of the scope and purpose of art.24(4), reviewing the relevant ECJ and domestic authorities, see *Eli Lilly & Co v Genetech Inc* [2017] EWHC 3104 (Pat); [2018] 1 W.L.R. 1755 (Birss J) at para.37 et seq.

### 5. Enforcement of judgments

**6JRx.32.1**  Article 24(5) states that in proceedings "concerned with the enforcement of judgments" the courts of the Member State in which the judgment has been or is to be enforced shall have exclusive jurisdiction regardless of the domicile of the parties. It is for the courts of that State alone to apply the rules relating to the actions of the authorities responsible for enforcement. In *Integral Petroleum SA v Petrogat FZE* [2018] EWHC 2686 (Comm); [2019] 1 W.L.R. 574 (Moulder J), on the ground that third parties (D) in the proceedings (all resident outside the Member States) had acted in breach of an ex parte interim restraining order made by the court under the Arbitration Act 1996 s.44, the claimants (C), on the basis that the court had exclusive jurisdiction under art.24(5), issued an application to commit D for breach of that order and served the application on D out of the jurisdiction. On their application under r.11, applying for an order setting aside service and a declaration that the court had no jurisdiction to determine the committal application, D submitted (1) that art.24(5) only applied where the defendants were domiciled in a Member State, and (2) that art.24(5) did not apply to committal proceedings as they were not "proceedings concerned with the enforcement of judgments". The judge accepted the first submission, applying the decision of the Court of Appeal in *Choudhary v Bhatter* [2009] EWCA Civ 1176; [2010] 2 All E.R. 1031; [2010] I.L.Pr. 8, CA, but rejected the second, holding that there was no reason (1) to read into art.24(5) a more restricted definition of "judgment" than that given in art.2(a), or (2) to restrict the application of art.24(5) to enforcement proceedings directed at property.

### 6. "Reflexive" application of art.24

**6JRx.33**  Article 24 is on the face of it concerned with the jurisdictional position as between Member States. It does not in terms address what should happen where the principal subject matter of proceedings is, say, the validity of decisions of a company with its seat outside the EU, or the validity of entries in a public register kept outside the EU.

In a number of cases in the High Court it has been accepted that art.24 can be applied "reflexively"; in other words, that the Courts of a Member State can decline to exercise jurisdiction in circumstances where the article would apply were the country in which, say, a register is kept, or a company, legal person or association has its seat, a Member State; see *Ferrexpo AG v Gilson Investments Ltd* [2012] EWHC 721 (Comm); [2012] 1 Lloyd's Rep. 588 (Andrew Smith J) (a dispute regarding the ownership of shares in a Ukranian mining company), *Blue Tropic Ltd v Chkhartishvili* [2014] EWHC 2243 (Ch); [2014] I.L.Pr. 33 (Newey J) (a dispute regarding ownership of shares in BVI companies). However, those cases were decided before the recast Judgments Regulation came into force. In *Gulf International Bank BSC v Aldwood* [2019] EWHC 1666 (QB); [2020] 1 All E.R. (Comm) 334, John Kimbell QC (sitting as a deputy High Court judge) held that there is no power to decline jurisdiction in favour of a non-EU court in a case falling outside the express powers in arts 33 and 34 (in that case, despite the presence of an exclusive jurisdiction clause in favour of a non-EU court, so it would have been a reflexive application of art.25 rather than art.24). See also *UCP Plc v Nectrus Ltd* [2018] EWHC 380 (Comm); [2018] 1 W.L.R. 3409 and para.6JRx.47 below. In *PJSC Commercial Bank Privatbank v Kolomoisky* [2019] EWCA Civ 1708, the Court of Appeal approved the analysis in *Ferrexpo*, in the context of considering the reflexive application of the lis pendens rules in the Lugano Convention. However, it did not comment on the question of whether the same approach could be applied under the Judgments Regulation, in light of the express powers to stay proceedings in favour of non-EU courts under arts 33 and 34.

## E. Prorogation of jurisdiction (arts 25 and 26)

### 1. Introduction

**6JRx.34**  English law, and the laws of the legal systems of the other Member States, recognise an agreement of the parties as to the competence of the court, that is to say, an agreement creating a forum prorogatum. So far as English domestic law is concerned this was illustrated by para.3.1(6)(d) of Practice Direction 6B which (until 6 April 2021) stated that a claimant may serve a claim form out of the jurisdiction with the permission of the court under r.6.36 where a claim is made in respect of a contract where the contract "contains a term to the effect that the court shall have jurisdiction to determine any claim in respect of the contract" (see further para.6HJ.20 above). In the Judgments Regulation (recast) art.25(1) states that, if the parties have agreed that a court or the courts of a Member State are to have jurisdiction, that court or those courts "shall have jurisdiction".

Article 25(1) is not confined to a claim made in respect of a contract, but applies where the parties have agreed that a court or the courts of a Member State are to have jurisdiction "to settle any disputes which have arisen or which may arise in connection with a particular legal relationship". Historically speaking, this is consistent with the traditional continental approach, which did not restrict prorogatio fori to contractual cases (whilst not universally extending it to all cases). In England, the effect of the rule that, if a person by his conduct voluntarily submitted to the jurisdiction of the court, he was precluded from objecting to it, a rule which covered practically all non-contractual cases, was such that, as a practical matter, there was no real difference between the continental approach and the English approach.

Under the articles in Section 7 of Chapter II of the Judgments Regulation (recast) (arts 25 and

26) prorogation of jurisdiction takes three forms: (1) an agreement by the parties to a contract as to the court that is to have jurisdiction with regard to a given legal relationship (art.25(1) (previously art.23(1))), (2) a provision in a trust instrument conferring jurisdiction on a particular court (art.25(3) (previously art.23(4))), and (3) submission by the defendant to the jurisdiction of a court in which proceedings have been instituted (art.26(1) (previously art.24). Article 25(1), art.25(3) and art.26(1) are subject to art.24 (exclusive jurisdiction), so neither a choice-of-court clause nor submission can affect the rules of exclusive jurisdiction (art.25(4) and art.26(1)). Article 25(1) and art.25(3) are also subject to the special jurisdiction rules on matters relating to insurance, consumer contracts and individual employment (art.25(4)).

What are now art.25 and art.26 in the Judgments Regulation (recast) were, in the original Judgments Regulation, art.23 and art.24. Going further back, in the 1968 Convention the comparable provisions were art.17 and art.18. In art.17 it was said that an agreement conferring jurisdiction should be in writing or evidenced in writing or, alternatively, "in international trade or commerce, in a form which accords with practices in that trade or commerce of which the parties are or ought to have been aware". In 1990, at the time of the revision of the 1968 Convention upon the accession of Spain and Portugal, the opportunity was taken in the light of experience to amend art.17 by describing more particularly the alternative forms that an agreement conferring jurisdiction must take (see Civil Jurisdiction and Judgments Act 1982 (Amendment) Order 1990 (SI 1990/ 2591)). As amended, art.17 was taken into the original Judgments Regulation (as art.25) and in the Judgments Regulation (recast) the alternative forms (which have not been varied since) are as described in paras (a), (b) and (c) in art.25(1). In the revised Lugano Convention (2007) the prorogation of jurisdiction articles are art.23 and art.24 which, in terms, coincide with art.23 and art.24 of the original Judgments Regulation.

## 2. Jurisdiction by agreement (choice of court agreement) (art.25.1)

Article 25 applies to non-exclusive, as well as exclusive, jurisdiction agreements (*Antec International Ltd v Biosafety USA Inc* [2006] EWHC 47 (Comm) (Gloster J), at [3]). **6JRx.35**

The provisions of art.25(1) must be strictly interpreted insofar as they exclude both the general jurisdiction laid down in art.4 (defendant's domicile) and the special jurisdiction provided for in arts 7 to 9 (*Leventis v Malcolm Navigation Co Ltd* (C-436/16) EU:C:2017:497; [2018] 1 W.L.R. 80; ECJ, at [39]; *El Majdoub v CarsOnTheWeb.Deutschland GmbH* (C-322/14) EU:C:2015:334; [2015] 1 W.L.R. 3986, ECJ, at [25], and case law cited).

