**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **VIRGINIA L. GIUFFRE,** | **Case No. 1:21-cv-06702-LAK** |
| *Plaintiff,* | |
| v. | |
| **PRINCE ANDREW, DUKE OF YORK,** **a/k/a ANDREW ALBERT CHRISTIAN** **EDWARD, in his personal capacity,** | |
| *Defendant.* | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**
**PURSUANT TO FRCP 12(b)(6) OR, IN THE ALTERNATIVE, FOR A MORE**
**DEFINITE STATEMENT PURSUANT TO FRCP 12(e)**

Andrew B. Brettler (AB2662)
Melissa Y. Lerner (*pro hac vice*)
2049 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 556-3501
Email: abrettler@lavelysinger.com
Email: mlerner@lavelysinger.com

*Attorneys for Prince Andrew, Duke of York*

7147-2

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................1

II.     SUMMARY OF RELEVANT FACTS ......................................................................5

    A.      GIUFFRE'S ROLE IN EPSTEIN'S CRIMINAL ENTERPRISE................................5

    B.      GIUFFRE'S 2009 LAWSUIT AGAINST JEFFREY EPSTEIN AND SETTLEMENT OF THE DISPUTE ......................................................................................................7

    C.      GIUFFRE'S INCONSISTENT ALLEGATIONS REGARDING PRINCE ANDREW ...8

        1.      The 2011 Interview.........................................................................................8

        2.      The December 2014 Filing and 2015 Interviews .................................................9

    D.      GIUFFRE'S PARALLEL PROCEEDING AGAINST PROFESSOR DERSHOWITZ.10

III.    LEGAL STANDARD ............................................................................................11

IV.     ARGUMENT ........................................................................................................12

    A.      GIUFFRE'S COMPLAINT SHOULD BE DISMISSED BECAUSE HER CLAIMS ARE BARRED BY THE TERMS OF THE RELEASE AGREEMENT.................................12

        1.      Prince Andrew Is ███████████████████ as That Term Is Defined in the Release Agreement. ................................................................13

        2.      As ████████████████ Prince Andrew Is a Third Party Beneficiary of the Release Agreement and Entitled To Enforce the General Release Contained Therein..................................................................................14

    B.      GIUFFRE FAILS TO STATE CLAIMS FOR BATTERY AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BECAUSE SHE HAS NOT ADEQUATELY ALLEGED A VIOLATION OF THE NEW YORK PENAL CODE. 19

    C.      GIUFFRE'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ALSO MUST BE DISMISSED BECAUSE IT IS DUPLICATIVE OF HER BATTERY CLAIM. ......................................................................................................24

    D.      GIUFFRE FAILS TO STATE CLAIMS FOR BATTERY OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BECAUSE THE CVA'S CLAIM REVIVAL PROVISION VIOLATES THE DUE PROCESS CLAUSE OF THE NEW YORK STATE CONSTITUTION.......................................................................24

    E.      IN THE ALTERNATIVE, PRINCE ANDREW IS ENTITLED TO A MORE DEFINITE STATEMENT BECAUSE THE COMPLAINT IS AMBIGUOUS AND WHOLLY DEVOID OF FACTUAL ALLEGATIONS REGARDING THE PURPORTED NEW YORK INCIDENT. ................................................................................................29

V.      CONCLUSION .....................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Agilent Techs., Inc. v. Micromuse, Inc.*,
No. 04 Civ. 3090, 2004 WL 2346152 (S.D.N.Y. Oct. 19, 2004) ......................................12, 29

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937 (2009) .......................................................................11, 21, 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955 (2007) ..............................................................................11, 23

*Bower v. Weisman*,
639 F. Supp. 532 (S.D.N.Y. 1986) ...................................................................................12, 29

*Caraveo v. Nielsen Media Research, Inc.*,
No. 01 Civ. 9609, 2002 WL 530993 (S.D.N.Y. Apr. 8, 2002).........................................12, 29

*Conn. State Fed'n of Teachers v. Bd. of Educ. Members*,
538 F.2d 471 (2d Cir. 1976)...................................................................................................27

*Dean v. Bennett M. Lifter, Inc.*,
336 So. 2d 393 (Fla. Dist. Ct. App. 1976) .............................................................................16

*Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*,
810 F.3d 861 (2d Cir. 2015)...................................................................................................24

*Doe v. Hartford Roman Catholic Diocese Corp.*,
317 Conn. 357 (2015) .............................................................................................................25

*Drake v. Drake*,
455 N.Y.S.2d 420 (App. Div. 1982) .......................................................................................18

*Encore Lake Grove Homeowners Ass'n v. Cashin Assocs.*,
976 N.Y.S.2d 143 (App. Div. 2013).................................................................................16, 17

*Fla. Mun. Power Agency v. Fla. Power & Light Co.*,
81 F. Supp. 2d 1313 (M.D. Fla. 1999).............................................................................14, 15

*Gallewski v. Hentz & Co.*,
301 N.Y. 164 (1950) .........................................................................................................25, 28

*Giuffre v. Dershowitz*,
No. 19 Civ. 3377, 2020 WL 2123214 (S.D.N.Y. Apr. 8, 2020).............................................27

7147-2

*Giuffre v. Dershowitz*,
  No. 19 Civ. 3377 (S.D.N.Y. Aug. 5, 2021) ........................................................................10

*Hester v. Gatlin*,
  332 So. 2d 660 (Fla. Dist. Ct. App. 1976) ....................................................................15, 18

*Hymowitz v. Eli Lilly & Co.*,
  73 N.Y.2d 487 (1989) .................................................................................................25, 28

*Jane Doe No. 102 v. Epstein*,
  No. 09 Civ. 80656 .................................................................................................... *passim*

*Kelly v. L.L. Cool J.*,
  145 F.R.D. 32 (S.D.N.Y. 1992) .................................................................................12, 29

*Logan-Baldwin v. L.S.M. Gen. Contractors, Inc.*,
  942 N.Y.S.2d 718 (App. Div. 2012) .................................................................................16

*Lynch v. City of New York*,
  952 F.3d 67 (2d Cir. 2020) .........................................................................................11, 19

*M-I LLC v. Utility Directional Drilling, Inc.*,
  872 So. 2d 403 (Fla. Dist. Ct. App. 2004) .......................................................................15

*Matter of McCann v. Walsh Constr. Co.*,
  123 N.Y.S.2d 509 (App. Div. 1953), *aff'd without op.*, 306 N.Y. 904 (1954) .................26, 28

*Mendez v. Hampton Court Nursing Ctr., LLC*,
  203 So. 3d 146 (Fla. 2016).............................................................................................14

*MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*,
  701 F. Supp. 2d 518 (S.D.N.Y. 2010), *aff'd*, 410 F. App'x 408 (2d Cir. 2011)....................24

*Olney v. Town of Barrington*,
  118 N.Y.S.3d 898 (App. Div. 2020) .................................................................................24

*Olsen v. O'Connell*,
  466 So. 2d 352 (Fla. Dist. Ct. App. 1985) .......................................................................15

*In re Oxford Health Plans, Inc.*,
  191 F.R.D. 369 (S.D.N.Y. 2000) .....................................................................................27

*PC-36 Doe v. Niagara Falls City Sch. Dist.*,
  152 N.Y.S.3d 242 (Sup. Ct. 2021)...................................................................................27

*PC-41 Doe v. Poly Prep Cty. Day Sch.*,
  No. 20 Civ. 3628, 2021 WL 4310891 (E.D.N.Y. Sept. 22, 2021), *appeal filed* (2d
  Cir. Oct. 22, 2021) ..........................................................................................................27

7147-2

*People v. Orda,*
    690 N.Y.S.2d 822 (Sup. Ct. 1999)........................................................................23

*Robinson v. Robins Dry Dock & Repair Co.,*
    238 N.Y. 271 (1924)................................................................................25, 28

*S.H. v. Diocese of Brooklyn,*
    No. 517999/2019, 2020 WL 4730433 (N.Y. Sup. Ct. Aug. 14, 2020)....................19

*Svensson v. Securian Life Ins. Co.,*
    706 F. Supp. 2d 521 (S.D.N.Y. 2010).....................................................................27

*Technicable Video Sys., Inc. v. Americable of Greater Miami, Ltd.,*
    479 So. 2d 810 (Fla. Dist. Ct. App. 1985) ............................................................15

*Torrey v. Portville Cent. Sch.,*
    125 N.Y.S.3d 531, slip op. (Sup. Ct. 2020) ..........................................................27

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP),*
    412 U.S. 669, 93 S. Ct. 2405 (1973) ..............................................................12, 29

*Van Vleet v. Rhulen Agency Inc.,*
    578 N.Y.S.2d 941 (App. Div. 1992)......................................................................16

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.,*
    30 N.Y.3d 377 (2017)......................................................................................25, 27

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.,*
    66 F. Supp. 3d 466 (S.D.N.Y. 2014)...............................................................25, 27

*Zumpano v. Quinn,*
    6 N.Y.3d 666 (2006) ................................................................................26, 27, 28

**Statutes**

18 U.S.C. § 2255........................................................................................................7

New York Penal Law Section 130.................................................................. 4, 19-23

    § 130.00.3 ........................................................................................................21

    § 130.00(8)................................................................................................22, 23

    § 130.05(3)(a) ...................................................................................................22

    § 130.05.1.........................................................................................................22

    § 130.05.2(c).....................................................................................................22

iv

§ 130.20.................................................................................................................20

§ 130.52.................................................................................................................21

§ 130.55.................................................................................................................21

§ 130.65.................................................................................................................21

N.Y. Consolidated Laws,  Civil Practice Law and Rules

§ 214-g (2020)..................................................................................................2, 19


**Other Authorities**

Federal Rules of Civil Procedure

Rule 11 .................................................................................................................10

Rule 12(b)(6)....................................................................................................1, 11

Rule 12(e)...................................................................................................1, 12, 29

7147-2

Defendant Prince Andrew, Duke of York, a/k/a Andrew Albert Christian Edward ("Prince Andrew") respectfully submits this memorandum of law in support of his motion, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(e), to dismiss the Complaint filed by Plaintiff Virginia L. Giuffre ("Giuffre") or, in the alternative, for a more definite statement.

