UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **VIRGINIA L. GIUFFRE,**<br><br>*Plaintiff*,<br><br>v.<br><br>**PRINCE ANDREW, DUKE OF YORK, a/k/a ANDREW ALBERT CHRISTIAN EDWARD, in his personal capacity,**<br><br>*Defendant.* | Case No. 1:21-cv-06702-LAK |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6) OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT PURSUANT TO FRCP 12(e)**

Andrew B. Brettler (AB2662)
Melissa Y. Lerner (*pro hac vice*)
2049 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 556-3501
Email: abrettler@lavelysinger.com
Email: mlerner@lavelysinger.com

*Attorneys for Prince Andrew, Duke of York*

7147-2

For someone who claims that the Release Agreement she signed in 2009 is entirely "irrelevant" to this case, Giuffre devotes a significant portion of their Opposition trying to avoid the application of its plain terms. Giuffre does not challenge the authenticity of the Release Agreement – nor can she reasonably do so, considering that her own counsel provided the document to Prince Andrew's team with the permission of the Epstein Estate. Contrary to Giuffre's mischaracterizations, Prince Andrew does not ask the Court to analyze the parties' intent when entering into the Release Agreement. Rather, he requests that the Court recognize that the Release Agreement exists and that, on its face, it bars Giuffre's claims against him. Most of Giuffre's Opposition focuses on concocting "factual disputes" as a pretext to avoid dismissal of her Complaint. The Court should not permit Giuffre's strawman arguments to distract from the resolution of the legal issues presented in the Motion.

Likewise, Giuffre ignores the plain language of the New York Child Victims Act, N.Y. C.P.L.R. § 214-g (2020) (the "CVA"), and Article 130 of the New York Penal Code to justify her allegations. She also defends the constitutionality of the CVA after underscoring the very reasons why the statute, as enacted, is unreasonable and ambiguous.

Finally, Giuffre's Opposition *confirms* that her intentional infliction of emotional distress ("IIED") claim is duplicative of her battery claim; her Complaint is ambiguous at best and unintelligible at worst. Giuffre's refusal to include anything but the most conclusory allegations is puzzling given her pattern of disclosing to the media the purported details of the same allegations included in the Complaint. Perhaps it is Giuffre's tendency to change her story that prompted her to keep the allegations of the Complaint vague, so as not to commit to any specific account. Whatever the motivating factor, Giuffre's Complaint is deficient and fails to state a claim upon which relief may be granted.

## I. GIUFFRE'S CLAIMS ARE BARRED BY THE RELEASE AGREEMENT.

### A. The Release Agreement Is the Proper Subject of Judicial Notice.

On a motion to dismiss, the Court may properly consider matters subject to judicial notice. The existence, authenticity, and plain language of the Release Agreement are not subject

1

7147-2

to reasonable dispute and Giuffre does not challenge them. Moreover, she faces no prejudice from the Court's consideration of this document for its legal effect alone because she has had it in her possession for over a decade. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[G]enerally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered."). Where, as here, a plaintiff relies "on the terms and effect of a document in drafting the complaint," and has notice and possession of the document, it may be considered without converting a motion to dismiss into a summary judgment motion under Rule 56. *Id.*[1]

Giuffre's contention that the Release Agreement is not subject to judicial notice because it has only been filed under seal in two separate actions places form over substance and, in any event, has no support in law. Public availability on a court's docket is not a prerequisite for the Court to take judicial notice of the Release Agreement.[2] As an initial matter, a confidential

---

[1] *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488 (S.D.N.Y. 2003), cited by Giuffre, is easily distinguishable. In *Calcutti*, the moving party seeking dismissal of a third-party complaint introduced an ***unauthenticated*** release ***on reply***. *Id.* at 498. Here, Giuffre does not challenge the authenticity of the Release Agreement, it was properly submitted with Prince Andrew's moving papers and Giuffre was aware of the agreement when she filed the Complaint. Indeed, it was also filed in the parallel lawsuit she filed against Alan Dershowitz. It was the existence of the Release Agreement that led Giuffre to dismiss her sexual assault claim against Professor Dershowitz. (ECF No. 32-8.)

