# GIUFFRE

# VS.

# MAXWELL

### Deposition

# VIRGINIA GIUFFRE

05/03/2016

_____

# Agren Blando Court Reporting & Video, Inc.
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

## Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 15-cv-07433-RWS

CONFIDENTIAL VIDEOTAPED DEPOSITION OF
VIRGINIA GIUFFRE     May 3, 2016

VIRGINIA L. GIUFFRE,

Plaintiff,

v.

GHISLAINE MAXWELL,

Defendant.

APPEARANCES:

FAMER, JAFFE, WEISSING, EDWARDS, FISTOS &
LEHRMAN, P.L.
  By Brad Edwards, Esq.
     425 N. Andrews Avenue
     Suite 2
     Fort Lauderdale, FL 33301
     Phone: 954.524.2820
     brad@pathtojustice.com
     Appearing on behalf of the
     Plaintiff

BOIES, SCHILLER & FLEXNER LLP
  By Sigrid S. McCawley, Esq. (For Portion)
     401 East Las Olas Boulevard
     Suite 1200
     Fort Lauderdale, FL 33301-2211
     Phone: 954.356.0011
     smccawley@bsfllp.com
     Appearing on behalf of the
     Plaintiff

## Page 2

APPEARANCES: (Continued)

HADDON, MORGAN AND FORMAN, P.C.
  By Laura A. Menninger, Esq.
     Jeffrey S. Pagliuca, Esq.
     150 East 10th Avenue
     Denver, CO 80203
     Phone: 303.831.7364
     lmenninger@hmflaw.com
     jpagliuca@hmflaw.com
     Appearing on behalf of the
     Defendant

Also Present:
     Brenda Rodriguez, Paralegal
     Nicholas F. Borgia, CLVS Videographer

## Page 3

Pursuant to Notice and the Federal Rules of Civil Procedure, the VIDEOTAPED DEPOSITION OF VIRGINIA GIUFFRE, called by Defendant, was taken on Tuesday, May 3, 2016, commencing at 9:00 a.m., at 150 East 10th Avenue, Denver, Colorado, before Kelly A. Mackereth, Certified Shorthand Reporter, Registered Professional Reporter, Certified Realtime Reporter and Notary Public within Colorado.

\* \* \* \* \* \* \*

I N D E X

| EXAMINATION | PAGE |
|---|---|
| MS. MENNINGER | 8 |

PRODUCTION REQUEST(S):

(None.)

## Page 4

INDEX OF EXHIBITS

| | DESCRIPTION | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | Complaint and Demand for Jury Trial re Jane Doe No. 102 v. Jeffrey Epstein | 17 |
| Exhibit 2 | Jane Doe #3 and Jane Doe #4's Motion Pursuant to Rule 21 for Joinder in Action | 21 |
| Exhibit 3 | Declaration of Virginia L. Giuffre re Jane Doe #1 and Jane Doe #2 vs. United States of America | 23 |
| Exhibit 4 | Declaration of Jane Doe 3 re Jane Doe #1 and Jane Doe #2 vs. United States of America | 31 |
| Exhibit 5 | Declaration of Virginia Giuffre re Bradley J. Edwa▬▬ssell vs. ▬▬▬▬ | 33 |
| Exhibit 6 | FBI documentation, date of entry 7/5/13 | 36 |
| Exhibit 7 | Document titled Telecon, Participants Jack Scarola, Brad Edwards, Virginia Roberts. Re Edwards adv. Epstein, 4/7/11, (23 pages of transcription) | 39 |
| Exhibit 8 | The Billionaire's Playboy Club, By Virginia Roberts | 41 |
| Exhibit 9 | Plaintiff's Response and Objections to Defendant's First Set of Discovery Requests to Plaintiff re Giuffre v. Maxwell | 44 |

### Page 77

1. A  To make a wage for my family.
2. Q  (BY MS. MENNINGER)  All right.  The next
3. job, Gemma Catering and Wedding Receptions, did it --
4. is that a job that you actually held?
5. A  I did actually work there.  I don't know
6. the dates, but I was a server, waitress and
7. bartender.
8. Q  March of 2003 to April 2004, is that about
9. when you worked there?
10. A  It could be very close to it.  I'm not too
11. sure.
12. Q  You're not sure?
13. A  No, I'm not sure.
14. Q  Did you have children -- had you already
15. had children at the time you worked there?
16. A  No, I do not believe I did.  I became a
17. stay-at-home mom when I had my first child.
18. Q  And what year was that?
19. A  2006.
20. Q  Okay.  So you believe you worked at Gemma
21. Catering and Wedding Receptions before 2006?
22. A  I believe so.
23. Q  And other than that, you can't recall what
24. dates you worked there?
25. A  I'm sorry, I couldn't help, no.

### Page 78

1. Q  All right.  And then what were your
2. actual -- is that your actual job that you had there?
3. A  The description of it?
4. Q  The title, server, waitress, bartender?
5. A  Yes.
6. Q  All right.  Is the description accurate?
7. A  To a T.
8. Q  What's that?
9. A  To a T.
10. Q  Okay.  The next job you list is Mannway
11. Logistics, Logistics Receptionist.
12.    Is that a job you actually held?
13. A  It is a job I held.
14. Q  And when did you hold it?
15. A  Again, I'm very bad at dates.  I'm not too
16. sure.
17. Q  All right.  Approximately when did you
18. have it?
19. A  I don't want to speculate and give you the
20. wrong answer, so I'm not too sure.
21. Q  Did you have children at the time you
22. worked there?
23. A  No.
24. Q  So before 2006?
25. A  Yes.

