UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

VIRGINIA L. GIUFFRE,

               Plaintiff,

        -against-                             21-cv-6702 (LAK)

PRINCE ANDREW, Duke of York, in his personal capacity,
also known as Andrew Albert Christian Edward,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

Appearances:

        David Boies
        Sigrid McCawley
        Andrew Villacastin
        Erika Nyborg-Burch
        Sabina Mariella
        BOIES SCHILLER FLEXNER LLP
        *Attorneys for Plaintiff*

        Andrew B. Brettler
        Melissa Y. Lerner
        LAVELY & SINGER P.C.
        *Attorneys for Defendant*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 01/12/22

*Table of Contents*

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    The Epstein Sex Trafficking Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Defendant's Relationship with Epstein and Maxwell. . . . . . . . . . . . . . . . . . . . . . . . 3
    Epstein Recruits Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Defendant's Alleged Sexual Abuse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    The Florida State Prosecution and the Federal Non-Prosecution Agreement. . . . . . . . . 6
    Ms. Giuffre's Florida Suit Against Epstein . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    The Federal Criminal Case Against Epstein. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    The 2009 Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    I.    Dismissal on the Basis of the 2009 Agreement Is Not Justified on this Motion
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        A.    Legal Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            1.    Materials Properly Considered . . . . . . . . . . . . . . . . . . . . . . . 11
            2.    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        B.    Analysis of the 2009 Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            1.    Whether the Defendant Is Among the Purportedly Released Persons
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            2.    Whether Defendant is Entitled to Enforce the Release as a Third
                Party Beneficiary of the 2009 Agreement. . . . . . . . . . . . . . . . . 22
                a.    Relevant Provisions of the Agreement . . . . . . . . . . . . . . 23
                b.    Defendant's Cases Are Inapposite . . . . . . . . . . . . . . . . . 25
                c.    The Dershowitz Argument . . . . . . . . . . . . . . . . . . . . . 28
    II.    The Complaint States Legally Sufficient Claims . . . . . . . . . . . . . . . . . . . . . 31
        A.    Legal Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        B.    Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
            1.    The Complaint Is Legally Sufficient. . . . . . . . . . . . . . . . . . . . 32
            2.    Defendant's Contention that the Plaintiff Was Obliged to Plead
                Specific Facts Demonstrating Violation of the New York Penal Law
                Is Incorrect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
            3.    Plaintiff's IIED and Battery Claims Are Not Duplicative . . . . . . 35
    III.    The Attack on the Constitutionality of the New York Child Victims Act Is Without
        Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    IV.    Defendant Is Not Entitled to a More Definite Statement.  He Will Get the Detail He
        Seeks During Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

LEWIS A. KAPLAN, *District Judge.*

Plaintiff Virginia Roberts Giuffre brings this action against defendant Prince Andrew, Duke of York, for battery and intentional infliction of emotional distress. In short, she alleges that the late Jeffrey Epstein and others trafficked her to Prince Andrew who took advantage of the situation by sexually abusing her when she was under the age of eighteen.

Defendant denies Ms. Giuffre's allegations and attacks her credibility and motives. He asserts that she was complicit in Epstein's unlawful activities. But this is a motion to dismiss Ms. Giuffre's complaint as legally insufficient – not to determine the truth or falsity of charges in her complaint. And defendant relies mainly, although not exclusively, on a 2009 agreement between Ms. Giuffre and Epstein that settled a different lawsuit, between Giuffre and Epstein, that defendant now argues released him from any liability to Ms. Giuffre.

The fact that defendant has brought the matter before the Court on a motion to dismiss the complaint as legally insufficient is of central importance. As is well known to lawyers but perhaps not known to the lay public, the defendant – by making this motion – placed upon the Court the unyielding duty to assume – for the purposes of this motion only – the truth of all of plaintiff's allegations and to draw in plaintiff's favor all inferences that reasonably may be drawn from those allegations.[1] In consequence, the law prohibits the Court from considering at this stage of the proceedings defendant's efforts to cast doubt on the truth of Ms. Giuffre's allegations, even though his efforts would be permissible at a trial. In a similar vein and for similar reasons, it is not open to the Court now to decide, as a matter of fact, just what the parties to the release in the 2009

---

[1]     *E.g., Littlejohn v. City of New York,* 795 F.3d 297, 306 (2d Cir. 2015) ("On a motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor."); *see Ahmed v. Cuccinelli,* 792 F. App'x 908, 910 (2d Cir. 2020).

2

settlement agreement signed by Ms. Giuffre and Jeffrey Epstein actually meant.  As will appear more fully below, the Court's job at this juncture is simply to determine whether there are two or more reasonable interpretations of that document.  If there are, the determination of the "right" or controlling interpretation must await further proceedings.

*Facts*

Except as otherwise noted, the facts are drawn from Ms. Giuffre's complaint.  It bears repeating that its allegations are deemed true for purposes of this motion, whatever a trier of fact ultimately might determine at a trial.

*The Epstein Sex Trafficking Scheme.*

Plaintiff's allegations arise principally from a sex trafficking scheme orchestrated by the late sex offender Jeffrey Epstein, which by now has been publicized widely.  According to Ms. Giuffre's complaint, Epstein "sexually abused more than 30 minor girls . . . in the United States and overseas" from between about 1999 and 2007.[2]  In concert with paid employees and others – notably Ghislaine Maxwell, who recently was convicted in this district of sex trafficking in connection with the Epstein events[3] – Epstein and others lured vulnerable young girls into a scheme of abuse for Epstein's own sexual gratification and for that of some of his powerful and wealthy friends.[4]

---

[2]

Complaint [Dkt. 1] (hereinafter "Compl.") ¶ 4 (citing Opinion and Order, Dkt. 435 at 1-2, *Doe v. United States*, No. 08-cv-80736 (KAM) (S.D. Fla. Feb. 21, 2019)).

[3]

*United States v. Maxwell*, No. 20-cr-0330 (AJN).

[4]

Compl. ¶ 5.

Epstein relied on Maxwell and others to identify and target vulnerable young girls in numerous settings, including "schools, spas, trailer parks, and the street."[5]  Epstein's "recruiters" lured these girls into his orbit with the promise of what appeared to be legitimate masseuse positions.  Once manipulated into returning to one of Epstein's residences, however, the girls were groomed for abuse by Epstein and others through displays of wealth, power, and sexual imagery.[6]

Once initial sexual abuse had occurred, Epstein and Maxwell further manipulated the victims with a combination of promises, threats, and surveillance.[7]  At its height, Epstein's sexual abuse scheme, managed principally by Maxwell, was transcontinental.  Using his private jet, Epstein trafficked dozens of minors for sexual abuse at his New York City mansion, his New Mexico ranch, his private island in the U.S. Virgin Islands, his Palm Beach, Florida, estate, and elsewhere.  In 2008, he pleaded guilty in Florida to procuring a minor for prostitution.[8]

*Defendant's Relationship with Epstein and Maxwell*

Again according to Ms. Giuffre's complaint, the defendant first met Epstein in 1999 through the former's "close friend," Ghislaine Maxwell.[9]  Over the next several years, the defendant traveled with Epstein and Maxwell on Epstein's private plane and was a guest at Epstein's numerous

---

[5]     *Id.* ¶ 19.

[6]     *Id.* ¶¶ 20-21.

[7]     *Id.* ¶ 22.

[8]     *Id.* ¶ 49.

[9]     *Id.* ¶ 30.

4

homes, including the private island in the U.S. Virgin Islands, Little St. James, and properties in Palm Beach and New York City. Epstein and Maxwell were guests at the defendant's fortieth birthday party in 2000 as well as at a birthday party that the defendant threw for Maxwell in Sandringham, United Kingdom, in the same year.

In 2006, one month after Florida state prosecutors charged Epstein with procuring a minor for prostitution, the defendant invited Epstein to the eighteenth birthday party of one of defendant's daughters. As recently as 2010, and therefore after Epstein had done jail time in connection with the 2006 Florida charges and registered as a sex offender, the defendant was photographed with Epstein and stayed at Epstein's New York City mansion.[10]

*Epstein Recruits Plaintiff*

Ms. Giuffre's complaint continues:

Maxwell recruited Ms. Giuffre into Epstein's sex trafficking activities in 2000, when Ms. Giuffre was sixteen years old and employed at the Mar-A-Lago Club in Palm Beach.[11] Like other minor girls whom Epstein and Maxwell targeted, plaintiff initially was recruited to "provide massages, and thereafter to engage in a variety of sexual acts, for Epstein."[12] From 2000 through 2002, plaintiff traveled frequently with Epstein, both within the United States and internationally, on his private plane. In addition to being "on call for Epstein for sexual purposes," plaintiff on other

---

[10]    *Id.* ¶ 50.

[11]    *Id.* ¶¶ 2, 24.

[12]    *Id.* ¶ 5.

occasions was "lent out to other powerful men,"[13] including the defendant.

*Defendant's Alleged Sexual Abuse*

The complaint alleges, and the Court for present purposes is obliged to accept, that the defendant sexually abused Ms. Giuffre when she was under the age of eighteen years old. On one occasion, defendant allegedly forced plaintiff to have sex with him against her will at Maxwell's home in London. Ms. Giuffre's complaint includes a reproduction of a now widely published photograph of Ms. Giuffre, Prince Andrew, and Maxwell at Maxwell's home, which plaintiff says was taken prior to that event.[14] On another occasion, defendant allegedly abused Ms. Giuffre during a visit to Epstein's private island, Little St. James.

Ms. Giuffre alleges also that defendant abused her at Epstein's mansion on the Upper East Side of Manhattan, which lies within this judicial district. During that particular encounter, Maxwell forced "[p]laintiff, a child, and another victim to sit on Prince Andrew's lap as Prince Andrew touched her."[15] During this visit to New York, according to the complaint, the defendant forced Ms. Giuffre to engage in sex acts against her will and was aware both of her age and that she was a coerced sex-trafficking victim.[16]

In each of these encounters, plaintiff alleges, Epstein, Maxwell, and the defendant compelled her to engage in sexual acts by express or implied threat. In consequence, plaintiff feared

---

[13]    *Id.*

[14]    *Id.* ¶ 38.