As enacted in the Judgments Regulation (recast) art.25(1) applies regardless of the domicile of the parties, whereas previously that provision applied only where one or more of them was domiciled in a Member State (even if other parties were domiciled outside the EU) (*BNP Paribas SA v Anchorage Capital Europe LLP* [2013] EWHC 3073 (Comm) (Males J)). Further, it is expressly provided that art.25(1) applies "unless the agreement is null and void as to its substantive validity", a matter to be determined in accordance with the law of the Member State of the court or courts designated in the agreement, including the conflict of law rules of that Member State (reversing earlier authority holding that "agreement conferring jurisdiction" was an independent Regulation concept; see *Knorr-Bremse Systems v Haldex Brake Products* [2008] EWHC 156 (Pat); [2008] 2 All E.R. (Comm) 448; [2008] I.L.Pr. 26; *British Sugar Plc v Fratelli Babbini di Lionello Babbini & Co SAS* [2004] EWHC 2560; [2005] 1 Lloyd's Rep 332; [2005] 1 All E.R. (Comm) 55). Also it is expressly provided that the principle of separability applies and therefore (as anticipated by the Court of Appeal in *Deutsche Bank v Asia Pacific Broadband Wireless Communications Inc* [2008] EWCA Civ 1091; [2008] 2 Lloyd's Rep. 619, CA) the validity of the jurisdiction agreement cannot be challenged solely on the basis that the underlying contract is not valid (art.25(5)). These express provisions are in addition to changes made to other Sections of Chapter II of the Judgments Regulation concerning the application and effect of jurisdiction agreements; see in particular art.31 (stay of proceedings where art.25 agreement confers exclusive jurisdiction).

The agreement must be in one or other of the forms stated in paras (a) to (c) in art.25(1). It has to be clearly and precisely demonstrated that the parties actually agreed to every clause conferring jurisdiction. The purpose of art.25(1) is to neutralise the effect of jurisdiction clauses that might pass unnoticed in contracts (*Bols Distilleries BV v Superior Yacht Services Ltd* [2006] UKPC 45; [2007] 1 W.L.R. 12; [2007] 1 Lloyd's Rep. 683; [2007] All E.R. (Comm) 461). In *Saey Home & Garden NV/SA v Lusavouga-Maquinas e Acessorios Industriais SA* (C-64/17) EU:C: 2018:173; [2018] 4 W.L.R. 95, the ECJ stated (at para.25) that the court before which the matter is brought has the duty of examining, in *limine litis*, whether the jurisdiction clause was in fact the subject of consensus between the parties, and ruled that a jurisdiction clause set out in general terms and conditions of sale, which were mentioned in invoices issued by one of the contracting parties, did not satisfy the requirements of art.25(1).

An agreement concluded between parties to a claim already proceeding in the English courts, to the effect that the claimant company would accept service through its solicitors of an application to join a party for the purpose of enabling an additional claim to be pursued, was held not to amount to an exclusive jurisdiction clause falling within art.25, as the aim of the agreement was to avoid the delay and cost of having to serve out of the jurisdiction, rather than to abandon all jurisdictional arguments (*PHP Tobacco Carib Sarl v BAT Caribbean SA* [2017] EWCA Civ 1131; [2017] C.P. Rep. 44, CA).

The Court of Appeal has held that an asymmetric jurisdiction clause is an exclusive jurisdiction clause for the purposes of arts 25 and 31(2) of the Judgments Regulation (recast), see *Etihad Airways PJSC v Flother* [2020] EWCA Civ 1707.

For an examination of the authorities on the evidence in writing criterion in para.(a) of art.25(1) (formerly art.23(1)), and on the course of dealing criterion in para.(b) of that provision, see *Polskie Ratownictwo Okretowe v Rallo Vito & C. SC* [2009] EWHC 2249 (Comm); [2010] 1 Lloyd's Rep. 384 (Hamblen J); *Kolmar Group AG v Visen Industries Ltd* [2009] EWHC 3765 (QB); [2010] I.L.Pr. 23 (Flaux J). Article 25(2) provides that any communication by electronic means which provides a durable record of the agreement shall be equivalent to "writing". For conditions to be satisfied under that provision where a contract containing an exclusive jurisdiction clause is concluded electronically, see *El Majdoub v CarsOnTheWeb.Deutschland GmbH* (C-322/14) [2015] 1 W.L.R. 3986, ECJ. A contract on the terms of a bill of lading said to be implied from the parties' course of conduct did not satisfy the formal requirements of art.25(1)(a) since it was not demonstrated that the parties' consent was in writing or evidenced in writing (*Pan Ocean Co Ltd v China-Base Group Co Ltd* [2019] EWHC 982 (Comm); [2019] 2 Lloyd's Rep. 335 (Christopher Hancock QC)).

Where the parties have entered into a complex transaction with competing jurisdiction clauses and the dispute is at the commercial centre of the transaction, it is those jurisdiction clauses that are also at its centre which the parties must have intended to apply to the dispute; *UBS AG v HSH Nordbank AG* [2009] EWCA Civ 585; [2009] 2 Lloyd's Rep. 272 CA; see also *ACP Capital Ltd v IFR Capital Plc* [2008] EWHC 1627 (Comm); [2008] 2 Lloyd's Rep. 655 (Beatson J); *Sebastian Holdings Inc v Deutsche Bank AG* [2010] EWCA Civ 998; [2010] I.L.Pr. 52, CA; *Lornamead Acquisitions Ltd v Kaupthing Bank HF* [2011] EWHC 2611 (Comm); [2013] 1 B.C.L.C. 73; *Citibank NA, London Branch v Oceanwood Opportunities Master Fund* [2018] EWHC 305 (Ch) (Mann J). In *Deutsche Bank AG v Comune di Savona* [2018] EWCA Civ 1740; [2018] 4 W.L.R. 151, CA, where there were theoretically competing English and foreign jurisdiction agreements which the Court of Appeal found, on the facts, to be mutually exclusive, the Court commented that whilst it is desirable that potentially conflicting jurisdiction clauses be given a mutually exclusive construction, that might not always be possible and a convoluted construction should not be adopted merely to ensure that outcome (at [31] per Longmore LJ). (See also *BNP Paribas SA v Trattamento Rifiuti Metropolitani SPA* [2019] EWCA Civ 768; [2019] 2 All E.R. (Comm) 992 to similar effect.)

When considering whether two separate contracts with competing dispute resolution clauses constitute a single overarching agreement, the "one stop, one jurisdiction presumption" in *Fiona Trust & Holding Corp v Privalov* [2007] UKHL 40; [2007] Bus. L.R. 1719, HL, is a useful starting-point but is not to be treated as giving rise to a presumption: see *AmTrust Europe Ltd v Trust Risk Group SpA* [2015] EWCA Civ 437, [2015] 2 Lloyd's Rep. 154, CA. It is most unlikely that the parties to a jurisdiction clause would have intended that claims in contract and deceit should be heard in different jurisdictions (*Maple Leaf Macro Volatility Master Food v Rouvroy* [2009] EWHC 257 (Comm); [2009] Lloyd's Rep 475 (Andrew Smith J). The scope and effect of the Fiona Trust "one stop, one jurisdiction presumption" were referred to in *Ryanair Ltd v Esso Italiana SrL* [2013] EWCA Civ 1450; [2013] 2 C.L.C. 950, CA, where the question arising on a challenge to the jurisdiction of the English court by the defendant oil company (D) was whether, as the claimant (C) airline operators contended, an exclusive jurisdiction clause contained in a contract for the supply of jet fuel embraced a claim against D in which it was alleged that they were a member of an Italian cartel selling jet fuel in Italian airports, a claim advanced on the basis of a statutory tort under English law in vindication of rights arising out of art.101 of the Treaty on the Functioning of the European Union. The Court held that the exclusive jurisdiction clause did not cover a claim based on a finding that D had breached EU competition rules. See also *Cartel Damage Claims (CDC) Hydrogen Peroxide SA v Akzo Nobel NV* (C-352/13) [2015] 3 W.L.R. 909, ECJ, where held in a cartel damages claim that contractual jurisdiction clauses do not extend to disputes arising from tortious liability except in the unlikely event of the victim being fully aware of the cartel arrangement at the time the jurisdiction clause was concluded. In *Apple Sales International v MJA* (C-595/17) EU:C:2018:854; [2019] 1 W.L.R. 2705, ECJ, it was held that art.23 must be interpreted as meaning that the application, in the context of an action for damages brought by a distributor against its supplier on the basis of art.102 TFEU (anti-competitive conduct by abuse of dominant position), of a jurisdiction clause within the contract binding the parties is not excluded on the sole ground that that clause does not expressly refer to disputes relating to liability incurred as a result of an infringement of competition law. Further, a finding of an infringement of competition law by a national or European authority is not a necessary prerequisite for the application of a jurisdiction clause in the context of such an action.