## I.   __INTRODUCTION__

Virginia Giuffre may well be a victim of sexual abuse at the hands of Jeffrey Epstein ("Epstein"), and nothing can excuse, nor fully capture, the abhorrence and gravity of Epstein's monstrous behavior against Giuffre, if so. However, and without diminishing the harm suffered as a results of Epstein's alleged misconduct, ***Prince Andrew never sexually abused or assaulted Giuffre.*** He unequivocally denies Giuffre's false allegations against him.

For over a decade, Giuffre has profited from her allegations against Epstein and others by selling stories and photographs to the press and entering into secret agreements to resolve her claims against her alleged abusers, including Epstein and his ex-girlfriend, Ghislaine Maxwell ("Maxwell"). Most people could only dream of obtaining the sums of money that Giuffre has secured for herself over the years. This presents a compelling motive for Giuffre to continue filing frivolous lawsuits against individuals such as Prince Andrew, whose sullied reputation is only the latest collateral damage of the Epstein scandal.

Accusing a member of the world's best known royal family of serious misconduct has helped Giuffre create a media frenzy online and in the traditional press. It is unfortunate, but undeniable, that sensationalism and innuendo have prevailed over the truth. Giuffre has initiated this baseless lawsuit against Prince Andrew to achieve another payday at his expense and at the expense of those closest to him. Epstein's abuse of Giuffre does not justify her public campaign against Prince Andrew. Giuffre's pattern of filing a series of lawsuits against numerous high-profile individuals should no longer be tolerated, as it continues to irreparably harm many innocent people and diverts already limited judicial resources from the adjudication of meritorious claims asserted against those who have actually perpetrated sexual offenses against minors.

7147-2

Giuffre settled her sex-trafficking and sexual abuse claims against Epstein in 2009. In doing so, she provided Epstein with a general release of all claims against him and numerous other individuals and entities.  To avoid being dragged into future legal disputes, Epstein negotiated for this broad release, insisting that it cover any and all persons who Giuffre identified as potential targets of future lawsuits, regardless of the merit—or lack thereof—to any such claims.  Epstein's former attorney, Alan Dershowitz, and Prince Andrew are axiomatically among the releasees in that 2009 settlement agreement.  Indeed, that same agreement was the basis for Giuffre agreeing to dismiss her previously released battery claim against Professor Dershowitz earlier this year.  Professor Dershowitz, as a third-party beneficiary of the 2009 settlement agreement, was entitled to rely upon and enforce the terms of that secret deal. Faced with the prospect of a sanctions motion and a motion for summary judgment for pursing a claim that Giuffre has previously released, she had little choice but to withdraw and dismiss the battery allegation she leveled against Professor Dershowitz.  Giuffre's baseless claims against Prince Andrew should be treated similarly and must be dismissed at this stage.

In filing this action, Giuffre took advantage of the now-expired New York Child Victims Act, N.Y. C.P.L.R. § 214-g (2020) (the "CVA"), which temporarily (albeit unconstitutionally) re-opened the statute of limitations on the otherwise long time-barred and factually meritless claims that Giuffre has asserted against Prince Andrew.  In what amounts to blatant forum shopping, Giuffre cobbled together a series of allegations against Prince Andrew, irrespective of when the alleged misconduct occurred, in what jurisdiction it supposedly occurred, or what specifically was even alleged to have happened to her.  She then rushed to file this specious lawsuit in a New York courthouse just five days prior to the filing deadline extended by the arbitrary and likewise unconstitutional May 2020 amendment to the CVA.

Since at least 2009, the rhetoric from Giuffre has grown ever more lurid, as she has sought to peddle increasingly salacious and inconsistent accounts of alleged sexual abuse by friends, business associates, and mere acquaintances of Epstein and Maxwell.  In addition to her November 2009 monetary settlement with Epstein, Giuffre received another payday in 2011

when she sold the *Daily Mail* an exclusive interview and a photograph of her and Prince Andrew for $160,000.  Notwithstanding that Giuffre's "bombshell interview" was devoid of even an insinuation that she had sexual contact with Prince Andrew, she milked the publicity for all she could.

Yet Giuffre still wanted more.  On December 30, 2014, using the pseudonym "Jane Doe 3," Giuffre publicly filed a motion seeking to join the Crime Victims' Rights Act ("CVRA") lawsuit against the United States then pending in the Southern District of Florida (the "CVRA Action").  In those papers, Giuffre for the first time claimed (falsely) that Prince Andrew had sexual relations with her, and that Professor Dershowitz supposedly raped her multiple times.  A week later, and with Giuffre's authorization, the *Daily Mail* identified Giuffre as "Jane Doe 3" and published, among other things, the sensational account of her purported interactions with Prince Andrew and Professor Dershowitz, as she alleged in her pleading.[1]

In September 2015, Giuffre sued Maxwell for defamation because Maxwell denied Giuffre's allegations against her and publicly stated that Giuffre was not a credible source or an honest person.  The parties reached a settlement in 2017, pursuant to which Giuffre purportedly received millions of dollars.

In 2019, Giuffre sued Professor Dershowitz for defamation because he also publicly denied her allegation of sexual abuse and attacked her for being dishonest and unreliable.  Then, when the CVA temporarily revived the statute of limitations to allow otherwise time-barred claims of purported sexual abuse to be filed in New York, Giuffre added a claim for battery in her suit against Professor Dershowitz.  As an affirmative defense to that new allegation, Professor Dershowitz argued that the release contained in Giuffre's 2009 settlement agreement with Epstein served as an absolute bar to her claim against Professor Dershowitz.  Citing the 2009 release agreement, Professor Dershowitz threatened to seek judicial sanctions and summary judgment against Giuffre and her attorneys if they did not immediately withdraw the battery

---

[1] These allegations were later stricken from the record by the federal district court, and Giuffre's motion to join the lawsuit was denied.  (Request for Judicial Notice ("RJN") Ex. E.)

claim. Without any way to avoid the legal effect of the release, Giuffre voluntarily dismissed her battery claim against Professor Dershowitz.  Only days prior to the dismissal, Giuffre filed this action against Prince Andrew.  This lawsuit, too, indisputably violates the terms of the 2009 release agreement and must be dismissed.

As an initial matter, Giuffre is barred from pursuing claims against Prince Andrew that she unequivocally released in 2009, just as she conceded in the *Dershowitz* action.  Additionally, Giuffre has failed to plead ***any*** facts giving rise to a plausible claim that Prince Andrew committed a violation of Article 130 of the New York Penal Code, a prerequisite for asserting otherwise time-barred claims under the CVA.  It is evident from her conflicting allegations, public statements, and other written accounts that Giuffre cannot keep her stories straight. Presumably in an effort to avoid making further inconsistent statements, Giuffre filed a threadbare Complaint that conspicuously lacks any facts to support her wild allegations against Prince Andrew.  Instead, Giuffre deliberately conflates alleged incidents of misconduct and purposely confuses and combines allegations from various times, dates, and locations regarding events that purportedly took place in the United Kingdom and/or in the U.S. Virgin Islands.  In fact, only a ***single paragraph*** in the Complaint refers to any alleged misconduct that supposedly occurred within New York State.

Inexplicably, Giuffre fails to allege ***when*** she was purportedly sexually abused by Prince Andrew in New York; specifically ***what*** Prince Andrew supposedly did to her there; or specifically ***where*** the alleged abuse supposedly occurred.  Critically, even if her allegations were plausible, Giuffre concedes she was 17 years old at the time of the alleged abuse, and thus over the age of consent under New York law. She has not pleaded a single fact regarding the requisite "forcible compulsion" by "express or implied threats" that she claims to have been under when she allegedly engaged in sexual acts with Prince Andrew.