[2] Giuffre relies on a single, unpublished decision for the proposition that only publicly filed settlement agreements may be the subject of judicial notice. Besides the fact that this Court is not bound by that decision, the case does not stand for the proposition that judicial notice may be taken of publicly filed documents ***only***. In fact, the court noted that "[i]t is also ***routine*** for courts to take judicial notice of court documents," without specifying that they must be publicly filed and available. *Traore v. Ali*, No. 14 Civ. 8463, 2016 WL 316856, at *3 (S.D.N.Y. Jan. 26, 2016) (emphasis added). Giuffre also relies on two unpublished decisions from district courts in different circuits. In one of those cases, the facts are plainly distinguishable from those here because the moving defendant asked "the Court to take its word" that the agreement was "authentic and accurate." *MLR Inv. Grp., LLC v. Pate Ins. Agency, Inc.*, No. 12-cv-118, 2012 U.S. Dist. LEXIS 179035, at *5 (M.D. Ga. Dec. 19, 2012) [ECF No. 43-2]. Here, by contrast, the authenticity of the 2009 Release Agreement is indisputable. The other, a section 1983 case, involved "[a] release of claims for violations of civil and constitutional claims," the validity of which required an analysis of "the totality of the circumstances surrounding the execution of the release." *Day v. Ryan*, No. CV 19-01091, 2020 WL 3414699, at *4 (D. Ariz. June 19, 2020). Further, there is established precedent for courts considering settlement agreements on Rule 12(b)(6) motions. *See, e.g.*, *Deylii v. Novartis Pharms. Corp.*, No. 13-cv-06669, 2014 WL

2

7147-2

settlement agreement cannot be filed publicly by its own terms. However, while documents filed under seal may not be publicly available, they are nevertheless part of a court's record and therefore the proper subject of judicial notice.[3] Moreover, the existence of the Release Agreement – and the Florida district court's continued jurisdiction to enforce its terms – was acknowledged in the parties' publicly-filed stipulation of dismissal with prejudice in the Epstein Action. (*See* ECF Nos. 32-3, 32-4.)

Giuffre also tries to manufacture a "dispute" about the validity of the Release Agreement. Yet Giuffre does not dispute that she signed the Release Agreement to settle the Epstein Action and received ▓▓▓▓▓ in exchange for ▓▓▓▓▓ ▓▓▓▓▓. There is no evidence that Giuffre sought to rescind the Release Agreement or otherwise challenge its validity. It is all too convenient that, after accepting ▓ ▓▓▓▓▓ from Epstein, Giuffre now refuses to be bound by the very contractual obligations that constituted consideration for ▓▓▓▓▓.

Prince Andrew requests only that the Court interpret the plain language of the Release Agreement. He has not asked the Court to make an "inferential leap of drawing facts from the Settlement that are not necessarily borne out by its terms." *Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27, 43 (S.D.N.Y. 2018). The Court should not be distracted by Giuffre's hypothetical disputes regarding the intent of the parties that are not borne out by the language of the Release Agreement, nor that of the unauthenticated and actually "irrelevant" General Release for the Epstein Victims' Compensation Program ("EVCP"), dated October 20, 2020 (the "EVCP Release").[4] (ECF No. 43 at pp. 13-17.)

---

2757470, at *4 (S.D.N.Y. June 16, 2014) (taking judicial notice of settlement agreement in a related case and noting that "[s]ettlement agreements are documents of which a court may take judicial notice in order to determine whether future claims are barred by a previous settlement").

[3] *Record*, *Black's Law Dictionary* (11th ed. 2019) ("The official report of proceedings in a case."; "**public record.** (16c) A record that a governmental unit is required by law to keep . . . . Public records are generally open to view by the public."; "**sealed record**. (19c) A record to which access is restricted by court order.").