### Page 79

1. Q  And after you moved to Australia, which
2. was what year?
3. A  I moved to Australia at the end of 2002, I
4. believe.
5. Q  All right.  Do you recall going to work
6. shortly after you got to Australia?
7. A  Yes.
8. Q  How --
9. A  I had to obtain my -- my ability to work
10. there.  So I think that took a couple months.  You
11. can get a temporary visa that allows you to work
12. while you're waiting for your permanent resident
13. status, and that's what we did.
14. Q  All right.  Were you able to apply for
15. that temporary job permission before you actually got
16. married in Australia?
17. A  I got married in Aus -- we were married in
18. Thailand, really, but we made it official in January
19. of 2003.  And within a couple of weeks, I was granted
20. the permission to work in Australia legally.
21. Q  Okay.  So to the best of your
22. recollection, you got permission to work in Australia
23. sometime in the spring of 2003?
24.    MR. EDWARDS:  Form.
25. A  That's actually summer over there.

### Page 80

1. Q  (BY MS. MENNINGER)  Fair enough.  The
2. first quarter of the year, calendar year --
3. A  Yes.
4. Q  -- 2003?
5. A  If we're going to be politically correct,
6. yes.
7. Q  That's what you recall?
8. A  (Indicating.)
9.    I'm sorry, yes.
10. Q  And is your description of Mannway
11. Logistics correct?
12. A  Yes.
13. Q  All right.  And how long did you work
14. there?
15. A  I think that was less than a year that I
16. worked there.  I would approximate about six, seven
17. months.
18. Q  Can you name one coworker you had or boss
19. or anybody else that worked there?
20. A  I know her name started with an M, but I
21. can't remember.  I remember what she looks like.  I
22. just don't remember her name.
23. Q  Okay.  And how much did you make there?
24. A  I don't remember the exact amount.
25. Approximately about $20 an hour, I think.

| Page 93 | Page 95 |
|---|---|
| 1  A   He didn't hand me the tickets at that | 1   shortly before my birthday, but not my birthday. |
| 2   time, but he told me that he had booked me in for | 2   Q   (BY MS. MENNINGER)  Okay.  And he told you |
| 3   massage training at an institute in Chiang Mai. | 3   he had booked you tickets to go to Thailand, right? |
| 4   Q   And he told you he had booked you tickets | 4   A   Correct. |
| 5   to a massage training in Chiang Mai, Thailand | 5   Q   All right.  So you remember one birthday |
| 6   sometime before your actual 19th birthday? | 6   at which you received makeup, bracelet and earrings |
| 7       MR. EDWARDS:  Form. | 7   and one birthday at which you received tickets to |
| 8   Q   (BY MS. MENNINGER)  Did I get that right? | 8   Thailand. |
| 9   A   Yes. | 9       Do you remember any other birthdays that |
| 10  Q   Okay.  Did he hand you -- | 10  you spent with Jeffrey Epstein and/or Ghislaine |
| 11  A   Excuse me. | 11  Maxwell? |
| 12  Q   -- hand you anything at that time? | 12  A   I'm sure there is, but I honestly can't |
| 13  A   No, I don't think so. | 13  remember what I did for my 18th birthday. |
| 14  Q   And where were you located when he told | 14  Q   Okay.  Well, I'm sorry, did you know for |
| 15  you this about the Thailand massage training? | 15  sure that the bracelet, earrings and makeup were from |
| 16  A   Jeffrey, Ghislaine and I had just gone | 16  your 17th birthday, or do you know? |
| 17  scuba -- not scuba diving, not with the big tanks, | 17  A   I don't know. |
| 18  but snorkeling with just the mask and the two-piece, | 18  Q   But you know they were not for your |
| 19  and on Jeffrey's island, by the way. | 19  16th birthday, right? |
| 20      And we had gone out for a while.  And we | 20  A   Correct. |
| 21  had come back.  And he's got a pier where it's got a | 21  Q   All right.  If I could have you go back to |
| 22  ladder and you climb up.  And we were wearing wet | 22  Defendant's Exhibit 1, I think. |
| 23  suits.  So we were taking off our flippers and our | 23  A   Defendant's, sorry, Exhibit 1? |
| 24  wet suits and all of our gear. | 24  Q   Um-hum.  Page 9, either at the bottom or |
| 25      And they said they wanted to sit down and | 25  in the upper right-hand corner. |

| Page 94 | Page 96 |
|---|---|
| 1   talk to me, just the three of us.  And he -- first, | 1       Do you see that page? |
| 2   he told me about the -- | 2   A   Page 9 of 27, yes. |
| 3   Q   If I could just stop you.  I think I asked | 3   Q   All right.  And paragraph 23, do you see |
| 4   where were you -- | 4   that paragraph? |
| 5   A   Oh, I'm sorry. | 5   A   I see the paragraph. |
| 6   Q   -- when you had this conversation about | 6   Q   All right. |
| 7   the -- | 7   A   I was just going to read it over quickly. |
| 8   A   Just the island.  I'm just trying to | 8   Q   By all means. |
| 9   describe the instance that he gave it to me. | 9   A   I've read it. |
| 10  Q   Oh, okay. | 10  Q   And the sentence, Defendant and |
| 11  A   It was on the island, on the pier in the | 11  Ms. Maxwell acknowledged and celebrated plaintiff's |
| 12  Caribbean. | 12  16th birthday, is not a true statement, correct? |
| 13  Q   Okay.  And it was sometime before your | 13  A   Only upon learning about the fact that I |
| 14  19th birthday? | 14  just found out my records.  I assumed at the time it |
| 15  A   Correct. | 15  was my 16th birthday.  But now we know different. |
| 16  Q   How much time before? | 16  Q   You admit, as you sit here today, that |
| 17  A   I don't know.  A couple -- six weeks, a | 17  defendant and Ms. Maxwell did not celebrate your 16th |
| 18  couple of months.  I don't know.  Close to my | 18  birthday with you, correct? |
| 19  birthday.  It was my birthday present, that's what he | 19  A   Correct, based upon the records. |
| 20  told me. | 20  Q   Which you don't know when you saw? |
| 21  Q   Okay.  So you don't know when you had this | 21  A   I know it was, you know, it wasn't -- it |
| 22  conversation? | 22  wasn't a year ago, but it wasn't that long ago |
| 23      MR. EDWARDS:  Form. | 23  either.  So I'm not too sure.  I can't tell you the |
| 24  A   I mean, I -- no, I didn't record the time | 24  date that I actually saw them. |
| 25  and the date, so I can only speculate.  It was | 25  Q   All right.  Last year you lived in |