[15]    *Id.* ¶ 39.

[16]    *Id.* ¶¶ 41-48.

6

death or physical injury to herself or another, among other repercussions, if she disobeyed.[17]

Ms. Giuffre asserts that the defendant's actions caused and continue to cause her significant emotional and psychological distress and harm.

*The Florida State Prosecution and the Federal Non-Prosecution Agreement*

At this point, it is helpful and appropriate to refer to facts not alleged in the complaint in this case but of which the Court takes judicial notice.[18]

In July 2006, a Florida state grand jury indicted Epstein in a state court on a single count of felony solicitation of prostitution (the "Florida State Indictment").[19]  As will appear, that charge remained pending until mid-2008.

As previously noted, defendant's motion in this case relies heavily on the 2009 agreement between Epstein and Ms. Giuffre, which already is before the Court as a matter of judicial notice (the "2009 Agreement").[20]  The 2009 Agreement contains the following paragraph:

---

[17]     *Id.* ¶ 41.

[18]     The Court takes judicial notice only to the extent of the facts set forth in this section of this opinion and, in the case of documents, for the existence or contents of the documents, but not for the truth of assertions the documents contain.  *See In re SKAT Tax Refund Scheme Litig.*, No. 18-CV-05053 (LAK), 2020 WL 7496272, at *3 (S.D.N.Y. Dec. 21, 2020).

[19]     Indictment, *State v. Epstein*, No. 06-9454CF (Fl. Cir. Ct. July 19, 2006), *reprinted in* U.S. Dep't of Just., Off. of Pro. Resp., *Report – Investigation into the U.S. Attorney's Office for the Southern District of Florida's Resolution of Its 2006–2008 Federal Criminal Investigation of Jeffrey Epstein and Its Interactions with Victims during the Investigation*, Ex. 1 (Nov. 2020).  The OPR Report contains a great deal of information about how the NPA came to pass.  But the Court does not take judicial notice of its statements or consider it in deciding this motion.

[20]     Dkt. 57 (taking judicial notice of Dkt. 32, Ex. A).

"First and Second Parties[21] further stipulate and agree that this Settlement Agreement is pursuant to and is in fulfillment of Jeffrey Epstein's obligations to Virginia Roberts [Giuffre] . . . pursuant to and in conformity with the Non-Prosecution Agreement, its Addendum, and its Affirmation . . . between Jeffrey Epstein and the United States Attorney for the Southern District of Florida."[22]

Thus, the terms of the non-prosecution agreement (the "NPA") may shed light on the meaning of the 2009 Agreement. The Court therefore takes judicial notice of the NPA, its addendum, and affirmation.[23]

For present purposes, the following terms of the NPA are of possible interest here:

1.    Epstein agreed to plead guilty to the Florida State Indictment and to a state Information charging him with solicitation of minors to engage in prostitution.

2.    The U.S. Attorney's office agreed to provide Epstein's attorneys "with a list of individuals whom it ha[d] identified as victims, as defined in 18 U.S.C. § 2255" and, "in consultation with and subject to the good faith approval of Epstein's counsel, [would] select an attorney representative for these persons, who [would] be paid for by Epstein." Epstein's lawyers

---

[21]    The agreement defines the term "First Parties" to mean "Virginia Roberts [n/k/a Giuffre] and her agent(s), attorney(s), predecessor(s), successor(s), heir(s), administrator(s), and/or assign(s)." It defines the term "Second Parties" to mean "Jeffrey Epstein and his agent(s), attorney(s), predecessor(s), successor(s), heir(s), administrator(s), assign(s) and/or employees(s)." For ease of expression, unless otherwise indicated or the context otherwise requires, the balance of this opinion uses the term "Ms. Giuffre" to refer collectively to Ms. Giuffre and the others included in the defined term "First Parties." Similarly, it uses the term "Epstein" to refer collectively to Epstein and the others included in the defined term "Second Parties."

[22]    Dkt. 32, Ex. A at 2.

[23]    *See* Non-Prosecution Agreement [hereinafter "NPA"], Dkt. 361-62, *Doe v. United States,* No. 08-cv-80736 (KAM) (S.D. Fla. Feb. 10, 2016).

could "contact the identified individuals through that representative."[24]

3.      Epstein agreed that, if one or more of the individuals whom the government had identified as victims elected to sue Epstein under 18 U.S.C. § 2255, Epstein would not contest jurisdiction over him in the Florida federal court and he would waive his right to contest his liability. In addition, he would "waive[] his right to contest damages up to an amount as agreed to between the identified individual and Epstein, so long as the identified individual elect[ed] to proceed exclusively under 18 U.S.C. § 2255, and agree[d] to waive any other claim for damages, whether pursuant to state, federal, or common law."[25] Epstein's waivers, however, would not apply to anyone who had not been identified by the government as a victim or, having been so identified, did not proceed exclusively under 18 U.S.C. § 2255.

4.      The U.S. Attorney's office agreed that it would not prosecute Epstein nor "institute any criminal charges against any potential co-conspirators of Epstein, including but not limited to" four specifically identified persons if Epstein pleaded guilty to the Florida charges and otherwise discharged his obligations under the NPA.[26]

The NPA bears signatures dated variously in late September and in October 2007. Ms. Giuffre's complaint alleges that Epstein pled guilty to the Florida information (and presumably the indictment) in 2008.[27]

---

[24]      *Id.* at 4.

[25]      *Id.*

[26]      *Id.* at 5.

[27]      Compl. ¶ 49.

*Ms. Giuffre's Florida Suit Against Epstein*

In May 2009, while Epstein was incarcerated in Palm Beach County, Florida, as a result of his guilty plea to the Florida state charges, Ms. Giuffre sued Epstein in the United States District Court for the Southern District of Florida (the "Florida Case") under 18 U.S.C. § 2255 as an alleged victim of Epstein's alleged federal sex trafficking, sexual exploitation, and child pornography offenses.[28] Her complaint asserted that Epstein and Epstein's "adult male peers, including royalty, politicians, academicians, businessmen, and/or other professional and personal acquaintances," had sexually exploited her.[29]

Ms. Giuffre and Epstein entered into the 2009 Agreement, entitled  Settlement Agreement and General Release, pursuant to which Giuffre voluntarily dismissed her action against Epstein in exchange for $500,000.[30] The defendant argues that Ms. Giuffre's claims against him are barred by the terms of the 2009 Agreement.

*The Federal Criminal Case Against Epstein*

On July 2, 2019, a grand jury in this district indicted Epstein for an alleged sex

---

[28]   *See* Complaint, *Jane Doe No. 102 v. Epstein*, No. 09-cv-80656 (KAM) (S.D. Fla. May 1, 2009) (hereinafter "Florida Compl.")

[29]   *Id.* ¶ 21.

[30]   *See* Final Order of Dismissal, Dkt. 65, *Jane Doe No. 102*, No. 09-cv-80656 (KAM) (S.D. Fla. Dec. 8, 2009).

trafficking conspiracy and the substantive crime of sex trafficking in violation of 18 U.S.C. § 1591.[31]
He was arrested on July 8, 2019.  On August 10, 2019, Epstein was found dead in his cell at the
Metropolitan Correctional Center.[32]

*The 2009 Agreement*

   The 2009 Agreement is the crux of defendant's motion.  It contains six and a fraction
pages of substantive text consisting of nine individually labeled provisions.  These are an agreement
to dismiss the Florida Case (§ 1), a one and one-half page provision captioned "general release" that
contains additional covenants beyond the releasing language (§ 2), a payment section (§ 3), a
confidentiality provision (§ 4), covenants dealing with maintaining Ms. Giuffre's anonymity (§ 5),
a "no contact" covenant (§ 6), a provision relating to governing law and enforcement of the
agreement (§ 7), a clause concerning attorneys' fees (§ 8), and a collection of miscellaneous
provisions (§ 9).

   A number of these provisions bear importantly on the resolution of this motion and
are discussed in detail below so there is no need to quote or summarize them in great detail here.
Suffice it to say by way of introduction that:

- This motion raises two pivotal issues regarding the 2009 Agreement:

  - Whether the 2009 Agreement demonstrates that its releasing language
    in Section 2 unambiguously applies to this defendant and, if so,

  - Whether the defendant – who is not a party to nor mentioned in the

---

[31]  *See* Indictment, Dkt. 2, *United States v. Epstein,* No. 19-CR-490 (RMB) (S.D.N.Y. July 2,
2019).

[32]  Compl. ¶ 56.

agreement – is entitled to invoke it.

•  The 2009 Agreement is far from a model of clear and precise drafting.  Both sides agree that Epstein and Ms. Giuffre agreed to its language.  It must have meant something to them.  But Ms. Giuffre and the defendant in this case disagree emphatically as to what it meant with respect to both issues.

*Discussion*

I.  *Dismissal on the Basis of the 2009 Agreement Is Not Justified on this Motion*

  A.  *Legal Principles*

    1.  *Materials Properly Considered*

The defendant moves to dismiss pursuant to Rule 12(b)(6).  As noted previously, the Court, in this posture, must accept as true all well pleaded factual allegations in the complaint and draw "all reasonable inferences that can be drawn from [them] in the light most favorable to the plaintiff."[33]  With limited exceptions, the motion must be decided solely on the basis of the allegations of the complaint without regard to any extraneous claims or materials.

The 2009 Agreement neither appears in nor is referred to in the complaint.  But the copy before the Court concededly is authentic.  Its wording (as distinguished from its legal effect) is undisputed, and the Court consequently has taken judicial notice of it.[34]    Moreover,

---

[33]

  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (citations and internal quotation marks omitted).