In considering the application of the "one stop adjudication" presumption to the construction of agreements where art.25 is engaged, it is important to note that in terms that article is confined to agreements to settle disputes "which have arisen or which may arise in connection with a particular legal relationship." The emphasis on a "particular legal relationship" shows that a dispute arising from a second relationship is not likely to be included in an agreement for resolving disputes in an earlier, and different, relationship (*Deutsche Bank AG London Branch v Petromena* [2015] EWCA Civ 226; [2015] 1 W.L.R. 4225, CA, at para.85 per Longmore LJ). In *Altera Absolute Global Master Fund v Sapinda Invets Sarl* [2017] EWHC 871 (Comm); [2018] 1 All E.R. (Comm) 71 (Burton J), the court rejected the defendant's submission that, although the English court had jurisdiction over a claim for breach of a share option agreement containing a non-exclusive English jurisdiction clause, it did not have jurisdiction over a claim for breach of a prior oral agreement concerning the purchase of shares, and held that latter claim was a dispute that "arose out of or in connection with" the dispute in the former claim and was within the jurisdiction clause.

General words of incorporation in a reinsurance contract are not sufficient to incorporate a jurisdiction clause in the underlying insurance contract (*AIG Europe SA v QBE International Insurance Ltd* [2001] 2 Lloyds Rep. 268). On the other hand, in relation to a contract concluded orally in

international trade or commerce, an agreement conferring jurisdiction is validly concluded under (what is now) art.25(1)(c) if one party to the contract did not react to a commercial letter of confirmation sent to it by the other party or repeatedly paid invoices without objection, where those documents contained a pre-printed reference to the courts having jurisdiction, provided that such conduct was consistent with a practice in force in the field of international trade or commerce in which the parties operated and the parties were or ought to have been aware of that practice (*Mainschiffahrts v Les Gravieres Sarl* (C-106/95) EU:C:1997:70; [1997] Q.B. 731). A jurisdiction clause in a bill of lading is an effective agreement between the parties to the bill of lading contract (*OT Africa Line Ltd v Hijazy (The Kribi)* [2001] 1 Lloyd's Rep. 76). However, in *Refcomp SPA v AXA Corporate Solutions Assurance SA* (C-543/10) [2013] I.L.Pr.17, the ECJ held that the line of jurisprudence establishing that a transferee holder of a bill of lading could be bound by a jurisdiction clause could not be transposed to the relationship between a sub-purchaser of goods and an intermediate seller under a string contract. Moreover, in *Antonio Gramsci Shipping Corp v Alvars Lembergs* [2013] EWCA Civ 730; [2013] I.L.Pr. 36, CA, the Court of Appeal considered that the effect of the decision in *Refcomp SpA* (above) was that "deemed consent" was only available where there had been a transfer of the contract in question or the transfer of all the rights and obligations for which it provides. Printed clauses on the back of an order may be incorporated in this way (*Lafi Office and International Business SL v Meriden Animal Health Ltd* [2000] 2 Lloyd's Rep. 51).

In the absence of a relevant practice, there will be no jurisdiction agreement compliant with art.25(1) where acceptance of the clause is not manifest in writing (*Lafarge Plasterboard v Fritz Peters & Co KG* [2000] 2 Lloyd's Rep. 689). Where an offer is contained in a faxed quotation that expressly states that it is "according to the offeror's general terms and conditions" and those terms contain an exclusive jurisdiction clause, a signed purchase order accepting the quotation may constitute a contract constituting an agreement compliant with art.25(1) (*7E Communications v Vertex Anntennentechnik GmbH* [2007] EWCA Civ 140; [2007] 1 W.L.R. 2175; [2007] 2 All E.R. (Comm) 798; [2007] 2 Lloyd's Rep. 411). For a summary of the rules applicable to jurisdiction clauses contained in standard form contracts, see *Coys of Kensington Automobiles Ltd v Pugliese* [2011] EWHC 655 (QB); [2011] 2 All E.R. (Comm) 664 as referred to with approval in *Sherdley v Nordea Life and Pensions SA* [2012] EWCA Civ 88; [2012] Lloyd's Rep. I.R. 437, CA.

Article 25(1) states that the jurisdiction conferred by an agreement complying with that provision "shall be exclusive unless the parties have agreed otherwise". The words "unless the parties have agreed otherwise" did not appear in the comparable article in the 1968 Convention (art.17) but were added for purposes of clarification when the original Judgments Regulation was enacted, and also subsequently included in the 2007 Lugano Convention (art.23(1)). In *Insured Financial Structures Ltd v Elektrocieplownia Tychy SA* [2003] EWCA Civ 110; [2003] Q.B. 1260, CA, a Lugano Convention case decided before the words "unless the parties have agreed otherwise" were added, the Court of Appeal held that, in the circumstances of that case, the benefit of an express reference in the agreement to the non-exclusive jurisdiction of the courts of Poland was that the courts of that country were to have non-exclusive jurisdiction even if, in the absence of such reference, they would not have such jurisdiction. In *Perella Weinberg Partners UK LLP v Codere SA* [2016] EWHC 1182 (Comm) (Walker J), it was held that a clause expressed to confer non-exclusive jurisdiction on the English Courts "for the benefit of" the Claimants did not in fact confer exclusive jurisdiction on those Courts.

In *Carnoustie Universal SA v International Transport Workers Federation* [2002] EWHC 1624; [2003] I.L.Pr. 17 (Richard Siberry QC), the claimants contended that a settlement agreement was void or voidable for economic duress and the question arose whether that dispute fell within a jurisdiction clause in the agreement conferring jurisdiction on a Finnish court. The judge accepted that there was little doubt that if the settlement agreement and a related collective bargaining agreement were procured by duress, that duress affected the choice of law and jurisdiction provisions therein as it did the substantive provisions. But the judge concluded that it was difficult to see how a jurisdiction (or arbitration) clause could in such circumstances be wide enough to encompass claims challenging the validity of the contract in which it was contained on the grounds of duress. To be effective the clause would probably have to contain express provisions encompassing such claims, and even then, it might be open to the party challenging the validity of the contract to contend that he was not bound by the clause as he did not truly consent to its terms.

### 3. Jurisdiction by agreement—burden and standard of proof

The standard of proof required when a defendant seeks to rely on a foreign jurisdiction agreement in a case where, apart from the alleged agreement, the English court would have jurisdiction under the Judgments Regulation is that of a good arguable case. See further generally para.6JRx.8 above.    **6JRx.36**

The claimant must establish that they have a better argument than the defendant in respect of all matters, including the scope of any jurisdiction agreement (for example, whether as a matter of construction a particular dispute is covered by the agreement), and not merely in respect of the formal requirements of art.25(1) (*Cinnamon European Structured Credit Master Fund v Banco Commercial Portugues SA* [2009] EWHC 3381 (Ch); [2010] I.L.Pr. 11 (Sir William Blackburne) at [21]; *Knorr-Bremse Systems for Commercial Vehicles Ltd v Haldex Brake Products GmbH*, [2008] EWHC 156 (Pat); [2008] 2 All E.R. (Comm) 448; [2008] I.L.Pr. 26). Where it is established that the claimant has a better argument than the defendant on the requirements of art.25(1) (namely that there is a jurisdiction agreement and that the agreement satisfied one or other of the formalities set out in that provision), it is then for the national court to construe the agreement to determine whether the particular dispute falls within its scope (ibid).

As to the burden of proof and the meaning of good arguable case, see *Bank of Tokyo-Mitsubishi Ltd v Baskan Gida Sanayi Ve Pazarlama AS* [2004] EWHC 945; [2004] I.L.Pr. 26, *Konkola Copper Mines Plc v Caromin* [2006] EWCA Civ 5; [2006] I.L.Pr. 46; [2006] 1 Lloyd's Rep. 410, *Bols Distilleries BV v Superior Yacht Services Ltd* [2006] UKPC 45; [2007] 1 W.L.R. 12; [2007] 1 Lloyd's Rep. 683; [2007] 1 All E.R. (Comm) 461, *WPP Holdings Italy Srl v Benatti* [2007] EWCA Civ 263; [2007] 1 W.L.R. 2316; [2007] 2 All E.R. (Comm) 525; [2008] 1 Lloyd's Rep. 396, *Deutsche Bank AG v Asia Pacific Broadband Wireless Communications Inc* [2008] EWCA Civ 1091; [2009] 2 All E.R. (Comm) 129, *Polskie Ratownictwo Okretowe v Rallo Vito & C. SC* [2009] EWHC 2249 (Comm); [2010] 1 Lloyd's Rep. 384 (Hamblen J), *Kolmar Group AG v Visen Industries Ltd* [2009] EWHC 3765 (QB); [2010] I.L.Pr. 23, *Cube Lighting and Industrial Design Ltd v Afcon Electra Romania SA* [2011] EWHC 2565 (Ch), *Altimo Holdings and Investment Ltd v Kyrgyz Mobile Tel Ltd* [2011] UKPC 7; [2012] 1 W.L.R. 1804, PC at [71].