For these same reasons, Giuffre's duplicative claim for intentional infliction of emotional distress also must be dismissed because it arises from the same alleged conduct and seeks the same damages as her battery claim, rendering it equally flawed.  Finally, the Complaint should

7147-2

be dismissed because the CVA's claim revival provision violates Prince Andrew's right to due process under the New York State Constitution.

## II.    SUMMARY OF RELEVANT FACTS

### A.    GIUFFRE'S ROLE IN EPSTEIN'S CRIMINAL ENTERPRISE

Giuffre contends that she was recruited into Epstein's sex-trafficking operation by Maxwell in 2000, when Giuffre was working at the Mar-A-Lago Club in Palm Beach, Florida.[2] (ECF No. 1, ¶¶ 24-25.)  From the beginning, Giuffre claims she was forced to engage in sexual acts with both Epstein and Maxwell, in addition to being sexually abused by Epstein alone. (ECF No. 1, ¶ 5.)

Soon, Giuffre was "slowly climbing the ladder" within Epstein's organization.  (RJN Ex. L at p. 41.)  She "frequently traveled with [Epstein] both nationally and internationally," including numerous trips on his private jet to his multiple residences (his Upper East Side mansion in New York, his 7,500-acre ranch in New Mexico, and 70-acre private island in the U.S. Virgin Islands), other locations in the United States, and foreign destinations such as the Bahamas, London, Paris, Tangier and Granada.  (ECF No. 1, ¶¶ 5, 26.)  Giuffre "loved spending time at [Epstein's] ranch" because "it was [her] favorite of all of his residences." (RJN Ex. L at p. 46.)  Epstein paid Giuffre in cash (RJN Ex. B, ¶ 17) and bought her expensive diamond jewelry, furniture, and designer clothing (RJN Ex. J.)  Giuffre said Epstein "was paying me very well because I'd give him sex whenever he wanted it."  (*Id.*)  She and Maxwell regularly went on shopping sprees together in New York and Palm Beach.  (*Id.*)

Eventually, Giuffre claims she found herself as "one of the very few [who Epstein] trusted as 'special' and chosen to 'entertain' his friends."  (*Id.*)  Epstein introduced her as his

---

[2] Previously, Giuffre falsely alleged that she met Epstein in 1998 when she was 15 years old, and that she was abused by him for four years.  (*See* RJN Ex. B, ¶¶ 17, 20, 22-23, 26.)  Later, Giuffre alleged that Maxwell recruited her into Epstein's sex ring in 1999.  (RJN Ex. F, ¶ 9.)  After being confronted with her own employment records, which prove that she was employed at Mar-A-Lago in **2000**, Giuffre changed her allegations a third time.  (RJN Ex. G, ¶¶ 2, 31; *accord* ECF No. 1, ¶¶ 2, 25.)  Notably, Giuffre never contacted the *Daily Mail* to request that they correct her demonstrably false statements regarding when she first met Epstein and Maxwell.  (*See* RJN Ex. J at p. 3; RJN Ex. M at p. 3.)

7147-2

"traveling masseuse" when he invited her to meet various political leaders and celebrities such as Al and Tipper Gore, Bill Clinton, Senator George Mitchell, and others.  (RJN Ex. K.)  In 2001, Giuffre "threw her arms around [Epstein] and gave him a peck on the cheek" when he told her that she would be accompanying him to Europe and North Africa on a six-week trip.  (RJN Ex. J at p. 6.)  Giuffre acknowledged that "[a] lot of it was very glamorous."  (*Id.* at p. 5.)

Giuffre also was trained to and did, in fact, recruit other young women into Epstein's sex trafficking ring.  Philip Guderyon, who used to date Giuffre and would drive her to Epstein's Palm Beach mansion, told the *New York Daily News*, "She was like the head b***h. She'd have like nine or 10 girls she used to bring to him.  She never looked like she was being held captive . . . .  She and the other girls would walk out of there smiling, with their little bathing suits on, like they had just come from the beach. She'd have like four grand. And then I'd take them all to the mall and they'd get their nails done."  (RJN Ex. N.)  Crystal Figueroa, whose brother also dated Giuffre at the time, said that Giuffre asked for her help to recruit underage girls for Epstein.  Figueroa recalled, "She [Giuffre] would say to me, 'Do you know any girls who are kind of slutty?'"  (*Id.*)

In 2002, "[o]ne of [Giuffre]'s assignments from Epstein was to bring a young girl back to Epstein in the United States."  (ECF No. 1, ¶ 29.)  Epstein booked Giuffre a trip to Thailand in September 2002 with this goal, after she had just turned 19.  It is a striking feature of this case that while lurid allegations are made against Prince Andrew by Giuffre, the only party to this claim whose conduct has involved the willful recruitment and trafficking of young girls for sexual abuse is Giuffre herself, including while she was an adult.  Once in Thailand, she met her future husband, decided that she did not want to subject another young girl to sexual abuse, broke all ties with Epstein, and made plans to move to Australia.  (*Id.*). When Giuffre called Epstein from Thailand to tell him that she had fallen in love, Epstein told her to "have a good life" and hung up on her.  (RJN Ex. J at p. 7; RJN Ex. L at pp. 126-27.).  Thereafter, she did not hear from Epstein, Maxwell, or any others involved in the enterprise until 2008, after the first of Epstein's victims filed a civil lawsuit against him in Florida.  (RJN Ex. B, ¶ 28.)

6

**B.**     **GIUFFRE'S 2009 LAWSUIT AGAINST JEFFREY EPSTEIN AND**
          **SETTLEMENT OF THE DISPUTE**

On May 4, 2009, Giuffre sued Epstein in the U.S. District Court for the Southern District of Florida pursuant to 18 U.S.C. § 2255, in the action styled *Jane Doe No. 102 v. Epstein*, No. 09 Civ. 80656 (the "Epstein Action").  (*See generally* RJN Ex. B.) In her Complaint, Giuffre asserted nine causes of action against Epstein arising out of his alleged sexual abuse of her. Significantly, Giuffre alleged that "Plaintiff was required to be sexually exploited by [Epstein]'s adult male peers, including ***royalty***, politicians, academicians, businessmen, and/or other professional and personal acquaintances." (*Id.*, ¶ 21 (emphasis added).)

In November 2009, Giuffre and Epstein settled the Epstein Action by entering into a Settlement Agreement and General Release (the "Release Agreement").  (*See generally* RJN Ex. A.)  Pursuant to this Release Agreement, ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

_____

█████████████████████████████████████████████ ████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████

### C.   GIUFFRE'S INCONSISTENT ALLEGATIONS REGARDING PRINCE ANDREW

#### 1.   The 2011 Interview

In early 2011, Giuffre publicly revealed herself as "Jane Doe No. 102" in the Epstein Action.  At that time and with the encouragement of journalist Sharon Churcher, Giuffre sold an exclusive interview to the *Daily Mail*, along with a photograph of her and Prince Andrew that was supposedly taken in London in 2001.  (*See generally* RJN Ex. J.)  Giuffre received $160,000 for selling her story and photograph, and received additional monies from the syndication and republication of the same.  In her *Daily Mail* interview, Giuffre claimed that she met Prince Andrew three times, all in 2001.  Giuffre alleged that she met Prince Andrew twice when she was 17 years old: once in London, and once in New York.  (*Id.* at p. 7.)  She further alleged that she met Prince Andrew a third and final time in the U.S. Virgin Islands after she turned 18.  (*Id.*)

In her 2011 interview, Giuffre stated that, before first meeting Prince Andrew, Maxwell took her on a luxury shopping spree that ended at Burberry, where Maxwell purchased a £5,000 bag for Giuffre.  (*Id.* at p. 6.)  That night, Epstein, Maxwell, Giuffre, and Prince Andrew supposedly went out to dinner and a nightclub, where Giuffre allegedly danced with Prince Andrew.  (*Id.*)  When they returned to Maxwell's home, Giuffre "asked Jeffrey [Epstein] to snap a picture of me with the Prince. I wanted something to show my Mom."  (*Id.*)  During their second meeting at Epstein's New York mansion, Maxwell allegedly put Giuffre on Prince Andrew's lap, across from Epstein's employee Johanna Sjoberg, who was 21 at the time.  (*Id.* at pp. 6-7.)  Epstein had just given Maxwell a gift, a Spitting Image puppet of Prince Andrew.  Ms. Sjoberg stated that Maxwell placed the hand of the puppet on Giuffre's breast and supposedly Prince Andrew then placed his hand on Ms. Sjoberg's breast.  (*Id.* at p. 7.)  Giuffre did not

---

████████████████████████████████

7147-2

provide any details about her alleged third meeting with Prince Andrew during the 2011 interview.  (*Id.*)

There is no indication that Giuffre accused Prince Andrew of any sexual abuse or assault in her 2011 interview.  In fact, the *Daily Mail* article explicitly states: "There is no suggestion that there was any sexual contact between Virginia [Giuffre] and [Prince] Andrew, or that [Prince] Andrew knew that Epstein paid her to have sex with his friends."  (*Id.* at p. 6.)