[4] *See cf. Byrd v. City of New York*, No. 04-1396-CV, 2005 WL 1349876, at *2 (2d Cir. June 8, 2005) (summary order) (affirming district court's granting of a Rule 12(c) motion on grounds

3

7147-2

B.      **The Release Agreement's Plain Language Reflects the Parties' Intent To Provide Direct and Substantial Benefits to Third Parties.**

"Florida law looks to 'nature or terms of a contract' to find the parties' clear or manifest intent that it 'be for the benefit of a third party.'" *Jenne v. Church & Tower, Inc.*, 814 So. 2d 522, 524 (Fla. Dist. Ct. App. 2002). "The intention of the contracting parties, ***gleaned from the contract itself***, is determinative." *City of Tampa v. Thornton-Tomasetti, P.C.*, 646 So. 2d 279, 282 (Fla. Dist. Ct. App. 1994) (emphasis added); *accord M-I LLC v. Util. Directional Drilling, Inc.*, 872 So. 2d 403, 404-05 (Fla. Dist. Ct. App. 2004); *Boat Town U.S.A., Inc. v. Mercury Marine Div. of Brunswick Corp.*, 364 So. 2d 15, 17 (Fla. Dist. Ct. App. 1978). The Court should look to the plain language of the agreement itself to determine the parties' intent, without considering any parol evidence or Giuffre's eleventh-hour contention that she "never intended to release Prince Andrew in the 2009 Release." (ECF No. 43 at p. 13.) The Release Agreement, by its plain terms, embodies the parties' intent to benefit directly and substantially a class of persons of which Prince Andrew is a member: "█████████████████," *i.e.*, persons "█████████████████████████████████" in the Epstein Action. (ECF No. 32-1, ¶ 2.)

C.      **Prince Andrew Falls Within the Class of ███████████████████.**

Giuffre's allegations, both in the Epstein Action and here, compel the conclusion that Prince Andrew ████████████████████████████████████████████████████████. Giuffre has alleged that Prince Andrew was aware of, complicit in, and benefitted from Epstein's purported sex trafficking enterprise; that Prince Andrew traveled on a number of occasions to visit Epstein in Florida; and that she suffered harm as a result of the alleged conduct of Epstein, Prince Andrew, and other alleged co-conspirators in the sex trafficking scheme. (*See* ECF No. 1, ¶¶ 24, 30-31, 34-35, 43-45; ECF No. 32-2, ¶ 21.) Notably, Giuffre alleges that, because Prince Andrew *knew* that she was a victim of sex trafficking as a minor, he knew she could not consent to any sexual contact. (ECF No. 1, ¶¶ 24-29, 43-35; *see also* ECF No. 43 at pp. 25-26.)

---

that plaintiff's action was barred by earlier settlement agreement and rejecting plaintiff's contention that she only intended to release "claims actually asserted in the prior actions," because "the plain language of the settlement agreement, which provided [plaintiff] with significant monetary consideration, is controlling, and it clearly and unambiguously covers claims that could have been raised in the prior actions").

Giuffre's protestations that she does not accuse Prince Andrew of being a co-conspirator of Epstein in connection with his sex-trafficking scheme are belied by her own allegations.[5]

The plain language of the Release Agreement grants ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[6] Neither the allegations set forth in the Epstein Action nor a potential challenge to personal jurisdiction imposes a limitation on the class of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Giuffre brought the Epstein Action under the Child Abuse Victims' Rights Act, 18 U.S.C. § 2255, which permits a victim of certain predicate offenses to recover damages for the harm she suffered as a result. Because Giuffre alleged that Prince Andrew aided and abetted Epstein's federal sex-trafficking crimes and was Epstein's co-conspirator in the alleged criminal enterprise (ECF No. 1, ¶¶ 24, 30-31, 34-35, 43-45), Prince Andrew could have been included as a ▓▓▓▓▓▓▓▓▓▓ in the Epstein Action in at least two ways. Giuffre could have sued him directly for violating section 2423 (the basis of her third claim in the Epstein Action), or vicariously, under an aiding and abetting and/or co-conspirator theory.