Page 97

1 Colorado for part of the year, correct?
2  A   For part of the year, yes.
3  Q   And then you moved to Australia, correct?
4  A   Yes.
5  Q   You did not live in Florida at any point
6 in time during 2015, correct?
7  A   I believe I left Titusville at the end of
8 2014.
9  Q   Okay.  So you did not live in Florida
10 during 2015, correct?
11  A   I believe so.
12  Q   All right.  So when you reviewed these
13 records sometime in 2015 that caused you to know the
14 real date of when you worked at Mar-a-Lago, where
15 were you physically located?
16      MR. EDWARDS:  Object to the form and
17 mischaracterized her testimony.
18  A   I don't remember where I saw these
19 records, when I saw these records.  I know it wasn't
20 a year ago.  I know it was more recent.  I can't
21 pinpoint the date that I actually saw them, but I
22 recently, I believe -- I don't know.  I don't want to
23 sit here and speculate and then give you the wrong
24 answer.  It's just new knowledge for me.
25  Q   (BY MS. MENNINGER)  All right.  Did you

Page 98

1 receive the records by e-mail?
2  A   I believe so.
3  Q   Okay.  Did you use any e-mail address
4 other than ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  A   No.
6  Q   That's the only e-mail address that you've
7 used?
8  A   That's correct.
9  Q   And the Mar-a-Lago records that you
10 reviewed you received by e-mail at that e-mail
11 address?
12  A   Possibly.  I mean, I can't say
13 100 percent.  I could have been told about them.  I
14 could have seen them on a piece of paper.  I really
15 don't know.  This is a very hazy subject.  All I know
16 is that I found out and that was able to clarify a
17 lot of dates for us.
18  Q   Okay.  What other dates were clarified?
19      MR. EDWARDS:  I object and instruct the
20 witness not to answer if any of your knowledge is
21 based on any privileged communication that you had
22 between yourself and any of your lawyers.
23  Q   (BY MS. MENNINGER)  Okay.  You just said
24 you reviewed records yourself, correct?
25      MR. EDWARDS:  Object.  That

Page 99

1 mischaracterized her testimony.  She actually just
2 testified that she may have heard that.
3      MS. MENNINGER:  No, you're not testifying.
4 I've asked her --
5      MR. EDWARDS:  I'm clearing the record up
6 right now, though.
7      MS. MENNINGER:  You can object based on
8 form.  That's a valid objection.  You've made your
9 record.
10  Q   (BY MS. MENNINGER)  Did you review records
11 that clarified dates for you?
12  A   I've either reviewed them or I've been
13 told about -- I can't remember.  I'm sorry.  I
14 know -- I know now that the dates are what they are,
15 but I don't remember.
16  Q   You don't know when you learned that the
17 dates are what they are?
18  A   No, I don't.
19  Q   And your best guess is what?
20      MR. EDWARDS:  Objection.
21      If any of your answer is based on
22 attorney-client privilege, I'm instructing you not to
23 answer.
24  A   I can't answer, then.
25  Q   (BY MS. MENNINGER)  Okay.  So have your

Page 100

1 attorneys told you to change your dates?
2      MR. EDWARDS:  Objection.
3      Do not answer that question.  This is a
4 question intentionally devised to invade the
5 attorney-client privilege.
6      She's not going to answer those questions.
7  Q   (BY MS. MENNINGER)  You can answer a
8 question about whether your attorneys had told you to
9 lie.  Because that would be a crime, and I'm sure --
10  A   I will --
11  Q   -- I'm sure you want to tell me that your
12 attorneys did not tell you to lie, correct?
13  A   I can tell you for a fact my attorneys
14 have never told me to lie.
15  Q   All right.  And did your attorneys tell
16 you to change a date?
17      MR. EDWARDS:  Objection.  She's not
18 answering any questions about communications between
19 her lawyers and herself, period.
20  Q   (BY MS. MENNINGER)  So if I could also
21 direct your attention to Defendant's Exhibit 8.  It's
22 the manuscript.  If you could turn to page 40.
23      THE VIDEOGRAPHER:  I just have a quick
24 request, Counsel.
25      Ms. Giuffre, would you mind bringing the