[34]

  *See, e.g., Alt. Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) ("Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. *There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties*; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.") (citations and internal quotation marks omitted) (emphasis added).

12

notwithstanding the general rule that an affirmative defense is not considered at this stage of the litigation, such a defense "may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) . . . if the defense appears on the face of the complaint."[35]  And while the defendant's argument does not rest on the face of the complaint, here that is a distinction without a difference in light of the fact that the wording of the 2009 Agreement (again, as distinguished from its legal effect) is accepted by both parties. Accordingly, the Court considers defendant's argument.

#### 2. Governing Law

The 2009 Agreement provides that it "shall be governed by the laws of the State of Florida." The parties agree. Accordingly, the Court applies Florida law to the two pivotal questions that bear on the defendant's release argument.

### B. Analysis of the 2009 Agreement

#### 1. Whether the Defendant Is Among the Purportedly Released Persons

We begin by focusing on the first two pages of the 2009 Agreement, which contain Sections 1 and 2.

Section 1 contains the agreement of plaintiff and Jeffrey Epstein to dismiss plaintiff's Florida Case upon receipt of a monetary payment.[36]  Section 2, which occupies one and one-half typewritten pages, contains, among other things, language by which "First Parties" (generally, Ms. Giuffre and some others) released "Second Parties" (generally, Epstein and some others) and

---

[35]  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).

[36]  It is undisputed that "Jane Doe No. 102" referred to Ms. Giuffre and that her identity was not revealed in the complaint in the Florida Case.

"any other person or entity who could have been included as a potential defendant ('Other Potential Defendants') from all, and all manner of [claims] that said First Parties ever had . . . or may have, against Jeffrey Epstein, or Other Potential Defendants . . . ."

The defendant insists that he was among the "Other Potential Defendants" and therefore was released by Ms. Giuffre from "all, and all manner of," claims that she "ever had" against him. Ms. Giuffre maintains with equal adamancy that he was not among the "Other Potential Defendants" that the parties to the 2009 Agreement had in mind.

The basic principles of Florida law that govern this aspect of the parties' dispute are clear. Unless contract language is "unambiguous and free of conflicting inferences," ambiguity "must be resolved as a question of fact."[37] In other words, unless the terms of an agreement leave no reasonable doubt about the intent of the contracting parties, the ambiguity must be resolved by the trier of fact,[38] ordinarily a trial jury. The Court may not resolve any such ambiguity on a motion to dismiss the complaint.

Whether a contract is ambiguous "is a question of law"[39] – specifically, whether the agreement, in whole or by its terms and conditions, is "reasonably susceptible to more than one

---

[37] *Soncoast Cmty. Church of Boca Raton, Inc. v. Travis Boating Ctr. of Fla., Inc.*, 981 So. 2d 654, 655 (Fla. Dist. Ct. App. 2008) (quoting *No. Star Beauty Salon, Inc. v. Artzt*, 821 So. 2d 356, 358 (Fla. Dist. Ct. App. 2002)). This principle is subject to an exception, not relevant on this motion, that the court may resolve the ambiguity as a matter of law where that can be done by undisputed parol evidence of the parties' intent. *Decoplage Condo. Ass'n, Inc. v. Deco Props. & Invs., Inc.*, 971 So. 2d 860, 861 (Fla. Dist. Ct. App. 2007).

[38] *See Berkowitz v. Delaire Country Club, Inc.*, 126 So. 3d 1215, 1219 (Fla. Dist. Ct. App. 2012); *Neumann v. Brigman*, 475 So. 2d 1247, 1249 (Fla. Dist. Ct. App. 1985); *see also Talbott v. First Bank Fla., FSB*, 59 So. 3d 243, 245 (Fla. Dist. Ct. App. 2011) ("When a contract is ambiguous, an issue of fact is created that cannot be resolved by summary judgment.").

[39] *No. Star Beauty Salon, Inc.*, 821 So. 2d at 358.

interpretation."[40]  That is so even where both sides insist that language is unambiguous but ascribe materially different meanings to it.[41]

In this case, everyone agrees that the phrase "could have been included as a potential defendant ('Other Potential Defendants')" must mean something.  No doubt that is so.  Nor is there much doubt that better drafting probably could have eliminated any uncertainty as to the meaning. In fact, however, the meaning of the phrase is far from self evident for a number of reasons.

We perhaps should begin with the question of what was meant by "could have been included as a *potential* defendant" – as opposed to "could have been included as a defendant."[42]

One might suppose that whether one was, or could have been, included as a defendant – not included as a "potential" defendant – is clear enough, although even that seemingly simple supposition, as we will see, is not accurate in the context of this case.  But the concept of inclusion "as a *potential* defendant" is even less capable of definition.  If the quoted language from Section 2 of the 2009 Agreement – that is, the phrase "could have been included as a potential defendant" –

---

[40] *Lambert v. Berkley S. Condo. Ass'n*, 680 So. 2d 588, 590 (Fla. Dist. Ct. App. 1996); *see Miller v. Kase*, 789 So. 2d 1095, 1097-98 (Fla. Dist. Ct. App. 2001).

[41] *Killearn Homes Ass'n, Inc. v. Visconti Fam. Ltd.*, 21 So. 3d 51, 53-54 (Fla. Dist. Ct. App. 2009).

[42] Indeed, we might have begun with the fact that the 2009 Agreement defines "Other Potential Defendants" as "any other person or entity who could have been included as a potential defendant" without specifying *in what*.  Defendant's brief sought to solve that problem by asserting that the 2009 Agreement "defines 'Other Potential Defendants' as 'any other person or entity who could have been included as a potential defendant' in *Giuffre's lawsuit against Epstein*" despite the fact that the italicized words do not appear in the 2009 Agreement. Def. Mem., Dkt. 31 at 13 (emphasis added).  Plaintiff, however, takes the same view. *See* Pl. Mem., Dkt. 43, at 10 ("The 2009 Release, by its terms, encompassed only claims against Epstein and 'Other Potential Defendants' 'who could have been included as a potential defendant' in the Florida Complaint.").  Accordingly, the Court accepts the parties' agreed gloss on this point for purposes of this motion.

was intended to mean someone who was not actually a defendant when the 2009 Agreement was signed, but who *might* have been made a defendant previously *if* the plaintiff had named him or her as an actual defendant, then the word "potential" would be entirely superfluous. That is so because the language would mean exactly the same thing with or without the word "potential." Put another way, the phrase under consideration would mean exactly the same thing even if one deleted the word "potential" entirely.

It is a basic rule of contractual construction that a contract should be construed, whenever possible, in a manner that gives meaning to every word and phrase.[43] The presumption is that contracting parties do not include words or phrases for no purpose.[44] Nevertheless, the parties have briefed this matter as if the word "potential" were not in the agreement at all. And as the Court sees no other appropriate course, it will do so as well. It sees no way to construe it in a manner that would give non-redundant meaning to the word "potential."

So we come to the question of what was meant by the phrase "could have been included as a . . . defendant." At one level, of course, literally anyone "could have been included .

---

[43] *See, e.g., Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n,* 117 F.3d 1328, 1338 (11th Cir. 1997) (applying Florida law); *Premier Ins. Co. v. Adams,* 632 So. 2d 1054, 1057 (Fla. Dist. Ct. App. 1994); *see generally* 11 WILLISTON ON CONTRACTS § 32:5 (4th ed.) ("To the extent possible, and except to the extent that the parties manifest a contrary intent, by stating, for example, that recitals or headings are not to be considered or given effect in determining the meaning of their agreement, every word, phrase or term of a contract must be given effect.").

[44] *Fla. Inv. Grp. 100, LLC v. Lafont,* 271 So. 3d 1, 5 (Fla. Dist. Ct. App. 2019) ("[N]o word or part of an agreement is to be treated as a redundancy or surplusage if any meaning, reasonable and consistent with other parts, can be given to it.") (quoting *Royal Am. Realty, Inc. v. Bank of Palm Beach & Tr. Co.,* 215 So. 2d 336, 338 (Fla. Dist. Ct. App. 1968)); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 203 (1981).

. . as a defendant."[45]  If the plaintiff had wished to include someone else – anyone else – as a defendant, she easily could have done so.  Someone can be included as a defendant in a lawsuit simply by including that person's name in the caption of a complaint.[46] Nothing else is required.  But neither party takes that position despite the fact it would be consistent with the literal terms of the 2009 Agreement.  Rather, defendant argues that he "could have been included" as a "potential defendant" in the Florida Case because Ms. Giuffre made a general reference to "royalty" in her Florida complaint, even though it did not name Prince Andrew as a defendant nor even mention his name.

Plaintiff rejoins that Prince Andrew could not have been included as a defendant in the Florida Case because (1) he was not subject to personal jurisdiction there and, in any case, (2) the claims that plaintiff brought against Epstein in the Florida Case were based solely on 18 U.S.C. § 2255,[47] which created a federal civil cause of action in favor of anyone who, while a minor, was injured in consequence of a violation of any of any of several federal criminal statutes.[48]  As to the latter, she contends that Prince Andrew could not have been sued in the Florida Case under any of

---

[45]  The defendant so conceded at argument.  *See* Transcript (hereinafter "Tr."), Jan. 4, 2022, at 5.

[46]  *See* FED. R. CIV. P. 10(a).

For a clear (though misguided) illustration of this point, see *Craig v. Pope John Paul II*, Civil Action No. 100824, 2010 WL 1994620, at *1 (D.D.C. May 18, 2010) (naming "Pope 'John Paul II in Heaven with God,' Pope Benedict XVI, 'the Holy Mother Roman Catholic Church,' and many Cardinals and Archbishops and Bishops of the Roman Catholic Church" as defendants and seeking $3 trillion, $9 million in damages).

[47]  Florida Compl. ¶ 32.