### 4. Stay of proceedings where court seised on basis of exclusive jurisdiction agreement

**6JRx.37**     As enacted in the Judgments Regulation (recast), art.31 contains innovative provisions, in particular arts 31.2 and 31.3. Article 31.2 states that where a court of a Member State (court A) on which an art.25.1 jurisdiction agreement confers exclusive jurisdiction is seised, any court of another Member State (court B) shall stay the proceedings until such time as court A on the basis of the agreement declares that it has no jurisdiction. Where court A establishes jurisdiction in accordance with the agreement, court B shall decline jurisdiction in favour of that court (art.31.2). See further commentary on art.31 (para.6JRx.42 below).

Where English proceedings are brought pursuant to an exclusive jurisdiction clause in favour of the English court, the effect of art.25.1 is that the jurisdiction of the English court is exclusive, and the authorities suggest that the court is deprived of its common law discretion to stay proceedings in favour of another court on classic forum non conveniens grounds. However, circumstances may exist where a stay can be imposed in the exercise of case management powers (*Equitas Ltd v Allstate Insurance Co* [2008] EWHC 1671 (Comm); [2009] 1 All E.R. (Comm) 1137; [2009] 1 Lloyd's Rep. I.R. 227 (Beatson J)).

Article 25.4 of the Judgments Regulation provides that agreements conferring jurisdiction have no legal force if the courts whose jurisdiction they purport to exclude have exclusive jurisdiction by virtue of art.24. In *Ablynx NV v VHsquared Ltd* [2019] EWCA Civ 2192; [2020] 1 W.L.R. 1412, the Court of Appeal clarified the interaction between these provisions and art.31.2 in circumstances where the English court potentially had exclusive jurisdiction over the claim under art.24.4 (see para.6JRx.32 above) and the Belgian court potentially had exclusive jurisdiction under an agreement conferring jurisdiction. It held that, where (as here) the English court had decided that there was a prima facie case that art.25.4 did not invalidate the jurisdiction agreement, it was for the Belgian court to decide definitively. The English court therefore stayed its proceedings pursuant to art.31.2 pending the decision of the Belgian court.

### Trust instrument conferring jurisdiction (art.25.3)

**6JRx.38**     In the original Judgments Regulation art.25.3 stood (in the same terms) as art.23.4. The comparable provision in the 2007 Lugano Conventon is art.23.4.

The court or courts of a Member State on which a trust instrument has conferred jurisdiction shall have exclusive jurisdiction in any proceedings brought against a settlor, trustee or beneficiary, if relations between those persons or their rights or obligations under the trust are involved (art.25.3). Provisions of a trust instrument conferring jurisdiction shall have no legal force is they are contrary to arts 15, 19 or 23, or if the courts whose jurisdiction they purport to exclude have exclusive jurisdiction by virtue of art.24 (art.25.4).

This provision was added to the 1968 Convention upon the accession of the UK to the European Community as it was thought wise to amend what was then art.17 by adding to the rule providing for choice of court by contract (now art.25.1) a rule providing for choice of court by clauses in trust instruments.

### Jurisdiction derived where defendant enters appearance (art.26)

**6JRx.39**     In the original Judgments Regulation art.26 stood (in the same terms) as art.24. The comparable provision in the 2007 Lugano Convention is art.24.

Article 26 states that, apart from jurisdiction derived from other provisions of the Regulation, a court of a Member State before which a defendant enters an appearance "shall have jurisdiction". (By entering an appearance the defendant is deemed to have submitted to the jurisdiction.) The article adds that this rule shall not apply where another court has exclusive jurisdiction under art.24 (Exclusive jurisdiction) (see para.6JRx.29 above). (Jurisdiction based on submission to one court does not trump, as it were, jurisdiction based on a rule of jurisdiction conferring exclusive jurisdiction on another court.) And it shall not apply where the defendant entered appearance "to contest the jurisdiction". Jurisdiction is not conferred on a court under art.26 where a defendant enters an appearance, not only for the purpose of making submissions contesting the court's jurisdiction, but additionally for the purpose of making other submissions (including submissions as to the merits of the claim). For a period uncertainty on this latter point was caused by the fact that the comparable article in the 1968 Convention, as amended (art.18), contained the phrase "solely to contest the jurisdiction". Whether or not a Defendant "enters an appearance" is a question of national procedural law provided that does not undermine the effective operation of the

Regulation, see *Deutsche Bank AG London Branch v Petromena ASA* [2015] EWCA Civ 226; [2015] 1 W.L.R. 4225. In *OD v Ryanair DAC* (C-646/18) EU:C:2019:330; [2019] I.L.Pr. 31, the CJEU considered that a failure to submit observations on a court's jurisdiction, following a court's invitation to do so did not amount to an "appearance" for the purposes of art.26. For what might or might not constitute submission to the jurisdiction, see *Winkler v Shamoon* [2016] EWHC 217 (Ch); 18 I.T.E.L.R. 818.

See, further, CPR r.11 (Procedure for disputing the court's jurisdiction), and commentary thereon, in particular para.11.1.4 (Filing an acknowledgement of service and making application).

## F. Priority of Jurisdiction—Lis Pendens and Related Actions

### *Introduction*

**6JRx.40** Historically speaking, in their domestic law most legal systems have recognised lis alibi pendens as a defence available to a defendant where, after starting an action against him in one court, the claimant commences another action against him in another court for the same cause. The question whether the plea of lis alibi pendens is a good defence where the first proceedings are brought, not in another court within the jurisdiction, but in a court of a foreign country, has not always been answered in the same way. Unlike the position in continental civil systems, in England the common law had no strict rule. The common law answer to the question depended on whether the taking of the second proceedings were "vexatious or oppressive". If they were, the English court had jurisdiction to stay or dismiss the English action or to restrain the claimant from proceeding with his foreign action. Further, again unlike the position in continental civil systems, the English common law did not require that the issues raised in the two actions should be identical and had no objection to the bringing of two actions on the same subject.

In the Judgments Regulation (recast) the problem of conflicting jurisdictions between the courts of different Member States is dealt with in Section 9 (Lis pendens—related actions) of Chapter II (Jurisdiction). Put broadly, the solution to the problem offered is that priority should be given to the court "first seised". Section 9 consists of six articles, arts 29 to 34. The first two of these six articles (arts 29 and 30) deal with the circumstances where proceedings involving the same cause of action and between the same parties are brought in the courts of different Members States (art.29), or where related actions are pending in the courts of different Members States (art.30). And art.31(1) makes special provision for the circumstance where several actions come within the exclusive jurisdiction of several courts. Articles 29, 30 and 31.1 have their origins in arts 21 to 23 of the 1968 Convention. In the original Judgments Regulation those three articles were re-enacted (as arts 27, 28 and 29), the first two in significantly altered form, and with the addition of an article dealing with circumstances in which a court "shall be deemed to be first seised" (art.30). In the Lugano Convention (revised) 2007 the cognate articles are arts 27 to 30 and are expressed in the same terms as they appeared in the original Judgments Regulation.

In the Judgments Regulation (recast) the four articles referred to in the previous paragraph are, respectively, arts 29, 30, 31(1) and 32(1). An important difference between the recast and the original Judgments Regulation consists of the additions to art.31, which now includes, in addition to art.31(1), arts 31(2) to 31(4). Article 31(1) states (as this provision has always done) that, where actions come before the exclusive jurisdiction of several courts, any court other than the court first seised shall decline jurisdiction. Articles 31(2) to 31(4) are designed to deal in the light of experience with practical difficulties which had emerged where the jurisdiction of a court seised is based on a choice of court agreement conferring exclusive jurisdiction (see further para.6JRx.37 above and para.6JRx.42 below).