Also, in or about 2011, when her brief exclusivity period with the *Daily Mail* expired, Giuffre began shopping a manuscript for a book entitled *The Billionaire's Playboy Club*.  (*See generally* RJN Ex. L.)  Giuffre again turned to Ms. Churcher for her assistance.  Ms. Churcher introduced Giuffre to literary agents to review her working draft of the book.

## 2.    The December 2014 Filing and 2015 Interviews

In 2014, Giuffre sought further media exposure and profit.  In addition to resuming efforts to sell her book, Giuffre also attempted (unsuccessfully) to leverage interest from the *Daily Mail* interview by publishing an updated version of her story as an exclusive provided to the *New York Post*.

On December 30, 2014, Giuffre (using the pseudonym "Jane Doe 3") filed a motion requesting to join a then-pending lawsuit arising from law enforcement's prior investigation into Epstein's sex trafficking enterprise.  (RJN Ex. I.)  In the publicly filed documents, Giuffre, for the first time, alleged that she was forced to have sex with Prince Andrew against her will three times when she was 17 years old.[4]  (*Id.* at p. 5.)

Only a week later, the *Daily Mail* published another exclusive article about Giuffre's salacious allegations against Prince Andrew.  Even then, Giuffre said: "To be honest, I was sort of excited to meet the Prince. That was the lifestyle to which Jeffrey [Epstein] had accustomed me."  (RJN Ex. M at p. 8.)

---

[4] Giuffre made this false claim—repeated in her Complaint—even though she had previously stated in her 2011 *Daily Mail* interview that she was *18* years old when she purportedly met Prince Andrew in the U.S. Virgin Islands.  (RJN Ex. J at p. 7.)

In this follow-up interview, Giuffre also made new and equally outrageous allegations about her alleged second meeting with Prince Andrew at Epstein's home in New York.  (*Id.* at p. 9.)  Finally, in this interview, Giuffre falsely claimed that she entertained Prince Andrew at an "orgy" with other underage girls in the Virgin Islands.  (*Id.* at p. 10.)  Giuffre did not provide the *Daily Mail* with any details of her purported sexual contact with Prince Andrew during this alleged incident.[5]

### D.  GIUFFRE'S PARALLEL PROCEEDING AGAINST PROFESSOR DERSHOWITZ

In addition to this lawsuit, Giuffre is the plaintiff in a parallel proceeding against Epstein's former attorney, Alan Dershowitz, which is currently pending before Judge Preska in this Court.  In her December 2014 CVRA filing, Giuffre accused Professor Dershowitz of rape. In 2019, Giuffre sued him for defamation because he disputed her claims and accused her of lying about the alleged assault.  On April 15, 2020, Giuffre relied on the claim revival provision of the New York CVA to add what otherwise would have been a time-barred claim for battery against Professor Dershowitz.  In response, Professor Dershowitz asserted an affirmative defense based on the terms of the Release Agreement and threatened to bring a motion for Rule 11 sanctions and a motion for summary judgment against Giuffre and her attorneys if they did not immediately dismiss the battery claim, which was barred by the release.  *See Giuffre v. Dershowitz*, No. 19 Civ. 3377 (S.D.N.Y. Aug. 5, 2021) [ECF No. 229].

Conceding that the Release Agreement operated as a bar to her battery claim because Professor Dershowitz was covered as a releasee, on August 12, 2021, Giuffre agreed to drop the

---

[5] Presumably, the lack of detail was a consequence of Giuffre's fabrication of this purported orgy.  Giuffre's manuscript goes into explicit detail regarding an alleged orgy in the U.S. Virgin Islands shortly after her 18th birthday, involving Epstein and another man she has accused of procuring young girls for him.  (RJN Ex. L MS at pp. 96-98.)  There is no mention of Prince Andrew in this account whatsoever.  Instead, the manuscript contains a detailed account of a two-night sexual liaison between Giuffre and Prince Andrew that supposedly occurred at Epstein's ranch in New Mexico. (*Id.* at pp. 105-06.)  Giuffre later changed her story again, admitting during a deposition that the entire New Mexico encounter never occurred, and seeking through her lawyers to describe her autobiographical manuscript as a "fictionalized account of what happened to her."

7147-2

claim.  (RJN H.)  On August 16, 2021, the Court dismissed Giuffre's battery claim, with

prejudice.  (*Id.*)  Almost simultaneously with the voluntary dismissal of Professor Dershowitz,

Giuffre initiated the instant action against Prince Andrew.  Because Prince Andrew also falls

within the specific categories of individuals who █████████████████████████████

████████  in the Epstein Action – *i.e.*, "royalty" – the Court must dismiss her claims here in

light of the plain language of the Release Agreement.

## III.   LEGAL STANDARD

To survive dismissal under Rule 12(b)(6), a plaintiff must plead "enough facts to state a

claim to relief that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127

S. Ct. 1955, 1974 (2007).  A claim is plausible on its face "when the plaintiff pleads ***factual***

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing

*Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965) (emphasis added).  A plaintiff must show "more

than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678, 129 S. Ct.

at 1949.  If the plaintiff's pleadings "have not nudged [her] claims across the line from

conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570, 127 S.

Ct. at 1974.

Although the Court must "accept all 'well-pleaded factual allegations' in the complaint as

true . . . [and] 'construe all reasonable inferences that can be drawn from the complaint in the

light most favorable to the plaintiff,'" conclusory statements and legal argument are ***not*** entitled

to the same treatment.  *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020) (citations

omitted).  To the contrary, at this procedural posture, the Court is "not to give effect to a

complaint's assertions of law or legal conclusions couched as factual allegations."  *Id.* at 75-76.

A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a

cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]'

devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting

*Twombly*, 550 U.S. at 555, 557, 127 S. Ct. at 1966).

11

Pursuant to Rule 12(e), "[a] party may move for a more definite statement of a [complaint] . . . which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). "The essence of a complaint is to inform the defendant as to the general nature of the action and as to *the incident out of which a cause of action arose*." *Bower v. Weisman*, 639 F. Supp. 532, 538 (S.D.N.Y. 1986) (emphasis added). A more definite statement is appropriate where, as here, a complaint contains "allegations . . . wholly barren of specifics." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.15, 93 S. Ct. 2405, 2417 n.15 (1973).

Courts in this district have granted Rule 12(e) motions where plaintiffs have failed to allege the specific facts giving rise to a claim, *see, e.g.*, *Agilent Techs., Inc. v. Micromuse, Inc.*, No. 04 Civ. 3090, 2004 WL 2346152, at *5-6 (S.D.N.Y. Oct. 19, 2004); failed to clearly identify which defendants were responsible for specific acts alleged, *see, e.g.*, *Caraveo v. Nielsen Media Research, Inc.*, No. 01 Civ. 9609, 2002 WL 530993, at *1-2 (S.D.N.Y. Apr. 8, 2002); *Bower*, 639 F. Supp. at 537-38; or failed to allege facts necessary to establish the elements of a claim, *see, e.g.*, *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36-37 (S.D.N.Y. 1992).

As set forth below, Giuffre's claims must be dismissed because they are legally defective and because the Complaint is devoid of any factual allegations giving rise to plausible claims upon which relief can be granted. In the alternative, the Court should order Giuffre to amend her pleading by filing a more definite statement of the claims specifically alleging where, when and in what manner her claims of abuse under the CVA arose.

IV.   **ARGUMENT**

**A.   GIUFFRE'S COMPLAINT SHOULD BE DISMISSED BECAUSE HER CLAIMS ARE BARRED BY THE TERMS OF THE RELEASE AGREEMENT.**

Giuffre's Complaint should be dismissed in its entirety because ███████████████ ██████ from Epstein as consideration for releasing her claims and potential future claims against Epstein and others, who she alleged participated in his sex trafficking scheme and caused her harm. By its express terms, the Release Agreement, a copy of which is attached as Exhibit A

12

to the concurrently-filed Request for Judicial Notice, releases not only Epstein but also █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████  Giuffre's claims in this lawsuit arise from events that purportedly

occurred more than 20 years ago.  Because the allegations predate the effective date of Release

Agreement, the broad general release contained therein bars Giuffre's claims against Prince

Andrew, as a matter of law.