Similarly, Prince Andrew's potential challenge to the Florida district court's personal jurisdiction does not exclude him from the class of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, as Giuffre claims. This is particularly true because Prince Andrew could have waived any such challenge

---

[5] Giuffre disingenuously draws a distinction between "[t]he federal claims that the 2009 Release resolved" and the time-barred tort claims she has asserted against Prince Andrew here. (ECF No. 43 at p. 11.) However, the Release Agreement unequivocally releases the "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (ECF No. 32-1, ¶ 2.) By its plain terms, the Release Agreement bars the claims Giuffre has asserted against Prince Andrew. In any event, both the Epstein Action and this lawsuit arise from the *same* alleged sex-trafficking enterprise.

[6] The release is *not* limited to potential co-conspirators identified by the federal government, as Giuffre suggests in her Opposition. (ECF No. 43 at pp. 11-12.) Had the parties to the Release Agreement intended to release only those persons identified in Epstein's Non-Prosecution Agreement, the language of the Release Agreement would so state. To the contrary, the definition of "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" does not contain any reference to the Non-Prosecution Agreement or the government's list of conspirators included therein. Instead, the definition refers to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (ECF No. 32-1, ¶ 2.)

and consented to the Court's jurisdiction, as he has done here.  Setting aside the issue of consent, Giuffre's conclusion that the court could not have exercised personal jurisdiction over Prince Andrew in the Epstein Action is simply wrong.  Florida courts have long recognized that, under the state's long-arm statute and minimum contacts test, a court has personal jurisdiction over non-resident defendants who engage in conspiracies to commit tortious or statutorily prohibited actions against Florida residents, even if those defendants were never physically present in the state and/or never committed a tortious act there.  *See Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 583-86 (Fla. 2000) (nonresident co-conspirators subject to personal jurisdiction); *accord Phelan v. Lawhon*, 229 So. 3d 853, 857-59 (Fla. Dist. Ct. App. 2017) (collecting cases).  Here, Giuffre's allegations regarding Prince Andrew's travel to Florida to visit Epstein at his Palm Beach residence, which served as the headquarters for his alleged sex-trafficking scheme, and his purported benefit from that scheme, are sufficient to establish the requisite minimum contacts for purposes of due process.  (ECF No. 1, ¶¶ 30-31, 34-35.)

  **D.** **The EVCP Release Is a Red Herring and Does Not Change the Legal Analysis of the Release Agreement.**

  As a Hail Mary, Giuffre attaches an unauthenticated 2020 agreement to her Opposition without any formal request for judicial notice, and claims that her receipt of ▇▇▇▇▇▇ from the ECVP somehow reflects the parties' intent regarding the 2009 Release Agreement or constitutes modification or abandonment of that prior agreement.  However, the 2020 EVCP Release makes no mention of the 2009 Release Agreement, and does not purport to modify, replace, or otherwise invalidate it.  (*See* Dkt. 43-1 at pp. 1-4.)  The EVCP Release releases additional parties not covered by the 2009 Release Agreement (*e.g.*, the Co-Executors of the Epstein Estate) and the categories of releasees identified therein would not include Prince Andrew, rendering meaningless his purported exclusion from the release.  (*Id.* at pp. 1-2, 9.)