|  | Page 185 |
|---|---|
| 1 | Q    And he rented that apartment? |
| 2 | MR. EDWARDS:  Object to the form. |
| 3 | Mischaracterization. |
| 4 | A    He lived there with me for a short period. |
| 5 | I don't -- I don't know how long he lived there with |
| 6 | me for. |
| 7 | Q    (BY MS. MENNINGER)  And who rented the |
| 8 | apartment? |
| 9 | A    Well, Jeffrey paid for the apartment.  I |
| 10 | was the occupant, and he was an occupant. |
| 11 | Q    Did you ever see the lease? |
| 12 | A    Yes, I believe I had to sign the paperwork |
| 13 | saying that I was living there. |
| 14 | Q    So you were living at -- is it ▓▓▓▓▓▓ |
| 15 | ▓▓▓▓▓▓ |
| 16 | A    I can't honestly read it.  It looks like a |
| 17 | C-a-c (sic), but that doesn't make sense. |
| 18 | Q    So January of 2001 you signed a document |
| 19 | under oath putting ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| 20 | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| 21 | A    Yes. |
| 22 | Q    And you put your permanent address and |
| 23 | your mail your passport to at your parents' |
| 24 | address -- |
| 25 | A    Yes. |

Page 186

1   Q    -- is that right?
2        And it's your position that that is the
3   apartment that Jeffrey paid for and you signed a
4   lease?
5   A    Yes, Jeffrey paid for it and I think I had
6   to sign something that said I was going to occupy it.
7   I don't know if James ever did.
8   Q    Okay.  And you stayed at that apartment
9   from at least January 2001 until you left in the fall
10  of 2002, right?
11  A    I would say before then, yes.  Like I
12  said, I can't really tell you the exact date that I
13  moved there, but --
14  Q    Why did you have your passport sent to
15  your parent's house if you weren't living at your
16  parents' house?
17  A    Um, I don't know.  I guess a fail-safe.
18  I'm not too sure.
19  Q    When was the next passport that you got?
20  A    I think I had to reapply for one in --
21  well, this one expired in 2002.  So I would have had
22  to apply for another one.
23  Q    I'm asking do you remember when you got
24  another passport?
25  A    This expired January 10th, 2002.

Page 187

1   Q    Let me have you put the paper down.
2   A    Yes.
3   Q    Do you recall applying for another
4   passport?
5   A    No.
6   Q    Okay.  Do you recall ever applying for
7   another passport, ever?
8   A    Well, yeah, when I got to Australia I had
9   to -- I don't have it on me right now, but I could
10  tell you it's -- I had to apply for another one
11  because the other one ran out as expiree.
12  Q    So whenever one expired, you applied for
13  another one from the U.S.?
14  A    (Indicating.)
15  Q    Have you ever gotten --
16       Is that right?
17  A    Yeah.
18  Q    Have you ever gotten a passport from
19  Australia?
20  A    An Australian passport?
21  Q    Right.
22  A    No.
23  Q    Have you ever lost a passport and had to
24  get one replaced?
25  A    I don't think so.

Page 188

1   Q    **When was the first time that you came back**
2   **to the U.S. from Australia?**
3   A    **October 16th, 2013.**
4   Q    And did you come back before that?
5   A    No.
6   Q    Did you ever tell Sharon Churcher or
7   Sharon White or Marianne Strong that you were going
8   on a trip to New York in 2011?
9   A    No.
10  Q    Is it your contention that Ghislaine
11  Maxwell sexually trafficked you to famous people?
12  A    If you have a document in front of you
13  that you could show me so I could see what you're
14  talking about, yes.
15  Q    I'm asking you, is it your contention that
16  Ghislaine Maxwell sexually trafficked you to famous
17  people?
18  A    Could you be more specific, like are we
19  talking about rock stars or royalty or --
20  Q    Politically connected and financially
21  powerful people.
22  A    Yes.
23  Q    Okay.  To whom did Ghislaine Maxwell
24  sexually traffic you?
25  A    You have to understand that Jeffrey and

| Page 209 | Page 211 |
|---|---|

Page 209
1  possession right now.
2  Q  Where is it?
3  A  Probably in some storage boxes.
4  Q  Where?
5  A  In Sydney.
6  Q  Where in Sydney?
7  A  At some family's house. We got the boxes
8  shipped to Australia, and they were picked up off the
9  porch by my nephews and brought to their house.
10 Q  Which is where?
11 A  In Sydney.
12 Q  Where in Sydney?
13 A  [redacted]
14 Q  And who lives in that house?
15 A  Well, it's owned by my mother-in-law and
16 father-in-law, but my nephews live in the house.
17 Q  What are their names?
18 A  I'm not giving you the names of my
19 nephews.
20 Q  What's the address of the house?
21 A  Why would you want that?
22 Q  I want to know where the photograph is.
23 I'm asking you where the photograph is. And you've
24 just told me it's somewhere in [redacted]
25 A  Yes.

Page 210
1  Q  So where in [redacted] is the photograph
2  located?
3  A  If I can't 100 percent say that the
4  photograph is there, it could be at my house that I
5  presently live in. I'm not going to give you the
6  address of my nephews' residence.
7  Q  When is the last time you saw the
8  photograph in person?
9  A  When I packed and left America.
10 Q  Colorado?
11 A  Yes.
12 Q  All right. So you had that photograph
13 here with you in Colorado?
14 A  Yes.
15 Q  What's on the back of the photograph?
16 A  I'm sorry?
17 Q  Is there anything on the back of the
18 photograph?
19 A  There's like the date it was printed, but
20 no writing or anything.
21 Q  Okay. Does it say where it was printed?
22 A  I don't believe so. I think it just -- I
23 don't remember. I just remember there's a date on
24 it.
25 Q  Whose camera was it taken with?