[48]  18 U.S.C. §§ 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423.

the Section 2255 predicate statutes because there was no basis for doing so.

The parties' respective positions show that they agree that the release language – i.e., the phrase "could have been included as a . . . defendant" – applies only if there is a nexus between the person in question and the claim Ms. Giuffre made against Epstein in the Florida Case. They disagree, however, as to the nature of the requisite nexus.

The defendant argues that the nexus is supplied by plaintiff's complaint in the Florida Case.[49] It charged Jeffrey Epstein, to quote the defendant in this case, with "sex-trafficking and sexual abuse."[50] It alleged that girls whom Epstein trafficked were abused by others, including unspecified "royalty."[51] That, defendant submits, is enough.

From the plaintiff's standpoint, defendant's position is too extreme. As noted, the Florida complaint did not mention Prince Andrew. Moreover, Ms. Giuffre argues in substance that one "could have been included as a . . . defendant" (1) only if that could have been done on the same basis as the claim in the Florida Case was made against Epstein – violation of one or more of the Section 2255 predicate criminal statutes – and even then (2) only if that person would have been subject to the personal jurisdiction of the Florida court. Yet there is no basis for concluding that defendant would have been subject to the personal jurisdiction of the Florida court.[52] Nothing in Ms.

---

[49]   As that complaint was filed in the Florida Case, the Court takes judicial notice of its words, not for the truth of the allegations, but for the fact that they were uttered on behalf of the plaintiff.

[50]   Dkt. 31, at 2.

[51]   Florida Compl. ¶ 21.

[52]   In 2009, when the Florida Case was settled, the Florida long-arm statute in relevant part permitted the exercise of personal jurisdiction over a non-resident in circumstances such as those in issue here only if the claim arose from the commission of a tortious act within the

18

Giuffre's Florida complaint indicates that the defendant violated any of the Section 2255 predicates. Nor is its reference to "royalty" sufficient to remedy this absence. The crux of the Florida Case was that Epstein harmed Ms. Giuffre by trafficking her for sex with himself and with others. Indeed, defendant's counsel made clear at oral argument his view that the complaint against Epstein was that Epstein "trafficked [Ms. Giuffre] to a number of individuals, forced her into sex slavery, and . . . forced [her] to have sex or be sexually abused by many people, including members of academia, including businessmen and the category of royalty."[53] Yet there is no suggestion in the Florida Case that this defendant was himself engaged in sex trafficking.

In considering whether the only reasonable interpretation of the phrase "could have been included as a . . . defendant" is the one advanced by the defendant – i.e., that it would inherently be unreasonable to construe that phrase as referring only to persons who could have been sued in the Florida Case on essentially the same theory as was Epstein and over whom the Florida court could have exercised personal jurisdiction – it is helpful also to consider the context in which the 2009

State of Florida. *See* FL. STAT. ANN. § 48.193(1)(b) (2007); *Beta Drywall Acquisition, LCC v. Mintz & Fraade, P.C.*, 9 So. 3d 651, 653 (Fla. Dist. Ct. App. 2009) (discussing then-FL. STAT. ANN. § 48.193(1)(b)). But nothing in the Florida complaint (nor any of the other materials properly before this Court) alleges that Ms. Giuffre had a claim *against this defendant* arising out of the commission by him of any tortious act in Florida. Defendant's contention that the Florida court nevertheless could have exercised personal jurisdiction on a co-conspirator theory, Dkt. 52 at 4-6, overlooks the fact that the Florida complaint, which was limited to asserting specific violations by Epstein of certain federal criminal statutes, does not allege that Prince Andrew conspired with Epstein to commit any of them. The general reference to conspiracy "with others, including assistants and/or [Epstein's] driver(s) and/or pilot(s), and his socialite friend/partner, Ghislaine Maxwell, to further [Epstein's] acts," Florida Compl. ¶ 16, would not have been a sufficient basis for the exercise of personal jurisdiction over Prince Andrew. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1282 (11th Cir. 2009) ("[A]ny conspiracy-based exercise of personal jurisdiction must be founded on conduct committed in Florida by others that can be attributed to [defendant] as a co-conspirator.").

[53]

Tr., Jan. 4, 2022, at 3:20-24.

Agreement was signed to the extent context can be ascertained on the present record.

Of course, we do not know what, if anything, went through the parties' minds with respect to the specific terms of the 2009 Agreement. Hypothetically, we can imagine what someone in Epstein's position might have thought at the time this agreement to settle the Florida Case was made. At least some of the goals of a such person presumably would have been to end the Florida Case, to gain as much protection for himself as he could get against involvement in similar litigation in the future, and to do so for an acceptable price. In other words, a possible concern could have been that (1) Ms. Giuffre, having settled with Epstein, would sue someone else (2) who, in turn, might make a claim against Epstein (a "Claim Over") based on a contention that Epstein should bear or, at least contribute to, any liability that person might be found to have to Ms. Giuffre. Obtaining a release from Ms. Giuffre of claims against such a person therefore could eliminate the possibility of a Claim Over against Epstein. But the objectives of one in Epstein's position were unlikely to have been shared by the other contracting party, an individual in Ms. Giuffre's position. And that matters.

The goals of one in Ms. Giuffre's position hypothetically could have included getting as much money as she could for settling the case and keeping as much of her freedom to go after other alleged wrongdoers as she could keep while still getting an acceptable sum of money. Limiting the release language to persons who could have been sued in a particular court on a particular type of claim could secure that freedom to a substantial degree.

The logic of the situation thus suggests that the parties to the 2009 Agreement had competing goals, and the muddled release language that they agreed upon suggests that they may have arrived at something of a middle ground: a release extending not as broadly as Epstein ideally may have wanted and somewhat more broadly than would have been a "best case" outcome for Ms. Giuffre. Moreover, it would not be unreasonable to recognize, among other considerations, that the

settlement amount may have been affected by the views of both parties concerning the terms of the release. Epstein perhaps would not have been willing to pay a price demanded for the broadest possible release of other persons or, short of that, clearer language concerning the nexus between "Other Potential Defendants" and claims in the Florida Case.

There are additional considerations supporting the reasonableness of plaintiff's interpretation of the phrase "could have been included as . . . defendant . . ." For one thing, the Florida Case was brought in a federal court. The sole alleged basis of federal jurisdiction was Section 2255 of Title 18 of the United States Code, which confers subject matter jurisdiction on federal courts only with respect to claims based on alleged violations of certain federal criminal statutes. The complaint in the Florida Case specifically alleged that *Epstein* had committed a number of such violations. But it nowhere alleges that *this defendant* committed any.[54] It not clear that a claim in the Florida Case against this defendant would have been within the subject matter jurisdiction of the Florida court, even on a co-conspirator[55] or supplemental jurisdiction theory.[56] It is questionable

---

[54] Neither does her present complaint. Defendant argues in conclusory fashion that "Giuffre could have sued him directly for violating section 2423" in the Florida Case. Dkt 52 at 5. But on their face, plaintiff's allegations, taken as true, would not establish the "transports" element of § 2423(a), the "purpose of travel" element of § 2423(b), the naturalization element of § 2423(c), or the "commercial advantage" element of § 2423(d). Nor would her allegations, taken as true, have established an unlawful agreement to accomplish one or more of the predicate offenses, nor action intended to facilitate those violations that plaintiff attributed to Epstein in the Florida Case. The Court would need to draw numerous inferences in the defendant's favor to adopt his view that plaintiff's claims should be dismissed on the theory that she would have had viable § 2255 claims against Prince Andrew in the Florida Case, whether on a direct or vicarious liability theory.

[55] Prince Andrew's assertion, first made in his reply memorandum, that Ms. Giuffre's complaint in this action "alleged that Prince Andrew aided and abetted Epstein's federal sex-trafficking crimes and was Epstein's co-conspirator in the alleged criminal enterprise," a proposition for which he cites eight specific paragraphs of the complaint, Dkt. 52, at 5, cannot be taken at anything approaching face value.

also whether the Florida court could have exercised personal jurisdiction over this defendant, even assuming that subject matter jurisdiction existed.

In the last analysis, it is not now the Court's function to decide which party's view of

The first paragraph cited (¶ 24) does not even mention Prince Andrew. The second through fifth (¶¶ 30-31, 34-35) allege no more than that Prince Andrew has said he first met Epstein in 1999 through Maxwell, that the defendant has been photographed with Maxwell at social events, that defendant has flown with Epstein and Maxwell on Epstein's plane to various locations, and that defendant on occasion has visited Epstein homes. While the existence of a relationship among putative co-conspirators almost always is admissible in a conspiracy case, it alone does not remotely approach a sufficient allegation of a criminal conspiracy.

The last three paragraphs the defendant cites (¶¶ 43-45) allege that the defendant, at the invitation of Epstein and Maxwell, engaged in sexual acts with plaintiff without her consent, knowing her age, and knowing that she was a sex-trafficking victim being forced to engage in those acts. If the allegations of the last three paragraphs are true, as they must be regarded for purposes of this motion, they actions would have been reprehensible. No doubt a defendant prosecutor or plaintiff might argue that the events alleged could be considered as evidence of an unlawful agreement. But they are consistent as well with the absence of a conspiracy or of any intention to aid and abet the commission of predicate crimes by Epstein and/or Maxwell. As the complaint on this motion must be construed in a light most favorable to the plaintiff, these allegations are insufficient to carry the day for the defendant on his theory. At trial, should the case proceed that far, he perhaps could have an opportunity to prove that Prince Andrew could have been sued successfully in Florida on a § 2255 claim, in which case these claims might be pertinent to an assertion of the release defense in this case. But this motion is not the time for that.