Articles 33 and 34 of the Judgments Regulation (recast) had no counterparts in the original Judgments Regulation (or in the Lugano Convention (revised) 2007). They mirror (with necessary modifications) arts 29 and 30, but apply (as the case may be) where proceedings involving the same cause of action and between the same parties are pending, or where related actions are pending, in the courts of a Member State and in the courts of a non-Member State ("a third State") (see further para.6JRx.47 below).

### *Priority of jurisdiction—court first seised (art.29)*

**6JRx.41** The Court of Justice of the European Union has explained that the purpose of art.29 (formerly art.27) is to prevent the courts of two Member States from giving inconsistent judgments and to preclude, so far as possible, the non-recognition of a judgment on the ground that it is irreconcilable with a judgment given by the court of another Member State (*Gubisch Maschinenfabrik KG v Palumbo* (C-144/86) EU:C:1987:528; [1989] E.C.C. 420 at [8]). And that Court has explained that the objective of art.30 (formerly art.28) is to improve co-ordination of the exercise of judicial functions within the EU and to avoid conflicting and contradictory decisions, thus facilitating the proper administration of justice (*Owners of Cargo Lately Laden on Board the Tatry v Owners of the Maciej Rataj (The Maciej Rataj)* (C-406/92) [1999] Q.B. 515, ECJ, at [32], [52] and [55]; see also *Sarrio SA v Kuwait Investment Authority* [1999] 1 A.C. 32, HL, at 39 per Lord Saville, and *Starlight Shipping Co v Allianz Marine & Aviation Versicherungs AG* [2013] UKSC 70; [2014] Bus. L.R. 873, SC, at [27] per Lord Clarke).

Article 29 (previously art.27) provides that, where proceedings in the courts of two different

CPR 6

Member States have three identities, they are, the same parties, the same cause of action (la même cause) and the same object (objet), any court other than "the court first seised" shall of its own motion stay its proceedings until such time as the jurisdiction of the court first seised is established (art.29.1). Where the jurisdiction of the court first seised is established, any other court shall decline jurisdiction in favour of that court (art.29.2).

It is the respective jurisdictions of "courts" that is in issue here. In *Lehman Brothers Finance AG v Klaus Tschira Stiftung GmbH* [2014] EWHC 2782 (Ch); [2014] 2 C.L.C. 242 (David Richards J), the defendants (D) applied for a stay of proceedings within the scope of the revised Lugano Convention 2007 brought against them in England by the claimants (C) on 2 April 2013, in circumstances where, as the first mandatory procedural step in a civil claim against D before Swiss courts involving the same cause of action, on 25 March 2013, C had lodged with justices of the peace in Zurich a written request for conciliation. C's submission, made in resisting D's application, that the equivalent to art.29 in the Lugano Convention (i.e. art.27) did not apply because, for the purposes of that article, the conciliation authority was not a "court", and the conciliation proceedings were not "proceedings", was rejected by the judge.

In *Nigeria v Royal Dutch Shell Plc* [2020] EWHC 1315 (Comm), Foxton J held that art.29 applied even though the prior Italian proceedings had been brought as an adjunct to criminal proceedings. Since the proceedings involved the same cause of action and the same parties, the English court was obliged to decline jurisdiction.

For meaning of "first seised" in this context, see *Tavoulareas v Tsavliris (The Atlas Pride)* [2004] EWCA Civ 48; [2004] 1 Lloyd's Rep. 445, CA, and authorities referred to there. A court may be first seised for this purpose without the legal basis of the claim being spelt out in the proceedings before it (*Football Dataco Ltd v Sportradar GmbH* [2011] EWCA Civ 330; [2011] 1 W.L.R. 3045, CA). In *Barclays Bank Plc v Ente Nazionale di Previdenza ed Assistenza dei Medici e Degli Odontoiatri* [2016] EWCA Civ 1261; [2017] 2 All E.R. (Comm) 432; [2016] 2 C.L.C. 859, CA, the Court of Appeal accepted the submission that the question whether proceedings involving the same cause of action between the same parties have been brought in the courts of different Member States so as to engage art.29 is to be determined at the date of commencement of proceedings in the court second seised (para.12). In *FKI Engineering Ltd v Stribog Ltd* [2011] EWCA Civ 622; [2011] 1 W.L.R. 3264, CA, the Court of Appeal had to consider when the German and English courts had become seised of the respective actions for the purposes of art.30. The proceedings in Germany had been issued first and the English proceedings some months later, but after the English proceedings had been issued an amendment was made in the German proceedings to contest the validity of an assignment that had been pleaded and relied on in the English action. As a result, the two actions became "related" within the meaning of art.30(1) and a question arose whether the English or German court had been first seised. The court held that the court first seised was that in which proceedings had first been issued, in that case the German court. In the *Barclays Bank Plc* case, op cit, the Court of Appeal commented (at para.16) that that decision is perhaps not surprising, given that art.30 is concerned with related "proceedings", and pointed out that art.30 may be contrasted with art.29 which is concerned with proceedings involving the same cause of action and the same parties and therefore requires that attention should be focussed on "causes of action" rather than on "proceedings". The court concluded (para.19) that the expression "proceedings involving the same cause of action and between the same parties" in art.29 is to be read as a whole and that such proceedings do not come into existence, and the court is not seised of the relevant claim, "until the cause of action has been raised in proceedings before the court, whether originally or by amendment".

Article 32 first appeared as art.30 of the original Judgments Regulation. It was enacted for the purpose of removing doubts as to what is meant by "first seised", and did so by deeming a court to be first seised in particular circumstances which were amplified when the article was re-enacted as art.32 in the Judgments Regulation (recast). (In the 1968 Convention, art.21 assumed that the meaning of "first seised" was self-evident; see *Molins Plc v GD SpA* [2000] 1 W.L.R. 1741; [2000] 2 Lloyd's Rep. 234, CA, where held that, although proceedings had been commenced in an Italian court, that court was not first seised.)

Article 32 provides that a court is deemed seised when the document instituting the proceedings is received by the court, or, if it requires service before lodging with the court, when it is received by the agency responsible for service, provided that the claimant then gets on with service or lodging as appropriate. The document referred to in para.(b) of art.32(1) has to be one capable of being served and lodged with the court so as to institute the proceedings against the relevant party *WPP Holdings Italy Srl v Benatti* [2007] EWCA Civ 263; [2007] 1 W.L.R. 2316; [2007] 2 All E.R. (Comm) 525; [2008] 1 Lloyd's Rep. 396. Accordingly, in relation to parties in Regulation States, the English court will be seised on issue of a claim form, although it is necessary to get on with service. Unless service is dispensed with under r.6.16, Convention proceedings only become definitively pending in England upon service; see *Dresser UK Ltd v Falcongate Freight Management Ltd* [1992] Q.B. 502, CA and *Neste Chemicals SA v DK Line SA* [1994] 3 All E.R. 180; *Molins Plc v GD SpA* [2000] 1 W.L.R. 1741, CA; but note *Canada Trust Co v Stolzenberg (No.2)* [2002] 1 A.C. 1, HL; *Phillips v Nussberger* [2008] UKHL 1; [2008] 1 W.L.R. 180; [2008] 1 Lloyd's Rep. 344; [2008] I.L.Pr. 21, HL.

Article 32(1)(a) (formerly art.30(1)) provides that a court is deemed to be first seised, not only where a document instituting proceedings is lodged with the court, but also where an "equivalent document" is lodged. For an explanation of the concept of "equivalent document", in the context of an article in the French Civil Code providing a procedure for "measures of inquiry" for the preserving or establishing of evidence "prior to any legal proceedings", see *HanseYachts AG v Port d'Hiver Yachting SARL* (C-283/16) [2017] I.L.Pr. 25 (ECJ).

It is implicit in the structure of art.32 that the first lodging of a document instituting the proceedings does not always mean first seised of the proceedings. The general statements in paras (a) and (b) of art.32(1) as to when the court is deemed to be seised of proceedings are each subject to an express proviso as to the circumstances in which the court is not deemed to be seised of the proceedings at all. Thus, for example, where the circumstances fall within para.(a) and the proviso therein applies, the result is that the pending proceedings first lodged in court do not enjoy the prima facie precedence of being the proceedings first seised by that court; see *Debt Collection London Ltd v SK Slavia Praha-Fotbal AS* [2010] EWCA Civ 1250; [2011] 1 W.L.R. 866, CA (where held Czech court not first seised because claimant had failed to pay court fee, a step required to effect service on the defendant. In a case where para.(b) of art.32(1) applies and the document has to be served before being lodged with the court, receipt by fax by the agency responsible is sufficient (*Arbuthnot Latham & Co Ltd v M3 Marine Ltd* [2013] EWHC 1019 (Comm); [2013] 2 Lloyd's Rep. 307 (Hamblen J)).