    1.    **Prince Andrew Is** █████████████████████████ **as That Term Is Defined in the Release Agreement.**

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████  (*Id.*, ¶ 2.)  When considered together (and accepted as true for purposes of adjudicating

this motion), the allegations in both the complaint that Giuffre filed in the Epstein Action and the

Complaint she filed here demonstrate that Prince Andrew was a person ██████████████████

████████████████████████████████████

    Giuffre's complaint in the Epstein Action alleges, in relevant part, that, "[i]n addition to

being continually exploited to satisfy [Epstein]'s every sexual whim, [Giuffre] was also required

to be sexually exploited by [Epstein]'s adult male peers, including ***royalty***, politicians,

academicians, businessmen, and/or other professional and personal acquaintances."  (RJN Ex. B,

¶ 21 (emphasis added).)  In the Complaint here, Giuffre goes into detail regarding Prince

Andrew's purported contacts with Epstein and the State of Florida.  Among other things, Giuffre

alleges:

- "Prince Andrew's name also appears in other flight log entries . . . , showing travel with Epstein and Maxwell to and from other locations, including ***West Palm Beach, Florida*** and Teterboro, New Jersey."  (ECF No. 1, ¶ 31 (emphasis added)); and,

- "Prince Andrew has himself confirmed that he has been on Epstein's private plane, stayed at Epstein's private island, and stayed at Epstein's homes in **Palm Beach, Florida**, and New York, New York." (*Id.*, ¶ 34 (emphasis added).)

Giuffre also alleges that she "became a victim of sex trafficking and repeated sexual abuse after Maxwell recruited her into Epstein's sex-trafficking operation when [Giuffre] was working at the Mar-A-Lago Club in Palm Beach, Florida." (*Id.*, ¶ 24.) ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

According to her own allegations, Giuffre could have sued Prince Andrew in the Southern District of Florida when she sued Epstein, based on her claims that she was sexually abused by "royalty" and other of Epstein's "adult male peers," (*id.*, ¶ 21), the ongoing harm she allegedly suffered due to the alleged abuse, and her assertion that Prince Andrew purportedly participated in Epstein's criminal enterprise and had the requisite minimum contacts with the State of Florida (ECF No. 1, ¶¶ 30-31, 34-35).

2.   **As ███████████████████████ Prince Andrew Is a Third-Party Beneficiary of the Release Agreement and Entitled To Enforce the General Release Contained Therein.**

Under both Florida and New York law, Prince Andrew is a third-party beneficiary of the Release Agreement.[6]  Accordingly, he has standing to invoke the general release provision which forecloses Guiffre's claims as a matter of law.  "[T]he third-party beneficiary doctrine enables a non-contracting party to enforce a contract against a contracting party." *Mendez v. Hampton Court Nursing Ctr., LLC*, 203 So. 3d 146, 149 (Fla. 2016).  As a rule, third parties to a contract may not enforce its terms if they receive only incidental or consequential benefits from it.  *Fla. Mun. Power Agency v. Fla. Power & Light Co.*, 81 F. Supp. 2d 1313, 1324 (M.D. Fla. 1999) (citations omitted).  However, a nonparty is entitled to do so if he "is an intended third party beneficiary of the contract." *Id.* at 1324.

---

[6] ████████████████████████████████████████████████ As discussed below, New York law is consistent with Florida law on the issue of third-party beneficiaries.

7147-2

To determine whether Prince Andrew is a third-party beneficiary of the Release Agreement, "Florida law looks to [the] 'nature or terms of a contract' to find the parties' clear or manifest intent that it 'be for the benefit of a third party.'" *M-I LLC v. Utility Directional Drilling, Inc.*, 872 So. 2d 403, 404-05 (Fla. Dist. Ct. App. 2004) (internal quotation marks omitted). "'[T]he language used in a contract is the best evidence of the intent and meaning of the parties.'" *Id.* at 405 (quoting *Jenne v. Church & Tower, Inc.*, 814 So. 2d 522, 524 (Fla. Dist. Ct. App. 2002)). A third-party beneficiary need not demonstrate that the contract was made solely for his benefit to assert enforcement rights. *Technicable Video Sys., Inc. v. Americable of Greater Miami, Ltd.*, 479 So. 2d 810, 812 (Fla. Dist. Ct. App. 1985); *see also Fla. Mun. Power Agency*, 81 F. Supp. 2d at 1325 ("Florida law does not require a contract to have been made solely for the benefit of the third party."). In addition, "[i]t is not necessary that the third party be specifically named. ***It is sufficient if the claimant is a member of the limited class which was intended to benefit from the contract.***" *Technicable Video Sys., Inc.*, 479 So. 2d at 812 (emphasis added) (internal citations omitted); *accord Fla. Mun. Power Agency*, 81 F. Supp. 2d at 1324-25 (holding that plaintiff was third party beneficiary of defendant's contract because plaintiff fell within the definition of "neighboring entity" and contract obligated defendant to provide certain services to neighboring entities, such that "the parties intended to confer a direct and substantial benefit upon" plaintiff).

Florida courts long have recognized that an intended third-party beneficiary of a broad release contained in a settlement agreement has standing to enforce that release, even when the release does not identify that third party specifically by name. *See, e.g.*, *Olsen v. O'Connell*, 466 So. 2d 352, 355 (Fla. Dist. Ct. App. 1985) (purchasers of real property were third-party beneficiaries of contract between judgment lienholders and sellers of that property because the parties to the contract clearly intended benefits of contract—release of the judgment lien—to extend to purchasers); *Hester v. Gatlin*, 332 So. 2d 660, 662-63 (Fla. Dist. Ct. App. 1976) (owner of car involved in multi-car accident was third-party beneficiary of settlement agreement between plaintiff and the drivers who rear-ended him, which contained release of "any and all

7147-2

other persons and/or corporations *who are or may be liable for injuries or damages sustained as a result of the subject accident*") (emphasis added); *Dean v. Bennett M. Lifter, Inc.*, 336 So. 2d 393, 394-95 (Fla. Dist. Ct. App. 1976) (employer of driver who caused fatal car accident was third party beneficiary of settlement agreement between administratrix of victim's estate and driver's insurance company, which contained general release of "*any other person, corporation, association or partnership charged with responsibility for injuries to the person and property of the Undersigned*, and the consequences flowing therefrom, as the result" of the fatal accident) (emphasis added). ███████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

Similarly, New York law regarding third party beneficiaries directs the Court to begin its analysis by considering the terms of the contract in question.  In New York, "'[a]n obligation rooted in contract may engender a duty owed to those not in privity when the contracting party knows that the subject matter of a contract is intended for the benefit of others. An intention to benefit a third party must be gleaned *from the contract as a whole*.'"  *Van Vleet v. Rhulen Agency Inc.*, 578 N.Y.S.2d 941, 943 (App. Div. 1992) (emphasis added) (internal citations omitted).  A third party seeking to enforce a contract must establish "that the contract was intended for [their] benefit" and "that the benefit to [them] is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [them] if the benefit is lost."  *Logan-Baldwin v. L.S.M. Gen. Contractors, Inc.*, 942 N.Y.S.2d 718, 720 (App. Div. 2012) (internal quotation marks and citations omitted) (alteration in original).  In connection with this analysis, "[t]he focus is on the intent of the promisee, inasmuch as 'the promisee procured the promise by furnishing the consideration therefor.'"  *Id.* (quoting *Drake v. Drake*, 455 N.Y.S.2d 420, 422 (App. Div. 1982)).

As is true of Florida law, New York law acknowledges that "the identity of a third-party beneficiary need not be set forth in the contract."  *Encore Lake Grove Homeowners Ass'n v. Cashin Assocs.*, 976 N.Y.S.2d 143, 145 (App. Div. 2013) (internal quotations marks omitted).  In

fact, New York law does not require that the identity of a third-party beneficiary "***even be known*** as of the time of [the contract's] execution." *Id.* (emphasis added) (internal citations omitted).

Here, the plain language of the Release Agreement reflects the parties' intent to confer a direct and significant benefit to a defined and limited class of third parties that includes Professor Dershowitz, Prince Andrew, and others accused (whether truthfully or falsely) by Giuffre. Specifically, this direct and significant benefit was Giuffre's agreement, █████████



(RJN Ex. A, ¶ 2.)

7147-2

circumstances under which the settlement was reached compel the same conclusion.  Here, Epstein's intent "is of primary importance," as the promisee who paid significant monies in consideration for a general release for himself and ███████████████ *Drake*, 455 N.Y.S.2d at 422.  The release of ███████████████ clearly benefitted Epstein as well and was bargained for in exchange for the settlement payment.  In the years leading up to execution of the Release Agreement, Epstein was the subject of a criminal investigation and numerous civil lawsuits filed by other victims of his sex trafficking enterprise.

Prior to entering into the Release Agreement, in 2008, Epstein pleaded guilty in Florida to one count of solicitation of a minor for prostitution.  (ECF No. 1, ¶ 49.)  Correctly predicting that he would be the target of other criminal investigations and a defendant in additional civil suits, Epstein had an incentive to completely resolve any potential claims Giuffre may have had involving his sex trafficking enterprise, including purported claims against other people who Giuffre claimed (truthfully or otherwise) participated in that scheme.  Epstein knew that, should Giuffre pursue claims against any of these other individuals based on their alleged role in his sex trafficking scheme, he would become embroiled in the resulting litigation—even if he were not named personally, as a party to the suit.  ██████████████████████████ ██████████████████  Epstein sought to avoid further legal entanglements with Giuffre (*e.g.*, further negative publicity prompted by legally privileged allegations set forth in other pleadings, testifying as a witness, and/or responding to subpoenas in the course of discovery).  "The fact that the consideration for this release only flowed from [Epstein] to [Giuffre]" does not "prevent [Prince Andrew] from obtaining its benefits as a third party beneficiary."  *Hester*, 332 So. 2d at 662.