**II.** **GIUFFRE FAILS TO ADEQUATELY ALLEGE THAT HER OTHERWISE TIME-BARRED CLAIMS ARE REVIVED BY THE CVA.**

  In her Opposition, Giuffre asks the Court to ignore the canons of statutory construction and disregard the CVA's limitations on its claims revival provision.  The CVA only permits a

plaintiff to pursue otherwise time-barred civil claims against a party for harm suffered "*as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the [New York] penal law committed against a child less than eighteen years of age*," incest, or the use of a child in a sexual performance, "which conduct was committed against a child less than eighteen years of age." N.Y. C.P.L.R. 214-g (emphasis added). In other words, a party may face civil liability for his conduct – notwithstanding any applicable statute of limitations – *only* if that conduct violates specific New York State laws. Accordingly, Prince Andrew's alleged conduct in 2001, purportedly constituting a sexual offense under Article 130, is *a predicate act* that Giuffre must plead in order to pursue this action twenty years after the events described in the Complaint. Because Giuffre has not alleged such conduct, she is not entitled to rely on the CVA to support her claims against Prince Andrew.

It is disingenuous for Giuffre to characterize Prince Andrew's challenge to her Complaint as the assertion of a "statute of limitations defense" that he bears the burden of proving or a question as to whether her claim is "timely under the CVA." (ECF No. 43 at pp. 19-20, 23.) The CVA effectively strips defendants of any timeliness defense so long as the conduct over which they are sued constitutes a sexual offense under Article 130 or violations of other enumerated statutes. The threshold issue is whether Giuffre is entitled to assert her claims belatedly and without regard to the long-expired statute of limitations applicable to her tort claims. Prince Andrew submits that the plain language of the CVA is conclusive regarding the predicate act requirement.[7]

---

[7] The CVA further provides:

> In addition to any other defense and affirmative defense that may be available in accordance with law, rule or the common law, *to the extent that the acts alleged in such action are of the type described in subdivision one of section 130.30 of the penal law or subdivision one of section 130.45 of the penal law*, the affirmative defenses set forth, respectively, in the closing paragraph of such sections of the penal law shall apply.

N.Y. C.P.L.R. 214-g (emphasis added). This language explicitly acknowledges that "the acts alleged in [the] action" must fall within the three qualifying categories of offenses identified in the CVA. *Id.* Moreover, the CVA's importation of affirmative defenses enumerated in certain

7

7147-2

### III. THE CVA IS UNCONSTITUTIONAL.

Giuffre has taken the position that any claims revival statute the New York State Legislature thinks is reasonable and necessary is, by definition, constitutional without any further review by the judiciary. Not so. It is not a foregone conclusion that the CVA is a reasonable measure to address an injustice, nor has a decision on the subject been issued by the New York Court of Appeals, the Second Circuit, or the U.S. Supreme Court. If it were so clear, non-parties would not have taken the extraordinary measure of petitioning at the district court level to file *amicus curie* briefs in opposition to Prince Andrew's Motion.

The CVA revives claims for those who allegedly suffered harm as a result of certain sexual offenses they claim were committed against them when they were under the age of *eighteen*, even though the age of consent in New York is *seventeen*. While lack of consent is established *as a matter of law* for individuals who were under the age of seventeen at the time of the alleged underlying sexual offense, the issue of consent is unsettled with regard to those – like Giuffre – who were between the ages of seventeen and eighteen. In that regard, lack of consent is an element of an Article 130 offense that must be affirmatively established when the alleged victim is over the age of seventeen. N.Y. Penal Law § 130.05.1 ("Whether or not specifically stated, it is an element of every offense defined in [Article 130] that the sexual act was committed without consent of the victim."). Giuffre and other similarly situated individuals may establish lack of consent by an "implied threat," or, for certain offenses, by "any circumstances in which the victim does not expressly or impliedly acquiesce." *Id.* §§ 130.00(8), 130.05(2)(c). These highly subjective determinations are the kind most likely to be hampered by the passage of time, as memories fade, false memories are created, and witnesses die or otherwise become unavailable. Here, the only witnesses to the purported implied threats under which Giuffre allegedly engaged in unconsented sex acts with Prince Andrew are Epstein (deceased), Maxwell (incarcerated), Prince Andrew (the accused) and Giuffre herself. According to Giuffre's tortured

---

sections of Article 130 makes sense only if a CVA plaintiff's claims arise from these specific predicate acts.

interpretation of the CVA, it revives civil claims for plaintiffs who allegedly suffered sexual abuse when they were seventeen years of age or older based solely on the unverified (and unverifiable) contention that they did not consent to those acts. This is not a reasonable mechanism to address the injustice of child sexual abuse in New York.