Page 211
1  A  My little yellow Kodak camera.
2  Q  Who took the picture?
3  A  Jeffrey Epstein.
4  Q  And where did you have it developed?
5  A  I believe when I got back to America.
6  Q  So where?
7  A  I don't know.
8  Q  Palm Beach?
9  A  I don't know.
10 Q  What is the date the photograph was
11 printed?
12 A  I believe it's in March 2001.
13 Q  Okay.
14 A  But that's just off of my photographic
15 memory. I don't -- it could be different, but I
16 think it's March 2001.
17 Q  You have a photographic memory?
18 A  I'm not saying I have a photographic
19 memory. But if I'd look at the back of the photo and
20 I remember what it says, I believe it was March 2001.
21 Q  Did the photograph ever leave your
22 possession for a while?
23 A  I gave it to the FBI.
24 Q  Okay. And when did you get it back?
25 A  When they took copies of it.

Page 212
1  Q  When was that?
2  A  2011.
3  Q  When they came to interview you?
4  A  Yes.
5  Q  So from 2011 until you left Colorado it
6  was in your personal possession?
7  A  Yes.
8  Q  What other documents related to this case
9  are in that, storage boxes in Australia?
10    MR. EDWARDS: Object to the form.
11 A  Documents related to this case -- there --
12 I don't know. I really can't tell you. I mean,
13 there's seven boxes full of Nerf guns, my kids' toys,
14 photos. I don't know what other documents would be
15 in there.
16 Q  (BY MS. MENNINGER) Did anyone search
17 those documents after you received discovery requests
18 from us in this case?
19 A  I haven't been able to obtain those boxes.
20 I can't get them sent back up to me. It's going to
21 cost me a large amount of money. And right now I'm
22 trying to look after my family, so I'm not able to
23 afford to get them up.
24 Q  You live in Australia, correct?
25 A  I do.

Page 245

1  answer any questions --
2      MR. EDWARDS:  Fine.
3      MS. MENNINGER:  -- Mr. Edwards.
4      MR. EDWARDS:  Fine.
5      MS. MENNINGER:  I appreciate it, but I'm
6  asking the witness to answer these questions.
7      MR. EDWARDS:  I know, I'm just trying to
8  help you today.
9      For today, don't answer the questions.
10     THE DEPONENT:  I don't mind explaining.
11     MR. EDWARDS:  I know, but you --
12     THE DEPONENT:  Okay.
13     MR. EDWARDS:  I wanted to help.
14     THE DEPONENT:  Okay.
15  Q   (BY MS. MENNINGER)  So have you spoken to
16  any law enforcement officers in Colorado since
17  January of 2015 until today?
18  A   I am not answering that question.
19  Q   Have your attorneys spoken to any law
20  enforcement officers in Colorado since the beginning
21  of 2015 until today?
22  A   I'm not answering that question.
23  Q   Have you been living with your husband in
24  Australia since October of 2015?
25  A   Yes.

Page 246



Page 247

1  other terms of his probationary period?
2  A   No.  He went to everything that he was
3  supposed to go to.
4  Q   Has he paid his fines?
5  A   Yes, as far as I know.
6  Q   Describe for me the contract that you had
7  with the Mail On Sunday?
8  A   Could you be a little bit more specific?
9  Like --
10 Q   Have you had more than one contract with
11 the Mail On Sunday?
12 A   Well, there was one contract for the
13 picture.  And that was to pay me 140,000 for the
14 picture.  And then two stories were printed after
15 that for the amount of 10,000 each.
16 Q   Is that the only money that you received
17 from the Mail On Sunday?
18 A   Correct.
19 Q   Did you receive any money for syndication
20 of the photograph?
21 A   Isn't that what the 140 was for?
22 Q   I'm asking you.
23 A   Well, I don't really know what syndication
24 means.
25 Q   Did you have a written contract with the

Page 248

1  Mail on Sunday?
2  A   Yes.
3  Q   Where is that contract right now?
4  A   I don't know.  I've moved that many times.
5  I -- I lose paperwork wherever I go.
6  Q   Is it possible it's in the boxes in
7  Sydney?
8  A   I don't think I kept it, to be honest.
9  Q   Did you ever refer back to it after you
10 signed it?
11 A   I know I kept it for a short while, but I
12 mean, like I said, I've moved countries twice in the
13 last two years and three different houses.  So the
14 paper trail is lost.  I don't know where it would be.
15 Q   Did you receive it via e-mail?
16 A   No.  I received it -- Sharon Churcher
17 handed it to me by paper.
18 Q   And you signed it?
19 A   I signed it.
20 Q   And then did you make a copy of it?
21 A   No.
22 Q   You never had a copy of it?
23 A   Well, I had my own copy.  I'm sure she has
24 hers.
25 Q   Do you recall there being a period of

Page 313

1  Q   And when you say she called you a liar,
2  that's the Ms. Roberts' claims are obvious lies part?
3  A   Yes.
4  Q   Okay.  When is the first time that you saw
5  this whole document?
6  A   I guess when you guys handed it over for
7  discovery.
8  Q   Okay.  And who showed it to you?
9  A   It was sent to me by e-mail.
10  Q   Okay.  Just through the course of
11  communicating with your attorneys?
12  A   Yes.
13  Q   You've never seen it published?
14  A   Not this whole e-mail, no.
15  Q   All right.  Did you -- I'm sorry, did you
16  discuss this publication of what you saw in the press
17  with Judith Lightfoot?
18  A   Yes.
19  Q   All right.  And when did you discuss it
20  with her?
21  A   When I got back to Australia, Judith and I
22  started seeing each other again.  Before then, I
23  spoke with a doctor in Colorado about this.  His name
24  is Dr. Olsen.  And it was causing me a lot of
25  distress to have to deal with being called a liar all