56   Pursuant to 28 U.S.C. § 1367(a), the district court "shall have supplemental jurisdiction over all of the claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . . Such supplemental jurisdiction shall include claims that include joinder or intervention of additional parties." 28 U.S.C. § 1367(a). However, 28 U.S.C. § 1367(c) provides that district courts may decline to exercise supplemental jurisdiction over a claim under Section 1367(a) if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." *Id.*§ 1367(c).
   Given district courts' broad discretion to decline supplemental jurisdiction under 1367(c), the Court can do little more than speculate about whether any state law tort claims predicated on Section 1367 would have been within the Florida court's subject matter jurisdiction. *See, e.g., Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., L.L.C.*, 596 F.3d 1313, 1328 (11th Cir. 2010) (upholding *sua sponte* dismissal of state law claims "[g]iven the deference we afford a district court's decision whether to exercise supplemental jurisdiction").

the meaning of the term "could have been included as a potential defendant" in the Florida Case properly reflects the parties' intent. It is enough to conclude that the meaning of this pivotal phrase in the contract is not by any means "unambiguous and free of conflicting inferences."[57] The parties have articulated at least two reasonable interpretations of the critical language. The agreement therefore is ambiguous. Accordingly, the determination of the meaning of the release language in the 2009 Agreement must await further proceedings.

While the foregoing is dispositive of defendant's motion to dismiss on the basis of the 2009 Agreement, the Court turns now to his other arguments for dismissal, which rest on independent grounds.

2.      *Whether Defendant is Entitled to Enforce the Release as a Third Party Beneficiary of the 2009 Agreement*

As very general matter, the only persons who can enforce a provision of a contract are parties to that contract – the people who agreed to it. The defendant was not a party to the Agreement between Epstein and Ms. Giuffre. Accordingly, even if the releasing language in the 2009 Agreement included the defendant among the persons Ms. Giuffre released, the question would remain whether the defendant may take advantage of that release under Florida law. That depends on whether Epstein and Ms. Giuffre intended that he be able to do so – in other words, whether he was what the law calls a third-party beneficiary of the contract.

Under Florida law, it is "[e]ssential to the right of a third party beneficiary . . . to [enforce a contract to which he or she is not a party that] the *clear* intent and purpose of the contract

---

[57]      *Soncoast Cmty. Church of Boca Raton, Inc.*, 981 So. 2d at 655 (citations omitted).

23

[was] to *directly* and *substantially* benefit the third party."[58] A "merely incidental or consequential third-party beneficiary of a contract may not sue for its enforcement."[59]

>        a.        *Relevant Provisions of the Agreement*

In this case, there are substantial indications on the face of the 2009 Agreement itself that Epstein and Ms. Giuffre did not clearly intend for the releasing language with respect to "Other Potential Defendants" in the Florida Case, whatever that was intended to mean, to "directly," "primarily," or "substantially" benefit those persons.

As an initial matter, one reasonably might conclude (although that may not be the only permissible inference), for reasons already stated, that Epstein's purpose in seeking to obtain a release of persons other than Epstein and the other "Second Parties" was primarily and directly to protect himself from becoming embroiled in future litigation. That goal – even assuming that the requirements of "clear" intention to benefit the persons released "primarily" and "substantially" were satisfied, which is doubtful – would have been served *only if persons arguably within the releasing language were aware of it* and, *if later sued by Ms. Giuffre, successfully could have asserted the 2009 Agreement release against her.* But the 2009 Agreement contains provisions that appear to have been intended to make sure that such persons would not be aware of the release and, even if aware of it, were prohibited from or at least severely limited in their ability to use it defensively.

---

[58] *Thompson v. Com. Union Ins. Co. of New York*, 250 So. 2d 259, 262 (Fla. 1971) (emphasis added); *accord, e.g., Reconco v. Integon Nat'l Ins. Co.*, 312 So. 3d 914, 917 (Fla. Dist. Ct. App. 2021), *review denied*, No. SC21-576, 2021 WL 2588930 (Fla. June 24, 2021); *Legare v. Music & Worth Const., Inc.*, 486 So. 2d 1359, 1362 (Fla. Dist. Ct. App. 1986) (holding that the contract must "*clearly* establish the parties' intent to create a right *primarily and directly* benefitting the third party") (emphasis added).

[59] *McKinney-Green, Inc. v. Davis*, 606 So. 2d 393, 396 (Fla. Dist. Ct. App. 1992).

First, Section 4, the confidentiality clause, provides in pertinent part, that

"the Parties *shall not provide any copy*, in whole or in part, or in any form, of this Settlement Agreement *to any third party*, except to the extent required by law or rule or in response to a validly issued subpoena from a governmental or regulatory agency. *Moreover, neither this Settlement Agreement, nor any copy hereof, nor the terms hereof shall be used or disclosed in any court, arbitration, or other legal proceedings, except to enforce the provisions of this Settlement Agreement.*"[60]

So both Epstein and Ms. Giuffre were prohibited from providing all or part of the 2009 Agreement even to anyone who might have been among the persons possibly included within its releasing language.

The second is a portion of Section 2, the release provision, that provides:

"Additionally, as a material consideration in settling, First Parties [Ms. Giuffre] and Second Parties [Epstein] agree that *the terms of this Settlement Agreement are not intended to be used by any other person nor be admissible in any proceeding or case against or involving Jeffrey Epstein, either civil or criminal.*"[61]

Taken together, these provisions at least reasonably could be interpreted as meaning that Epstein and Ms. Giuffre agreed that (1) neither would disclose the 2009 Agreement in whole or in part to anyone except upon compulsion of legal process, and (2) no one was intended to use the terms of the 2009 Agreement, which of course included the release language upon which the defendant relies, in any proceeding or case "involving Jeffrey Epstein."[62]

---

[60]    Dkt. 32, Ex. A at 3 (emphasis added).

[61]    *Id.* at 2 (emphasis added).  These limitations appear to attach even where the Agreement contemplates that Epstein could reveal plaintiff's identity in connection with "ongoing or future litigation-related or claim-related matters" *Id.* at 4.  Section 4 anticipates that subpoenas and other legal process could result in the agreement's disclosure in cases like this one, and it limits how it may be "used" even if so discovered.  Whether or not disclosure owed in whole or in part to Epstein's ability to disclose plaintiff's identity under the conditions provided in Section 5 would be immaterial.

[62]    At oral argument, defendant claimed that § 7 of the agreement supports his position that he is entitled to enforce the release.  In relevant part, it provides: "Should the federal court not

  b.  *Defendant's Cases Are Inapposite*

  Defendant nevertheless contends that Florida courts have "long recognized that an intended third-party beneficiary of a broad release . . . has standing to enforce that release, even when the release does not identify that third party by name."[63]  That is at least an unduly broad generalization.

  The first case he cites, *Olsen v. O'Connell*,[64] held that purchasers of real property were third-party beneficiaries of a contract between sellers of that property and holders of an existing judgment lien on it.  There, however, the court indicated that the agreement existed only as a

retain jurisdiction, the Parties (*and any third party*) agree that the" state courts in Palm Beach County "shall have exclusive jurisdiction over the subject matter and shall have personal jurisdiction over the Parties (*and third parties*)." *Id.*, at 5 (emphasis added); *see* Tr., Jan. 4, 2022, at 39-42.  But this is unpersuasive.

As an initial matter, the parties to the agreement had no authority to bind third parties.  To be sure, the Court recognizes that defendant's point is different, viz. that the references to "third parties" § 7 evidences an intention to benefit others.  Perhaps.  But it does not inevitably follow that benefitting Prince Andrew or others in comparable positions was a primary purpose of the release.

Complicating defendant's argument even further is the way in which the terms "enforcement" and "third party" are used elsewhere in the agreement.  Section 4 – the only other section to use the term "third party" – purports to create rights and obligations with respect to disclosure of the "amount of [the] settlement."  The reciprocal confidentiality covenant provides: "Any *third party* who is advised of the settlement amount must sign a document acknowledging that such third party is aware of this confidentiality provision and is bound by it, including the provisions contained in the Settlement Agreement relating to the *enforcement of this confidentiality provision*." Dkt. 32, Ex. A at 3.  It would be eminently reasonable to interpret § 7's references to "third parties" and "enforcement" as referring specifically § 4's reciprocal confidentiality provision, which, in addition to employing those two terms together, is the only other place in the Agreement where either term appears at all.  What is more, § 7 specifies that if a breach of confidentiality were to occur, only "the aggrieved First or Second Parties . . . may seek a remedy with the Court"–no third party rights attach. *Id.*

63

Dkt. 31, at 15.

64

466 So. 2d 352 (Fla. Dist. Ct. App. 1985).

necessary part of the impending sale of the property to the third-party buyers. The sellers had sought the agreement only because they "they could not consummate the sale of the property without obtaining a release of the judgment lien." They made the deal with the judgment creditor "in order to affect [sic] the sale to" the buyers."[65] The buyers – the unnamed third parties – were so integral to the deal between the sellers and the judgment creditor that the court hypothesized that they were "likely even actual parties to the agreement as evidenced by their execution of the note and mortgage payable to [sellers] and their closing of the sale in reliance upon the agreement."[66] This case bears no resemblance to *Olsen*.

Defendant points next to *Hester v. Gatlin*[67] and *Dean v. Bennett M. Lifter, Inc.*,[68] both of which involved auto accidents with multiple potential tortfeasors. In *Hester*, the owner of a car involved in a multi-car accident was held to be a third-party beneficiary of a release agreement that had been executed between the plaintiff in that case and other drivers who were involved in the accident.[69] There, the release language extended to "any and all other persons and/or corporations who are or may be liable for injuries or damages sustained as a result of the subject accident."[70] And in *Dean*, a court held that the employer of a driver who caused a fatal car accident was a third-party

---

[65]  *Id.*

[66]  *Id.* at 355.

[67]  332 So. 2d 660 (Fla. Dist. Ct. App. 1976).

[68]  336 So. 2d 393 (Fla. Dist. Ct. App. 1976).

[69]  *Hester*, 332 So. 2d at 660.