In *WPP Holdings Italy Srl v Benatti* [2007] EWCA Civ 263; [2007] 1 W.L.R. 2316; [2007] 2 All E.R. (Comm) 525; [2008] 1 Lloyd's Rep. 396, it was submitted by the second claimant (C) that such steps as the defendant (D) had taken in Italy to initiate proceedings against him there did not have the effect of the Italian court being deemed to be seised under art.32(1). In allowing D's appeal (in part), holding that the Italian court was first seised, the Court of Appeal stated that art.32(1) (then art.30) is concerned with seisin not service, and it was not relevant whether such service that D had managed to effect on C, which suffered from technical objections (later rectified), was valid service under the Service Regulation. This decision may be contrasted with the judgment of the Court of Appeal in *Tavoulareas v Tsavliris (No.2)* [2006] EWCA Civ 1772; [2007] 1 W.L.R. 1573; [2007] 2 All E.R. (Comm) 356), an enforcement of judgment case, where it was said (obiter) that "the concept of 'service' in art.32.1 must be consonant with the concept of 'service' in the Service Regulation" (at para.8 per Longmore LJ).

There is no relator back so as to retain jurisdiction where a claim form issued in the jurisdiction first seised is amended to add new facts adding a fresh cause of action after another jurisdiction has also become seised of the jurisdiction (*The Underwriting Members of Lloyd's Syndicate 980 v Sinco SA* [2008] EWHC 1842 (Comm); [2008] 2 Lloyd's Rep 500; [2009] 1 All E.R. (Comm) 272; [2008] I.L.Pr. 49).

### Lis pendens and exclusive jurisdiction—stay of proceedings (art.31)

**6JRx.42**

Article 31.1 in the Judgments Regulation (formerly art.29, and art.29 in the revised Lugano Convention 2007) states that where actions come within "the exclusive jurisdiction" of several courts, any court other than the court first seised "shall decline jurisdiction". (In the 1968 Convention that provision stood as art.23.)

In *Erich Gasser GmbH v Misat Srl* (C-116/02) [2005] 1 Q.B. 1; [2004] 1 Lloyd's Rep. 222; [2004] I.L.Pr. 7, the ECJ held (1) that the rule that the court first seised of a matter had initial jurisdiction prevailed over the rule that a court nominated by the parties in the event of a dispute had jurisdiction, and (2) that it applied and prevailed even when generally the conclusion of legal proceedings in the country of the first court seised were excessively delayed. In the Judgments Regulation (recast) art.31.2 and art.31.3 were inserted to rectify practical difficulties arising from this state of affairs.

Articles 31.2 and 31.3 apply where a choice of court agreement confers exclusive jurisdiction on a Member State court seised, whether first seised or otherwise. They require any court of another Member State also seised to stay its proceedings until such time as the court seised on the basis of the agreement declares that it has no jurisdiction under the agreement (art.31.2), or to decline jurisdiction in the event of jurisdiction being established in the other court in accordance with the agreement (art.31.3). Article 31.2 and art.31.3 do not apply where the proceedings include matters falling with the special jurisdiction provisions concerning matters relating to insurance, to consumer contracts, and to individual contracts of employment where, as the case may be, the policyholder, the insured, a beneficiary of the insurance contract, the injured party, the consumer or the employee is the claimant and the agreement is not valid (art.31.4). Articles 31.2 to 31.4 were enacted in furtherance of the policies, stated in Recital 22 of the Judgments Regulation (recast), of enhancing the effectiveness of exclusive choice-of-court agreements, and of avoiding "abusive litigation tactics". In *Generali Italia SpA v Pelagic Fisheries Corp* [2020] EWHC 1228 (Comm) (Foxton J), it was held that the effect of art.31.2 was to allow the designated but second-seised court to decide whether it had exclusive jurisdiction by virtue of art.25, and, if it did so decide, to proceed with the case, irrespective of the position in the court first seised. The court went on to find that it did have jurisdiction under art.25. This was on the basis that a specifically agreed provision in an insurance policy in favour of the English courts prevailed over a standard set of terms in the same policy which granted jurisdiction to the Italian courts.

Article 31.2 has no equivalent under the Lugano Convention or the Brussels I Regulation or Brussels Convention. In *Mastermelt Ltd v Siegfried Evionnaz SA* [2020] EWHC 927 (QB), the High Court confirmed that the "first seised" rule under the Lugano Convention is unaffected by art.31.2 of the Recast Brussels Regulation, and that *Erich Gasser* still applies in that context.

### Negative declarations

**6JRx.43**

It should be noted that Convention jurisprudence does not preclude the establishment of prior jurisdiction by way of an early claim for a negative declaration.

The Court of Justice has said that it makes no difference for the purposes of (what are now) art.29 and art.30 (arts 21 and 22 of the Brussels Convention) whether the first claim is framed in positive or negative terms (*Owners of Cargo Lately Laden on Board the Tatry v Owners of the Maciej Rataj (The Maciej Rataj)* (C-406/92) EU:C:1994:400; [1999] Q.B. 515, ECJ). In *Folien Fischer AG v Ritrama SpA* (C-133/11) [2013] Q.B. 523, ECJ, the Court confirmed that jurisdiction under (what is now) art.7(2) can be founded upon a claim for negative declaratory relief. However, as a matter of English domestic law, a negative declaration can only be sought in England if a declaration is properly sought by domestic standards, which requires, in effect, that it would serve a useful purpose; see *Messier-Dowty Ltd v Sabena SA* [2000] 1 W.L.R. 2040, CA. For a recent example of the jurisdictional complexities that may be raised by an application for negative declaratory relief, see *McGraw-Hill International (UK) Ltd v Deutsche Apotheker und Artzebank EG* [2014] EWHC 2436 (Comm); [2014] 2 Lloyd's Rep. 523 (Cooke J).

### Same parties

**6JRx.44**  As to the "same parties" requirement under art.29 of the recast Judgments Regulation (art.27 of the Judgments Regulation), it has been held by the Court of Justice that the hull insurer would not be regarded as the same party as the shipowner (where the insurer had brought proceedings for contribution from cargo and the shipowner had brought proceedings elsewhere for limitation) unless it was established that the interests of those parties, the insurer and its insured, were identical and indissociable; *Drouot Assurances SA v Consolidated Metallurgical Industries (CMI Industrial Sites)* (C-351/96) EU:C:1998:242; [1999] Q.B. 497; [1999] 2 W.L.R. 163.

In considering whether two entities are the "same party" for the purposes of art.29, the court looks to the substance rather than the form. Two separate legal entities such as an assignor and an assignee can have a sufficient identity of interest in the subject matter of proceedings so as to be regarded as the same party, if a judgment against one would be res judicata as against the other and their interests are identical and indissociable; *Kolden Holdings v Rodette Commerce Ltd* [2008] EWCA Civ 10; [2008] 2 All E.R. (Comm) 289. Applying this approach, in *Awendale Resources Inc v Pyxis Capital Management Ltd* [2020] EWHC 1286 (Ch), Tom Leech QC (sitting as a Judge of the Chancery Division) would have been prepared to find that a company was the "same party" as the beneficial owner of its minority shareholder who had brought a derivative action on behalf of the company in Cyprus. (On the facts, it was not necessary to make this finding as the company itself was a party to both actions.)

Where foreign proceedings had been issued against a patentee, but not the exclusive licensee of the patent, English proceedings against both of them would not be stayed under art.27 (now art.29) as the licensee had been granted a specific right which was additional to the right which the patentee continued to hold, so that its interests were different and the parties were not, accordingly, identical and indissociable (*Möhnlycke Health Care AB v BSN Medical Ltd* [2009] EWHC 3370 (Pat); [2010] I.L.Pr. 9 (Floyd J) (where the law on what is now art.29 is reviewed)).