Because Prince Andrew is a senior member of the British royal family, he falls into one of the expressly identified categories of persons, *i.e.*, royalty, released from liability under the Release Agreement, along with politicians, academicians, businessmen, and others allegedly associated with Epstein.  (RJN Ex. B, ¶ 21.)  As a third-party beneficiary of the Release Agreement, Prince Andrew is entitled to enforce the general release contained therein.  ██

7147-2

███████████████████████████████████████████████████████████

████████████████████   (RJN Ex. A, ¶ 2.)  Accordingly, Giuffre's claims against Prince Andrew

arising from his alleged misconduct when she was a minor are barred as a matter of law.

Because Giuffre has not—and, critically, *cannot*—state a claim for relief against Prince Andrew,

the Complaint must be dismissed in its entirety, without leave to amend.

## B. GIUFFRE FAILS TO STATE CLAIMS FOR BATTERY AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BECAUSE SHE HAS NOT ADEQUATELY ALLEGED A VIOLATION OF THE NEW YORK PENAL CODE.

Giuffre filed her Complaint during the last few days of the extended claim revival period

created by the CVA.[7]  In relevant part, the CVA permits an individual to assert otherwise time-

barred claims "alleging intentional or negligent acts or omissions by a person for physical,

psychological, or other injury or condition suffered as a result of *conduct which would*

*constitute a sexual offense as defined in article one hundred thirty of the penal law*"

committed against a minor under the age of 18.  N.Y. C.P.L.R. § 214-g (emphasis added).

Pursuant to the CVA, Giuffre's time-barred claims against Prince Andrew fail as a matter of law

unless she can prove that Prince Andrew committed one of the sexual offenses enumerated in

Section 130 of the New York Penal Law.  Giuffre has not and cannot do so.

Further, "[c]laims arising pursuant to the CVA *must* be tied to an alleged violation of

*New York* criminal law, and thus the CVA cannot revive claims where the alleged abuse

occurred outside of New York."  *Holloway v. Holy See*, No. 19 Civ. 2195 (NRB), 2021 WL

1791456, at *2 n.2 (S.D.N.Y. May 5, 2021) (emphasis added); *see also S.H. v. Diocese of*

*Brooklyn*, No. 517999/2019, 2020 WL 4730433, at *3-4 (N.Y. Sup. Ct. Aug. 14, 2020)

(dismissing complaint based on purported sexual misconduct that took place in Florida because

"none of the identified sections of New York's Penal Law [in the CVA] apply to criminal

conduct that occurred in Florida," rendering plaintiff's claims "improper under the CVA," and

---

[7] As set forth below, Prince Andrew also challenges the constitutionality of the CVA and the amendment extending the CVA's claim revival period.

observing that the CVA "was intended to benefit New York residents alleged to have suffered wrongs committed within the state"). Consequently, Giuffre's salacious allegations regarding abuse that purportedly occurred outside of the State of New York and/or outside of the United States altogether are wholly irrelevant and may not be considered by this Court.

In the Complaint, Giuffre alleges that she is entitled to assert her time-barred claims under the CVA because they concern Prince Andrew's conduct constituting sexual misconduct (N.Y. Penal Law § 130.20), rape in the third and first degrees (*id.* §§ 130.25, 130.35), forcible touching (*id.* § 130.52), and sexual abuse in the third and first degrees (*id.* §§ 130.55, 130.65). (ECF No. 1, ¶ 67.)[8]  ***Yet the Complaint is wholly devoid of any factual allegations to support these grave accusations.***  Giuffre contends repeatedly that she is a victim of sexual abuse at the hands of Epstein and others, but fails to identify, with any specificity, what Prince Andrew supposedly did to her that amounts to a Section 130 sexual offense.  Giuffre's conclusory allegations—that Prince Andrew "committed sexual assault and battery" (ECF No. 1, ¶ 10), "abused [Giuffre] on separate occasions when she was under the age of 18 years old" (*id.*, ¶ 36), "sexually abused [Giuffre] in Epstein's New York mansion" and "forced [Giuffre] to engage in

---

[8] To state a claim for sexual misconduct, Giuffre must allege that Prince Andrew (i) engaged in sexual intercourse, oral sexual conduct, or anal sexual conduct with Giuffre; (ii) without her consent.  N.Y. Penal Law § 130.20.  To state a claim for rape in the third degree, Giuffre must allege that Prince Andrew (a) engaged in sexual intercourse with Giuffre; (b) without her consent; (c) where such lack of consent is by reason of some factor other than incapacity to consent.  *Id.* § 130.25.  To state a claim for rape in the first degree, Giuffre must allege that Prince Andrew (a) engaged in sexual intercourse with Giuffre; (b) by forcible compulsion. *Id.* § 130.35.  To state a claim for forcible touching, Giuffre must allege that Prince Andrew (a) intentionally, and for no legitimate purpose; (b) purposely touched; (c) the sexual or other intimate parts of Giuffre; (d) for the purpose of degrading or abusing her, or for the purpose of gratifying his sexual desire; (e) without Giuffre's consent.  *Id.* §§ 130.52, 130.05.  To state a claim for sexual abuse in the third degree, Giuffre must allege that Prince Andrew (a) subjected Giuffre to sexual contact; (b) without her consent.  *Id.* §§ 130.55, 130.05.  To state a claim for sexual abuse in the first degree, Giuffre must allege that Prince Andrew (a) subjected Giuffre to sexual contact; (b) by forcible compulsion.  *Id.* § 130.65.  None of these allegations are adequately pleaded anywhere in the Complaint.

20

sex acts against her will" (*id.*, ¶ 39)—are improper legal conclusions that must be discounted for purposes of determining this Motion.  *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950.[9]

Giuffre's *only* allegations regarding Prince Andrew's purported commission of sexual offenses *within the State of New York* are intentionally bookended by calculatedly vague, superfluous, and irrelevant allegations regarding events that took place elsewhere.  In conclusory fashion, Giuffre alleges:

> Prince Andrew sexually abused [her] in Epstein's New York mansion in this District.  During this encounter, Maxwell forced [Giuffre] . . . to sit on Prince Andrew's lap as [he] touched her. During his visit to New York, Prince Andrew forced [Giuffre] to engage in sex acts against her will.

(ECF No. 1, ¶ 30.)  The allegation that "Prince Andrew sexually abused" Giuffre is an unembellished legal conclusion to be given no weight by the Court.  *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. Nor does the allegation that Giuffre supposedly sat on Prince Andrew's lap while he "touched" her give rise to even the least serious sex offenses under New York law of which Prince Andrew stands accused by Giuffre.

In that regard, to state a claim for forcible touching or sexual abuse, Giuffre must allege that Prince Andrew touched "the sexual or other intimate parts" of her body.  *See* N.Y. Penal Law §§ 130.52, 130.55, 130.65, 130.00.3.  Without describing *where* he allegedly touched her or *how*, Giuffre fails to plead facts that constitute a sex offense under Section 130 of the New York Penal Law.  Similarly, Giuffre's assertion that Prince Andrew "forced" her "to engage in sex acts"—again without describing how she supposedly was "forced" or what those purported "sex acts" were—is merely a conclusory and purposefully abstract allegation that should be given no weight at this stage.  *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950.

Giuffre deliberately conflates alleged events, geographic locations, and dates because, as discussed above, she cannot keep her numerous stories straight.  Considered as a whole, these

---

[9] Giuffre also alleges that she was "forced to have sex" with Prince Andrew "at Epstein and Maxwell's direction," but does not specify when or where this purportedly occurred, let alone how she was forced to do so.  (ECF No. 1, ¶ 27.)  As pleaded, there is no indication that this allegation pertains to conduct that occurred in New York and/or when Giuffre was a minor.

7147-2

allegations are amorphous at best.  It is unclear whether the purported tortious acts occurred on one or more dates or in one or more locations in New York.  Giuffre cannot identify, with any specificity, what Prince Andrew supposedly did to her (*e.g.*, whether they engaged in sexual intercourse, oral sexual conduct, etc.), where the acts took place (save a general reference to Epstein's mansion), or who else (if anyone) was present at the time.  Given the laundry list of purported sexual offenses Giuffre claims Prince Andrew committed against her, the utter lack of factual allegations on the topic is conspicuous and insufficient under the federal pleading standards.