### IV. GIUFFRE'S IIED CLAIM IS DUPLICATIVE OF HER BATTERY CLAIM.

As pleaded, Giuffre's claim for intentional infliction of emotional distress ("IIED") is duplicative of her cause of action for battery because it arises from the *same* facts and seeks the *same* relief. Giuffre tries to distinguish between the alleged trauma supposedly caused by Prince Andrew's purported sexual assault, on the one hand, and the alleged trauma supposedly caused by Prince Andrew purportedly "knowingly benefitting from the sex-trafficking scheme in which she was trapped." (ECF No. 43 at pp. 28-29.) Even if such a distinction were pleaded in Giuffre's Complaint (it is not), it is a distinction without a difference because the alleged wrongful acts giving rise to both causes of action is *identical*. Notably, Giuffre does not even bother to distinguish the authorities cited by Prince Andrew in his moving papers because those cases are squarely on point.[8] Where, as here, two causes of action arise from the *same set of facts* and seek *the same damages*, they are duplicative and may not be pursued simultaneously by the plaintiff.

### V. IN THE ALTERNATIVE, PRINCE ANDREW IS ENTITLED TO A MORE DEFINITE STATEMENT.

Giuffre's Opposition confirms the vague and ambiguous nature of the allegations in the Complaint. First, she contends that her battery claim is based on not only the alleged incident in New York City (the only alleged incident that could plausibly constitute a sexual offense under Article 130), but also on events that allegedly took place in England and the U.S. Virgin Islands.

---

[8] Giuffre's reliance on *McGrath v. Dominican College of Blauvelt*, 672 F. Supp. 2d 477 (S.D.N.Y. 2009), is unavailing. There, because the operative complaint alleged separate and distinct conduct forming the basis of the IIED claim, the court refused to dismiss the claim as duplicative because it was "uncertain" whether there would be any "overlap" between plaintiff's recovery for IIED and for the seven other asserted claims. *Id.* at 492. Here, by contrast, the Complaint contains only *two* causes of action and unequivocally seeks *the same relief for the same damages arising from the same alleged nonconsensual sex acts*.

(ECF No. 43 at pp. 17, 19, 26 n.11, 33.)  But the CVA applies *only* to sexual offenses occurring in the State of New York.  To the extent Giuffre's causes of action are based on conduct taking place elsewhere, they fail to state a claim and must be stricken.[9]  Further, as set forth in Section III, Giuffre has not clearly or sufficiently alleged conduct constituting an Article 130 offense and bringing her claims within the CVA's ambit.

## VI.   CONCLUSION

For the reasons set forth in his moving papers (ECF Nos. 30-32) and herein, Prince Andrew respectfully requests that the Court dismiss the Complaint without leave to amend or, in the alternative, order Giuffre to provide a more definite statement.

Respectfully submitted,

Dated: December 13, 2021
Los Angeles, California

LAVELY & SINGER, P.C.

s/      Melissa Y. Lerner
Andrew B. Brettler (AB2662)
Melissa Y. Lerner (*pro hac vice*)
2049 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (310) 556-3501
Email: abrettler@lavelysinger.com
Email: mlerner@lavelysinger.com

*Attorneys for Prince Andrew, Duke of York*

---

[9] Neither England and Wales nor the U.S. Virgin Islands has enacted a claims revival provision analogous to the CVA and any claims arising from conduct that allegedly occurred in those jurisdictions decades ago likely would be time-barred in those jurisdictions.  Permitting Giuffre to proceed with claims arising from events that took place outside of New York pursuant to the CVA would be tantamount to endorsement of blatant forum shopping.  *Holloway v. Holy See*, No. 19 CIV 2195, 2021 WL 1791456, at *2 (S.D.N.Y. May 5, 2021).