Page 314

1  over again, when I know I'm standing up doing the
2  right thing.  And the doctor prescribed me
3  ▌▌▌▌▌▌▌▌▌▌▌.  And, yeah.
4  Q   Okay.  So my question was, when did you
5  discuss it with Judith Lightfoot?
6      I think I now understand you did that
7  after you returned to Australia in November or so of
8  2015; is that right?
9  A   I returned to Australia in October, and
10  that's when I picked up talking to her again.
11  Q   All right.  And you're saying that at
12  another point in time you talked to another doctor,
13  Dr. Olsen, in Colorado, correct?
14  A   Correct.
15  Q   And when did you meet with Dr. Olsen?
16  A   I don't know the first date that I met
17  with him.
18  Q   Did you meet with him more than once?
19  A   I believe so.
20  Q   And you believe you spoke with him about
21  Ghislaine Maxwell's published statement in the press
22  that Ms. Roberts' claims are obvious lies.
23      That's what you believe you spoke with
24  Dr. Olsen about?
25  A   I spoke with Dr. Olsen about being called

Page 315

1  a liar from the people that abused me.
2  Q   Okay.  Do you recall specifically
3  mentioning to him Ghislaine Maxwell's statement to
4  the press?
5  A   I mentioned a lot of names to him.
6  Q   Okay.  What new symptoms did you
7  experience following January 2nd, 2015?
8  A   I think it's one thing to be a victim of
9  sexual abuse and survive it and come out trying to
10  tell the world my story, and then another thing for
11  it to be shut down because these people, Ms. Maxwell
12  and others are calling me liars (sic).
13  Q   And I asked you what symptoms had you
14  experienced --
15      MR. EDWARDS:  She's going to finish her
16  answer to this question.  You cut her off so many
17  times.
18      MS. MENNINGER:  It has nothing to do with
19  this.
20      MR. EDWARDS:  It absolutely does.  Because
21  this is a psychological damages claim, and she is
22  trying to explain to you what those damages are.
23  Q   (BY MS. MENNINGER) Okay.  What are your
24  symptoms that you experienced since January 2nd, 2015
25  that are new?

Page 316

1  A   Very strong anxiety attacks, bad panic
2  attacks.  My throat closes up, I can't breathe.  I
3  vomit when I have anxiety attacks.  My -- this is
4  personal, but my sex life has suffered.  My marriage
5  has suffered.  Psychologically, it's just hurt me all
6  over again.  I mean, they've hurt me before, and now
7  they've hurt me again by doing this.
8      And I felt like I was in the process of
9  healing before this came out because I had opened up
10  this wonderful charity called Victims Refuse Silence.
11  And then my aim was to heal by helping other girls
12  get out of the situations that I was in before.
13      And my lawyers were nice enough to help
14  me.  I have this beautiful website where you can
15  click on in any state and you can find a place.  I
16  have personally called all of them and they will help
17  you get out of the situation that you're in.  They
18  will get you medical help.  They will get you legal
19  advice.  I think I was in the really good process of
20  healing.  And when this came out, it just ruined me
21  all over again.
22  Q   (BY MS. MENNINGER) All right.  Tell me
23  all of the damages that you claim occurred to you
24  because of Defendant's Exhibit 27.
25  A   My reputation, my psychological abuse,

| Page 321 | Page 323 |
|---|---|
| 1  Q   And what do you recall any reporter saying | 1  Trafficking Coalition sometime after January 2nd, |
| 2  to you that included the name Ghislaine Maxwell? | 2  2015? |
| 3  A   Asking me -- I don't remember what they | 3  A   I did give -- I did go for a speaking |
| 4  asked me, to be honest.  There was regarding | 4  engagement.  I don't remember when. |
| 5  Ghislaine and [redacted] and Jeffrey Epstein.  I | 5  Q   Was there any speaking engagement you had |
| 6  mean, it was an array -- you know how reporters can | 6  booked that was canceled after January 2nd, 2015? |
| 7  be when they're hashing at you. | 7  A   I can't remember off the top of my head. |
| 8  Q   Okay.  So no one in Penrose, Colorado who | 8  Q   All right.  You founded Victims Refuse |
| 9  lived there mentioned Ghislaine Maxwell by name to | 9  Silence in February of 2014, correct? |
| 10 you? | 10 A   It was -- it was a process because, |
| 11 A   Besides reporters? | 11 obviously, you have to go through all the bylaws and |
| 12 Q   Right.  People who live in Penrose, | 12 everything.  I think we started it in October of |
| 13 Colorado. | 13 2014, but it wasn't official until January, I think. |
| 14 A   Right.  I didn't know anyone in Penrose, | 14 Q   Okay.  So in the period it was in |
| 15 except for my mom. | 15 operations before January 2nd, 2015, had you gotten |
| 16 Q   Okay.  Now, in March or April of 2015 did | 16 any -- had you been paid any salary by Victims Refuse |
| 17 you fly to New York? | 17 Silence? |
| 18 A   I'm sorry, what date? | 18 A   No, I hadn't. |
| 19 Q   March or April of 2015, did you fly to New | 19 Q   Had -- |
| 20 York? | 20 A   I mean, it was just up and running.  So |
| 21 A   It's a possibility. | 21 there was no -- |
| 22 Q   Did you stay at the Ritz-Carlton? | 22 Q   Had any contributions been made to Victims |
| 23 A   It's definitely a possibility. | 23 Refuse Silence before January 2nd, 2015? |
| 24 Q   Were you there with Mr. Edwards and | 24 A   I can't recall.  You know, we've only had |
| 25 Mr. Cassell and Sigrid McCawley? | 25 a few contributions.  I don't know what dates they |