[70]  *Id.* at 662.

beneficiary to a settlement agreement between the driver's insurance company and the administratrix of the victim's estate. The settlement there included general language releasing "any other person, corporation, association or partnership charged with responsibility for injuries to the person and property of the Undersigned, and the consequences flowing therefrom, as the result of" the fatal accident.[71]

As Ms. Giuffre observes in her brief, the *Hester* and *Dean* releases were confined to discrete events on a specific day – identifiable subject accidents circumscribing narrowly the subject matter of the purportedly released persons or claims.[72] So they too are inapposite here.

And there is a further problem common to all of defendant's cases. None of the cases that defendant cites dismissed claims against a defendant-putative third-party beneficiary who asserted a release defensively at the motion-to-dismiss stage.[73] Prince Andrew's view of "Other Potential Defendants," on the other hand, seeks to confer rights on unnamed third parties that would be orders of magnitude broader those contemplated in any of the Florida cases that have been brought to this Court's attention. Moreover, whichever way these comparisons break, they matter little on the facts of this case. The ultimate goal in any case involving a contract is to determine and give effect to the "[t]he intention of the contracting parties."[74] Unlike the cases cited by the defendant, where the parties' intentions were perfectly plain, at least by the time the cases were decided, the intentions of Ms. Giuffre and Epstein concerning the release are anything but clear here, at least at

---

[71]     *Dean*, 336 S.O. 2d at 394.

[72]     Dkt. 43, at 12-13.

[73]     *Id.* at 13.

[74]     *City of Tampa v. Thornton-Tomasetti, P.C.*, 646 So. 2d 279, 282 (Fla. Dist. Ct. App. 1994).

this stage.  The cases upon which defendant relies are of no assistance in determining those intentions.

### c.    The Dershowitz Argument

Finally, the defendant nevertheless argues that his interpretation of the Other Potential Defendants clause is the *only* reasonable one on the basis of alleged events relating to Alan Dershowitz, a lawyer and retired law professor whom Ms. Giuffre has sued in another case.[75] Defendant asserts that Ms. Giuffre "dismissed her claims against Professor Dershowitz . . . when this release was raised to her as a potential defense."[76] This, according to Prince Andrew, proves that the 2009 Agreement released Mr. Dershowitz and, by parity of reasoning, the defendant in this case, the theory apparently being that both were Other Potential Defendants in the Florida Case.

During oral argument, the Court questioned that argument based on its suggestion that Mr. Dershowitz was covered by the release in the 2009 Agreement because he has been one of

---

[75]      *Giuffre v. Dershowitz*, No. 19-cv-3377 (LAP).

[76]      Tr., Jan. 4, 2022, at 11:15-20; Dkt. 32, at 2, 3-4; Dkt. 52, at 2 n.1.

The argument rests on the factual premise that the release was asserted privately on behalf of Mr. Dershowitz to Ms. Giuffre's counsel, who acquiesced in that assertion and backed off, with respect to his proposed addition, in Ms. Giuffre's case against Mr. Dershowitz, of a new battery claim when threatened with Rule 11 sanctions. That factual premise is not supported by anything in Ms. Giuffre's complaint in this action. Part of the premise is supported by a recital, and part contradicted by another provision, in a document filed in the Dershowitz action of which judicial notice now is taken. Dkt. 32, Ex. H at 2. Inasmuch as judicial notice extends only to establishing the contents of that document, but not its truth, however, the only thing it establishes for purposes of this motion is that counsel for Mr. Dershowitz and Ms. Giuffre agreed that the document "shall not at any time, or for any purpose, be construed as an admission by either party of the validity or invalidity of Plaintiff's battery claim or Defendant's release defense, or the truth or falsity of the factual predicates thereto." *Id.* ¶ 4.

Epstein's attorneys[77] and therefore was among the "Second Parties" – in other words, that he was covered by the release independent of whether he was an Other Potential Defendant, as the defendant now claims that he is.  On further reflection and analysis,  however, the suggestion that Mr. Dershowitz was covered because he was one of the "Second Parties" was not necessarily correct.

A release has three essential elements: (1) one who gives the release, usually referred to as a releasor; (2) one against whom the releasor gives up or surrenders something, such a person usually being referred to as a releasee; and (3) a description of what is being released, which may be general (e.g., all claims whatever that the releasor has or may have against the releasee) or specific (e.g., a releasor's claim for damages caused by the releasee's motor vehicle).  In Section 2, the category of releasors is plain enough: "the First Parties."  There also is a description of the releasees: (1) "the Second Parties and [2] any other person or entity who could have been included as a potential defendant ('Other Potential Defendants')."  The problem, however, is with the claims against the Second Parties (other than Epstein) that purportedly were released.  Specifically, Section 2 says that the claims released were claims that the First Parties ever had or may have "*against Jeffrey Epstein, or Other Potential Defendants* for, upon, or by reason of any matter, cause, or thing whatsoever . . . ."[78]  Strikingly, it does not say that the First Parties released the Second Parties (other than Epstein personally), as such, from any particular claims at all, whether all claims or some specific claims.  Accordingly, Element 3 of the essential elements of a release – the specification of what claims against the Second Parties were being released – is missing as to the Second Parties.  Accordingly, it would be reasonable, indeed, arguably unambiguously clear, that the 2009 Agreement did not

---

[77]  Tr., Jan. 4, 2022, at 12:2-4.

[78]  Dkt. 32, Ex. A, at 2 (emphasis added).

release *any* claims against any Second Parties except (1) for Epstein himself[79] and (2) those Second Parties (other than Epstein) who, in addition to being Second Parties, came within the definition of Other Potential Defendants, whatever that is.

To be sure, it might be argued that Section 2 should be read as a broad release of all claims that First Parties had or may have had against all of the Second Parties notwithstanding its failure to say that. But that alternative interpretation cannot be the only reasonable view of its meaning. Accordingly, the meaning and, indeed, as to the Second Parties as such (other than Epstein), the validity of the release cannot be decided on this motion. The difficulty the problem presents, however, is relevant to the extent it demonstrates yet again that the 2009 Agreement, whatever it was intended to mean, is riddled with drafting problems and ambiguities.

\* \* \*

The 2009 Agreement cannot be said to demonstrate, clearly and unambiguously, that the parties intended the instrument "directly," "primarily," or substantially" to benefit Prince Andrew. The existence of the requisite intent to benefit him, or others comparable to him, is an issue of fact that could not properly be decided on this motion even if defendant fell within the releasing language, which itself is ambiguous. Thus, independent of whether the release language applies to Prince Andrew, the agreement, at a minimum, is "reasonably susceptible to more than one interpretation" on the equally important question of whether this defendant may invoke it.[80] As a matter of Florida law, this Court cannot rewrite the 2009 Agreement to give the defendant rights where the agreement does not clearly manifest an intent to create them.

---

[79]  As we have seen, Epstein was included in the definition of Second Parties.

[80]  *See, e.g., Lambert,* 680 So. 2d at 590; *Miller,* 789 So. 2d at 1097-98.

## II.    The Complaint States Legally Sufficient Claims

Ms. Giuffre's complaint asserts two causes of action.  Both are state law tort claims, the first for battery and the second for intentional infliction of emotional distress ("IIED"). Defendant moves to dismiss both on the theory that plaintiff has not alleged adequately any violation of the New York Penal Code.

### A.    Legal Principles

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face."[81]  This standard is met where the "pleaded factual content," which on this motion must be assumed to be true, permits a "reasonable inference that the defendant is liable for the misconduct alleged."[82]

A complaint need not "anticipate potential affirmative defenses" or "affirmatively plead facts in avoidance of such defenses."[83]  As is the case with defendant's arguments predicated on the 2009 Agreement, the Court may not dismiss on an affirmative defense unless "the defense appears on the face of the complaint."[84]

---

[81]    *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[82]    *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

[83]    *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007); *see Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 315 (S.D.N.Y. 2014).

[84]    *Pani.* 152 F.3d at 74.

B.     *Analysis*

1.     *The Complaint Is Legally Sufficient*

Plaintiff's complaint plainly alleges *prima facie* cases of battery and IIED under New York law.  Indeed, defendant does not directly contest whether plaintiff's allegations satisfy the elements of those causes of action.

The allegation that plaintiff was forced to sit on defendant's lap while he touched her is sufficient to state a battery claim under New York law, regardless of which part(s) of her body defendant ultimately is alleged to have touched.  To state such a claim, a plaintiff need allege only that there was "bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent."[85]  Contact is offensive if it is "wrongful under all the circumstances," which certainly is a reasonable inference from Ms. Giuffre's allegations.[86]  The only intent required is an intent to "cause a bodily contact that a reasonable person would find offensive."[87]  Any intentional touching effected "for the purpose of satisfying [one's] sexual desires" or made with knowledge "that [plaintiff] was a sex-trafficking victim being forced to engage in sexual acts with him" would permit a reasonable person to find that the alleged contact was inappropriate in all of the circumstances, to say nothing of the allegedly forced sex acts or sexual

---

[85]  *Leytman v. U. S. Dep't of Homeland Sec. Transp. Sec. Admin.*, 804 F. App'x 78, 80 (2d Cir. 2020) (quoting *Bastein v. Sotto*, 299 A.D.2d 423, 433, 749 N.Y.S.2d 538, 539 (2d Dept. 2002)).

[86]  *Messina v. Matarasso*, 284 A.D.2d 32, 35, 729 N.Y.S.2d 4, 7 (1st Dept. 2001) (quoting *Zgraggen v. Wilsey*, 200 A.D.2d 818, 819, 606 N.Y.S.2d 444, 445 (3d Dept. 1994)).