### Same cause of action

**6JRx.45**  The principles of EU law which are relevant to the determination of the question whether, for the purposes of art.29.1, the "cause of action" in proceedings brought in the court of one Member State is the "same cause of action" as that in proceedings between the same parties brought in the court of another Member State, were summarised by Lord Clarke in *Starlight Shipping Co v Allianz Marine & Aviation Versicherungs AG* [2013] UKSC 70; [2014] Bus. L.R. 873, SC, at para.28. In this case a claim brought by shipowners (C) in an English court against marine insurers (D) was settled by agreement, stayed under a Tomlin order. In the course of the proceedings C had alleged that D had bribed witnesses, had spread false and malicious rumours against them, and had failed to meet their claims timeously (with consequential loss). Subsequently, C commenced proceedings in a Greek court against D and their solicitors claiming damages and making essentially the same allegations. D then applied to an English court for declarations that the Greek proceedings were in breach of the settlement agreement and that they were, inter alia, entitled to an indemnity against any damages awarded in the Greek proceedings. The Court of Appeal held (1) that C's claim in the Greek court and D's application for declarations etc in the English court involved the same cause of action, (2) that the Greek court was the one first seised of the issues raised in those proceedings, and (3) that, under art.29.1, the English court was bound to stay D's application ([2012] EWCA Civ 1714; [2013] 1 Lloyd's Rep. 217, CA). In allowing D's appeal in part the Supreme Court held (1) that certain of D's claims in the English proceedings were claims in contract, whereas C's claims in the Greek proceedings were claims in tort, (2) that to that extent the respective claims did not have identity of cause or identity of object and did they in any way interfere with each other, and (3) that, therefore, they did not involve the same cause of action for the purposes of art.29.1. In *Easy Rent a Car Ltd v Easygroup Ltd* [2019] EWCA Civ 477; [2019] 1 W.L.R. 4639, the Court of Appeal held that a claim in the English Court for passing off and trade mark infringement had the same "cause" as a claim in the Cypriot Court that the effect of a settlement agreement was that the claimant had consented to the defendant's use of the trade mark. In contrast, in *Wright v Granath* [2021] EWCA Civ 28, the Court of Appeal held (by a majority) that a claim in the English court for defamation in respect of a tweet, and an earlier claim in the Norwegian court for a declaration that the same tweet was not defamatory, did not have the same cause of action for the purposes of the equivalent provision (art.27) under the Lugano Convention. The two claims did not mirror each

other such that they were legally irreconcilable, as the Norwegian claim included a legal element that did not form part of the English claim, namely whether the allegations were made negligently (Moylan LJ at [173]).

As to the "same cause of action" requirement in art.29 (formerly art.27 and art.21 in the 1968 Convention), it has been held by the Court of Appeal that a straightforward civil claim for money was different from a tracing claim into assets based on breach of fiduciary duty. The court also considered that it would be inappropriate to defer to the jurisdiction of another Contracting State where the competing civil claim was tacked on to criminal proceedings in another Contracting State which made (what is now) art.30 inappropriate (*Haji-Ioannou v Frangos* [1999] 2 Lloyd's Rep. 337, CA).

The principles underlying the concept of "same cause of action" were explained, and the reasoning in the *Starlight Shipping Co* case was applied, at first instance in *Barclays Bank Plc v Ente Nazionale di Previdenza ed Assistenza dei Medici e Degli Odontoiatri* [2015] EWHC 2857 (Comm) [2015] 2 Lloyd's Rep. 527 (Blair J), at paras 63 to 72. See also *Nigeria v Royal Dutch Shell Plc* [2020] EWHC 1315 (Comm) (Butcher J) where the court held that it did not have jurisdiction over claims alleging bribery and corruption as proceedings involving the same cause of action and between the same parties were already pending in Italy.

In *Gantner Electronic GmbH v Basch Exploitatie Maatschappij BV* (C-11/01) EU:C:2003:257; [2003] I.L.Pr. 37, ECJ, the ECJ (5th Ch) ruled that art.29 (formerly art.27) must be construed as meaning that, in order to determine whether two claims brought between the same parties before the courts of different Member States have the same subject-matter, account should be taken only of the claims of the respective applicants, to the exclusion of submissions raised by a defendant whatever their nature (including submissions alleging set-off). See also discussion in *Secret Hotels 2 Ltd v E A Travellers Ltd* [2010] EWHC 1023 (Ch); [2010] I.L.Pr. 33 (Peter Smith J), where court considered question whether the reasoning in the Gantner case applied to all forms of set-off or only to those actually before the court.

For the approach to cases where positive relief is sought in one jurisdiction and negative relief in another and the definition of "cause of action" for the purposes of art.29 (formerly art.27); see *JP Morgan Europe Ltd v Primacom AG* [2005] EWHC 508 (Comm); [2005] 2 Lloyd's Rep. 665.

In *SET Select Energy GmbH v F&M Bunkering Ltd* [2014] EWHC 192 (Comm); [2014] 1 W.L.R. 452 (Blair J), it was held that a claim for the costs of bunkers supplied had a different "object" and "cause" from a claim for an injunction to prevent payment to the claimant under a bank guarantee.

### Degree to which proceedings must be "related"

Article 30 (formerly art.28), which provides that where "related actions" are pending in the **6JRx.46** courts of different Member States, any court other than the court first seised may stay its proceedings, and art.8(1) (formerly art.6(1)), which provides that a person domiciled in a Member State may also be sued in the courts of another Member State, being a State in which his co-defendant is domiciled, provided the claims against each defendant are "closely connected", have the common objective of limiting the risk of irreconcilable judgments; see *Kalfelis v Bankhaus Schroder Munchmeyer Hengst & Co* (C-189/87) EU:C:1988:459; [1989] E.C.C. 407, where the Court of Justice held that a court with special jurisdiction under (what is now) art.7(2) over the tort part of an action would not thereby have jurisdiction to try other non-tort parts of the action, unless there was an alternative basis for jurisdiction under (what is now) art.8(1). See also *Gascoine v Pyrah* [1994] I.L.Pr. 82, CA; *Research in Motion Ltd v Visto Corp* [2008] EWCA Civ 153; [2008] I.L.Pr. 34. The relevant risk extends to findings of law as well as fact (*Casio Computer Co Ltd v Sayo* [2001] EWCA Civ 661; [2001] I.L.Pr. 43, per Tuckey LJ).

Article 30 allows a court to look at issues raised by claim and the defence (cf the position under art.29 as explained in para.6JRx.45 above). It is not enough to render proceedings related that "one issue could arise in both actions" (*Underwriting Members of Lloyd's Syndicate 980 v Sinco SA* [2009] Lloyd's Rep. I and R 365 (Beatson J) at para.34). For another case in which a stay was refused although some common issues arose, see *Seven Licensing Co Sarl v FFG-Platinum SA* [2011] EWHC (Comm); [2012] I.L.Pr.7.

The question whether proceedings are "related" is determined under art.30.3, and the question of when seisin of related proceedings occurs, and thus which of the courts is the court first seised, is determined under art.32. In *FKI Engineering Ltd v Stribog Ltd* [2011] EWCA Civ 622; [2011] 1 W.L.R. 3264, CA, the Court of Appeal considered and explained the relationship between these two questions. In this case proceedings between the same parties were commenced by one party (D) in a German court and subsequently by the other party (C) in an English court. Later on, after the German proceedings had been amended by D, D applied for a stay of the English proceedings. The Court held that a limited stay should be granted, and in doing so rejected C's submission that, upon the amendment of the German proceedings (but not before), the two proceedings became related for the purpose of art.30 (then art.28), and that in these circumstances the English court was "first seised" and had no jurisdiction to grant a stay of the English proceedings. In *Sarrio SA v Kuwait Investment Authority* [1999] 1 A.C. 32, HL, Lord Saville said (p.41) there should be "a broad common sense approach" to the question whether the actions in question are related, bearing in mind the objective of the article, applying the simple wide test set out in (what is now) art.30 and refraining from "an over-sophisticated analysis of the matter". In *JP Morgan Europe Ltd v Primacom AG* [2005] EWHC 508 (Comm); [2005] 2 Lloyd's Rep. 665, Cooke J considered that the existence of an exclusive jurisdiction clause strongly pointed to the refusal of a stay under (what is now) art.30.