Giuffre does not allege ***any*** facts demonstrating that she did not consent to any purported sexual contact with Prince Andrew.  "Whether or not specifically stated, it is an element of every offense defined in [Article 130] that the sexual act was committed without consent of the victim." N.Y. Penal Law § 130.05.1.  Because the age of consent in New York is 17 years old, Giuffre, who alleges she was 17 at the time of the events alleged in the Complaint (*see* ECF No. 1, ¶ 10), cannot rely on her minority status alone to establish a lack of consent. N.Y. Penal Law § 130.05(3)(a).  Instead, she must ***plead and prove*** forcible compulsion or one of the other options applicable to a subset of the sex offenses listed in her Complaint.[10] Giuffre comes nowhere close to doing so.

"Forcible compulsion" is defined as compulsion by either "use of physical force" or "a threat, express or implied, which places a person in fear of ***immediate death or physical injury*** to himself, herself or another person, or in fear that he, she or another person will immediately be kidnapped."  *Id.* § 130.00(8) (emphasis added).  "This makes clear that the compulsion may come solely from the use of physical force; alternatively, in the absence of physical force,

---

[10] For the offenses of sexual abuse in the third degree, forcible touching, and rape in the third degree, New York law recognizes other ways to establish a victim's lack of consent. *See* N.Y. Penal Law § 130.05.2(c) (sexual abuse in the third degree and forcible touching); *id.* § 130.05.2(d) (rape in the third degree).  As currently pleaded, Giuffre does not rely on either of these alternative methods for establishing the element of lack of consent.

22

compulsion can be found in a threat that, at least, induces fear of physical injury."  *People v. Orda*, 690 N.Y.S.2d 822, 825 (Sup. Ct. 1999).

In her Complaint, Giuffre's only allegation regarding lack of consent is a modified recitation of the elements of "forcible compulsion."  (ECF No. 1, ¶ 41.)  In particular, Giuffre alleges that, "[d]uring each of the aforementioned incidents"—intentionally conflating, yet again, the events in New York with those that allegedly took place in the United Kingdom and/or the U.S. Virgin Islands and which are irrelevant for purposes of establishing her eligibility to avail herself of the CVA's claim revival provision—she "was compelled by express or implied threats by Epstein, Maxwell, and/or Prince Andrew to engage in sexual acts with Prince Andrew, and feared death or personal injury to herself or another and other repercussions for disobeying Epstein, Maxwell, and Prince Andrew due to their powerful connections, wealth, and authority."  (ECF No. 1, ¶ 41.)  Nowhere, however, does Giuffre allege the nature of those threats (*e.g.*, even to the extent of saying whether they were express or implied), the identity of those for whom she feared death or personal injury, what "other repercussions" she feared,[11] which of the three (Epstein, Maxwell, or Prince Andrew) made the threats on each occasion, or when and how the threats were conveyed.  Simply put, Giuffre's mere "formulaic recitation of the [consent] element" of these sexual offenses "will not do" and her legal conclusions must be disregarded for purposes of resolving this Motion.  *Twombly*, 550 U.S. at 555, 127 S. Ct. at 965; *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950.

Because Giuffre has alleged ***no*** facts regarding her lack of consent by forcible compulsion, Giuffre has not satisfactorily pleaded ***any*** violation of Section 130 of the New York Penal Law by Prince Andrew.  Accordingly, she cannot assert her time-barred claims for assault or emotional distress as a matter of law.

---

[11] A threat of "other repercussions" does not fall within the statutory definition of "forcible compulsion," unless those other repercussions are the immediate kidnapping of Giuffre or another person.  *See* N.Y. Penal Law § 130.00(8).

C.   **GIUFFRE'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ALSO MUST BE DISMISSED BECAUSE IT IS DUPLICATIVE OF HER BATTERY CLAIM.**

Under well-established New York law, "claims are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'"  *Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 50 (App. Div. 2010)).  "[I]t is not the theory behind a claim that determines whether it is duplicative," but whether it "is premised on the same conduct and seeks the same relief."  *MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*, 701 F. Supp. 2d 518, 532 (S.D.N.Y. 2010), *aff'd*, 410 F. App'x 408 (2d Cir. 2011); *see also Olney v. Town of Barrington*, 118 N.Y.S.3d 898, 901 (App. Div. 2020) (dismissing negligence claim as duplicative of defamation claim also asserted against town's code enforcement officer because negligence claim "is based on the same facts, alleges the same wrongs, and seeks the same relief").

Here, in pleading her claim for intentional infliction of emotional distress, Giuffre merely incorporates by reference those allegations of "sexual abuse" that form the basis of her flawed battery claim (ECF No. 1, ¶¶ 69-72) and reproduces verbatim the same allegations of causation and harm that are pleaded in connection with that claim (*compare id.* ¶¶ 68 *with* 73).  Giuffre also seeks the same damages in connection with both claims—"compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial."  (*Id.* at p. 15).  Because Giuffre's claim for intentional infliction of emotional distress "is premised on the same conduct and seeks the same relief" as her battery claim, it is barred under New York law and must be dismissed.

D.   **GIUFFRE FAILS TO STATE CLAIMS FOR BATTERY OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BECAUSE THE CVA'S CLAIM REVIVAL PROVISION VIOLATES THE DUE PROCESS CLAUSE OF THE NEW YORK STATE CONSTITUTION.**

The Due Process Clause of the New York Constitution (the "New York Due Process Clause") imposes a critical restraint on the legislature's enactment of laws that, like the CVA, provide for revival of time-barred claims.  The Court of Appeal has consistently interpreted the

New York Due Process Clause to permit claim revival only under exceptional circumstances that are not present here.

"Statutes of limitations serve important policies in New York, such as 'fairness to defendant and society's interest in adjudication of viable claims not subject to the vagaries of time and memory.'" *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 66 F. Supp. 3d 466, 473 (S.D.N.Y. 2014) (quoting *Ackerman v. Price Waterhouse*, 84 N.Y.2d 535, 542 (1994)), *vacated on other grounds*, 892 F.3d 108 (2d Cir. 2018). "For this reason, the New York Court of Appeals has described so-called 'revival statutes' as an '***extreme exercise of legislative power***," and upheld them only in limited circumstances." *Id.* (quoting *Hopkins v. Lincoln Tr. Co.*, 233 N.Y. 213, 215 (1922) (Cardozo, J.)) (emphasis added). The Court of Appeals recently reaffirmed that "a claim-revival statute will satisfy the Due Process Clause of the [New York] State Constitution if it was enacted as a reasonable response in order to remedy an injustice." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d 377, 400 (2017).

Although the New York Court of Appeals has upheld other claim revival statutes, it has done so only to remedy the injustice that results when "the plaintiff could not have brought an action in a timely manner." *Doe v. Hartford Roman Catholic Diocese Corp.*, 317 Conn. 357, 433 n.58 (2015) (interpreting New York law and collecting cases). Nearly a hundred years of precedent make clear that claim revival is permitted ***only*** when there is an injustice of a type that makes a plaintiff ***legally unable to sue***, *Robinson v. Robins Dry Dock & Repair Co.*, 238 N.Y. 271, 280-81 (1924) (claim revival for spouses of deceased workers comported with due process because they had no legal right to bring a timely claim until the U.S. Supreme Court invalidated New York's worker's compensation law, previously the spouses' exclusive legal remedy); ***physically unable to sue***, *Gallewski v. Hentz & Co.*, 301 N.Y. 164, 171-75 (1950) (statute enacted to retroactively toll the statute of limitations for individuals residing in Axis-occupied countries during World War II comported with due process because they were "under a practical and total inability to commence action in the courts of this State"); or when the plaintiff ***could not have known about his injury until after the limitations period expired,*** *Hymowitz v. Eli*

*Lilly & Co.*, 73 N.Y.2d 487, 502-03 (1989) (claim revival provision comported with due process because the exposure to the drug diethylstilbestrol (DES) by pregnant mothers causes a latent injury in utero and "many claims [are] barred by the Statute of Limitations before the injury [is] discovered"); *Matter of McCann v. Walsh Constr. Co.*, 123 N.Y.S.2d 509, 511 (App. Div. 1953), *aff'd without op.*, 306 N.Y. 904 (1954) (claim revival provision comported with due process because Cassion disease is "of a slow-starting or insidious nature" and "very often . . . more than twelve months elapse[s] after the contraction of the disease before its presence [is] known or apparent").

The claims revived by the CVA do not fit within the scope of this narrowly circumscribed legislative authority.  Instead, they are analogous to claims whose revival was deemed unconstitutional in recent years.  In *Zumpano v. Quinn*, 6 N.Y.3d 666 (2006), the Court of Appeals addressed whether more than 40 plaintiffs who had asserted time-barred claims based on allegations of clergy sexual abuse—and who had attempted to invoke various common law doctrines to do so—were capable of timely asserting their claims before the limitations period expired. The Court expressly held that they were and, specifically, that "each plaintiff was aware of the sexual abuse he or she suffered" and "had sufficient knowledge to bring an intentional tort cause of action" during the limitations period.  *Id.* at 674, 676 ("Plaintiffs possessed timely knowledge of the actual misconduct and the relationship between the priests and their respective dioceses to make inquiry and ascertain relevant facts prior to the running of the statute of limitations.").  Here, too, Giuffre was unquestionably capable of asserting her claims within the applicable three-year statute of limitations. As with the plaintiffs in *Zumpano*, who "each reached adulthood more than 10 years prior to the filing of the action," *id.* at 682, Giuffre reached adulthood **20 years** before commencing this action—and well within the applicable three-year statute of limitations.