| Page 322 | Page 324 |
|---|---|
| 1  A   I've been to New York quite a few times. | 1  were put in. |
| 2  So I'd have to refresh my memory.  But I have been to | 2  Q   Has anyone else called you a liar in the |
| 3  New York with Brad Edwards and Paul Cassell and | 3  press? |
| 4  Sigrid McCawley. | 4  A   Yes. |
| 5  Q   Was that after January 2nd, 2015? | 5  Q   Who? |
| 6  A   Definitely could be. | 6  A   [redacted]. |
| 7  Q   Did you give an interview to ABC News on | 7  Q   Anyone else? |
| 8  camera? | 8  A   Ghislaine Maxwell, obviously. |
| 9  A   I did. | 9  Q   Anyone else? |
| 10 Q   And that was after January 2nd, 2015? | 10 A   Not that I know of. |
| 11 A   I did. | 11 Q   Has anyone else publicly denied your |
| 12 Q   Did you give an interview to Good Morning | 12 allegations? |
| 13 America? | 13 A   From what Ghislaine Maxwell said? |
| 14 A   No. | 14 Q   Have you seen any press in which another |
| 15 Q   All right.  Did you correspond at all with | 15 person has denied your allegations? |
| 16 Good Morning America about the publication of your | 16     MR. EDWARDS:  Objection.  Vague. |
| 17 story? | 17 A   I've seen allegations denied by |
| 18 A   I can't remember if ABC and Good Morning | 18 Ms. Maxwell.  And I've seen the allegations denied by |
| 19 America wanted to do something together.  I can't -- | 19 [redacted]. |
| 20 all I know is I was interviewed by one person at ABC. | 20 Q   (BY MS. MENNINGER)  And [redacted] |
| 21 I never was interviewed by anyone from Good Morning | 21 actually went on TV and called you a serial liar, |
| 22 America.  Maybe they were going to show the same | 22 correct? |
| 23 airing in the same show, but powers that be, of | 23 A   Very correct. |
| 24 course, wouldn't let it go forward. | 24 Q   You saw that, correct? |
| 25 Q   Did you give a lecture to the Human | 25 A   Yes. |

| | |
|---|---|
| **Page 325**<br>1  Q  And that hurt your feelings?<br>2  A  Badly.<br>3  Q  ████████████████<br>   ████████<br>   ████████████<br>   ████████████████████<br>   ████████████<br>8  MR. EDWARDS: Form.<br>9  A  ████████<br>10 Q  (BY MS. MENNINGER) How do you know which<br>11 harm you've suffered is attributable to Ghislaine<br>12 Maxwell's denial versus ████████████<br>   ████████████<br>14 A  Ghislaine Maxwell brought me into the sex<br>15 trafficking industry. She's the one who abused me on<br>16 a regular basis. She's the one that procured me,<br>17 told me what to do, trained me as a sex slave, abused<br>18 me physically, abused me mentally.<br>19     She's the one who I believe, in my heart<br>20 of hearts, deserves to come forward and have justice<br>21 happen to her more than anybody. Being a woman, it's<br>22 disgusting.<br>23 Q  So you cannot delineate what harm you have<br>24 suffered in terms of all of the psychological damage<br>25 you just disclosed? | **Page 327**<br>1  context?<br>2     MR. EDWARDS: Object to the form of the<br>3  question.<br>4  A  Can I point to a person -- I'm sorry. I<br>5  don't understand. Can you rephrase it for me --<br>6  Q  (BY MS. MENNINGER) All right.<br>7  A  -- so I can understand what you mean?<br>8  Q  Where you live in Australia now, has<br>9  anyone referenced the name Ghislaine Maxwell to you?<br>10 A  After all of the news hits, after the<br>11 press hits in 2015 and, you know, everyone is calling<br>12 me a liar, all of my friends in Australia called me<br>13 and talked to me and said, I can't believe this. I<br>14 can't believe what you went through.<br>15     That was very embarrassing for something<br>16 that I tried to keep separate from my other life<br>17 where I would like to help victims. I didn't want<br>18 the friends of my kids parents knowing about that<br>19 stuff. You know, and of course they all felt sorry<br>20 for me. And you know, like I said. I didn't know<br>21 anybody in Penrose. So there's nobody that could<br>22 have come up to me and talked to me about it. My<br>23 mom.<br>24 Q  This question was about Australia, sorry.<br>25 A  Oh, sorry, I thought you were talking |
| **Page 326**<br>1  A  Oh, of course.<br>2  Q  -- if that is attributable to Ghislaine<br>3  Maxwell's statement on January 2nd versus ████<br>4  ████████ calling you a serial liar on Good Morning<br>5  America?<br>6  A  Of course, it all hurts. Okay? I ████<br>   ████████████████████████<br>   ████████ Of course those hurt. It<br>9  doesn't feel good to have people who have done<br>10 something to you deny something that's happened, when<br>11 I'm actually brave enough to come forward and talk<br>12 about it.<br>13     What hurts me the worst is that Ghislaine<br>14 Maxwell brought me into this. Not only has she hurt<br>15 me once, but she's hurt me twice coming forward and<br>16 saying, This is not true, this is categorically<br>17 untrue and obvious lies.<br>18     That to me is a stick in the mud and that<br>19 to me is what caused the most harm to me.<br>20 Q  Okay. And so can you point to any person<br>21 who has referenced Ghislaine Maxwell's denial in the<br>22 press or to your face or anywhere?<br>23 A  Can I point to a person?<br>24 Q  Can you point to any time that someone has<br>25 referenced Ghislaine Maxwell's denial to you in any | **Page 328**<br>1  about pointing out people.<br>2  Q  No.<br>3  A  Okay, well in Australia, yes, at least a<br>4  dozen friends.<br>5  Q  They came up and they mentioned Ghislaine<br>6  Maxwell's denial to the press to you?<br>7  A  They couldn't believe what I had been<br>8  through and, you know, that these were, you know,<br>9  being denied, and they felt sorry for me. And, you<br>10 know, it was the whole circumference of things.<br>11 Q  So the people in Australia that came up to<br>12 you had sympathy for you and believed you, correct?<br>13 A  Yes.<br>14 Q  All right. And when you spoke to<br>15 Dr. Olsen you recall specifically mentioning<br>16 Ghislaine Maxwell's press release?<br>17    MR. EDWARDS: Object to the form.<br>18 A  Yes, I remember mentioning her, as well as<br>19 the press release, as well as other press releases.<br>20 And the abuse that I had occurred (sic) from the<br>21 hands of Jeffrey and Ghislaine.<br>22 Q  (BY MS. MENNINGER) Okay. When have you<br>23 been diagnosed with a mental health condition, first?<br>24 A  I don't know. I mean, I've been told that<br>25 I've ████████████████. You know -- |