[87]  *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 134 (2d Cir. 2005) (quoting *Jeffreys v. Griffin*, 1 N.Y.3d 34, 43, 769 N.Y.S.2d 184, 189 n.2 (2d Dept. 2003)).

intercourse.[88]

The sufficiency of plaintiff's IIED claim is similarly apparent. To state an IIED claim under New York law, a plaintiff must allege "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."[89]

Defendant does not challenge the complaint's sufficiency as to any of these elements. Plaintiff has alleged severe emotional distress.[90] She alleges that it was "a direct and proximate result of Prince Andrew's criminal acts."[91] She asserts that he "knew or disregarded the substantial likelihood that [his] actions would cause Plaintiff severe emotional distress."[92] And, although she so alleges in her complaint, it should go without saying that the alleged conduct, if it occurred, reasonably could be found to have gone "beyond all possible bounds of decency and is intolerable in a civilized community."[93]

---

[88] Compl. ¶¶ 42-48.

[89] *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993)).

[90] Compl. ¶¶ 68, 73.

[91] *Id.*

[92] *Id.* ¶ 72.

[93] *Id.* ¶ 71; *see Chanko v. Am. Broad. Companies Inc.*, 27 N.Y.3d 46, 56, 29 N.Y.S.3d 879 (2016) (defining extreme and outrageous conduct as that which is "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community") (citations and internal quotation marks omitted); *Farrell v. U.S. Olympic & Paralympic Comm.*, No. 20-CV-1178 (FJS/CFH), 2021 WL 4820251, at *9 (N.D.N.Y. Oct. 15, 2021).

2.    *Defendant's Contention that the Plaintiff Was Obliged to Plead Specific Facts Demonstrating Violation of the New York Penal Law Is Incorrect*

Abandoning reference to the causes of action in the complaint, defendant seeks dismissal on the ground that plaintiff "has not adequately alleged a violation of the New York Penal Code."[94]  He insists that plaintiff is required to allege "*conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law.*"[95]  The argument relies heavily on the observation that plaintiff's claims would be time-barred but for the New York Child Victims Act ("CVA"), which revived child sex abuse claims "tied to an alleged violation of New York criminal law."[96]

Defendant's view of the pleading standard is at odds with the Federal Rules of Civil Procedure.  Rule 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" on the theory asserted.[97]  Here, the CVA does not create plaintiff's cause of action.  She is required only to plead facts sufficient to allege battery and IIED.  Whether any of the alleged conduct rose to a violation of New York Penal Law goes only to the question whether Ms. Giuffre's claims are time-barred – that is, to an affirmative defense.  When defendant asserts such a defense, it will be his burden to establish that the claims are untimely.  Whatever hurdles the CVA ultimately requires plaintiff to clear to defeat a statute of limitations defense are not relevant on this

---

[94]    Dkt. 31, at 19.

[95]    *Id.* (quoting and adding emphasis to N.Y. CPLR § 214-g).

[96]    N.Y. CPLR § 214-g; *Holloway v. Holy See*, No. 19 Civ. 2195 (NRB), 2021 WL 1791456, at *2 n.2 (S.D.N.Y. May 5, 2021).

[97]    FED. R. CIV. P. 8(a)(2).

motion.[98]

### 3.   *Plaintiff's IIED and Battery Claims Are Not Duplicative*

The defendant argues next that Ms. Giuffre's IIED claim should be dismissed as duplicative of her battery claim.  He says this is so because "under well-established New York Law, 'claims are duplicative when both arise from the same facts and seek the identical damages for each alleged breach.'"[99]  But Ms. Giuffre's claims do neither.

Defendant's motion misunderstands the two causes of action.  Plaintiff's IIED claim arises, at least in part, from alleged conduct that forms no element of her battery claim.  Ms. Giuffre alleges, among other potentially distinguishing conduct, that the defendant caused her to witness the abuse of another victim.[100]  That allegation thus alleges injury flowing from different conduct than the alleged non-consensual physical contact.  As a claim is not duplicative where a plaintiff has set

---

[98]   Of course, the complaint does allege that the conduct rises to the level of an Article 130 violation, "including but not limited to sexual misconduct as defined in Article 130.20, rape in the third degree as defined in Article 130.25, rape in the first degree as defined in Article 130.35, forcible touching as defined in Article 130.52, sexual abuse in the third degree as defined in Article 130.55, and sexual abuse in the first degree as defined in article 130.65," supported by her actual allegations.  Compl. ¶ 67.  There is no colorable argument that defendant's statute of limitations defense appears "on the face of the complaint."  *Pani,* 152 F.3d at 74; *cf. Doe v. Baram,* 20 Civ. 9522 (ER), 2021 WL 4847076 (S.D.N.Y. Oct. 15, 2021) (denying motion to dismiss even where complaint did not cite specific provisions of Article 130).

[99]   Dkt. 31 at 24 (quoting *Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.,* 810 F.3d 861, 869 (2d Cir. 2015) (internal citations and quotation marks omitted) (applying New York law)).

[100]   Compl. ¶ 39.

forward "substantiating conduct that differs from . . . other causes of action,"[101] her IIED claim is not duplicative of her battery claim.  Regardless of what share of her injuries, if any, is due to battery committed against her person, her IIED claim therefore must be permitted at this stage to proceed because she has alleged potentially tortious conduct in addition to battery.  Moreover, as defendant admitted during oral argument, the single satisfaction rule would foreclose plaintiff from recovering more than once for any given harm.[102]

More substantially, the two claims do not seek identical relief.  Even though plaintiff seeks damages on each claim, her requested relief does not entirely overlap.  To be sure, Ms. Giuffre asserts that the alleged battery caused some measure of "extreme emotional distress" and "psychological trauma."[103]  But when drawing all inferences in plaintiff's favor, the complaint pleads facts sufficient to allow a reasonable jury to return a damages award on emotional distress that is over and above what it might award on battery.  As it stands, any risk of duplicative recovery may be resolved by jury instructions.[104]  It is for these reasons that battery and IIED claims routinely proceed

---

[101]  *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 521 (S.D.N.Y. 2015); *see also Chau v. Donovan*, 357 F. Supp. 3d 276, 288-89 (S.D.N.Y. 2019) (holding a defendant's text messages pressuring plaintiff to engage in sex supported a separate IIED claim since that "potentially tortious conduct" was not subsumed by any theory of battery).

[102]  Tr., Jan. 4, 2022, at 20-21.

[103]  Compl. ¶ 68.

[104]  *See Bender v. City of New York*, 78 F.3d 787, 793, 794 n.5 (2d Cir. 1996) (concluding that "at least part of the injury . . . suffered from the battery—emotional pain and suffering—is part of the injury . . . suffered from the emotional injury tort" and suggesting the following language for a jury instruction to prevent duplicative awards: "Any damage award for the emotional distress claim must be limited to the component of injury you find sustained for this claim, if any, over and above whatever emotional distress you have already compensated by your awards for other claims").

in tandem under New York law.[105]

---

III.   *The Attack on the Constitutionality of the New York Child Victims Act Is Without Merit*

The final ground on which defendant moves to dismiss the complaint is that the CVA's claim-revival provision – in other words, the limited extension of the statute of limitations for civil claims by child victims of sexual abuse – is unconstitutional.  Specifically, he argues that the New York State Legislature violated the Due Process Clause of the New York Constitution when it temporarily revived child sexual abuse claims that otherwise would have been too late.[106]

Defendant is not the first litigant to advance this argument, which has been rejected

---

[105]   *See, e.g., Laurie Marie M. v. Jeffrey T.M.*, 816 F.3d 214, 227 (2d Cir. 2016); *Chau* 357 F. Supp. 3d at 288; *Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *27 (S.D.N.Y. Jan. 28, 2019); *Doe v. Alsaud*, 224 F. Supp. 3d 286, 295 (S.D.N.Y. 2016).

[106]   *See* N.Y. CONST. art. 1, § 6; N.Y. CPLR § 214-g.  At oral argument, defendant shifted his ground extensively, suggesting that former Governor Andrew Cuomo twice extended the revival period fixed by the Legislature for the commencement of actions covered by the Act by executive order and that the Governor's action was unconstitutional. Tr., Jan. 4, 2022, at 22-26.  This argument is based on an inaccurate factual premise, comes too late, and is without merit in any case.

First, this argument surfaced only during oral argument.  As new arguments first made in a reply brief are too late, it follows necessarily that the same is true of new arguments first raised at oral argument.

Second, it is true that the Governor extended the original extension period, but he did so only once, *see* Executive Order No. 202.29, *Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency* (May 8, 2020), not twice as defendant claimed, and the Legislature subsequently extended it again.  *See* 2020 Sess. Law News of N.Y. Ch. 130 (S. 7082) (McKinney).  Thus, the timeliness of plaintiff's suit depends only on the Legislature's action, not the Governor's.

Third, the Court sees no meaningful distinction between the Legislature's enactment of the original revival statute and its later extension of it.  Accordingly, the constitutionality of the revival of the limitations period turns entirely on whether the New York Legislature deprived Prince Andrew of constitutional rights by reviving the limitations period, either generally or as applied to this case.  The Court thinks not.

by every New York state and federal court to have encountered it.[107]   And it has been rejected repeatedly for good reason.