For a further consideration of the relevant criteria, see *Bank of Tokyo-Mitsubishi Ltd v Baskan Gida Sanayi Ve Pazarlama AS* [2004] EWHC 945; [2004] I.L.Pr. 26; *Research in Motion UK Ltd v Visto Corp* [2008] EWCA Civ 153; [2008] I.L.Pr. 34, CA; *FKI Engineering Ltd v Striborg Ltd* [2011] EWCA Civ 622; [2011] 1 W.L.R. 3264; *Nordea Bank Norge ASA v Unicredit Corporate Banking SpA* [2011] EWHC 2620 (Comm) (Gloster J); *WMS Gaming Inc v B Plus Giocolegale Ltd* [2011] EWHC 30 (Comm); [2012] I.L. Pr. 5; *UBS Ltd v Regione Calabria* [2012] EWHC 699 (Comm); [2012] I.L.Pr. 22; *Lehman Brothers AG Ins v CMA CGM* [2013] EWHC 171 (Comm); [2013] 2 All E.R. (Comm) 557 (Walker J); *Nomura International Plc v Banca Monte Dei Paschi Di Siena SpA* [2013] EWHC 3187 (Comm); [2014] 1 W.L.R. 1584 (Eder J).

In the account of the case of *Starlight Shipping Co v Allianz Marine & Aviation Versicherungs AG* [2013] UKSC 70; [2014] Bus. L.R. 873, SC, given above (para.6JRx.42) in the context of the meaning of "same cause of action" in art.29.1, it was not explained that the case also raised (at first instance and on appeal to the Supreme Court) an issue as to whether the action brought by the marine insurers (D) in the English court on the basis of settlement agreements reached between the parties in earlier English proceedings (but stayed under a Tomlin order) was an action "related" within the meaning of art.30.1 to that brought previously by the shipowners (C) in the Greek court. The judge held (1) that the English court was the court first seised by virtue of the settlement agreements, (2) that the English court was not, within the meaning of art.30.1, a court "other than the court first seised", and (3) that therefore he had no discretion to grant C's application for a stay under that provision. In the Supreme Court that holding was appealed by C in their cross-appeal. The Court dismissed that appeal holding that the earlier proceedings, though stayed, remained on foot and were thus "pending" for the purposes of art.30.1.

Passing-off proceedings in England did not give way to earlier proceedings in Germany for infringement of a German trade mark registration where the defendant in the German proceedings was a mere licensee of the English claimant (*Mecklermedia Corp v DC Congress GmbH* [1998] Ch. 40). Where Dutch proceedings were issued against insurers seeking a declaration of non-liability and the assured subsequently issued proceedings seeking compensation from the claimants in the Dutch proceedings in respect of the same incident, although the parties and issues in the two actions were not identical they were related for the purposes of (what is now) art.30 and the English court declined the jurisdiction in the light of the arguments in favour of the Dutch courts (*Sony Computer Entertainment Ltd v RH Freight Services Ltd* [2007] EWHC 302 (Comm); [2007] I.L.Pr. 21).

In *Maxter Catheters SAS v Medicina Ltd* [2015] EWHC 3076 (Comm); [2016] 1 W.L.R. 349 it was explained (1) that an *action en référé* brought in a French court is to be distinguished from an *action au fond*, and that the former action is a summary procedure most often used to prevent imminent harm, danger or unlawful activity, (2) that for the purposes of art.30 the *action en référé* does not appear to be relevant because it is not designed to produce a judgment on the merits, and (3) that in the instant case because the former action was not designed to resolve the substantive dispute between the parties it did not constitute proceedings parallel to proceedings in English court which gave rise to a risk of inconsistent judgments. However, the judge further explained (para.37) that under the Judgments Regulation the mere fact that the court in country A granted provisional relief will not mean that the court in country B where substantive proceedings were later commenced will be the court first seised, because, if the proceedings before the court in country A can, although they commenced with the grant of provisional relief, proceed to a determination of the substantive issue between the parties (as in an English action), then the court of country A can be regarded as the court first seised.

In *Euroeco Fuels (Poland) Ltd v Szczecin and Swinoujscie Seaports* [2019] EWCA Civ 1932; [2019] 4 W.L.R. 156, the Court of Appeal considered the meaning to be given to the phrase "*hear and determine them together*" in art.30(2) and held that it did not mean (as had been held at first instance) "in the same Member State" but required that the cases be tried by the same judge or panel of judges in the same court and that judgment would be given in both actions at the same time.

In *Office Depot International BV v Holdham SA* [2019] EWHC 2115 (Ch); [2019] 4 W.L.R. 120, Sir Geoffrey Vos, Chancellor, held that an application pursuant to art.30 for a temporary stay of English proceedings pending final determination of related Swedish proceedings was not an application to which the procedure for challenging jurisdiction set out at CPR Pt 11 applied.

### Discretionary stay in favour of proceedings before courts of non-EU states (arts 33 and 34)

**6JRx.47**  In *Owusu v Jackson* (C-281/02) [2005] Q.B. 801, the ECJ ruled that, where a court of a Member State is seised on the ground that it is a court of the territory of the defendant's domicile, that court may not decline jurisdiction in favour of court in a non-EU State on the basis that the latter court is the more appropriate forum. There has been conflicting authority on whether the ruling in *Owusu* also precludes a power to stay proceedings in favour of a non-EU court other than on forum non conveniens grounds—for instance, where there is an exclusive jurisdiction clause in favour of the non-EU court, or there are parallel proceedings in the non-EU court, or some other grounds on which the non-EU court could take exclusive jurisdiction (sometimes referred to as giving "reflexive effect" to the grounds of jurisdiction in the Judgments Regulation, or applying them by analogy to non-EU countries).

Articles 33 and 34 of the Judgments Regulation (which have no equivalent in the Brussels I Regulation or the Brussels or Lugano Conventions) introduced new rules granting the national court discretion to stay proceedings in favour of court proceedings before a non-EU court. In the

case of proceedings involving the same cause of action, under art.33 the grant of a stay is subject to four conditions. First, the court in the non-EU state must have been seised first. Second, proceedings must have been brought in an EU court on the basis of the defendant's domicile or the special jurisdiction provisions. Third, the judgment of the non-EU court must be expected to be capable of recognition and enforcement in the member state in question. Fourth, the stay is necessary for the administration of justice. Some guidance as to the meaning of the last condition is to be found in Recital (24). Article 34 contains similar rules when related proceedings are brought both before EU and non-EU courts.

In the case of *Re Zavarco Plc* [2015] EWHC 1898 (Ch); [2015] 1 W.L.R. 1479 (David Donaldson QC), a shareholder (C) in a UK company (D), relying on the exclusive jurisdiction rule in art.24(2), commenced two actions in an English court, one for a declaration to the effect that a notice served by him pursuant to his statutory right as a shareholder to call a general meeting was valid, and the other to rectify D's register of members to delete the issue of additional shares to another shareholder. D, having commenced parallel proceedings in Malaysia, applied for a stay of C's actions under art.34 on lis alibi pendens or forum non conveniens grounds, arguing that those proceedings were a related action in the court of a third State within that article. The judge dismissed the application, holding that, where jurisdiction is assigned by art.24, the stay provisions in art.34 have no application, as the issue of whether a court be seised is to be determined by the nature and basis of the claim rather than by any defence to it, even (as might be assumed in this case) where the defences were purely contractual and not art.24 matters.

In *UCP Plc v Nectrus Ltd* [2018] EWHC 380 (Comm); [2018] 1 W.L.R. 3409 it was held that arts 33 and 34 did not apply where the court's jurisdiction was based on a non-exclusive English jurisdiction clause, and therefore the court had no power to stay its proceedings despite proceedings having been commenced first in time in a non-Member State (the Isle of Man). (The High Court reached the same conclusion in similar circumstances in *Ness Global Services Ltd v Perform Content Services Ltd* [2020] EWHC 3394 (Comm) (Stephen Houseman QC) even though the court in that case would also have had jurisdiction based on the defendant's domicile.) Similarly, in *Gulf International Bank BSC v Aldwood* [2019] EWHC 1666 (QB); [2020] 1 All E.R. (Comm) 334, John Kimbell QC (sitting as a deputy High Court judge) held that there is no power to decline jurisdiction in favour of a non-EU court in a case falling outside the express powers in arts 33 and 34 (in that case, despite the presence of an exclusive jurisdiction clause in favour of a non-EU court falling within art.25). In *PJSC Commercial Bank Privatbank v Kolomoisky* [2019] EWCA Civ 1708; [2020] 2 W.L.R. 993, the Court of Appeal rejected arguments that *Owusu* prevented the court granting a stay on the basis that the provisions of the Lugano Convention could be applied by analogy to non-EU countries. However, the court did not comment on the question of whether the same is true under the Judgments Regulation, in light of the express powers to stay proceedings in favour of non-EU courts under arts 33 and 34.