Similarly, in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, a federal district court, applying the Court of Appeals' binding due process precedent, ruled that a statute seeking to revive claims of workers to recover damages for injuries that they incurred

when cleaning up toxic dust from the collapse of the World Trade Center on September 11, 2001 violated the New York Due Process Clause.  The federal court held that the enactment "[did] not fall within the narrow exception for revival statutes," because the relief workers were not subjected to a "'practical and total inability to commence (an) action'" in a timely manner.  66 F. Supp. 3d at 476 (quoting *Gallewski*, 301 N.Y. at 175).  The legislature thus did not have the authority to revive these claims, notwithstanding that many of the workers at issue were unaware of the applicable limitations period or even that they had been provided insufficient information about their work conditions.  *Id.* at 475.  As with the claimants asserting time-barred claims for clergy sexual abuse in *Zumpano*, "those who wished to sue were not barred from doing so," *id.* at 476, and the legislature therefore lacked the constitutional authority to revive their claims.[12]

Even if the CVA's original one-year claim revival period constitutes a "reasonable response in order to remedy an injustice," *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d at 400, the legislature's arbitrary extension of that period by one year in May 2020 is not.  When it was enacted in February 2019 after years of opposition, the CVA reflected the legislature's determination that a one-year window for victims to file time-barred claims was a reasonable response to remedy the injustice of child sexual abuse.  However, on May 28, 2020,

---

[12] As of the date of this filing, there has been no adjudication of the constitutionality of the CVA by the U.S. Supreme Court, Second Circuit, New York Court of Appeals, or any intermediate appellate court of New York State.  Nevertheless, Prince Andrew acknowledges that other courts have considered and ultimately rejected facial challenges to the constitutionality of the CVA under the New York Due Process Clause.  *See, e.g.*, *PC-41 Doe v. Poly Prep Cty. Day Sch.*, No. 20 Civ. 3628, 2021 WL 4310891, at *3-9 (E.D.N.Y. Sept. 22, 2021), *appeal filed*, (2d Cir. Oct. 22, 2021); *PC-36 Doe v. Niagara Falls City Sch. Dist.*, 152 N.Y.S.3d 242, 247-48 (Sup. Ct. 2021); *Giuffre v. Dershowitz*, No. 19 Civ. 3377, 2020 WL 2123214, at *2-3 (S.D.N.Y. Apr. 8, 2020); *Torrey v. Portville Cent. Sch.*, 125 N.Y.S.3d 531, slip op. at *4-5 (Sup. Ct. 2020).  The Court is not bound by the rulings of its sister courts in this and other districts, nor by those of the trial courts of New York State.  *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 377 (S.D.N.Y. 2000) (decisions of district courts, even those located within the same district, are not binding on other district courts); *Conn. State Fed'n of Teachers v. Bd. of Educ. Members*, 538 F.2d 471, 485 (2d Cir. 1976) ("[A]s a definitive exposition of state law, these two unreported decisions by trial courts of general jurisdictions are not binding" on federal courts.); *Svensson v. Securian Life Ins. Co.*, 706 F. Supp. 2d 521, 524 n.2, 536 (S.D.N.Y. 2010) (in a diversity case, a federal court is not bound by a state trial court decision).

7147-2

the legislature hastily passed legislation to amend the CVA by doubling the claim revival period from one year to two.  Prior Court of Appeal precedent has upheld statutes providing for a claim revival period of **one year or less**, and there is no indication that the Court of Appeal has ever approved of a legislature's extension of the deadline for filing time-barred claims in the middle of the original claim revival period.  *See Robinson*, 238 N.Y. 271 at 276 (one-year claim revival period); *Gallewski*, 301 N.Y. at 172 (one-year claim revival period); *McCann*, 123 N.Y.S.2d at 447 (90-day period to file time-barred claims); *Hymowitz*, 541 N.Y.S.2d at 513 (one-year claim revival period).  The amendment to the CVA was passed only weeks after then-Governor Andrew Cuomo issued Executive Order 202.29 on May 8, 2020.  Executive Order 202.29 purported to extend the CVA filing window by **five months** to account for court closures and other COVID-19 pandemic-related barriers to justice.  In that regard, to the extent the amendment to the CVA was premised on concerns about limited court access (and without concession as to whether the limited court access caused by the pandemic itself met the *Zumpano* standard of rendering plaintiff's legally or physically incapable of filing a suit), the legislature's actions departed substantially from the Governor's near-contemporaneous assessment of the appropriate or "reasonable" response to those issues.  This discrepancy confirms that the arbitrary extension of the revival period runs afoul of the New York Due Process Clause.[13]

The CVA is unconstitutional as applied to Giuffre's claims against Prince Andrew because Giuffre has not and cannot allege a "practical and total inability to commence [an] action" against Prince Andrew within the applicable limitations period.  *Gallewski*, 301 N.Y. at 175.  In addition, the arbitrary doubling of the CVA's claim revival period in May 2020 violates

---

[13] As applied in this case, the extension of the claim revival period is particularly problematic. Giuffre waited until only five days before the August 14, 2021 expiration of the extended window before initiating this action, notwithstanding that she had publicly accused Prince Andrew of sexual abuse well over six and a half years earlier, was represented by a team of sophisticated attorneys, and was actively litigating cases related to her abuse as a victim of Epstein in both the Southern District of New York and the Second Circuit during the original claim revival period.

7147-2

Prince Andrew's due process rights.  As a result, Giuffre's Complaint should be dismissed in its entirety without leave to amend.

**E.    IN THE ALTERNATIVE, PRINCE ANDREW IS ENTITLED TO A MORE DEFINITE STATEMENT BECAUSE THE COMPLAINT IS AMBIGUOUS AND WHOLLY DEVOID OF FACTUAL ALLEGATIONS REGARDING THE PURPORTED NEW YORK INCIDENT.**

In the alternative, should the Court decline to dismiss the Complaint, Prince Andrew respectfully requests that the Court order Giuffre to amend her Complaint to provide a more definite statement of her claims.  Fed. R. Civ. P. 12(e).  As currently pleaded, the Complaint "is so vague or ambiguous that [Prince Andrew] cannot reasonably prepare a response."  *Id.* Specifically, the Complaint is devoid of factual allegations regarding the purported sex offense(s) Giuffre alleges were committed against her by Prince Andrew in New York.  (ECF No. 1, ¶¶ 36, 39, 41, 43-44.)  Giuffre does not allege what purported sexual contact occurred between her and Prince Andrew, when and where the incident occurred, or the forcible compulsion she was under due to express or implied threat (*e.g.*, who threatened her—Epstein, Maxwell, and/or Prince Andrew, the nature of those threats, and/or how Prince Andrew allegedly acted "knowing that [Giuffre] was a sex-trafficking victim being forced to engage in sexual acts with him").  (*Id.*)

Wholesale failure to include any factual allegations regarding the elements of a claim or to identify to which party certain conduct is attributable each constitutes a recognized basis for granting a motion for a more definite statement.  *See, e.g.*, *SCRAP*, 412 U.S. at 689 n.15, 93 S. Ct. at 2417 n.15; *Agilent Techs.*, 2004 WL 2346152, at *5-6; *Caraveo*, 2002 WL 530993, at *1-2; *Bower*, 639 F. Supp. at 537-38; *Kelly*, 145 F.R.D. at 36-37.  To correct these deficiencies, the Court should order Giuffre to provide a more definite statement of factual allegations regarding: (i) when and where the alleged New York incident occurred; (ii) what kind of physical contact she had with Prince Andrew; (iii) the facts demonstrating her lack of consent, including the nature of the implied or express threats and who made those threats to her and when; and (iv) the

how Prince Andrew purportedly knew that she was a "sex-trafficking victim being forced to engage in sexual acts with him."

## V.      **CONCLUSION**

For the reasons set forth hereinabove, Prince Andrew respectfully requests that the Court dismiss Giuffre's Complaint in its entirety, without leave to amend.  In the alternative, Prince Andrew respectfully requests that the Court order Giuffre to provide a more definite statement.

Respectfully submitted,

Dated: October 29, 2021
Los Angeles, California

LAVELY & SINGER, P.C.

s/ Andrew B. Brettler
Andrew B. Brettler (AB2662)
Melissa Y. Lerner (*pro hac vice*)
2049 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 556-3501
Email: abrettler@lavelysinger.com
Email: mlerner@lavelysinger.com

*Attorneys for Prince Andrew, Duke of York*

7147-2