## Page 345

```
 1   STATE OF COLORADO)
 2                   ) ss.   REPORTER'S CERTIFICATE
 3   COUNTY OF DENVER )
 4        I, Kelly A. Mackereth, do hereby certify
 5   that I am a Registered Professional Reporter and
 6   Notary Public within the State of Colorado; that
 7   previous to the commencement of the examination, the
 8   deponent was duly sworn to testify to the truth.
 9        I further certify that this deposition was
10   taken in shorthand by me at the time and place herein
11   set forth, that it was thereafter reduced to
12   typewritten form, and that the foregoing constitutes
13   a true and correct transcript.
14        I further certify that I am not related to,
15   employed by, nor of counsel for any of the parties or
16   attorneys herein, nor otherwise interested in the
17   result of the within action.
18        In witness whereof, I have affixed my
19   signature this 11th day of May, 2016.
20        My commission expires April 21, 2019.
21
22        _____
          Kelly A. Mackereth, CRR, RPR, CSR
23        216 - 16th Street, Suite 600
          Denver, Colorado  80202
24
25
```

## Page 346

```
 1   AGREN BLANDO COURT REPORTING & VIDEO, INC.
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202
     4450 Arapahoe Avenue, Suite 100
 3   Boulder, Colorado  80303
 4   May 11, 2016
 5   Sigrid S. McCawley, Esq.
     BOIES, SCHILLER & FLEXNER LLP
 6   401 East Las Olas Boulevard
     Suite 1200
 7   Fort Lauderdale, FL 33301-2211
 8   Re:  Videotaped Deposition of VIRGINIA GIUFFRE
         Giuffre v. Maxwell
 9       Case No. 15-cv-07433-RWS
10   The aforementioned deposition is ready for reading
     and signing.  Please attend to this matter by
11   following BOTH of the items indicated below:
12   _____ Call 303-296-0017 and arrange with us to read
            and sign the deposition in our office.
13
     _XXX_ Have the deponent read your copy and sign
14         the signature page and amendment sheets, if
           applicable; the signature page is attached.
15
     _____ Read the enclosed copy of the deposition and
16          sign the signature page and amendment
            sheets, if applicable; the signature page is
17          attached.
18   _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
19   _____ By _____ due to a trial date of _____
20   Please be sure the original signature page and
     amendment sheets, if any, are SIGNED BEFORE A NOTARY
21   PUBLIC and returned to Agren Blando for filing with
     the original deposition.  A copy of these changes
22   should also be forwarded to counsel of record.
     Thank you.
23
     AGREN BLANDO COURT REPORTING & VIDEO, INC.
24
25   cc:  All Counsel
```

## Page 347

```
 1   AGREN BLANDO COURT REPORTING & VIDEO, INC.
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202
     4450 Arapahoe Avenue, Suite 100
 3   Boulder, Colorado  80303
 4
 5
 6                    VIRGINIA GIUFFRE
                      May 3, 2016
 7                    Giuffre v. Maxwell
                      Case No. 15-cv-07433-RWS
 8
 9   The original videotaped deposition was filed with
10   Laura A. Menninger, Esq., on approximately the
11   11th day of May, 2016.
12   _____ Signature waived.
13
     _____ Unsigned; signed signature page and
14          amendment sheets, if any, to be filed at
            trial.
15
     _____ Reading and signing not requested pursuant
16          to C.R.C.P. Rule 30(e).
17   _XXX_ Unsigned; amendment sheets and/or signature
           pages should be forwarded to Agren Blando to
18         be filed in the envelope attached to the
           sealed original.
19
20
21   Thank you.
22   AGREN BLANDO COURT REPORTING & VIDEO, INC.
23   cc:  All Counsel
24
25
```

## Page 348

- AMENDMENT SHEET -

Videotaped Deposition of VIRGINIA GIUFFRE
May 3, 2016
Giuffre v. Maxwell
Case No. 15-cv-07433-RWS

The deponent wishes to make the following changes in the testimony as originally given:

Page   Line        Should Read              Reason
____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

____   ____   _____   _____

Signature of Deponent: _____

Acknowledged before me this ____ day of
_____, 2016.
         Notary's signature _____
(seal)
         My commission expires _____.