Drawing primarily on New York cases from the 1920s and 1950s,[108] defendant urges that "[n]early a hundred years of precedent make clear that claim revival is permitted *only* when there is an injustice of a type that makes a plaintiff *legally unable to sue*[.]"[109] Whatever the historical practice may have been, the New York Court of Appeals recently made clear that the test for whether a claim-revival statute runs afoul of the New York Due Process Clause is simply whether the revival statute is "a reasonable measure to address an injustice."[110] The CVA's limited claim-revival window was a reasonable measure to address an injustice and well within bounds of the new legal standard articulated shortly before its passage.  As another judge of this Court recently concluded with respect to Ms. Giuffre's pending action against Mr. Dershowitz, "New York Courts' historical skepticism of claim-revival provisions appears to be just that: historical."[111]

Defendant suggests that the Legislature "lacked the constitutional authority to revive

---

[107]   *Farrell*, 2021 WL 4820251, at *9 ; *PC-41 Doe v. Poly Prep Country Day Sch.*, 20-CV-03628 (DG) (SJB), 2021 WL 4310891, at *7 (E.D.N.Y. Sept. 22, 2021); *PC-41 Doe*, 2021 WL 791834, at *1 (E.D.N.Y. Mar. 1, 2021); *PB-36 Doe v. Niagara Falls City Sch. Dist.*, 152 N.Y.S.3d 242, 248 (N.Y. Sup. Ct. Niagara Co. 2021); *Torrey v. Portville Cent. Sch.*, No. 88476, 2020 WL 856432, at *4 (N.Y. Sup. Ct. Cattaraugus Co. Feb. 21, 2020); *ARK3 Doe v. Diocese of Rockville Ctr.*, No. 9000010/2019 (N.Y. Sup. Ct. Nassau Co. May 11, 2020); *Giuffre v. Dershowitz*, 19-cv-3377 (LAP), 2020 WL 2123214, at *2 (S.D.N.Y. Apr. 8, 2020).

[108]   Dkt. 31, at 24-26.

[109]   *Id.* at 25.

[110]   *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d 377, 400, 67 N.Y.S.3d 547 (2017).

[111]   *Dershowitz*, 2020 WL 2123214, at *2.

. . . claims" for sexual abuse plaintiffs who have "reached adulthood . . . within the applicable three-year statute of limitations."[112]  His argument fundamentally is that enforcing the usual statute of limitations to bar claims of child sexual abuse causes no "injustice" where "those who wished to sue were not barred from doing so" solely because they were minors – in other words, where the victims became adults at a time when they could have brought suit before the statute of limitations period expired.[113]  The Court of Appeals, however, has made clear also that "[i]n the context of a claim-revival statute, there is no principled way for a court to test whether a particular injustice is 'serious' or whether a particular class of plaintiffs is blameless; such moral determinations are left to the elected branches of government."[114]

　　　　As Ms. Giuffre notes in her opposition, a range of legislative judgments undergird the provision's patent constitutionality, both on its face and as applied to her claims.[115]  These include New York's comparatively restrictive limitations period for sexual abuse claims, improved understanding of victims' barriers to coming forward with those claims, and the imminent threat that abusers pose to public safety.[116]  Each of these is capable of insulating both the initial one-year revival window and its subsequent extension from a New York Due Process Clause challenge, to say nothing of the latter measure's relationship to ensuring access to justice during a global pandemic.

　　　　As to whether the claim-revival legislation represents a "reasonable measure,"

---

[112]　　Dkt. 31 at 26-27.

[113]　　*Id.* at 27.

[114]　　*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d at 400.

[115]　　Dkt. 43 at 30.

[116]　　*See id.*

defendant's most discernable objection is that "the legislature hastily passed legislation to amend the CVA by doubling the claim-revival period from one year to two."[117]  He contends that the Legislature's one-year extension was not a "reasonable response" in light of the Governor's near-contemporaneous executive order extending the filing window by five months on account of COVID-19.  He argues also that there is "no indication" that the New York Court of Appeals "ever [has] approved of a legislature's extension of the deadline for filing time-barred claims in the middle of the original claim-revival period."[118]

With or without a global pandemic, New York's modest two-year revival window was a reasonable measure for remedying injustice to victims without treading upon the state Constitution's Due Process Clause.  Not only was it reasonable, it was modest compared to the claim-revival measures adopted by other state legislatures in the child sex abuse context.  Numerous states have opened revival windows that were two years or longer from their inception, some of which were later extended for additional multiyear periods.[119]  Other jurisdictions have enacted indefinite claim-revival windows.[120]  And in some of the states that have adopted an age-based approach, Ms.

---

[117]  Dkt. 31 at 28.

[118]  *Id.*

[119]  *See, e.g.,* 10 DEL. CODE § 8145(b) (opening two-year window beginning in 2007); *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1258-59 (Del. 2011) (confirming constitutionality); 2013 Minn. Sess. Law Serv. Ch. 89 § 5(d) (amending MINN. STAT. § 514.073) (opening three year window beginning in 2013); *K.E. v. Hoffman*, 452 N.W.2d 509, 513-14 (Minn. 1990) (confirming constitutionality of initial revival period); HAW. REV. STAT. § 657-1.8(2)(b) (extending original two-year window to eight years).

[120]  *See, e.g.,* 12 VT. STAT. ANN. § 522(a); 7 G.C.A. § 11301.1(b).

Giuffre's claims would have remained timely for at least another decade.[121]  Certainly, each of those revival statutes was passed against the enacting state's unique constitutional backdrop.  But each is relevant to show that the measures here selected by the New York Legislature were among the most tailored and most mindful of the due process concerns defendant emphasizes in his motion.  It is difficult to imagine substantially narrower measures capable of addressing the injustices animating the CVA.  Indeed, our attention has not been called to any state or territory that ever has adopted a sexual abuse claim-revival window shorter than one year.

     Defendant's observation that the CVA revived claims for those who suffered harm as a result of sexual abuse when they were under the age of eighteen, when the New York age of consent for other purposes now is seventeen, does not bear on the CVA's constitutionality.[122]  There are many ways a plaintiff may establish that a sexual act was committed without his or her consent.  Such acts also may be nonconsensual on more than one legal theory.  True, lack of consent is established as a matter of law for individuals who were under the age of seventeen at the time of the offense.  But that fact says nothing of the reasonableness of reviving claims of others who were over seventeen but less than eighteen when they were abused.  Lack of consent in such cases can be established at least by physical force or actual or implied threats.  Contrary to his assertion, defendant's concerns over "false memories" and other evidentiary matters are not always greater in cases in which the alleged victim claims that he or she acquiesced as a result of such duress.[123]  Even

---

[121]    *See, e.g.*, 9 R.I. GEN. LAWS § 9-1-51 (opening window until age 53 as against perpetrators); MASS. GEN. LAWS ch.260 § 4C (opening window until age 53 as against perpetrators); *Sliney v. Previte*, 41 N.E.3d 732, 739-43 (Mass. 2015) (confirming constitutionality).

[122]    *See* Dkt. 52 at 8.

[123]    *Id.*

where a claimant can establish lack of consent as a matter of law, other evidence – including subjective evidence – often is required to prove the conduct that actually occurred. Defendant's far-reaching speculation about what evidence will or will not be relevant to the issue of consent, both in this case and in others like it, is no basis for distinguishing between claims brought by victims who were under seventeen and those where were under eighteen. The CVA's creation of a narrow window for allowing previously time-barred child sexual abuse claims to proceed is neither more nor less reasonable for having set the upper age limit for those who benefit from that window at age eighteen rather than setting it at the legal age of consent, seventeen.

Lacking persuasive legal authority with which to question the CVA's constitutionality, defendant's motion falls back onto doctrinal anachronism and inapposite authority on claim revival at common law.[124] Accordingly, as another court in our Circuit has put it, "while [his] argument regarding unconstitutionality is creative, it is . . . without merit."[125]

IV.    *Defendant Is Not Entitled to a More Definite Statement.  He Will Get the Detail He Seeks During Discovery.*

Defendant's alternative motion for a more definite statement is similarly meritless. As defendant correctly observes, Rule 12(e) affords relief where the complaint "is so vague or ambiguous that the [defendant] cannot reasonably prepare a response."[126] That Rule, however, entitles movants to a more definite statement only where the complaint is so vague or ambiguous as

---

[124]    *See* Dkt. 31 at 26 (relying on *Zumpano v. Quinn*, 6 N.Y.3d 666(2006) to suggest that the CVA revival provision goes beyond "the scope of . . . legislative authority").

[125]    *PC-41 Doe*, 2021 WL 791834, at *1.

[126]    FED. R. CIV. P. 12(e).

to be unintelligible.[127]

Ms. Giuffre's complaint is neither "unintelligible" nor "vague" nor "ambiguous. It alleges discrete incidents of sexual abuse in particular circumstances at three identifiable locations. It identifies to whom it attributes that sexual abuse.

Defendant nevertheless holds out that he cannot reasonably prepare a response because plaintiff has not described "what purported sexual contact occurred . . . when and where the incident occurred, or the forcible compulsion she was under due to express or implied threat" to the degree of specificity that he would like.[128] While he understandably seeks more detail about the precise details of plaintiff's claims, he will be able to obtain that detail during pretrial discovery.[129] Moreover, defendant's assertion that he cannot reasonably prepare a response to plaintiff's allegations plainly contradicts the content of his moving papers, in which he denies Ms. Giuffre's allegations in no uncertain terms.[130]

## Conclusion

For the foregoing reasons, defendant's motion to dismiss the complaint or for a more definite statement is denied in all respects. Given the Court's limited task of ruling on this motion,

---

[127]
See Kok v. First Unum Life Ins. Co., 154 F. Supp. 2d 777, 781-82 (S.D.N.Y. 2001); Kelly v. L.L. Cool J., 145 F.R.D. 32, 35 (S.D.N.Y. 1992), aff'd, 23 F.3d 398 (2d Cir. 1994).

[128]
Dkt. 31 at 29.

[129]
See, e.g., Casella v. Hugh O'Kane Elec. Co., No. 00 Civ. 2481 (LAK), 2000 WL 1530021, at *1 n.2 (S.D.N.Y. Oct. 17, 2000).

[130]
Dkt. 31 at 1 ("Prince Andrew never sexually abused or assaulted Giuffre. He unequivocally denies Giuffre's false accusations against him.").

44

nothing in this opinion or previously in these proceedings properly may be construed as indicating a view with respect to the truth of the charges or countercharges or as to the intention of the parties in entering into the 2009 Agreement.

SO ORDERED.

Dated:          January 11, 2022

Lewis A. Kaplan
United States District Judge